**Defendant The GAP, Inc.'s Motion for Summary Judgment**

Exhibit "H"

(William Newberry Report – November 9, 2006)

E$^x$ponent®

Exponent
39100 Country Club Drive
Farmington Hills, MI 48331

telephone 248-324-9100
facsimile 248-324-9199
www.exponent.com

November 9, 2006

Scott D. Feringa, Esquire
Sullivan, Ward, Asher, & Patton, P.C.
1000 Maccabees Center
25800 Northwestern Highway
Southfield, MI 48075-1000

Subject:  Hofer v. The Gap, Inc. *et al.*
          Project No. DT56555.000
          Client file #: PAG-121179

Dear Mr. Feringa:

In accordance with your request, Exponent® Failure Analysis Associates® has performed a biomechanical analysis of the incident involving Stephanie Hofer that occurred on March 18, 2004, at the Turtle Beach Towers in Jamaica. The objective of this analysis was to evaluate the motions and forces experienced by Ms. Hofer and to determine the mechanisms of Ms. Hofer's injuries.

## Information Received and Reviewed

The following information has been received and reviewed:

- Complaint, undated
- Deposition transcript of Carrie L. LaRoche with exhibits, dated July 27, 2006
- Deposition transcript of Douglas Hofer, dated July 11, 2006
- Deposition transcripts of Stephanie Hofer with exhibits, dated June 29, 2006, and July 10, 2006
- Deposition transcript of Lauren M. Drew, dated August 28, 2006
- Deposition transcript of Faylin Miller, dated August 21, 2006
- Deposition transcript of Patricia Reese with exhibits, dated October 20, 2006

DT56555.000 A0T0 1106 REPT

Scott D. Feringa, Esquire

November 9, 2006
Page 2

- Deposition transcript of Nadine Manfredi with exhibits, dated October 20, 2006
- Deposition transcript of Denroy Scarlett, dated August 21, 2006
- Exemplar flip-flops (two, one blue left foot, one pink right foot) provided by Old Navy
- Exemplar flip-flops (pair, lavender) provided by the Plaintiff
- Flip Flop Strap Cycling Test, Test Method H-9207, dated July 1, 2003
- Flip Flop Strap Directional Pull Test, Test Method H-9208, dated July 1, 2003
- Footwear and Accessories; Regulatory Compliance, Performance Standards and Testing Procedures; A Supplement to the Vendor Handbook, dated October, 2003
- Footwear and Accessories; Regulatory Compliance, Performance Standards and Testing Procedures; A Supplement to the Vendor Handbook, dated August, 2000
- Gap, Inc.'s Technical Bulletin #88, dated April 5, 2002
- Gap, Inc.'s Technical Bulletin #103, dated November 25, 2003
- Vendor Compliance Agreement, dated September, 2003
- Color photographs (5) of site, undated
- Color photographs (17) of site, undated
- Color photographs (31) and measurements from Alex Morgan, dated October 25, 2006
- Medical records pertaining to Stephanie Hofer

### Incident Summary

According to deposition testimony, Ms. Hofer had arrived in Jamaica and had cleared customs around 5:00 in the evening of March 18, 2004. She had dinner with her friend. She left her room around 11:00 pm to get information from the front desk, but fell outside the front doors and sustained a large laceration to her left leg.

At the time of the incident Ms. Hofer was 31 years old. According to her medical records, she was 5 feet 3 inches tall and weighed 185 pounds.

### Incident Scene

According to deposition testimony, the subject incident occurred near the turtle pond at Turtle Beach Towers in Jamaica. Photographs and measurements show that the subject site consists of an approximately 9 foot, 9 inch wide landing outside of a set of double glass doors that lead to a

Scott D. Feringa, Esquire

November 9, 2006
Page 3

public area of the resort. When looking at the doors, there is a ramp on the right side and two steps coming down from the landing that are approximately 6 feet, 8 inches wide. Each step has a rise of 6 inches and a tread of 13.5 inches. There are bushes on the right side of the ramp and a turtle pond, with outer dimensions of 6 feet, 5.5 inches by 3 feet, 11 inches, on the left side of the steps. There is a bench on each side of the landing, one in front of the turtle pond and one in front of the bushes.

