**Defendant The GAP, Inc.'s Motion for Summary Judgment**

# Exhibit "I"

# (Dr. John E. Moalli and Dr. Maureen T.F. Reitman Report – February 14, 2007)

E<sup>x</sup>ponent®
*Failure Analysis Associates®*

Exponent
4901 Telsa Drive, Suite L
Bowie, MD 20715

telephone 301-464-4060
facsimile 301-464-4099
www.exponent.com

February 14, 2007


Scott D. Feringa, Esq.
Sullivan, Ward, Asher, & Patton, P.C.
1000 Maccabees Center
25800 Northwestern Highway
Southfield, MI 48075-1000


Subject:  Hofer v. The Gap, et al.
          Project No. SF37277.000
          Client file #: PAG-121179


Dear Mr. Feringa:

Your firm has retained Exponent® Failure Analysis Associates, Inc. ("Exponent") to review documents, inspect items, and perform testing to provide opinions regarding the materials involved in the above-named action. This letter summarizes our qualifications and experience relevant to this matter, as well as the results of our inspections, technical review, analysis, and testing.

## Qualifications and Experience

John E. Moalli, Sc.D. is a Principal Engineer and Group Vice President at Exponent, which is based in Menlo Park, California. Exponent, founded in 1967, is the largest engineering firm in the country dedicated primarily to the analysis and prevention of failures of an engineering or scientific nature. Exponent employs approximately 700 full-time staff, including about 500 degreed professionals, more than 200 of whom hold doctorates in their fields.

Dr. Moalli holds two academic degrees: (1) a Bachelor of Science degree in Civil Engineering from Northeastern University, and (2) a Doctor of Science degree in Polymers (Plastics and Rubbers) from the Massachusetts Institute of Technology. He has been practicing in the field of polymer science and engineering for more than 20 years. A true and correct copy of Dr. Moalli's curriculum vitae is attached as Exhibit 1. He provides consulting engineering services in all aspects of polymer science and engineering including but not limited to structural analysis, material selection, product design and development, mechanical testing, polymer physics, fractography, and polymer processing.

Scott D. Feringa, Esq.
February 14, 2007
Page 2

Maureen T.F. Reitman, Sc.D. is a Principal Engineer in Exponent's Mechanical Engineering and Materials Science practice. She holds two academic degrees: (1) a Bachelor of Science in Materials Science and Engineering from the Massachusetts Institute of Technology, and (2) a Doctor of Science in Materials Science and Engineering, with a thesis in the field of polymers, from the Massachusetts Institute of Technology. Dr. Reitman has been practicing in the field of polymer science and engineering for more than 18 years. She provides consulting engineering services in all aspects of the field, including but not limited to material selection, testing, fractography, product design and development, and failure analysis. Dr. Reitman has firsthand experience with the design, development, manufacture, and qualification of plastic and rubber products and is a member of the Underwriters Laboratory Standard Technical Panel for Polymeric Materials. A true and correct copy of Dr. Reitman's curriculum vitae is attached as Exhibit 2.

Drs. Moalli and Reitman manage both large and small consulting projects at Exponent and have at their disposal, and regularly consult with, the resources of Exponent including doctoral level engineers specializing in such areas as biomechanics, mechanical engineering, polymer science and chemistry.

### Previous Testimony

A list of testimony given by Dr. Moalli and Dr. Reitman in the past four years is attached as Exhibit 3.

### Compensation

Exponent charges at a rate of $525 per hour for Dr. Moalli's services and at a rate of $350 per hour for Dr. Reitman's services. These billing rates are independent of the outcome of this matter.

### Material Reviewed

To prepare our opinions, we reviewed documents provided by counsel and technical information related to the flip-flops associated with the case. These items are listed in Exhibit 4. In addition, we inspected a number of exemplar materials related to this matter and directed their characterization by Fourier Transform Infrared Spectroscopy (FTIR). Finally, under our direction and control, testing on the exemplars was conducted at Bureau Veritas Consumer Products Services in Taunton, Massachusetts; this testing was witnessed by Dr. Reitman.

SF37277.000 A0T0 0207 MR01

Scott D. Feringa, Esq.
February 14, 2007
Page 3

## Exhibits

Exhibits that we expect to use at the time of trial include, but are not limited to:

- Documents produced in this litigation
- Information contained in this report
- Photographs taken of the exemplar flip-flops
- Results and/or photographs from FTIR and mechanical testing

# Analysis and Opinions

## Background

On March 18, 2004, Ms. Stephanie Hofer was a guest at the Turtle Beach Towers in Jamaica. She testified that she was wearing dark blue flip-flop sandals during the first evening of her stay, and has testified that these were previously unworn sandals purchased at Old Navy. Around 11pm, she walked to the landing in front of doors to the front desk and tried to open them, but found they were locked. She alleges that when she turned to go down the stairs, the circular end of the toe strap on the right flip-flop was extracted through the sole, which caused her to fall into the turtle pond that was on her right. Ms. Hofer cut her leg on materials located in the pond.

