# EXHIBIT 5

### Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF MASSACHUSETTS
 3                    C.A. No. 05-40170 FDS
 4    * * * * * * * * * * * * *
 5    STEPHANIE HOFER and DOUGLAS HOFER,     *
 6                    Plaintiffs             *
 7    v.                                     *
 8    THE GAP, INC., EXPEDIA, INC. and       *
 9    TURTLE BEACH TOWERS,                   *
10                    Defendants             *
11    * * * * * * * * * * * * *
12                       VOLUME I
13                     PAGES 1-238
14
15         VIDEOTAPED DEPOSITION OF STEPHANIE
16    HOFER, a witness called on behalf of the
17    Defendant The Gap, Inc., pursuant to the
18    Federal Rules of Civil Procedure, before
19    Jessica L. Williamson, Registered Merit
20    Reporter, Certified Realtime Reporter and
21    Notary Public in and for the Commonwealth of
22    Massachusetts, at the Offices of Morrison,
23    Mahoney, LLP, 250 Summer Street, Boston,
24    Massachusetts, on Thursday, June 29, 2006,
25    commencing at 9:17 a.m.
```

### Page 2

```
 1                   A P P E A R A N C E S
 2
 3    LAW OFFICES OF RUSSO & MINCHOFF
 4       (By India Minchoff, Esq.)
 5       123 Boston Street
 6       First floor
 7       Boston, Massachusetts  02125
 8       (617) 740-7240
 9       india@russominchofflaw.com
10       Counsel for the Plaintiffs
11
12    SULLIVAN, WARD, ASHER & PATTON, P.C.
13       (By Scott D. Feringa, Esq.)
14       1000 Maccabees Center
15       25800 Northwestern Highway
16       Southfield, Michigan  48075-1000
17       (248) 746-2727
18       sferinga@swappc.com
19       Counsel for the Defendant The Gap, Inc.
```

### Page 3

```
 1         A P P E A R A N C E S, Continued
 2
 3    BURNS & LEVINSON, LLP
 4       (By Thomas T. Reith, Esq.)
 5       125 Summer Street
 6       Boston, Massachusetts  02110
 7       (617) 345-3258
 8       treith@burnslev.com
 9       Counsel for the Defendant Expedia, Inc.
10
11    ALSO PRESENT:
12
13       Adam Cook, Videographer
```

### Page 4

