EXHIBIT 6

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2             FOR THE DISTRICT OF MASSACHUSETTS
 3                  C.A. No. 05-40170 FDS
 4    * * * * * * * * * * * * * *
 5    STEPHANIE HOFER and DOUGLAS HOFER,      *
 6            Plaintiffs                      *
 7    v.                                      *
 8    THE GAP, INC., EXPEDIA, INC. and        *
 9    TURTLE BEACH TOWERS,                    *
10            Defendants                      *
11    * * * * * * * * * * * * * *
12                      VOLUME I
13                    PAGES 1-210
14
15         VIDEOTAPED DEPOSITION OF CARRIE L.
16    LaROCHE, a witness called on behalf of the
17    Defendant Expedia, Inc., pursuant to the
18    Federal Rules of Civil Procedure, before
19    Jessica L. Williamson, Registered Merit
20    Reporter, Certified Realtime Reporter and
21    Notary Public in and for the Commonwealth of
22    Massachusetts, at the Offices of Morrison,
23    Mahoney, LLP, 250 Summer Street, Boston,
24    Massachusetts, on Thursday, July 27, 2006,
25    commencing at 9:46 a.m.
```

Page 2

```
 1                  A P P E A R A N C E S
 2
 3    LAW OFFICES OF RUSSO & MINCHOFF
 4       (By India Minchoff, Esq.)
 5       123 Boston Street
 6       First floor
 7       Boston, Massachusetts  02125
 8       (617) 740-7240
 9       india@russominchofflaw.com
10       Counsel for the Plaintiffs
11
12    SULLIVAN, WARD, ASHER & PATTON, P.C.
13       (By Scott D. Feringa, Esq.)
14       1000 Maccabees Center
15       25800 Northwestern Highway
16       Southfield, Michigan  48075-1000
17       (248) 746-2727
18       sferinga@swappc.com
19       Counsel for the Defendant The Gap, Inc.
```

Page 3

```
 1         A P P E A R A N C E S, Continued
 2
 3    BURNS & LEVINSON, LLP
 4       (By Thomas T. Reith, Esq.)
 5       125 Summer Street
 6       Boston, Massachusetts  02110
 7       (617) 345-3258
 8       treith@burnslev.com
 9       Counsel for the Defendant Expedia, Inc.
10
11    ALSO PRESENT:
12
13       Shawn Budd, Videographer
```

Page 4

```
 1                       I N D E X
 2    DEPONENT                                  PAGE
 3    CARRIE L. LaROCHE
 4    Examination By Mr. Reith              7, 206
 5    Examination By Mr. Feringa               161
 6
 7                    E X H I B I T S
 8    NO.                                       PAGE
 9    1   Drawing                                 36
10    2   Copies of photographs, 5 pages          40
11    3   Amended Notice of Videotaped            76
        Deposition Duces Tecum
12      Directed to Plaintiffs
13    4   Multipage document headed              107
        "Exhibit B1"
14
15    5   Expedia.com sample trip pages          113
16    6   Document headed "Expedia, Inc.         133
        Web Site Terms, Conditions,
        and Notices"
17
18    7   Sunrays Co., Ltd. receipt              172
        dated 19-03-04
19
20    8   Expedia, Inc. document headed          174
        "Turtle Beach Towers
        Reservation information"
21
22    Note:  Original Exhibits 1 - 8 were retained
           by the court reporter and forwarded on to
23         Bienenstock Court Reporting for
           distribution.
```

Page 5

1  PROCEEDINGS
2  THE VIDEOGRAPHER: Okay. We are on
3  the record. This is the video operator
4  speaking, Shawn Budd. Today's date is July
5  27th, 2006, and the time is 9:46. We are
6  here at the offices of Morrison Mahoney
7  located in Boston, Massachusetts, to take
8  the videotaped deposition of Carrie LaBelle
9  in the matter of Stephanie Hofer vs. -- and
10 Douglas Hofer vs. The Gap, Inc., et al.
11    Would counsel please introduce
12 themselves.
13    MS. MINCHOFF: Attorney India
14 Minchoff for the plaintiffs.
15    MR. FERINGA: Scott Feringa for
16 Gap.
17    MR. REITH: Thomas Reith, Burns &
18 Levinson for Expedia, Inc.
19    THE VIDEOGRAPHER: And would the
20 court reporter please swear in the witness.

