EXHIBIT 7

# HOFER, ET AL v. THE GAP, INC., ET AL

## DENROY SCARLETT

August 21, 2006

*Prepared for you by*



**BIENENSTOCK**
COURT REPORTING & VIDEO

Bingham Farms | Ann Arbor | Detroit | Flint | Grand Rapids | Jackson | Lansing | Mt. Clemens

PHONE: 248.644.8888   FAX: 248.644.1120

www.bienenstock.com

DENROY SCARLETT
August 21, 2006

## Page 1

```
 1    IN THE DISTRICT COURT OF THE UNITED STATES
 2         FOR THE DISTRICT OF MASSACHUSETTS
 3
 4   STEPHANIE HOFER and DOUGLAS HOFER,
 5          Plaintiffs,
 6   vs.                    Case No. 05-40170
 7   THE GAP, INC., EXPEDIA, INC.,
 8   and TURTLE BEACH TOWERS,
 9          Defendants.
10   _____
11
12
13        The Videotaped Deposition of DENROY SCARLETT,
14        Taken at Turtle Beach Towers, Main Street,
15        Ocho Rios, St. Ann, Jamaica, W.I.,
16        Commencing at 11:46 a.m.,
17        Monday, August 21, 2006,
18        Before Rebecca J. Callow, CSR-5228, RPR.
```

## Page 2

```
 1   APPEARANCES:
 2
 3   STEPHEN J. KUZMA
 4   Stephen Kuzma Law Office
 5   75 Federal Street
 6   Suite 17
 7   Boston, Massachusetts 02110
 8   (617) 338-3020
 9        Appearing on behalf of the Plaintiffs.
10
11   INDIA L. MINCHOFF
12   Russo & Minchoff
13   123 Boston Street
14   Boston, Massachusetts 02125
15   (617) 740-7340
16        Appearing on behalf of the Plaintiffs.
17
18   SCOTT D. FERINGA
19   Sullivan, Ward, Asher & Patton, P.C.
20   25800 Northwestern Highway
21   Suite 1000
22   Southfield, Michigan 48037
23   (248) 746-0700
24        Appearing on behalf of the Gap, Inc.
25
```

## Page 3

```
 1   THOMAS T. REITH
 2   Burns & Levinson, L.L.P.
 3   125 Summer Street
 4   Boston, Massachusetts 02110
 5   (617) 345-3000
 6        Appearing on behalf of Expedia, Inc.
 7
 8   ALSO PRESENT:
 9   Lynsey Williams - Video Technician
```

## Page 4

```
 1   Ocho Rios, St. Ann, Jamaica, W.I.,
 2   Monday, August 21, 2006
 3   11:46 a.m.
 4
 5        VIDEO TECHNICIAN: We are now on the record.
 6   This is the videotape deposition of Denroy Scarlett
 7   being taken on Monday, August 21st, 2006. The time is
 8   now 11:46 and 40 seconds a.m. We are located at the
 9   Turtle Beach Towers in Ocho Rios, Jamaica. This
10   deposition is being taken on behalf of the defendants
11   in the matter of Stephanie Hofer and Douglas Hofer
12   versus The Gap, Incorporated; Expedia, Incorporated;
13   and Turtle Beach Towers. This is case number 05-40170
14   FDS. This matter is being held in the United States
15   District Court for the District of Massachusetts.
16        My name is Lynsey Williams, video
17   technician. Will the court reporter swear in the
18   witness and the attorneys briefly identify themselves
19   for the record, please.
20        DENROY SCARLETT,
21   was thereupon called as a witness herein, and after
22   having first been duly sworn to testify to the truth,
23   the whole truth and nothing but the truth, was
24   examined and testified as follows:
25        MR. FERINGA: I'm Scott Feringa. I
```

