```
0001
 1          IN THE UNITED STATES DISTRICT COURT
 2           FOR THE DISTRICT OF MASSACHUSETTS
 3                 C.A. No. 05-40170 FDS
 4     *  *  *  *  *  *  *  *  *  *  *  *  *  *
 5    STEPHANIE HOFER and DOUGLAS HOFER,       *
 6             Plaintiffs                       *
 7    v.                                        *
 8    THE GAP, INC., EXPEDIA, INC. and          *
 9    TURTLE BEACH TOWERS,                      *
10             Defendants                       *
11     *  *  *  *  *  *  *  *  *  *  *  *  *  *
12                  VOLUME I
13                  PAGES 1-238
14
15        VIDEOTAPED DEPOSITION OF STEPHANIE
16    HOFER, a witness called on behalf of the
17    Defendant The Gap, Inc., pursuant to the
18    Federal Rules of Civil Procedure, before
19    Jessica L. Williamson, Registered Merit
20    Reporter, Certified Realtime Reporter and
21    Notary Public in and for the Commonwealth of
22    Massachusetts, at the Offices of Morrison,
23    Mahoney, LLP, 250 Summer Street, Boston,
24    Massachusetts, on Thursday, June 29, 2006,
25    commencing at 9:17 a.m.
0002
 1    A P P E A R A N C E S
 2
 3    LAW OFFICES OF RUSSO & MINCHOFF
 4       (By India Minchoff, Esq.)
 5       123 Boston Street
 6       First floor
 7       Boston, Massachusetts  02125
 8       (617) 740-7240
 9       india@russominchofflaw.com
10       Counsel for the Plaintiffs
11
12    SULLIVAN, WARD, ASHER & PATTON, P.C.
13       (By Scott D. Feringa, Esq.)
14       1000 Maccabees Center
15       25800 Northwestern Highway
16       Southfield, Michigan  48075-1000
17       (248) 746-2727
18       sferinga@swappc.com
19       Counsel for the Defendant The Gap, Inc.
20
21
22
23
24
25
0003
 1    A P P E A R A N C E S, Continued
 2
 3    BURNS & LEVINSON, LLP
 4       (By Thomas T. Reith, Esq.)
```

```
 5      125 Summer Street
 6      Boston, Massachusetts  02110
 7      (617) 345-3258
 8      treith@burnslev.com
 9      Counsel for the Defendant Expedia, Inc.
10
11   ALSO PRESENT:
12
13     Adam Cook, Videographer
14
15
16
17
18
19
20
21
22
23
24
25
0004
 1                    I N D E X
 2   DEPONENT                             PAGE
 3   STEPHANIE HOFER
 4   Examination By Mr. Feringa              7
 5
 6                  E X H I B I T S
 7   NO.                                   PAGE
 8    1  Notice of Deposition               5
 9    2  Copies of photographs of           9
          sandals
10
      3  Copies of photographs, four       13
11       pages, W-2 form
12    4  Plaintiff's Response to           29
          Defendant, The Gap, Inc.'s
13        First Request For Admissions
          Pursuant to Fed. R. Civ. P. 36
14
      6  Defendants' Third Request For    101
15       Production of Documents and
          Things Pursuant to Fed. R.
16        Civ. P. 34
17    5  Drawing                          152
18    7  Copies of pictures of Tower 4    182
          turtle pond
19
20
21   Note:  Original Exhibits 1 - 7 were retained
22   by the court reporter and forwarded to
23   Bienenstock Court Reporting & Video for
24   distribution.
25
0005
 1                  P R O C E E D I N G S
 2              (Exhibit No. 1, Notice of
```

```
 3      Deposition, premarked for identification.)
 4              THE VIDEOGRAPHER:  We are now on
 5      the record.  This is the videotaped
 6      deposition of Stephanie Hofer being taken on
 7      June 29th, 2006.  The time is now 9:17 a.m.
 8      We are located at 250 Summer Street, Boston,
 9      Massachusetts.
10          This deposition is being taken on
11      behalf of the defendant in the matter of
12      Stephanie Hofer and Douglas Hofer vs. The
13      Gap, Inc., Expedia, Inc. and Turtle Beach
14      Towers.  The case number is 05-40170 FDS.
15      This matter is being held in the United
16      States District Court for the District of
17      Massachusetts.
18          My name is Adam Cook, the videotape
19      operator.  Would the court reporter swear in
20      the witness and the attorneys briefly
21      identify themselves for the record, please.
22              MS. MINCHOFF:  Attorney India
23      Minchoff for Stephanie Hofer.
24              MR. FERINGA:  I'm Scott Feringa.  I
25      represent The Gap, Inc.
0006
 1              MR. REITH:  Thomas Reith.  I
 2      represent Expedia, Inc.
 3
 4                  STEPHANIE HOFER,
 5      a witness called on behalf of the Defendant
 6      The Gap, Inc., having first been duly sworn,
 7      was deposed and testifies as follows:
 8                  *  *  *  *  *
 9
10              MR. FERINGA:  It is my
11      understanding that there are stipulations
12      that are to be placed on the record before
13      we start.  Why don't you go ahead, Mr.
14      Reith.
15              MR. REITH:  Thomas Reith for
16      Expedia, Inc.  The parties have discussed
17      off the record the stipulations to be
18      entered.  The parties stipulate that they'll
19      reserve all objections, except as to form,
20      but including motions to strike, until the
21      time of trial, and the witness will have --
22      Scott, it's up to you.  We usually do 30
23      days to read and sign.
24              MR. FERINGA:  That's fine.
25              MS. MINCHOFF:  And waive the
0007
 1      notary.
 2              MR. REITH:  Agree to waive the
 3      notary?
 4              MR. FERINGA:  Yes.
 5              MR. REITH:  Thank you.
 6              MR. FERINGA:  Can we go off the
 7      record.
```

```
 8              THE VIDEOGRAPHER:  The time is
 9       9:18.  We are off the record.
10           (Discussion off the record.)
11              THE VIDEOGRAPHER:  The time is
12       9:20.  We are back on the record.
13
14                   DIRECT EXAMINATION
15
16       BY MR. FERINGA:
17   Q.  Ms. Hofer, as we were introduced off the
18       record, my name is Scott Feringa.  I am
19       going to be asking you some questions today.
20       I represent Gap in this lawsuit.  This is
21       not going to be an endurance contest, and
22       thus should you need to take any time, if
23       you need to confer with your lawyer, if you
24       need to take a break for any reason, please
25       let us do so -- please do so at your
0008
 1       convenience, all right?
 2   A.  Okay.
 3   Q.  Additionally, everything that is said is
 4       going to be taken down.  It's an artificial
 5       way of doing things, and while we all
 6       understand nods of the head and things of
 7       that nature, it doesn't translate well for
 8       our court reporter.  So your responses,
 9       whatever they are, are going to have to be
10       verbal.  Is that fine?
11   A.  Okay.  Yeah.
12   Q.  And finally, while we typically talk over
13       each other and understand that, court
14       reporters get very upset when that happens
15       because we don't know who is going to take
16       down what, and thus if you'll wait till I'm
17       finished, sometimes I have a hesitant way of
18       talking, and I will wait till you're
19       finished or one of the other counsel are
20       finished, that way we'll get your testimony
21       down on the record, okay?
22   A.  Okay.
23   Q.  Good.  I'm going to show you what has been
24       marked as Exhibit No. 1, which is a copy of
25       the deposition notice.  Have you seen this
0009
 1       document?
 2           (Witness reviews document.)
 3   A.  No, I have not.
 4   Q.  Have you brought with you any of -- any
 5       documents, records, photographs to this
 6       deposition?
 7   A.  That would -- I have not.
 8   Q.  All right.  Let's go through it.  I've asked
 9       for evidence logs.  I assume that you do not
10       keep evidence logs yourself?
11   A.  No.
12   Q.  I've asked for on No. 2 photographs of the
```

```
13          Old Navy sandals or exemplar sandals.  And I
14          know that we were supplied photographs in
15          response to one of your counsel's discovery.
16          I'm going to mark this packet as Exhibit
17          No. 2 and ask you whether you are aware of
18          any other photographs for -- are you aware
19          of any other photographs that have been
20          taken of the sandals or exemplar sandals or
21          the subject sandals other than these?
22                   (Exhibit No. 2, Copies of
23          photographs of sandals, marked for
24          identification.)
25     A.   No.
0010
 1     Q.   With respect to the sandals that you claim
 2          are the subject matter of this litigation,
 3          did you ever take photographs of those
 4          sandals either before or after your
 5          accident?
 6     A.   No.
 7     Q.   And, to your knowledge, you have no
 8          photographs of testing that has been done on
 9          these sandals at all?
10     A.   No.
11     Q.   And "these" being Exhibit No. 2.
12     A.   No.
13     Q.   With respect to No. 3, then, you're not
14          aware of any videotape, DVDs or electronic
15          recording of images taken of the sandals
16          other than for testing purposes, you don't
17          know anything about that, correct?
18     A.   No.
19     Q.   Okay.  And No. 4, you have no testing
20          protocols or anything of the sort?
21     A.   No.
22     Q.   5 is the same thing.
23               Have you been interviewed by any sort
24          of consultant by -- that has been retained
25          by your counsel -- I'm looking at No. 6 --
0011
 1          to talk about the circumstances of the
 2          incident which is the subject matter of this
 3          litigation?
 4     A.   No.
 5     Q.   No. 7, do you have photographs taken of you
 6          during the Jamaica vacation in 2004?
 7     A.   No.
 8     Q.   No one took any photographs?
 9     A.   No.
10     Q.   Your traveling companion was whom?
11     A.   Carrie LaBelle.
12     Q.   L-A capital B-E-L-L-E, correct?
13     A.   Yes.
14     Q.   And is it -- it's your testimony that none
15          of you took -- strike that.
16               Had you ever been to Jamaica before?
17     A.   No.
```

```
18  Q.  It's your testimony that no one took
19      photographs?
20  A.  Yes.
21  Q.  Are you aware of photographs being taken of
22      you?
23  A.  No.
24  Q.  And while you were in Jamaica, for No. 8,
25      you're not aware of anybody taking
0012
 1      photographs of the Turtle Beach Towers, the
 2      surrounding area, you, your leg, to document
 3      the condition of your leg before you left
 4      Jamaica, anything?
 5  A.  No.
 6  Q.  For No. 9, I noticed in the -- at least one
 7      of the sets of discovery that your counsel
 8      has responded to, there's a photograph taken
 9      of your leg while it appears to be in a
10      hospital room.  There were photographs taken
11      of you at Mass. General, correct?
12  A.  Yes.
13  Q.  Where are those photographs?
14  A.  Given to my attorney.
15          MR. FERINGA:  All right.  We asked
16      to produce those.  We haven't seen them.
17          MS. MINCHOFF:  You have all the
18      photographs that I have.
19          MR. FERINGA:  I have one -- I have
20      one Xerox of a lateral view of the leg, side
21      view of the leg.  Is that it?
22          MS. MINCHOFF:  That's it.
23          MR. FERINGA:  Do we have digital
24      copies other than the -- have we received
25      digital copies either --
0013
 1          MS. MINCHOFF:  I don't have digital
 2      copies.
 3      BY MR. FERINGA:
 4  Q.  To your knowledge, was there more than one
 5      photograph taken of your leg while you were
 6      at Mass. General?
 7  A.  No.
 8  Q.  What about after you had been -- after you
 9      left Mass. General?
10  A.  Yes.
11  Q.  And where -- who took those photographs?
12  A.  My nurse.
13  Q.  Your nurse being whom?
14  A.  She was a nurse from the visiting nurse
15      association, Diversified Nursing
16      Association.
17          MR. FERINGA:  And let me see.
18      These were copies of photographs that we
19      received in response to discovery.  They're
20      Xeroxes.  We didn't receive anything other
21      than that.  I'm going to mark this as
22      Exhibit No. 3.
```

```
23                  (Exhibit No. 3, Copies of
24          photographs, four pages, W-2 form, marked
25          for identification.)
0014
 1   Q.   These photographs, which are one, two,
 2        three, four pages, and then there's a W-2
 3        tax statement on the back, by the way, these
 4        photographs specifically on Pages 2 and 3,
 5        are these the photographs that you're
 6        referring to that were taken by your nurse?
 7   A.   There is a series of photographs, the first
 8        taken by my nurse, the others taken by
 9        either myself or my husband.
10   Q.   And is it -- were only six photographs
11        taken?
12   A.   No.
13   Q.   All right.  Where are the rest?
14   A.   I'm unaware of that.
15   Q.   All right.  How many photographs were taken?
16   A.   I can't recall.
17   Q.   All right.  Were these digital or film?
18   A.   Digital.
19   Q.   All right.  And did you download -- strike
20        that.
21                  Were those stored on some sort of
22        memory card?
23   A.   In my camera.
24   Q.   All right.  Do you know the difference
25        between a memory card and just the standard
0015
 1        memory that exists within your camera?
 2   A.   Yes.
 3   Q.   Okay.  So this is not a removable memory
 4        card on which the photographs were stored,
 5        it's simply stored on the memory that's
 6        internal to your camera?
 7   A.   No, it is a memory card.
 8   Q.   All right.  Has that memory card been
 9        preserved?
10   A.   I can't recall.
11   Q.   When were these photographs taken?
12   A.   The first taken in April.
13   Q.   What you're talking about, just so that
14        we're all clear, the first is this faded
15        thing in this upper left-hand corner
16        (indicating)?
17   A.   Yes.
18   Q.   And it was taken in April of 2000 and --
19   A.   '4.
20   Q.   Okay.
21   A.   I believe the second and third to be taken
22        approximately May or June.
23   Q.   When you're talking about the second and
24        third, you're referring to the picture in --
25   A.   Top right and the bottom left.
0016
 1   Q.   Okay.
```

```
 2   A.   And then the bottom right, approximately
 3        July or August.
 4   Q.   Of 2000 --
 5   A.   Of 2004.
 6   Q.   Thank you.  What about the next two?
 7   A.   The top, I can't recall when that was taken.
 8        The bottom looks as if it were taken in
 9        April 2004 because there is still writing on
10        my toes.
11   Q.   All right.  What happened to this -- strike
12        that.
13            Did you download the contents of the
14        memory card to some sort of file or CD?
15   A.   Yes.
16   Q.   And where is that?
17   A.   On my computer.
18   Q.   All right.  So there are more photographs.
19        We have a selected group?
20   A.   I've given my attorney all the photographs.
21   Q.   And I appreciate that.  I'm asking you what
22        more may be existing.  And so we have
23        identified now that there may be more
24        photographs of your foot and leg than what
25        has been produced to us?  I think you've
0017
 1        identified that; you have more than -- you
 2        have more than six pictures?
 3   A.   Yes.
 4   Q.   So we need to get those.
 5            Have you taken photographs of -- have
 6        you taken photographs of your foot and leg
 7        from the time that you returned home to your
 8        house from UMass after you were discharged
 9        to the present time?
10   A.   Yes.
11   Q.   Okay.  So what I'm asking for is, have you
12        documented how your foot and leg have
13        healed?
14   A.   Yes.
15   Q.   And approximately how many photographs are
16        there?
17   A.   Approximately two per month.
18   Q.   Two per month since May or March or April --
19        strike that.
20            Two per month since April of 2004?
21   A.   Yeah, I think I stopped taking photographs
22        after a certain period of time.
23   Q.   And what certain period of time was that?
24   A.   I would say approximately a year after the
25        accident.
0018
 1   Q.   So we should have approximately 24
 2        photographs of your foot, leg and ankle, two
 3        per month over a year?
 4   A.   Some -- yes.
 5   Q.   Approximately.  And I understand --
 6   A.   Approximately.
```

```
 7   Q.   And, Ms. Hofer, I'm not attempting to pin
 8        you down to a number and then at trial say
 9        ah-hah, you lied, I'm trying to figure out
10        what else existed out there, okay?
11   A.   Uh-huh.
12   Q.   And the whole purpose of this deposition is
13        for me to find out some of this stuff and to
14        exhaust your memory about things.  So if
15        there are questions that you simply don't
16        know the answer to or you're not sure, just
17        tell me I'm not sure, I think they may be X
18        number, okay?  Is that fair?
19   A.   That's fair.
20   Q.   Okay.  Good.  So aside from the 24,
21        approximate 24 photographs, only six of
22        which we've been produced, have been
23        produced here, do you have any other
24        photographs that have been taken of your leg
25        by someone else?
0019
 1   A.   No.
 2   Q.   Is there a video or -- by "video" I mean
 3        something recorded, either on tape or
 4        digital now.  I'll use video, it's easier --
 5        of your leg?
 6   A.   I don't understand --
 7   Q.   Poor question.  I'm sorry.  Do you have
 8        videos or digital moving pictures of your
 9        leg?
10   A.   No, I do not.
11   Q.   What about any of your therapy sessions;
12        have any of those been documented, your
13        progress in the therapy sessions by any sort
14        of recording?
15   A.   Not to my knowledge, no.
16   Q.   All right.  While we're on the subject
17        matter of this exhibit, which is, I believe,
18        Exhibit No. 3, the first page of this group,
19        what are these pictures of?
20   A.   These are pictures of me before the accident
21        and then at the back after the accident.
22   Q.   Okay.  Let me back up.
23   A.   Page 1 is before the accident.
24   Q.   Yeah.  Who are the people in the pictures?
25   A.   The first is myself, my niece newly born,
0020
 1        and my nephew at two.  The second is myself
 2        and my nephew at age three.  The third is
 3        myself and a friend at an event.
 4   Q.   This friend is not Ms. LaBelle?
 5   A.   No.
 6   Q.   Okay.  What about the two photographs that
 7        show you with two different people?
 8   A.   The top photograph is myself and my cousin
 9        after the accident.
10   Q.   When was that taken?
11   A.   Approximately August of 2005.
```

```
12   Q.   And, again, we have a Xerox of this, so it's
13        hard for me to see the background, but is
14        that water in the background?
15   A.   Yes, it is.
16   Q.   And where is it?
17   A.   That is at her beach home in York, Maine.
18   Q.   All right.  And what about the bottom one?
19   A.   The bottom photograph is myself and my
20        sister Christmas 2005.
21             MS. MINCHOFF:  I'm sorry, yourself
22        and who?
23             THE WITNESS:  My sister,
24        stepsister.
25   Q.   Okay.  Do you have any -- and going to that
0021
 1        Exhibit No. 1 now, please, that one
 2        (indicating), now, looking at No. 10, you
 3        got back to the United States on a flight
 4        from U.S. Air?
 5   A.   Yes.
 6   Q.   So there was no air ambulance or ambulance
 7        records?
 8   A.   Not to my knowledge.
 9   Q.   All right.  How did you get from I suppose
10        Boston Airport, Logan Airport, to Mass.
11        General?
12   A.   My husband.
13   Q.   Okay.  So there's no such -- there's no
14        record of your transport from the St. Ann's
15        Hospital in Jamaica to the airport and no
16        record from Logan to Mass. General by any
17        sort of ambulance, correct?
18   A.   Not to my knowledge.
19   Q.   Did you bring with you your employment
20        records from No. 11, including personnel and
21        payment files from your employers for the
22        three years preceding the incident?  Did you
23        bring those with you today?
24   A.   I did not.
25   Q.   Is there some reason why you didn't bring
0022
 1        anything with you today?
 2             MS. MINCHOFF:  Stephanie, you need
 3        to actually not look at me and answer his
 4        questions.
 5             THE WITNESS:  Okay.
 6             MS. MINCHOFF:  I mean --
 7   A.   There is no record ---
 8             MS. MINCHOFF:  -- I'll state for
 9        the record -- I'll state for the record that
10        a lot of this was duplicate of what was
11        asked for previously and produced to
12        counsel.
13             MR. FERINGA:  Some of it was.  Some
14        of it was.  We've now learned that there are
15        more photographs, but I don't --
16             MS. MINCHOFF:  But speaking of
```

```
17          No. 11, for instance, that was included in,
18          I believe yours, if one of the two of you's
19          document requests, but --
20              MR. FERINGA:  I haven't seen
21          employment records from employers and
22          including personnel and payment files.
23          There is a document with a W-2 in it, but I
24          don't see anything more than that.  So
25          that's all right.
0023
1           BY MR. FERINGA:
2    Q.     So we don't have 11 -- I'm sorry.  Go ahead.
3    A.     As far as employment records --
4    Q.     Yes.
5    A.     -- I've produced to my attorney my tax
6           information.
7    Q.     Okay.
8    A.     I don't have employment records, so to
9           speak.
10   Q.     I recognize you may not, but you have access
11          to those which we do not, and thus I have
12          asked you to produce the personnel files
13          from your employers.
14   A.     I don't understand --
15   Q.     Sure.  Employers will have files on people.
16          They do that.  And we asked for copies of
17          the files that your employers have kept.
18          You have access to those, you have a right
19          to those under federal and I presume state
20          law, and we've asked you to produce those.
21   A.     I understood that to be payment.
22   Q.     That's why I put "including personnel and
23          payment files."  So you didn't -- we don't
24          have those.
25              In terms of No. 12, tax returns, you
0024
1           produced the tax returns for the years 2000
2           to the present?
3    A.     Yes.
4    Q.     All right.  For No. 13, it's my
5           understanding that the actual sandals do not
6           exist, correct?
7    A.     Not anymore.
8    Q.     All right.  And according to your responses
9           to our -- what we have, request for
10          admissions, the last time -- you left those
11          at the hotel, the Turtle Beach Towers,
12          correct?
13   A.     I can't recall.
14   Q.     All right.  And the reason I'm asking that
15          is because we asked you to admit that based
16          upon present information and belief -- I'm
17          looking at Request to Admit No. 2 --
18          "plaintiff Stephanie Hofer is of the opinion
19          that the original footwear was left by her
20          at the hotel that has been identified as
21          Turtle Beach Towers, on the day of the
```

```
22        incident, that being March 19, 2004."
23             The response, Ms. Hofer, was denied as
24        being untrue?
25   A.   Could I see that, please?
0025
 1   Q.   Sure.  I'll be more than happy to show you.
 2        This is a document that we just received,
 3        actually.  And I can make copies, and if you
 4        would like we can make an exhibit, but what
 5        I'm looking for is Exhibit No. 2, please.
 6   A.   Thank you.
 7             (Witness reviews document.)
 8   A.   To my knowledge, I did not leave anything
 9        behind, but I was unaware of anything after
10        the accident --
11   Q.   Okay.  Let me --
12   A.   -- so I did not intentionally...
13   Q.   The answer is "Denied."  Denied under the
14        Federal Rules of Civil Procedure means that
15        it's not true.  Now, what I need you to tell
16        me is -- and the rules also provide that if
17        you cannot admit nor deny, you're supposed
18        to state the reasons why you cannot admit or
19        deny it.  Your attorney just put "Denied."
20        And under my understanding of the rules it
21        means it's not true.
22             So the question is, what happened to
23        the sandals?  How are you denying that?
24             MS. MINCHOFF:  I would just object
25        because the question actually says "personal
0026
 1        knowledge."  That's in the question.  So if
 2        you're going to -- I would just ask that you
 3        rephrase the question because the admission
 4        says "to your personal knowledge."
 5             MR. FERINGA:  And she says
 6        "Denied," and that means it's not true.
 7             MS. MINCHOFF:  To her personal
 8        knowledge.
 9   BY MR. FERINGA:
10   Q.   It's not true that you left them there, that
11        they were left there?
12   A.   To my personal knowledge?
13   Q.   Yeah.
14   A.   I don't know anything that happened in the
15        immediate time of the accident.
16   Q.   So the response shouldn't be "Denied," it
17        should be you have no information with which
18        to form a belief?
19   A.   That's a legal --
20   Q.   I know.
21   A.   I don't understand that.
22   Q.   And that's something I'll talk about with
23        your lawyer, but from the statement that we
24        asked you, you have no knowledge what
25        happened to the sandals; is that true?
0027
```

```
 1   A.   Yes.
 2   Q.   Okay.  The last you saw them was when?
 3   A.   Right before the accident.
 4   Q.   Okay.  After -- after the accident -- and
 5        we'll get into what happened and everything
 6        else -- the last that you realized that --
 7        or your last memory of them was at Turtle
 8        Beach Towers on the steps or walkway or
 9        turtle pond --
10   A.   Correct.
11   Q.   -- somewhere around there, correct?
12   A.   Correct.
13   Q.   That's it?  And since then, since that day
14        you haven't seen them, correct?
15   A.   Correct.
16   Q.   And just while we're on the subject, No. 3
17        was "Admit to the best of" your knowledge
18        "she has no information that any other
19        individual recovered and retained the
20        subject footwear."  You have "Denied" there.
21        At least your lawyer put that down.
22             MS. MINCHOFF:  Objection.
23   Q.   The question that I have is, on what basis
24        is that denied?
25   A.   I have no personal knowledge of anything
0028
 1        that happened.
 2   Q.   So you don't know whether somebody did or
 3        did not retain the footwear, correct?
 4   A.   Correct.
 5   Q.   All right.  So --
 6   A.   So to my personal knowledge, I don't know
 7        anything, which is the denial.
 8   Q.   No, "deny" means it's not true.  The
 9        question is that you have no personal
10        knowledge to answer one way or the other.
11             MS. MINCHOFF:  Objection.
12             MR. FERINGA:  Okay.  Fine.
13   Q.   Look at No. 5 and read that to yourself,
14        please.
15        (Discussion off the record.)
16   Q.   And you may want to show your lawyer that,
17        too.
18             MR. REITH:  Could we actually get a
19        quick copy of that?
20             MR. FERINGA:  Yeah, we'll mark it
21        as an exhibit.
22             MR. REITH:  Thanks.
23             MR. FERINGA:  Why don't we go off
24        the record while we're doing that.  We'll
25        get copies and mark it as an exhibit so
0029
 1        people can see it.
 2             THE VIDEOGRAPHER:  The time is
 3        9:43.  We are off the record.
 4        (Discussion off the record.)
 5             (Exhibit No. 4, Plaintiff's
```

```
 6          Response to Defendant, The Gap, Inc.'s First
 7          Request For Admissions Pursuant to Fed. R.
 8          Civ. P. 36, marked for identification.)
 9              (Recess taken.)
10                  THE VIDEOGRAPHER:   The time is
11          9:54.  We are back on the record.
12       BY MR. FERINGA:
13    Q.    All right.  We have marked now as Exhibit
14          No. 4 the answers to requests for admissions
15          that were provided to us, and just so that
16          we're clear, on the last page of this
17          document, Ms. Hofer, that is a copy of your
18          signature, correct?
19    A.    Yes.
20    Q.    Okay.  So let's go to No. 5.  The question
21          essentially was, are you aware of any
22          photographs that were taken by anybody after
23          the incident complained of of the footwear,
24          and you have "Denied" there, which does this
25          mean -- does your denial here mean that you
0030
 1          have no knowledge?  Is that what that means?
 2    A.    No.  I read -- I read this differently than
 3          you, meaning that I had no personal
 4          knowledge; therefore, I denied based upon
 5          information.
 6    Q.    So I understand this, just so that we're
 7          very clear, you do not know -- strike that.
 8              You are not aware of anybody taking
 9          photographs of the sandals after --
10          immediately after the accident; is that
11          correct?
12    A.    Can you say --
13    Q.    Sure.  To the best of your knowledge, based
14          on all the memory that you have, you don't
15          have any knowledge that anyone at Turtle
16          Beach Towers or your friend or some other
17          bystander in Jamaica took photographs of the
18          sandals immediately after the accident?
19    A.    I have no knowledge of anybody taking any
20          photos of the sandals after -- immediately
21          after.
22    Q.    Or at any time?
23    A.    At any time.
24    Q.    Okay.  And you have no knowledge as to where
25          the sandals are after you left Jamaica?