### Deposition Testimony of Stephanie Hofer

According to her deposition testimony, Ms. Stephanie Hofer arrived in Jamaica on March 18, 2004, around 4:00 PM and got through customs and luggage around 5:00 before traveling to Turtle Beach Towers on a shuttle bus. The subject incident occurred on the day of her arrival in Jamaica. That day was the first time that Ms. Hofer wore the dark blue flip-flops that she had purchased from Old Navy, but she did not remember if she wore the flip-flops from her house or if she packed them.

Ms. Hofer was wearing the blue flip-flops when she went to dinner and back to her room prior to going to the front desk. After dinner, Ms. Hofer decided to take a walk to the front desk to get information and left her room between 11:00 and 11:15 PM. She took a five-minute walk around the grounds and was following the sidewalk. She knocked on the window of her room and scared her friend Carrie before walking around the back of the building to the front desk area. Ms. Hofer walked up the stairs and tried to open the door, but the door was locked. She turned to go down the stairs, at which time her right flip-flop broke. She said, "I was at the top of the stairs getting ready to make my step down, in the process of taking my step down," and continued, "Something felt wrong, I looked down and the flip-flop was broken and all within that same few seconds I fell." Ms. Hofer testified that the toe strap separated from the right flip-flop and the round circular portion had pulled all the way through. When she fell, she was in the process of leaving the door to turn around and walk. She testified that she had probably taken a step, so she was not right at the door. She cannot recall if the flip-flop separated before she reached the step or as she was going down. Ms. Hofer did not recall if she struck her head. No one was present at the time of her fall.

Ms. Hofer does not remember stumbling or having any problem with the flip-flop before it broke. She lost her balance and fell to her right into the turtle pond and gouged her leg on the materials in the pond including sharp coral and rock. Ms. Hofer testified that the edge of the pond was lower than the height of the stairs. She stated:

> "Realizing what happened, I jumped up and I was wet and embarrassed. When I went to take a step out, nothing happened. I looked down, and I saw that I was bleeding. I had no idea of the extent of my injury. I

Scott D. Feringa, Esquire

November 9, 2006
Page 4

> *thought to myself that's going to need stitches. I had no idea that the reason I could not move my leg was because I had severed every vital part of my leg except for the bone."*

Ms. Hofer does not remember how she landed. She testified that her entire body was in the turtle pond. When she got up, she rolled over to the side from where she fell because she could not stand up. She does not remember if the flip-flop was still on her foot when she rolled onto the side. She "absolutely" denies being drunk.

Ms. Hofer believed that there were two turtle ponds, one on each side of the stairway, which contained several inches of water, coral, slate, and turtles. She remembered there being between four and six stairs, and that she was on the landing when the right flip-flop separated. She testified that the incident was caused by the breaking flip-flop in a dimly lit stairway and that she would not have fallen in the turtle pond had there been railings.

## Deposition Testimony of Denroy Scarlett

Denroy Scarlett, a night auditor/receptionist at Turtle Beach Towers, testified that guests would have access to the doors at the top of the stairs near the turtle pond 24 hours a day. He heard "someone screaming for help" and assisted Ms. Hofer out of the pond. He described that "her legs was in the pond down here and she was like hanging out of the pond, and her head was out like this." He went on further to say, "She was more like – she was more resting on the bench here, leaning on the edge of the pond and the bench." Ms. Hofer's legs, feet, and buttocks were still in the pond, and her upper back was on the edge of the pond. Mr. Scarlett testified that when he reached her, she said that she was admiring the turtles and thinks that she slipped on something. He further commented, "But when I went there, it was like…she was actually too close to the edge of the pond." Ms. Hofer did not say that she slipped because of a broken flip-flop. One flip-flop was in the pond, and Mr. Scarlett did not see a flip-flop on the stairs or landing. Ms. Hofer did not say that she fell because of dim lighting or because there was no railing.