There has been no physical evidence that we have examined to date that would confirm that Ms. Hofer was wearing a pair of flip-flops manufactured by Old Navy at the time of the incident; the actual flip-flops that allegedly broke have never been produced. When deposed, travel companion Carrie LaRoche and night receptionist Denroy Scarlett both recalled flip-flops being in the vicinity of the accident scene. However, there is no further description of the flip-flops, no confirmation that they were Old Navy flip-flops, and no confirmation that either had broken.

Given these facts, we will nonetheless address and rebut the allegations at hand by assuming, *arguendo*, that Ms. Hofer, at the time of the incident, was wearing Old Navy flip-flops similar to the pair that the Plaintiff produced as an exemplar.

## Inspection and Testing

We have inspected and directed the characterization of a variety of flip-flops produced in this matter including the lavender sandals the Plaintiff indicates were purchased concurrently with the alleged failed flip-flop, as well as seventeen individual flip-flops of the style and approximate vintage as the incident flip-flop (Photodocumentation and data are presented in Exhibits 5 through 7).

SF37277.000 A0T0 0207 MR01

Scott D. Feringa, Esq.
February 14, 2007
Page 4

**Material Characterization (FTIR Testing)**

As previously described in the memo to you dated January 17, 2007, FTIR spectra were obtained to characterize the material composition of the two flip-flops initially submitted for review. The first flip-flop, provided by Old Navy, had blue straps and trim, and a yellow sole. The second flip-flop, identified as an exemplar flip-flop and provided by the plaintiff, had lavender straps and trim and a dirty white sole. The FTIR analysis showed that the two flip-flops were comprised of a polyethylene vinyl acetate (EVA) sole and a plasticized polyvinyl chloride (PVC) strap, which is consistent with documents provided by the Gap.

Additional exemplars, including seven pair of black and white flip-flops, a teal and purple flip-flop, and a yellow and pink flip-flop, were obtained from Old Navy. These exemplars were also examined by FTIR, and the resultant analysis showed similar composition to the first two sandals we examined (soles and straps comprised of EVA and plasticized PVC, respectively). The complete results from the FTIR testing are included in Exhibit 7.

**Mechanical Testing**

On February 2, 2007, Dr. Reitman supervised mechanical testing of flip-flops in both a horizontal and a vertical configuration using methods outlined in the Gap protocols[1]. The three thong/strap connection points were cyclically loaded to "evaluate the effect of the cycling stress on flip-flop straps during walking" and the three points were simply loaded and held for ten seconds to "evaluate the pull strength of different flip-flop strap attachment points." The toe thong on one sandal was also tested in tension to failure. The configuration for a vertical cyclic or pull test is shown in Figure 1, while the configuration for a horizontal cyclic or pull test is shown in Figure 2.[2]

---

[1] Flip Flop Strap Cycling Test; Test Method H-9207 and Flip Flop Directional Pull Test; Test Method H-9208

[2] Notes taken during testing use "vertical" and "horizontal" to indicate the orientation of the sole of the flip-flop. In contrast, in this report "vertical" and "horizontal" are used as in the Gap protocols; they indicate the orientation of the direction of pull.

SF37277.000 A0T0 0207 MR01

Scott D. Feringa, Esq.
February 14, 2007
Page 5



Figure 1: Photograph of Vertical Test Set-Up



Figure 2: Photograph of Horizontal Test Set-Up

**Horizontal and Vertical Cyclic Tests**

For cyclic testing, the flip-flop was mounted securely to the stressing fixture as shown in the figures above, and the toe strap was clamped between flat metal plates. The maximum load was set to twenty pounds, and the flip-flop was cycled twenty times at a rate of twenty inches per minute from the neutral condition. The flip-flop was examined for defects before and after cycling; the outer and inner side strap attachments were tested in the same manner. Thus, three

SF37277.000 A0T0 0207 MR01

Scott D. Feringa, Esq.
February 14, 2007
Page 6

tests were run on each flip-flop, one stressing each connection point, either in the horizontal or the vertical configuration.