```
 1                       I N D E X
 2    DEPONENT                                   PAGE
 3    STEPHANIE HOFER
 4    Examination By Mr. Feringa                    7
 5
 6                      E X H I B I T S
 7    NO.                                        PAGE
 8    1  Notice of Deposition                       5
 9    2  Copies of photographs of                   9
       sandals
10
11    3  Copies of photographs, four              13
       pages, W-2 form
12
    4  Plaintiff's Response to                    29
       Defendant, The Gap, Inc.'s
13     First Request For Admissions
       Pursuant to Fed. R. Civ. P. 36
14
    6  Defendants' Third Request For             101
15     Production of Documents and
       Things Pursuant to Fed. R.
16     Civ. P. 34
17    5  Drawing                                 152
18    7  Copies of pictures of Tower 4           182
       turtle pond
19
20
21    Note:  Original Exhibits 1 - 7 were retained
22    by the court reporter and forwarded to
23    Bienenstock Court Reporting & Video for
24    distribution.
```

Page 5

1      PROCEEDINGS
2      (Exhibit No. 1, Notice of
3   Deposition, premarked for identification.)
4      THE VIDEOGRAPHER: We are now on
5   the record. This is the videotaped
6   deposition of Stephanie Hofer being taken on
7   June 29th, 2006. The time is now 9:17 a.m.
8   We are located at 250 Summer Street, Boston,
9   Massachusetts.
10     This deposition is being taken on
11  behalf of the defendant in the matter of
12  Stephanie Hofer and Douglas Hofer vs. The
13  Gap, Inc., Expedia, Inc. and Turtle Beach
14  Towers. The case number is 05-40170 FDS.
15  This matter is being held in the United
16  States District Court for the District of
17  Massachusetts.
18     My name is Adam Cook, the videotape
19  operator. Would the court reporter swear in
20  the witness and the attorneys briefly
21  identify themselves for the record, please.
22     MS. MINCHOFF: Attorney India
23  Minchoff for Stephanie Hofer.
24     MR. FERINGA: I'm Scott Feringa. I
25  represent The Gap, Inc.

Page 6

1      MR. REITH: Thomas Reith. I
2   represent Expedia, Inc.
3
4      STEPHANIE HOFER,
5   a witness called on behalf of the Defendant
6   The Gap, Inc., having first been duly sworn,
7   was deposed and testifies as follows:
8           * * * * *
9
10     MR. FERINGA: It is my
11  understanding that there are stipulations
12  that are to be placed on the record before
13  we start. Why don't you go ahead, Mr.
14  Reith.
15     MR. REITH: Thomas Reith for
16  Expedia, Inc. The parties have discussed
17  off the record the stipulations to be
18  entered. The parties stipulate that they'll
19  reserve all objections, except as to form,
20  but including motions to strike, until the
21  time of trial, and the witness will have --
22  Scott, it's up to you. We usually do 30
23  days to read and sign.
24     MR. FERINGA: That's fine.
25     MS. MINCHOFF: And waive the

Page 7

1   notary.
2      MR. REITH: Agree to waive the
3   notary?
4      MR. FERINGA: Yes.
5      MR. REITH: Thank you.
6      MR. FERINGA: Can we go off the
7   record.
8      THE VIDEOGRAPHER: The time is
9   9:18. We are off the record.
10     (Discussion off the record.)
11     THE VIDEOGRAPHER: The time is
12  9:20. We are back on the record.
13
14          DIRECT EXAMINATION
15
16  BY MR. FERINGA:
17  Q.  Ms. Hofer, as we were introduced off the
18      record, my name is Scott Feringa. I am
19      going to be asking you some questions today.
20      I represent Gap in this lawsuit. This is
21      not going to be an endurance contest, and
22      thus should you need to take any time, if
23      you need to confer with your lawyer, if you
24      need to take a break for any reason, please
25      let us do so -- please do so at your

Page 8

1       convenience, all right?
2   A.  Okay.
3   Q.  Additionally, everything that is said is
4       going to be taken down. It's an artificial
5       way of doing things, and while we all
6       understand nods of the head and things of
7       that nature, it doesn't translate well for
8       our court reporter. So your responses,
9       whatever they are, are going to have to be
10      verbal. Is that fine?
11  A.  Okay. Yeah.
12  Q.  And finally, while we typically talk over
13      each other and understand that, court
14      reporters get very upset when that happens
15      because we don't know who is going to take
16      down what, and thus if you'll wait till I'm
17      finished, sometimes I have a hesitant way of
18      talking, and I will wait till you're
19      finished or one of the other counsel are
20      finished, that way we'll get your testimony
21      down on the record, okay?
22  A.  Okay.
23  Q.  Good. I'm going to show you what has been
24      marked as Exhibit No. 1, which is a copy of
25      the deposition notice. Have you seen this

Page 145

1        AFTERNOON SESSION
2        THE VIDEOGRAPHER: The time is
3   12:50 p.m. We are back on the record.
4
5        (STEPHANIE HOFER, Resumed.)
6        DIRECT EXAMINATION, Continued
7
8   BY MR. FERINGA:
9   Q.   I'm going to start asking you some questions
10       about Turtle Beach Towers and the vacation,
11       or the attempted vacation. When was it that
12       you started making plans to go somewhere
13       with Ms. LaBelle?
14  A.   The Tuesday before we left.
15  Q.   Was this a spur-of-the-moment thing?
16  A.   Yes.
17  Q.   And how was it that Turtle Beach Towers was
18       then selected as opposed to any other
19       location in the Caribbean?
20  A.   I can't speak for Carrie because she booked
21       the trip through Expedia, and I believe that
22       Expedia spits out the deals, and since she
23       booked the trip, I can't exactly speak for
24       her. We didn't -- I didn't choose.
25  Q.   What was magical about the Tuesday to make a

Page 146

1        decision for getting out of town?
2   A.   Just needed the end of the winter blues-
3        type, sit on the beach and read a book.
4   Q.   Okay. Who is Ms. LaBelle to you? Is she a
5        friend, a co-worker, anything?
6   A.   She's my friend.
7   Q.   How long have you known her?
8   A.   Five years --
9   Q.   Ever vacationed with --
10  A.   -- approximately five years.
11  Q.   Ever vacation with her before?
12  A.   No.
13  Q.   How was it that a decision was made to go
14       out of the country?
15  A.   We were looking for someplace warm.
16  Q.   And did you do any Internet searches
17       yourself about what deals may or may not be
18       out there in the Caribbean or Jamaica or
19       someplace?
20  A.   No. It was her -- she called me up and
21       said, "Do you want to go somewhere?" And I
22       said, "Sure. Where do you want to go?" And
23       she said, "I don't know. I'll look around."
24       And she called me and said, "Do you want to
25       go to Jamaica?" And I said, "Okay."

Page 147

1   Q.   Did you -- after being told that Jamaica was
2        a potential destination, did you go on the
3        Internet and check to see anything about
4        Turtle Beach Towers or Jamaica or Ocho Rios
5        or anything?
6   A.   I looked up Ocho Rios but nothing about
7        Turtle Beach Towers. I wasn't aware of
8        where we were staying at that point.
9   Q.   When you went to look at Ocho Rios as your
10       search term, did it turn up a bunch of
11       hotels?
12  A.   No. I looked at things to do.
13  Q.   Oh. Before you got down to Turtle Beach
14       Towers did you look on the Internet to see
15       what Turtle Beach Towers looked like, what
16       the amenities were?
17  A.   I did not. I believe -- I did not.
18  Q.   Whether Ms. LaBelle did or not is another
19       issue, but specifically for you, what you're
20       telling us is you did not go on the
21       Internet --
22  A.   No.
23  Q.   -- type in "Turtle Beach Towers," try and
24       look at what some of the rooms might look
25       like or...

Page 148