Page 6

1  CARRIE L. LaROCHE,
2  a witness called on behalf of the Defendant
3  Expedia, Inc., having first been duly sworn,
4  was deposed and testifies as follows:
5
6  * * * * *
7
8    MR. REITH: For the record, this is
9  Attorney Reith. The parties have agreed to
10 the usual stipulations, that being that the
11 parties will reserve all objections, except
12 as to form, but including motions to strike,
13 until the time of trial. The witness will
14 have 30 days to read and sign the deposition
15 transcript, and the parties will waive
16 notary on that?
17    MS. MINCHOFF: I'm fine with that.
18 I don't know if the witness knows what that
19 means.
20    MR. REITH: I'll explain it to her
21 in a second.
22    MR. FERINGA: I agree to the
23 stipulations.

Page 7

1  DIRECT EXAMINATION
2
3  BY MR. REITH:
4  Q. First let me introduce myself. My name is
5     Thomas Reith. I represent Expedia, Inc.
6     Today I'm going to be asking you some
7     questions. If I ask a question that you
8     don't understand, you can't hear me, please
9     let me know, and I'll do my best to either
10    rephrase or to speak up, all right?
11 A. Okay.
12 Q. You've already caught on to one of the rules
13    in today's deposition is please answer with
14    a verbal response, and I appreciate that you
15    did. If you have any questions for me about
16    the process or what have you as we go
17    through this today, please let me know, and
18    I'll try to answer the question to the best
19    of my ability, all right?
20 A. Okay.
21 Q. You just heard me read into the record
22    various stipulations that the parties agreed
23    to. The only stipulation that you need to
24    concern yourself with is the reading and
25    signing of the transcript. After we finish

Page 8

1     the deposition today a transcript will be
2     put together and will be, in essence, the
3     questioning and testimony of you today.
4     You will receive it in the mail.
5     You'll then have 30 days to read it, go
6     through it. If there's anything that you
7     find is not as you recall it, you'll be
8     given a chance to make a change on what's
9     called an errata sheet. It will be in the
10    back of the packet usually. Just take that,
11    fill it out. If there are no changes to be
12    made, just sign it and send it back to me,
13    okay?
14 A. Okay.
15 Q. Thank you. First, please state your name
16    for the record.
17 A. My married name now or as it is on all the
18    other paperwork?
19 Q. All right. Well, let's first try your
20    married name.
21 A. My married name is Carrie LaRoche.
22 Q. And when were you married?
23 A. July 8th.
24 Q. Congratulations.
25 A. Thank you.

Page 9

1  Q. Now, what was your name -- last name prior
2     to July?
3  A. Previously Carrie LaBelle.
4  Q. Okay. How do you spell LaBelle, please?
5  A. L-A capital B-E-L-L-E.
6  Q. Okay. Have you ever had the last name
7     LaBlanc?
8  A. Never.
9  Q. Are you hear today with counsel, Ms.
10    LaRoche?
11 A. No.
12 Q. Does Minchoff represent you?
13 A. No.
14 Q. Prior to today have you spoken with Ms.
15    Minchoff?
16 A. Yes.
17 Q. Okay. When was the last time that you spoke
18    with her?
19 A. Last night.
20 Q. Okay. And what did you talk about?
21 A. I called her to find out what exactly a
22    deposition was.
23 Q. Okay. And what did she tell you?
24 A. She told me that the lawyers would ask me a
25    series of questions related to the trip to

Page 10

1     Jamaica.
2  Q. Is that all she said?
3  A. We talked a little bit about my wedding and
4     honeymoon.
5  Q. Okay. Aside from the wedding and honeymoon,
6     any discussion about the procedure of
7     depositions, was there anything else that
8     you talked about?
9  A. No.
10 Q. Did you discuss the substance of Ms. Hofer,
11    who is here today, her deposition testimony?
12 A. I don't think I understand what you're
13    asking.
14 Q. When you were talking with Ms. Minchoff last
15    night, did you talk at all about what Ms.