Page 5

1  represent Gap.
2       MR. REITH: Thomas Reith. I represent
3  Expedia, Inc.
4       MS. MINCHOFF: India Minchoff, for the
5  plaintiff, Stephanie Hofer and Douglas Hofer.
6       MR. KUZMA: Good morning, sir. My name is
7  Stephen Kuzma. I represent Stephanie Hofer.
8  A. Good morning.
9       MR. KUZMA: And note my -- again, the
10  objection -- the continuing objection to the authority
11  granted or not granted for the deposition to go
12  forward today.
13              EXAMINATION
14  BY MR. FERINGA:
15  Q. Can you give me your full name, please?
16  A. Denroy Scarlett.
17  Q. Mr. Scarlett, we introduced before. My name is Scott
18     Feringa. I represent Gap. I'm going to be asking you
19     some questions today. This is an artificial way of
20     talking, and thus I would ask that before you answer
21     you wait until any one of the lawyers is finished
22     asking the question, then you can answer the question.
23     We'll wait until after you're finished. We do that
24     because our court reporter needs to get everything
25     down accurately that is said, and if we talk over each

Page 6

1     other, it's very difficult.
2          Additionally, sir, while we all understand
3     nods of the head or "um-hmm"s or something like that,
4     we would ask that your responses be all verbal,
5     whatever they are.
6  A. Okay.
7  Q. It has to be verbal.
8  A. Okay.
9  Q. Okay. Finally, if you have any -- if you don't
10    understand my question, if I'm unclear or if you're
11    unclear with any of lawyers' questions, please tell
12    them, I'm sure they'd be more than happy to rephrase
13    questions for you. Is that fair, sir?
14 A. Okay. No problem.
15 Q. Okay. Mr. Scarlett, we are here today at a place
16    called Turtle Beach Towers on Main Street in Ocho Rios
17    Jamaica. Is that correct?
18 A. Yes, sir.
19 Q. And are you a citizen of Jamaica?
20 A. Yes, sir, I'm a citizen.
21 Q. How old are you, sir?
22 A. 24.
23 Q. Are you presently employed at Turtle Beach Towers?
24 A. Yes, sir, I'm presently employed here.
25 Q. And what is your position at Turtle Beach Towers, sir?

Page 7

1  A. Night auditor/reception.
2  Q. And in March of 2004, were you also so employed?
3  A. Yes, sir.
4  Q. How long have you been employed at Turtle Beach
5     Towers?
6  A. It's going forward to five years now.
7  Q. So does that mean that you would have been employed in
8     either 2001, 2002?
9  A. Yes, sir.
10 Q. And has it always been as the night auditor or
11    receptionist?
12 A. From ever since I've been here.
13 Q. And on March 18, 2004, do you know whether you were
14    presently working at Turtle Beach Towers?
15 A. Yes, I was here, sir.
16 Q. How many days a week do you work?
17 A. Five days per week.
18 Q. And does that rotate Monday through Friday or is it
19    times Tuesday through Sunday?
20 A. It's from -- it's normally -- it's from Thursday to
21    Monday.
22 Q. Okay. In front of you, or to your left, sir, is a
23    photograph that has been marked as Deposition Exhibit
24    Number 1 for Mrs. Miller. Will you look at that,
25    Exhibit Number 1? Is the reception area at which you

Page 8

1     worked in March 18, 2004, located behind the glass
2     doors that is shown on Exhibit Number 1?
3  A. Yes, sir. That's the reception area behind the glass
4     there.
5  Q. And would you mind turning that around and showing
6     that to the camera so we can see that? Thank you,
7     sir.
8          And is there a sign on there that says
9     "Tower Number 4"?
10 A. Yes, sir.
11 Q. And is this the tower in which -- or in front of which
12    is -- the turtle pond is located?
13 A. Yes, sir. That's it.
14 Q. And are there any other turtle ponds on the property
15    of Turtle Beach Towers?
16 A. Not that I have know of or have ever seen. That's the
17    only one.
18 Q. Okay. Now, in terms of the glass doors that are shown
19    on that picture, are those open or locked at various
20    times during the day?
21 A. They're not locked with keys, but they're always like
22    shut that way. They're not locked, but they're shut
23    that way.
24 Q. If a guest comes in and at any time during the day or
25    night, can the guest go through those doors?