0031
 1    A.    Correct.
 2    Q.    And the last that you saw of the sandals was
 3          immediately before the incident?
 4    A.    Yes.
 5    Q.    And "the incident" being the subject matter
 6          of this litigation --
 7    A.    Yes.
 8    Q.    -- the fall, correct?
 9    A.    Yes.
10    Q.    And just so that I'm also clear, you did
```

```
11          nothing to yell out to people -- I wouldn't
12          expect you to do this, but to yell out "Save
13          the sandals.  I need to take them back with
14          me to Massachusetts"?
15   A.     Correct.
16   Q.     Again, it's a silly question, but there was
17          nothing that you did to make sure that the
18          sandals got saved?
19   A.     It was the last thing I was thinking.
20   Q.     I don't doubt that.  And, to the best of
21          your knowledge, your traveling companion,
22          Ms. LaBelle, did nothing to preserve the
23          sandals, either, to take them back?
24   A.     To the best of my knowledge?
25   Q.     Yes.
0032
 1   A.     No.  I can't -- I don't know what she did.
 2   Q.     Who packed you?  Who packed you to go back?
 3          I mean, you -- do you need me to rephrase
 4          that?
 5   A.     Yes, please.
 6   Q.     Sure.  After your accident, after you went
 7          to the hospital, St. Ann's Hospital, did you
 8          go back to the hotel?
 9   A.     No, I did not.
10   Q.     All right.  Did you stay in the hospital?
11   A.     Yes.
12   Q.     All right.  Who packed up all the stuff that
13          was in your room?
14   A.     Carrie.
15   Q.     Do you have any knowledge as to whether --
16          strike that.
17              How did you get from the Turtle Beach
18          Towers to the hospital?
19   A.     A man named Henry McKenzie.
20   Q.     Okay.  Taxi driver?
21   A.     Yes.
22   Q.     To the best of your knowledge, did the
23          sandals even make it into Mr. McKenzie's
24          taxi?
25   A.     I have no idea.
0033
 1   Q.     So I'm going back to this Exhibit No. 1,
 2          which was the notice of taking deposition.
 3          No. 14, did you bring with you today the
 4          exemplar sandals?
 5   A.     No, I did not.
 6   Q.     Are they here?
 7                  MS. MINCHOFF:  No.
 8                  MR. FERINGA:  Is there a reason
 9          why --
10                  MS. MINCHOFF:  Yes.
11                  MR. FERINGA:  -- they're not here?
12                  MS. MINCHOFF:  Yes.  I understand
13          that Attorney Kuzma and you were still
14          working out an agreement with respect to the
15          sandals.
```

16          MR. FERINGA:  But I get to see --
17     the agreement that he and I are talking
18     about, she hasn't -- the agreement that he
19     and I are talking about was for me to have
20     one pair of sandals released.  I was hoping
21     to see the sandals themselves today so that
22     we could look at them and talk about them in
23     the deposition, which is why I received --
24     which is why I sent this rather elaborate
25     discovery request.
0034
1          MS. MINCHOFF:  Well, it's my
2     understanding that when you and Steve,
3     Attorney Kuzma work out the agreement --
4          MR. FERINGA:  There was --
5          MS. MINCHOFF:  But let me say this
6     on the record.  If -- I have no problem
7     ensuring that they come over here throughout
8     the course of this deposition.  Obviously
9     until an agreement is worked out with
10     respect to the release of the sandals,
11     they're not -- they're coming back with me
12     in my possession, but I have no problem
13     ensuring throughout the course of this
14     deposition -- and we can take a minute off
15     record to let me make a phone call and
16     ensure that they come over.
17          MR. FERINGA:  They need to come
18     here.  I mean, I received no objections to
19     this notice of taking duces tecum.  It's not
20     typical for -- if people are going to not
21     produce things, there's usually some sort of
22     letter, or there's usually some sort of
23     objection or something.  I received nothing,
24     so I assumed that these things were going to
25     be produced.
0035
1          MS. MINCHOFF:  It's my standard
2     practice to actually do a written response
3     with a subpoena or this kind of notice, it
4     is to a document request.  And I don't
5     consider them the same.  I think -- either
6     most of these requests have been covered
7     previously in different document requests
8     that were actually sent by you or Attorney
9     Reith, which you guys have been copied on
10     discovery going out in both directions,
11     but --
12          MR. FERINGA:  Actually, I've got to
13     tell you they haven't, which is why I sent
14     this again.  These are -- under the federal
15     court rules and most state rules I think
16     these are absolutely proper.  But I want the
17     sandals here, and we'll stop and get them,
18     but I will be questioning her about them,
19     and I'm just distressed that nothing has
20     been produced, including other photographs

```
21        that we find for the first time today exist
22        that haven't been produced.  We were
23        produced apparently selectively only six
24        photographs when the request was for a total
25        amount.
0036
 1              MS. MINCHOFF:  Okay.
 2              THE WITNESS:  May I?
 3   Q.   If you want to talk, your attorney can talk.
 4        I'm really having a discussion with her, but
 5        if you want to say something, go right
 6        ahead.  I'm not in the practice of telling
 7        you and I have no authority to tell you one
 8        way or the other what to say or what not to
 9        say.
10   A.   Most of the photographs are duplicate, one
11        shot, another shot, another shot.  I gave my
12        attorney the ones I thought most important
13        in the progress of my healing.
14   Q.   And I appreciate that, Ms. Hofer, but when
15        attorneys like me ask for all photographs, I
16        don't expect to receive selected
17        photographs.
18   A.   I misunderstood.
19   Q.   Well, that's between you and your lawyer,
20        but that's why I send out again, having had
21        this happen before, a request to produce
22        things at depositions, so that we don't have
23        this issue.  All right.  Let's move on.
24              No. 15, there have been UMass Medical
25        records produced, some inpatient, some
0037
 1        outpatient records.  It's my understanding
 2        that there's a host of other records that
 3        have been requested that we have not yet
 4        seen, and those are the -- and so I was
 5        hoping today for you to bring the rest of
 6        the records.
 7              Have you -- you haven't brought with
 8        you any of your other medical records that
 9        have been requested, correct?
10   A.   There have been requests made.
11   Q.   I understand that, but you have not brought
12        with you today those medical records from
13        2000 to the present for all of your
14        healthcare and mental healthcare providers
15        that have been requested, correct?
16   A.   Correct.
17   Q.   And for No. 16 we asked you for payments,
18        evidence of payments to all potential
19        healthcare providers.  You haven't brought
20        those with you as well, correct?
21   A.   No.  My attorney has.
22   Q.   All right.  No. 17 asked you to produce "any
23        and all applications for any disability
24        determination, including but not limited to
25        all supporting documents for such
```

0038
1          applications."  Have you produced any such
2          documents?
3     A.   To my attorney.
4     Q.   All right.  Let's talk about what documents,
5          then, exist that we haven't seen.
6               MS. MINCHOFF:  Objection.
7     Q.   When was it that you filed for any sort of
8          disability?
9     A.   August 2004.
10    Q.   All right.  And with whom did you file?
11    A.   Social Security disability.
12    Q.   In order to file for SSDI benefits, you have
13         to have accompanying documentation from some
14         sort of healthcare provider.  What
15         healthcare provider accompanied your -- what
16         healthcare provider reports accompanied your
17         application?
18    A.   I had another attorney for my Social
19         Security disability case who took care of
20         all records.
21    Q.   And who was that attorney?
22    A.   Her name is Alida Howard.
23    Q.   How do you spell the first name?
24    A.   A-L-I-D-A.
25    Q.   Do you know where she is, what --
0039
1     A.   Worcester, Massachusetts.
2     Q.   Worcester, Mass.
3     A.   (No verbal response.)
4     Q.   Howard is H-O-W-A-R-D?
5     A.   Yes.
6     Q.   Did you prepare the application or did Ms.
7          Howard?
8     A.   Ms. Howard.
9     Q.   Did Ms. Howard send you to any healthcare
10         provider?
11    A.   Excuse me.
12    Q.   Don't worry about it.  It's no worries,
13         okay?  Did Ms. Howard -- do you need to take
14         a drink?  Go ahead, please.
15    A.   I'm sorry.  Go ahead.
16    Q.   I don't mean to be an ogre.
17              Did Ms. Howard send you to any doctor,
18         service evaluator to provide a report or a
19         determination of your status that would then
20         accompany the application for SSDI benefits?
21    A.   I don't understand.
22    Q.   Sure.  It's probably poorly worded, I'm
23         sorry.
24              Did Ms. Howard send you to any doctor
25         for an examination to -- for as part of the
0040
1          application for SSDI benefits?
2     A.   No.
3     Q.   Did -- to the best of your knowledge, did
4          any of your treating physicians at that

```
 5        time, 2004/2005, did they provide any sort
 6        of reports?
 7   A.   To the best of my knowledge?
 8   Q.   Yeah.
 9   A.   Yes.
10   Q.   Okay.  And who was it that did that?
11   A.   As far as doctors, you mean?
12   Q.   Yeah.
13   A.   All of my treating doctors.
14   Q.   All right.  I'm looking for names.
15   A.   Okay.  Dr. Fraser, my primary care
16        physician, Dr. Hord, my attending physician
17        at Mass. General.
18   Q.   Hord is spelled H --
19   A.   H-O-R-D.
20   Q.   Okay.
21   A.   Dr. --
22   Q.   And if you need to look at something, go
23        right ahead.  This is not a memory contest
24        and if there's a document you need to look
25        at, feel free to look at whatever you need
0041
 1        to look at.  I just need to know.
 2   A.   I believe there's a list in the complaint.
 3   Q.   Probably not in the complaint.
 4   A.   Okay.
 5             MS. MINCHOFF:  Make a suggestion
 6        that maybe they're in the answers to
 7        interrogatories or the disclosure.
 8             MR. FERINGA:  Sure.  If she needs
 9        to look at --
10             MS. MINCHOFF:  Which I did not
11        bring with me, so...
12             MR. FERINGA:  Hang on.
13   BY MR. FERINGA:
14   Q.   Here's the 26th disclosure, my copy of the
15        disclosure, which is February 15, 2006.  If
16        you look at Page 3 of this document, there's
17        a list of doctors.  So the question that I
18        have is, to the best of your knowledge,
19        which of the doctors provided some
20        information to support the disability
21        application that was made by you and Ms.
22        Howard?
23   A.   Doctors 1 through 9.
24   Q.   Doctors 1 through 9?
25   A.   Yes.
0042
 1   Q.   To the best of your knowledge, all of those
 2        provided reports or some data to support
 3        that?
 4   A.   Correct.
 5   Q.   How do you know that?
 6   A.   They are all the doctors that were requested
 7        information from.
 8   Q.   Okay.  But, to the best of your knowledge,
 9        did all of those doctors respond?
```

```
10   A.   No.
11   Q.   All right.  So then the question is -- and
12        maybe my question was unclear -- which of
13        the doctors actually supported your
14        disability determination?
15   A.   I don't know.
16   Q.   Okay.  Thank you.  While we're on that
17        subject, has any -- has your lawyer, either
18        Ms. Howard or Ms. Minchoff --
19             MS. MINCHOFF:  Minchoff.
20             MR. FERINGA:  I apologize.
21             MS. MINCHOFF:  That's okay.
22             MR. FERINGA:  I'm really sorry.  I
23        don't know how to mispronounce (sic) names.
24             MS. MINCHOFF:  There's an H in
25        there, Minchoff.
0043
1              MR. FERINGA:  Minchoff, I
2        apologize.
3        BY MR. FERINGA:
4    Q.   -- or Mr. Kuzma send you to any doctors
5        outside of the doctors that you have
6        normally been seeing for an evaluation?
7    A.   No.
8    Q.   And in turn -- and after your application
9        for SSDI was made by Ms. Howard, did the --
10        were you sent by Social Security
11        disability -- or Social Security for any
12        sort of evaluation to a doctor that you had
13        never seen before?
14   A.   Yes.
15   Q.   And what doctor was that, and when did that
16        take place?
17   A.   I don't recall his name and/or when it was.
18   Q.   All right.  You made your application when?
19   A.   August 2004.
20   Q.   Okay.  And --
21   A.   I believe.  It was approximately August.
22   Q.   I'm not going to hold you to the August or
23        September.  You know it was sometime in the
24        fall of 2004, okay?  Is that fair?
25   A.   Or summer.
0044
1    Q.   Okay.  Fine.  Now, when was it that you went
2        to see this other doctor that apparently
3        SSDI or Social Security sent you to?
4    A.   I don't know.
5    Q.   Was it in 2004?
6    A.   I don't recall.
7    Q.   Was it in 2005?
8    A.   I don't recall.  It -- approximately 2004 or
9        2005.
10   Q.   Was it a long time after you made your
11        application, "long time" being months?
12   A.   Approximately four to six months.
13   Q.   Okay.  Do you remember it being spring?
14   A.   No.
```

```
15   Q.   Okay.  And do you have a list of what name
16        that -- strike that.
17             Do you have any card, any information
18        that would indicate who that doctor is?
19   A.   That would be in the records from my
20        attorney.  I don't recall his name.
21   Q.   Was it in Worcester, or did you go someplace
22        other than Worcester?
23   A.   I remember going to Fitchburg.
24   Q.   I'm not from here.  Can you spell that for
25        me?
0045
 1   A.   F-I-T-C-H-B-U-R-G.
 2   Q.   And how far is that from Worcester?
 3   A.   Approximately 30 minutes.
 4   Q.   Okay.  Do you know what type of doctor
 5        this -- was it a man or a woman?
 6   A.   It was a man.
 7   Q.   Do you know what type of doctor this man
 8        was?
 9   A.   I believe he was a psychologist.
10   Q.   Was the determination because of a
11        psychological disability or a physical
12        disability?
13   A.   It was both.
14   Q.   All right.  And the psychologist, were you
15        required to undergo a day-long series of
16        tests?
17   A.   No.
18   Q.   How long was the session?
19   A.   10 minutes.
20   Q.   Really?
21   A.   Yeah.
22   Q.   Was there any sort of -- did he take notes,
23        as far as you know?
24   A.   As far as I know, I don't remember.  It was
25        very brief.
0046
 1   Q.   Had you ever -- did you go there with
 2        someone else?
 3   A.   My mother dropped me off.
 4   Q.   Your mother's name is?
 5   A.   Lauren Pompei.
 6   Q.   Thank you.  Was the session recorded in any
 7        fashion?
 8   A.   I don't recall.
 9   Q.   Did you sign anything, to the best of your
10        knowledge, that authorized the recording of
11        any such session?
12   A.   Not to my knowledge.
13   Q.   And to the best of your knowledge, have you
14        seen a report from that session?
15   A.   No, I have not.
16   Q.   Other than seeing a psychiatrist at the
17        request of Social Security --
18   A.   Psychologist.
19   Q.   -- psychologist at the request of Social
```

```
20          Security, did you see any other physician,
21          either a mental health professional,
22          psychiatrist, psychologist, orthopedic
23          surgeon, anybody?
24     A.   Per Social Security?
25     Q.   Yes.
0047
 1     A.   No.
 2     Q.   As a result of the visit to the
 3          psychologist, did your attorney send you to
 4          someone else after that?
 5     A.   No.
 6     Q.   What was the result of the application for
 7          disability?
 8     A.   Denied.
 9     Q.   Has, to the best -- and when did you learn
10          that there was a denial?
11     A.   I can't recall.
12     Q.   All right.  If your application -- if you
13          went to see a psychologist four to six
14          months after your application was put in
15          place, which would have brought us to the
16          winter or spring of 2005, when was it that
17          now you think you may have learned that your
18          application was denied?
19     A.   It was approximately January.
20     Q.   "It," what are you referring --
21     A.   The initial denial.
22     Q.   Okay.  So likely then the psychologist was
23          before that or after?
24     A.   Yes, he was before that.
25     Q.   Okay.  So you filed your application
0048
 1          sometime in the summer or fall of 2004?
 2     A.   Yes.
 3     Q.   You were asked to see a psychologist for
 4          this 10-minute visit that you talked to us
 5          about, and then sometime in January of 2005
 6          you were denied, correct?
 7     A.   Correct.
 8     Q.   Then what happened with respect to the
 9          disability determination?
10     A.   My attorney, Alida Howard, submitted an
11          appeal which was then sent for hearing where
12          I met with a judge and was granted
13          disability.
14     Q.   When did that take place?
15     A.   That hearing took place on February 14th of
16          2006.
17     Q.   So this year?
18     A.   Yes.
19     Q.   Between the time that the appeal was filed
20          and the time of the granting of your
21          disability status, did you see any doctors
22          specifically, doctor, by that I mean Ph.D.s
23          or M.D.s, for any further evaluations with
24          respect to the Social Security disability
```

```
25        request?
0049
 1   A.   No.
 2   Q.   Are you aware of whether any of the treating
 3        physicians whom are identified as Physicians
 4        1 through 9 on your Rule 26 disclosure were
 5        asked to file supplemental reports?
 6   A.   Yes.
 7   Q.   And do you know which ones actually did?
 8   A.   Yes.
 9   Q.   Who?
10   A.   Dr. Fraser, Dr. Hord, Dr. --
11   Q.   Do you need to see the list?
12   A.   Please.
13   Q.   (Hands document to witness.)
14   A.   Thank you.
15   Q.   Sure.
16   A.   Dr. Hord, Dr. Fraser, Dr. Borgen.
17   Q.   You're going to have to spell that, please.
18   A.   Dr. Borgen, B-O-R-G-E-N.
19   Q.   Thank you.
20   A.   And there is one more, I believe, that --
21   Q.   Is that one more listed on this document?
22   A.   No.  He's relatively new, probably new --
23   Q.   Since --
24   A.   -- since the document.
25   Q.   Okay.  We'll talk to your attorney about
0050
 1        that, but what -- who is this new person?
 2   A.   Dr. John Aney, A-N-E-Y.
 3   Q.   And who is Dr. John Aney?
 4   A.   He's a psychiatrist.
 5   Q.   And when did you first see Dr. John Aney?
 6   A.   I can't recall when I first saw him.
 7   Q.   Okay.  But was it -- give me a year.
 8   A.   2005, approx -- in the fall of 2005.
 9   Q.   How was it that you got to Dr. Aney?
10   A.   My primary care physician, Dr. Fraser,
11        recommended that I see him.
12   Q.   Okay.  And it's my understanding that Dr.
13        Aney has provided a report to assist in the
14        appeal?
15   A.   Yes.
16   Q.   Okay.  Approximately how many times have you
17        seen Dr. Aney since beginning to see him in
18        two -- the fall of 2005?
19   A.   10 to 12 times.
20   Q.   Do you --
21   A.   Perhaps.  Approximately.
22   Q.   And do you have his records with you today?
23   A.   No, I don't.
24   Q.   Do you -- in addition to seeing Dr. Aney, do
25        you see any therapists within his office,
0051
 1        either a social worker, psychologist,
 2        master's degree level limited license
 3        psychologist?
```

```
 4   A.   Not within his office.
 5   Q.   Do you see any therapists, using that term
 6        to encompass all of those types of
 7        individuals, other than Dr. Aney?
 8   A.   No. 9, Dr. Borgen, B-O-R-G-E-N --
 9   Q.   Okay.
10   A.   -- for pain management.
11   Q.   Okay.  Here, let me back up.  What I'm
12        looking for is a mental health professional.
13   A.   She is.
14   Q.   She is, okay.  I'm sorry.
15             Is there any other therapist, mental
16        health professional that you see in addition
17        to Dr. Borgen and Dr. Aney?
18   A.   No.
19   Q.   Is Dr. Aney the prescribing physician for
20        the medications that you take?
21   A.   Yes, some.
22   Q.   Yes, I understand that there are --
23   A.   Many.
24   Q.   -- there are medications that are prescribed
25        by other physicians, but in terms of
0052
 1        psychiatric medications that you are on, it
 2        is Dr. Aney that prescribes those?
 3   A.   Yes.
 4   Q.   And we'll get into later what medications
 5        those are.
 6             All right.  So we got into this whole
 7        line of questioning because I asked you
 8        about disability determination.  I'm looking
 9        at No. 17.  Recognizing that the records
10        were not brought today for that, it's your
11        testimony that on February 14, 2006 after a
12        hearing you were granted SSDI, correct?
13   A.   Correct.
14   Q.   And as a result of being granted SSDI
15        status, disability determination status, I
16        assume that you are receiving some sort of
17        compensation?
18   A.   I have received my notice of approval, and
19        I'm waiting.  They give you a ballpark.
20   Q.   All right.  So to the present day while
21        you've been approved, you haven't received a
22        check?
23   A.   No.  I expect to.
24   Q.   And how much will the check be?  Have they
25        told you?
0053
 1   A.   It's retroactive.  I don't know.
 2   Q.   So it's going to be retroactive to when?
 3   A.   To the date of my application.
 4   Q.   Sometime in the summer or fall of 2004?
 5   A.   Yes.
 6   Q.   Have you been granted permanent disability
 7        status?
 8   A.   I don't know.
```

```
 9  Q.   Meaning have you been determined to be
10       permanently disabled forever?
11  A.   I don't know.
12  Q.   Have you been set up on a schedule of
13       examinations where you'll be yearly --
14       examined yearly, for example?
15  A.   No.  Not to my knowledge, no.
16  Q.   Other than obviously receiving a check for
17       the -- prorated back to the date of your
18       application, have you received any sort of
19       understanding as to how much your check will
20       then be on a monthly basis once you're
21       caught up and current?
22  A.   Approximately $1,000 a month.
23  Q.   Okay.  Have you received a piece of paper
24       that says --
25  A.   No.  No.
0054
 1  Q.   All right.  When you had the hearing on
 2       the -- in front of this, what will be an
 3       administrative law judge, where did that
 4       hearing take place?
 5  A.   In Boston.
 6  Q.   And where in Boston?
 7  A.   I don't know.
 8  Q.   Some sort of federal building?
 9  A.   Yes, the Social Security Office.
10  Q.   And do you have any sense of whether that
11       hearing was recorded in any sense?  Was
12       there a court reporter present, or was there
13       a videotape, or was there an audiotape?
14  A.   I believe there was a court reporter
15       present.
16  Q.   Okay.  Have you seen a copy of that
17       transcript?
18  A.   No, I have not.
19  Q.   Okay.  Let's go to No. 18.  I have asked you
20       to provide copies of any e-mail or Instant
21       Message correspondence that you might have
22       sent between Ms. LaBelle and yourself from
23       March 1, 2004 to the present.  Do you have
24       it?
25  A.   No.
0055
 1  Q.   Do you have an Internet account, and do you
 2       with that Internet account e-mail people?
 3  A.   Yes.
 4  Q.   All right.  Did you communicate with Ms.
 5       LaBelle about your trip that you and she
 6       were planning on taking by e-mail before you
 7       went on it?
 8  A.   No.
 9  Q.   What about after your trip; did you
10       communicate in any way, Instant Message or
11       by e-mail, comments on -- between Ms.
12       LaBelle and yourself about how you're doing,
13       how you're progressing, she's asking the
```

```
14        questions, you respond?
15   A.   Not that I recall.  We speak on the phone or
16        in person.
17   Q.   So you have no e-mail communications?
18   A.   No, not to my knowledge.  I didn't keep any
19        if I had.
20   Q.   Who was your Internet service provider in
21        2004, Yahoo, AOL?
22   A.   Verizon.
23   Q.   You sure?  Is Verizon your cell phone, or
24        did you --
25             MS. MINCHOFF:  It does Internet,
0056
 1        too.
 2   Q.   Verizon was your Internet?
 3   A.   And telephone, yeah.  It's all --
 4   Q.   All big one thing?
 5   A.   -- one.
 6   Q.   And Verizon has been your Internet service
 7        provider from March of 2004 to the present?
 8   A.   I believe so, yes.
 9   Q.   All right.
10   A.   Yeah.  I don't take care of that.
11   Q.   All right.  No. 19 asked you to produce
12        documents, records and things that you
13        reviewed in preparation for your testimony
14        today.  What have you brought with you?
15   A.   No, I haven't brought anything with me.
16   Q.   Did you review anything to help refresh your
17        memory about anything before you came here
18        today?
19   A.   I reviewed my copies of the admissions and
20        the complaint and the supplemental
21        admissions.
22   Q.   Okay.  So where are those documents, your
23        copies of all of this stuff?
24   A.   I didn't bring them with me today.  They're
25        the same as these (indicating).
0057
 1   Q.   I appreciate that.  And the reason why you
 2        didn't bring that today was why?
 3   A.   I don't know.
 4   Q.   You never received a copy of this document?
 5   A.   This document (indicating)?
 6   Q.   Yes, asking you to bring all of these --
 7   A.   I don't recall the documents.
 8   Q.   My question is, with Exhibit No. 1, did you
 9        ever receive from any source this document
10        asking you to bring all of this material
11        today?
12   A.   This is a legal --
13   Q.   Yes.
14   A.   -- document.  Right, I don't -- I remember
15        seeing the date and time of when I needed to
16        be here, but as far as the rest of the
17        document, I don't recall.
18   Q.   Let me just make sure.  Ms. Hofer, did you
```

```
19          receive a copy of this document from any
20          source prior to today?
21                  MS. MINCHOFF:  Objection.
22                  MR. FERINGA:  On what basis?
23                  MS. MINCHOFF:  It's asked and
24          answered.
25                  MR. FERINGA:  No.  And she says she
0058
 1          recalls, quote, seeing the date and time,
 2          end quote.  That could have been in a
 3          correspondence from you.  It could have been
 4          something else.  My question specifically is
 5          with respect to Exhibit No. 1, "Have you
 6          seen this document before today?"
 7                  MS. MINCHOFF:  And to that she
 8          answered "I don't recall."  I'll let you
 9          answer it again.
10    A.    I don't recall.
11                  MR. REITH:  If I could just
12          interject.  Just let -- India, just let the
13          witness answer the question.  Don't repeat
14          her testimony.  If she had testified to it
15          before, she's competent enough to testify
16          that "I testified to it before."  I would
17          just ask that you don't talk --
18                  MS. MINCHOFF:  Well, I was actually
19          responding to Attorney Feringa's
20          characterization of what he believed her
21          testimony was, but I respect your comment
22          for the record.
23          BY MR. FERINGA:
24    Q.    Let's see if we can pin down what you
25          actually looked at.  You looked at the
0059
 1          complaint.  You looked at the answers to
 2          requests for admissions.  Did you look at
 3          those documents that were called
 4          interrogatories?
 5    A.    Yes.
 6    Q.    Did you look at documents that -- things
 7          that are called requests for production of
 8          documents?
 9    A.    No, not that I recall.
10    Q.    Did you look at the thing that I passed you
11          a couple of times that have the physicians
12          identified as Nos. -- Physicians 1 through
13          9?  Did you look at that?  It's called a
14          Rule 26 disclosure.
15    A.    No, not that I recall.
16    Q.    Did you look at any medical records that you
17          have in your possession?
18    A.    No.
19    Q.    Did you look at any other things -- and I'm
20          using that term broadly because I don't
21          know -- to help you refresh your memory with
22          respect to any testimony today?
23    A.    The only things I looked at are the things
```

```
24        I've stated I don't have in my possession,
25        any medical records or such to refresh my
0060
 1        memory.  My --
 2   Q.   Okay.  I'm sorry.  Are you finished?
 3   A.   Uh-huh.
 4   Q.   Okay.  While we were on the subject of
 5        electronic correspondence, have you e-mailed
 6        any of your physicians or received e-mail
 7        from your physicians, psychiatrists,
 8        psychologists, about your condition, how
 9        you're doing?
10   A.   No.
11   Q.   What about friends that you communicate
12        with; do you send messages about your -- how
13        you are doing physically and mentally to
14        your friends by electronic correspondence?