## Deposition Testimony of Faylin Miller

Faylin Miller, the general manager for Turtle Beach Towers, testified that the reception area is staffed 24 hours a day and that the doors are never locked. Mr. Scarlett called Ms. Miller at home around midnight and told her that a guest had fallen into the turtle pond and was bleeding. Ms. Miller told them to go directly to the hospital. Ms. Miller was also told that the guest had been sitting in the turtle pond earlier that evening and wanted to take a turtle back to her room and put it in her bathtub. Ms. Miller was told that the guest was drunk. She did not get any information from her employees that broken footwear had caused Ms. Hofer to fall.

Scott D. Feringa, Esquire

November 9, 2006
Page 5

## Deposition Testimony of Carrie LaRoche

According to her deposition testimony, Ms. LaRoche was traveling with Ms. Hofer at the time of the incident. A hotel employee called the room and told Ms. LaRoche that her friend had just cut her foot and that she needed to come to the front desk. When she first saw Ms. Hofer, she was "laying on the bench right next to the turtle pond." Ms. Hofer said that her flip-flop broke, and she fell down the stairs and into the turtle pond. Ms. Miller saw the flip-flop on the middle stair, but did not look for the subject flip-flops after accompanying Ms. Hofer to the hospital. Ms. Hofer had worn the flip-flops all day and had one margarita at dinner.

## Medical Findings for Stephanie Hofer

Ms. Hofer was taken to Saint Ann's Bay Hospital on March 19, 2004. The left side of her foot was cut, and there was heavy constant bleeding from the injury. The progress notes, dated March 18, 2004, state that she reported she was able to bear weight after the injury for a few seconds, but she felt like it was buckling and she quickly sat down. The wound was described as a 10 cm elliptoid [sic] laceration on the anterior distal third of Ms. Hofer's leg extending over the lateral malleolus and along the dorsum of her left foot. A two-centimeter laceration was noted at the base of Ms. Hofer's second toe. Ms. Hofer was unable to dorsiflex her foot. A few superficial abrasions were noted to the dorsum of the left foot. Orthopedic progress notes of Dr. Barnes described lacerations to Ms. Hofer's second and fifth toes with decreased sensation on the dorsum of her foot and decreased extension of her toes. An x-ray was taken of her left ankle, but neither the films nor the report were available for review. Treatment records taken by H. Russell Bralan and Campbell indicated that the area was dressed and Ms. Hofer left the hospital via taxi.

Ms. Hofer was treated at Massachusetts General Hospital on March 20, 2004. It was noted on her records that she had twisted her ankle and fallen into a turtle pond. She had a large wound to her left lower leg, which had been sutured in Jamaica on March 18, 2004. She presented at Massachusetts General Hospital with severe pain and noticeable foot drop of her left foot with minimal movement and positive paresthesia. Ms. Hofer had sensation in her left toes, but complained of numbness. The attending physician, David Brown, M.D., described the wound as a "very large sutured flap laceration of the anterior aspect of the lower leg extending from just below the mid shin down to just above the malleoli." Dr. Brown also noted that Ms. Hofer had no sensation to light touch on the dorsum of the foot and no ability to dorsiflex the foot or extend her toes. X-rays taken of the left ankle on March 20, 2004, were interpreted by a radiologist to show soft tissue deformities consistent with the known laceration. There was a 0.5 cm radiopaque density in the lateral soft tissues anterior to the fibula 4.5 cm above the lateral malleolus that may be a foreign body. No fractures were seen in the x-rays.

Scott D. Feringa, Esquire

November 9, 2006
Page 6

On March 20, 2004, David Lhowe, M.D., operated on Ms. Hofer's left lower extremity. The pre- and post-operative diagnoses were of a left leg laceration with tears of the left tibialis anterior, extensor hallucis longus, and extensor digitorum communis tendons. Additionally, the deep and superficial peroneal nerves, the dorsalis pedis artery, and the left second toe were lacerated. The surgeon explored the left leg wound and repaired the left tibialis anterior tendon with sutures. He also repaired the left superficial peroneal nerve and the left second toe laceration. The report stated that the dorsalis pedis artery was not felt to be repairable.