A representative plot of the data collected during the 20th cycle of a horizontal cyclic test (the configuration in Figure 2) is shown in Figure 3. A representative plot of the data collected during the 20th cycle of a vertical cyclic test (configuration in Figure 1) is shown in Figure 4.



Figure 3: Representative Plot from a Horizontal Cyclic Test on the Toe Thong

SF37277.000 A0T0 0207 MR01

Scott D. Feringa, Esq.
February 14, 2007
Page 7



Figure 4: Representative Plot from a Vertical Cyclic Test on the Toe Thong

Eight flip-flops were tested utilizing the horizontal and vertical cyclic protocols, representing twenty-four individual tests. The straps visibly stretched and recovered through the course of the cyclic testing, and all eight flip-flops passed the requisite criteria. Graphical data were captured for the 20th cycle of each test and are included in Exhibit 7.

**Horizontal and Vertical Pull Tests**

Eight additional flip-flops were tested utilizing the horizontal and vertical pull protocols. The straps visibly stretched and recovered through the course of the pull testing but did not break or pull through the sole when tested to 35 pounds. Graphical data collected for the pull tests can be found in Exhibit 7.

For vertical pull testing, the flip-flop was mounted securely onto the stressing fixture as shown in Figure 1, and the toe strap was clamped between flat metal plates. The toe thong was pulled at a rate of twenty inches per minute until the pre-set maximum load was achieved and then held for ten seconds. The flip-flop was examined for damage, and the test was repeated on the outer and inner straps.

Four flip-flops were tested twice in the vertical pull configuration, once at a maximum load of thirty pounds and a second time at a maximum load of thirty-five pounds at each connection point, for a total of twenty-four tests. All flip-flops passed this test. Figure 5 shows a representative plot of the data collected from a vertical pull test.

SF37277.000 A0T0 0207 MR01

Scott D. Feringa, Esq.
February 14, 2007
Page 8



Figure 5: Representative Plot from a Vertical Pull Test on the Toe Thong

For horizontal testing, the flip-flop was securely mounted onto the fixture as shown in Figure 2. The flip-flop was pulled at a rate of twenty inches per minute until the pre-set load of thirty-five pounds (five pounds greater than the Gap protocol requires) was achieved and then held for ten seconds. The flip-flop was examined for damage, and the test was repeated on the other attachment points.

Four flip-flops were tested at each connection point, for a total of twelve tests. All flip-flops passed this test. Figure 6 shows a representative plot of the data collected from a horizontal pull test.

Scott D. Feringa, Esq.
February 14, 2007
Page 9



Figure 6: Representative Plot from a Horizontal Pull Test on the Toe Thong

**Vertical Pull to Failure Test**

The toe thong of flip-flop 7L, initially tested in vertical cyclic testing, was subsequently pulled at twenty inches per minute to failure. The toe thong stretched to more than twice its original length before breaking at the button at a load in excess of 63 pounds. The button did not pull through the sole of the flip-flop. Figure 7 shows the toe thong during the vertical pull to failure test.



Figure 7: Flip-Flop 7L During Test to Failure

SF37277.000 A0T0 0207 MR01

Scott D. Feringa, Esq.
February 14, 2007
Page 10

## Summary and Opinions

- The alleged failed accident flip-flops were not made available for inspection or for testing.

- There is no physical evidence that Ms. Hofer was wearing Old Navy flip-flops at the time she sustained her leg laceration.

- There is no physical evidence that any portion of the Old Navy flip-flop alleged to be at issue broke and caused Ms. Hofer to fall.

- Given these facts, we offer the following additional opinions in rebuttal:

  - The Gap employs testing protocols with specific performance criteria to evaluate flip-flop behavior in both cyclic and pull tests.

  - The model of flip-flop produced by the plaintiff meets or exceeds the requirements for cyclic and pull testing outlined in the protocols employed by The Gap.

  - When excessive pull force is applied, the observed failure mode of the model of flip-flop produced by the plaintiff is fracture of the PVC toe thong; the button was not pulled through the sole.

  - No design or manufacturing defects were observed in the model of flip-flop that has been provided by the plaintiff as an exemplar.

This report summarizes opinions formed during our investigation and is based on information reviewed to date. Our analysis continues, and if additional information becomes available we reserve the right to modify or append our opinions. If you have any questions, please do not hesitate to contact Dr. Moalli at (650) 688-7204 or Dr. Reitman at (301) 464-4065.

Sincerely,

Dr. John E. Moalli
Principal Engineer and Group Vice President

Dr. Maureen T.F. Reitman
Principal Engineer

SF37277.000 A0T0 0207 MR01