1   A.   Huh-uh.
2   Q.   No?
3   A.   No. She had all the information. She took
4        care of it all. I went along for the ride.
5   Q.   You flew down there on the 18th, 2004?
6   A.   Yes.
7   Q.   Did you fly out of Logan?
8   A.   Yes.
9   Q.   Before you -- before you boarded the
10       airplane did you have anything alcoholic to
11       drink at any of the bars?
12  A.   No.
13  Q.   While you were on the plane -- strike that.
14            This wasn't a straight shot from Logan
15       to Jamaica, was it?
16  A.   No.
17  Q.   All right. It went from where to where to
18       where?
19  A.   It went from Logan to I think, is it Philly
20       that is a really big airport?
21  Q.   I'm in so many airports that I could tell
22       you. There's --
23  A.   I'm not --
24  Q.   Logan's a pretty big airport.
25  A.   We had to take a golf cart from one side of

Page 149

1    the airport to another to catch our next
2    flight. I think it was Philly because we
3    came through Philly on the way home.
4  Q. Okay. All right. You flew U.S. Air?
5  A. Yes.
6  Q. Okay. Probably Philly. Just I fly a lot.
7  A. Okay.
8  Q. And so from Philly to Jamaica, did you have
9    anything alcoholic --
10 A. No.
11 Q. -- to drink?
12    What time did you arrive in Jamaica?
13 A. I believe our flight landed around 4:00 p.m.
14 Q. Okay. And when you got to Jamaica --
15 A. Around 5:00 after we got through customs and
16    luggage.
17 Q. Okay. How did you get from the airport to
18    Turtle Beach Towers?
19 A. A shuttle bus.
20 Q. Did they take you directly to Turtle Beach
21    Towers, or did you go somewhere where you
22    could buy things to stock your condo with?
23 A. No. They brought us directly.
24 Q. And while you were in the airport in
25    Jamaica, you didn't have anything alcoholic

Page 150

1    to drink --
2  A. No.
3  Q. -- is that correct?
4    The evening of the 18th, the first
5    night that you were there -- I should ask
6    you, did you move rooms from the 18th to the
7    19th or move -- may seem like a strange
8    question, but if you checked -- sometimes
9    when you check into a room, it's not really
10   what you want and you go down and, at least
11   I have, complained about the room and then
12   get into another room within the same tower
13   or hotel?
14 A. No.
15 Q. And was the tower -- there were four towers,
16   correct?
17 A. I believe -- maybe the one where the lobby
18   was, another -- I don't know if there were
19   four or if there were more than four.
20 Q. Okay. When you walked into the lobby --
21   strike that.
22   The turtle ponds that you were talking
23   about, that was next to your building,
24   correct?
25 A. No.

Page 151

1  Q. Where was that?
2  A. They were directly in front, directly inside
3    of the entry to the lobby.
4  Q. Of the building where you were staying?
5  A. No.
6  Q. What lobby?
7  A. The lobby of the -- the main lobby of the
8    hotel.
9  Q. Okay.
10 A. We were -- we -- our room was in a separate
11   building.
12 Q. Was there a designation of the building
13   where the lobby was, that is, Building 1, 2,
14   3, 4?
15 A. I don't recall.
16 Q. Okay. To check into your room did you have
17   to go past the turtle pond?
18 A. Yes.
19 Q. Was it daylight when you went past the
20   turtle pond?
21 A. Yes.
22 Q. And in order to go to the building where
23   your unit was, your collectively, unit was,
24   did you have to go past the turtle pond and
25   then walk to one of the other buildings?

Page 152

1  A. Yes.
2  Q. Okay. So can you help me -- are you any
3    good at drawing?
4  A. Yes.
5  Q. Okay. Would you mind drawing the entrance
6    to the lobby of the building where the
7    turtle pond was located and then identify
8    the steps, identify the turtle pond,
9    identify the entrance to the building,
10   please?
11 A. (Drawing.)
12   (Discussion off the record.)
13   (Exhibit No. 5, Drawing, marked for
14   identification.)
15 Q. Okay. I'm going to mark this as Exhibit
16   No. 5, and this is what you've just drawn
17   us; is that correct?
18 A. Yes.
19 Q. Would you hold that up for the camera just
20   so that they can focus in on it.
21   MR. FERINGA: Adam, let me know
22   when you have that.
23 Q. Okay. Good. You can put it down. There
24   are stairs leading up to a glass door?
25 A. Yes.

Page 153

1  Q.  And on either side of the stairs there were
2      turtle ponds, correct?
3  A.  Yes.
4  Q.  And the turtle ponds you have drawn there
5      are square?
6  A.  Rectangular.
7  Q.  Okay. And do you know what the composition
8      of the sides are, what they're made out of?
9  A.  They looked as if they were made out of like
10     stone wall.
11 Q.  Stone wall, okay.
12     And what about the inside of the
13     turtle ponds; what's in there?
14 A.  Turtles and water, and they have like
15     decorations and almost look like flagstone,
16     that blue slate for the turtles to climb up
17     and sun themselves on.
18 Q.  Okay.
19 A.  So --
20 Q.  So you said there were two turtle ponds?
21 A.  I believe there were one on each side.
22 Q.  And that's what it says in your complaint,
23     Paragraph 12, located on each side of the
24     stairway were turtle ponds, P-O-N-D-S?
25 A.  Yes.

Page 154

1  Q.  Which contain several inches of water,
2      turtles, coral and slate; is that correct?
3  A.  Yes.
4  Q.  And the inside of the turtle ponds, were
5      those -- was -- were there any ceramic or
6      was there just cement or --
7  A.  I didn't examine it.
8  Q.  Okay. Did you have any difficulty on the
9      18th -- strike that.
10     What were you wearing as footwear on
11     the 18th, your flip-flops?
12 A.  My new flip-flops.
13 Q.  Which one of A, B, C or --
14 A.  None.
15 Q.  -- the new ones?
16 A.  The new ones.
17 Q.  Okay. When did you put the -- strike that.
18     What we're talking about as the new
19     ones are the flip-flops that you wore on the
20     19th, which -- when the accident occurred?
21     MS. MINCHOFF: Objection.
22 A.  The accident occurred on the 18th.
23 Q.  Sorry. On the day you arrived?
24 A.  Yes. I was there for four hours.
25 Q.  Okay.

Page 155

1  A.  Yes.
2  Q.  So when was it that you put on the pair of
3      sandals that you were wearing on the day of
4      the accident?
5  A.  That day.
6  Q.  So you wore those from your house?
7  A.  I don't remember if I wore them from my
8      house or if I had packed them. I can't
9      remember.
10 Q.  Let me ask this question: When you dressed
11     to go on the plane knowing your end place
12     was going to be Jamaica, did you dress sort
13     of in resort warm clothes, so --
14 A.  (No verbal response.)
15 Q.  No?
16 A.  No, sweatpants and...
17 Q.  But were you wearing sandals at the time
18     which -- the flip-flops that you normally
19     always wore, you said?
20 A.  Most likely. I don't remember if they were
21     that pair.
22 Q.  Okay. When was it that you switched to that
23     pair, then?
24     MS. MINCHOFF: Objection.
25 A.  That would be after we arrived and unpacked

Page 156

1      and refreshed and changed.
2  Q.  Are you certain of the fact that you didn't
3      wear those sandals on the trip down?
4  A.  No, I'm not certain.
5  Q.  Okay. Could be, couldn't be, you just don't
6      know?
7  A.  I don't know.
8  Q.  Okay. Do you remember having any difficulty
9      with the footwear prior to arriving in
10     Jamaica as you're traveling the various
11     airports?
12 A.  No.
13 Q.  Do you remember having any difficulty with
14     the footwear from the time you left the
15     Jamaica airport to the time that you arrived
16     at the Turtle Beach Towers?
17 A.  No.
18 Q.  After you arrived at Turtle Beach Towers, I
19     assume that you had to go check in through
20     the lobby and sign in someplace, correct?
21 A.  Carrie checked us in. I did not sign
22     anything.
23 Q.  Did you go back -- did you go with her to
24     the registration desk?
25 A.  Yes.

Page 157