16    Hofer testified to during her deposition?
17 A. No.
18 Q. Prior to last night, when was the -- prior
19    to last night, were there any other
20    instances where you spoke with Ms. Minchoff?
21 A. Once.
22 Q. Okay. When was that?
23 A. I don't recall the exact date.
24 Q. Okay. Can we talk about a year? When was
25    the year?

Page 11

1  A. This year.
2  Q. Okay. Was it in the winter of this year?
3  A. No. There hasn't been a winter of this year
4     yet, really.
5  Q. Would you include January and February in
6     that?
7  A. I don't believe so.
8  Q. Okay. Was it in the spring?
9  A. Yes.
10 Q. Okay. And what did you discuss with Ms.
11    Minchoff during that conversation?
12 A. Possible dates for the deposition.
13 Q. Okay. And, again, did you talk about
14    anything substantively about the case during
15    that discussion?
16 A. No.
17 Q. Aside from Ms. Minchoff, have you spoken
18    with any other attorney about this matter?
19 A. No.
20 Q. Do you recognize the name Stephen Kuzma?
21 A. No.
22 Q. Okay. Aside from attorneys, was there
23    anybody else from Ms. Minchoff's office that
24    you spoke with prior to today?
25 A. Maja.

Page 12

1  Q. Who is Maja?
2  A. Her secretary.
3  Q. Okay. And what did you talk to Maja about?
4  A. Deposition dates.
5  Q. Is that it?
6  A. Yes.
7  Q. And when you first spoke with Ms. Minchoff
8     about deposition dates, who initiated that
9     call?
10 A. She did.
11 Q. When were you born?
12    ████████████
13 Q. Of what year?
14 A. 1976.
15 Q. Can you just tell me a little bit about your
16    education, beginning with high school to
17    present, please.
18 A. I went to Killingly High School.
19 Q. I'm sorry, Killingly?
20 A. Killingly High School.
21 Q. Do you mind giving us a spelling for the
22    record?
23 A. K-I-L-L-I-N-G-L-Y.
24 Q. And where is that?
25 A. That would be in Danielson, Connecticut.

Page 97

1  same as the credit card ones.
2 Q. Aside from being specifically the same, did
3    they have sections that say, "These terms
4    and conditions govern our specific website"?
5    Have you ever seen that other than the bank
6    website?
7 A. Yes.
8 Q. Okay. How many trips have you booked
9    on-line?
10 A. I am not sure off the top of my head.
11 Q. Okay. More than five?
12 A. It might be right around five. I'm not sure
13    of a specific number.
14 Q. And what websites did you use when you
15    booked those trips?
16 A. Various websites.
17 Q. Which various websites?
18 A. Different airline ones, Expedia, a couple of
19    other ones that I'm not sure of the names
20    that people have told me to try.
21 Q. Have you ever been on Orbitz?
22 A. Yes.
23 Q. Have you ever been on Travelocity?
24 A. Yes.
25 Q. Ever been on Hotels.com?

Page 98

1 A. No.
2 Q. And where did you book those five trips to?
3    MS. MINCHOFF: Objection.
4 A. Off the top of my head, I'm not sure of
5    specifically all of them. I booked my
6    honeymoon.
7 Q. To where?
8 A. To Sedona, Arizona.
9 Q. It's nice there.
10    Any others that you can remember?
11 A. I booked the trip with Stephanie and I down
12    to Jamaica. I know I've booked a cruise
13    on-line before. There might be other ones.
14    I'm not sure.
15 Q. All right. And when you booked those trips
16    on-line using those websites that you talked
17    about, did you ever come across a section of
18    the websites that said you needed to review
19    certain terms and conditions of that
20    website?
21 A. I'm not positive.
22 Q. Okay. You have at least encountered it in
23    connection with the bank that we talked
24    about earlier?
25 A. Yes.

Page 99

1 Q. And when you encountered it in connection
2    with the bank, what was the language like?
3    What were the terms and conditions like?
4    MS. MINCHOFF: Objection.
5 A. Are you asking for, like, what they stated
6    throughout the whole thing?
7 Q. Yeah. What do they state?
8 A. I am not exactly sure.
9 Q. Okay. Were you required to review on the
10    bank's website those documents before you
11    proceeded using the bank's website?