Page 9

1  A. Yes. They would have access to it 24 hours.
2  Q. And is the desk in which you sat behind those glass
3     doors to the left?
4  A. Yes, sir. That's the desk.
5  Q. And thus if somebody came up and knocked on the doors
6     you would hear them to let them in. Correct?
7  A. Yes. That would be correct; because I would be there
8     24 hours for the eight hours working.
9  Q. What was your shift?
10 A. 11:30 to 7:30.
11 Q. 11:30 p.m. --
12 A. -- p.m. to 7:30 a.m.
13 Q. Now, do you have a memory of a guest, Ms. Stephanie
14    Hofer, having an accident on March 18, 2004, in which
15    she injured her leg?
16 A. Yes, sir.
17 Q. And you were on duty that evening?
18 A. Yes. I was the one on duty. I'm the night person.
19 Q. From the desk or from the lobby area, can you actually
20    see the turtle pond?
21 A. Not from the -- not from behind the desk, but if
22    you're in the lobby area outside, you could see the
23    turtle pond.
24 Q. Where do you normally sit when you're on duty?
25 A. I'm behind the desk. I couldn't see the turtle pond.

Page 10

1  Q. Is there a way from the desk area to see whether
2     guests are approaching the glass doors?
3  A. You could see when they're approaching the glass
4     doors.
5  Q. How?
6  A. When they're on the -- like the landing here stepping
7     up, you could -- if you're looking out, if you're at
8     the desk like, not sitting. If you're sitting, you
9     couldn't see. But if you're like standing and maybe
10    at the desk, you could see when they're coming in.
11 Q. When you're talking about the landing, sir, you're
12    talking about the area in front on top of the stairs,
13    if you'll show the camera. Is the landing where that
14    mat is located?
15 A. Yes, sir.
16       MR. KUZMA: Objection.
17 BY MR. FERINGA:
18 Q. What -- I want to ask you what first drew your
19    attention to something happening on that shift -- on
20    your shift that day?
21       MR. KUZMA: Objection.
22 BY MR. FERINGA:
23 Q. Go ahead.
24 A. Someone screaming for help.
25 Q. And do you remember what that individual said?

Page 11

1  A. I don't remember the exact words, but I think she was
2     saying like, "somebody help me, somebody help me."
3     Something of this sort.
4  Q. And the glass doors were shut?
5  A. Yes, sir.
6  Q. And so you could hear this lady screaming from the
7     outside through the glass doors?
8  A. That's right.
9  Q. What did you do response to that, Mr. Scarlett?
10 A. Well, I went out immediately and I assisted her by
11    getting her out of the pond.
12 Q. Okay. Now, we're talking about "her." Who is it that
13    you assisted?
14 A. Well, it's a white female. Her -- I think her name
15    was Stephanie, and she was like a thick-built person,
16    you know. So she was in the pond.
17 Q. All right. I want to ask you, if you could go to the
18    photograph and perhaps the -- if I might, sir, with
19    respect to Exhibit Number 1, when you saw
20    Ms. Stephanie, as you've described it, where
21    specifically was she located in the pond? And if
22    you'll show the members of jury.
23 A. She was -- her legs was in the pond down here and she
24    was like hanging out of the pond, and her head was out
25    like this.

Page 12

1  Q. Which was -- when you say her legs were in the pond,
2     there's a dark section on that photograph. Can you
3     indicate where her legs were inference to that dark
4     section?
5  A. It was down here.
6  Q. Do you want to use this to point, sir?
7  A. Like down here. This section. This area.
8  Q. Okay. And when you said she was spread out and her
9     legs -- and her head was in a location, where was her
10    head?
11 A. She was more like -- she was more resting on the bench
12    here, leaning on the edge of the pond and the bench.
13 Q. So was she in the pond or outside the pond at this
14    point?
15       MR. KUZMA: Objection.
16 A. She was part -- partly in the pond and partly out.
17 BY MR. FERINGA:
18 Q. What part of her was out?
19 A. The upper body.
20 Q. Where was -- where was her buttocks?
21 A. It was more in the pond.
22 Q. Okay. And in terms of where her legs were facing,
23    where were her legs -- or were her feet facing toward
24    the green shrubbery in the back of the pond where it
25    says "Tower Number 4"?