15   A.   Yes.
16   Q.   Okay.  And have you talked about your injury
17        and how you're doing and how you're getting
18        about your daily living to your friends by
19        e-mail?
20   A.   Vaguely.
21   Q.   Maybe I don't understand that.  What do you
22        mean "vaguely"?  You did it or didn't or may
23        have?
24   A.   I may have, not specifically.  "How are
25        you?"  "Well, thank you."
0061
 1   Q.   What about have you received any
 2        correspondence from or communicated with
 3        anyone who is associated with Turtle Beach
 4        Towers or the management company since March
 5        of 2004?
 6   A.   No.
 7   Q.   Did you receive a telephone call from
 8        somebody at Turtle Beach Towers about two
 9        weeks after the accident?
10   A.   I received a phone call from somebody.  I
11        don't recall who it was from.  It was a very
12        fuzzy phone call.  It wasn't a good
13        connection.
14   Q.   All right.  Was it a man or a woman?
15   A.   I don't recall.
16   Q.   And do you remember how that individual
17        identified themselves?
18   A.   No.
19   Q.   Do you -- how do you know that it was then
20        associated with Turtle Beach Towers?
21   A.   I --
22             MS. MINCHOFF:  Objection.
23   Q.   You can answer unless your lawyer tells you
24        not to.  And take your directions from your
25        lawyer.  I don't mean to tell you what to
0062
 1        do, I apologize.
 2             MS. MINCHOFF:  I'm just objecting
```

```
 3            for the record, Stephanie.  By all means
 4            answer.
 5    A.      I recall somebody saying they were from
 6            Jamaica.  I don't recall who or from where.
 7            I don't recall the conversation.  I was very
 8            medicated, so it's not very clear.
 9    Q.      All right.  Let me explore that a little bit
10            if I could.
11    A.      Uh-huh.
12    Q.      You were at Mass. General?  Were you still
13            in the hospital?
14    A.      No.
15    Q.      You were at home?
16    A.      Yes.
17    Q.      And did -- was this a prearranged call, or
18            did this just come out of the blue?
19    A.      Out of the blue.
20    Q.      Was somebody else there listening to this
21            phone call --
22    A.      No.
23    Q.      -- or was it just you?
24    A.      Just me.
25    Q.      And you don't remember whether it was a man
0063
 1            or a woman?  You don't -- you remember some
 2            reference to Jamaica, bad connection.  Do
 3            you remember anything more about the phone
 4            call?
 5    A.      No.
 6    Q.      Do you know how long the phone call took
 7            place?
 8    A.      It was very brief.
 9    Q.      Did you receive any documents, then, after
10            that from anyone associated with Turtle
11            Beach Towers or the management company that
12            may have run it or somebody else from
13            Jamaica?
14    A.      No.
15    Q.      Did you ever make a claim -- other than this
16            complaint, did you ever make a claim to any
17            insurance company associated with Turtle
18            Beach Towers or management company that ran
19            Turtle Beach Towers in Jamaica?
20    A.      No.
21    Q.      Other than this one phone call that you
22            received from an unidentified person from --
23            that you think was from Jamaica a couple of
24            weeks after the accident, did you receive
25            any other phone calls from people
0064
 1            representing themselves to be from Jamaica?
 2    A.      No.
 3    Q.      Are you aware of whether Ms. LaBelle
 4            received any similar photo -- telephone
 5            calls?
 6    A.      I'm not aware.
 7    Q.      Do you know whether your husband or your
```

```
 8        mother or somebody else received -- from --
 9        around your family, with your family?
10   A.   I'm not aware.
11   Q.   Okay.  Let me ask some questions about you.
12        You're married, correct?
13   A.   Yes.
14   Q.   Your husband is whom?
15   A.   Douglas Hofer.
16   Q.   And you've been married for how long?
17   A.   13 years in August.
18   Q.   May I ask your birth date and birthplace,
19        please?
20   A.   July 18th, 1972.  I was born in Harvard,
21        Massachusetts.
22   Q.   Do you have any children?
23   A.   No.
24   Q.   I generally don't ask this question, but
25        because it's part of the answers to
0065
 1        interrogatories, I'm going to be asking it.
 2        And the reason I'm asking it, just to let
 3        you know, is there are some allegations that
 4        your weight has varied, and so I never ask
 5        people weight.  I want you to know I've been
 6        married 26 years, and I've never asked my
 7        wife, for the record.
 8             MS. MINCHOFF:  That's why you're
 9        married 26 years.
10             MR. FERINGA:  Right.
11   Q.   So I'm going to have to ask you, and I
12        apologize for asking this type of personal
13        question.  Can you give me the weight that
14        you were before your accident?
15   A.   130 pounds.
16   Q.   130?
17   A.   Yes.
18   Q.   Okay.  And can I ask you your weight
19        presently, please?
20   A.   215.
21   Q.   Okay.  And in terms of your weight,
22        recognizing it was 130 before the accident,
23        did your weight prior to that over your
24        teenage years or your early years, adult
25        years, did your weight vary?
0066
 1   A.   Yes.
 2   Q.   All right.  And from what to what would it
 3        generally vary?
 4   A.   From 115 to 130, approximately.
 5   Q.   And with respect, Ms. Hofer, to the weight
 6        that you presently have, are you on any sort
 7        of program to try and reduce it, if you wish
 8        to do that?
 9   A.   Weight Watchers.
10   Q.   Okay.  Is there any sort of indication from
11        any of your healthcare professionals that
12        some of the weight is due to the medication
```

13          that you're taking?
14    A.    Yes.
15    Q.    And is it for the antidepressant medication?
16    A.    It is for the nerve medication.
17    Q.    Which one?
18    A.    Neurontin.
19    Q.    Neurontin, okay?
20    A.    And possibly one of the antidepressants that
21          I take.
22    Q.    All right.  You've been on a medication
23          called Prozac --
24    A.    Yes.
25    Q.    -- for a period of time, correct?
0067
1     A.    Yes.  I'm no longer on Prozac.
2     Q.    All right.  What is the -- what has been
3           substituted in place of Prozac for your
4           antidepressant?
5     A.    Cymbalta.
6     Q.    And does Cymbalta have as one of its side
7           effects the potential for weight gain?
8     A.    Yes.
9     Q.    Again, this is a personal question, and I'm
10          asking it only because of some of the
11          allegations that have been made in this
12          complaint.  Prior to this accident, you and
13          your husband did not have children, correct?
14    A.    Correct.
15    Q.    Is there a reason why you decided to delay
16          plans for a family or decide not to have a
17          family before this accident?
18    A.    We were young and waiting.
19    Q.    That's fine.  I'm sorry, forgive me, you
20          were married when?
21    A.    1993.
22    Q.    And you were how old when you got married?
23    A.    21.
24    Q.    So at the time of the accident you were 31?
25    A.    Yes.
0068
1     Q.    Had your family in terms of the discussions
2           about having a family with your husband
3           prior to this accident, had you had
4           discussions about having a family?
5     A.    Yes.
6     Q.    And had there been discussions about why you
7           waited 10 years?
8     A.    Not really.
9     Q.    And, again, because of the allegations that
10          you're going to make I'm going to ask you
11          some questions about this, but were you on
12          any sort of prescribed birth control
13          medications from the time that you got
14          married to the time of your accident?
15    A.    Yes.
16    Q.    And what was the prescription that you had?
17    A.    It was a birth control pill, and I stopped

```
18        taking it years before the accident --
19   Q.   Okay.
20   A.   -- maybe two or three years prior to.  I
21        can't recall.
22   Q.   Had you been to any sort of reproductive
23        gynecologist or talked to your general
24        gynecologist about when it was that would be
25        optimal for you then after stopping birth
0069
 1        control to maybe try to become pregnant?
 2   A.   Yes.
 3   Q.   And was this a discussion with a
 4        gynecologist that you were seeing, or was
 5        this a special gynecologist?
 6   A.   It was my --
 7   Q.   Your gynecologist?
 8   A.   Yes.
 9   Q.   And that -- her name is what, please?
10   A.   His name is Dr. Michael Schatz.
11   Q.   Spell that.
12   A.   S-C-H-A-T-Z.
13   Q.   And when was it that you began having
14        discussions with Dr. Schatz about family
15        planning decisions, optimal times?
16   A.   When I was about 28 or 29.
17   Q.   And was there a plan that you and your
18        husband had sort of thought about as to when
19        you should maybe start, as my wife said,
20        trying, end quote?
21   A.   Yes.
22   Q.   And when was that?
23   A.   When I was 30 or 31, in that ballpark.
24   Q.   And, again, not attempting to be personal,
25        but for the reason that it has now become a
0070
 1        subject of this lawsuit, had you and your
 2        husband begun, quote, trying --
 3   A.   Yes.
 4   Q.   -- end quote?
 5   A.   Yes.
 6   Q.   And had you been -- and was that -- that was
 7        not successful, or was it successful?  Had
 8        you become pregnant?
 9   A.   No.
10   Q.   And had -- if you had been trying for a year
11        or so prior to the accident, however long it
12        was, had you then moved to the next phase
13        where you began doing some sort of testing
14        as to figure out why things -- you hadn't
15        become pregnant?
16   A.   We were about to at the time of the
17        accident.
18   Q.   So had you begun keeping charts with those
19        basal cell thermometers and --
20   A.   Yes.
21   Q.   I hate those things.
22             And other than keeping charts to try
```

```
23          and determine optimal time for temperatures,
24          did you do anything more than that?
25   A.     Not at the -- no.
0071
 1   Q.     So there were no medications, there was no
 2          sort of --
 3   A.     No.
 4   Q.     -- testing or anything of the sort?
 5              And it's my understanding that you --
 6          at least there's an allegation that you've
 7          been advised not to become pregnant?
 8   A.     Yes.
 9   Q.     And who is it that has done that?
10   A.     My neurologist and my primary care physician
11          and my gynecologist.
12   Q.     All right.  So we have Dr. Fraser?
13   A.     Yes.
14   Q.     We have -- the neurologist is who?
15   A.     Dr. Hord.
16   Q.     And the reason is because of what?
17   A.     The medications that I take.
18   Q.     All right.  Has he talked to you -- have
19          they talked to you about the specific
20          medications that they think may have an
21          effect on pregnancy?
22   A.     All of them, pretty much.
23   Q.     And is there going to be -- have you had
24          trials where they have asked you to stop all
25          medications?
0072
 1   A.     No.
 2   Q.     Now, while we're on the subject, prior to
 3          March of -- prior to the date of the
 4          accident you were on Prozac, correct?
 5   A.     Yes.
 6   Q.     What other medications were you on?
 7   A.     That's all.
 8   Q.     And the prescription for Prozac was 40 or 60
 9          milligrams one time a day; do you remember?
10   A.     I don't remember.
11   Q.     Did you take one pill or two pills?
12   A.     I don't remember.  It was a very long time.
13   Q.     But you had been on Prozac for how many
14          years?
15   A.     Five maybe, approximately five or -- I don't
16          remember.
17   Q.     In terms of discussions with your
18          gynecologist prior to the accident, did you
19          have discussions with your gynecologist
20          about becoming pregnant while on Prozac?
21   A.     Yes.
22   Q.     And the discussion was?
23   A.     That it would be safe.
24   Q.     Okay.  All right.  Let me move back to sort
25          of the line that I was starting on.  I sort
0073
 1          of jump all over, I apologize.
```

```
 2              Your educational is what, please?
 3   A.   A high school graduate and I attended two
 4        years of college at Mount Wachusett
 5        Community College in Gardner.
 6   Q.   And you graduated from high school when?
 7   A.   In 1990.
 8   Q.   And that two years of community college,
 9        what types of things did you study?
10   A.   I took a medical background.
11   Q.   A medical background?
12   A.   Pre-sciences, pre-nursing.
13   Q.   So basic biology, chemistry --
14   A.   Yes.
15   Q.   -- physics?
16   A.   Yes.
17   Q.   And did you do anything more within the
18        medical field so that you got into actual
19        clinical work?
20   A.   I became a certified dental assistant.
21   Q.   And in order to do certified dental
22        assistant, you had to take some other
23        sciences?
24   A.   Not required.  I had to take an exam.
25   Q.   Did you receive a degree?
0074
 1   A.   I received a certificate.
 2   Q.   Okay.  And did you take those classes at
 3        that community college --
 4   A.   No.
 5   Q.   -- or was it a different place?
 6   A.   The certification for dental assistants
 7        comes from the DANB, which is the Dental
 8        Assisting National Board.
 9   Q.   Okay.  But in order to become -- to qualify
10        to be certified, other than taking the basic
11        science courses in a community college,
12        potentially, did you have to attend courses
13        at any other institution?
14   A.   No.
15   Q.   Did they have a track for dental assistants
16        in that community college?
17   A.   Not in that particular community college,
18        no.
19   Q.   So where did you go for those?
20   A.   I was trained in an office.
21   Q.   Okay.  And after being trained in an office,
22        then you were able to take the exam?
23   A.   Yes.
24   Q.   So you practiced as a dental assistant for
25        how long?
0075
 1   A.   Almost 13 years.
 2   Q.   And were -- in 2004 were you part time or
 3        full time?
 4   A.   Part time.
 5   Q.   Give me an idea of what it meant to be part
 6        time, please.
```

```
 7   A.   I was working about 15 to 20 hours a week at
 8        that time.
 9   Q.   At what rate of pay?
10   A.   $18 an hour.
11   Q.   No benefits?
12   A.   No.
13   Q.   Is that correct --
14   A.   Yes.
15   Q.   -- you had no benefits?
16   A.   Yes, that's correct.
17   Q.   I'm sorry.  Sometimes we talk nos, and I'm
18        just trying to make sure we both
19        communicate.
20   A.   Okay.
21   Q.   So you had just a straight hourly pay; is
22        that correct?
23   A.   Yes.
24   Q.   At least in one of the records that you saw
25        you were working for your mother part time
0076
 1        as well?
 2   A.   Yes.
 3   Q.   And what was that?
 4   A.   Really wasn't working.  I went to school to
 5        become a manicurist so that I could do nails
 6        while going back to school in my mother's
 7        salon.  I didn't do it very much.
 8   Q.   Okay.  So let me ask you some questions
 9        about that if I might.  When was it that
10        you -- when you were talking about, quote,
11        going back to school, what was -- is this
12        the community college that you're talking
13        about, or is this a different time?
14   A.   This was going to be another time, yeah.
15   Q.   Okay.  So let's see if I can understand it.
16        From high school you went to the community
17        college?
18   A.   Yes.
19   Q.   Contiguously as you finished high school in
20        June, you went to the community college in
21        the fall?
22   A.   Yes.
23   Q.   And then did you go to school there for
24        about two years?
25   A.   Two years.
0077
 1   Q.   Straight?
 2   A.   Yeah.
 3   Q.   Then was there a period of time when you
 4        stopped?
 5   A.   Yes.
 6   Q.   So might I assume that's probably about
 7        1992, 1993, somewhere in there?
 8   A.   Yes.
 9   Q.   Okay.  When was it that you -- and then did
10        you then get your dental hygienists or
11        dental assistant degree shortly after that?
```

```
12   A.   Yes.
13   Q.   1993/1994?
14   A.   Yes.
15   Q.   Somewhere in there?
16   A.   Yes.
17   Q.   When was it then in terms of time that you
18        were thinking about going back to school and
19        working in your mother's nail salon?
20   A.   1998.
21   Q.   Okay.  So between 1993 and 1994 and 1998
22        what were you essentially working as a
23        dental assistant during that time or full
24        time?
25   A.   Full time at that time.
0078
 1   Q.   And then what was it about 1998 that made
 2        you decide that you may think you may want
 3        to go back to school?
 4   A.   I wanted to become a dental hygienist.
 5   Q.   And that requires much more training and
 6        certification?
 7   A.   Two more years of school.
 8   Q.   Did you actually make application, Ms.
 9        Hofer, at any school for dental hygienists?
10   A.   Not -- no.
11   Q.   So this was a plan that you were thinking of
12        but it never happened?
13   A.   Yes.
14   Q.   However, did you stop going full -- did you
15        stop working full time as a dental
16        assistant?
17   A.   Yes.
18   Q.   Did you continue on part time or just stop?
19   A.   I stopped for a period of time.
20   Q.   And so while you were stopped, is that when
21        you went to school to get some sort of -- or
22        you had some training to do nails?
23   A.   Yes.
24   Q.   Since you can tell I don't have my nails
25        done, what type of schooling did you need to
0079
 1        do to do that?
 2   A.   You need to attend like a vocational
 3        program.
 4   Q.   And did you?
 5   A.   Yes.
 6   Q.   Where?
 7   A.   In Marlborough, Massachusetts.
 8   Q.   Is this some sort of private place that --
 9   A.   No.
10   Q.   -- or was it a community college or what?
11   A.   Nashoba, Nashoba -- Nashoba Valley
12        Vocational -- it's a -- they do continuing
13        education at --
14   Q.   All right.
15   A.   -- for -- yeah.
16   Q.   So I can understand, what you went to was
```

```
17        some sort of adult continuing ed. within a
18        public school community-type place?
19   A.   Yes.
20   Q.   That was poorly worded, but thank you for
21        saving me with that yes.
22   A.   Yes.
23   Q.   And so how long did you continue with that?
24   A.   I finished the program.  I don't recall how
25        long.
0080
 1   Q.   So did you then get licensed or certified?
 2   A.   Yes.
 3   Q.   Is that license or certification current?
 4   A.   Yes.
 5   Q.   Is it something that you've continued
 6        renewing on a yearly --
 7   A.   I have kept it current.
 8   Q.   And in order to keep it current, do you have
 9        to just pay the money, or do you have to go
10        and take some other upgrades, tests?
11   A.   No.  You just pay the money.
12   Q.   So you've been doing that?
13   A.   Yes.
14   Q.   So how long did you work in your mom -- your
15        mother's salon?
16   A.   Not very long.  I can't recall.
17   Q.   Are we talking months, a year?
18   A.   A few months.
19   Q.   Okay.  And then after a few months you
20        decided, what, you're not going to be a
21        dental hygienist anymore and you're going to
22        go back to being an assistant?
23   A.   Sort of.
24   Q.   Tell me if I'm wrong.
25   A.   It's still something I would like to do.
0081
 1   Q.   And I was going to ask you that.  You have
 2        not worked as a dental assistant since the
 3        Jamaica vacation in March?
 4   A.   No, I have not.
 5   Q.   So it's now a little more than two years
 6        later.  Have you during that two years
 7        decided, well, maybe I'm going to go to
 8        school and try and do something else?
 9   A.   I've thought about that, but there are very
10        limited things that I can do currently.
11   Q.   And tell me about that.  Tell me what things
12        limit you going to school.
13   A.   No. 1, being the chronic pain and RSD
14        diagnosis that I have, No. 2, being all of
15        the medications that I take, they inhibit my
16        ability to concentrate.  They inhibit my
17        dexterity.  I'm a little slow on the uptake
18        sometimes.  There are a lot of powerful pain
19        medications that make it virtually
20        impossible for me to function in the
21        capacity that I used to.
```

```
22   Q.   Have -- I'm not trying to be rude, but have
23        you tried?
24   A.   Yes.
25   Q.   And did you then make application and go to
0082
 1        school?
 2   A.   No.  I tried to go back to work.
 3   Q.   And when was it that you tried to go back to
 4        work as a dental assistant?
 5   A.   I don't recall exactly when.
 6   Q.   Give me a time -- a year and a time of the
 7        year, spring, summer, fall.
 8   A.   Probably the fall of the --
 9   Q.   Of what year?
10   A.   Of the following year.
11   Q.   So are we talking --
12   A.   2000 --
13   Q.   2005.
14   A.   -- '5.
15   Q.   And you went -- you tried to go back to work
16        at what?
17   A.   For my prior -- for the employer that I was
18        working for at the time of the accident.
19   Q.   And who is that?
20   A.   Dr. Mark Meszaros, M-E-S-Z-A-R-O-S.
21   Q.   And how long did you attempt to do that?
22   A.   I attempted a few days, and didn't make full
23        days, but I attempted to do that, and I
24        could not.
25   Q.   So did this take place over a week, over two
0083
 1        or three days?
 2   A.   Over a period of maybe two or -- two weeks
 3        or so.
 4   Q.   All right.  And what was it that you
 5        perceive kept you from continuing?
 6   A.   My hands shake, and I can't be on my feet
 7        very long.
 8   Q.   Okay.  All right.  So --
 9   A.   Among --
10   Q.   Among other things, right?
11   A.   Yes.
12   Q.   I think you've mentioned the pain and the
13        concentration issues.
14            What I was also looking at is, have
15        you attempted to go back to school to look
16        for things to do other than standing on your
17        feet or things that you may need to do with
18        your hands?
19   A.   I've spoken with a vocational counselor.
20   Q.   Ah.  And who is the vocational counselor,
21        and when did that take place?
22   A.   I don't recall who, but they supply you
23        with -- when you apply for Social Security
24        disability, you -- when you first apply, you
25        meet with a person who does your application
0084
```

```
 1        and then goes over certain different
 2        vocations that you can look into, and they
 3        will also put you on a list of some sort
 4        that generates different options for work
 5        depending on your educational background,
 6        and that's that.  I never heard back.
 7   Q.   All right.  So the vocational counselor that
 8        you saw was in conjunction with your
 9        application that took place in August of
10        2004?
11   A.   Yes.  I wouldn't call -- I may have
12        misworded that.  I wouldn't call it a
13        counselor as in a doctor or a psychiatrist
14        or a psychologist.
15   Q.   You used the words, quote, I have spoken
16        with a vocational counselor, end quote.  So
17        what you're now -- you want to amend that
18        and say it wasn't necessarily somebody who
19        held that title --
20   A.   Of --
21   Q.   -- of a vocational counselor, it was
22        somebody else who talked to you about
23        vocational options?
24   A.   Yeah.
25   Q.   Okay.
0085
 1   A.   It's not a counselor as in like a social
 2        worker or...
 3   Q.   All right.  But it was in conjunction with a
 4        Social Security application?
 5   A.   Yes.
 6   Q.   Have you seen, however, some individual
 7        other than that one that we've just --
 8        you've just shared with us, have you seen
 9        some individual to help, "Well, maybe you
10        can go to school, maybe you can do these,
11        these jobs are open to you, these aren't"?
12   A.   No.
13   Q.   Do you have any appointment set in the
14        future for that?
15   A.   No.
16   Q.   Have you considered going back to school to
17        do some job that is much more -- to learn to
18        do some job that's much more sedentary?
19   A.   Had I thought about it?
20   Q.   Yeah.  Have you thought about it since your
21        accident in 2004?
22   A.   Yes, I've thought about it.
23   Q.   And have you then made application to any of
24        those schools to begin the process?
25   A.   No.
0086
 1   Q.   Why not?
 2   A.   Money, for one.  I can't afford to go back
 3        to school at this time.
 4   Q.   Have you looked into the loan -- the
 5        potential for loans or scholarships or
```

```
 6         grants?
 7    A.   No.
 8    Q.   "Money," meaning that you're -- because your
 9         income was lost, the family income that you
10         have has decreased?
11    A.   Yes.
12    Q.   And that's causing you problems, correct?
13    A.   Yes.
14    Q.   Have those financial problems caused
15         problems in your marriage?
16    A.   No.
17    Q.   Did you have marital difficulties prior to
18         2004?
19    A.   Yes.
20    Q.   What were they?
21    A.   We separated at one point.
22    Q.   When was it that you separated?
23    A.   1995.
24    Q.   And the reason for the separation?
25    A.   We were young.
0087
 1    Q.   And how long did you live apart?
 2    A.   Approximately eight months.
 3    Q.   And then did you see counselors --
 4    A.   Yeah.
 5    Q.   -- to help you get back?
 6    A.   Yes.
 7    Q.   Was this someone different from
 8         psychiatrists or psychologists or
 9         therapists?
10    A.   I saw a therapist.
11    Q.   Did he --
12    A.   She.
13    Q.   Did he, your husband --
14    A.   Oh.  Not to my knowledge.
15    Q.   -- see a therapist?
16    A.   He may have.  I don't recall.
17    Q.   Was the separation in 1994 related to the
18         psychiatric hospitalization that you had --
19         strike that.
20             Was the separation in 1995 related to
21         the psychiatric hospitalization that you had
22         in 1994?
23    A.   Not directly.
24    Q.   There was a psychiatric hospitalization in
25         1994 for drug overdose on pain medications
0088
 1         and alcohol, correct?
 2    A.   Yes.
 3    Q.   And -- I'm sorry?
 4    A.   It was not pain medication.
 5    Q.   Well, I'm looking at the note from January
 6         31, 2005 at the UMass Medical Center
 7         behavioral medicine program, and that's what
 8         they have recorded.
 9    A.   I don't recall being at the UMass Medical
10         Center.
```

```
11   Q.   In January 31, 2005 at the behavioral
12        medicine program?
13   A.   Oh.
14   Q.   I'm looking at a note that contains this
15        history of 1994.
16   A.   I misunderstood.
17   Q.   Sure.
18   A.   Did you say 2005?
19   Q.   Sure.  Let me start again.
20   A.   Thank you.
21   Q.   And if I can be confusing from time to time,
22        just tell me, okay?
23   A.   Okay.
24   Q.   I got that information from a note of
25        medical records that were turned over to us
0089
 1        by your lawyer.  The note that I'm
 2        referencing contains -- is from the BMH
 3        behavioral medicine program of January 31,
 4        2005, a visit on that day.
 5   A.   Okay.
 6   Q.   It references a history.  And sometimes when
 7        doctors report on what has happened to you
 8        before, they call that a history, and in the
 9        history it says that you were hospitalized
10        in 1994 in a psychiatric hospital after a
11        drug overdose on pain medications and
12        alcohol.
13   A.   I don't recall that it was pain medication,
14        and it was not an intentional --
15   Q.   I'm not saying that it was or wasn't.  I'm
16        reporting what is in this record.
17   A.   I see, okay.
18   Q.   And I was going to ask you questions about
19        it.
20   A.   Okay.
21   Q.   Okay?  So what psychiatric hospital were you
22        in in 1994?
23   A.   Charter Healthcare in Nashua, New Hampshire.
24   Q.   And the reason for the hospitalization was
25        what?
0090
 1   A.   Severe depression.
 2   Q.   And the reason for the depression, based on
 3        your understanding, is what?
 4   A.   I was very young and wasn't very much aware
 5        of the demands of a 60- or 70-hour workweek
 6        and a marriage and a house and recent
 7        surgery and life.
 8   Q.   And the severe depression led to -- and I'm
 9        going to tell you what is in this record --
10        anger, moodiness, depression, sleep
11        problems.  All of those are true?
12   A.   Yes.
13   Q.   What pain medications were you taking at
14        that time that were -- that -- strike that.
15            Were you taking pain medications in
```

```
16        1994 that led to an overdose?
17   A.   I can't recall.
18   Q.   What pain issues were you having at that
19        time?
20   A.   In 1994?
21   Q.   Yeah.
22   A.   There's two things I can think of.  One, I
23        had surgery, abdominal surgery, and the
24        other I had broken my right leg playing
25        softball.  Those are the only two incidences
0091
1         that I can think that I would have had pain
2         medication.
3    Q.   In 1994 you would have been how old?
4    A.   22.
5    Q.   Okay.  And did you break your leg and have
6         surgery in the same year?
7    A.   I can't recall.
8    Q.   Okay.  With respect to -- let me just ask
9         questions about either surgery or the
10        fracture of the leg.  Strike that.
11            Which leg was it?
12   A.   My right leg.
13   Q.   Same one that we're talking about?
14   A.   No.
15   Q.   Left leg?  The incident leg is the left leg,
16        correct?  Let me be very clear.