## Biomechanical Analysis

The incident of March 18, 2004, was evaluated from a biomechanical engineering perspective to evaluate Ms. Hofer's kinematics during the event and the mechanisms associated with her injuries and to determine whether the incident as described could have produced Ms. Hofer's injuries. This evaluation was based on the materials received and reviewed, the laws of physics, principles of human motion and gait, principles of human tolerance, and biomechanical literature. In addition, the analysis involved a detailed review of Ms. Hofer's medical records.

Several scenarios by which Ms. Hofer may have entered the turtle pond were explored in the context of the geometry of the scene and knowledge of human gait and physics. During normal human gait, each leg alternates between a stance phase and a swing phase. The stance phase occurs when the foot is in contact with the ground, and the swing phase occurs when the foot is not in contact with the ground. The stance phase may be divided into three periods: heel strike, full contact, and toe off. The stance phase for each leg lasts for approximately 60% of the gait cycle during level walking, allowing for time when both feet are simultaneously in contact with the ground.

According to her deposition testimony, Ms. Hofer turned around and was beginning to walk down the stairs when her right flip-flop broke causing her to fall to her right into a turtle pond and injure her left leg. Ms. Hofer testified that the flip-flop broke when she was at the top of the stairs in the process of taking a step down. A trip occurs when an obstacle prevents the foot from moving forward. If the leg is unable to overcome the obstruction and make contact with the ground during the following step, the body falls forward due to the forward momentum of the body and the center of mass (COM) moves towards the ground until the fall is arrested. Ms. Hofer described the middle support of her flip-flop pulling through as she began to step down the stairs. In this scenario, the trip would most likely have been caused during the late stance phase of the right leg. It is conceivable that Ms. Hofer's foot and flip-flop could have then become caught up and prevented her from beginning her swing phase as expected. Had this occurred, Ms. Hofer would have either been preparing for or would have experienced heel strike with the left foot around the same time. This period when two feet are on the ground at the same

Scott D. Feringa, Esquire

November 9, 2006
Page 7

time during walking is known as double stance, and is the period of the gait cycle during which an individual is the most stable because of the larger base of support provided by both feet being on the ground. If Ms. Hofer's flip-flop had broken and she tripped during the toe-off of the right foot, it is probable that she would have been able to recover. Many falls occur because there is not sufficient time to position the recovery foot under the COM, and the continued forward momentum of the COM results in a fall. It is noteworthy that had Ms. Hofer tripped from the steps as she described in her testimony, the height of the stairs would have given her additional time to react to the trip and orient her body in a more optimal position to arrest her fall.

Ms. Hofer's testimony that she had "probably" taken a step after turning from the double doors and that the flip-flop broke as she was taking a step down are inconsistent with the geometry of the site. The distance between the door and the first step is approximately seven feet, indicating that she had ample space to turn around and take steps towards the stairs before taking the first step down. These steps between the door and the stairs would have allowed for Ms. Hofer to establish her forward momentum, making it even less likely that an event such as a trip would cause her momentum to shift to the right to cause her to fall into the turtle pond. Momentum is a measure of an object's tendency to continue its motion. It is a vector quantity, meaning it has both a magnitude and a direction, and its direction is the same as that object's velocity. In the scenario as described in her testimony, Ms. Hofer's momentum would have been oriented in a direction away from the doors and down the stairs. According to Newton's first law, Ms. Hofer's momentum could not have changed unless an outside force acted upon her. In the event that she tripped as a result of her flip-flop breaking, her momentum would have caused her body to continue to move forward and not in the direction of the turtle pond. Specifically, there would have been no outside force that would have caused her to move to her right. Additionally, her testimony that the door was locked was inconsistent with the employees' testimony that the door is open 24 hours a day.