```
 1  Q.  So you would have had to use those stairs?
 2  A.  Yes.
 3  Q.  So you were familiar with the condition of
 4      the stairs as you're walking up?
 5  A.  Not something -- I wouldn't say familiar.
 6      It's something that you don't really -- I
 7      wouldn't say familiar.  I went up the stairs
 8      and down the stairs one time.
 9  Q.  Were you carrying your bags?
10  A.  No.
11  Q.  Where were they?
12  A.  At the bottom of the stairs.
13  Q.  Did you have any difficulty walking up and
14      down the stairs?
15  A.  No.
16  Q.  Did the individual who checked you in, was
17      that a woman?
18  A.  I can't recall.  I don't know.  Carrie did
19      the checking in.  I hung back.  I don't
20      remember if it was a man or a woman.
21  Q.  All right.  So you would have arrived at
22      Turtle Beach Towers 5:00 or 6:00, something
23      like that?
24  A.  Yes, right around there.
25  Q.  You then -- would you then go to another
```

Page 158

```
 1      building where your room was contained?
 2  A.  Somebody, a man, escorted us from that
 3      building, took our bags and walked us to our
 4      room.
 5  Q.  You refreshed, changed?
 6  A.  Yes.
 7  Q.  And then what did you do?
 8  A.  We relaxed for a little while.  We decided
 9      what we were going to do, if we were going
10      to go to dinner or if we were just going to
11      hang back, because it was a long day.  We
12      decided to go to the marketplace directly
13      across the street from Turtle Beach Towers,
14      and inside the marketplace was Jimmy
15      Buffet's Margaritaville, so we decided to go
16      have dinner there and then come back,
17      because it was directly across the street,
18      so that we could get a good night's sleep
19      and jump on the morning.
20  Q.  Before you went to Jimmy Buffet's
21      Margaritaville but after you arrived at the
22      Turtle Beach Towers, did you have anything
23      alcoholic to drink at all?
24  A.  No.
25  Q.  Did they not provide you with some sort of
```

Page 159

```
 1      alcohol for your room?
 2  A.  No.
 3  Q.  Between the time that you left -- between
 4      the time that you went to your room and the
 5      time that you went to the market across the
 6      street where the Margaritaville was did you
 7      at all go back to the turtle ponds?
 8  A.  No, not that I can recall.  We had to go
 9      past them.
10  Q.  Okay.  And when you were past them, did you
11      do anything, as far as you can remember, to
12      either play with the turtles or look at them
13      or anything?
14  A.  I can't remember.  We may have looked at
15      them.
16  Q.  Okay.  But sitting here today, you don't
17      remember looking at them, sort of spending a
18      lot of time trying to play with them or
19      anything of the sort?
20  A.  No.
21  Q.  Okay.  Then you went to the Margaritaville
22      and had dinner, correct?
23  A.  Correct.
24  Q.  How many alcoholic drinks did you have?
25  A.  I had one margarita that I did not finish.
```

Page 160

```
 1  Q.  Anything else?
 2  A.  I ordered a filet mignon.
 3  Q.  Did you have anything alcoholic to drink?
 4  A.  No.
 5  Q.  Had you taken [REDACTED] at day?
 6  A.  I don't recall.
 7  Q.  It was your habit to take that medication
 8      every day, correct?
 9  A.  There's that word again, "habit."
10  Q.  Yeah, every day you took [REDACTED] as a matter
11      of course, correct?
12  A.  You used the word "habit" when it came to
13      shopping as well, and I don't consider
14      them -- this a habit.  This is something
15      that I was directed to do.  It's not a
16      habit.
17  Q.  Legal terms when we talk about "habit," it's
18      what you do every day, not the fact that
19      you're a drug addict.  I didn't mean to --
20  A.  But that's a legal term, and I'm confused
21      about a legal term.
22  Q.  All right.  It was your practice to take
23      your medications every day?
24  A.  In the morning, yes.  So if I was still
25      taking [REDACTED] at that time, which I can't
```

Page 161

```
1       recall, I would have taken it that morning.
2   Q.  If your medical records say that you were on
3       ▓▓▓▓ at that time, you wouldn't dispute
4       that, would you?
5   A.  No.
6   Q.  Okay.  What other medications were you
7       taking on that day other than ▓▓▓▓
8   A.  None.
9   Q.  Okay.  So you had one drink that you didn't
10      finish, and then did you return back to the
11      Turtle Beach Towers, or did you go to a bar
12      afterwards?
13  A.  No.  We went directly back to Turtle Beach
14      Towers.  We left Turtle Beach Towers, we
15      walked through the marketplace, we may have
16      stopped at a kiosk that sold silver jewelry
17      for two minutes and went directly back to
18      our room.
19  Q.  And when you went directly back to your
20      room, did you go to the -- go past the
21      turtle ponds again?
22  A.  I don't recall if we went past that again,
23      because there were two ways that we had
24      found to go back.  Instead of going through
25      the front, we could go around to the side
```

Page 162

```
1       because our building was towards the back of
2       the grounds.
3   Q.  It wasn't the one on the beach?
4   A.  If it was, I didn't get to see it.
5   Q.  Okay.  So then you went back -- did you make
6       it back to your room?
7   A.  Yes.
8   Q.  All right.
9   A.  From dinner?
10  Q.  Yes.
11  A.  Yes.
12  Q.  And then what happened?
13  A.  Carrie and I were going to get ready for
14      bed, and we talked about what we were going
15      to do the next morning and we had wanted to
16      do Dunn River Falls.
17  Q.  D-U-N-N?
18  A.  Yes.  So as she was getting ready, I said,
19      I'll take a walk over to the front desk to
20      get the information on what time that we
21      could get a shuttle to Dunn River or how to
22      get there, you know, the information, and
23      I'll come back with it.  And I left the
24      room --
25  Q.  Okay.  Let me stop you there.
```

Page 163

```
1   A.  Okay.
2   Q.  Up until the time at least from the time
3       that you were in your room the first time as
4       you refreshed, unpacked, went to
5       Margaritaville, went back to your room, to
6       the best of your knowledge, you were wearing
7       the same set of sandals or flip-flops?
8   A.  Correct.
9   Q.  Okay.  And during the time that you were
10      walking however distance that is, did you
11      have any difficulty with those sandals at
12      all?
13  A.  Nothing that I can remember, no.
14  Q.  Did you sense them feeling any different
15      from other flip-flops that you had worn of
16      the same sort, either A, B or C, that you
17      had worn before?
18  A.  I can't say that I sensed anything wrong.
19  Q.  All right.  Did you have any difficulty, did
20      they feel loose, did they feel strange,
21      anything of the sort?
22  A.  Not that I can recall.  I don't know.
23  Q.  Between the time that you put them on,
24      possibly in the morning before the flight or
25      possibly when you were refreshing and
```

Page 164