12 A. Yes.
13 Q. And did you read the terms and conditions on
14    that bank website?
15 A. I skimmed them.
16 Q. Okay. But you continued to use the website
17    after you skimmed them?
18 A. Yes.
19 Q. Who booked the trip to Jamaica?
20 A. I did.
21 Q. Who was present when you booked the trip?
22 A. Nobody.
23 Q. Where did you book the trip from?
24 A. My house.
25 Q. This was in Danielson, Connecticut?

Page 100

1 A. Yes.
2 Q. Before you booked the trip, did you and
3    Stephanie discuss going on vacation?
4 A. Yes.
5 Q. And did you discuss possible locations for
6    the vacation?
7 A. I'm not positive off the top of my head.
8    I'm assuming we would have.
9 Q. Why do you assume that?
10 A. Because I wouldn't just book a trip and say,
11    "You're going here." I would ask for input.
12 Q. Okay. Do you recall asking her for input?
13 A. Not specifically, but I would assume I
14    wouldn't just call up my friend and say,
15    "Hey, we're going here."
16 Q. Do you recall Stephanie offering any input
17    on where you should go for vacation?
18 A. I don't remember.
19 Q. Do you remember what day of the week it was
20    that you flew down to Jamaica?
21 A. It was a Thursday.
22 Q. How soon did you and Stephanie begin talking
23    about going on vacation prior to that?
24 A. Monday night.
25 Q. Okay. Do you recall any other specific

REDACTED

Page 101

```
 1       destinations, you know, locations that you
 2       would consider going?
 3              MS. MINCHOFF: Objection.
 4   A.  I don't remember.
 5   Q.  Well, who chose to go to Jamaica?
 6   A.  I'm not sure whose decision it actually was
 7       at this point.
 8   Q.  Did anyone recommend to either of you that
 9       you should go to Jamaica?
10   A.  I don't remember.
11   Q.  Well, did anybody say to you specifically,
12       "You should go to Jamaica for a vacation"?
13   A.  I don't remember that far back.
14   Q.  Okay. Well, did anyone from Expedia.com
15       refer Jamaica to you as a vacation location?
16   A.  Do you mean a specific person?
17   Q.  Yes.
18   A.  I didn't talk to a specific person, no.
19   Q.  Okay. Did Stephanie give you her permission
20       to book the trip for her?
21   A.  Yes.
22   Q.  What did she say to let you know that you
23       could book the trip for her?
24   A.  I believe I called her and said, "How does
25       this sound?" And she said, "Go for it."
```

Page 102

```
 1   Q.  Okay. So before you actually booked the
 2       trip you gave a call to Stephanie to talk
 3       about the actual booking?
 4   A.  Yes.
 5   Q.  Okay. Do you recall what you said to her?
 6   A.  Not specifically. I'm assuming I would have
 7       told her where we would be staying, the
 8       price, when we would leave, those kinds of
 9       things.
10   Q.  Okay. Do you remember generally talking to
11       her about it being in Jamaica?
12   A.  Yeah.
13   Q.  Do you remember talking to her generally
14       about it being Ocho Rios?
15   A.  We weren't in Ocho Rios.
16   Q.  Where were you?
17   A.  I know it wasn't Ocho Rios.
18   Q.  So when you traveled down to Jamaica, the
19       resort you stayed at was not in Ocho Rios?
20   A.  I'm not positive at this point.
21   Q.  Do you recognize the name Ocho Rios?
22   A.  Yes.
23   Q.  What do you recognize it from?
24   A.  I don't know.
25   Q.  When you were in the planning process of the
```

Page 103

```
 1       vacation, did you -- how did you search for
 2       possible destinations?
 3   A.  I don't recall at this point.
 4   Q.  Okay. Do you remember doing a Google search
 5       in general?
 6   A.  I was on Expedia, and I did a search through
 7       Expedia.
 8   Q.  Okay. And when you did the search for
 9       Expedia, how did you access the Internet, as
10       a new customer or as a previous customer?
11   A.  I'm not positive.
12   Q.  Had you booked a trip on Expedia.com prior
13       to the Jamaica trip?
14   A.  I believe I did.
15   Q.  Do you recall where it was to?
16   A.  I believe it was a cruise.
17          (Pause.)