Page 13

1  MR. KUZMA: Objection.
2  A. They were facing that way.
3  BY MR. FERINGA:
4  Q. They were facing toward the tower?
5  A. She was here.
6  Q. Okay. Were her legs and feet still in the pond?
7  A. Yes, sir.
8  Q. You have to speak --
9  A. Yes. Yes, sir. I'm sorry.
10 Q. And her buttocks were in the pond?
11 A. Yes, sir.
12 Q. And her upper back was on the edge of the pond?
13 A. Yes, sir.
14 Q. When you first got to her, what did she say to you,
15    what did you say to her?
16 A. Not exact words, but she said she was looking at the
17    turtles. She was looking at the turtles and, you
18    know, she was like crying and all of that, and she was
19    just -- she was like repeating, saying that she was
20    just admiring the turtles, and she thinks she slipped
21    on something, you know. But when I went there, it was
22    like -- she was -- she was actually too close to the
23    edge of the pond.
24 Q. When you said she was too close to the edge of the
25    pond, what do you mean by that, sir?

Page 14

1  A. She was up on the edge here. She had to be up on the
2     edge here to slip in the pond.
3  Q. Okay. Let me show you another exhibit. And this is
4     an exhibit that has been marked as Exhibit Number 5,
5     and this is a side view.
6        When you say she was close -- she was close
7     to the edge of the pond, what -- you showed that,
8     would you hold that up? When you said she was close
9     to the edge of pond, where was she?
10 A. She would have to be here.
11 Q. So are you pointing to the section -- is that section
12    close to the bench?
13 A. Yes. That's the section close to the bench.
14 Q. All right. And did she tell you specifically where
15    she was standing before she fell into the pond?
16 A. No, she didn't; but, you know --
17    MR. KUZMA: Objection.
18 A. -- just looking at what happened, she must have been
19    close to the edge of the pond to fall into it.
20    MR. KUZMA: Objection. Move to strike.
21 BY MR. FERINGA:
22 Q. Let me ask this question. Did she tell you, sir --
23    first of all, did she tell you that she was attempting
24    to look at the turtles?
25    MR. KUZMA: Objection.

Page 15

1  A. Yes, sir.
2  BY MR. FERINGA:
3  Q. Okay. What specifically did she tell you?
4     MR. KUZMA: Objection. Asked and answered.
5  A. She told me that she was admiring the turtles. You
6     know, she was just admiring the turtles.
7  BY MR. FERINGA:
8  Q. Did she how it was that when she was admiring the
9     turtles that she ended up in the pond?
10 A. She said that she was just admiring the turtles and
11    she slipped -- you know, just slipped in the pond. I
12    don't know how, but she just slipped in the pond.
13 Q. Okay. Did she say -- when you asked her how did this
14    happen, did she say anything about the fact that a
15    flip-flop or her slipper broke which caused her to
16    fall in the pond?
17    MR. KUZMA: Objection, that he even asked
18    her that.
19 A. Well, I saw the flip-flop --
20 BY MR. FERINGA:
21 Q. No. My question was --
22    MR. KUZMA: No, if he could finish the --
23    MR. FERINGA: No. Move to strike.
24    MR. KUZMA: If the witness can finish the
25    answer before interrupting.

Page 16

1     MR. FERINGA: Mr. Kuzma, you have been
2  interrupting --
3     MR. KUZMA: He's in middle of an answer.
4  I'd like his full answer.
5     MR. FERINGA: I'm going to ask my question.
6  BY VIDEO TECHNICIAN:
7  Q. My question specifically is, did she tell you that
8     the -- that she slipped because there was a broken
9     flip-flop?
10 A. No, sir.
11 Q. All right. Did you see the flip-flop?
12 A. Yes, sir.
13 Q. Where did you see the flip-flop?
14 A. It was there.
15 Q. Okay. Where?
16 A. In the pond.
17 Q. All right. So show me where you saw the flip-flop.
18 A. I couldn't remember and tell you exactly where we took
19    the flip-flop, but we took the flip-flop from out of
20    the pond.
21 Q. So when you first saw the flip-flop it was in the
22    pond?
23 A. Yes, sir.
24 Q. Was -- and was there any flip-flop on the staircase or
25    the landing?