17            The leg that you injured in Jamaica is
18        the left leg?
19   A.   My left one.
20   Q.   You had problems with your right leg in the
21        1990s; is that right?
22   A.   Yes.
23   Q.   All right.  And did you have -- after you
24        broke your leg obviously because of -- after
25        the initial trauma there was some pain, but
0092
1         was there residual pain that you were having
2         for which you needed to be on pain
3         medications for more than three or four
4         weeks?
5    A.   Not that I can recall.
6    Q.   So what about after your -- strike that.
7             What type of abdominal surgery did you
8         have?
9    A.   I had a gynecological surgery.
10   Q.   And in terms -- did you have problems with
11        endometriosis?
12   A.   Yes.
13   Q.   Okay.  Is that one of the reasons that you
14        and your husband had trouble getting
15        pregnant --
16            MS. MINCHOFF:  Objection.
17   Q.   -- as far as you know?
18   A.   No.
19   Q.   In terms of the endometriosis, were you --
20        let me back up.
```

```
21              In 1994 was one of the reasons why you
22          were on birth control pills to control your
23          cycle because of the endometriosis?
24    A.    Yes.
25    Q.    All right.  And is that because at various
0093
1           times in your cycle you would be -- there
2           would be a significant amount of pain
3           associated with the endometriosis?
4     A.    Yes.
5     Q.    And was that the reason why you were on pain
6           medications?
7     A.    I can't recall, but most likely, yes.
8     Q.    All right.  And so --
9     A.    I do recall taking pain medication for that
10          condition.
11    Q.    So in terms of the psychiatric
12          hospitalization, then, the reports indicate
13          that it was an overdose of pain medications
14          and alcohol.  You have told us, and you
15          correct me if I'm wrong, that this was not
16          an intentional overdose, correct?
17    A.    Correct.
18    Q.    Was this a situation where you mixed alcohol
19          and pain medications when you probably
20          weren't supposed to?
21    A.    Probably.
22    Q.    You're aware of the fact that with some
23          medications -- strike that.
24              And you had been on antidepressant
25          medications prior to this hospitalization as
0094
1           well, 1994?
2     A.    I can't recall.
3     Q.    You had told me that you had been depressed,
4           severely depressed, correct?
5     A.    At this time.
6     Q.    In 1994?
7     A.    Yes.
8     Q.    Had you been seeing a psychiatrist or --
9           psychiatrist or psychologist prior to this
10          psychiatric hospitalization for which you
11          received some sort of prescribed
12          medications, either Prozac or --
13    A.    Yes.
14    Q.    Okay.  How long were you hospitalized?
15    A.    Approximately two weeks at the most.  I
16          can't recall.  It wasn't very long.
17    Q.    And I began asking you some questions about
18          pain medications.  In terms of your own
19          body, when you are injured or have surgery
20          or -- do you have -- how would you
21          characterize your tolerance for pain?
22    A.    I can't really answer that question.
23    Q.    That's probably not a good question, then.
24              Is it -- has it been the practice for you to
25          have to take prescribed pain medications
```

```
0095
 1          following surgeries, following fractures?
 2   A.     Yes.
 3   Q.     But have those been more than just the --
 4          have you -- is your recovery time longer;
 5          that is, you feel pain longer than two or
 6          three weeks after a fracture or four to five
 7          weeks after a fracture?
 8   A.     I can't really answer that question.  It was
 9          a very long time ago of both incidences.  I
10          don't recall how long or my tolerance.
11   Q.     Have you been told prior to 1990 -- prior to
12          this hospitalization that you should not mix
13          alcohol with pain medications when you take
14          them?
15   A.     Yes.
16   Q.     And had you been told prior to 1994 that you
17          should not mix alcohol with antidepressant
18          medication such as Prozac?
19   A.     Yes.
20   Q.     Other than the 1994 hospitalization, the
21          psychiatric hospitalization, were you
22          hospitalized for any other reasons between
23          1994 and 2004?
24   A.     No.
25   Q.     You continued, however, outpatient
0096
 1          psychotherapy from 1993 to 1999, correct,
 2          approximately?
 3   A.     Approximately.
 4   Q.     That's what the record says.
 5   A.     Okay.
 6   Q.     Well, here, don't -- I don't want you to
 7          agree with what I say, please.  If you don't
 8          have a memory --
 9   A.     Can I see the record?
10   Q.     I don't know if I can pull it out real
11          quickly.  I'm looking at my summary of it.
12   A.     Okay.
13   Q.     But do you remember being in -- let me ask
14          this question:  Do you remember being in
15          psychotherapy from approximately 1993 before
16          your psychiatric hospitalization up through
17          1999?
18   A.     I remember seeing a therapist occasionally.
19   Q.     And that therapist was whom?
20   A.     Linda Simmons.
21   Q.     All right.  And where was Ms. Simmons
22          located?
23   A.     In Leominster, L-E-O-M-I-N-S-T-E-R.
24   Q.     Thank you.  And was Ms. Simmons affiliated
25          with any sort of clinic --
0097
 1   A.     No.
 2   Q.     Just on her own, yes?
 3   A.     Yes.
 4   Q.     And were you seeing also in that time
```

```
 5        period, the 1990s, a psychiatrist or a
 6        psychologist -- let me back up.
 7             Were you seeing a psychiatrist who
 8        would prescribe you antidepressant,
 9        antianxiety sort of medications?
10   A.   Before the hospitalization or after?
11   Q.   That's a good question.  Both before and
12        after.
13   A.   Before --
14   Q.   Yes.
15   A.   -- my primary care provided the prescription
16        for Prozac.
17   Q.   And is that Dr. Fraser, or was that a
18        different one?
19   A.   Dr. Fraser.
20   Q.   Okay.
21             MS. MINCHOFF:  Sorry, just when we
22        say "before," are we before '94?
23             MR. REITH:  Before 1994.
24             MS. MINCHOFF:  All right.
25             MR. FERINGA:  Correct.  I'm sorry.
0098
 1             MS. MINCHOFF:  That's okay.
 2        BY MR. FERINGA:
 3   Q.   What about after 1994; after that
 4        hospitalization were you then assigned a
 5        psychiatrist who you saw on a periodic basis
 6        that would handle the psychiatric
 7        medications?
 8   A.   Yes.
 9   Q.   And that individual was whom?
10   A.   I can't recall.
11   Q.   Is there some way that we can find that out?
12   A.   I assume that would be in my medical record
13        from my primary care physician.
14   Q.   Dr. Fraser?
15   A.   Yes.
16   Q.   Okay.  We're still waiting for that one.
17             But it's your understanding that it
18        was that individual, the psychiatrist that
19        was the individual who actually prescribed
20        you medications?
21   A.   As far as Prozac.
22   Q.   Were there any others than Prozac?
23   A.   There was an antianxiety medication that I
24        took for a brief time.
25   Q.   Does Risperdal ring a bell?
0099
 1   A.   No.
 2   Q.   No, okay.
 3             All right.  Any -- so you had an
 4        antidepressant, antianxiety.  Any others?
 5   A.   Not that I recall.
 6   Q.   And so why did this end in approximately
 7        1999?  Why did the therapy end?
 8   A.   I didn't need it.
 9   Q.   Were you advised during that period of time,
```

```
10          1994 to 1999 not to become pregnant because
11          of the medications that you were on?
12    A.    No.
13    Q.    Was it your understanding that the
14          medications would have prevented you from
15          being pregnant?
16    A.    No.
17    Q.    Was it during that period of time, however,
18          because of the marital issues were having
19          that you were not even thinking about having
20          kids at that time?
21    A.    For -- I'm sorry?
22    Q.    Sure.  Was that during this period of time,
23          1994 to 1999, that you and your husband
24          weren't really thinking about having kids?
25    A.    There was a period of time, but I can't
0100
 1          recall how long or when.
 2    Q.    Was this a legal separation; that is, had
 3          papers been filed?
 4    A.    No.
 5    Q.    Had a divorce action been filed?
 6    A.    No.
 7    Q.    What about after that one instance where you
 8          were separated for approximately eight
 9          months in 1995; have you ever been
10          separated --
11    A.    No.
12    Q.    -- since then?
13    A.    No.
14    Q.    Did you have -- and I'm asking this question
15          because of the record that I have, again.
16          Did you have a problem with alcohol at the
17          time, abusing alcohol in 1994?
18    A.    No.
19    Q.    Have you been diagnosed or do you consider
20          yourself to be an alcoholic or an individual
21          that has problems with alcohol?
22    A.    No.
23    Q.    Do you consider yourself or have you been
24          diagnosed as a problem -- as a person that
25          has a problem with taking prescription
0101
 1          drugs?
 2    A.    No.
 3    Q.    Did you attend any sort of alcohol
 4          rehabilitation counseling sessions in the
 5          1990s after this 1994 hospitalization?
 6    A.    No.
 7                (Pause.)
 8                    MR. FERINGA:  Do you need to take a
 9          break?
10                    MS. MINCHOFF:  Five minutes.
11                    MR. FERINGA:  Let's go off the
12          record, please.
13                    THE VIDEOGRAPHER:  The time is
14          11:11.  We're off the record.
```

```
15              (Recess taken.)
16                   (Exhibit No. 6, Defendants' Third
17         Request For Production of Documents and
18         Things Pursuant to Fed. R. Civ. P. 34,
19         marked for identification.)
20                   THE VIDEOGRAPHER:  The time is
21         11:26 a.m.  This is the beginning of
22         Cassette No. 2 in the deposition of
23         Stephanie Hofer.  We're back on the record.
24         BY MR. FERINGA:
25    Q.   While we were off the record I handed out
0102
1          and had marked Exhibit No. 6.  This was
2          defendant's third request for production of
3          documents, and basically I'm looking for any
4          credit card statements, records of any
5          credit card statements that you have between
6          March 17 and March 20.  Do you have any such
7          statements?
8     A.   For the dates --
9     Q.   When you were in Jamaica.  I'm looking for
10         any evidence for you of -- evidence that you
11         purchased anything by credit card in Jamaica
12         while you were in Jamaica.
13    A.   I don't have it with me today.
14    Q.   Okay.  But you did have a credit card of
15         some sort?
16    A.   I did have a receipt for dinner.
17    Q.   Okay.  Were there any other receipts other
18         than that?
19    A.   No.
20    Q.   Okay.  Your attorney and I can talk about
21         how we're going to be able to get these.
22                   MS. MINCHOFF:  You have that,
23         Scott.
24                   MR. FERINGA:  I haven't seen it.
25                   MS. MINCHOFF:  I've produced a
0103
1          receipt from the dinner, I'm positive of it.
2                    MR. FERINGA:  I haven't seen a
3          response to this request.
4                    MS. MINCHOFF:  No, you haven't --
5          no, technically not --
6                    MR. FERINGA:  No.
7                    MS. MINCHOFF:  -- today, yeah --
8                    MR. FERINGA:  Right.
9                    MS. MINCHOFF:  -- but you have the
10         receipt that she's referring to in a prior
11         document production.
12                   MR. FERINGA:  I have one from Ms.
13         LaBelle.
14                   MS. MINCHOFF:  And I think
15         that's Jimmy Buffet's Margaritaville?
16                   MR. FERINGA:  No, it's Runway's
17         Deli and Bar.
18                   MS. MINCHOFF:  Okay.  There should
19         be a receipt, and I believe it's from Jimmy
```

```
20         Buffet's Margaritaville.
21              THE WITNESS:  Yeah, that's what it
22         said on my receipt.
23              MS. MINCHOFF:  And I know that I
24         provided that.
25              MR. FERINGA:  Okay.  Maybe I missed
0104
 1         it because the only receipts that I
 2         received -- the only ones that I remember,
 3         and I'm not disputing this, are three
 4         receipts, one of which is from National
 5         Commercial Bank signed by Ms. LaBelle, a
 6         LaBelle receipt and a receipt from a
 7         hospital.
 8              MS. MINCHOFF:  I know there's been
 9         several docu -- do you have it?
10              MR. REITH:  I would say the only
11         documents I have are the same ones that
12         Scott's referring to.
13              MR. FERINGA:  And maybe there are.
14         I just haven't seen it, so --
15              MS. MINCHOFF:  Okay.  I'm really --
16         I remember trying to get it darker for you
17         guys when I photocopied it, so I remember it
18         going out.  I'll take a look after this.
19         BY MR. FERINGA:
20    Q.   So what you remember is that there was a
21         single dinner receipt?
22    A.   Yes.
23    Q.   And do you remember which day?
24    A.   It was the first day.
25    Q.   Okay.  You arrived on the 17th?
0105
 1    A.   Yes.
 2    Q.   Okay.  So it would have been the evening of
 3         the 17th or the next day?
 4    A.   Do you have a record of the day I arrived in
 5         Jamaica?  Is it the 17th or the 18th?
 6    Q.   I know that we do.  I may not with me.
 7    A.   I can't recall the exact date.  I know I
 8         should.
 9              MR. FERINGA:  Tom, do you know?
10              MR. REITH:  According to the
11         complaint, Paragraph 9, upon arrival in
12         Jamaica on March 18, 2004.
13              MR. FERINGA:  Okay.
14    A.   Okay.
15    Q.   So --
16    A.   The receipt was from the night of the 18th
17         at approximately 10:30 p.m.
18    Q.   And it was from where?
19    A.   Jimmy Buffet's Margaritaville.
20    Q.   And so was there any other -- would you have
21         had any other purchase on your credit card
22         from the time that you arrived to the time
23         that you left?
24    A.   No.
```

```
25  Q.   Okay.  I understand that we may have a
0106
 1       receipt from the Jimmy Buffet's thing, but I
 2       was looking -- one of the requests was for
 3       the entire bank statement from the 17th
 4       through the 20th, so --
 5            MS. MINCHOFF:  No, I understand
 6       this request.
 7            MR. FERINGA:  Okay.  Good.
 8       BY MR. FERINGA:
 9  Q.   Okay.  Now, let me back up now.  I was
10       talking -- you were talking about your
11       marriage, and we were talking about the
12       separation, and that sort of led us into the
13       1994 thing.
14  A.   Excuse me?
15  Q.   Yeah.
16  A.   Going back again --
17  Q.   Yeah.
18  A.   -- there was a couple of things that we
19       discussed that I wanted -- wasn't able to
20       finish my answers, and I would like to go
21       back to those as well.
22  Q.   Sure.  Was it something -- did I keep you
23       from answering?
24  A.   Sort of.
25  Q.   Okay.  If that happens, you have to let me
0107
 1       know right away.  I apologize, I don't mean
 2       to cut you off, but go ahead and finish
 3       whatever answer you wish to finish.
 4  A.   We were discussing the matters of jobs and
 5       vocation and going back to school, and I
 6       said -- you know, I began my answer -- you
 7       asked why I haven't done it.
 8  Q.   Yes.
 9  A.   And I began with one of those reasons being
10       money, but in addition to not being able to
11       afford to go back to school there are other
12       issues that are more important, first of
13       all, being my inability to concentrate,
14       which kind of leads me into I can be very
15       forgetful, get very tired very easily.  As
16       far as going back to school, my ability to
17       actually memorize and concentrate on one
18       particular thing for any period of time is a
19       little -- it's quite difficult, and walking
20       from classroom to classroom, again, would be
21       very difficult on me.
22            I have doctors' appointments most
23       every week.  For a period of time I had two
24       to three doctors' appointments per week, and
25       I'm actually lucky to be down a bit.  I have
0108
 1       to break and take medications throughout the
 2       day that inhibit my ability to do things
 3       such as even write, because I shake, and I
```

```
 4        get tremors.  And that's a side effect of
 5        the medication.
 6             I also have such intense pain in my
 7        leg and up into my spine from the nerves,
 8        and I sweat profusely sometimes because of
 9        that.  And these are just some of the
10        reasons that prevent me from doing other
11        jobs, going back to school, sometimes even
12        leaving my house.  So I wanted to touch on
13        that.
14   Q.   Okay.  Have you completed all the answers
15        that you felt I kept you from answering?
16   A.   No.
17   Q.   All right.  Is there something else?
18   A.   Yes, I apologize.  This comes along with the
19        concentration issue.
20   Q.   Go ahead.
21   A.   I'm sorry.  You had asked me about the
22        endometriosis --
23   Q.   Yes.
24   A.   -- and if that was the reason I couldn't get
25        pregnant or that I was -- if I was told I
0109
 1        couldn't get pregnant because of that.
 2   Q.   I think the question that I asked you was,
 3        was that one of the reasons why --
 4   A.   Okay.
 5   Q.   -- you were having difficulty getting
 6        pregnant?
 7   A.   Okay.  The understanding from my doctor was
 8        that it could possibly have something to do
 9        with having a difficult time getting
10        pregnant, whether it was scar tissue or
11        whatever, and I had the surgery, but it --
12        you know, I'm not completely positive on
13        that.
14   Q.   Okay.  Are there any other questions that
15        you thought that I cut you off that you need
16        to answer and would like to complete those
17        answers now, sitting here today?
18   A.   I think there was one more.
19   Q.   If you think of it --
20   A.   Can I go back to it?
21   Q.   Absolutely.  If you think of it, go right
22        ahead.
23   A.   Okay.
24   Q.   Okay?  You know, if something pops into your
25        mind, just let me know and say, "I need to
0110
 1        go back."
 2   A.   Okay.
 3   Q.   Is that fair?
 4   A.   Yes, thank you.
 5   Q.   Sure.  I want to ask you some questions
 6        about your salaries.
 7   A.   Okay.
 8   Q.   I looked at your tax returns, those that
```

```
 9          were provided to us, and in the year 2000
10          there was a joint tax return filed that
11          essentially had 83,500 and some dollars;
12          2001 there was a drop to 73,690; 2002, that
13          dropped to 65,531.  Do you have any
14          indication as to why between 2000 and 2002
15          there was a $20,000 drop in your income?
16   A.     I believe that's when I took time off of
17          work.  I --
18   Q.     2002?
19   A.     -- began to -- I went from full time to part
20          time and then to not working.
21   Q.     Okay.  I'm just sort of --
22   A.     And that's when I went to the manicurist
23          school.
24   Q.     Okay.  In 2002?
25   A.     Yes.
0111
 1   Q.     Okay.  Because I thought you said it was in
 2          the '90s, but that's --
 3   A.     No.
 4   Q.     That's fine.
 5   A.     All right.  And I don't --
 6   Q.     So you went --
 7   A.     I did not go to manicuring school in the
 8          '90s, I know that.
 9   Q.     Okay.  Good.
10   A.     Yeah.
11   Q.     So when we look at your tax returns -- and
12          I'm looking at the time prior to this
13          accident, okay?
14   A.     Yeah.
15   Q.     -- you were -- you had gone from full time
16          to part time to no time as a dental
17          assistant, right?
18   A.     Uh-huh.
19   Q.     Is that correct?
20   A.     Yes.
21   Q.     Okay.  And would that account for the drop
22          in your family's income, "family," you and
23          your husband --
24   A.     Yes.
25   Q.     -- from 80,000 to 65,000 and then in 2003 to
0112
 1          56,000?
 2               MS. MINCHOFF:  Objection.
 3               MR. FERINGA:  On what basis?
 4               MS. MINCHOFF:  I'm not sure that
 5          you've stated the numbers correctly.
 6               MR. FERINGA:  Well, my number shows
 7          83,573 --
 8               MS. MINCHOFF:  And I thought you
 9          said 80 just now.
10               MR. FERINGA:  No.  I could be
11          wrong.  I could be corrected.  I don't think
12          so.
13          BY MR. FERINGA:
```

```
14   Q.   It went from 83,573 in 2000; 2001 was
15        73,690; 2002 was 65,531; 2003 is 56,222.
16   A.   Excuse me.
17   Q.   And so the question is why?
18   A.   My husband changed jobs.
19   Q.   All right.  Was there a time -- and maybe
20        this is me, but 2002/2003 that you did not
21        work other than as a manicurist for your
22        mother?
23   A.   Yes.
24   Q.   Okay.  And when we look at your section of
25        the tax returns, the 2497.5 for 2002 and
0113
 1        the -- that's 2,497, and 2,290 for 2003,
 2        that reflects what?
 3             MS. MINCHOFF:  Do you have a copy
 4        of that?
 5             MR. FERINGA:  I have my summary of
 6        her tax returns.
 7             MS. MINCHOFF:  Okay.
 8   A.   I can't recall.  I --
 9   Q.   Okay.  Were you making approximately $2,000
10        a year in 2002/2003, as best as you can
11        recall, if it says that in your tax returns?
12   A.   If it were the beginning of the year, I
13        would think so, but it doesn't sound right
14        to me.
15   Q.   Okay.  Well, we'll look.
16             And then in 2004 there is no income
17        for you?
18   A.   No.
19   Q.   And in 2005 --
20   A.   Actually, yes, there is.
21   Q.   Okay.  You had some income to a point in
22        time?  It's that W-2 that's attached?
23   A.   Yes.
24   Q.   Okay.
25   A.   I worked in 2004 from January to March 17th.
0114
 1   Q.   Full time or part time?
 2   A.   Part time.
 3   Q.   Okay.  So at least on the tax returns I'm
 4        looking at, 2003, the joint income is
 5        56,222; 2004, 53,066; 2005, 47,166.  Was
 6        there a change in your husband's income
 7        downward?
 8   A.   Yes.
 9   Q.   Okay.  And was the -- what jobs did your
10        husband move from?
11   A.   He moved from one job to another.
12   Q.   Okay.  And the second job that he moved to
13        was less pay than the previous job?
14   A.   Yes.
15   Q.   Okay.  And is it your testimony that in 2005
16        that -- strike that.
17             You told me that you were having some
18        financial difficulties in 2005, correct?
```

```
19   A.   Yes.
20   Q.   Okay.  Did that cause marital discord?
21   A.   No.
22   Q.   And are the financial difficulties due to
23        the fact -- in part due to the fact that
24        your husband changed jobs and was making
25        less?
0115
 1   A.   No.
 2   Q.   Was it your plan in 2004 to go back to work?
 3   A.   Yes, actually it was.
 4   Q.   And had that been arranged with your dental
 5        employer?
 6   A.   We had a plan --
 7   Q.   We being whom?
 8   A.   He and I.
 9   Q.   He being whom?
10   A.   Dr. Meszaros.
11   Q.   Okay.
12   A.   That my hours would increase as his schedule
13        increased to accommodate dental assistants
14        working at the top of their pay scale.
15   Q.   Was the reason that you were part time in
16        March because the doctor didn't have enough
17        patients to justify two full-time dental
18        assistants?
19   A.   The reason I was part time in March was
20        because I chose to be.  When I began that
21        job, it was for a part-time position.
22   Q.   All right.  And when was it that the doctor,
23        your employer and you looked at developing a
24        plan to move you to eventually a full-time
25        position?
0116
 1   A.   As seen fit throughout the schedule.  There
 2        were -- it was a plan.
 3   Q.   Okay.  But my question is, was there a time
 4        in 2004 that this doctor and you had worked
 5        out a schedule such that, you know, April
 6        you would be --
 7   A.   No.
 8   Q.   -- 20 hours, May 25 hours, et cetera?
 9   A.   No.
10   Q.   Was this contingent upon the ability of the
11        doctor to provide enough patients for two
12        full-time dental assistants?
13   A.   I can't answer that for him.
14   Q.   Was there a -- was there another full-time
15        dental assistant that was working in the
16        office?
17   A.   Yes.
18   Q.   And -- okay.  To the best of your knowledge,
19        having been in an office from January until
20        March of 2004, did he have enough patients
21        to handle two full-time dental assistants?
22   A.   Yes.  Are you asking in my opinion?
23   Q.   Yes, I did.  And you said yes?
```

```
24   A.   Yes.
25   Q.   Let me go back.  Were you in the habit of
0117
 1        keeping a journal or a diary or now I use
 2        the word blog --
 3   A.   No.
 4   Q.   -- I hate that word -- about the events of
 5        2004 and on?
 6   A.   Yes, I kept notes.
 7   Q.   And where are those notes?
 8   A.   In my personal notes.
 9   Q.   Okay.  Let me ask about your personal notes,
10        then.  What personal notes do you have?
11   A.   Notes regarding my condition, my doctors'
12        appointments and what was discussed between
13        my doctors and I.
14   Q.   Okay.  Is this in some sort of file
15        someplace?
16   A.   No.
17   Q.   Is this in a calendar or a spiral notebook
18        or a binder of some sort?
19   A.   Calendar-type.
20   Q.   And so in this -- in these document -- in
21        this calendar-type thing, each time you
22        would go to a doctor would you write a
23        summary of what he or she said to you?
24   A.   I wouldn't exactly call it a summary.  I
25        would call it maybe things to note.
0118
 1   Q.   Okay.  When -- so that I understand and we
 2        all can understand this, when you went to
 3        see a physician and she would talk to you
 4        about whatever, you would write down
 5        notes -- and I'm using that in a loose
 6        form -- about the discussion or what you
 7        should be doing or something like that?
 8   A.   Yes.
 9   Q.   And that is in this document that you call a
10        calendar?
11   A.   It's not a document.  It's --
12   Q.   I'm using that -- lawyers get excited when
13        they hear the word "document," so -- what is
14        it?
15   A.   My appointment book --
16   Q.   Okay.
17   A.   -- calendar.
18   Q.   So do you have an appointment book for 2004?
19   A.   Probably not.
20   Q.   Do you have one for 2005?
21   A.   Probably not.
22   Q.   Do you have one for 2006?
23   A.   Yes.
24   Q.   Okay.  But before 2006 were you keeping
25        notes or summaries or a diary or some other
0119
 1        form of keeping notes down or conversations
 2        or things that were happening to you?
```

```
 3   A.   No.
 4   Q.   Okay.  Were you in the habit of keeping a
 5        diary or a journal that you would write in
 6        on a weekly or daily basis?
 7   A.   No.  I would keep appointment dates.
 8   Q.   So what happened to your appointment dates
 9        for 2004 and 2005?
10   A.   You take them out of the calendar and throw
11        them away.
12   Q.   So you would have discarded them?
13   A.   Yes.
14   Q.   Is this like a daily planner-type thing?
15   A.   Yes.
16   Q.   And so you would have --
17   A.   It's a calendar.
18   Q.   So you would have thrown away the notes that
19        you would have kept from conversations with
20        physicians or meetings with physicians for
21        the years 2004 and 2005?
22   A.   I wouldn't call them -- they're
23        appointments.  They're check off what I've
24        done.  It's not exactly -- I mean, are you
25        talking about, you know --
0120
 1   Q.   I'm talking about anything that you've
 2        written down that had to do with doctors'
 3        visits.
 4   A.   Yes, I've thrown them away.
 5   Q.   Okay.  And separately, did you ever keep a
 6        diary or a journal of the events beginning
 7        in March of 2004 --
 8   A.   No.
 9   Q.   -- to the present time?
10   A.   No.
11   Q.   Have you as a result of this incident sent
12        any letters to -- you, yourself,
13        specifically is what I'm referring to -- to
14        either Gap or Old Navy about this incident?
15   A.   No.
16   Q.   Have you communicated in any fashion by
17        e-mail or telephone, calling any sort of
18        complaint line or hotline or sending an
19        e-mail to them?
20   A.   No.
21   Q.   Did you ever go -- I'm sorry.
22   A.   I believe I may have sent an e-mail
23        following up on a request for credit card
24        receipts, if that is all.  I know I made a
25        phone call to the number on the credit card
0121
 1        receipt to get a copy of all of my credit
 2        card receipts.
 3   Q.   Okay.
 4   A.   I may have followed up with that on an
 5        e-mail, but I can't recall.
 6   Q.   That may have been to a bank.  You had a
 7        credit card issued --
```

```
 8   A.   For Old Navy.
 9   Q.   For Old Navy, okay.
10   A.   Yes.
11   Q.   I think that's handled by a particular bank,
12        but thank you for telling me.