Ms. Hofer's injury patterns do not support her testimony that she tripped and fell into the turtle pond from the landing. There were no abrasions, cuts, or scrapes documented on Ms. Hofer's arms, either in the medical records from St. Ann's immediately following the incident or in the medical records from Massachusetts General Hospital the next day. Had Ms. Hofer fallen as a result of a broken flip-flop, she most likely would have fallen forward and would have reacted to the situation by placing her hands in front of her to arrest her fall. Ms. Hofer testified that she knew something was happening and had time to look down and see that the flip-flop had broken. Clearly, if this were the case, she would have had plenty of time to also put her hands out to prepare for the fall. Also, had Ms. Hofer fallen as she described, she would have likely injured her upper body and/or upper extremities as she attempted to recover and arrest her fall.

Scenarios consistent with the evidence and testimony involve Ms. Hofer voluntarily being in the vicinity of the turtle pond to observe the turtles. One possible scenario involves Ms. Hofer sitting along the edge of the pond with her feet in the water. A loss of balance while exiting due

Scott D. Feringa, Esquire

November 9, 2006
Page 8

to the slippery surfaces in the turtle pond could have resulted in the laceration to Ms. Hofer's left leg, especially considering the proximal-to-distal nature of the wound. There would be a high potential to slip on the wet tile surface of the turtle pond, which was not designed as a walking surface for humans. The momentum resulting from a slip when Ms. Hofer's feet were already on the bottom of the pool would be oriented in the appropriate direction to cause her leg to forcefully contact the aggressive surface of the angled rock slab located in the pool and cause the leg injury. The orientation and direction of the laceration, which appears to have originated on the proximal portion of her lower leg and proceeded downward to the foot, is more consistent with a scenario involving Ms. Hofer falling while attempting to get out of the turtle pond rather than her falling into the pond from the landing. This scenario is also consistent with the testimony of Mr. Scarlett, who stated that Ms. Hofer told him that she was admiring the turtles and must have slipped. She did not mention a broken flip-flop to Mr. Scarlett at the incident scene. Had Ms. Hofer decided to put her feet in the water while watching the turtles, it is likely that she would have first removed her flip-flops and placed them nearby. Therefore, it is possible that she was not even wearing the flip-flops at the time of the injury.

The location and appearance of Ms. Hofer's leg wound is consistent with coming in contact with a sharp object in a top-to-bottom direction. Such a wound would be consistent with Ms. Hofer having her leg in the turtle pond, attempting to leave, slipping on the tile, and catching her leg on the rock slab within the pond as her body was moving past it in an uncontrolled manner due to the slip. It is not consistent with a fall into the pond, where the leg would be going foot first into the pool and a wound appearing as if the sharp object traveled bottom-to-top, resulting in a flap that was attached towards the top of the lower leg.

## Conclusions

Based upon the scientific analysis outlined above, Ms. Hofer's injuries are not consistent with her testimony as to how the injuries occurred. The opinions presented in this report are offered with a reasonable degree of scientific and biomechanical engineering certainty. These opinions are based on the information reviewed as well as the education, experience, and knowledge of the author. If additional information becomes available, this report may be amended.

Exponent currently bills my time at $230 per hour. This rate is the same for all activities including analysis, consultation, travel, deposition testimony, and trial testimony. Enclosed are a current copy of my curriculum vitae and a list of my recent testimony.

The following exhibits may be used at time of trial:

- Graphics/models/photographs depicting the incident scene
- Injury diagrams for Stephanie Hofer



DT56555.000 A0T0 1106 REPT

Scott D. Feringa, Esquire

November 9, 2006
Page 9

- Graphics/models depicting Ms. Hofer's injury mechanisms
- Graphics/models depicting relevant anatomy
- Graphics/models to describe human gait
- Literature
- Exemplar flip-flops

If you have any questions, please do not hesitate to call.

Sincerely,

William N. Newberry
Managing Engineer

Enclosures (2)