```
1       changing your outfit to the time that you
2       moved back to your room after
3       Margaritaville, did you take them off at all
4       to look at them?
5   A.  I don't recall examining them --
6   Q.  Okay.
7   A.  -- for any reason.
8   Q.  So there was nothing that -- other than the
9       fact that you may have liked them, there was
10      nothing that drew your attention to them or
11      caused you any concern about the sandals; is
12      that fair?
13  A.  That's fair.
14  Q.  Okay.  So what time was it, then, that you
15      would have left your room now to go to see
16      what you could do to arrange the Dunn River
17      Falls trip?
18  A.  Probably quarter of 11:00 to 11:00 p.m.
19  Q.  And it's your testimony that from the time
20      that you arrived at Turtle Beach Towers to
21      the time that you left to go to the lobby to
22      arrange for the Dunn River Falls you had
23      part of a margarita and that was it?
24  A.  Yes.
25  Q.  There was no alcohol in your room that you
```

Hofer, Stephanie Vol. 1 06/29/2006

Page 165

1 stopped, purchased at the kiosk area or the
2 marketplace area; is that correct?
3 A. Correct.
4 Q. So you would have then walked from your
5 building to the lobby --
6 A. Uh-huh.
7 Q. -- correct?
8 A. Yes.
9 Q. And how far of a distance was that; do you
10 remember?
11 A. I don't really remember, maybe a five-minute
12 walk around the grounds.
13 Q. Were you following cement trails, or was --
14 A. Yes.
15 Q. All right. So it's a sort of a sidewalk-
16 like thing that you were following?
17 A. Yes.
18 Q. So tell me what happened as you're walking
19 to the -- as you're walking to the lobby
20 area.
21     MS. MINCHOFF: Stephanie, you can
22 have -- before you answer you can have a sip
23 of your water.
24 Q. Yeah, please, I'll just keep going. You
25 just tell me when to stop, all right?

Page 166

1 A. I get really thirsty.
2 Q. Well, stop any time. Take as many drinks as
3 you like.
4     So the question was, just so that
5 we're very clear, tell me what happened, as
6 best as you can recall, from the time that
7 you left your building and walked the five
8 minutes or so to the lobby around 11:00
9 or -- 10:30 or 11:00, 11:30 p.m.
10     MS. MINCHOFF: Objection.
11     MR. FERINGA: I'm sorry?
12     MS. MINCHOFF: I don't think she
13 said it took five minutes for her to get to
14 the lobby.
15     THE WITNESS: It could have been a
16 five-minute --
17     MS. MINCHOFF: I think she said it
18 was five minutes from the marketplace to --
19     MR. FERINGA: No, that's not what
20 she said. So --
21     MS. MINCHOFF: I'll object because
22 I heard it differently, but --
23 BY MR. FERINGA:
24 Q. Just so -- it takes you about -- you said it
25 took you five minutes.

Page 167

1 A. It took about five minutes to get from Jimmy
2 Buffet's Margaritaville to the hotel room --
3 Q. Right.
4 A. -- and then from my hotel room probably five
5 minutes to get --
6 Q. To the lobby?
7 A. -- to the lobby.
8 Q. That's what I heard.
9 A. Okay.
10 Q. So tell me from that five minutes from your
11 hotel room to the lobby what you did, what
12 you remember doing. Do you remember
13 anything?
14 A. I was walking -- I do remember leaving the
15 room and going around the other side to see
16 how close we were to the beach because our
17 door was on the end of the building. So I
18 took a walk around the side, and I saw our
19 window, and I knocked on it and waved at
20 Carrie and scared her, and I didn't mean to
21 scare her. And then I walked back around
22 the building via the sidewalk over to the
23 front desk area, walked up the stairs, tried
24 to open the door. The door was locked.
25 Q. Right. Now, when you're talking about the

Page 168

1 stairs, looking at Exhibit 5, you're talking
2 about the central stairs?
3 A. Yes. I walked from somewhere over here
4 (indicating).
5 Q. What you're doing is the left side?
6 A. Yes, the left side of the main entry
7 building. I followed that sidewalk over to
8 the stair area and went up the stairs --
9 Q. Okay.
10 A. -- went to open the single glass door. That
11 was locked. At that time I turned around to
12 go down the stairs.
13 Q. And then what happened?
14 A. That's when the flip-flop broke --
15 Q. Okay.
16 A. -- sandal broke.
17 Q. So where was it when the flip-flop broke?
18 Where were you on -- were you on the stairs,
19 before the stairs?
20 A. I was at the top of the stairs getting ready
21 to take my step down, in the process of
22 taking my step down.
23 Q. Were you in the center of the stair, center
24 of the thing, right side, left side?
25 A. I can't recall. I can't recall. It wasn't

Page 169

```
1       a very large stairway to be on, you know,
2       one side or another.  It was sort of like a
3       one person type of stairway, not a very
4       large stairway at all.
5  Q.   One person?
6  A.   Wasn't very wide, is what I'm saying.
7  Q.   Okay.  So then what happened?
8  A.   I fell.
9  Q.   Well, how do you know your flip-flop broke?
10 A.   Something felt wrong, I looked down and the
11      flip-flop was broken and all within that
12      same few seconds I fell.
13 Q.   Okay.  So let's just -- let's look at
14      Exhibit A -- I mean, not Exhibit A.  This is
15      A, the flip-flop exemplars that your
16      attorney was kind enough to have messengered
17      over.  When you said you looked down -- and
18      I recognize these are not the flip-flops but
19      these are the style of the flip-flops --
20 A.   Yes.
21 Q.   -- with respect -- when you looked down,
22      what did you see?
23 A.   This (indicating).
24 Q.   "This" being?
25 A.   The center between the toes was separated
```

Page 170

```
1       from the sandal itself.
2  Q.   Okay.  Now, let me ask this question:  If
3       you look at the bottom of that sandal, and I
4       apologize for standing up, but there's a --
5       if you can show the camera, too, there's a
6       sort of a bullet, there's sort of a round
7       circular thing that I think is probably the
8       -- a portion of the strap?
9  A.   It's this (indicating), yeah.
10 Q.   Okay.  Now, when you looked down and saw
11      that your flip-flop had broken, had the
12      round circular thing pulled all the way
13      through?
14 A.   Yes.
15 Q.   So that thing that we see at the bottom of
16      the toe piece on the bottom of the heel -- I
17      mean, bottom of the sole actually pulled all
18      the way through?
19 A.   Yes.
20 Q.   And was attached to the -- it was attached
21      to -- if you can -- it was attached to the
22      toe piece that goes into the sole?  That's a
23      stupid way of saying things, wasn't it?
24 A.   I'm very confused right now.
25 Q.   So am I.
```

Page 171