18   Q.  Do you recognize the account name
19       ███████████?
20   A.  I'm not sure off the top of my head. It
21       might be one of my business credit cards.
22       I'm not sure.
23   Q.  Okay. Do you know if you used the name
24       ███████ to sign onto Expedia.com when you
25       booked the trip for Jamaica?
```

Page 104

```
 1   A.  I don't remember.
 2   Q.  At any point did you ever have a user name
 3       and password to book trips on Expedia.com?
 4   A.  Yes.
 5   Q.  Okay. When?
 6   A.  When did I have a password?
 7   Q.  Yes.
 8   A.  I'm assuming I still have one now.
 9   Q.  Okay. What is that password?
10   A.  I have no idea.
11   Q.  When was the last time you booked a trip via
12       Expedia.com?
13   A.  The Jamaica one.
14   Q.  Who chose Turtle Beach Towers to stay at?
15   A.  I did.
16   Q.  Why?
17   A.  Because the pictures looked nice on the
18       Internet.
19   Q.  Aside from the pictures looking nice, did
20       you do any review of other persons' comments
21       who had stayed there in the past?
22              MS. MINCHOFF: Objection.
23   A.  I believe on the website there was like a
24       star kind of rating, if I remember right.
25   Q.  Was there a section in the star rating that
```

REDACTED

Page 105

1      said "Review" -- "Customer Reviews"?
2   A. There may have been. I don't remember at
3      this time.
4   Q. Do you have any specific recollection that
5      you did any sort of these -- reviewed any of
6      these reviews?
7           MS. MINCHOFF: Objection.
8   A. I am not positive. I would have assumed
9      that I would have tried to find out
10     information about the place to make sure
11     that it was a safe and decent place to go
12     to.
13  Q. And you wouldn't have gone to a place that
14     you thought was not safe or decent, correct?
15  A. Not to my knowledge, no.
16  Q. Again, during the planning process and right
17     before you booked the trip, did you talk to
18     Stephanie about how you were going to book
19     the trip, whether it be on-line or via a
20     conventional travel agent?
21  A. I don't remember if we discussed that.
22  Q. Now, you said you had Stephanie's permission
23     to book the trip for her, correct?
24  A. Yes.
25  Q. Did Stephanie give you permission to book

Page 106

1      the trip via Expedia.com?
2   A. I don't know if she specifically said, "I
3      give you permission to book it through
4      Expedia."
5   Q. Well, you understood that you had her
6      permission to book the trip for her,
7      however?
8   A. To the best of my knowledge, yes.
9   Q. And you used Expedia.com to book the trip?
10  A. I did use Expedia.com, yes.
11  Q. How did you get to Expedia.com? Did you
12     type it into your cursor?
13  A. I don't remember at this point.
14  Q. Okay. So you don't recall if you were
15     hyperlinked from some other website?
16  A. I'm not sure.
17  Q. Prior to booking the trip on Expedia.com,
18     did you search any other websites for travel
19     packages to Jamaica?
20  A. I may have. I'm not sure.
21  Q. Okay. Prior to booking the trip via
22     Expedia.com, did you do any other research,
23     if you would, on Turtle Beach Towers via any
24     other websites?
25  A. I don't remember.

Page 107

1   Q. Can you say for certain that you did not?
2           MS. MINCHOFF: Objection.
3   A. I don't remember.
4   Q. When you called Ms. Hofer about booking the
5      trip, did you tell her that you were going
6      to book it via Expedia.com?
7   A. I'm not sure if I mentioned it or not.
8   Q. At some point did you tell Ms. Hofer that
9      you booked the trip via Expedia.com?
10  A. At some point I'm sure I did.
11  Q. Do you know when it was?
12  A. I have no idea.
13  Q. Do you know if you told her over the
14     telephone or by some other method?
15  A. I don't know. I don't remember.
16          MR. REITH: Just please mark that
17     as the next exhibit.
18          (Exhibit No. 4, Multipage document
19     headed "Exhibit B1," marked for
20     identification.)
21  Q. I'm just going to walk you through these.
22     I'm not going to ask you to review the whole
23     packet right now. We'll go one by one.
24  A. Okay.
25  Q. So that way we'll try to expedite this as

Page 108

1      much as possible, okay?