DENROY SCARLETT
August 21, 2006

Page 17

1  A. No, sir.
2  Q. All right. And so the flip-flop -- who was the one
3     that took the flip-flop from the pond?
4  A. Well, I can't remember that. It was either me or
5     Mr. MacKenzie.
6  Q. All right. And Mr. MacKenzie is who?
7  A. He's ones of the security who was on duty.
8  Q. All right. And we've heard his name before. Did he
9     somehow assist Ms. Hofer to go to -- Stephanie Hofer
10    to go to the hospital?
11 A. Yes, sir.
12 Q. Was it -- was it a taxi that drove or was it
13    Mr. MacKenzie?
14 A. Mr. MacKenzie.
15 Q. Okay.
16 A. In his personal car.
17 Q. All right. So let me go back what you saw and what
18    you did when you first spoke to Ms. Hofer.
19        When you asked her what she -- what
20    happened, you said she was crying. Correct?
21 A. Yes, sir.
22 Q. Was she upset?
23 A. No, sir. Not from what I see. She was more in the
24    crying mode. More crying.
25 Q. When you asked her a question, did she respond to you?

Page 18

1  A. Yes. She did respond.
2  Q. And did you -- did you have any sense of whether she
3     was coherent or incoherent when you talked to her?
4        MR. KUZMA: Objection.
5  A. She was responding.
6  BY MR. FERINGA:
7  Q. When you say she was responding, what do you mean by
8     that, sir?
9  A. She was like, you know, replying to me.
10 Q. Okay. And when she was relying to you, did you get
11    the sense that you two were communicating?
12 A. Yes, sir.
13 Q. Okay. So when you saw her in the pond, and the legs
14    in the pond, did you see whether she was injured or
15    not?
16 A. Yes. She was injured.
17 Q. And what drew you to the attention that she was
18    injured, sir?
19 A. There was blood, and her legs were tearing.
20 Q. And so when you saw that, what did you attempt -- what
21    did you do? What did you do next?
22 A. Well, immediately I couldn't just take her out by
23    myself, so I called for the assistance of the
24    security. And we took her out and put her on the
25    bench --

Page 19

1  Q. Can I stop you? The security that you called for
2     assistance, was that Mr. MacKenzie?
3  A. Yes, sir.
4  Q. Okay. So you can't -- you couldn't lift her out of
5     the pond, you needed some help, and Mr. MacKenzie came
6     after responding to your calls. Is that right?
7  A. Yes.
8  Q. Then what did you do, sir?
9  A. We put her on the bench and we got some towels and so
10    forth and then we -- I called my manager. And we
11    tried to get in touch with a doctor, but there was no
12    one there, so we shipped her off. Just put her in a
13    car immediately, me and Mr. MacKenzie, and take her to
14    the hospital.
15 Q. Let me ask you a couple of questions, if I might, to
16    follow up with that, Mr. Scarlett.
17        You said that you called -- after you got
18    Ms. Hofer out of the pond, you put her on the bench.
19    Is that the bench that's shown in Exhibit Number 5?
20 A. Yes, sir. That's the bench.
21 Q. Okay. And, sir, then you made -- then you got some
22    towels?
23 A. Yes.
24 Q. Was -- at this point in time, was there any other
25    individual nearby or close by that identified herself

Page 20

1     as a friend of Mrs. Hofer?
2  A. To my memory, not that I remember.
3  Q. Okay. So you got the towels and attempted to wrap the
4     leg?
5  A. Yes, sir.
6  Q. Then you said that you called your manager. Is that
7     Mrs. Miller?
8  A. Yes, sir.
9  Q. And what did you tell Mrs. Miller?
10 A. That there was this guest that had an accident and she
11    fell in the pond. You know, asking her what to do,
12    and she said call the doctor. And not getting through
13    to the doctor, I think we went ahead and -- you know,
14    Mr. MacKenzie had a car there, so she just asked him
15    to assist by taking her to the hospital.
16 Q. Was there a -- was there any point in time at which
17    somebody attempted to contact Mrs. Hofer's roommate?
18 A. I don't remember a roommate. I'm not remembering her
19    roommate.
20 Q. So how long was it -- strike that.
21        You get on duty at 11:30?
22 A. Yes, sir.
23 Q. About how long into your shift did this take place?
24 A. Maybe about an hour.
25 Q. Okay.