13             Other than making a telephone call for
14        a credit card receipt to the number that was
15        on the back of the Old Navy credit card that
16        you had, did you in any other way
17        communicate with Gap or Old Navy by
18        telephone, by e-mail or letter form?
19   A.   No.
20   Q.   Did you ever go back to the store where you
21        claim to have purchased the sandals and make
22        any complaints about the sandals to the
23        store?
24   A.   No.
25   Q.   Did you ever make any -- send any letters to
0122
 1        any state, county, city or federal
 2        government entity or agency about this
 3        incident?
 4   A.   No.
 5   Q.   So you did not make any complaints about the
 6        product to an entity known as the Consumer
 7        Products Safety Commission?
 8   A.   No.
 9   Q.   And has anyone from any entity, federal,
10        state government as a result of your being
11        hospitalized contacted you about the fact
12        that you claim that part of the reason why
13        you were injured was because of a failed
14        product?
15   A.   No.
16   Q.   Now I want to ask you some questions about
17        the sandals.
18   A.   Can I cry again?
19   Q.   You can cry any time you would like.
20   A.   Okay.
21   Q.   You purchased them where?
22   A.   At Old Navy.
23   Q.   Where at Old Navy, which Old Navy store?
24   A.   In Leominster, Massachusetts.
25   Q.   And was this in a mall or a freestanding
0123
 1        store?
 2   A.   A freestanding store at a mall.
 3   Q.   And you purchased them about when?
 4   A.   I can't recall.  I purchased in the early
 5        spring.
 6   Q.   Of 2004?
 7   A.   Possibly.  I can't recall.  I purchased a
 8        bunch of them all at once --
 9   Q.   Okay.
10   A.   -- I think.
11   Q.   And is that -- are the ones that you would
12        have purchased all at once those photographs
```

```
13          that we see in Exhibit 2?
14   A.     Yes.
15   Q.     Before you went to the store that day to
16          purchase these things -- or when they were
17          purchased, those sandals, was there any
18          advertisement from Old Navy that you
19          received that advertised sandals?
20   A.     Not that I can recall.
21   Q.     So you didn't see anything on television,
22          you didn't see anything in print, you didn't
23          get an e-mail, you didn't get something in
24          the mail that said, "Old Navy sandals on
25          sale.  Come and buy them," as far as you can
0124
 1          remember; is that fair?
 2   A.     As far as I can remember, no.
 3   Q.     Okay.  Had you ever purchased Old Navy
 4          sandals or sandals from Old Navy before?
 5   A.     No.
 6   Q.     Had you purchased sandals of this sort as
 7          identified in Exhibit 2, meaning style, from
 8          any other entity, store, Internet, anywhere
 9          before March of 2004?
10   A.     Similar but different.
11   Q.     All right.  So let's -- if you'll look at
12          that exhibit, for example, they have for A,
13          we have something where there's a -- there's
14          the toe, there's a single piece of material
15          of some sort that attaches to the bed of the
16          foot -- of the sole, and then it's attached
17          at two other points toward the heel.
18   A.     Uh-huh.
19   Q.     Is that the type of sandal that you've -- is
20          the type of sandal that you've purchased
21          before a type that had that similar sort of
22          configuration?
23   A.     Yes, but not of the same material.
24   Q.     Okay.  What I'm just doing is trying to look
25          at, have you had something that was like
0125
 1          connected at three different points with a
 2          single point being at the toe?
 3   A.     Yes.
 4   Q.     You've purchased flip-flops before?
 5   A.     Yeah.
 6   Q.     You've probably had them for years?
 7   A.     Yes.
 8   Q.     Yeah, okay.
 9              In terms of this particular sandal,
10          before you purchased this particular sandal
11          did any individual from the Old Navy store
12          direct you to these sandals and talk to you
13          about the sandals in any way?
14   A.     No.
15   Q.     So when you went to the Old Navy store, was
16          this sort of to pick up a bunch of stuff and
17          this was then an impulse buy?
```

```
18                MS. MINCHOFF:  Objection.
19   A.   I can't recall.
20   Q.   Do you have any sense of before you went to
21        Old Navy on the day that you purchased the
22        sandals thinking "I'm going to go purchase
23        sandals"?
24   A.   I can't recall that.
25   Q.   Were you in the habit of before you went
0126
 1        shopping knowing what you were going to
 2        purchase before you went into the store and
 3        just sort of going there, purchasing it and
 4        leaving?
 5   A.   I can't recall.
 6   Q.   But is that your habit?
 7   A.   Do you mean random shopping?
 8   Q.   Well, my wife maintains that I shop
 9        differently than she does.  I know what I
10        want, I go in, pick something up and then
11        leave, and I don't look around.  When you
12        shop -- when she shops, shopping is a state
13        of art for her, and she then goes into a
14        store and then makes decisions about what
15        she may or may not want to purchase once
16        she's in the store.  I'm not saying that
17        you're anything like my wife, please, but in
18        terms of the style of shopping that you do,
19        do you generally have an idea in mind about
20        what you're going to get, or you just sort
21        of go in and say I'm going to shop and I'll
22        see what looks good and purchase some
23        things?
24   A.   I would say that.
25   Q.   You would say what?  I gave you two choices,
0127
 1        that you go in and shop --
 2   A.   That I would go in and shop, look around.
 3   Q.   That's what I thought.  So --
 4   A.   It's just an odd question.  I'm sorry.
 5   Q.   No, no, no.  It could be my vagueness, so
 6        don't worry about it.
 7   A.   Okay.
 8   Q.   So when -- believe me, there's a purpose
 9        here.  When you went in to shop at Old Navy
10        on that day, were you following the habit,
11        routine that you normally would have; that
12        is, I'm going to go shopping, I'm going to
13        look around and then make decisions about
14        what I'm going to get once I'm in the store?
15   A.   I would say so.
16   Q.   Okay.  So with respect to these particular
17        sandals, then -- correct me if I'm wrong,
18        but you did not have any conversations with
19        any salespeople about the sandals before you
20        bought them?
21   A.   No.
22   Q.   Were there any sort of displays, that is,
```

```
23          writing on a display advertising sandals in
24          the store that drew you to them, as far as
25          you can remember?
0128
 1    A.    As far as I can remember, I have seen in the
 2          past displays, walls of flip-flops.
 3    Q.    Okay.  But was there any -- recognizing that
 4          you may have seen walls of flip-flops, do
 5          you remember seeing -- do you call these
 6          flip-flops?
 7    A.    Yes.
 8    Q.    Okay.
 9    A.    Sandals, flip-flops.
10    Q.    Just so that we're all clear.  Other than
11          seeing walls of flip-flops or sandals, were
12          there any writing above them advertising,
13          you know, "Purchase these" or anything like
14          that?
15    A.    I can't recall that.
16    Q.    Okay.  So before you purchased these, there
17          was nothing in writing from Gap advertising
18          these particular sandals; is that fair?
19               Let me rephrase that.  Before you
20          purchased these sandals there was nothing in
21          writing that drew you to these sandals that
22          was put out by Old Navy, correct?
23    A.    No.  No, I don't think so.
24    Q.    What I said is correct, there was no
25          writing?
0129
 1                 MS. MINCHOFF:   Objection.
 2    A.    I don't know.
 3    Q.    You don't remember any?
 4    A.    No.  It was a very long time ago.  I don't
 5          recall if there was any advertisement...
 6    Q.    Okay.  That's fine.
 7    A.    Okay.
 8    Q.    And when you were looking at these
 9          particular sandals, this group of sandals or
10          flip-flops, do you remember reading anything
11          talking about the characteristics of the
12          sandals, the -- that was around the display
13          or in the display that made you make a
14          decision as to whether to buy or not to buy
15          the sandals?
16    A.    No.
17    Q.    Did you go shopping with somebody other than
18          you when these were purchased?
19    A.    I don't remember.
20    Q.    There are three different sets of sandals
21          identified in -- or flip-flops in these
22          photographs.  Did you buy all three of these
23          sets on that day?
24    A.    I believe I may have.  I don't recall.
25    Q.    Do you remember after your accident going
0130
 1          back to Old Navy and purchasing sandals?
```

```
 2   A.   No, never.
 3   Q.   So, to the best of your knowledge, these
 4        three sets that are identified as A, B and C
 5        are sandals that you purchased at the same
 6        time that you purchased the sandals that you
 7        were wearing on the day of your accident?
 8   A.   I don't know if I purchased them at the same
 9        time.  I do know that they were all
10        different colors.
11   Q.   I know that.  Thank you.  I see that.
12   A.   Okay.
13   Q.   But my question is, sitting here today, do
14        you think you purchased this whole group at
15        the same time?
16   A.   I don't recall if it was the same day.
17   Q.   Was it within the same week?
18   A.   I can't recall that.
19   Q.   Was it in even in the same season?
20   A.   I don't know.
21   Q.   See, that's why -- do you know -- do you
22        have any sense --
23   A.   The credit card receipts?  Do I have any
24        sense of when I purchased these?  No.
25   Q.   But do you have any sense as to whether you
0131
 1        even bought these in the same season, that
 2        is --
 3   A.   They're all very similar.  I would assume
 4        that they are all in the same season.  They
 5        are all the same style.
 6   Q.   Okay.  Had you purchased Old Navy flip-flops
 7        or sandals prior to --
 8   A.   No.
 9   Q.   Okay.  So, to the best of your knowledge,
10        they were all purchased during the same
11        season, that season probably being spring of
12        2004?
13   A.   Approximately, yes, I would have to say so.
14   Q.   Okay.  Now, the color that you -- that is
15        not depicted -- strike that.
16            The one that is not depicted in these
17        photographs is the one that was -- the pair
18        that was left in Jamaica?
19   A.   Yes.
20   Q.   What color were those?
21   A.   They were blue.
22   Q.   Again, being -- there are different colors
23        of blue.  Is it dark blue, light blue, teal
24        blue?  Give me some sense.  It would help.
25   A.   I believe that the base was dark blue.
0132
 1   Q.   Like a navy?
 2   A.   I wouldn't say navy.
 3   Q.   Darker than that?
 4   A.   No.  I would say -- perhaps one of the
 5        colors of blue in Item B --
 6   Q.   Okay.
```

```
 7   A.   -- with another shade of blue top.
 8   Q.   Okay.  You've said in your complaint that
 9        the first time that you wore the sandals
10        that were, you claim, involved in this
11        accident was on the day of the accident,
12        correct?
13   A.   Yes.
14   Q.   If I look at Exhibits A -- at Exhibit 2, A
15        and B in particular, those look like they've
16        been worn a bit?
17   A.   Yes.
18   Q.   When were those worn?
19   A.   I can't recall.
20   Q.   Were those worn before you went down to
21        Jamaica?
22   A.   Yes.
23   Q.   All right.  With respect to the sandal that
24        is not here, the fourth sandal, fourth pair
25        that you purchased, if you look at
0133
 1        Exhibit -- if you look at, for example, the
 2        second page of Exhibit 2, there's a note
 3        that says April -- there's an April 6th,
 4        2006, and you see how it shows the bottom?
 5   A.   Yes.
 6   Q.   You see how those dots are there attaching
 7        the top part to the bottom?
 8   A.   (No verbal response.)
 9   Q.   Was that the same type of configuration, as
10        far as you know, that the sandals that you
11        were wearing at the time of the incident
12        had?
13   A.   Yes.
14   Q.   Now, I want to ask you some questions
15        about -- as far as you can remember, about
16        how you purchased these sandals on the day
17        you purchased these sandals, okay?
18   A.   Okay.
19   Q.   And if you can't answer, let me know.  Were
20        you in the habit of taking the sandal from
21        the display, looking at it, turning it over
22        sort of examining it?
23   A.   No.
24   Q.   All right.  Were you in the habit of taking
25        it off, putting it on your foot and walking
0134
 1        around on it?
 2   A.   No.
 3   Q.   Tell me what you did, how you selected this
 4        sandal, then?
 5   A.   They're on a hanger with a size.
 6   Q.   Right.
 7   A.   You pull it off and you shop.  You buy it.
 8   Q.   Okay.
 9   A.   They're Old Navy sandals.  You don't walk
10        around on them to make sure they're
11        comfortable.  They're flip-flops.  They look
```

```
12          cute with certain outfits, you know.  The
13          purple went with a purple shirt.  You know,
14          the red with a red shirt.  The blue that I
15          wore went with a new outfit or whatever, all
16          from Old Navy.
17     Q.   Okay.  And we thank you for that.  But when
18          you pulled the thing -- the flip-flops from
19          the display, they're on the hanger, you get
20          your size, do you put them in your hands and
21          sort of look at them at all?
22     A.   I looked at the color.
23     Q.   Okay.  Did you turn them over and look at
24          the bottom?
25     A.   I don't recall if I did.
0135
 1     Q.   Do you have -- when you shop for things, if
 2          you see something that looks strange, that
 3          is, looks like a flaw in a blouse or a pair
 4          of pants or something obvious, a pair of
 5          shoes, a mark on it, you would reject it,
 6          right?
 7     A.   Yeah, if it was an obvious --
 8     Q.   Right.
 9     A.   -- problem.
10     Q.   You have done that before?  You have in
11          purchasing things sort of gone to a store,
12          looked at it and said this is a spot on it
13          or this isn't sewn right or this is missing
14          a button?  That's something you've seen,
15          right?
16     A.   Yes.
17     Q.   Okay.  With respect to the sandals, did you
18          remember seeing anything in the sandals on
19          that day of any of the pair that you
20          purchased saying this looks strange, there's
21          a spot on it, this doesn't look like the
22          others?
23     A.   Not that I can remember.
24     Q.   So there was nothing obvious about any of
25          the problems with any of the sandals that
0136
 1          you purchased?
 2     A.   No, not that I can recall anything being
 3          obviously wrong with them.  If there had
 4          been, I would not have purchased it.
 5     Q.   Correct.  And in terms of the way the top
 6          portion is attached to the sole, it's your
 7          testimony that the fourth pair of sandals
 8          was constructed in a similar fashion to what
 9          is shown in Exhibit 2 on the second page?
10     A.   They are all the same.
11     Q.   Okay.  And so looking at how the top portion
12          was attached, that strap was attached to the
13          sole, you saw nothing in the fourth pair
14          that you purchased that would indicate that
15          the way that the sandal was attached, that
16          the strap was attached to the sandal was any
```

```
17        different?
18   A.   No.  They were all the same.  They all had
19        the grid across the bottom.
20   Q.   Okay.
21   A.   They all had contrasting colors.  They were
22        all the same.
23   Q.   Okay.  So as far as you could see as a
24        consumer deciding whether to purchase
25        something or not, you saw no defect?
0137
 1   A.   I saw no defect that I can recall, no.  If
 2        there had been a defect, I would not have
 3        bought it.
 4   Q.   Right.  I assume that was the case.  Between
 5        the time that you took these things, these
 6        four pair off of the hangers and paid for
 7        them, might I assume that you didn't have
 8        any discussions with Old Navy personnel
 9        about them?
10   A.   You would assume correctly.
11   Q.   Okay.  And did you go and purchase other
12        outfits at Old Navy that day?
13   A.   Probably.  I can't recall.
14   Q.   Okay.
15   A.   I don't know.
16   Q.   Did these sandals -- strike that.
17             I assume that the pair was attached
18        together in some fashion, probably with some
19        sort of plastic loop?
20             MS. MINCHOFF:  Objection.
21   Q.   Do you remember how they were attached?
22   A.   Attached?
23   Q.   Yeah.  To make sure that you got a right and
24        left one?
25   A.   Oh, they come on hangers.  I don't know.  I
0138
 1        don't remember.
 2   Q.   Do you remember any hang tags -- and by
 3        "hang tags" I mean there's a plastic loop
 4        with a piece -- with a label on it or
 5        something else.  Do you remember hang tags
 6        being --
 7   A.   Price tags?
 8   Q.   Well, there are price tags, and then there
 9        are other things called hang tags that talk
10        about the product in some fashion?
11   A.   Not that I recall.
12   Q.   Do you remember if there were stickers on
13        the sandals, either the top or the bottom?
14   A.   Right here (indicating).
15   Q.   When you say "right here," you're talking
16        about the place where your --
17   A.   I'm sorry.
18   Q.   -- heel would go?
19   A.   Yes.
20   Q.   Was this a square or round?
21   A.   It was a square, I believe.
```

22  Q.   And did it have various writing on it?
23  A.   It had a price and then the Old Navy logo.
24  Q.   Did it have any other information on it?
25  A.   I don't know.
0139
 1  Q.   Do you remember, sitting here today, one way
 2       or the other whether there were any hang
 3       tags on it?
 4  A.   I can't remember if there were hang tags.
 5  Q.   And if there were labels or hang tags on
 6       them, you would have taken them off and
 7       discarded the hang tags or labels, correct?
 8  A.   Yes.
 9  Q.   You have none of those items that were with
10       the sandals at the time you purchased
11       them --
12  A.   No.
13  Q.   -- presently, correct?
14  A.   Correct.
15  Q.   And in terms of the hangers they were on,
16       did they take them from the store or at the
17       store before you purchased them, or did you
18       take them home?
19  A.   I don't remember, but I think they usually
20       take the hangers.
21  Q.   Okay.  In the flip-flops that you purchased
22       before, not from Old Navy, have you ever had
23       a situation where you -- where the flip-flop
24       came apart?
25  A.   No.
0140
 1  Q.   Do you listen to --
 2  A.   Different construction.
 3  Q.   Do you listen to -- do you listen to Jimmy
 4       Buffet?
 5  A.   Yes.
 6  Q.   Do you remember the song "blew out my
 7       flip-flop"?  There's one of his songs where
 8       he talks about blowing out his flip-flop.
 9       Never mind.
10           Have you blown out a flip-flop?  Have
11       you separated the toe piece --
12  A.   Obviously.
13  Q.   -- of a flip-flop?
14  A.   Yes.
15  Q.   Other than in March of 2004?
16  A.   No.
17  Q.   Okay.  You've never had a situation where a
18       flip-flop has come apart?
19  A.   No.
20  Q.   Did you ever go back to Old Navy after this
21       incident in 2004?
22  A.   No.
23  Q.   And these were all purchased by that credit
24       card?
25  A.   I believe so.
0141

```
 1   Q.   And to the best of your knowledge, finishing
 2        up with respect to Exhibit No. 2, these
 3        photographs of the sandals, did you wear any
 4        of these sandals after the incident?
 5   A.   No.
 6   Q.   All right.  So the use of -- the wear on the
 7        sandals that we see particularly with
 8        Exhibit A and B must have been wear that
 9        occurred before you went to Jamaica?
10   A.   Yes.  I was a big flip-flop fan.
11   Q.   Say that fast.
12   A.   No.
13   Q.   And did you have any difficulty with the
14        sandals that you did wear?
15   A.   No.
16   Q.   Exhibits -- if you look at C, sandal C,
17        that's a navy blue with a white --
18   A.   They're purple.
19   Q.   Thank you.  Did you wear those?
20             MS. MINCHOFF:  Objection.
21             MR. FERINGA:  I'm sorry?
22             MS. MINCHOFF:  Did you say "with a
23        white"?
24             MR. FERINGA:  Yeah, there's a white
25        band around the side.
0142
 1   A.   Yeah, it's purple.  They're dark purple and
 2        light purple.
 3   Q.   Well, thanks.  My copy shows --
 4   A.   I know.  No, it's not a great color --
 5   Q.   Thanks.
 6   A.   -- depiction.
 7   Q.   So Exhibit C is purple, dark purple and
 8        light purple?
 9   A.   Yes.
10   Q.   Okay.  And did you ever wear those?
11   A.   Yes.
12   Q.   So you wore -- how is it that you wore three
13        sets of your sandals but not the one that
14        you were wearing on the date of the
15        incident?
16   A.   Different colors.  These don't look very
17        worn to me.  I probably wore them a few
18        times.  I used to wear flip-flops everywhere
19        I went, yes.
20   Q.   Even in --
21   A.   Yes.
22   Q.   -- February and March --
23   A.   Yes.
24   Q.   -- in Boston?
25   A.   I don't live in Boston.
0143
 1   Q.   Worcester?
 2   A.   I live in Leominster actually, and --
 3   Q.   Leominster.
 4   A.   -- I'm not a big snow person, so I would
 5        wear flip-flops around the house as slippers
```

```
 6        and whatnot.
 7   Q.   So it looks like you wore all of the various
 8        examples in Exhibit 2 but not the one that
 9        you used on the date of the incident?
10   A.   Yeah.
11   Q.   Okay.
12              MR. FERINGA:  It's after 12:00.  I
13        generally don't eat, but I am more than
14        willing to stop if you guys wish to --
15              MS. MINCHOFF:  I only need a few
16        minutes.  I usually don't take an hour, but,
17        Stephanie, how do you feel?
18              THE WITNESS:  I need to take
19        medication, and I should have something to
20        eat when I do.
21              MR. FERINGA:  Again, at any time
22        you need to stop you need to let me know,
23        because I'll keep going.
24              THE WITNESS:  I usually take it
25        around noon.
0144
 1              MR. FERINGA:  Okay.  So why don't
 2        we stop.  How much time do you want to take
 3        to get something to eat?  You want a half
 4        hour?  Can we start up again in 45 minutes?
 5              MS. MINCHOFF:  I'm fine with a half
 6        hour.
 7              MR. FERINGA:  Whatever you guys
 8        want to do.
 9              THE WITNESS:  That's fine.
10              MS. MINCHOFF:  Is that okay with
11        you?
12              THE WITNESS:  Yeah, I just need
13        something small.
14              MR. FERINGA:  Go ahead.  So we'll
15        go off the record.  We'll start back a
16        little after 12:30.
17              THE VIDEOGRAPHER:  The time is
18        12:10 p.m.  We are off the record.
19           (Lunch recess taken.)
20
21
22
23
24
25
0145
 1                 AFTERNOON SESSION
 2              THE VIDEOGRAPHER:  The time is
 3        12:50 p.m.  We are back on the record.
 4
 5              (STEPHANIE HOFER, Resumed.)
 6           DIRECT EXAMINATION, Continued
 7
 8        BY MR. FERINGA:
 9   Q.   I'm going to start asking you some questions
10        about Turtle Beach Towers and the vacation,
```

```
11          or the attempted vacation.  When was it that
12          you started making plans to go somewhere
13          with Ms. LaBelle?
14   A.     The Tuesday before we left.
15   Q.     Was this a spur-of-the-moment thing?
16   A.     Yes.
17   Q.     And how was it that Turtle Beach Towers was
18          then selected as opposed to any other
19          location in the Caribbean?
20   A.     I can't speak for Carrie because she booked
21          the trip through Expedia, and I believe that
22          Expedia spits out the deals, and since she
23          booked the trip, I can't exactly speak for
24          her.  We didn't -- I didn't choose.
25   Q.     What was magical about the Tuesday to make a
0146
1           decision for getting out of town?
2    A.     Just needed the end of the winter blues-
3           type, sit on the beach and read a book.
4    Q.     Okay.  Who is Ms. LaBelle to you?  Is she a
5           friend, a co-worker, anything?
6    A.     She's my friend.
7    Q.     How long have you known her?
8    A.     Five years --
9    Q.     Ever vacationed with --
10   A.     -- approximately five years.
11   Q.     Ever vacation with her before?
12   A.     No.
13   Q.     How was it that a decision was made to go
14          out of the country?
15   A.     We were looking for someplace warm.
16   Q.     And did you do any Internet searches
17          yourself about what deals may or may not be
18          out there in the Caribbean or Jamaica or
19          someplace?
20   A.     No.  It was her -- she called me up and
21          said, "Do you want to go somewhere?"  And I
22          said, "Sure.  Where do you want to go?"  And
23          she said, "I don't know.  I'll look around."
24          And she called me and said, "Do you want to
25          go to Jamaica?"  And I said, "Okay."
0147
1    Q.     Did you -- after being told that Jamaica was
2           a potential destination, did you go on the
3           Internet and check to see anything about
4           Turtle Beach Towers or Jamaica or Ocho Rios
5           or anything?
6    A.     I looked up Ocho Rios but nothing about
7           Turtle Beach Towers.  I wasn't aware of
8           where we were staying at that point.
9    Q.     When you went to look at Ocho Rios as your
10          search term, did it turn up a bunch of
11          hotels?
12   A.     No.  I looked at things to do.
13   Q.     Oh.  Before you got down to Turtle Beach
14          Towers did you look on the Internet to see
15          what Turtle Beach Towers looked like, what
```

```
16        the amenities were?
17   A.   I did not.  I believe -- I did not.
18   Q.   Whether Ms. LaBelle did or not is another
19        issue, but specifically for you, what you're
20        telling us is you did not go on the
21        Internet --
22   A.   No.
23   Q.   -- type in "Turtle Beach Towers," try and
24        look at what some of the rooms might look
25        like or...
0148
1    A.   Huh-uh.
2    Q.   No?
3    A.   No.  She had all the information.  She took
4         care of it all.  I went along for the ride.
5    Q.   You flew down there on the 18th, 2004?
6    A.   Yes.
7    Q.   Did you fly out of Logan?
8    A.   Yes.
9    Q.   Before you -- before you boarded the
10        airplane did you have anything alcoholic to
11        drink at any of the bars?
12   A.   No.
13   Q.   While you were on the plane -- strike that.
14            This wasn't a straight shot from Logan
15        to Jamaica, was it?
16   A.   No.
17   Q.   All right.  It went from where to where to
18        where?
19   A.   It went from Logan to I think, is it Philly
20        that is a really big airport?
21   Q.   I'm in so many airports that I could tell
22        you.  There's --
23   A.   I'm not --
24   Q.   Logan's a pretty big airport.
25   A.   We had to take a golf cart from one side of
0149
1         the airport to another to catch our next
2         flight.  I think it was Philly because we
3         came through Philly on the way home.
4    Q.   Okay.  All right.  You flew U.S. Air?
5    A.   Yes.
6    Q.   Okay.  Probably Philly.  Just I fly a lot.
7    A.   Okay.
8    Q.   And so from Philly to Jamaica, did you have
9         anything alcoholic --
10   A.   No.
11   Q.   -- to drink?
12            What time did you arrive in Jamaica?
13   A.   I believe our flight landed around 4:00 p.m.
14   Q.   Okay.  And when you got to Jamaica --
15   A.   Around 5:00 after we got through customs and
16        luggage.
17   Q.   Okay.  How did you get from the airport to
18        Turtle Beach Towers?
19   A.   A shuttle bus.
20   Q.   Did they take you directly to Turtle Beach
```

```
21          Towers, or did you go somewhere where you
22          could buy things to stock your condo with?
23    A.    No.  They brought us directly.
24    Q.    And while you were in the airport in
25          Jamaica, you didn't have anything alcoholic
0150
1           to drink --
2     A.    No.
3     Q.    -- is that correct?
4               The evening of the 18th, the first
5           night that you were there -- I should ask
6           you, did you move rooms from the 18th to the
7           19th or move -- may seem like a strange
8           question, but if you checked -- sometimes
9           when you check into a room, it's not really
10          what you want and you go down and, at least
11          I have, complained about the room and then
12          get into another room within the same tower
13          or hotel?
14    A.    No.
15    Q.    And was the tower -- there were four towers,
16          correct?
17    A.    I believe -- maybe the one where the lobby
18          was, another -- I don't know if there were
19          four or if there were more than four.
20    Q.    Okay.  When you walked into the lobby --
21          strike that.
22              The turtle ponds that you were talking
23          about, that was next to your building,
24          correct?
25    A.    No.
0151
1     Q.    Where was that?
2     A.    They were directly in front, directly inside
3           of the entry to the lobby.