```
1              Was this part (indicating) --
2  A.   Yes.
3  Q.   -- still attached --
4  A.   Yes.
5  Q.   -- to this part?
6  A.   Yes, it was.
7  Q.   So it is as if this whole unit (indicating)
8       had pulled through?
9  A.   Yes, it did.
10 Q.   Okay.  And you saw that?
11 A.   I saw that.
12 Q.   And was it on your right or left?
13 A.   It was on my right.
14 Q.   And were you in the process of making a
15      right step?
16 A.   I don't recall.
17 Q.   Okay.  And up to that point in time had you
18      caught the toe of the sandal?  Had you
19      stumbled?  Had anything happened?
20 A.   Prior to this?
21 Q.   Yes.
22 A.   No.
23 Q.   Okay.
24 A.   I don't remember stumbling.  I don't
25      remember having any problem with the sandal
```

Page 172

```
1       up until the break.
2  Q.   You know how sometimes when you wear new
3       shoes and you're not necessarily used to new
4       shoes, sometimes you stumble or --
5  A.   But they're all the same sandals, so it's
6       not like --
7  Q.   I'm not arguing with you.
8  A.   Yeah.
9  Q.   What I'm saying is, was there ever a
10      situation that you recall on Jamaica where
11      you dragged a toe or something of that
12      nature?
13 A.   No.
14 Q.   Okay.  So you said it broke.  Essentially
15      that knob pulled through the sole of the toe
16      of the flip-flop, right?
17 A.   Yes.
18 Q.   And then what happened?
19 A.   I fell.
20 Q.   And you fell how?  Where did you fall?
21      Where --
22 A.   I lost my balance --
23 Q.   Yeah.
24 A.   -- and fell to my right.  Looking at this
25      diagram, coming back down the stairs I fell
```

Page 173
1      that way (indicating).
2  Q.  Okay. So you have to hold that up so the
3      camera can see it.
4  A.  (Witness complies.)
5  Q.  So looking at the diagram, looking at it
6      would be -- you had fell to your right into
7      the turtle pond that was to your right, the
8      camera's left?
9  A.  Yes.
10  Q.  Okay. And what -- you can put that down.
11      Thank you.
12      Where -- what happened to your leg?
13      Is that a stupid question? By the way
14      you're looking, it may have been a vague
15      question. Let me ask: Where -- how was it
16      that your leg got injured, as far as you
17      know?
18  A.  As far as I know?
19  Q.  Yeah.
20  A.  I gouged my leg over on whatever material
21      was in that pond.
22  Q.  Okay. There was a -- was there a -- was the
23      edge of the pond the same height as the
24      stairs?
25  A.  No.

Page 174
1  Q.  Was there a lip? Was it higher or lower?
2  A.  It was lower.
3  Q.  Okay.
4  A.  It was --
5  Q.  So do you have a sense as to whether your
6      leg caught the edge of the pond or something
7      inside the pond?
8  A.  Something inside the pond. I was inside the
9      pond. I have -- this is the one thing that
10      is indelled (sic) in my mind.
11  Q.  And what is that?
12  A.  The fall.
13  Q.  Okay. Tell me -- describe for me, then, if
14      it's just stuck in your mind like that, tell
15      us as if you're narrating a videotape about
16      how that occurred.
17      MS. MINCHOFF: Objection.
18  A.  I went down the stairs --
19  Q.  Okay.
20  A.  -- fell into the pond.
21  Q.  Okay.
22  A.  Realizing what happened, I jumped up and I
23      was wet and was embarrassed. When I went to
24      take a step out, nothing happened. I looked
25      down, and I saw that I was bleeding. I had

Page 175
1      no idea of the extent of my injury. I
2      thought to myself that's going to need
3      stitches. I had no idea that the reason I
4      could not move my leg was because I had
5      severed every vital part of my leg except
6      for the bone.
7  Q.  Did you see there's a flap of skin and
8      tissue that starts at your shin and goes
9      down towards your foot? Was that separated
10      at that point from your leg?
11  A.  Yes.
12  Q.  So you saw it as if from a --
13  A.  It looked like a potato peeler.
14  Q.  Right. I was going to ask about that.
15      Right or left leg again, I'm sorry?
16  A.  Left.
17  Q.  From the left leg about at the -- sort of
18      the shin area below the knee you have a flap
19      of skin and tissue that had peeled down over
20      the top of your foot, correct?
21  A.  Correct.
22  Q.  And that's what you saw?
23  A.  That's what I saw.
24  Q.  Okay. And I'm sure that that was a terribly
25      frightening thing for you to see.

Page 176
1  A.  Yes.
2  Q.  Okay. Do you need...
3  A.  Thanks.
4  Q.  You don't have to ask me to do these things,
5      please.
6      Now, I'm going to ask you what you
7      perceive is probably a stupid question, and
8      it probably is, but recognizing that you had
9      this flap of tissue and skin that you saw
10      and you couldn't move your leg, might I
11      assume that you didn't pay any attention to
12      the flip-flop anymore; is that correct?
13  A.  You would be correct in that --
14  Q.  Okay.
15  A.  -- assumption.
16  Q.  And that's fine. What happened next?
17  A.  That, I don't recall.
18  Q.  Okay. When's the next time you have a
19      memory?
20  A.  I have a vague memory of being in the back
21      seat of a car, a very bumpy ride, to the
22      hospital.
23  Q.  Do you have any sense, though, as to when
24      that memory begins, close to the hospital,
25      start of the ride, anything?

Page 177

1  A.  Start of the ride. I remember somebody
2      lift -- carrying me to the car.
3  Q.  Do you know who?
4  A.  I believe it was Henry McKenzie.
5  Q.  All right. Have you talked to Henry
6      McKenzie since that night?
7  A.  No, I have not. The following day we spoke.
8  Q.  Okay.
9  A.  He stayed with us the entire time until we
10     left Jamaica, but I have not spoken to him
11     since.
12 Q.  Did you get his address or telephone number
13     or anything?
14 A.  Yes.
15 Q.  You did?
16 A.  Yes.
17 Q.  And where is that?
18 A.  That is in my records.
19 Q.  What records?
20 A.  All of my -- it should be in all of the
21     documents.
22 Q.  I don't think we've been provided with the
23     address for Henry McKenzie.
24 A.  I just saw it.
25 Q.  Did you?

Page 178

1  A.  Yeah.
2  Q.  Okay.
3  A.  I --
4  Q.  Maybe I'm wrong, but --
5  A.  I saw it in here --
6  Q.  Okay.
7  A.  -- in one of these (indicating).
8         MR. FERINGA: Is it there?
9         MR. REITH: (No verbal response.)
10 Q.  It's there. Then I'm wrong. I'm absolutely
11     wrong, and I apologize.
12         MR. REITH: For the record, I'll