2   A. Uh-huh.
3   Q. I will represent to you and counsel at the
4      table this is B1 from plaintiffs'
5      supplemental document disclosures. I just
6      extracted it from the overall production.
7           MS. MINCHOFF: B1, B2, B3?
8           MR. REITH: Yes, yes, and
9      following. It was just pursuant to the
10     second supplemental production --
11          MS. MINCHOFF: All right.
12          MR. REITH: -- okay?
13  BY MR. REITH:
14  Q. Just directing your attention to the next --
15     the first page after B1, do you see at the
16     top there where it says "From," "To"?
17  A. Uh-huh.
18  Q. Okay. Do you recognize that address,
19     ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
20  A. Yeah.
21  Q. Okay. Do you recognize this document?
22  A. It looks like it was our travel summary.
23  Q. Okay. Is this the travel summary or
24     itinerary that you provided to Stephanie?
25  A. I'm not sure at this point. I don't recall

Page 149

1 A. I don't remember if we did or not.
2 Q. Okay. And what did Stephanie eat?
3 A. I'm not sure.
4 Q. What did Stephanie drink?
5 A. She had a margarita.
6 Q. And after dinner, what did you do next?
7 A. When we left the restaurant, we stopped at
8    one or two of the kiosks and went back to
9    the room.
10 Q. By "kiosks," you mean a shopping center of
11    some sort?
12 A. Yeah.
13 Q. Like a booth or something?
14 A. There was like booths kind of almost
15    attached to the restaurant.
16 Q. Okay. So this is in Jimmy's Margaritaville?
17 A. Yes.
18 Q. Do you recall what those kiosks were?
19 A. The names of them?
20 Q. Yeah, or what they sold.
21 A. All different kinds of souvenirs and things
22    like that, suntan lotion and whatnot.
23 Q. Did you buy anything?
24 A. I bought suntan lotion.
25 Q. And after you went to the kiosks, what did

Page 150

1    you do next?
2 A. We left the kiosks and went back to the
3    room.
4 Q. Did you walk directly to the room?
5 A. Yes.
6 Q. Did you have to walk past the lobby to get
7    to your room?
8 A. I believe we walked through the parking lot
9    in front of the lobby.
10 Q. Did you stop by the turtle pond at all on
11    your way back to your room?
12 A. No.
13 Q. After you got back to your room, what did
14    you do then, you personally?
15 A. I got changed into my pajamas.
16 Q. Okay. And what did Stephanie do when you
17    got back to your room?
18 A. Stephanie -- while I was changing into my
19    pajamas Stephanie said she was going to go
20    outside and have a cigarette.
21 Q. And did she leave the room?
22 A. Yes.
23 Q. Do you know what time she left the room to
24    have her cigarette?
25 A. I'm not sure of an exact time. I would

Page 151

1    probably say somewhere around 11:00.
2 Q. Okay. Was it before the 11:00 news started
3    that you talked about before?
4 A. No. The news was on when she left.
5 Q. How long had the news been on before she
6    left?
7 A. I don't know.
8 Q. And when did she come back from having her
9    cigarette?
10 A. Come back in the room or --
11 Q. Yes, come back in the room.
12 A. She didn't come back in the room.
13 Q. Well, what happened next after she left the
14    room to have her cigarette?
15 A. She left the room, and a couple minutes
16    later she tapped on the outside window of
17    our room and scared the daylights out of me.
18 Q. Okay. I assume you had some choice words
19    for her --
20 A. Yes.
21 Q. -- but we won't get into that.
22    What happened after she banged on the
23    window?
24 A. When she banged on the window, I opened it
25    up and told her that she scared the living

Page 152

1    daylights out of me, not quite in those
2    terms, but -- and she was like "I'm sorry,"
3    you know, just kind of -- you know, we kind
4    of laughed it off, and she said that she was
5    going to go to the front desk and grab some
6    brochures for us.
7 Q. Okay. And what type of brochures did she
8    say she was going to get?
9 A. I believe we were looking to go to Dunn
10    River Falls which is out there.
11 Q. What's Dunn River Falls?
12 A. I'm not quite sure exactly. Steph had heard
13    about it, I believe. I don't know much
14    about it myself.