DENROY SCARLETT
August 21, 2006

Page 21

1 A. Thereabouts.
2 Q. So -- and then from the time that you first noticed
3    Mrs. Hofer to the time she left in Mr. MacKenzie's
4    car, how long was -- was she there?
5 A. That's about -- from about 10 to 15 minutes,
6    thereabouts.
7 Q. Okay. So during that 10 to 15 minutes, did Mrs. Hofer
8    say anything more about how this accident occurred?
9 A. The only thing she said is that she was there admiring
10   the turtles and she fell in the pond and --
11 Q. Okay. I'm sorry, sir.
12 A. Go ahead.
13 Q. At what point in time did -- was the flip-flop taken
14   out of the pond?
15 A. I don't have any exact memory of that one.
16 Q. Was it after Mrs. Hofer left?
17 A. I couldn't tell. I couldn't tell.
18 Q. Okay. Who was it that cleaned up the pond?
19 A. There's a ground person who cleans up the pond.
20 Q. Okay. But in terms of -- in terms of the flip-flop,
21   it was -- it was in the pond, it was either you or
22   Mr. MacKenzie that would have taken it out, or someone
23   else?
24         MR. KUZMA: Objection.
25 A. Could be someone else.

Page 22

1 BY MR. FERINGA:
2 Q. Okay. Did you look at the condition of the flip-flop?
3 A. I'm not remembering.
4 Q. Did you see anything wrong with the flip-flop that
5    came from the pond?
6 A. Flip-flop, flip-flop. I not remembering about a
7    flip-flop. I wasn't -- that day I wasn't focusing on
8    the flip-flop. You know, I was more focusing on the
9    guest and her damage.
10 Q. Do you know what happened to the flip-flop that you
11   removed from the pond?
12 A. I don't know of it.
13 Q. Okay.
14 A. I don't know where it is.
15 Q. After this 10 to 15 minutes where you were with
16   Mrs. Hofer, and after she left for the hospital with
17   Mr. MacKenzie, did you have any further contact with
18   her at all?
19 A. No, sir.
20 Q. Did you --
21 A. Only with Mr. MacKenzie.
22 Q. Only with Mr. MacKenzie. Did you have any contact
23   with the -- a lady by the name of Ms. Carrie LaBelle,
24   who was purported to be the roommate with Ms. Hofer?
25 A. I don't remember any roommate.

Page 23

1 Q. After that next morning when Mrs. Miller came in and
2    came on duty, did you have a conversation with
3    Mrs. Miller?
4 A. Yes. I spoke to Ms. Miller. I had to like, you know,
5    talk to her, because she's my manager, before I go.
6 Q. And did you have any conversations with her about the
7    accident that had occurred the night before with
8    Mrs. Hofer?
9 A. Yes, sir.
10 Q. All right. And what essentially did you tell her?
11 A. Basically what I told Ms. Miller is that -- I told her
12   what happened the night before and what did I do after
13   and how everything run. And after Mr. MacKenzie
14   reported that she was okay and everything was all
15   right with her at the hospital and all of that, that
16   was basically my report to Ms. Miller.
17 Q. Okay. Did you fill out anything in writing,
18   Mr. Scarlett?
19 A. No, sir.
20 Q. After that conversation that you had with Mrs. Miller
21   on the morning of now the 19th of March, did you ever
22   have any further discussions with Mrs. Miller about
23   this incident?
24 A. No, sir.
25 Q. You and I have spoken. Is that right?

Page 24

1 A. Yes, sir. Yes.
2 Q. All right. And was that in person or by telephone?
3 A. By telephone.
4 Q. And do you remember what I asked you?
5 A. Some stuff. Not everything.
6 Q. Do you remember, did I go over questions that I would
7    purport to ask with you at the deposition?
8 A. No.
9 Q. Did you agree in that telephone conversation to
10   voluntarily appear to give a deposition in this
11   matter?
12 A. Yes, sir.
13 Q. And our office and you have communicated by e-mail.
14   Is that right?
15 A. Yes, sir.
16 Q. And you received a copy of the Notice of Deposition?
17 A. Yes, sir.
18 Q. Did you and I talk today before the deposition?
19 A. No. Only from like maybe a month or so ago, yes.
20 Q. Okay.
21 A. But not before today.
22 Q. Have you talked with any of the other lawyers, either
23   Ms. Minchoff or Mr. Kuzma or Mr. Reith?
24 A. No, sir.
25        MR. FERINGA: I don't have any other