4     Q.    Of the building where you were staying?
5     A.    No.
6     Q.    What lobby?
7     A.    The lobby of the -- the main lobby of the
8           hotel.
9     Q.    Okay.
10    A.    We were -- we -- our room was in a separate
11          building.
12    Q.    Was there a designation of the building
13          where the lobby was, that is, Building 1, 2,
14          3, 4?
15    A.    I don't recall.
16    Q.    Okay.  To check into your room did you have
17          to go past the turtle pond?
18    A.    Yes.
19    Q.    Was it daylight when you went past the
20          turtle pond?
21    A.    Yes.
22    Q.    And in order to go to the building where
23          your unit was, your collectively, unit was,
24          did you have to go past the turtle pond and
25          then walk to one of the other buildings?
```

0152
 1   A.   Yes.
 2   Q.   Okay.  So can you help me -- are you any
 3        good at drawing?
 4   A.   Yes.
 5   Q.   Okay.  Would you mind drawing the entrance
 6        to the lobby of the building where the
 7        turtle pond was located and then identify
 8        the steps, identify the turtle pond,
 9        identify the entrance to the building,
10        please?
11   A.   (Drawing.)
12             (Discussion off the record.)
13                (Exhibit No. 5, Drawing, marked for
14        identification.)
15   Q.   Okay.  I'm going to mark this as Exhibit
16        No. 5, and this is what you've just drawn
17        us; is that correct?
18   A.   Yes.
19   Q.   Would you hold that up for the camera just
20        so that they can focus in on it.
21             MR. FERINGA:  Adam, let me know
22        when you have that.
23   Q.   Okay.  Good.  You can put it down.  There
24        are stairs leading up to a glass door?
25   A.   Yes.
0153
 1   Q.   And on either side of the stairs there were
 2        turtle ponds, correct?
 3   A.   Yes.
 4   Q.   And the turtle ponds you have drawn there
 5        are square?
 6   A.   Rectangular.
 7   Q.   Okay.  And do you know what the composition
 8        of the sides are, what they're made out of?
 9   A.   They looked as if they were made out of like
10        stone wall.
11   Q.   Stone wall, okay.
12             And what about the inside of the
13        turtle ponds; what's in there?
14   A.   Turtles and water, and they have like
15        decorations and almost look like flagstone,
16        that blue slate for the turtles to climb up
17        and sun themselves on.
18   Q.   Okay.
19   A.   So --
20   Q.   So you said there were two turtle ponds?
21   A.   I believe there were one on each side.
22   Q.   And that's what it says in your complaint,
23        Paragraph 12, located on each side of the
24        stairway were turtle ponds, P-O-N-D-S?
25   A.   Yes.
0154
 1   Q.   Which contain several inches of water,
 2        turtles, coral and slate; is that correct?
 3   A.   Yes.
 4   Q.   And the inside of the turtle ponds, were

```
 5        those -- was -- were there any ceramic or
 6        was there just cement or --
 7   A.   I didn't examine it.
 8   Q.   Okay.  Did you have any difficulty on the
 9        18th -- strike that.
10             What were you wearing as footwear on
11        the 18th, your flip-flops?
12   A.   My new flip-flops.
13   Q.   Which one of A, B, C or --
14   A.   None.
15   Q.   -- the new ones?
16   A.   The new ones.
17   Q.   Okay.  When did you put the -- strike that.
18             What we're talking about as the new
19        ones are the flip-flops that you wore on the
20        19th, which -- when the accident occurred?
21             MS. MINCHOFF:  Objection.
22   A.   The accident occurred on the 18th.
23   Q.   Sorry.  On the day you arrived?
24   A.   Yes.  I was there for four hours.
25   Q.   Okay.
0155
 1   A.   Yes.
 2   Q.   So when was it that you put on the pair of
 3        sandals that you were wearing on the day of
 4        the accident?
 5   A.   That day.
 6   Q.   So you wore those from your house?
 7   A.   I don't remember if I wore them from my
 8        house or if I had packed them.  I can't
 9        remember.
10   Q.   Let me ask this question:  When you dressed
11        to go on the plane knowing your end place
12        was going to be Jamaica, did you dress sort
13        of in resort warm clothes, so --
14   A.   (No verbal response.)
15   Q.   No?
16   A.   No, sweatpants and...
17   Q.   But were you wearing sandals at the time
18        which -- the flip-flops that you normally
19        always wore, you said?
20   A.   Most likely.  I don't remember if they were
21        that pair.
22   Q.   Okay.  When was it that you switched to that
23        pair, then?
24             MS. MINCHOFF:  Objection.
25   A.   That would be after we arrived and unpacked
0156
 1        and refreshed and changed.
 2   Q.   Are you certain of the fact that you didn't
 3        wear those sandals on the trip down?
 4   A.   No, I'm not certain.
 5   Q.   Okay.  Could be, couldn't be, you just don't
 6        know?
 7   A.   I don't know.
 8   Q.   Okay.  Do you remember having any difficulty
 9        with the footwear prior to arriving in
```

```
10        Jamaica as you're traveling the various
11        airports?
12   A.   No.
13   Q.   Do you remember having any difficulty with
14        the footwear from the time you left the
15        Jamaica airport to the time that you arrived
16        at the Turtle Beach Towers?
17   A.   No.
18   Q.   After you arrived at Turtle Beach Towers, I
19        assume that you had to go check in through
20        the lobby and sign in someplace, correct?
21   A.   Carrie checked us in.  I did not sign
22        anything.
23   Q.   Did you go back -- did you go with her to
24        the registration desk?
25   A.   Yes.
0157
 1   Q.   So you would have had to use those stairs?
 2   A.   Yes.
 3   Q.   So you were familiar with the condition of
 4        the stairs as you're walking up?
 5   A.   Not something -- I wouldn't say familiar.
 6        It's something that you don't really -- I
 7        wouldn't say familiar.  I went up the stairs
 8        and down the stairs one time.
 9   Q.   Were you carrying your bags?
10   A.   No.
11   Q.   Where were they?
12   A.   At the bottom of the stairs.
13   Q.   Did you have any difficulty walking up and
14        down the stairs?
15   A.   No.
16   Q.   Did the individual who checked you in, was
17        that a woman?
18   A.   I can't recall.  I don't know.  Carrie did
19        the checking in.  I hung back.  I don't
20        remember if it was a man or a woman.
21   Q.   All right.  So you would have arrived at
22        Turtle Beach Towers 5:00 or 6:00, something
23        like that?
24   A.   Yes, right around there.
25   Q.   You then -- would you then go to another
0158
 1        building where your room was contained?
 2   A.   Somebody, a man, escorted us from that
 3        building, took our bags and walked us to our
 4        room.
 5   Q.   You refreshed, changed?
 6   A.   Yes.
 7   Q.   And then what did you do?
 8   A.   We relaxed for a little while.  We decided
 9        what we were going to do, if we were going
10        to go to dinner or if we were just going to
11        hang back, because it was a long day.  We
12        decided to go to the marketplace directly
13        across the street from Turtle Beach Towers,
14        and inside the marketplace was Jimmy
```

```
15        Buffet's Margaritaville, so we decided to go
16        have dinner there and then come back,
17        because it was directly across the street,
18        so that we could get a good night's sleep
19        and jump on the morning.
20   Q.   Before you went to Jimmy Buffet's
21        Margaritaville but after you arrived at the
22        Turtle Beach Towers, did you have anything
23        alcoholic to drink at all?
24   A.   No.
25   Q.   Did they not provide you with some sort of
0159
 1        alcohol for your room?
 2   A.   No.
 3   Q.   Between the time that you left -- between
 4        the time that you went to your room and the
 5        time that you went to the market across the
 6        street where the Margaritaville was did you
 7        at all go back to the turtle ponds?
 8   A.   No, not that I can recall.  We had to go
 9        past them.
10   Q.   Okay.  And when you were past them, did you
11        do anything, as far as you can remember, to
12        either play with the turtles or look at them
13        or anything?
14   A.   I can't remember.  We may have looked at
15        them.
16   Q.   Okay.  But sitting here today, you don't
17        remember looking at them, sort of spending a
18        lot of time trying to play with them or
19        anything of the sort?
20   A.   No.
21   Q.   Okay.  Then you went to the Margaritaville
22        and had dinner, correct?
23   A.   Correct.
24   Q.   How many alcoholic drinks did you have?
25   A.   I had one margarita that I did not finish.
0160
 1   Q.   Anything else?
 2   A.   I ordered a filet mignon.
 3   Q.   Did you have anything alcoholic to drink?
 4   A.   No.
 5   Q.   Had you taken your Prozac that day?
 6   A.   I don't recall.
 7   Q.   It was your habit to take that medication
 8        every day, correct?
 9   A.   There's that word again, "habit."
10   Q.   Yeah, every day you took Prozac as a matter
11        of course, correct?
12   A.   You used the word "habit" when it came to
13        shopping as well, and I don't consider
14        them -- this a habit.  This is something
15        that I was directed to do.  It's not a
16        habit.
17   Q.   Legal terms when we talk about "habit," it's
18        what you do every day, not the fact that
19        you're a drug addict.  I didn't mean to --
```

```
20   A.   But that's a legal term, and I'm confused
21        about a legal term.
22   Q.   All right.  It was your practice to take
23        your medications every day?
24   A.   In the morning, yes.  So if I was still
25        taking Prozac at that time, which I can't
0161
 1        recall, I would have taken it that morning.
 2   Q.   If your medical records say that you were on
 3        Prozac at that time, you wouldn't dispute
 4        that, would you?
 5   A.   No.
 6   Q.   Okay.  What other medications were you
 7        taking on that day other than Prozac?
 8   A.   None.
 9   Q.   Okay.  So you had one drink that you didn't
10        finish, and then did you return back to the
11        Turtle Beach Towers, or did you go to a bar
12        afterwards?
13   A.   No.  We went directly back to Turtle Beach
14        Towers.  We left Turtle Beach Towers, we
15        walked through the marketplace, we may have
16        stopped at a kiosk that sold silver jewelry
17        for two minutes and went directly back to
18        our room.
19   Q.   And when you went directly back to your
20        room, did you go to the -- go past the
21        turtle ponds again?
22   A.   I don't recall if we went past that again,
23        because there were two ways that we had
24        found to go back.  Instead of going through
25        the front, we could go around to the side
0162
 1        because our building was towards the back of
 2        the grounds.
 3   Q.   It wasn't the one on the beach?
 4   A.   If it was, I didn't get to see it.
 5   Q.   Okay.  So then you went back -- did you make
 6        it back to your room?
 7   A.   Yes.
 8   Q.   All right.
 9   A.   From dinner?
10   Q.   Yes.
11   A.   Yes.
12   Q.   And then what happened?
13   A.   Carrie and I were going to get ready for
14        bed, and we talked about what we were going
15        to do the next morning and we had wanted to
16        do Dunn River Falls.
17   Q.   D-U-N-N?
18   A.   Yes.  So as she was getting ready, I said,
19        I'll take a walk over to the front desk to
20        get the information on what time that we
21        could get a shuttle to Dunn River or how to
22        get there, you know, the information, and
23        I'll come back with it.  And I left the
24        room --
```

```
25   Q.   Okay.  Let me stop you there.
0163
 1   A.   Okay.
 2   Q.   Up until the time at least from the time
 3        that you were in your room the first time as
 4        you refreshed, unpacked, went to
 5        Margaritaville, went back to your room, to
 6        the best of your knowledge, you were wearing
 7        the same set of sandals or flip-flops?
 8   A.   Correct.
 9   Q.   Okay.  And during the time that you were
10        walking however distance that is, did you
11        have any difficulty with those sandals at
12        all?
13   A.   Nothing that I can remember, no.
14   Q.   Did you sense them feeling any different
15        from other flip-flops that you had worn of
16        the same sort, either A, B or C, that you
17        had worn before?
18   A.   I can't say that I sensed anything wrong.
19   Q.   All right.  Did you have any difficulty, did
20        they feel loose, did they feel strange,
21        anything of the sort?
22   A.   Not that I can recall.  I don't know.
23   Q.   Between the time that you put them on,
24        possibly in the morning before the flight or
25        possibly when you were refreshing and
0164
 1        changing your outfit to the time that you
 2        moved back to your room after
 3        Margaritaville, did you take them off at all
 4        to look at them?
 5   A.   I don't recall examining them --
 6   Q.   Okay.
 7   A.   -- for any reason.
 8   Q.   So there was nothing that -- other than the
 9        fact that you may have liked them, there was
10        nothing that drew your attention to them or
11        caused you any concern about the sandals; is
12        that fair?
13   A.   That's fair.
14   Q.   Okay.  So what time was it, then, that you
15        would have left your room now to go to see
16        what you could do to arrange the Dunn River
17        Falls trip?
18   A.   Probably quarter of 11:00 to 11:00 p.m.
19   Q.   And it's your testimony that from the time
20        that you arrived at Turtle Beach Towers to
21        the time that you left to go to the lobby to
22        arrange for the Dunn River Falls you had
23        part of a margarita and that was it?
24   A.   Yes.
25   Q.   There was no alcohol in your room that you
0165
 1        stopped, purchased at the kiosk area or the
 2        marketplace area; is that correct?
 3   A.   Correct.
```

```
 4   Q.   So you would have then walked from your
 5        building to the lobby --
 6   A.   Uh-huh.
 7   Q.   -- correct?
 8   A.   Yes.
 9   Q.   And how far of a distance was that; do you
10        remember?
11   A.   I don't really remember, maybe a five-minute
12        walk around the grounds.
13   Q.   Were you following cement trails, or was --
14   A.   Yes.
15   Q.   All right.  So it's a sort of a sidewalk-
16        like thing that you were following?
17   A.   Yes.
18   Q.   So tell me what happened as you're walking
19        to the -- as you're walking to the lobby
20        area.
21             MS. MINCHOFF:  Stephanie, you can
22        have -- before you answer you can have a sip
23        of your water.
24   Q.   Yeah, please, I'll just keep going.  You
25        just tell me when to stop, all right?
0166
 1   A.   I get really thirsty.
 2   Q.   Well, stop any time.  Take as many drinks as
 3        you like.
 4             So the question was, just so that
 5        we're very clear, tell me what happened, as
 6        best as you can recall, from the time that
 7        you left your building and walked the five
 8        minutes or so to the lobby around 11:00
 9        or -- 10:30 or 11:00, 11:30 p.m.
10             MS. MINCHOFF:  Objection.
11             MR. FERINGA:  I'm sorry?
12             MS. MINCHOFF:  I don't think she
13        said it took five minutes for her to get to
14        the lobby.
15             THE WITNESS:  It could have been a
16        five-minute --
17             MS. MINCHOFF:  I think she said it
18        was five minutes from the marketplace to --
19             MR. FERINGA:  No, that's not what
20        she said.  So --
21             MS. MINCHOFF:  I'll object because
22        I heard it differently, but --
23   BY MR. FERINGA:
24   Q.   Just so -- it takes you about -- you said it
25        took you five minutes.
0167
 1   A.   It took about five minutes to get from Jimmy
 2        Buffet's Margaritaville to the hotel room --
 3   Q.   Right.
 4   A.   -- and then from my hotel room probably five
 5        minutes to get --
 6   Q.   To the lobby?
 7   A.   -- to the lobby.
 8   Q.   That's what I heard.
```

```
 9   A.   Okay.
10   Q.   So tell me from that five minutes from your
11        hotel room to the lobby what you did, what
12        you remember doing.  Do you remember
13        anything?
14   A.   I was walking -- I do remember leaving the
15        room and going around the other side to see
16        how close we were to the beach because our
17        door was on the end of the building.  So I
18        took a walk around the side, and I saw our
19        window, and I knocked on it and waved at
20        Carrie and scared her, and I didn't mean to
21        scare her.  And then I walked back around
22        the building via the sidewalk over to the
23        front desk area, walked up the stairs, tried
24        to open the door.  The door was locked.
25   Q.   Right.  Now, when you're talking about the
0168
 1        stairs, looking at Exhibit 5, you're talking
 2        about the central stairs?
 3   A.   Yes.  I walked from somewhere over here
 4        (indicating).
 5   Q.   What you're doing is the left side?
 6   A.   Yes, the left side of the main entry
 7        building.  I followed that sidewalk over to
 8        the stair area and went up the stairs --
 9   Q.   Okay.
10   A.   -- went to open the single glass door.  That
11        was locked.  At that time I turned around to
12        go down the stairs.
13   Q.   And then what happened?
14   A.   That's when the flip-flop broke --
15   Q.   Okay.
16   A.   -- sandal broke.
17   Q.   So where was it when the flip-flop broke?
18        Where were you on -- were you on the stairs,
19        before the stairs?
20   A.   I was at the top of the stairs getting ready
21        to take my step down, in the process of
22        taking my step down.
23   Q.   Were you in the center of the stair, center
24        of the thing, right side, left side?
25   A.   I can't recall.  I can't recall.  It wasn't
0169
 1        a very large stairway to be on, you know,
 2        one side or another.  It was sort of like a
 3        one person type of stairway, not a very
 4        large stairway at all.
 5   Q.   One person?
 6   A.   Wasn't very wide, is what I'm saying.
 7   Q.   Okay.  So then what happened?
 8   A.   I fell.
 9   Q.   Well, how do you know your flip-flop broke?
10   A.   Something felt wrong, I looked down and the
11        flip-flop was broken and all within that
12        same few seconds I fell.
13   Q.   Okay.  So let's just -- let's look at
```

```
14          Exhibit A -- I mean, not Exhibit A.  This is
15          A, the flip-flop exemplars that your
16          attorney was kind enough to have messengered
17          over.  When you said you looked down -- and
18          I recognize these are not the flip-flops but
19          these are the style of the flip-flops --
20     A.   Yes.
21     Q.   -- with respect -- when you looked down,
22          what did you see?
23     A.   This (indicating).
24     Q.   "This" being?
25     A.   The center between the toes was separated
0170
 1          from the sandal itself.
 2     Q.   Okay.  Now, let me ask this question:  If
 3          you look at the bottom of that sandal, and I
 4          apologize for standing up, but there's a --
 5          if you can show the camera, too, there's a
 6          sort of a bullet, there's sort of a round
 7          circular thing that I think is probably the
 8          -- a portion of the strap?
 9     A.   It's this (indicating), yeah.
10     Q.   Okay.  Now, when you looked down and saw
11          that your flip-flop had broken, had the
12          round circular thing pulled all the way
13          through?
14     A.   Yes.
15     Q.   So that thing that we see at the bottom of
16          the toe piece on the bottom of the heel -- I
17          mean, bottom of the sole actually pulled all
18          the way through?
19     A.   Yes.
20     Q.   And was attached to the -- it was attached
21          to -- if you can -- it was attached to the
22          toe piece that goes into the sole?  That's a
23          stupid way of saying things, wasn't it?
24     A.   I'm very confused right now.
25     Q.   So am I.
0171
 1              Was this part (indicating) --
 2     A.   Yes.
 3     Q.   -- still attached --
 4     A.   Yes.
 5     Q.   -- to this part?
 6     A.   Yes, it was.
 7     Q.   So it is as if this whole unit (indicating)
 8          had pulled through?
 9     A.   Yes, it did.
10     Q.   Okay.  And you saw that?
11     A.   I saw that.
12     Q.   And was it on your right or left?
13     A.   It was on my right.
14     Q.   And were you in the process of making a
15          right step?
16     A.   I don't recall.
17     Q.   Okay.  And up to that point in time had you
18          caught the toe of the sandal?  Had you
```

```
19        stumbled?  Had anything happened?
20   A.   Prior to this?
21   Q.   Yes.
22   A.   No.
23   Q.   Okay.
24   A.   I don't remember stumbling.  I don't
25        remember having any problem with the sandal
0172
 1        up until the break.
 2   Q.   You know how sometimes when you wear new
 3        shoes and you're not necessarily used to new
 4        shoes, sometimes you stumble or --
 5   A.   But they're all the same sandals, so it's
 6        not like --
 7   Q.   I'm not arguing with you.
 8   A.   Yeah.
 9   Q.   What I'm saying is, was there ever a
10        situation that you recall on Jamaica where
11        you dragged a toe or something of that
12        nature?
13   A.   No.
14   Q.   Okay.  So you said it broke.  Essentially
15        that knob pulled through the sole of the toe
16        of the flip-flop, right?
17   A.   Yes.
18   Q.   And then what happened?
19   A.   I fell.
20   Q.   And you fell how?  Where did you fall?
21        Where --
22   A.   I lost my balance --
23   Q.   Yeah.
24   A.   -- and fell to my right.  Looking at this
25        diagram, coming back down the stairs I fell
0173
 1        that way (indicating).
 2   Q.   Okay.  So you have to hold that up so the
 3        camera can see it.
 4   A.   (Witness complies.)
 5   Q.   So looking at the diagram, looking at it
 6        would be -- you had fell to your right into
 7        the turtle pond that was to your right, the
 8        camera's left?
 9   A.   Yes.
10   Q.   Okay.  And what -- you can put that down.
11        Thank you.
12            Where -- what happened to your leg?
13        Is that a stupid question?  By the way
14        you're looking, it may have been a vague
15        question.  Let me ask:  Where -- how was it
16        that your leg got injured, as far as you
17        know?
18   A.   As far as I know?
19   Q.   Yeah.
20   A.   I gouged my leg over on whatever material
21        was in that pond.
22   Q.   Okay.  There was a -- was there a -- was the
23        edge of the pond the same height as the
```

```
24        stairs?
25   A.   No.
0174
 1   Q.   Was there a lip?  Was it higher or lower?
 2   A.   It was lower.
 3   Q.   Okay.
 4   A.   It was --
 5   Q.   So do you have a sense as to whether your
 6        leg caught the edge of the pond or something
 7        inside the pond?
 8   A.   Something inside the pond.  I was inside the
 9        pond.  I have -- this is the one thing that
10        is indelled (sic) in my mind.
11   Q.   And what is that?
12   A.   The fall.
13   Q.   Okay.  Tell me -- describe for me, then, if
14        it's just stuck in your mind like that, tell
15        us as if you're narrating a videotape about
16        how that occurred.
17             MS. MINCHOFF:   Objection.
18   A.   I went down the stairs --
19   Q.   Okay.
20   A.   -- fell into the pond.
21   Q.   Okay.
22   A.   Realizing what happened, I jumped up and I
23        was wet and was embarrassed.  When I went to
24        take a step out, nothing happened.  I looked
25        down, and I saw that I was bleeding.  I had
0175
 1        no idea of the extent of my injury.  I
 2        thought to myself that's going to need
 3        stitches.  I had no idea that the reason I
 4        could not move my leg was because I had
 5        severed every vital part of my leg except
 6        for the bone.
 7   Q.   Did you see there's a flap of skin and
 8        tissue that starts at your shin and goes
 9        down towards your foot?  Was that separated
10        at that point from your leg?
11   A.   Yes.
12   Q.   So you saw it as if from a --
13   A.   It looked like a potato peeler.
14   Q.   Right.  I was going to ask about that.
15        Right or left leg again, I'm sorry?
16   A.   Left.
17   Q.   From the left leg about at the -- sort of
18        the shin area below the knee you have a flap
19        of skin and tissue that had peeled down over
20        the top of your foot, correct?
21   A.   Correct.
22   Q.   And that's what you saw?
23   A.   That's what I saw.
24   Q.   Okay.  And I'm sure that that was a terribly
25        frightening thing for you to see.
0176
 1   A.   Yes.
 2   Q.   Okay.  Do you need...
```

```
 3   A.   Thanks.
 4   Q.   You don't have to ask me to do these things,
 5        please.
 6             Now, I'm going to ask you what you
 7        perceive is probably a stupid question, and
 8        it probably is, but recognizing that you had
 9        this flap of tissue and skin that you saw
10        and you couldn't move your leg, might I
11        assume that you didn't pay any attention to
12        the flip-flop anymore; is that correct?
13   A.   You would be correct in that --
14   Q.   Okay.
15   A.   -- assumption.
16   Q.   And that's fine.  What happened next?
17   A.   That, I don't recall.
18   Q.   Okay.  When's the next time you have a
19        memory?
20   A.   I have a vague memory of being in the back
21        seat of a car, a very bumpy ride, to the
22        hospital.
23   Q.   Do you have any sense, though, as to when
24        that memory begins, close to the hospital,
25        start of the ride, anything?
0177
 1   A.   Start of the ride.  I remember somebody
 2        lift -- carrying me to the car.
 3   Q.   Do you know who?
 4   A.   I believe it was Henry McKenzie.
 5   Q.   All right.  Have you talked to Henry
 6        McKenzie since that night?
 7   A.   No, I have not.  The following day we spoke.
 8   Q.   Okay.
 9   A.   He stayed with us the entire time until we
10        left Jamaica, but I have not spoken to him
11        since.
12   Q.   Did you get his address or telephone number
13        or anything?
14   A.   Yes.
15   Q.   You did?
16   A.   Yes.
17   Q.   And where is that?
18   A.   That is in my records.
19   Q.   What records?
20   A.   All of my -- it should be in all of the
21        documents.
22   Q.   I don't think we've been provided with the
23        address for Henry McKenzie.
24   A.   I just saw it.
25   Q.   Did you?
0178
 1   A.   Yeah.
 2   Q.   Okay.
 3   A.   I --
 4   Q.   Maybe I'm wrong, but --
 5   A.   I saw it in here --
 6   Q.   Okay.
 7   A.   -- in one of these (indicating).
```

```
 8                  MR. FERINGA:  Is it there?
 9                  MR. REITH:  (No verbal response.)
10   Q.   It's there.  Then I'm wrong.  I'm absolutely
11        wrong, and I apologize.
12                  MR. REITH:  For the record, I'll
13        just interject, in the disclosure it states
14        an address, I believe, but there's no phone
15        number.
16                  MR. FERINGA:  Okay.  That's fine.
17        I apologize for that.
18        BY MR. FERINGA:
19   Q.   Have you communicated at all with him since
20        leaving Jamaica?
21   A.   No, I have not.
22   Q.   And, to the best of your knowledge, did he
23        witness your accident?
24   A.   To the best of my knowledge, I have no idea
25        if he witnessed it or not.
0179
 1   Q.   To the best of your knowledge, did anybody
 2        witness your accident?
 3   A.   Not to my knowledge.
 4   Q.   And one of the reasons why you claim this
 5        accident occurred was because the stairs
 6        were dimly lit, correct?
 7   A.   The reason the accident occurred was because
 8        the flip-flop broke.
 9   Q.   No.  You said that the -- in your complaint
10        the thing that your lawyer said was that
11        the -- Paragraph 11, "The only way to access
12        the resort lobbies" -- "resort's lobby was
13        by a series of steps.  The stairway was very
14        dimly lit and did not contain guardrails."
15              Was it dimly lit or not?
16   A.   Yes.
17   Q.   So could you not see the steps?
18   A.   No.  I could see the steps.
19   Q.   So the fact that it was dimly lit had
20        nothing to do with your fall now, is what
21        you're saying?
22                  MS. MINCHOFF:  Objection.
23   A.   That can't be said or not said.  I don't --
24   Q.   Does the fact --
25   A.   It may have.
0180
 1   Q.   Does the fact that this was dimly lit have
 2        anything to do with your fall?
 3   A.   I think the fact that it was dimly lit
 4        jeopardized my safety.
 5   Q.   How?
 6   A.   By being dimly lit.
 7   Q.   All right.  But did you trip and fall
 8        because you couldn't see the stairs?
 9   A.   No.
10   Q.   Did you trip and fall because you didn't see
11        the turtle pond?