13     just interject, in the disclosure it states
14     an address, I believe, but there's no phone
15     number.
16         MR. FERINGA: Okay. That's fine.
17     I apologize for that.
18     BY MR. FERINGA:
19 Q.  Have you communicated at all with him since
20     leaving Jamaica?
21 A.  No, I have not.
22 Q.  And, to the best of your knowledge, did he
23     witness your accident?
24 A.  To the best of my knowledge, I have no idea
25     if he witnessed it or not.

Page 179

1  Q.  To the best of your knowledge, did anybody
2      witness your accident?
3  A.  Not to my knowledge.
4  Q.  And one of the reasons why you claim this
5      accident occurred was because the stairs
6      were dimly lit, correct?
7  A.  The reason the accident occurred was because
8      the flip-flop broke.
9  Q.  No. You said that the -- in your complaint
10     the thing that your lawyer said was that
11     the -- Paragraph 11, "The only way to access
12     the resort lobbies" -- "resort's lobby was
13     by a series of steps. The stairway was very
14     dimly lit and did not contain guardrails."
15         Was it dimly lit or not?
16 A.  Yes.
17 Q.  So could you not see the steps?
18 A.  No. I could see the steps.
19 Q.  So the fact that it was dimly lit had
20     nothing to do with your fall now, is what
21     you're saying?
22         MS. MINCHOFF: Objection.
23 A.  That can't be said or not said. I don't --
24 Q.  Does the fact --
25 A.  It may have.

Page 180

1  Q.  Does the fact that this was dimly lit have
2      anything to do with your fall?
3  A.  I think the fact that it was dimly lit
4      jeopardized my safety.
5  Q.  How?
6  A.  By being dimly lit.
7  Q.  All right. But did you trip and fall
8      because you couldn't see the stairs?
9  A.  No.
10 Q.  Did you trip and fall because you didn't see
11     the turtle pond?
12 A.  No.
13 Q.  Okay.
14 A.  But I think it took a longer time for people
15     to find me because it was dimly lit, and,
16     you know, there are many other factors, but
17     the accident was caused by the breaking
18     flip-flop --
19 Q.  But --
20 A.  -- in a dimly lit stairway.
21 Q.  You've alleged -- you through your lawyer
22     and you have alleged that it was -- the
23     accident was caused in part because it was
24     dimly lit.
25         MS. MINCHOFF: Objection.

Page 197

1      Exhibit No. 7?
2  A.  I don't know if this is the pond. I don't
3      know --
4  Q.  Assuming that it is the pond.
5  A.  I can't assume that it is.
6  Q.  Did you -- if you look at the lip of the
7      turtle pond as evidenced by the third
8      photograph down, do you think that your leg
9      may have impacted on that, on the lip?
10 A.  I don't know.
11          MS. MINCHOFF: She's not in your
12     order, Scott.
13 Q.  This is the photograph (indicating), the
14     side photograph that shows the side view.
15 A.  I don't know.
16 Q.  When you got up, were you in the turtle
17     pond?
18 A.  Yes, and I was soaked.
19 Q.  And when -- in terms of how your body was
20     positioned in the turtle pond, how was it
21     positioned?
22 A.  I don't recall. Down.
23 Q.  Okay. Recognizing down, you'll notice that
24     it's a rectangle. Was your entire body in
25     the turtle pond?

Page 198

1  A.  Yes.
2  Q.  Do you have a sense of having any portion of
3      your body outside of the turtle pond?
4  A.  No, just when I got up and I rolled over to
5      the side.
6  Q.  All right. Now, you'll notice in the
7      photographs, particularly this photograph
8      (indicating), and this photograph is the
9      side view, and I -- there's a central slate,
10     central piece of stone and some stone sort
11     of more -- closer to the steps. Do you have
12     any sense of where your body was in
13     relationship to that?
14 A.  No, I don't.
15 Q.  When you rolled over and stood up, were you
16     standing on the --
17 A.  I did not stand up. I rolled over. I
18     couldn't stand up. I could not step out.
19 Q.  When you attempted to stand up, do you
20     remember being, any portion of your body, on
21     a raised portion of slate or stone or
22     something?
23 A.  I don't recall.
24 Q.  Do you remember trying to not be able to
25     get your -- or do you remember not having

Page 199

1      your footing?
2  A.  Yes, I remember not having my footing. I
3      fell.
4  Q.  You fell again?
5  A.  I fell.
6  Q.  I know.
7  A.  I didn't have my footing.
8  Q.  Okay. But then when you tried to stand up
9      again, could you put your feet down on
10     something solid as opposed to rock?
11 A.  I don't recall. My only concern was getting
12     out of where I was.
13 Q.  And you could not get out?
14 A.  No.
15 Q.  And --
16 A.  I rolled over to the side, and then I
17     realized the extent of my injury.
18 Q.  And you could not crawl up over that edge?
19 A.  I was --
20          MS. MINCHOFF: Objection.
21 A.  -- rolled here. If this is even it, I
22     rolled to the side, and I remember laying on
23     the side with my leg over my head screaming
24     for help.
25 Q.  When you said that you rolled over here

Page 200

1      (indicating), are you talking about the side
2      closest to the bench or the side closest to
3      the foliage?
4  A.  The side closest to the stairs.
5  Q.  Okay. Over which you claim you fell?
6  A.  Yes.
7  Q.  Was the flip-flop still on your foot?
8  A.  I don't remember.
9  Q.  How long was it that you remained in the
10     turtle pond before somebody came to you?
11 A.  I got myself out of the turtle pond before
12     somebody came.
13 Q.  And how -- where did you go? I mean, how
14     did you get yourself out?
15 A.  I rolled, picked myself up and rolled onto
16     the side.
17 Q.  So there's this side edge next to the
18     stairs. Is that where you were?
19 A.  I believe so.
20 Q.  And how long were you there?
21 A.  I don't know. Time was suspended. I don't
22     know how long I was there.
23 Q.  And --
24 A.  I was there long enough to bleed profusely
25     from my leg and almost die.

Page 205
1  A.  Yes.
2  Q.  -- telling you?
3      And what does she recall telling you,
4      subject to your counsel's hearsay objection?
5  A.  I can't speak for Carrie.
6  Q.  I know you can't speak for her, but you can
7      tell me what she said to you that would have
8      existed in her -- your memory. So tell me
9      what she's told you.
10 A.  She has told me what she saw --
11 Q.  What has she told --
12 A.  -- and what she did to get us home.
13 Q.  What did she -- what did she tell you about