15 Q. After you had the discussion about getting
16    things for the next day, what happened next?
17 A. I shut the window and I went and laid down
18    in bed.
19 Q. After you were laying in bed, is that when
20    you received the call from someone from the
21    hotel about Stephanie's accident?
22 A. I'm sorry, what?
23 Q. I'll ask it this way: How soon after you
24    were laying in bed did you receive the call
25    from the front desk about Stephanie's

Page 161

1   MR. FERINGA: I don't know.
2   MS. MINCHOFF: Okay. Go ahead.
3
4   CROSS EXAMINATION
5
6   BY MR. FERINGA:
7   Q.  Hi. We were introduced off the record. My
8       name is Scott Feringa. I represent The Gap.
9       I'm going to follow up on some questions
10      that Mr. Reith has asked, and if I am in any
11      way unclear, please let me know. I'll be
12      more than happy to rephrase the question,
13      all right?
14  A.  Okay.
15  Q.  In 2004 how would you characterize your
16      relationship with Mrs. Hofer?
17          MS. MINCHOFF: Objection.
18  A.  What do you mean, how would I characterize
19      it?
20  Q.  How would you characterize it? Were you
21      acquaintances? Were you friends? Were you
22      close friends? Were you best friends?
23          MS. MINCHOFF: Objection.
24  A.  What do you consider the difference between
25      close friends, best friends?

Page 162

1   Q.  Do you have best friends, people that you
2       consider your closest friends?
3   A.  To me closest friends and best friends is
4       one and the same.
5   Q.  Okay. That's fine. Whether you use close
6       friends or best friends, do you consider --
7       did you in 2004 consider Mrs. Hofer to be
8       one of your closest or best friends?
9   A.  Yes.
10  Q.  And does that continue today?
11  A.  Yes.
12  Q.  In that light, how often in 2004 would you
13      guys see each other?
14  A.  Back in 2004?
15  Q.  Yeah.
16  A.  I'm not sure exactly.
17  Q.  You know, once a week, twice a week? Did
18      you talk on the phone once a day, once a
19      week, something like that?
20  A.  I can't remember --
21          MS. MINCHOFF: Objection.
22  A.  -- back in 2004.
23  Q.  What about --
24  A.  Sorry.
25  Q.  That's fine. What about presently?

Page 163

1   A.  Presently if -- we see each other once every
2       couple of weeks.
3   Q.  What about do you talk on the telephone
4       between that period of time?
5   A.  Sometimes, not all the time.
6   Q.  Do you e-mail or instant message?
7   A.  No, not really. We forward the occasional
8       joke, but we don't, like, have conversations
9       through e-mail.
10  Q.  Was Mrs. Hofer invited -- Mr. and Mrs. Hofer
11      invited to your wedding?
12  A.  Yes.
13  Q.  Mr. Hofer in his deposition testified that
14      there was no reimbursement for the trip from
15      the Hofers to you.
16          MS. MINCHOFF: Objection.
17  Q.  Do you -- is that correct?
18          MS. MINCHOFF: Objection.
19  A.  I have no idea what he said.
20  Q.  I would like you to assume that that is what
21      his testimony was. Assuming that that was
22      his testimony, would that be correct
23      testimony?
24          MS. MINCHOFF: Objection.
25  A.  Assuming that he said that there was no

Page 164

1       money paid to me?
2   Q.  Correct.
3   A.  Is that what you're saying?
4   Q.  Correct.
5   A.  Then that would be incorrect.
6   Q.  All right. This was not an understanding on
7       your part that you would be paying for the
8       trip to take your friend to Jamaica,
9       correct?
10  A.  Say that one more time.
11  Q.  Sure. This was not a trip in which you had
12      agreed to pay for your trip for your friend
13      to accompany you on the trip to Jamaica,
14      correct?
15  A.  Correct.
16  Q.  The understanding was that Mrs. Hofer was
17      going to reimburse you for the -- half of
18      the trip, essentially her portion of the
19      trip, correct?
20  A.  Correct.
21  Q.  And I believe you testified that the
22      reimbursement was both in cash and in the
23      form of a check?
24  A.  Yes.
25  Q.  And was that reimbursement received by you