12   A.   No.
```

```
13   Q.   Okay.
14   A.   But I think it took a longer time for people
15        to find me because it was dimly lit, and,
16        you know, there are many other factors, but
17        the accident was caused by the breaking
18        flip-flop --
19   Q.   But --
20   A.   -- in a dimly lit stairway.
21   Q.   You've alleged -- you through your lawyer
22        and you have alleged that it was -- the
23        accident was caused in part because it was
24        dimly lit.
25             MS. MINCHOFF:  Objection.
0181
1    Q.   And I'm trying to figure out how the dimly
2         lit has to do with the accident.
3    A.   I believe that the accident was caused in
4         part by a dimly lit stairway with no rails.
5    Q.   Okay.  And so how would the presence of
6         guardrails have helped you?
7    A.   I would not have fallen into a turtle
8         pond --
9    Q.   You were --
10   A.   -- if there had been railings.
11   Q.   You were aware of the fact that it didn't
12        have guardrails before, correct?
13   A.   It's something you don't examine.
14   Q.   I know, but you had walked up and down it
15        several times?
16   A.   Twice.
17   Q.   And there were no guardrails, correct?
18   A.   I was unaware that there weren't any
19        guardrails.
20   Q.   But you don't remember using guardrails?
21   A.   Exactly.
22   Q.   Okay.
23   A.   I don't know.
24   Q.   So you were on notice that there weren't any
25        guardrails --
0182
1              MS. MINCHOFF:  Objection.
2    Q.   -- correct?
3    A.   This is wording, and --
4    Q.   I appreciate it's wording.  That's how we
5         communicate.
6    A.   Right, no --
7    Q.   You were aware of the --
8    A.   -- but you're confusing me, is what I'm
9         saying.
10   Q.   You were aware of the fact before your
11        accident that there were no guardrails?
12   A.   No, I was not.
13   Q.   Were you aware of the fact that there was a
14        ramp, that you didn't even need to take the
15        stairs?
16   A.   No, I was not.
17             (Exhibit No. 7, Copies of pictures
```

```
18          of Tower 4 turtle pond, marked for
19          identification.)
20    Q.    Okay.  I'm going to show you what I've
21          marked as Exhibit No. 6.  All right.
22                MR. FERINGA:  Right, 6?
23                THE REPORTER:  No.
24    Q.    7, sorry.  This is Exhibit No. 7.  That's
25          Tower 4 (indicating).  This is the lobby,
0183
 1          isn't it?
 2    A.    I don't recall.
 3    Q.    Well, look through this series of
 4          photographs.  I have one, two, three, four,
 5          five photographs there.  I represent to you
 6          that this is the lobby area (indicating),
 7          Tower No. 4, which is from Turtle Beach
 8          Towers.  Do you recognize this now?
 9    A.    Vaguely.
10    Q.    Okay.
11    A.    Honestly, I envisioned it completely
12          different.
13    Q.    Okay.  Well --
14                MR. REITH:  Do you mind if I take a
15          look at 5 while I'm comparing this?
16                MR. FERINGA:  Go ahead.
17                MR. REITH:  Thank you.
18                MR. FERINGA:  I'm going to use 5,
19          but go ahead and look at it.
20                MR. REITH:  Okay.  One moment.
21          BY MR. FERINGA:
22    Q.    So if you'll look on the first of the --
23          first of the photographs, you'll see in the
24          left-hand side of the photograph the turtle
25          pond.  That's what we're talking about,
0184
 1          correct?
 2    A.    Yes.
 3    Q.    And it looks like there is ceramic tile of
 4          some sort in that, correct?
 5    A.    Yes.
 6    Q.    Okay.  Now, you said that the stairs were
 7          only large enough for one person.  You would
 8          agree with me, would you not, that the
 9          stairs are wider than that?
10    A.    They are --
11    Q.    Okay.  And --
12    A.    -- but to the best of my recollection was
13          what I said.  I don't remember.  The
14          accident -- I was there very briefly, and
15          the accident happened in a flash.
16    Q.    Okay.
17    A.    I am going on pieces and bits of my memory.
18    Q.    So your memory may not be correct?
19    A.    Correct.
20    Q.    Okay.  Let's go.  Let's -- now, do you see
21          on the right side of the stairway -- and you
22          could look at any one of the photographs,
```

```
23        and maybe the third photograph gives you a
24        better -- I mean, the fourth paragraph gives
25        you a better idea -- there's an actual ramp
0185
 1        there.  Do you see that?
 2   A.   Yes.
 3   Q.   Okay.  You don't remember that ramp?
 4   A.   No, I don't.
 5   Q.   And while your Exhibit No. 5 and your
 6        complaint, by the way, says that there are
 7        two turtle ponds, there was actually in
 8        actuality only one, correct?
 9               MS. MINCHOFF:  Objection.
10               MR. FERINGA:  On what basis?
11               MS. MINCHOFF:  On the fact that I
12        don't know when these were taken, if this
13        represents the way it looked on the day.
14        She's going off of her memory, and I don't
15        think there's enough foundation so I
16        absolutely object.
17               MR. FERINGA:  Fine.
18   Q.   There was only one turtle pond, wasn't
19        there?
20               MS. MINCHOFF:  Objection.
21   A.   I didn't examine how many turtle ponds were
22        there.  I saw an entryway (indicating),
23        okay?
24   Q.   Okay.
25   A.   I assumed, maybe, that they were symmetrical
0186
 1        and that they had plants and turtles in both
 2        spots.  I apologize if I missed my memory.
 3   Q.   No, no, no.  What I'm trying to do is it has
 4        been alleged that there are two turtle ponds
 5        on both sides.  It is written in your
 6        document, Exhibit No. 5, that there are.
 7   A.   Okay.
 8   Q.   Sitting here today --
 9   A.   I fell in this turtle pond.
10               MS. MINCHOFF:  Let him finish the
11        question.
12   Q.   Sitting here today, do you have a memory
13        that there were two turtle ponds or one?
14   A.   I have a memory that I thought I saw two
15        turtle ponds.
16   Q.   Okay.  Fine.
17   A.   But my memory also --
18               MS. MINCHOFF:  You've answered the
19        question, Stephanie.
20               MR. REITH:  I would -- if your
21        witness is offering something, you cannot
22        jump in and tell her to stop talking.
23        That's not the way this works, India.
24               MS. MINCHOFF:  I don't have a
25        problem reminding my witness that she's
0187
 1        answered the question, Tom.
```

```
 2   Q.   Your memory could be wrong, correct?
 3              MS. MINCHOFF:  Objection.
 4   A.   My memory is what it is.
 5   Q.   Okay.  But you could be mistaken in your
 6        memory?
 7   A.   I may have been mistaken about a second
 8        turtle pond.
 9   Q.   Okay.  So --
10   A.   Doesn't --
11   Q.   So let's look at this.  If you look at --
12   A.   Can I ask a question?
13   Q.   No.  We're going to go off the record a
14        minute.
15              THE VIDEOGRAPHER:  The time is
16        1:30.  We are off the record.
17          (Recess taken.)
18              THE VIDEOGRAPHER:  The time is 1:37
19        p.m.  This is the beginning of Cassette No.
20        3 in the deposition of Stephanie Hofer.  We
21        are on the record.
22        BY MR. FERINGA:
23   Q.   At the time of the fall it is your
24        understanding that Ms. LaBelle was still in
25        the room; is that correct?
0188
 1   A.   Yes, that's correct.
 2   Q.   The time of the accident didn't take place
 3        about 11:00, it took place about 12:30 a.m.,
 4        didn't it?
 5   A.   I can't recall.
 6   Q.   Okay.  It is true, isn't it, that after you
 7        got out of the plane and made it to the
 8        Turtle Beach Towers the first time you and
 9        your friend began drinking very heavily,
10        isn't it?
11   A.   No, it is not.
12   Q.   Well, isn't it true that after you -- your
13        friend was checking in or before you went to
14        Margaritaville you actually were inside of
15        that turtle pond trying to catch turtles?
16   A.   Absolutely not.
17   Q.   Isn't it true that a woman by the name of
18        Shian, S-H-I-A-N, Nelson, who was the
19        daytime manager, told you to get out of the
20        turtle pond and actually escorted you back
21        to your room?
22   A.   Absolutely not.
23   Q.   Isn't it true that Ms. Shian Nelson told you
24        that you should not be in the turtle pond,
25        that you could fall and get injured?
0189
 1   A.   Absolutely not.
 2   Q.   Isn't it true that there was another
 3        representative of the hotel, together with
 4        Shian Nelson, that took you back to your
 5        room?
 6   A.   Absolutely not.
```

```
 7   Q.   And isn't it true that at 12:30 in the
 8        evening -- in the early morning hours, now
 9        of the 18th -- or 19th you went back trying
10        to go catch turtles in the turtle pond
11        again?
12   A.   Absolutely not.
13   Q.   Aren't you aware of the fact that you were
14        observed by a man by the name of Denroy,
15        D-E-N-R-O-Y, Scarlett, S-C-A-R-L-E-T-T, who
16        was the night manager?
17   A.   No.  I have no recollection of either of
18        those names.
19   Q.   Isn't he -- weren't you found by the night
20        manager at the time after your fall?
21   A.   Not to my recollection.
22   Q.   Ms. Hofer, there was no failure of a flip-
23        flop, was there?
24             MS. MINCHOFF:  Objection.
25   Q.   Was there?
0190
 1   A.   Absolutely there was.
 2   Q.   You're under oath, right?
 3   A.   Yes, I am.
 4   Q.   All right.  You were not falling into the
 5        turtle pond, you were actually in the turtle
 6        pond and fell in the turtle pond, weren't
 7        you?
 8   A.   No.
 9   Q.   And you were drunk?
10   A.   What?
11   Q.   You were drunk, weren't you?
12   A.   Absolutely not.
13   Q.   Then why is it that you told the physicians
14        at Mass. General that you had alcohol as --
15        at the time -- you were under the influence
16        of alcohol at the time of the incident?
17   A.   I told them that I had half a margarita.
18             MS. MINCHOFF:  Scott, I'm going to
19        ask you to change your tone.
20             MR. FERINGA:  My tone is fine.
21   A.   No, it is not.
22             MS. MINCHOFF:  Stephanie.
23             MR. FERINGA:  My tone is fine.
24             MS. MINCHOFF:  I'm making an
25        objection.  I asking because I don't think
0191
 1        it is fine.
 2             MR. FERINGA:  It's fine.
 3             MS. MINCHOFF:  I'm going to ask you
 4        to change your tone.  Your questions are
 5        completely appropriate, but I would ask that
 6        you change your tone.
 7             MR. FERINGA:  My tone is fine, and
 8        that's why I do this on record.
 9             MS. MINCHOFF:  I'm glad that you do
10        have it on videotape.  I'm asking you to
11        change your tone.
```

```
12        BY MR. FERINGA:
13   Q.   Ms. Hofer, you were inside the turtle pond
14        and actually fell within it at the time of
15        the incident, correct?
16               MS. MINCHOFF:  Objection, asked and
17        answered.
18   A.   I'm going with my attorney on that.  I asked
19        you -- you asked me, I answered.
20   Q.   I want your answer.
21   A.   I answered.
22   Q.   You were inside the turtle pond --
23   A.   No, I was not.  I was on the stairs.
24   Q.   So just so that we're very clear, you denied
25        ever being in the turtle pond earlier,
0192
 1        correct?
 2   A.   Yes.
 3   Q.   You denied being warned that you should not
 4        be in the turtle pond?
 5   A.   There is a bench there, if that's -- if this
 6        is -- if this is the turtle pond
 7        (indicating), if I'm not supposed to sit on
 8        that bench, I'm not supposed to sit on that
 9        bench, nobody told me.
10   Q.   That's not -- I'm not talking about sitting
11        on the bench.
12   A.   I was never inside a turtle pond until I
13        fell and got up and out and onto the bench.
14   Q.   Do you have any recollection of that day
15        prior to your accident of being escorted to
16        your room by a representative of the Turtle
17        Beach Towers because of the state of your
18        inebriation and your actions?
19   A.   I already answered that.  No, absolutely
20        not.  Inebriation?
21   Q.   Yes, intoxication.
22   A.   Hardly.  No.  We had water to drink, thank
23        you.
24   Q.   Did you have any other medication?
25   A.   No.
0193
 1   Q.   Did you take any other medication?
 2   A.   No.
 3   Q.   You're aware of the fact that Prozac and
 4        alcohol have an adverse effect on each
 5        other?
 6   A.   I just said I did not have any alcohol.
 7   Q.   But you said you did?  You said you had a
 8        margarita.
 9   A.   You're telling me I'm inebriated.  I said I
10        had a half a margarita.  You said I'm
11        inebriated during the day?  You need to
12        rephrase that, then, if that's not what
13        you're saying to me.
14   Q.   You are not supposed to be drinking alcohol
15        while you're on Prozac, correct?
16               MS. MINCHOFF:  Objection.
```

```
17   A.   You know what?  It's not written in law.
18        And my doctor says, "You can have a couple
19        of drinks.  Just don't overdo it."
20   Q.   What's the effect of alcohol on you when you
21        take Prozac?
22   A.   I don't know.  I'm not a doctor.  I can't
23        make that decision.
24   Q.   How do you feel when you drink alcohol and
25        are on Prozac?
0194
 1   A.   I don't drink alcohol while I'm on Prozac.
 2        I have a cocktail.
 3   Q.   All right.  When you drink a cocktail, a
 4        single cocktail, and you are -- and you have
 5        Prozac on board, and you have medication,
 6        what is your response?
 7             MS. MINCHOFF:  Objection.
 8   Q.   Do you feel strange?  Does it --
 9   A.   No.
10   Q.   Did you at any point in time in the day sit
11        on the bench that is in front of the turtle
12        pond?
13   A.   I don't even know if this is that entrance,
14        and if I did sit on that bench, then I sat
15        on that bench, but I don't recall.
16   Q.   Were there any other entrances to Tower 4
17        where there were turtle --
18   A.   I don't recall Tower 4.
19   Q.   Were there --
20   A.   I don't know where.
21   Q.   Were there any other entrances to the lobby
22        area where there were turtle ponds that you
23        would have passed by?
24   A.   I don't recall.
25   Q.   Do you remember any other turtle ponds other
0195
 1        than outside the lobby?
 2   A.   We were there very, very briefly.
 3   Q.   That's not my --
 4   A.   I don't recall any of the landscape.
 5   Q.   Do you remember any other place where there
 6        were turtle ponds other than outside the
 7        lobby --
 8   A.   No.
 9             MS. MINCHOFF:  Let him finish his
10        questions.
11   Q.   Do you remember having a conversation with a
12        woman who identified herself as the manager
13        of Turtle Beach Towers, Ms. Fay Miller?
14   A.   No.
15   Q.   At any time?
16   A.   I do not recall any of these names that
17        you're saying.  I don't have any names of
18        any people from this place.
19   Q.   Do you remember a conversation with a woman
20        who identified herself as the manager of
21        Turtle Beach Towers?
```

```
22   A.   No, I do not.
23   Q.   Are you denying that a conversation took
24        place?
25   A.   I don't remember having a conversation with
0196
 1        anybody.  I was at the hospital.  I didn't
 2        talk to anybody.
 3   Q.   What about after the hospital, after you got
 4        back to the States; do you remember having a
 5        conversation --
 6   A.   One phone call from somebody who identified
 7        themself through something I did not know.
 8        All I understood was a Jamaican accident.
 9        They asked if I was okay.  As far as I know,
10        that was the conversation.
11   Q.   And you don't know whether that was a man or
12        a woman?
13   A.   No, I don't.  I just know that they called
14        to see if I was okay.  I don't know who it
15        was.  It could have been Henry McKenzie's
16        wife.  I don't know who it was.
17   Q.   And as far as I know -- as far as you know,
18        rather, Henry McKenzie was not present at
19        the time of the fall?
20   A.   He was the one who saved my life.
21   Q.   And as far as you are aware, Henry McKenzie
22        was not present at the time of the fall?
23   A.   As far as I'm aware, nobody was present at
24        the time of my fall.  I didn't see anybody.
25   Q.   On what did your leg catch, now looking at
0197
 1        Exhibit No. 7?
 2   A.   I don't know if this is the pond.  I don't
 3        know --
 4   Q.   Assuming that it is the pond.
 5   A.   I can't assume that it is.
 6   Q.   Did you -- if you look at the lip of the
 7        turtle pond as evidenced by the third
 8        photograph down, do you think that your leg
 9        may have impacted on that, on the lip?
10   A.   I don't know.
11             MS. MINCHOFF:  She's not in your
12        order, Scott.
13   Q.   This is the photograph (indicating), the
14        side photograph that shows the side view.
15   A.   I don't know.
16   Q.   When you got up, were you in the turtle
17        pond?
18   A.   Yes, and I was soaked.
19   Q.   And when -- in terms of how your body was
20        positioned in the turtle pond, how was it
21        positioned?
22   A.   I don't recall.  Down.
23   Q.   Okay.  Recognizing down, you'll notice that
24        it's a rectangle.  Was your entire body in
25        the turtle pond?
0198
```

```
 1   A.   Yes.
 2   Q.   Do you have a sense of having any portion of
 3        your body outside of the turtle pond?
 4   A.   No, just when I got up and I rolled over to
 5        the side.
 6   Q.   All right.  Now, you'll notice in the
 7        photographs, particularly this photograph
 8        (indicating), and this photograph is the
 9        side view, and I -- there's a central slate,
10        central piece of stone and some stone sort
11        of more -- closer to the steps.  Do you have
12        any sense of where your body was in
13        relationship to that?
14   A.   No, I don't.
15   Q.   When you rolled over and stood up, were you
16        standing on the --
17   A.   I did not stand up.  I rolled over.  I
18        couldn't stand up.  I could not step out.
19   Q.   When you attempted to stand up, do you
20        remember being, any portion of your body, on
21        a raised portion of slate or stone or
22        something?
23   A.   I don't recall.
24   Q.   Do you remember trying to not be able to
25        get your -- or do you remember not having
0199
 1        your footing?
 2   A.   Yes, I remember not having my footing.  I
 3        fell.
 4   Q.   You fell again?
 5   A.   I fell.
 6   Q.   I know.
 7   A.   I didn't have my footing.
 8   Q.   Okay.  But then when you tried to stand up
 9        again, could you put your feet down on
10        something solid as opposed to rock?
11   A.   I don't recall.  My only concern was getting
12        out of where I was.
13   Q.   And you could not get out?
14   A.   No.
15   Q.   And --
16   A.   I rolled over to the side, and then I
17        realized the extent of my injury.
18   Q.   And you could not crawl up over that edge?
19   A.   I was --
20             MS. MINCHOFF:  Objection.
21   A.   -- rolled here.  If this is even it, I
22        rolled to the side, and I remember laying on
23        the side with my leg over my head screaming
24        for help.
25   Q.   When you said that you rolled over here
0200
 1        (indicating), are you talking about the side
 2        closest to the bench or the side closest to
 3        the foliage?
 4   A.   The side closest to the stairs.
 5   Q.   Okay.  Over which you claim you fell?
```

```
 6   A.    Yes.
 7   Q.    Was the flip-flop still on your foot?
 8   A.    I don't remember.
 9   Q.    How long was it that you remained in the
10         turtle pond before somebody came to you?
11   A.    I got myself out of the turtle pond before
12         somebody came.
13   Q.    And how -- where did you go?  I mean, how
14         did you get yourself out?
15   A.    I rolled, picked myself up and rolled onto
16         the side.
17   Q.    So there's this side edge next to the
18         stairs.  Is that where you were?
19   A.    I believe so.
20   Q.    And how long were you there?
21   A.    I don't know.  Time was suspended.  I don't
22         know how long I was there.
23   Q.    And --
24   A.    I was there long enough to bleed profusely
25         from my leg and almost die.
0201
 1   Q.    Did you receive transfusions when you were
 2         at St. Ann's Hospital?
 3   A.    No.
 4   Q.    How do you know you almost died?
 5   A.    Because of the volume of the blood I had
 6         lost and from the ensuing infection that
 7         surrounded my respiratory system, my heart
 8         and my brainstem and in my bone.
 9   Q.    What I am talking about is on that day at
10         that time.
11   A.    Well, when you're bleeding so much like that
12         and you can't even see, that's what you
13         think of.
14   Q.    Why couldn't you see?
15   A.    Because according to the doctors I was in
16         shock.
17   Q.    What doctors?
18   A.    The doctors that I saw.
19   Q.    Where?
20   A.    In Jamaica.
21   Q.    The doctor that you saw in Jamaica told you
22         you were in shock?
23   A.    They told Carrie and Henry.
24   Q.    All right.  I'll get to that in a minute.
25         But did you strike your head?
0202
 1   A.    I don't recall.
 2   Q.    Were there any injuries to your head, as far
 3         as you know?
 4   A.    I don't recall.
 5   Q.    Were there any other -- do you recall
 6         anybody telling you that you were injured on
 7         and about your head?
 8   A.    I don't recall.
 9   Q.    Do you remember receiving any treatment for
10         any injuries to your head?
```

```
11   A.   I remember they checked everything.
12   Q.   Okay.  Who was the first person that came to
13        your aid?
14   A.   Henry McKenzie.
15   Q.   Are you sure?
16   A.   He's the only person I remember.
17   Q.   Are you sure that he was the first person
18        that came to your aid?
19   A.   He is the first person who helped me.
20   Q.   That's not my question.  Who was the first
21        person that came to you?
22   A.   I don't know.  Henry McKenzie is the first
23        person I remember coming to me.
24   Q.   Henry McKenzie was a taxi driver?
25   A.   I believe he was a taxi driver.
0203
 1   Q.   How was it that he was there at 12:30 at
 2        night or approximately 12:30 at night?
 3   A.   I don't know.
 4   Q.   Are you -- do you have any sense that he was
 5        summoned, that he was called by somebody?
 6   A.   I have no idea.
 7   Q.   You don't have any sense of another man
 8        being present around you?
 9   A.   No.
10   Q.   Is that because it didn't happen or you have
11        no memory?
12             MS. MINCHOFF:   Objection.
13   Q.   There's a difference.  You denied the fact
14        that you were drunk and in the turtle pond.
15        You said that's not true.  I understand
16        that's what you say.  But in terms of --
17   A.   I deny being drunk, absolutely.
18   Q.   I know.  I know.  You've told me that.
19             Now, do you have a memory of somebody
20        coming to you before Mr. McKenzie, or is it
21        you just have no memory one way or the
22        other?
23   A.   I don't remember.
24   Q.   One way or the other?
25   A.   My biggest thing was Henry came.  I don't
0204
 1        know if he called other people or what, but
 2        somehow they got my friend and Henry brought
 3        me to the hospital.
 4   Q.   All right.
 5   A.   That's what I remember.
 6   Q.   All right.  So at some point did Ms. LaBelle
 7        come to see you before you got in the taxi
 8        to go to Henry (sic)?
 9   A.   Yes.
10   Q.   Okay.  And do you have any understanding
11        from conversations with her as to how she
12        was summoned, how she got there?
13   A.   Somebody went to the room to get her, is all
14        I know.
15   Q.   And when did you learn this information?
```

```
16   A.   The next day when we were talking, when I
17        was awake.
18   Q.   So between the next day, which would be the
19        20th, that's the day you left Jamaica -- or
20        the 19th?
21   A.   We left the 19th.
22   Q.   Okay.  On the day that you left Jamaica,
23        between that day and today have you had any
24        conversations with Carrie LaBelle about what
25        she recalls --
0205
1    A.   Yes.
2    Q.   -- telling you?
3              And what does she recall telling you,
4         subject to your counsel's hearsay objection?
5    A.   I can't speak for Carrie.
6    Q.   I know you can't speak for her, but you can
7         tell me what she said to you that would have
8         existed in her -- your memory.  So tell me
9         what she's told you.
10   A.   She has told me what she saw --
11   Q.   What has she told --
12   A.   -- and what she did to get us home.
13   Q.   What did she -- what did she tell you about
14        what she saw?
15   A.   She saw that I was bleeding profusely, and
16        she got towels from somewhere, and her and
17        Henry, and there were some other people, put
18        me in Henry's car and drove me to the
19        hospital.
20   Q.   Who are the other people?
21   A.   I don't know.
22   Q.   Were they guests or employees, as far as you
23        know?
24   A.   I don't know.  I don't know any -- the only
25        name I know is Henry McKenzie.
0206
1    Q.   In terms of the conversations that you've
2         had with Ms. LaBelle, all of which are now
3         subject to your counsel's hearsay
4         objection --
5              MS. MINCHOFF:  Just so you know,
6         that's why all objections, except as to
7         form, are waived any --
8              MR. FERINGA:  Or sometimes people
9         think that that's a hearsay objection, so...
10             MS. MINCHOFF:  I don't typically
11        think that forms a hearsay objection.
12             MR. REITH:  It's kind of a
13        catch-all.
14             THE WITNESS:  I don't understand
15        that.
16             MR. FERINGA:  No, we're not asking
17        you to.
18             MS. MINCHOFF:  Understanding that I
19        don't include that as part of the form here
20        if there's confusion.
```

```
21          BY MR. FERINGA:
22     Q.   With respect to Carrie's discussion with
23          you, what has she told you about what she
24          saw when she first came and saw you next to
25          the turtle pond?
0207
 1     A.   Bleeding.
 2     Q.   Okay.  Anything else?
 3     A.   No.
 4     Q.   Did she tell you that there were any other
 5          people around when she was there?
 6     A.   No.
 7     Q.   Did she tell you how long it was from the
 8          time that she first was summoned to the time
 9          that you made it to the hospital?
10     A.   She could -- she couldn't estimate.  It was
11          all very fast, and everything had to be done
12          very fast.
13     Q.   When she has talked to you about what
14          happened, does that help refresh your
15          memory?
16     A.   We both have tried to refresh our memories,
17          and there are a lot of things that are just
18          gone.
19     Q.   You told me that from the time that you
20          remember essentially seeing the injury and
21          bleeding that was in, I think you said
22          indelled in your mind --
23     A.   Yes, the fall and the bleeding --
24     Q.   Right.
25     A.   -- is indelled in my mind.  Everything else
0208
 1          is a blur to me.
 2     Q.   And the next thing that you remember is
 3          being in the --
 4     A.   In the hospital.
 5     Q.   I think you said --
 6     A.   In the car --
 7     Q.   Right.
 8     A.   -- to the hospital.
 9     Q.   Between those two points you have no memory,
10          that is, seeing or being in the car?
11     A.   A bumpy ride and to the hospital.
12     Q.   Okay.  So sitting there, how long you
13          waited, people coming up to you, you don't
14          remember?
15     A.   I have no idea.
16     Q.   Now, in terms of what Carrie has said, has
17          she said who it was that came and summoned
18          her from the room?
19     A.   No.
20     Q.   Did she say how it was that she was even
21          identified?
22     A.   I held my key and said, "Please go get my
23          friend."
24     Q.   So you remember that?
25     A.   That, I do remember.
```

```
0209
 1   Q.   Okay.  Now, who is it that you said that to?
 2   A.   I don't know.
 3   Q.   So you said the first person you remember
 4        is --
 5   A.   Is Henry.
 6   Q.   Do you remember saying it to somebody other
 7        than Henry?
 8   A.   I just kept saying it.  I don't know who was
 9        there.  I remember Henry because --
10   Q.   Henry helped you?
11   A.   Yes.
12   Q.   Okay.  So before Henry helped you there may
13        have been other people there, you just don't
14        have a memory of them?
15   A.   I don't remember.
16   Q.   Okay.  Other than holding up your key, do
17        you now remember anything else about the
18        time between the time that you fell and the
19        time that you were in Henry's cab?
20   A.   No.
21   Q.   Has Carrie LaBelle shared with you any more
22        information about what she recalls from the
23        time she was first summoned to the time that
24        you got into Henry's taxi?
25   A.   She and I had talked about what the doctors
0210
 1        said.