14     what she saw?
15 A.  She saw that I was bleeding profusely, and
16     she got towels from somewhere, and her and
17     Henry, and there were some other people, put
18     me in Henry's car and drove me to the
19     hospital.
20 Q.  Who are the other people?
21 A.  I don't know.
22 Q.  Were they guests or employees, as far as you
23     know?
24 A.  I don't know. I don't know any -- the only
25     name I know is Henry McKenzie.

Page 206
1  Q.  In terms of the conversations that you've
2      had with Ms. LaBelle, all of which are now
3      subject to your counsel's hearsay
4      objection --
5      MS. MINCHOFF: Just so you know,
6      that's why all objections, except as to
7      form, are waived any --
8      MR. FERINGA: Or sometimes people
9      think that that's a hearsay objection, so...
10     MS. MINCHOFF: I don't typically
11     think that forms a hearsay objection.
12     MR. REITH: It's kind of a
13     catch-all.
14     THE WITNESS: I don't understand
15     that.
16     MR. FERINGA: No, we're not asking
17     you to.
18     MS. MINCHOFF: Understanding that I
19     don't include that as part of the form here
20     if there's confusion.
21 BY MR. FERINGA:
22 Q.  With respect to Carrie's discussion with
23     you, what has she told you about what she
24     saw when she first came and saw you next to
25     the turtle pond?

Page 207
1  A.  Bleeding.
2  Q.  Okay. Anything else?
3  A.  No.
4  Q.  Did she tell you that there were any other
5      people around when she was there?
6  A.  No.
7  Q.  Did she tell you how long it was from the
8      time that she first was summoned to the time
9      that you made it to the hospital?
10 A.  She could -- she couldn't estimate. It was
11     all very fast, and everything had to be done
12     very fast.
13 Q.  When she has talked to you about what
14     happened, does that help refresh your
15     memory?
16 A.  We both have tried to refresh our memories,
17     and there are a lot of things that are just
18     gone.
19 Q.  You told me that from the time that you
20     remember essentially seeing the injury and
21     bleeding that was in, I think you said
22     indelled in your mind --
23 A.  Yes, the fall and the bleeding --
24 Q.  Right.
25 A.  -- is indelled in my mind. Everything else

Page 208
1      is a blur to me.
2  Q.  And the next thing that you remember is
3      being in the --
4  A.  In the hospital.
5  Q.  I think you said --
6  A.  In the car --
7  Q.  Right.
8  A.  -- to the hospital.
9  Q.  Between those two points you have no memory,
10     that is, seeing or being in the car?
11 A.  A bumpy ride and to the hospital.
12 Q.  Okay. So sitting there, how long you
13     waited, people coming up to you, you don't
14     remember?
15 A.  I have no idea.
16 Q.  Now, in terms of what Carrie has said, has
17     she said who it was that came and summoned
18     her from the room?
19 A.  No.
20 Q.  Did she say how it was that she was even
21     identified?
22 A.  I held my key and said, "Please go get my
23     friend."
24 Q.  So you remember that?
25 A.  That, I do remember.

Page 209

1  Q. Okay. Now, who is it that you said that to?
2  A. I don't know.
3  Q. So you said the first person you remember
4     is --
5  A. Is Henry.
6  Q. Do you remember saying it to somebody other
7     than Henry?
8  A. I just kept saying it. I don't know who was
9     there. I remember Henry because --
10 Q. Henry helped you?
11 A. Yes.
12 Q. Okay. So before Henry helped you there may
13    have been other people there, you just don't
14    have a memory of them?
15 A. I don't remember.
16 Q. Okay. Other than holding up your key, do
17    you now remember anything else about the
18    time between the time that you fell and the
19    time that you were in Henry's cab?
20 A. No.
21 Q. Has Carrie LaBelle shared with you any more
22    information about what she recalls from the
23    time she was first summoned to the time that
24    you got into Henry's taxi?
25 A. She and I had talked about what the doctors

Page 210

1     said.
2  Q. Okay. But that's -- I'm not there yet.
3  A. We haven't talked -- there was nothing to
4     talk about. It was "Get me to the
5     hospital." That's it.
6  Q. Okay. Have we exhausted your memory about
7     what happened that evening to cause you to
8     fall into the turtle pond? Do you remember
9     anything else?
10 A. Exhausted my memory?
11 Q. Yeah. I want to make sure that there is
12    nothing else that you remember about what
13    happened that evening --
14 A. I told you everything I remember.
15 Q. Okay.
16 A. And I was not drunk --
17 Q. Okay.
18 A. -- or inebriated.
19 Q. Now, do you remember being at the hospital?
20 A. Vaguely.
21 Q. Do you remember having conversations with
22    the doctor who attended to you?
23 A. No.
24 Q. Was Ms. LaBelle present with you the entire
25    time?

Page 211

1  A. Not the entire time.
2  Q. Did she -- was she not in the examining
3     room --
4  A. Yes, she was.
5  Q. -- when you were being stitched up?
6  A. Yes.
7  Q. Was she there?
8  A. Yes.
9  Q. When was she not there?
10 A. When Henry took her to the hotel to get our
11    things so that we could go home.
12 Q. So you stayed in the hospital the entire
13    night?
14 A. Yes.
15 Q. Do you remember receiving any blood
16    transfusions?
17 A. No. We refused any blood transfusions and
18    surgery. They wanted to do both, according
19    to Carrie.
20 Q. Did you receive -- do you remember that?
21 A. According to Carrie.
22 Q. I know. And my question is --
23 A. I do not remember.
24 Q. Do you remember receiving any intravenous
25    fluids?

Page 212

1  A. Yes.
2  Q. Was there one doctor who saw you or more
3     than one?
4  A. I don't recall.
5  Q. Do you have a memory of one doctor or more
6     than one?
7  A. I have a memory of a lot of people in the
8     hospital. I don't know who was doctors and
9     who wasn't.
10 Q. What do you remember the doc -- you saying
11    to the doctor and the doctor saying to you
12    who talked to you about the extent of your
13    injury?
14 A. I don't recall saying anything. I don't
15    remember the conversation at all.
16 Q. Do you remember signing any documents in the
17    hospital?
18 A. I know I had to sign myself out.
19 Q. Did they advise you to stay?
20 A. We discussed that I was going home, so they
21    were stabilizing me so that I could go home.
22 Q. When you said, "I know I had to sign myself
23    out," did you sign yourself out against
24    medical advice?
25 A. I don't know.