 2   Q.   Okay.  But that's -- I'm not there yet.
 3   A.   We haven't talked -- there was nothing to
 4        talk about.  It was "Get me to the
 5        hospital."  That's it.
 6   Q.   Okay.  Have we exhausted your memory about
 7        what happened that evening to cause you to
 8        fall into the turtle pond?  Do you remember
 9        anything else?
10   A.   Exhausted my memory?
11   Q.   Yeah.  I want to make sure that there is
12        nothing else that you remember about what
13        happened that evening --
14   A.   I told you everything I remember.
15   Q.   Okay.
16   A.   And I was not drunk --
17   Q.   Okay.
18   A.   -- or inebriated.
19   Q.   Now, do you remember being at the hospital?
20   A.   Vaguely.
21   Q.   Do you remember having conversations with
22        the doctor who attended to you?
23   A.   No.
24   Q.   Was Ms. LaBelle present with you the entire
25        time?
0211
 1   A.   Not the entire time.
 2   Q.   Did she -- was she not in the examining
 3        room --
 4   A.   Yes, she was.
```

```
 5   Q.   -- when you were being stitched up?
 6   A.   Yes.
 7   Q.   Was she there?
 8   A.   Yes.
 9   Q.   When was she not there?
10   A.   When Henry took her to the hotel to get our
11        things so that we could go home.
12   Q.   So you stayed in the hospital the entire
13        night?
14   A.   Yes.
15   Q.   Do you remember receiving any blood
16        transfusions?
17   A.   No.  We refused any blood transfusions and
18        surgery.  They wanted to do both, according
19        to Carrie.
20   Q.   Did you receive -- do you remember that?
21   A.   According to Carrie.
22   Q.   I know.  And my question is --
23   A.   I do not remember.
24   Q.   Do you remember receiving any intravenous
25        fluids?
0212
 1   A.   Yes.
 2   Q.   Was there one doctor who saw you or more
 3        than one?
 4   A.   I don't recall.
 5   Q.   Do you have a memory of one doctor or more
 6        than one?
 7   A.   I have a memory of a lot of people in the
 8        hospital.  I don't know who was doctors and
 9        who wasn't.
10   Q.   What do you remember the doc -- you saying
11        to the doctor and the doctor saying to you
12        who talked to you about the extent of your
13        injury?
14   A.   I don't recall saying anything.  I don't
15        remember the conversation at all.
16   Q.   Do you remember signing any documents in the
17        hospital?
18   A.   I know I had to sign myself out.
19   Q.   Did they advise you to stay?
20   A.   We discussed that I was going home, so they
21        were stabilizing me so that I could go home.
22   Q.   When you said, "I know I had to sign myself
23        out," did you sign yourself out against
24        medical advice?
25   A.   I don't know.
0213
 1   Q.   Did you sign some sort of form that said
 2        they wanted to keep you but you're leaving
 3        against their advice?
 4   A.   I don't know.
 5   Q.   They recommended -- strike that.
 6             Do you have a memory of being told by
 7        the physicians that you should stay and
 8        receive treatment in Jamaica as opposed to
 9        flying out?
```

```
10   A.   I don't know.
11   Q.   Other than signing a document you said, "I
12        know I had to sign myself out," end quote.
13        Aside from that document, do you remember
14        signing any other documents in that
15        hospital?
16   A.   No, I don't.
17   Q.   Did you receive a copy of the document that
18        you signed?
19   A.   I don't remember.
20   Q.   Because we've -- there's only a couple pages
21        of the St. Ann Hospital records that we have
22        that were attached to the UMass records.
23   A.   You have more than I do.
24   Q.   All right.  Did you ever -- did you, not
25        your lawyer, but did you ever make an
0214
 1        attempt to speak with those physicians or
 2        any of those medical care professionals that
 3        attended you at St. Ann's?
 4   A.   No.
 5   Q.   After leaving St. Ann's Hospital on the
 6        19th --
 7   A.   Excuse me.
 8   Q.   Yeah?
 9   A.   I just need to take a break.
10             MR. FERINGA:  Okay.  Why don't you
11        take a break for five minutes.
12   A.   No, just a minute.
13   Q.   Do you want us to stay on the record, or do
14        you want to go off?
15   A.   I just get very emotional.
16             MS. MINCHOFF:  Let's go off the
17        record.
18             MR. FERINGA:  Let's go off the
19        record.
20             THE VIDEOGRAPHER:  The time is 2:02
21        p.m.  We are off the record.
22        (Recess taken.)
23             THE VIDEOGRAPHER:  The time is 2:08
24        p.m.  We are back on the record.
25
0215
 1        BY MR. FERINGA:
 2   Q.   When you left St. Ann's Hospital on the 19th
 3        to go to the airport to fly back to the
 4        States, were you given any packet of records
 5        to take with you or X-rays?
 6   A.   No X-rays, but I believe I was given an
 7        envelope, and I was given antibiotics.
 8   Q.   With respect to what was in the envelope,
 9        did you look to see what those were?
10   A.   I was very heavily medicated.
11   Q.   I'm not disputing that.  My question is, did
12        you look to see?
13   A.   No.
14   Q.   So you don't know what was in the envelope
```

```
15        or the contents, correct?
16   A.   No.
17   Q.   When you -- were you taken -- were you taken
18        directly from Logan to UMass?
19   A.   Mass. General.
20   Q.   Mass. General?
21   A.   Yes.
22   Q.   And was that envelope then given to the
23        people at Mass. General?
24   A.   Yes.
25   Q.   Do you have any knowledge of whether the
0216
 1        doctors from Jamaica actually spoke with
 2        your doctors in Mass. General?
 3   A.   Excuse me?  Do I have any evidence?
 4   Q.   Yeah.  Did they telephone them in front of
 5        you when you were in Jamaica?
 6   A.   Not that I know of.  No.
 7   Q.   Were any photographs taken of your leg in
 8        the hospital at St. Ann's by anyone, as far
 9        as you remember?
10   A.   Not as far as I remember.
11   Q.   Your principal physician at Mass. General,
12        the surgeon who was -- attended you was
13        whom?
14   A.   Dr. David Lhowe.
15   Q.   L-O-W-E?
16   A.   L-H-O-W-E.
17   Q.   When was the last time you saw Dr. Lhowe?
18   A.   I saw him recently.  I saw him in March.
19   Q.   March of 2006?
20   A.   Yes.
21   Q.   Where?
22   A.   For my two-year follow-up.
23   Q.   When was the last time before that you had
24        seen Dr. Lhowe?
25   A.   Six months prior.
0217
 1   Q.   How long was it after you were discharged
 2        from Mass. General that you stopped seeing
 3        Dr. Lhowe on a regular basis, that is, once
 4        a week, once a month?
 5   A.   Approximately six months.
 6   Q.   And then you had a six-month visit, a year
 7        visit and then a two-year visit, correct?
 8   A.   I had a six-month, a 12-month, an 18-month
 9        and a 24-month.
10   Q.   Is there another visit scheduled?
11   A.   Yes.
12   Q.   When?
13   A.   In six months.
14   Q.   Did you and Dr. Lhowe talk about prognosis?
15   A.   Yes.
16   Q.   What did he tell you was your prognosis?
17   A.   That this is about as good as it's going to
18        get.
19   Q.   And what -- tell me what "this" means?
```

```
20   A.   My very limited range of motion, the scar
21        tissue and the nerve damage and all the, you
22        know, all the physical attributes from the
23        accident aren't going to change.
24   Q.   What can you do and what can't you do with
25        your leg?
0218
 1   A.   There are many things that I can and can't
 2        do.  Can you specify?
 3   Q.   Sure.  You walk with a cane, correct?
 4   A.   Yes.
 5   Q.   Can you walk without a cane?
 6   A.   For very short periods of time.
 7   Q.   And what -- why do you need a cane?
 8   A.   For balance and for -- to take the extra
 9        weight off of my ankle.
10   Q.   Other than a cane, do you need any other
11        sort of assistive device?
12   A.   Yes.
13   Q.   What?
14   A.   I wear a brace.
15   Q.   Do you have foot drop?
16   A.   Yes.
17   Q.   And so you wear an ankle brace that will
18        prevent your foot from dragging?
19   A.   Yes.
20   Q.   What else?  Strike that.
21            Do you wear any -- do you use any
22        other sort of assistive devices?
23   A.   I wear pressure bandages to keep the
24        swelling and the blood flow, circulation.
25   Q.   Do you still wear pressure bandages?
0219
 1   A.   Yes.
 2   Q.   Do you wear any sort of stocking, pressure
 3        stocking?
 4   A.   That's what I am talking about.
 5   Q.   It's not where you wrap your leg in Ace
 6        bandages, you wear those special --
 7   A.   Yes.
 8   Q.   -- fitted stockings?
 9   A.   Yes.
10   Q.   And is that on a 24-hour basis?
11   A.   A 12-hour.
12   Q.   Are you seeing any other physicians for your
13        leg other than Dr. Lhowe?
14   A.   Yes.
15   Q.   Who?
16   A.   Dr. -- I see the Mass. General pain
17        management clinic.  They have the team of
18        neurologists in there.  Those are who --
19        there are quite a few different doctors in
20        there that I see, Dr. Hord, Dr. Chen, Dr.
21        Stoyjanovic, Dr. Hamburger.  They all work
22        together, but my attending had been Dr. Hord
23        until just this past, I think it was
24        February I -- she was leaving, so now my
```

```
25         attending is Dr. Stoyjanovic, and he's the
0220
 1         one that has done my surgery.
 2    Q.   The surgery that you had is what?
 3    A.   I had a spinal -- I had a spinal surgery,
 4         too.
 5    Q.   The spinal surgery that you had was where,
 6         neck, lower back or --
 7    A.   Lower back.
 8    Q.   And the surgery that you had, was that known
 9         as a sympathectomy?
10    A.   The first one was a sympathetic nerve block.
11    Q.   Right, but what was the second --
12    A.   The second one -- actually, that makes
13         three, I'm sorry.  I had another -- the
14         second was a, excuse me, a spinal cord
15         stimulator trial where they -- they make a
16         small incision.  It's day surgery.  And then
17         I actually had the surgery to place the
18         leads where they actually open you up.  And
19         it failed, so that's that.
20    Q.   So what was the -- is the surgery that Dr.
21         Stoyjanovic performed, the surgery where the
22         leads were placed and to see whether you
23         could -- a trial of stimulation would block
24         the pain?
25    A.   To reduce the pain.
0221
 1    Q.   And so have the leads now been removed?
 2    A.   Yes.
 3    Q.   So is the spine surgery that you're talking
 4         about the placement of the leads?
 5    A.   Yes, two times.
 6    Q.   Okay.  Other than that, have you had any
 7         other surgeries?
 8    A.   Not -- no, not since --
 9    Q.   Are any other surgeries planned?
10    A.   They've been talked about.  We haven't
11         actually planned them yet.
12    Q.   So all of your treatment with respect to
13         your pain management has been through Mass.
14         General?
15    A.   Yes -- no, I'm sorry.  My treatment as far
16         as physical for pain management has been
17         through Mass. General at the Mass. General
18         pain management clinic.  I see Dr. Elaine
19         Borgen at the UMass Medical Center for pain
20         management therapy.
21    Q.   She is the psychologist?
22    A.   She's the act -- she's a doctor.  It's a
23         different --
24    Q.   Physiatrist?
25    A.   Yes.  I can never say it, I'm sorry.
0222
 1    Q.   No, that's all right.  Spelling it's even
 2         worse.
 3              But she is an M.D. physiatrist?
```

```
 4   A.   Yes.
 5   Q.   Physical medicine and pain specialist?
 6   A.   Yes.
 7   Q.   Is she the one that is prescribing the
 8        medications for you?
 9   A.   No.
10   Q.   According to the information that we have,
11        you are currently -- or at least the latest
12        group that we had, which I admit is six
13        months old, was Prozac?  You're no longer on
14        Prozac?
15   A.   No longer on Prozac.
16   Q.   Who took you off?
17   A.   Dr. Aney.
18   Q.   Okay.  We heard about him.
19             Celebrex?
20   A.   Dr. Aney.
21   Q.   All right.  C-E-L-E-B-R-E-X, what's that
22        for, and why did you start that?
23   A.   It is for depression and pain.
24   Q.   Neurontin, that's for the pain, correct?
25   A.   Related -- that's nerve medicine.
0223
 1   Q.   Dilaudid, D-I-L-A-U-D-I-D.
 2   A.   That's for breakthrough pain.
 3   Q.   How often do you take that?
 4   A.   Very seldom now.
 5   Q.   Have you had less breakthrough pain?
 6   A.   No.
 7   Q.   You've just decided not to take it?
 8   A.   I have decided to try something different.
 9   Q.   What?
10   A.   Ultram.
11   Q.   Then there's Cymbalta, C-Y-M-B-A-L-T-A,
12        right?
13   A.   I thought that was the first one.
14   Q.   No, Prozac was the first one.
15   A.   Oh, right, I'm not taking Prozac, and in
16        place of Prozac I take Cymbalta.
17   Q.   Were you taking them at the same time?
18   A.   No.
19   Q.   Ativan?
20   A.   At night.
21   Q.   To sleep?
22   A.   To help with sleep.
23   Q.   Zanaflex, Z-A-N-A-F-L-E-X?
24   A.   Yes.
25   Q.   What's that for?
0224
 1   A.   That is for the restless leg syndrome, the
 2        Sinemet and Zanaflex.
 3   Q.   S-I-N-E-M-E-T.
 4             Restless leg syndrome, meaning is this
 5        a situation where your leg twitches out of
 6        control?
 7   A.   Yes.  She called it restless leg syndrome,
 8        but it's -- because that's what it is, but
```

```
 9        she says it's related to the nerve damage
10        because I --
11   Q.   She?
12   A.   Dr. Hord.
13   Q.   Thank you.  Something called Ms. (sic)
14        Contin, M-C (sic) capital C-O-N-T-I-N?
15   A.   MS Contin.
16   Q.   And what is that?
17   A.   That is pain medication.
18   Q.   And then there's M-I-C-A-L-C-I-A-N spray?
19   A.   That's a calcium inhaler, because the
20        medications for restless leg can deplete the
21        body's calcium level.
22   Q.   It says in July of 2005 that you were having
23        an unusual number of falls.  Were you having
24        difficulty walking?  The notes that I have,
25        my summary of a UMass outpatient visit of
0225
 1        July 20, 2005 that related all of these --
 2        all of these medications indicates that an
 3        unusual number of falls is noted in the last
 4        six months?
 5   A.   I stumble.
 6   Q.   Were you reporting as part of your therapy,
 7        outpatient physical therapy, that you were
 8        having difficulty ambulating and thus were
 9        stumbling and falling?
10   A.   Yes.
11   Q.   Are you on any other medications presently,
12        other than the ones that we've talked about?
13   A.   Can I see your list?
14   Q.   Absolutely.
15   A.   Because I can elaborate --
16   Q.   It's my summary, but I'll be more than happy
17        to show you.  It's to the right across from
18        the 7/20/05.
19   A.   I have a thing I can compare it to.
20   Q.   All right.  Tell me what you're looking at.
21   A.   It's a medical alert card.
22   Q.   Okay.
23   A.   God, I hope I have it.  The medical alert
24        card has the medications.  It's about six
25        months old, so it might need to be updated,
0226
 1        but I can compare.
 2   Q.   Okay.  Tell me which ones were missing --
 3   A.   All right.
 4   Q.   -- or you're not presently on.
 5   A.   I am on Neurontin.
 6   Q.   Do you see where I'm -- the list of
 7        medications is?
 8   A.   7/20.
 9   Q.   Correct.  It's that big one right opposite
10        the yellow sticky note.
11   A.   All right.  I'm not taking Prozac.
12        Celebrex, 200 milligrams two times a day;
13        Neurontin, 9, 9 and 12; Dilaudid, I only
```

```
14          take it if I absolutely need to.
15          I've --
16   Q.     When was the last time you took Dilaudid?
17   A.     Maybe three weeks ago.
18   Q.     Okay.
19   A.     And in the place of Dilaudid on a regular
20          breakthrough basis I'm taking Ultram; I'm
21          taking Cymbalta; I'm talking Ativan; I'm
22          taking Zanaflex and Sinemet, MS Contin,
23          Micalcin; and Lamictal.
24   Q.     Spell that one.
25   A.     L-A-M-I-C-T-A-L.
0227
 1   Q.     And that's for what?
 2   A.     That's for depression.
 3   Q.     So you're on two antidepressant drugs right
 4          now?
 5   A.     One in the morning and one in the evening.
 6   Q.     Okay.  Anything else?
 7   A.     No.  That's it.
 8   Q.     How are you paying for all of this?
 9               MS. MINCHOFF:  Objection.
10   A.     How am I paying for all of this?
11   Q.     Yeah, all the Medicare -- all the
12          medication, all the care that you're
13          receiving?
14   A.     I have health insurance.
15   Q.     Okay.  Through whom?
16   A.     My husband's employer.
17   Q.     And can I have my records back, or do you
18          need to look at them again?
19   A.     Sorry.
20   Q.     No, that's all right.  Have you paid for any
21          amount of your care out of your own funds?
22   A.     Yes.
23               MS. MINCHOFF:  Objection.
24   Q.     How much?
25   A.     I --
0228
 1               MS. MINCHOFF:  Objection.
 2   A.     -- don't know.
 3   Q.     Does your husband have co-pays?
 4               MS. MINCHOFF:  Objection.
 5               MR. FERINGA:  Is that something
 6          other than the stipulations that we've had?
 7               MS. MINCHOFF:  What do you mean?
 8               MR. FERINGA:  At the beginning of
 9          the deposition, remember I'm not from
10          here --
11               MS. MINCHOFF:  Yeah, I'm objecting
12          to the form of the question.  I'm not --
13          that's it.
14               MR. FERINGA:  That's the form of
15          the question.  Is there something with the
16          way I asked the question?
17               MS. MINCHOFF:  I think co-pay is
18          open-ended.  I think it could have been
```

```
19        asked differently.
20              MR. FERINGA:  Okay.  That's fine.
21        I like my question.
22   BY MR. FERINGA:
23   Q.   Does your husband have co-pays as part of
24        his insurance?
25   A.   Yes.
0229
 1   Q.   Okay.  And what -- for example, for
 2        prescriptions, what percentage of the
 3        prescription price do you have to pay versus
 4        what is paid by your insurance?
 5   A.   I don't know what the percentage is.
 6   Q.   What about when you go to doctors' offices?
 7   A.   It's a standard co-pay.
 8   Q.   It's a standard co-pay.  You don't know what
 9        that is?
10   A.   $15 for an office visit.
11   Q.   Do you have any sense of how much out of
12        your own funds as opposed to the insurance
13        that you've actually had to pay for your
14        care?
15   A.   Do I have any sense?
16   Q.   Yeah.  A thousand bucks, $2,000, $5,000,
17        $10,000?
18   A.   I could say a lot.
19   Q.   Do you have any idea as to whether as part
20        of your taxes you've deducted medical
21        expenses as a line item deduction?
22   A.   I have no idea.  I don't -- I don't do the
23        taxes.
24   Q.   Who takes care of the finances in your
25        family?
0230
 1   A.   My husband.
 2   Q.   Okay.  So those are questions that we should
 3        ask him, correct?
 4   A.   (No verbal response.)
 5   Q.   Yes?  No?
 6   A.   Pertaining to --
 7   Q.   To --
 8   A.   -- finances?
 9   Q.   Yes.
10   A.   I can't -- yeah, I can't answer for him.
11   Q.   No, that's fine.  He takes -- in your family
12        he takes care of the finances, correct?
13   A.   Yeah, he takes care of the taxes, uh-huh,
14        everything.
15              MR. FERINGA:  Is this a good time
16        to stop?
17              MS. MINCHOFF:  It's up to you.
18        What time is it?
19              MR. FERINGA:  2:30.
20              MS. MINCHOFF:  If you want to stop
21        right now, you can.  I mean, I don't mind
22        going forward a little bit longer.  Tom --
23              MR. REITH:  Well, I can -- I'm fine
```

```
24          to stop if Scott's got to stop.  He has to
25          stop, and I have to go --
0231
 1                  MS. MINCHOFF:  Yeah, I mean --
 2                  MR. REITH:  -- so it's up to him.
 3          He has the plane.
 4                  MS. MINCHOFF:  -- if you have to
 5          stop now, that's fine.
 6                  MR. FERINGA:  Okay.  Why don't we
 7          do that.  We've been at this quite a while.
 8          Why don't we stop the deposition at this
 9          point.  We have a deposition scheduled of
10          Mr. Hofer on July 10th.  My proposal is we
11          continue the deposition of Mrs. Hofer to be
12          followed by Mr. Hofer on that same day.
13                  MS. MINCHOFF:  I don't think that's
14          going to be a problem.
15                  MR. REITH:  So we'll suspend at
16          this point, then?
17                  MR. FERINGA:  Yes.
18                  THE WITNESS:  What about -- my
19          mother is on the same day.
20                  MS. MINCHOFF:  I think your
21          mother's actually on the following day.
22                  MR. FERINGA:  On the 11th.
23                  MS. MINCHOFF:  Correct.
24                  THE WITNESS:  Oh, I thought it was
25          the 10th, I'm sorry.
0232
 1                  MR. FERINGA:  No, that's -- don't
 2          worry about it.  So is that agreed by all
 3          counsel?
 4                  MR. REITH:  That's agreed.  Just
 5          depending upon how long you go and how long
 6          I go, we may not actually get, you know,
 7          well, get into the husband before 5:00 or
 8          something like that, so we can either push
 9          over to the next day --
10                  MR. FERINGA:  Okay.
11                  MR. REITH:  I think we can play
12          that by ear, though.
13                  MR. FERINGA:  Right.
14                  MR. REITH:  Okay.
15                  MS. MINCHOFF:  Okay.  I mean, if
16          you guys think that you're going to be a
17          full other day, because I would rather not
18          have Mr. Hofer be made available during a
19          workday if I don't need to.
20                  MR. FERINGA:  Right, I appreciate
21          that.  And I -- for me, I don't anticipate
22          that much more.  I don't know how much Tom
23          has.  I anticipate, though, the ability to
24          begin Mr. Hofer on the 10th.
25                  MS. MINCHOFF:  But do you also
0233
 1          anticipate that ability?  That's what I'm
 2          trying to drive at here.  Because if you
```

```
 3          don't, we'll just push it to the 11th and
 4          then --
 5                  MR. FERINGA:  Push it to the 11th
 6          and do another day --
 7                  MS. MINCHOFF:  Right.
 8                  MR. FERINGA:  -- for his mother.
 9          That's fine.  I'm more than willing to do
10          that.
11                  MR. REITH:  I think that may make
12          more sense.
13                  MR. FERINGA:  Do that, that's fine.
14          Not a problem.
15                  MS. MINCHOFF:  Subject to I need to
16          speak to the mother --
17                  MR. FERINGA:  Sure.
18                  MS. MINCHOFF:  -- and make sure
19          that we can work something out, and also Mr.
20          Hofer.
21                  MR. FERINGA:  That won't be
22          difficult.
23                  MS. MINCHOFF:  Okay.
24                  MR. FERINGA:  Are we concluded then
25          today?
0234
 1                  MS. MINCHOFF:  Yes.
 2                  MR. REITH:  For today, yes.
 3                  MR. FERINGA:  Okay.  For this
 4          deposition, then, I would ask that the
 5          exhibits that have been marked be
 6          attached -- that the -- be attached to this
 7          deposition and that a court reporter take
 8          control of them.  I would -- don't know what
 9          you do in federal court in Massachusetts,
10          but typically the attorney who takes the
11          deposition maintains the original of the
12          deposition in a sealed fashion.  Copies are
13          then -- this is my practice.  Exhibits are
14          attached to the original and all copies.  Is
15          that agreeable with everybody else?
16                  MR. REITH:  That's fine.
17                  MS. MINCHOFF:  That's fine.
18                  MR. FERINGA:  And if anybody needs
19          the original at any point in time for
20          whatever reason, they can be made available
21          without difficulty, all right?
22                  MR. REITH:  That's fine.
23                  MR. FERINGA:  All right.  We're
24          done.
25                  THE VIDEOGRAPHER:  The time is 2:29
0235
 1          p.m.  This is the end of Cassette No. 3 in
 2          the deposition of Stephanie Hofer, and we
 3          are suspended for the day.  We are off the
 4          record.
 5                  (Whereupon the deposition was
 6                  suspended at 2:29 p.m.)
 7
```

```
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
0236
 1                    ATTACH TO THE DEPOSITION OF
                            STEPHANIE HOFER
 2        CASE:  HOFER -VS-  THE GAP
 3                        ERRATA SHEET
 4        INSTRUCTIONS:  After reading the transcript
          of your deposition, note any change or
 5        correction to your testimony and the reason
          therefor on this sheet.  DO NOT make any
 6        marks or notations on the transcript volume
          itself.   Sign and date this errata sheet
 7        (before a Notary Public, if required).
          Refer to Page 238 of the transcript for
 8        errata sheet distribution instructions.
 9        PAGE   LINE
          _____  _____ CHANGE:  _____
10                     REASON:  _____
          _____  _____ CHANGE:  _____
11                     REASON:  _____
          _____  _____ CHANGE:  _____
12                     REASON:  _____
          _____  _____ CHANGE:  _____
13                     REASON:  _____
          _____  _____ CHANGE:  _____
14                     REASON:  _____
          _____  _____ CHANGE:  _____
15                     REASON:  _____
          _____  _____ CHANGE:  _____
16                     REASON:  _____
          _____  _____ CHANGE:  _____
17                     REASON:  _____
          _____  _____ CHANGE:  _____
18                     REASON:  _____
          _____  _____ CHANGE:  _____
19                     REASON:  _____
20
              I have read the foregoing transcript
21        of my deposition and except for any
          corrections or changes noted above, I hereby
```

22        subscribe to the transcript as an accurate
          record of the statements made by me.
23
24        _____
                  STEPHANIE HOFER      DATE
25
0237
1         In the United States District Court
2         For the District of Massachusetts
3             I, Jessica L. Williamson, Registered,
4         Merit Reporter, Certified Realtime Reporter
5         and Notary Public in and for the
6         Commonwealth of Massachusetts, do hereby
7         certify that STEPHANIE HOFER, the witness
8         whose deposition is hereinbefore set forth,
9         was duly sworn by me and that such
10        deposition is a true record of the testimony
11        given by the witness.
12            I further certify that I am neither
13        related to or employed by any of the parties
14        in or counsel to this action, nor am I
15        financially interested in the outcome of
16        this action.
17            In witness whereof, I have hereunto set
18        my hand and seal this 4th day of July, 2005.
19
20
21
22        _____
23         Jessica L. Williamson, RMR, RPR, CRR
24         Notary Public, CSR No. 138795
25         My commission expires: 12/18/2009
0238
1         DEPONENT'S ERRATA SHEET
2         AND SIGNATURE INSTRUCTIONS
3
4             The original of the Errata Sheet has
5         been delivered to India Minchoff, Esq.
6             When the Errata Sheet has been
7         completed by the deponent and signed, a copy
8         thereof should be delivered to each party of
9         record and the ORIGINAL delivered to Scott
10        D. Feringa, Esq. to whom the original
11        deposition transcript was delivered.
12
13             INSTRUCTIONS TO DEPONENT
14
15             After reading this volume of your
          deposition, indicate any corrections or
16        changes to your testimony and the reasons
          therefor on the Errata Sheet supplied to you
17        and sign it.  DO NOT make marks or notations
          on the transcript volume itself.
18        REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE
19        COMPLETED AND SIGNED ERRATA SHEET WHEN
20        RECEIVED.
21

22
23
24
25