# HOFER, ET AL v. THE GAP, INC., ET AL

# STEPHANIE A. HOFER

## July 10, 2006

*Prepared for you by*



**Bingham Farms** | Ann Arbor | Detroit | Flint | Grand Rapids | Jackson | Lansing | Mt. Clemens

PHONE: 248.644.8888   FAX: 248.644.1120

www.bienenstock.com

Dockets.Justia.com

Page 239

STEPHANIE A. HOFER
July 10, 2006

```
 1              UNITED STATES DISTRICT COURT

 2           FOR THE DISTRICT OF MASSACHUSETTS

 3                  NO. 05-40170 FDS

 4

 5        _____

 6    STEPHANIE HOFER and            )

 7    DOUGLAS HOFER,                 )

 8                 Plaintiffs,    )

 9                                   )

10              vs.                  )

11                                   )

12    THE GAP, INC., EXPEDIA, INC.  )

13    and TURTLE BEACH TOWERS,       )

14                 Defendants.    )

15        _____)

16

17                  VOLUME II

18               PAGES 239 - 354

19

20

21        CONTINUED VIDEOTAPED DEPOSITION OF

22               STEPHANIE A. HOFER

23            MONDAY, 10 JULY, 2006

24                   9:25 AM

25
```



STEPHANIE A. HOFER
July 10, 2006

1

2

3               CONTINUED VIDEOTAPED DEPOSITION of

4    STEPHANIE A. HOFER, called as a witness by and on

5    behalf of The Gap, Inc., pursuant to the applicable

6    provisions of the Federal Rules of Civil Procedure,

7    before P. Jodi Ohnemus, Notary Public, Certified

8    Shorthand Reporter, Certified Realtime Reporter and

9    Registered Merit Reporter, within and for the

10   Commonwealth of Massachusetts, at the offices of

11   Morrison, Mahoney, LLP, 250 Summer Street, Boston,

12   Massachusetts, on Monday, 10 July, 2006, commencing

13   at 9:30 a.m.

14

15

16

17

18

19

20

21

22

23

24

25

STEPHANIE A. HOFER
July 10, 2006

```
 1    APPEARANCES:

 2

 3                    LAW OFFICES OF RUSSO & MINCHOFF

 4                    BY:  India Minchoff, Esq.

 5                    123 Boston Street

 6                    First Floor

 7                    Boston, MA  02125

 8                    617 740-7340

 9                    India@russominchofflaw.com

10                    For the Plaintiffs

11

12

13                    SULLIVAN, WARD, ASHER

14                    & PATTON, P.C.

15                    BY:  Scott D. Feringa, Esq.

16                    1000 Maccabees Center

17                    25800 Northwestern Highway

18                    Southfield, MI  48075-1000

19                    248 746-2727

20                    Sferinga@swappc.com

21                    For The Gap, Inc.

22

23

24

25
```



STEPHANIE A. HOFER
July 10, 2006

```
 1    APPEARANCES:  (CONT'D)

 2

 3                    BURNS & LEVINSON, LLP

 4                    BY:  Thomas T. Reith, Esq.

 5                    125 Summer Street

 6                    Boston, MA  02110

 7                    617 345-3258

 8                    Treith@burnslev.com

 9                    For Expedia, Inc.

10

11    ALSO PRESENT:

12

13                    Ralph Scopa, Videographer

14

15

16

17

18

19

20

21

22

23

24

25
```

STEPHANIE A. HOFER
July 10, 2006

```
 1                    I N D E X

 2

 3   EXAMINATION OF:                    PAGE

 4

 5   STEPHANIE HOFER

 6   (Cont'd by Mr. Feringa)            245

 7   (By Mr. Reith)                     305

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



STEPHANIE A. HOFER
July 10, 2006

```
 1                    E X H I B I T S

 2

 3    EXHIBITS          DESCRIPTION                PAGE

 4

 5    8                 Deposition Notice          246

 6    9                 Copy of photograph         259

 7    10                Diagram                    274

 8    11                Complaint                  345

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

STEPHANIE A. HOFER
July 10, 2006

        1            VIDEO OPERATOR:  We are now on the record.

        2    This is the videotape deposition of Stephanie Hofer

        3    being taken on July 10th, 2006.  The time is 9:30

        4    a.m.  We are located at Morrison Mahoney, 250

        5    Summer Street, Boston.  This deposition is being

        6    taken on behalf of Stephanie Hofer, Plaintiff, in

        7    the matter of Hofer versus The Gap, Incorporated,

        8    Expedia, Incorporated, Turtle Beach Towers, Case

        9    No. 05-40170 FDS.  This matter is being held at the

       10    -- for the US District Court, District of

       11    Massachusetts.  My name is Ralph Scopa, videotape

       12    operator.  Will the court reporter swear in the

       13    witness and the attorneys briefly identify

       14    themselves for the record, please.

       15            MS. MINCHOFF:  Attorney India Minchoff for

       16    Stephanie Hofer.

       17            MR. FERINGA:  Scott Feringa for the Gap.

       18            MR. REITH:  Thomas Reith for Defendant

       19    Expedia, Inc.

       20            STEPHANIE HOFER,

       21            having first been duly sworn,

       22            testified as follows to

       23            continued direct interrogatories

       24    BY MR. FERINGA:

       25        Q.  Good morning, Mrs. Hofer.



STEPHANIE A. HOFER
July 10, 2006

 1      A.   Good morning.

 2      Q.   I'm going to show you what I've marked as

 3  Exhibit No. 8, which is a copy of the notice of

 4  deposition for today.

 5           (Deposition notice marked Exhibit 8.)

 6      Q.   Did you ever receive a copy of Exhibit 8?

 7      A.   (Witness reviews document.)  Yes.

 8      Q.   All right.  At your last deposition that

 9  took place on June 29, we had asked for you to

10  bring groups of documents, and no -- you didn't

11  produce any documents.  And so my question is, for

12  example, you have -- you had photographs on your

13  camera on your -- on your computer.  You said that

14  you took approximately two photographs a month over

15  a six to eight-month period of time.  You only

16  produced a portion of those.  I was hoping that you

17  would bring the rest of those today.  Did you?

18      A.   I produced those to my attorney, and upon

19  review, I assume that they will be presented.

20      Q.   So they haven't been brought here today?

21      A.   No, I did not bring them today.

22      Q.   All right.  We also asked you to produce

23  today, as well as on June 29, your employment and

24  personnel records from the dental office at which

25  you served as a dental assistant.  Did you bring



STEPHANIE A. HOFER
July 10, 2006

1    those?

2         A.    There are no records of employment or

3    unemployment from my last dental position.  All I

4    have are my pay stubs and my W-2.

5         Q.    That's -- my question, however, is, are

6    you aware of whether --

7         A.    There are no documents.

8         Q.    How do you know that?

9         A.    Because I asked.

10        Q.    So the employer -- if we send a subpoena

11   to the employer, the employer will have no records

12   as -- as far as you know?

13        A.    As far as I know.

14        Q.    Who did you speak with at that office to

15   determine whether there were employment records?

16        A.    The office manager.

17        Q.    And that individual's name is who?

18        A.    Anne.

19        Q.    Anne what?

20        A.    Meszaros.

21        Q.    Spell the last name.

22        A.    M-e-s-z-a-r-o-s.

23        Q.    And when did this conversation take place?

24        A.    Couple of weeks ago.

25        Q.    Was it prior to your deposition of June



STEPHANIE A. HOFER
July 10, 2006

```
 1    29?

 2        A.   I can't recall.

 3        Q.   Well, did you inquire about your

 4    employment records before or after your last

 5    deposition?

 6        A.   I did before.

 7        Q.   While I'm on the subject, between June 29

 8    and today, have you reviewed any documents in

 9    preparation for your testimony today?

10        A.   I've reviewed documents with my attorney.

11        Q.   What documents have you reviewed in

12    preparation for your testimony today?

13        A.   Just the continued -- notice of continued

14    deposition.

15        Q.   The document that we've marked as Exhibit

16    No. 8, correct?

17        A.   Uh-huh.

18        Q.   Yes?

19        A.   I'm sorry.

20        Q.   No.  No.  Don't worry.  Did you review any

21    other documents in preparation for your testimony

22    today between June 29th and today?

23        A.   No.

24        Q.   The last time that we talked, you had

25    indicated that you had been granted disability
```



STEPHANIE A. HOFER
July 10, 2006

 1   status.  Have you produced those records --

 2       A.   To my attorney.

 3       Q.   -- today?  You don't have those today?

 4       A.   No, I don't.

 5            MR. FERINGA:  Do we have -- if records

 6   have been requested once again, do we have those

 7   today so we can --

 8            MS. MINCHOFF:  No, I haven't had an

 9   opportunity to review anything myself.

10            MR. FERINGA:   Okay.

11       Q.   All right.  We have also asked you to

12   produce copies of all of the medical records and

13   mental health records.  The records that we have

14   received are the Mass. General records, two pages

15   of records from St. Anne Hospital in Jamaica, and

16   the records we have from Mass. General are some

17   inpatient, some outpatient records.  We also have a

18   visiting nurse -- we have some physical therapy

19   records.  Have you brought with you the remaining

20   records that have been outstanding?

21       A.   I have produced all of the records that I

22   have, to my knowledge, to my attorney.

23       Q.   Apparently there were reports from Doctor

24   Fraser, a Doctor Hord, H-o-r-d, a Doctor

25   B-o-r-g-e-n, and a Doctor A-m-e-y that were


BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

STEPHANIE A. HOFER
July 10, 2006

 1    forwarded or filed in conjunction with your Social

 2    Security disability status.  Did you bring those

 3    reports?

 4         A.    I do not have copies of those reports.

 5         Q.    My question is, did you bring them?

 6         A.    No, I did not.

 7         Q.    In the Rule 26 disclosures there was a --

 8    address for the cab driver, Mr. McKenzie,

 9    M-c-K-e-n-z-i-e.  There was an address for him, but

10    there was no telephone number.  You indicated in

11    the deposition that you gave on June 29 that you

12    had the phone number.  Do you have that phone

13    number with you?

14         A.    Whatever I have of Mr. McKenzie was on

15    that one piece of paper.

16         Q.    So --

17         A.    If it didn't include --

18         Q.    What --

19         A.    If it didn't include a phone number, then

20    it didn't include a phone number.

21         Q.    What one piece of paper are you talking

22    about?

23         A.    I had produced one piece of paper with his

24    name and address, and I believe there was a phone

25    number on it, but if there is not, there is not.



STEPHANIE A. HOFER
July 10, 2006

 1       Q.    And Ms. Minchoff said that -- said before

 2    we started the deposition that you've requested

 3    your credit card statements for the time period

 4    that we had requested, and those have not as yet

 5    come in, is that correct?

 6       A.    No, they have not.

 7       Q.    Have you been able to identify any of the

 8    fees, costs, or records of your personal

 9    expenditures for the medical care that you have had

10    since March 18, 2004?

11       A.    I don't understand the question.

12       Q.    Sure.  You've indicated in your last

13    deposition that there were monies that you had to

14    pay separate and apart for -- from the money that

15    was paid by your insurance companies for your care.

16    The -- we had asked for all records that dealt with

17    the money that you and your family paid for your

18    care -- copays, things of that nature.  Have you

19    brought that information with you today?

20       A.    All of that information my attorney has.

21       Q.    But we don't have it here today, is that

22    correct?

23       A.    Not to my knowledge.

24       Q.    Have you brought with you all of -- any of

25    the personal notes, calendars that you identified



STEPHANIE A. HOFER
July 10, 2006

1    in your previous deposition?  Those would be dates

2    2004, 2005, 2006, in which you have discussed or

3    put down notes regarding medical care and treatment

4    or mental health care and treatment?

5         MS. MINCHOFF:  Objection.  You can answer.

6    A.   I don't have any personal notes regarding

7    treatment.  I have appointment dates and medication

8    lists.

9    Q.   All right.  Did you bring those with you?

10   A.   No, I did not.

11   Q.   Is there a reason why you didn't bring

12   those with you?

13   A.   I didn't realize I needed to keep

14   appointment cards and, you know, when that's all

15   listed in my medical records.

16   Q.   That's not my question.

17   A.   What is your question?

18   Q.   Did -- did you keep them?

19   A.   No.

20   Q.   Did you -- so all of that's been

21   destroyed.

22        MS. MINCHOFF:  Objection.

23   Q.   Yes?

24   A.   I can't recall if I've destroyed it or if

25   I've filed it.



STEPHANIE A. HOFER
July 10, 2006

1      Q.    All right.  We went over this a bit on

2    June 29, but you had said that you had maintained a

3    file or a collection of documents that you

4    identified as calendars or notes or appointment

5    cards.  I think you indicated that at least for a

6    portion of those -- and I can go to the transcript

7    should you wish -- that a portion of those you

8    destroyed.

9              MS. MINCHOFF:  Objection.

10             MR. FERINGA:  She did say that.

11     Q.    The question is, where is the rest of that

12   information?  Where are your appointment cards,

13   calendars, any notes that you received from

14   physicians?

15     A.    I don't know.

16     Q.    Do you have those at your house?

17     A.    I don't know.

18     Q.    How would we go about looking for those?

19     A.    I don't know.

20             MR. FERINGA:  I really have to state for

21   the record a protest of the manner in which the

22   lack of production of documents has -- has taken

23   place.  We had sent a very detailed, very specific

24   request for production of documents pursuant to the

25   federal rules for the June 29th deposition.  No



STEPHANIE A. HOFER
July 10, 2006

1    documents were produced.  There was no protective

2    order.  There was no letter sent by your -- by

3    counsel for Plaintiffs' office indicating that

4    nothing was going to be produced.

5         We then sent an amended deposition notice

6    for today.  Between June 29 and today we received

7    no -- no protective order or claim of protective

8    order.  We have received no -- no document from

9    Plaintiffs' counsel's office in protest.  Yet, once

10   again, we're here without any documents whatsoever.

11        MS. MINCHOFF:  Scott, I think what you are

12   missing is that perhaps you're not asking the right

13   questions.  The documents that she has she's

14   produced through me to you already.

15        MR. FERINGA:  No, that's not quite

16   correct.

17        MS. MINCHOFF:  It is correct, because I

18   know what your request says.  You spoke -- and I'm

19   going to respond to it.  I know what your request

20   says.  I know what your prior three document

21   requests have said.

22        MR. FERINGA:  It was identified that your

23   client did not provide you with complete copies of

24   documents when documents were provided

25   specifically.  For example, the photographs that



STEPHANIE A. HOFER
July 10, 2006

 1  exist on her computer.

 2      MS. MINCHOFF:  Specifically, the

 3  duplicates that you are looking for are identical.

 4  Which you said you tend to keep on ignoring that in

 5  your questions.  She's produced to me a disk of

 6  those identicals of what you already have.  I will

 7  look at them and produce them to you.  I got that

 8  this morning.  I'm not going to not look at it

 9  prior to producing it to counsel.

10      MR. FERINGA:  I don't disagree that it is

11  incumbent upon counsel for any party to review

12  documents before they're turned over.  The

13  difficulty that I have is that we've asked for

14  these documents be produced at this deposition, and

15  nothing has been produced at this deposition or the

16  prior deposition.  We have -- we still are missing

17  medical records.  We still are missing the

18  disability records and all -- apparently a series

19  of reports that have been filed, none of which have

20  ever been turned over, all of which you are

21  required to turn over, and --

22      MS. MINCHOFF:  And I don't disagree with

23  you.  I will state for the record, as I've made it

24  very clear to both attorneys here, requests have

25  been made for her medical records.  As they funnel



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

STEPHANIE A. HOFER
July 10, 2006

1    in, I continue to supplement the document requests

2    that the two of you have sent.  And there is no

3    more that I can do.  I know that -- actually, your

4    office, Scott, has sent out your own subpoenas, and

5    I query whether you've had better luck than I have

6    with receiving all of the documents.  But you

7    actually have more medical records than what you've

8    cited for the record.  I am aware of that.  But

9    simply put, as we would get them, they've been sent

10   over to you.  There is no more that can be done

11   when formal requests have been made.

12          MR. REITH:  I --

13          MR. FERINGA:  For example, the fees, costs

14   that --

15          MS. MINCHOFF:  You know what, I'm actually

16   going to also state that if you have an objection

17   to anything with respect to discovery, I suggest

18   you put it in a motion, and I'm not going to spend

19   the time on the deposition talking about a

20   discovery dispute.

21          MR. FERINGA:  Then what I'm going to do,

22   I'm going to continue the deposition under protest.

23   Simply put, I've never been in a situation where

24   these types of requests have been ignored and not

25   produced.



STEPHANIE A. HOFER
July 10, 2006

```
 1          MS. MINCHOFF:  Well, I think you're

 2   misqualifying it as being ignored.  They are not

 3   ignored.  You have everything that we have, Scott,

 4   with the exception of the duplicate photographs,

 5   which, by all means, I'll take a look at and get to

 6   you the exact copies of what you already have so

 7   you have it at today's or the next deposition.  But

 8   they're not ignored.  You have everything that we

 9   have.  I would actually state for the record, I

10   don't think your questions were artful in the fact

11   that they were including a lot of document requests

12   that were previously asked for.  And so when the

13   deponent is testifying that they've been produced

14   to her knowledge, they have been produced, and

15   they're in your possession.

16          But I'm going to conclude with -- I'm not

17   going to continue this at the deposition.  If you

18   want to suspend, by all means, that's your right.

19   I'll put an objection up to the suspension and see

20   if Attorney Reith would like to start, but --

21          MR. FERINGA:  No, I'm going to continue

22   under protest.

23          MS. MINCHOFF:  All right.

24          MR. FERINGA:  I don't -- I don't attempt

25   to waste people's time, although I'm -- it's
```



STEPHANIE A. HOFER
July 10, 2006

1   getting to that point.

2           MR. REITH:  If I could, Scott.  I just am

3   going to join in the protest.  You know, I

4   understand your position, Indie, that you state

5   everything your client's produced to you you have

6   produced on to us, but there are certain instances

7   that were novel in each of these latter requests

8   that I was hoping to see not only for the first

9   day, but the second day as well.  With

10  everything -- the specifics, yes, the photographs,

11  even if they're duplicates, and they could be

12  produced in toto.  And as to the other documents,

13  the disability thing, bothers me to no end that

14  should have been produced to today because

15  obviously that should have been produced in

16  connection with your initial disclosures.  I'm not

17  going to waste any time.  I don't think it was a

18  waste for Scott and/or you to discuss it on the

19  record.  I think it's necessary -- specifically,

20  if, in fact, we do have to move later on -- I think

21  it's necessary that a record be created.  And at

22  that, I will stop my secondary protest and allow

23  Scott to continue.

24      Q.  All right.  Have you spoken with your

25  mother, your husband, or Ms. LaBelle about the



STEPHANIE A. HOFER
July 10, 2006

1   circumstances of your injury or this deposition

2   between June 29 and today?

3            MS. MINCHOFF:   Objection.

4   A.   No.

5   Q.   Have you had any communications with Ms.

6   LaBelle between June 29th and today?

7   A.   Yes, I have.

8   Q.   All right.  And how -- what communications

9   have you had with her?

10  A.   She got married.

11  Q.   Okay.  And were you at her wedding?

12  A.   Yes, I was.

13  Q.   Okay.  Did you talk to her at all about

14  the -- this lawsuit between June 29th and today?

15  A.   No.

16  Q.   Did you provide her with any documents,

17  including a copy of your deposition transcript?

18  A.   No.

19  Q.   All right.  I want to ask you some

20  questions to go back over the fall, the

21  circumstances of the fall.  I've handed you what

22  I've specifically marked Exhibit No. 9, which is a

23  copy of the photographs that were part of the

24  initial -- initial document production.

25            (Copy of photograph marked Exhibit 9.)



STEPHANIE A. HOFER
July 10, 2006

 1    Q.   And I will --

 2         MS. MINCHOFF:   I'm sorry.  Did you just

 3    say a copy of a photograph that was part of the

 4    initial document production?

 5         MR. FERINGA:   I misspoke.  The -- a copy

 6    of the photograph that was produced at the last

 7    deposition on June 29th.

 8    Q.   You would indicate that just before the

 9    fall you looked down and saw your flip-flop had

10    separated, correct?

11    A.   Yes.

12    Q.   And looking at this photograph, Exhibit

13    No. 9, and looking at Exhibit No. 9, where do you

14    think you were in relationship to the turtle pond,

15    which is shown --

16    A.   I don't know.

17    Q.   When you were -- looked down and saw the

18    toe of -- toe piece of your flip-flop, your left

19    flip-flop -- strike that.  Was it your left or your

20    right?

21    A.   It was my right flip-flop.

22    Q.   Your right flop-flop.  When you looked

23    down and saw your right flip-flop had separated,

24    had you just taken a step onto the right foot or

25    had you taken -- were you stepping onto your left



STEPHANIE A. HOFER
July 10, 2006

1   foot?

2       A.   I can't remember that.

3       Q.   What was happening?  In terms then of

4   Exhibit No. 9, can you -- you told us before that

5   you fell into the turtle pond as a result, you say,

6   of the flip-flop failing, correct?

7       A.   That's what I said.

8       Q.   All right.  Your intention was to head

9   down the stairs, correct?

10      A.   That would be correct.

11      Q.   So how is it then that you fell to your

12  right?

13      A.   I couldn't really answer that.

14      Q.   All right.

15      A.   I lost my balance.

16      Q.   I recognize that.  But you were -- you

17  were in the process of walking, correct?

18      A.   I was in the process of leaving the door

19  to turn around to walk.

20      Q.   Okay.  I'm going to show you what we

21  marked as Exhibit No. 7 at the previous deposition,

22  okay.  When you say you were in the process of

23  leaving the door to turn around to walk, are you

24  talking about the glass doors that show up in

25  Exhibit No. 7?



STEPHANIE A. HOFER
July 10, 2006

```
 1      A.   I can't recall that.

 2      Q.   Well, what door are you talking about if

 3   it's not those glass doors?

 4      A.   I have a memory of a door --

 5      Q.   Okay.

 6      A.   -- that doesn't look like that.

 7      Q.   What --

 8      A.   I don't recall if this is where I fell.

 9      Q.   What shows up in Exhibit No. 7 you're now

10   saying you don't recall whether Exhibit No. 7 or

11   what is depicted in Exhibit No. 9 is actually where

12   you fell?

13      A.   I am not sure if this is the area where I

14   fell (indicating).

15      Q.   Right.  Was the -- have you -- are there

16   pictures of any other places on Turtle Beach Towers

17   in the property of Turtle Beach Towers upon which

18   there is a door and then a series of steps and a

19   turtle pond?

20      A.   Can you repeat that question --

21      Q.   Sure.

22      A.   -- in a different way, please.

23      Q.   Sure.  Is there another door and building

24   with a turtle pond that existed on the Turtle Beach

25   Towers property --
```



STEPHANIE A. HOFER
July 10, 2006

 1    A.   No --

 2    Q.   -- other than the one that's shown on

 3  Exhibit 7 or 9?

 4         MS. MINCHOFF:  Objection.

 5         MR. FERINGA:  Can she answer?

 6         MS. MINCHOFF:  Yes.

 7    A.   I don't know.

 8    Q.   All right.  Do you -- do you have it in

 9  your memory seeing more than one building that had

10  glass doors and a turtle pond next to the stairs?

11    A.   I don't know.  I wasn't there very long.

12    Q.   Okay.  So in your memory do you remember

13  seeing only one then?

14    A.   I remember seeing only one.

15    Q.   All right.  And if there was only one,

16  would you agree that it was in the building in

17  front of the glass doors where the lobby for the --

18  and the reception area for Turtle Beach Towers was?

19    A.   Can you repeat that.

20         MS. MINCHOFF:  Objection.

21    Q.   Sure.  The turtle pond into which you fell

22  was located out on the outside of the building

23  where the reception area was, correct?

24    A.   Yes.  To my knowledge, it was.

25    Q.   And -- and it was -- I think you testified



STEPHANIE A. HOFER
July 10, 2006

1    that the reason why you were there at -- I believe

2    between 11 and 12:30 at night?

3        A.   No, it was between 10:30 and 11.

4        Q.   Okay -- between 10:30 and 11 at night was

5    because you wanted to check with the receptionist

6    to make sure that you could perhaps arrange for a

7    trip to some sort of falls.

8            MS. MINCHOFF:   Objection.

9        A.   No.

10       Q.   What was the reason that you were there

11   that night?

12       A.   For brochures, not to speak to anybody.

13       Q.   Okay.  But you were going to go to the

14   reception and lobby area, correct?

15       A.   Yes, I was.

16       Q.   All right.  So assuming that this is the

17   only turtle pond and these -- what shows up in

18   Exhibit No. 7 is, in fact, the photograph of the

19   lobby area, would you agree that this is then the

20   area where you likely would have fallen?

21       A.   No, I will not agree.  I do not know if

22   this is even Turtle Beach Towers.

23       Q.   You don't even recognize that.

24       A.   No, I don't.

25       Q.   You recognize the turtle pond?



STEPHANIE A. HOFER
July 10, 2006

1     A.   No, I don't.

2     Q.   So does it look completely different from

3  what you remember?

4     A.   Yes, completely different from what I

5  remember.

6     Q.   All right.  So what is it that you -- what

7  is it that you remember about the -- the turtle

8  pond into which you fell?  How is it different from

9  what's shown on Exhibit No. 9?

10     A.   I couldn't tell you how it's different.  I

11  don't remember very much of the accident.  I

12  certainly didn't examine it before I fell.

13     Q.   So how is it that you can say that Exhibit

14  No. 9 does not show the turtle pond into which you

15  fell?

16          MS. MINCHOFF:  Objection.

17     A.   Because I don't know if that's the turtle

18  pond in which I fell.

19     Q.   That's not my question.

20     A.   That's my answer.

21     Q.   How is it that you can say it is not?

22     A.   I said I don't know if it is.  I don't

23  know if these pictures are representative, if

24  they're that area.  I don't know if it's Turtle

25  Beach Towers.



STEPHANIE A. HOFER
July 10, 2006

```
 1      Q.    You just don't remember that at all?

 2      A.    It was almost three years ago, Scott.

 3      Q.    I recognize that it was almost three years

 4   ago.

 5      A.    I do not remember.

 6      Q.    All right.  So let's -- let's look at this

 7   then.

 8      A.    Uh-huh.

 9      Q.    You said that you were -- you were at the

10   -- you were at the door, you turned around, and it

11   was at that point that you fell?

12      A.    It was at that point when my flip-flop

13   broke.

14      Q.    Okay.  And how far were you, in your

15   memory -- let me ask this question.

16            MR. FERINGA:  Do we need to go off the

17   record?

18            MS. MINCHOFF:  No.  No.

19      Q.    You drew Exhibit No. 5 at the last

20   deposition --

21      A.    Yeah.

22      Q.    -- remember?

23      A.    Yes, I do.

24      Q.    Okay.  So we have Exhibit No. 5 now in

25   front of you, and -- does Exhibit No. 5 now meet
```



STEPHANIE A. HOFER
July 10, 2006

 1    with your recollection of the layout of the Turtle

 2    Beach Tower door, stairs, and turtle pond?

 3            MS. MINCHOFF:  Objection.

 4    A.    This is what I drew to my memory.

 5    Q.    I know it is.  But does it represent it?

 6    A.    To my memory.

 7    Q.    Okay.  So you said that you were at the

 8    doorway where it says, "Enter door," on Exhibit No.

 9    5 and turned around and your right flip-flop broke,

10    correct?

11    A.    Correct.

12    Q.    All right.  And were you -- were you right

13    at the door --

14    A.    Yeah.

15    Q.    -- or had you taken a step?

16    A.    Oh, I probably had taken a step.

17    Q.    Do you have any memory of whether you did

18    or didn't?

19    A.    No, I don't.

20    Q.    Okay.

21    A.    The door was locked.

22    Q.    Okay.  So you went to the door, tried to

23    get into the door, pulled on it, and it didn't

24    open, correct?

25    A.    The door was locked, correct.


BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

STEPHANIE A. HOFER
July 10, 2006

1       Q.   And you remember the door at least being a

2   glass door, correct?

3       A.   Correct.

4       Q.   When you -- had you completed turning

5   around to go back down the stairs before your

6   flip-flop broke, or did it break in the process of

7   turning?

8       A.   I don't know.

9       Q.   Do you remember actually taking a step

10  away from the door?

11      A.   I don't know.

12      Q.   Do you remember, though, being in the

13  process of moving in a direction toward the

14  stairs --

15      A.   Yes.

16      Q.   -- when your flip-flop broke?

17      A.   Yes.

18      Q.   And you remember moving.  You weren't

19  standing still when your flip-flop broke, correct?

20      A.   Correct.

21      Q.   So might I assume then that that -- that

22  your direction would have been toward the stairs?

23      A.   (Witness nods.)  It's possible.  I don't

24  quite remember.

25      Q.   Likely?



STEPHANIE A. HOFER
July 10, 2006

```
 1      A.   Likely.

 2      Q.   Okay.  Do you remember the distance

 3   between -- at least from your recollection -- from

 4   the doorway to the stairs?

 5      A.   No, I do not.

 6      Q.   In terms of Exhibit No. 7, there is a

 7   distance from the stairs to the doorways at least

 8   that are depicted.  Do you see those?

 9           MS. MINCHOFF:  Objection.

10      A.   I do.

11      Q.   You do?

12      A.   I see that.

13      Q.   All right.  Do you have any memory of

14   whether that distance, as depicted on Exhibit No.

15   7, was, at least in your mind of what the scene

16   actually looked like, whether it was a shorter

17   distance, longer distance?

18      A.   Are you asking strictly about the distance

19   between the door and the stairs?

20      Q.   Yes.

21      A.   I would -- to my memory, I think it was

22   shorter.

23      Q.   Right.  And how much shorter?

24      A.   I can't recall how much shorter.

25      Q.   You have drawn on Exhibit No. 5 a doorway
```



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

STEPHANIE A. HOFER
July 10, 2006

1    which seems to immediately abut some stairs.  Is

2    that what you remember?

3        A.   I remember a set of stairs and a door --

4        Q.   Right.

5        A.   -- and a small landing.

6        Q.   All right.  And what is depicted on

7    Exhibit No. 7 does not meet with your recollection,

8    correct?

9        A.   No, it does not.

10       Q.   On Exhibit No. 7 there are two stairs

11   shown.  Do you remember whether there were more

12   stairs on the location where you claim this took

13   place?

14       A.   To my best recollection, in my memory, I

15   believe there were more stairs than that.

16       Q.   And how many more stairs were there?

17       A.   Possibly two more.  I believe maybe there

18   were between four and six stairs.

19       Q.   Okay.  Were you on the landing when you

20   claim the right flip-flop separated?

21       A.   Yes, I was.

22            MS. MINCHOFF:  Scott, just so we're clear,

23   since there was quite a few photographs in Exhibit

24   No. 7, can we just identify which photograph we're

25   speaking of or maybe have her hold it up.



STEPHANIE A. HOFER
July 10, 2006

```
 1            MR. FERINGA:  I think we have and -- and
 2   she can --
 3            MS. MINCHOFF:  Well, 7 had a few.
 4            MR. FERINGA:  No, this is --
 5            MS. MINCHOFF:  You've asked her about
 6   Exhibit No. 7 for the last few questions.
 7            MR. FERINGA:  It's the one -- it's the one
 8   with the mark -- actually the exhibit on it --
 9   exhibit sticker on it, but if you'll hold it up.
10            MS. MINCHOFF:  You're the only one that
11   has the exhibit sticker.
12            MR. FERINGA:  No, it was copied attached
13   to all copies of the deposition when it was --
14            MS. MINCHOFF:  I didn't get the
15   deposition, so I'm going off of the exhibits you
16   handed out on the 29th.
17            MR. FERINGA:  Got it.
18            VIDEO OPERATOR:  Yes.
19            MS. MINCHOFF:  That's fine.
20            MR. FERINGA:  That's fine.  Thank you.
21       Q.   All right.  You saw the flip-flop -- the
22   right flip-flop separate before you reached the
23   stair, correct?
24       A.   I can't recall if it was before I reached
25   the stair or as I was going down.  I can't recall.
```



STEPHANIE A. HOFER
July 10, 2006

1    I know I saw it, but I don't know when.

2          Q.    Did you have time to stop?

3          A.    No, I did not.

4          Q.    So tell me, as best as you can recall, the

5    configuration of your body as you fell.

6          A.    I don't know.

7          Q.    Did you -- were you holding anything in

8    your hands?

9          A.    No, I was not.

10         Q.    On Exhibit No. 5, which is the drawing

11   that you made, you have an arrow pointing into the

12   turtle pond that would have been to your right as

13   you're walking down the stairs, correct?

14         A.    Correct.

15         Q.    How is it that you ended up there?

16         A.    I don't know.

17         Q.    Do you remember -- do you remember what

18   portion of your body -- strike that.  Do you

19   remember how you fell into the turtle pond?  That

20   is, to your side, to your front forward, on your

21   back, on your left side?

22         A.    I don't know.

23         Q.    Do you remember what portion of your body

24   struck what first?

25         A.    I don't recall what portion of my body



STEPHANIE A. HOFER
July 10, 2006

 1    struck what first.

 2         Q.   Do you remember your right or left leg

 3    impacting the side of the turtle pond?

 4         A.   No, I do not.

 5         Q.   You do remember that the turtle pond was

 6    encased in some sort of concrete rectangle,

 7    correct?

 8         A.   I was under the impression it was a stone

 9    wall type.

10         Q.   So what appears on Exhibit No. 9 does not

11    appear to look like the turtle pond into which you

12    fell?

13         A.   No, it does not.

14              MS. FERINGA:  Let's go off the record,

15    because I'm going to ask you to draw what you

16    remember the turtle pond looked like, okay?

17              VIDEO OPERATOR:  Off the record at 10:04.

18              (Discussion off the record.)

19              VIDEO OPERATOR:  On the record at 10:08.

20         Q.   While we were off the record, Ms. Hofer, I

21    asked you to draw the turtle pond.  Have you done

22    so?

23         A.   To the best of my ability.

24         Q.   All right.  I'm going to reach over and

25    place an exhibit sticker, No. 10, on it, and I'm



STEPHANIE A. HOFER
July 10, 2006

1   asking you to -- if you would --  hold it up to the

2   camera so the camera can see it, please.

3        A.   (Witness complies.)

4             (Diagram marked Exhibit 10.)

5        Q.   All right.  Good.  So can you describe for

6   us now what you've drawn on Exhibit No. 10.

7        A.   I've drawn some stairs, and next to the

8   stairs I have drawn, to the best of my ability,

9   what I remember about the turtle -- the turtle

10  pond.

11       Q.   Now, I accept the fact that you're not an

12  artist.

13       A.   Thank you.

14       Q.   And so I have some questions about what

15  you drew if I could, okay.

16       A.   Please.

17       Q.   You have drawn an area that you've

18  identified as the turtle pond, correct?

19       A.   Yes.

20       Q.   And around that area that you've

21  identified as a turtle pond you have a series of

22  black squiggly lines.  Can you -- can you tell us

23  what the black squiggly lines mean?

24       A.   You know, stone wall, stones, stones,

25  stones, you know, round stones.



STEPHANIE A. HOFER
July 10, 2006

1      Q.    Okay.  That's -- okay.

2      A.    I am horrible -- I -- I am not an artist.

3      Q.    And I appreciate that, believe me.  I

4   appreciate that.  So if -- if you could hold up --

5   again, I'm sorry, for the camera, the area on the

6   lower left-hand side you've identified as stones

7   and those squiggly lines represent stones that

8   would have been on the outside of the turtle pond.

9      A.    Yes.

10     Q.    Okay.  And you have plants and flowers

11  behind the turtle pond closest to the building, is

12  that fair?

13     A.    Uhm, I would think, to my best of -- the

14  best of my knowledge, this is what I recall of that

15  area.

16     Q.    Okay.  And if you could hold up Exhibit

17  No. 9 this one --

18     A.    Oh.

19     Q.     -- next to yours, if we could, what

20  you're saying is that what is shown in the

21  photograph of Exhibit No. 9 is not the turtle pond

22  into which you fell.

23         MS. MINCHOFF:  Objection.

24     A.    To the best of my knowledge.

25     Q.    Okay.  So what you're saying is that the



STEPHANIE A. HOFER
July 10, 2006

```
 1    stones were jagged on the outside of the turtle

 2    pond?

 3         A.    No.

 4         Q.    Round?

 5         A.    I'm saying it looked like a stone wall --

 6         Q.    Okay.

 7         A.    -- on the outside.

 8         Q.    And the -- and the top of the wall, was

 9    the top of the wall flat or was it a stone, sort of

10    stones on the top?

11         A.    I -- I can't recall that.

12         Q.    Do you have any sense, as you fell into

13    the turtle pond, of feeling pain or an impact on

14    your left leg?

15         A.    Can you rephrase that.

16         Q.    Sure.  Probably a bad question.  As you're

17    falling, do you remember feeling pain specifically

18    on your left leg between your knee and your shin?

19         A.    Yes.

20         Q.    As you're falling?

21         A.    No.

22         Q.    Okay.

23         A.    Oh, okay.  I see where you -- can you

24    clarify that again.

25         Q.    I'd be more than happy to.
```



STEPHANIE A. HOFER
July 10, 2006

```
 1      A.   Thank you.

 2      Q.   What I'm attempting to do is sort of

 3  explore what your memory is about how you fell, and

 4  then what I'm trying to do is, like, if you're

 5  narrating a videotape, if we have a silent

 6  videotape of watching you fall in slow motion,

 7  seeing what portions of that you remember.

 8      A.   I understand.

 9      Q.   Okay.  So the question that I have is, as

10  you're falling into the turtle pond, do you have

11  any memory of your impacting your left leg on the

12  outside or -- of the wall of the turtle pond that

13  you've drawn now in Exhibit No. 10?

14      A.   I have no memory of that.

15      Q.   Do you have any memory as to how you

16  exactly landed in the turtle pond?

17           MS. MINCHOFF:   Objection.

18      A.   No, I do not.

19      Q.   Do you have any memory of feeling any pain

20  as you're -- as you've come to rest in the turtle

21  pond?

22      A.   I can't recall that.

23      Q.   Do you have any memory of being -- for the

24  lack -- for lack of a better word -- draped across

25  stones and coral within the turtle pond?  That is,
```



STEPHANIE A. HOFER
July 10, 2006

1   not -- you're not flat in the bottom of the turtle

2   pond, but you're lying on some stuff that's inside

3   of it.

4          MS. MINCHOFF:  Objection.

5      Q.   Do you understand what I'm asking you?

6      A.   I couldn't answer how I landed.  It

7   wouldn't be possible for me to remember exactly how

8   I landed and what I was draped over.

9      Q.   All right.  If you fell on the floor that

10  we have here, we -- we would land on a flat carpet,

11  essentially.  What I'm attempting to understand is

12  do you have any sense of landing on stones or slate

13  or coral or anything in the turtle pond?

14     A.   I recall cutting my leg, but I do not

15  recall how I landed.

16     Q.   Do you recall how you cut your leg?

17     A.   I cut my leg on sharp coral and rock and

18  flat stone, whatever -- what was in there was razor

19  sharp.

20     Q.   Okay.  Now, when you say, "what was in

21  there was razor sharp," are you talking about --

22     A.   I am talking about the coral and the tile

23  or flagstone.  The rock.

24     Q.   What my question was was -- are you

25  talking about what was inside of the pond as



STEPHANIE A. HOFER
July 10, 2006

1    opposed to the stuff the walls were made out of?

2        A.   I am talking what was inside.

3        Q.   Okay.

4        A.   What I gouged my leg on is what I am

5    speaking of.

6        Q.   And we're talking about your left leg.

7        A.   Yes.

8        Q.   Now, do you have any sense of at what

9    point you gouged your leg?

10       A.   No, I do not.

11       Q.   And my question -- and the question that

12   I'm asking you is, as you are -- you found yourself

13   in the turtle pond, I think you told us that you

14   attempted to step up -- stand up, and you couldn't.

15       A.   Yes.

16       Q.   Now, did you -- did you have the sense

17   that your left leg, at that point, was caught or

18   impacted or stuck on something?

19       A.   When I could not raise my leg out, I

20   looked down and had the sense that something was

21   wrong.

22       Q.   Okay.  So if I envision how you fell, you

23   attempt to stand up and can't get all the way up.

24   Is that fair?

25            MS. MINCHOFF:  Objection.



STEPHANIE A. HOFER
July 10, 2006

```
 1      A.   I can't recall.

 2      Q.   Well, I'm --

 3      A.   I can't recall -- you say, "stand up."  I

 4  can't recall if I were flat on my back or face

 5  down.  So I can't recall whether I was standing --

 6  I recall making an attempt to step out.

 7      Q.   Okay.  In order to step out, you would

 8  have to be off of your back or stomach or butt or

 9  whatever you're on, correct?

10      A.   Yes.

11      Q.   Logically.

12      A.   Yes.

13      Q.   So you would have to have made some

14  maneuver -- whatever it was -- from your initial

15  resting place within the pond to try and get out of

16  the pond.

17      A.   Can you rephrase that.

18      Q.   Sure.  You find yourself in the pond.

19  Clearly, you weren't expecting to be there.  You

20  find yourself in the pond, and now you're going to

21  try and get out, okay?

22      A.   Yes.

23      Q.   At the point where you're going to try to

24  get out, you have to do something, correct?

25      A.   Yes.
```



STEPHANIE A. HOFER
July 10, 2006

1      Q.    All right.  Do you remember when you

2    attempted to step out whether you actually were

3    successful in standing or moving to a partial

4    standing position?

5      A.    I can't recall.

6      Q.    Do you remember rolling around to try to

7    get to a position where you could try to stand up?

8      A.    I remember trying to get to a position

9    where I could get off my foot.

10      Q.    Okay.  So does that mean that you had

11    landed on -- when you were talking about your foot

12    -- your left foot?

13      A.    My left leg, foot.

14      Q.    Okay.  Do you have the sense, then, that

15    you had landed on your left foot or leg, now

16    thinking back on things?

17      A.    I -- I don't have the sense of -- I could

18    not tell you how I landed.

19      Q.    Okay.  Are you right-handed or

20    left-handed?

21      A.    I'm right-handed.

22      Q.    Okay.  Do you have a sense of attempting

23    to stand up in any way before you -- in order --

24    strike that.  Do you have a sense of attempting to

25    stand up inside of the turtle pond in an effort to



STEPHANIE A. HOFER
July 10, 2006

1    try to get out of the turtle pond?

2              MS. MINCHOFF:   Objection.

3        A.    I don't recall.

4        Q.    Do you have a sense of whether your left

5    foot or leg were caught underneath something?

6        A.    I don't recall.

7        Q.    Do you have a sense of looking down and

8    seeing your left leg touching or impacted by or

9    around either coral or flagstone or some -- some

10   sort of object within the turtle pond?

11       A.    Can -- can you say that again.

12       Q.    Sure.   You said that you attempted to

13   stand up or you attempted to get out of the turtle

14   pond, to be more accurate, I believe.

15       A.    Yes.

16       Q.    And -- and you couldn't because something

17   was wrong with your left leg, okay?

18       A.    (Witness nods.)

19       Q.    Is that --

20       A.    Correct.

21       Q.    Okay.   Now, again, using my videotape

22   slow-motion analogy that I'm trying to work on

23   here, as you're focusing now down, as you're

24   looking down at your left leg to see why in the

25   heck things aren't working, what do you see?



STEPHANIE A. HOFER
July 10, 2006

```
 1              MS. MINCHOFF:  Objection.

 2         A.   I know very vividly what I saw and --

 3         Q.   And that's what I want you to describe.

 4         A.   Okay.  But it has nothing to do --

 5         Q.   Do you remember seeing --

 6         A.   -- with what was around me.  It was what

 7    to do -- what happened to my leg.

 8         Q.   Okay.

 9         A.   That's all I saw.  I didn't see anything

10    around me.

11         Q.   What I'm asking -- what I'm asking about

12    is as you're looking down -- with this vivid

13    memory -- do you remember seeing anything impacting

14    your leg at that point?

15         A.   No.  My very -- my very vivid memory is

16    only my leg.  I don't recall anything around me.

17    All I know is that this pond was filled with these

18    coral and slate, and I could only, you know, see

19    the -- the severe laceration and blood pouring from

20    my leg.  That's all I could see.  I don't know if I

21    was hung up on anything.  I couldn't answer that.

22         Q.   Do you remember whether your foot was

23    underneath something?

24         A.   No, I do not.

25         Q.   Do you remember seeing your foot at all?
```



STEPHANIE A. HOFER
July 10, 2006

```
 1      A.   No, I do not.

 2      Q.   Okay.  So what you saw, looking down at

 3   your leg, was the laceration, lots of blood.  Do

 4   you remember the flap of skin?

 5      A.   Yes, I do, very vividly.

 6      Q.   And the flap of skin was -- was going from

 7   essentially your mid shin --

 8      A.   Yes.

 9      Q.   -- down toward your foot, correct?

10      A.   Toward my foot, yes.

11      Q.   But you don't remember seeing your foot?

12      A.   No, but I do remember seeing the blood

13   vessels and the nerves hanging out of my leg like

14   spaghetti.

15      Q.   Okay.  In attempting to get up and out of

16   the pond, just before you looked down at your leg,

17   were you trying to get out in the direction toward

18   the stairs, or were you trying to get out in the

19   direction now -- which would be parallel to the

20   stairs, that is, toward the pond, the back --

21   bottom part of that exhibit?

22      A.   I don't remember.

23      Q.   Do you remember getting out of the pond at

24   all?

25      A.   I don't remember.
```



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

STEPHANIE A. HOFER
July 10, 2006

```
 1      Q.   And from -- from the point where you have

 2   this very vivid memory of your -- the flap of skin

 3   and the nerves and blood vessels hanging down like

 4   spaghetti, after that point in time, your memory is

 5   spotty, fair?

 6      A.   That's -- my memory is more -- is worse

 7   than spotty.

 8      Q.   Okay.  And just so that I am clear, the

 9   deposition of June 29th and today was the first

10   time that you've seen photographs of what is

11   purported to be the turtle pond into which you

12   fell, correct?

13      A.   Purported to be, yes.

14      Q.   And again, so that we're clear, you are

15   not aware of any photographs taken by any

16   individual on your behalf of the turtle pond into

17   which you claim you fell, correct?

18      A.   I have no knowledge of any other photos

19   taken on my behalf.  Is that what you -- can you re

20   -- rephrase that so I can --

21      Q.   I'll be glad to.

22      A.   So I can finish -- so I can finish my

23   thought.  I'm sorry.

24      Q.   Sure.  So that we're all clear, you have

25   not seen any photographs of the turtle pond into
```



STEPHANIE A. HOFER
July 10, 2006

1    which you claim you fell taken by anybody, correct?

2         A.    Correct.

3         Q.    Okay.  I'll move to a different area, if I

4    could.  You have named in your Rule 26 disclosures

5    identification of persons having discoverable

6    information, and you've named Ms. Loren Pompei, who

7    we understand is your mother, P-o-m-p-e-i.

8         A.    Can I see that, please.

9         Q.    Sure.  This is my copy of this, but this

10   is the Rule 26 disclosure, which is a legal

11   document filed by your lawyer in this matter.  Look

12   at No. 3.

13        A.    Yeah.

14        Q.    And in there it says that Ms. Pompei is

15   familiar with the "averments to Plaintiffs'

16   complaint," if my memory serves me right.  What

17   knowledge does Ms. Pompei have about what occurred

18   on March 18 at the Turtle Beach Towers?

19        A.    I couldn't say.

20        Q.    Okay.  She wasn't there, huh?

21        A.    She was not there.

22        Q.    All right.  And whatever knowledge she has

23   would have been learned from you or potentially Ms.

24   LaBelle, L-a-B-e-l-l-e?

25        A.    Regarding the fall?



STEPHANIE A. HOFER
July 10, 2006

1        Q.    Correct.

2        A.    Yes.

3        Q.    She, to your knowledge, hasn't spoken with

4   Mr. McKenzie, the cab driver, correct?

5        A.    Not to my knowledge, no.

6        Q.    To your knowledge, she has had no

7   communications with anyone at the Turtle Beach

8   Towers, correct?

9        A.    Not to my knowledge, no.

10       Q.    All right.  So, tell me what information

11   Ms. Pompei has then with respect to this case.

12       A.    My mother was my almost full-time

13   caregiver after the accident.

14       Q.    And I assume that that would have been

15   after you returned back from the hospital after

16   being discharged from Mass. General?

17       A.    Yes.

18       Q.    And how long did your mother remain as

19   your almost full-time caregiver?

20       A.    While working full-time, she maintained --

21   you know, she would check on me multiple times a

22   day, make sure the medications were lined up.  She

23   would drive me to my doctors' appointments day in

24   and day out.  I did not drive.  She drove me to all

25   of my doctors' appointments, every single one.



STEPHANIE A. HOFER
July 10, 2006

```
 1       Q.   For how long?

 2       A.   About nine months, approximately.  I

 3  couldn't say.

 4       Q.   So approximately by -- would it be fair

 5  that by the end of 2004 she had stopped doing this?

 6       A.   I couldn't say.

 7       Q.   Would it --

 8       A.   It could have been longer.

 9       Q.   Do you have any knowledge of that?

10       A.   No.

11       Q.   Do you -- do you have any sense of whether

12  you reimbursed your mother for any of her

13  expenses -- gas money, parking money, or anything?

14       A.   Not to my knowledge.

15       Q.   Did she stay with you -- actually live at

16  your house -- during the initial portion of after

17  -- of when you -- strike that.  Did your mother

18  live with you after you were discharged from the

19  hospital for any period of time?

20       A.   No, she did not.

21       Q.   Who was the one that took care of her --

22  you if she was not there?

23       A.   The visiting nurses during the day, and my

24  husband at night.

25       Q.   And the Visiting Nurse Association sent a
```


BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

STEPHANIE A. HOFER
July 10, 2006

1   series of nurses each day?

2       A.   Yes.

3       Q.   Once a day?

4       A.   A nurse once a day, and a physical

5   therapist once a day.

6       Q.   Was that only in the morning?

7       A.   Nurse in the morning, physical therapist

8   in the afternoon.

9       Q.   Did you have anybody to assist --

10      A.   Varied between days.  I couldn't give you

11  a schedule.

12      Q.   Do you remember the names of the nurses?

13      A.   No, I do not.

14      Q.   Do you remember the names of the physical

15  therapists?

16      A.   No.

17      Q.   How long did the VNA nurses continue to

18  come once a day?

19      A.   I believe that's in the records.  I -- I'm

20  not positive on the time.

21      Q.   We haven't seen those records yet.  That's

22  why I'm asking.

23      A.   They've been requested.

24      Q.   Do you have any knowledge -- do you have

25  any sense whatsoever whether they were still coming



STEPHANIE A. HOFER
July 10, 2006

 1    once a day by Memorial Day or July 4th or --

 2              MS. MINCHOFF:  Objection.

 3        A.   I couldn't tell.  I couldn't say.

 4        Q.   What about the physical therapist, do you

 5    have any sense of whether the physical therapist

 6    showed up once a day or --

 7        A.   I couldn't tell you for how long.

 8        Q.   Other than the visiting nurse who would

 9    come once a day and the physical therapist that

10    would come once a day, did you have -- and your

11    mother that would come, did you have anyone else

12    that was assisting in your care?

13              MS. MINCHOFF:  Objection.

14        A.   No.

15              MS. MINCHOFF:  She said her husband as

16    well.

17              MR. FERINGA:  She didn't.  She just said

18    no.

19              MS. MINCHOFF:  The first time she said her

20    husband.

21        A.   The first time I said my husband.  I'm

22    sorry.

23        Q.   What did your husband do for you?

24        A.   That's a list too long to go through.

25        Q.   Can you give me a sense of what he did to



STEPHANIE A. HOFER
July 10, 2006

1    help take care of you during the first month that

2    you were home.

3         A.   He did everything.  He took care of my

4    medications.  He bathed me.  He clothed me.  He

5    helped me to get to the bathroom.  He cooked for

6    me.  He cleaned.  He did the laundry.  He took care

7    of the dogs.  He did everything that I -- that I

8    would normally do for myself and more.

9         Q.   May I have my -- this back?

10        A.   Oh, yes.

11        Q.   Sure.  Thanks.  He was working full time

12   at the time?

13        A.   Yes, he was.  He had taken maybe a week or

14   -- I can't -- I can't recall.  Yes, he worked full

15   time.

16        Q.   I was going to ask about that.  Do you

17   remember whether your husband took any vacation or

18   sick time that he was entitled to to help take care

19   of you?

20        A.   I believe he may.  I don't recall how

21   much.

22        Q.   There is something known as the Family

23   Medical Leave Act.  Are you aware of whether he

24   applied for and received the federal family medical

25   leave so that he could be with you for up to 12



STEPHANIE A. HOFER
July 10, 2006

```
 1    weeks at home?

 2        A.    No.

 3        Q.    Do you have a Massachusetts driver's

 4    license?

 5        A.    Yes, I do.

 6        Q.    Is it current?

 7        A.    Yes, it is.

 8        Q.    Are there any restrictions?

 9        A.    No, there aren't.

10        Q.    Some states have what they call

11    handicapped stickers for their cars that have to be

12    -- does -- does Massachusetts have that?

13        A.    Yes, they do.

14        Q.    Do you have one?

15        A.    Yes, I do.

16        Q.    Who -- in order to get those, at least in

17    some states, there has to be some sort of note or

18    letter from a doctor that you have to supply to

19    whatever agency provides them.

20        A.    Correct.

21        Q.    What doctor provided you with that -- that

22    information so that you could get that sticker?

23        A.    Doctor Hord, my neurologist/pain

24    management doctor.

25        Q.    I wanted to ask some questions about the
```



STEPHANIE A. HOFER
July 10, 2006

 1    treating doctors, if I could.

 2        A.    Uh-huh.

 3        Q.    You saw a Dr. David L-h-o-w-e, who is a

 4    surgeon at Mass. General, correct?

 5        A.    Doctor Lhowe.

 6        Q.    And Doctor Lhowe you only saw through

 7    Mass. General, correct?

 8        A.    Yes.

 9        Q.    Did Doctor Lhowe have an office outside of

10    the Mass. General system?

11        A.    Outside of the Mass. General system?  I

12    don't understand.

13        Q.    Meaning was he a private doc who simply

14    had privileges at -- at this hospital?

15        A.    I don't know.

16        Q.    Was his office within the Mass. General

17    complex?

18        A.    Yes, it was.

19        Q.    Doctor Zachary, did you only see him -- or

20    her?  I can't tell.

21        A.    Yeah, it's a he.

22        Q.    Okay.  Did you see that physician only

23    through Mass. General?

24        A.    Yes.

25        Q.    And was that only when you were



STEPHANIE A. HOFER
July 10, 2006

1   hospitalized, or did you see Doctor Zachary after?

2        A.   I saw Doctor Zachary for a very long time.

3        Q.   Okay.  And was his office at the Mass.

4   General system -- Mass. General complex as well?

5        A.   Yes.

6        Q.   Doctor Hord, who's listed as the attending

7   physician, H-o-r-d --

8        A.   Uh-huh.

9        Q.   -- Daniella Hord --

10       A.   Yes.

11       Q.   -- is her office within the Mass. General

12  system as well?

13       A.   Yes.

14       Q.   Dr. Ingrid Bassett, did you see her

15  outside of the hospitalization?

16       A.   No.

17       Q.   Okay.  So that would --

18       A.   Oh, excuse me.  I'm sorry.  I saw her as

19  part of the outpatient infectious disease.  She and

20  Doctor Zachary --

21       Q.   Worked together?

22       A.   -- worked together.

23       Q.   And you would have seen them within the

24  sort of same office complex at the Mass. General

25  complex?



STEPHANIE A. HOFER
July 10, 2006

```
 1        A.    Yes, at different times.

 2        Q.    Okay.  Now, Doctor Fraser is your primary

 3   care provider.  He is not with the Mass. General

 4   system, correct?

 5        A.    Correct.

 6        Q.    And you would have seen him at a different

 7   office?

 8        A.    Yes.

 9        Q.    And you had been seeing Doctor Fraser for

10   some period of time before this incident, correct?

11        A.    He's my primary care physician.

12        Q.    So you would have been seeing --

13        A.    I see him on a regular basis.

14        Q.    And you had been seeing him before this

15   injury, correct?

16        A.    On a regular basis.

17        Q.    Okay.  In terms of Doctor

18   S-t-o-j-a-n-o-v-i-c in the neurology department at

19   Mass. General, did you see him outside the Mass.

20   General system -- strike that that was a poor

21   question.  Did you see Doctor Stojanovic as an

22   outpatient?

23        A.    I can't answer that yes or no.

24        Q.    Okay.

25        A.    That's -- can you rephrase that, please.
```



STEPHANIE A. HOFER
July 10, 2006

```
 1      Q.   Sure, I just -- do you remember seeing

 2   Doctor Stojanovic on an inpatient basis or an

 3   outpatient?

 4      A.   Both.

 5      Q.   Both.  And is Doctor Stojanovic at the

 6   Mass. General system as well?

 7      A.   Yes.

 8      Q.   And his office is within the Mass. General

 9   complex?

10      A.   Yes.

11      Q.   Doctor Kulich, K-u-l-i-c-h, or Kulich?

12      A.   Kulich.

13      Q.   Have you seen that psychologist on an

14   outpatient basis?

15      A.   Yes.

16      Q.   And that psychologist is within the Mass.

17   General system?

18      A.   Yes, he is.

19      Q.   Is that associated with the pain

20   management?

21      A.   Yes, it is.

22      Q.   And you continue in your treatment with

23   Doctor Kulich?

24      A.   No.

25      Q.   When did you last treat with Doctor
```



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

STEPHANIE A. HOFER
July 10, 2006

 1   Kulich?

 2        A.   I can't remember.

 3        Q.   Have you seen Doctor Kulich at all in

 4   2006?

 5        A.   I can't recall.

 6        Q.   There's a Dr. Sarah R-e-i-f-f hyphen

 7   H-e-k-k-i-n-g --

 8        A.   Reiff.

 9        Q.   -- pain management, UMass?

10        A.   Yes.

11        Q.   Is -- is that the pain management

12   physician?

13        A.   That took over for Doctor Kulich.

14        Q.   Doctor Kulich is listed as a psychologist.

15   Is Dr. Sarah Reiff-Hekking a psychologist?

16        A.   She is an physiatrist.

17        Q.   Physiatrist, physical medicine and

18   rehabilitation specialist?

19        A.   Yes.

20        Q.   And is she in charge of your rehab now?

21        A.   No, I actually am not seeing her anymore.

22   She left UMass and Dr. Elaine Borgen, B-o-r-g-e-n,

23   who is also a physiatrist in rehabilitative

24   medicine, is who I am seeing currently.

25        Q.   When did you last see Dr. Sarah



STEPHANIE A. HOFER
July 10, 2006

 1    Reiff-Hekking?

 2        A.    I can't recall.

 3        Q.    Did you see her in 2005?

 4        A.    Yes.

 5        Q.    What about 2006?

 6        A.    No.

 7        Q.    There's also a doctor listed Dr. Jean

 8    L-e-B-l-a-n-c at the Worcester County Rehab Health

 9    Alliance plan, physical therapist?

10        A.    Could I see that, please.

11        Q.    Sure.

12        A.    Thank you.

13        Q.    This is -- I'm looking at -- under the

14    Plaintiffs' Rule 26 disclosure, Capital B,

15    "Description of Documents Supporting Plaintiffs'

16    Claims," Paragraph 1, "Medical Records By

17    Category," Item No. 10.

18        A.    Thank you.  (Witness reviews document.)

19    This is a typo.  Oh, no, you read it wrong.  Her

20    name is Jen LeBlanc and not Jean LeBlanc.

21    Unfortunately, it is a typo.  She is a licensed

22    physical therapist.

23        Q.    Okay.  Not a physician?

24        A.    Not a doctor.  And same with Bill Chapman.

25    He is a licensed physical therapist.



STEPHANIE A. HOFER
July 10, 2006

1      Q.   Bill Chapman is listed on No. 11?

2      A.   Yes, he is.

3      Q.   Okay.

4      A.   And they are in charge of my physical

5    therapy.

6      Q.   And when -- are you presently seeing both

7    of those individuals?

8      A.   I do have an appointment coming up.  My

9    doctor recently ordered physical therapy again.

10      Q.   How long has it been since you have had

11    physical therapy?

12      A.   With a provider?

13      Q.   Yes, ordered.

14      A.   Ordered?  Maybe eight months.

15      Q.   And which of your physicians recently

16    ordered you to go -- made an order for physical

17    therapy?

18      A.   My primary care physician.

19      Q.   Doctor Fraser?

20      A.   Doctor Fraser.

21      Q.   And had you seen Ms. Jen LeBlanc and Mr.

22    Bill Chapman before?  Had you seen them as physical

23    therapists before?

24      A.   Yes.

25      Q.   Was that eight months ago?



STEPHANIE A. HOFER
July 10, 2006

1      A.   Yes, from my introduction into an

2    outpatient physical therapy program.

3      Q.   And are you going to back -- go back and

4    see these two physical therapists again?

5      A.   If they are available.

6      Q.   And do you want -- what is your

7    understanding of the purpose of the physical

8    therapy that Doctor Fraser has now ordered?

9      A.   To strengthen my leg and to increase range

10   of motion and hopefully to reduce some of the pain

11   by using different methods not known to me yet.

12     Q.   Did you receive any sort of order or

13   letter or document from Doctor Fraser requesting

14   this physical therapy?

15     A.   No.  I call and make an appointment.

16     Q.   And what is Health Alliance?

17     A.   That is the local -- UMass is -- is a

18   large network of hospitals, and Health Alliance is

19   part of UMass at -- in my local area.

20     Q.   Let me ask this question:  Do you have --

21   are you a member of what is known as a PPO or an

22   HMO?

23     A.   I -- I don't know that.

24     Q.   Primary care or primary provider

25   organization, PPO, or HMO, health maintenance



STEPHANIE A. HOFER
July 10, 2006

 1    organization?

 2         A.   I have -- I have no idea.

 3         Q.   Is it -- in order for you to receive care

 4    from specialists, must that care be ordered by

 5    Doctor Fraser?

 6         A.   Do you mean do I need to have a referral?

 7         Q.   Yes.

 8         A.   No, I do not.

 9         Q.   So you can make an appointment without

10    going through Doctor Fraser, for example, to see

11    Doctor Borgen.

12         A.   Yes.

13         Q.   Are you aware of any liens that have been

14    placed on this matter or have you received letters

15    from any insurance provider indicating that they

16    are seeking reimbursement for any medical costs?

17         A.   I'm sorry?

18         Q.   Sure.

19         A.   Can you explain that.

20         Q.   Have you -- for your husband's insurance,

21    you're on your husband's medical insurance,

22    correct?

23         A.   Yes, I am.

24         Q.   Have you received any letters from the

25    medical insurance carrier indicating that they are



STEPHANIE A. HOFER
July 10, 2006

1    claiming a lien on any proceeds for this lawsuit?

2        A.   I have not read any such thing.

3        Q.   I wanted to ask you some questions about

4    how this incident has affected your marriage,

5    correct?

6            MS. MINCHOFF:  Do you mind taking just a

7    quick break before we get into a new line of

8    questions?

9            MR. FERINGA:  I don't mind.  Sure.  Go

10   ahead.  Let's go off the record.

11           VIDEO OPERATOR:  Off the record at 10:41.

12           (Recess was taken.)

13           VIDEO OPERATOR:  On the record at 10:49.

14       Q.   Ms. Hofer, looking at the experience that

15   you've been through with your injury, your rehab,

16   the pain issues that you have, do you think that

17   the injury and your responses to it have brought

18   you closer to your husband?

19       A.   Yes.

20       Q.   Has it, in a strange way, strengthened

21   your marriage?

22       A.   In a strange way.

23       Q.   How?

24       A.   There is that in sickness and in health

25   clause in the vows that you don't sometimes get an



STEPHANIE A. HOFER
July 10, 2006

 1    opportunity to actually follow through with until

 2    you're very old and we've had an opportunity to

 3    follow through.

 4         Q.    In what way?

 5         A.    Things have strengthened significantly our

 6    bond, because there are a lot of things, whether

 7    you're a completely happy person that you take for

 8    granted in your spouse or vice versa, and those

 9    things are no longer taken for granted.

10         Q.    In terms of Mr. Hofer's response to your

11    injury and you, have you seen a side of him that

12    you didn't realize was there?

13         A.    I knew it was always there, but it's --

14    he's a very compassionate man.

15         Q.    So then might I assume that between March

16    18 and today you and your husband have not

17    separated, filed for divorce, thought -- sought

18    marital counseling, or anything of the sort, is

19    that --

20         A.    No.

21         Q.    Is that fair?

22         A.    No, we have not.

23              MR. FERINGA:  I don't have any other

24    questions at this point, pending the receipt of

25    documents, but I'm certain that if I have further



STEPHANIE A. HOFER
July 10, 2006

1   questions, I'm sure that Ms. Minchoff and I can

2   work them out.  Thank you.

3                    CROSS-EXAMINATION

4   BY MR. REITH:

5       Q.   Good afternoon.  My name is Thomas Reith.

6   And we've met before.  I'm counsel for Expedia,

7   Inc.  I would ask you to bear with me today and all

8   counsel as well.  I'm dealing with an uber

9   migraine.  And so, to the extent you can't

10  understand me, please let me know.

11              MS. MINCHOFF:  Do you --

12              MR. REITH:  And I do not need to stop.

13  I'm more than happy to keep going.

14              MS. MINCHOFF:  Are you sure?  Okay.  Cause

15  I mean, we can do it tomorrow.

16              MR. REITH:  No.  No, I am here, ready and

17  rearing to go, as you can tell from my enthusiasm.

18              MS. MINCHOFF:  All right.

19      A.   I'm sorry.

20      Q.   Don't be sorry.

21      A.   No, I've had migraines.  I feel bad for

22  you.

23      Q.   Well, I'm glad we've already endeared

24  ourselves to each other, but here we are.  I'm

25  going to be asking some questions, just as Attorney



STEPHANIE A. HOFER
July 10, 2006

1   Feringa has been doing over the last couple of days

2   that we've seen each other.

3        A.   Yeah.

4        Q.   If you don't understand me, please let me

5   know.

6        A.   Okay.

7        Q.   If you have any questions, please let me

8   know.  I'll attempt to rephrase, I'll attempt to

9   restructure the question, and we'll work together

10  so we can get an answer to the question, okay?

11       A.   Okay.

12       Q.   One thing I'm going to ask -- this is

13  something that Attorney Feringa asked as well,

14  because it does cause problems for the

15  stenographer -- allow me to finish the question.

16       A.   Uh-huh.

17       Q.   Answer my question, to the extent your

18  attorney says it's allowable, and I'll allow you to

19  finish your answer, and I'll try not to interrupt

20  you.  If at any point you want to finish a question

21  you felt you had not had an opportunity to do so,

22  please let me know, and I will allow you an

23  opportunity to finish it, okay?

24       A.   Okay.

25       Q.   Another thing, verbal responses, always



STEPHANIE A. HOFER
July 10, 2006

1    the way to go.

2         A.   Yes.

3         Q.   Okay.  Before I get started, do you have

4    any questions for me?

5         A.   Actually, I do.

6         Q.   Okay.

7         A.   Do you represent Expedia, Inc.?

8         Q.   Yes.

9         A.   Okay.  That just -- wondered if they

10   encompassed -- do they encompass Turtle Beach

11   Towers, is that --

12        Q.   (Nods.)

13        A.   No?

14        Q.   Quick answer is no, they do not.

15        A.   It's a separate.

16        Q.   It's a separate entity completely.

17        A.   Okay.

18        Q.   It encompasses Expedia.com, Inc.?

19        A.   Okay.  I was curious.

20        Q.   That's fine.  I asked if you have any

21   questions.  That's fine.

22        A.   That's --

23        Q.   Have you ever been deposed before?

24        A.   No, I have not.

25        Q.   Okay.  Have you ever been a party to any



STEPHANIE A. HOFER
July 10, 2006

```
 1    other litigation prior to the present?

 2         A.    No, I have not.

 3         Q.    And by "party," I mean have you ever been

 4    sued by anybody?

 5         A.    No.

 6         Q.    And you've never sued anyone?

 7         A.    No.

 8         Q.    Has your husband ever been sued before?

 9         A.    No, he has not.

10         Q.    Has your husband ever sued anyone?

11         A.    No, he has not.

12         Q.    Okay.  I'm going to go over just some

13    general inquiry questions and probably touch upon

14    some issues that Attorney Feringa touched upon,

15    maybe do some follow-up that I feel is necessary

16    from my end, okay?

17         A.    Okay.

18         Q.    We may have touched upon this before, but

19    when were you born?

20         A.    July 18th, 1972.

21         Q.    And where do you presently live?

22         A.    Leominster, Massachusetts.

23         Q.    Do you rent or own?

24         A.    Own.

25         Q.    Okay.  And do you own that by yourself?
```



STEPHANIE A. HOFER
July 10, 2006

```
 1      A.    No, I own it with my husband.

 2      Q.    Okay.  And your husband's name, please?

 3      A.    Douglas Hofer.

 4      Q.    Okay.  And does Douglas live with you?

 5      A.    Yes, he does.

 6      Q.    How long have you lived in Leominster?

 7      A.    I've lived in Leominster since I was six-

 8  years old.

 9      Q.    What's the present address?

10      A.    My present address is 193 Hill Street.

11      Q.    Okay.  How long have you lived at 193 Hill

12  Street?

13      A.    Ten years.

14      Q.    Do you have any plans on moving within the

15  next your?

16      A.    No, I do not.

17      Q.    Okay.  And again, we may have touched upon

18  this during the first day, which I think was June

19  29: Do you presently work?

20      A.    No, I do not.

21      Q.    Okay.  And I believe you testified that

22  you did attempt to go back to work shortly after

23  the accident, correct?

24      A.    Yes, I did.

25      Q.    Okay.  And how long was that period that
```



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

STEPHANIE A. HOFER
July 10, 2006

1    you went back?

2        A.    It was a couple of days in a few-week

3    period -- couple of weeks.  Just a day here or

4    there, and didn't -- that didn't work out.

5        Q.    Okay.  And I believe I saw in your medical

6    records that was sometime in April of 2004?

7        A.    It --

8        Q.    Is that correct?

9        A.    No.

10       Q.    Okay.  When do you recall going back to

11   work?

12       A.    April of 2004 I was still in bed.  I think

13   it might have been discussed in a doctor's

14   appointment about my wish to be able to go back to

15   work.  I don't recall the dates that I did attempt

16   to go back to work.

17       Q.    Okay.

18       A.    The days that I did try didn't work out,

19   so there -- you know, therefore, there was no work

20   done.

21       Q.    Have you attempted to determine when you

22   went back to work by speaking to anybody at the

23   former employer?

24       A.    Yes, I had.

25       Q.    Okay.  And what was the response when you



STEPHANIE A. HOFER
July 10, 2006

1    inquired as to when you went back to work?

2         A.    They were absolutely -- when I asked them

3    that I would be interested in coming back to work,

4    you're looking for their response?

5         Q.    I'll rephrase, because the first -- the

6    first question was a little bit confusing.

7         A.    Thank you.

8         Q.    Since your last day of deposition, okay,

9    which is June 29 --

10        A.    Yes.

11        Q.    -- between that time and today, did you

12    call anybody at the doctor's office you used to

13    work at to attempt to determine when you tried to

14    go back to work?

15        A.    No.

16        Q.    Okay.  Have you done any searching outside

17    of the documents that have been produced to your

18    attorney which had been produced to us to determine

19    when you went back to work?

20        A.    No.

21        Q.    Okay.

22        A.    Well -- excuse me.

23        Q.    Yeah.

24        A.    Are -- you're asking if I have seen dates

25    regarding when I've tried to go back to work, is



STEPHANIE A. HOFER
July 10, 2006

1    that --

2        Q.   (Nods).

3        A.   Okay.  No, I have not seen any of those

4    dates.

5        Q.   (Nods.)  So as you sit here today, you're

6    not sure exactly when you went back to work?

7        A.   Exactly.

8        Q.   All right.  Do you know if it was after

9    April 2004?

10       A.   It was -- it would be after April -- it

11   would be after April 2004, but I couldn't tell you

12   when.

13       Q.   Can we talk seasonally?  Was it in the

14   summer of 2004?

15       A.   I couldn't recall.

16       Q.   Okay.  And you just touched upon an issue

17   what I'm talking about is and it's about been when

18   you inquired about actually going back to office,

19   okay, just focusing on that.

20       A.   Yes.  Yes.

21       Q.   Do you recall when you reached out to the

22   doctor's office to ask them or to let them know

23   that you were interested in coming back?

24       A.   Actually, I did not reach out to them.

25   They called me.



STEPHANIE A. HOFER
July 10, 2006

```
 1      Q.   Okay.  Do you recall when they called you?

 2      A.   Quite a few times.  But I don't recall

 3   when.

 4      Q.   Okay.  And why were they calling quite a

 5   few times?

 6      A.   They wanted to know how I was doing, and

 7   if I thought I would be able to come back to work

 8   at any point.  I don't remember when.

 9      Q.   Okay.  And during those conversations, did

10   you discuss with then -- them when you thought you

11   would be able to go back?

12      A.   I was not able to discuss with them at any

13   time when I thought I would be able to go back to

14   work, because I don't know.

15      Q.   Okay.  Were they willing to accommodate

16   you when you wanted to go back?

17      A.   They seemed to be.

18      Q.   Okay.  When you say, "they seemed to be,"

19   what do you mean by that?

20      A.   We tried a couple of days in a short

21   period of time where they had me come in to pick up

22   on some of my lighter duties, and I was unable to

23   do it.  So I don't recall when that was.  It was a

24   period in between -- a doctor saying that I could

25   make an attempt to -- and then later on having a
```



STEPHANIE A. HOFER
July 10, 2006

1    doctor say it's probably not a good idea if you had

2    a difficult time.

3        Q.   Okay.  Let's just talk, first of all,

4    about the lighter duties that you went back to.

5    What were those lighter duties that you tried out

6    when you went back to work?

7        A.   I don't recall.  Probably paperwork.

8        Q.   Okay.  But you recall they were your

9    lighter duties?

10       A.   It would be lighter duty.  I wouldn't be

11   able to see a patient.

12       Q.   Okay.  And you may have just touched upon

13   it but when I say, "lighter duties," what are you

14   comparing that to?

15       A.   Working chairside with a doctor on a

16   patient in any type of dental procedure.

17       Q.   And when was the last time you worked

18   chairside with a patient with a doctor prior to the

19   accident in March of '04?

20       A.   March 15th.

21       Q.   And again, at March 15th, at that point

22   you still were just part time, correct?

23       A.   Yes.

24       Q.   And again, at that point you were just

25   being paid hourly, correct?


BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

STEPHANIE A. HOFER
July 10, 2006

```
 1      A.   Uh-huh.

 2      Q.   And I believe you testified it was about

 3   18 --

 4      A.   I'm sorry.

 5      Q.   It's all right.  About $18 per hour?

 6      A.   Yes.

 7      Q.   All right.  And there was no benefits

 8   being assessed at that point.

 9      A.   No.

10      Q.   By "benefits," I just want to clarify, you

11   weren't receiving health coverage through this

12   office, were you?

13      A.   No, I was not.

14      Q.   There was no pension of any sort?

15      A.   No.

16      Q.   No 401-K?

17      A.   No.

18      Q.   No other investment vehicles?

19      A.   No.

20      Q.   All right.  Now, with the lighter duties

21   you mentioned paperwork.  Anything else that may

22   have been lighter duties that you tried when you

23   went back to work?

24      A.   I couldn't recall.  It wasn't a very long

25   visit.
```


BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

STEPHANIE A. HOFER
July 10, 2006

1      Q.   Okay.

2      A.   You know, it was more like a visit to the

3   office to see if I -- I mean, they don't -- my job

4   was chairside assistant.  So doing lighter duties

5   is really irrelevant to my job.  So we found that I

6   was unable to do my job at that time.

7      Q.   Okay.  So let me just understand the

8   chronology.  When you went back, was the intention

9   that you would work chairside initially?

10     A.   Yes.

11     Q.   Okay.  And did you attempt to work

12  chairside?

13     A.   I did.

14     Q.   Okay.  And was that the first day you went

15  back and tried chairside?

16     A.   I believe it was.

17     Q.   Okay.  And what happened?  Break that day

18  down for me.

19     A.   I called in another assistant to take over

20  for me after a short period of time.

21     Q.   All right.  Just to the best you can

22  recall, on that day --

23     A.   On that day --

24     Q.   -- walk me through coming into the office

25  to the point where you called that individual into



STEPHANIE A. HOFER
July 10, 2006

1    the office to help you.

2         A.    She was already in the office.

3         Q.    Okay.

4         A.    Okay.  I came into the office.  I seated

5    my first patient, sat down to get that patient

6    ready to be seen by the doctor, and got in position

7    to continue on with what my duties would be as a

8    chairside assistant, and found that I could not

9    stand for very long, and any movement or excess

10   weight on that leg produced excruciating pain.  So

11   I had to call her in where she would take over, and

12   I then went home.

13        Q.    And what was the position that you were

14   going back to?  Was it dental assistant?

15        A.    Yes.

16        Q.    Okay.  And a little side note here, when I

17   go to the dentist, sometimes the dental assistants

18   are sitting in chairs next to the doctors.

19        A.    Uh-huh.

20        Q.    Maybe they're a bit lazier than your

21   office was, but that being said, were you able to

22   sit in a chair while working on the procedures with

23   the patients?

24        A.    I did attempt to sit.

25        Q.    Okay.



STEPHANIE A. HOFER
July 10, 2006

1        A.   My problem is positioning.  It's

2   impossible for me to stand or sit in those

3   positions for any period of time.

4        Q.   Okay.  So after you experienced this pain,

5   you called the other assistant in the office,

6   correct?

7        A.   Yes, I asked her to come.

8        Q.   When I say, "office," I mean examining

9   room.

10       A.   Yes.

11       Q.   And so you decided that you were going to

12  try the lighter work?

13       A.   Yes.

14       Q.   And you worked with the doctor's office at

15  that point to be assigned to the lighter work?

16       A.   No.  I left the operatory and went to the

17  office area and decided to do some paperwork, where

18  sitting on my leg was very uncomfortable.  I can't

19  sit in a position without moving, fidgeting,

20  standing.  None of it is -- it wasn't -- I wasn't

21  able to complete more than an hour at the office

22  that day.

23       Q.   Okay.  And so you left about --

24       A.   I left.

25       Q.   -- about an hour.  Okay.  And did you try



STEPHANIE A. HOFER
July 10, 2006

1    to go back the next day?

2        A.    Not the next day.

3        Q.    Okay.  When did you try to go back?

4        A.    It might have been a couple of weeks

5    later.  I was trying, as I was hoping that I was

6    getting better, but it doesn't get better.

7        Q.    Okay.  And I believe a little bit earlier,

8    just prior to this line of questioning, you

9    testified that one doctor or a doctor said to you

10    that, let's give it a shot.  Let's try to go back

11    to work.

12        A.    At -- at one point my -- it wasn't a let's

13    give it a shot, it was a discussion.

14        Q.    Excuse the phraseology.

15        A.    Excuse me?

16        Q.    Excuse the phraseology.

17        A.    It was a discussion between my doctor and

18    I on whether he or she -- it was a series of

19    doctors -- Doctor Hord and her partner -- thought

20    it would be wise for me to attempt to go back to my

21    line of work.

22        Q.    And did they express to you why they

23    thought it would be wise for you to go back to your

24    line of work?

25        A.    They thought it was worth a try, because


BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

STEPHANIE A. HOFER
July 10, 2006

1    they encourage people to get back into a routine

2    after a traumatic accident, including, you know,

3    where you have any kind of, you know, limb or a

4    neurological damage, they still encourage you to

5    try to form and maintain a new routine.  So it was

6    discussed that I would make an attempt to go back

7    to work.  But I was also told not to push it.

8         Q.    Okay.  And you mentioned Doctor Hord.

9    What other doctors discussed this with you?

10        A.    Doctor Hord, Doctor Reiff-Hekking, Doctor

11   Stojanovic, Doctor Borgen, my primary care

12   physician.  I basically have had opinions from all

13   of them regarding my condition and what they think

14   I could or couldn't do or should or shouldn't do.

15        Q.    And this was prior to trying to go back to

16   work.

17        A.    This has kind of all been, you know, not

18   particularly at one time or another.  You know,

19   I've -- I'm always asking about, you know,

20   medications and what I can do, and you know, what

21   do you think -- you know, do you think I could go

22   back to work?  Do you think I could do -- and their

23   consensus at this point is that it's not a good

24   idea.

25        Q.    All right.  When you say, "at this point,"



STEPHANIE A. HOFER
July 10, 2006

```
 1   you mean as we sit here today?

 2        A.    As we sit here today.

 3        Q.    And that's from all the doctors that you

 4   just mentioned?

 5        A.    There are more.  There are more.

 6        Q.    Okay.  Are there more doctors than those

 7   which have been identified --

 8        A.    No.

 9        Q.    -- and discussed?

10        A.    In that list, do you mean?

11        Q.    Yeah.

12        A.    No, all of those doctors have -- I've

13   joined in in the conversation about this --

14        Q.    Okay.  Just so the record --

15        A.    -- at some time another --

16        Q.    Okay.

17        A.    -- with most -- with most of these

18   doctors.

19        Q.    And so I just want for the record to

20   reflect, we're referring to the Plaintiffs' 26

21   disclosure Sub B, Sub 1, right?  All the doctors we

22   discussed there?

23        A.    Correct.

24        Q.    Okay.

25        A.    There are a few that don't have -- that we
```



STEPHANIE A. HOFER
July 10, 2006

1   haven't discussed with, but they are infectious

2   disease doctors and doctors not right now

3   immediately involved in the neurological condition

4   and the pain management condition of my leg --

5   medication.

6       Q.   Okay.  Do you have any notes from any

7   doctors that say that you should not go back to

8   work?

9       A.   I do not have any notes, but I know that

10  when I applied for my disability, my primary care

11  physician declared me completely disabled, and

12  there were two other doctors that filled out forms.

13  I don't recall what kind of form it was --

14      Q.   Okay.

15      A.   -- uhm, that stated the reasons and the --

16  and -- the reasons and the conditions that they

17  came to to -- to this point.

18      Q.   Okay.  Just so you know, I'll be following

19  up the written request just as a supplemental

20  request, but on the record, I'm going to request --

21  to the extent it hasn't been done so already -- all

22  the documents that relate to the disability

23  application, specifically the application itself,

24  the doctors' opinions, etcetera, okay.

25           THE WITNESS:  I don't have any of that.



Page 322

STEPHANIE A. HOFER
July 10, 2006

1     Q.    Okay.

2     A.    That's -- those are things that you turn

3  in.  You don't get them back.

4     Q.    Okay.  To the extent you wanted to request

5  them, would you know where to go?

6     A.    No, I would not.

7     Q.    Okay.  Who did you turn them into?

8     A.    Into the Social Security department.

9     Q.    Okay.  Did you have an attorney that -- if

10  I'm not mistaken --

11     A.    Yes.

12     Q.    -- you had an attorney who --

13     A.    I had an attorney who took over my case

14  for my administrative law judge hearing.

15     Q.    Okay.  And did she have all those

16  documents at the time she went to the hearing?

17     A.    I don't know if she has the application

18  documents or not.

19     Q.    Okay.  Have you made inquiry of that

20  attorney for those documents?

21     A.    I have made inquiry to that attorney and

22  have not heard back.

23     Q.    Okay.  How many inquiries have you made?

24     A.    Many.

25     Q.    Okay.  By "many," is it more than five?



STEPHANIE A. HOFER
July 10, 2006

 1     A.   I would say I've called her maybe three to

 2   five times.

 3     Q.   Did you and she -- without getting into

 4   any substantive communications -- have a breakdown

 5   in the attorney/client relationship such that she

 6   wouldn't call you back?

 7     A.   No.  No.

 8     Q.   Do you have any reason to believe why she

 9   wouldn't call you back?

10     A.   I believe she's out of the office.

11     Q.   Each time you call her?

12     A.   Yes.

13     Q.   Okay.  Is she out of the office such that

14   she could not --

15     A.   I don't know.

16     Q.   Never call you back?

17     A.   Excuse me?  I've spoken to her secretary.

18     Q.   You have to let me finish the question.

19     A.   I'm sorry.  I apologize.

20     Q.   That's why I keep saying, "excuse me"

21   because I'm not getting it all out.  But my

22   question is, basically, why isn't she calling you

23   back?

24     A.   I don't know that.

25     Q.   Okay.  What's her address?



STEPHANIE A. HOFER
July 10, 2006

1      A.    I don't know that.

2      Q.    Okay.  Just give me her name.

3      A.    Alida, A-l-i-d-a.

4      Q.    Yeah.

5      A.    Howard, H-o-w-a-r-d.

6      Q.    And she's in Worcester, you said?

7      A.    Yes.

8      Q.    So to the extent I want to subpoena any

9   documents, you don't know which address she has?

10      A.    I do not.

11      Q.    Okay.  Do you recall discussing during

12   your first day of testimony about vocational

13   counseling?

14      A.    I do remember discussing it, and it was a

15   misunderstood conversation between Attorney Feringa

16   and I.

17      Q.    That's correct.  And that's exactly how I

18   remember it.  Do you recall that you clarified that

19   it wasn't a per se vocational therapist?

20      A.    Right.  It was a therapist.  It was Doctor

21   Kulich at the Mass. General Pain Center who spoke

22   to me about talking to a vocational counselor, and

23   he explained to me what a vocational counselor did

24   and how I would get in touch with one.  However,

25   there -- there was no contact between a vocational



STEPHANIE A. HOFER
July 10, 2006

1    counselor and I.

2        Q.   Now, why not?

3        A.   There was not only a mile-long waiting

4    list, but it's -- it was determined not to be

5    necessary in my case.

6        Q.   Now, you say, "a mile-long waiting list."

7    So did you at least apply --

8        A.   No, I did not.

9        Q.   Okay.  How did you determine it was a

10   mile-long waiting list?

11       A.   One of the doctors -- one of the

12   therapists look -- they look up that information

13   for certain people, apparently, and he said usually

14   there is a waiting list that's a mile long.

15       Q.   And you say -- that was my fault that

16   time.  And you say, "he."  Who was "he"?

17       A.   Doctor Kulich.

18       Q.   You said -- correct me if I'm wrong --

19   that it was determined in your case that it wasn't

20   necessary?

21       A.   I believe so.

22       Q.   Okay.

23       A.   I mean, it wasn't pursued, and it wasn't

24   -- I wasn't told to pursue it.

25       Q.   Okay.  Aside from being told by anybody,



STEPHANIE A. HOFER
July 10, 2006

 1    did you yourself look up a vocational counselor?

 2         A.    No, I did not.

 3         Q.    And why not?

 4         A.    I was told it wasn't necessary.

 5         Q.    And is --

 6         A.    My -- my -- I'm sorry.

 7         Q.    And Doctor Kulich is the one who told you

 8    it wasn't necessary?

 9         A.    I -- I believe -- I can't be certain of

10    the exact wording, but we had discussed that it

11    wouldn't be necessary.  My goal had been to go back

12    to work in my field.  I had a career.  So going to

13    a vocational counselor in -- I'm pretty much

14    unaware of what that entails, but --

15         Q.    You just --

16         A.    So I couldn't really give much more of an

17    answer.

18         Q.    Okay.  You say you had a career.  What

19    career was that?

20         A.    I was a dental assistant.

21         Q.    Okay, and this is the career that you took

22    some time off from, correct?

23         A.    Yes.  I was a dental assistant for 12

24    years.

25         Q.    Okay.  And were you a dental assistant for



STEPHANIE A. HOFER
July 10, 2006

1    the entire 12 years?

2        A.   Yes.

3        Q.   Okay.  I believe you testified during your

4    first day of deposition that there was a period

5    during which you stopped as a dental assistant and

6    did something that may have been related to

7    manicurism.  Is that the proper terminology?

8        A.   I worked during the day and went to school

9    at night.

10       Q.   Okay.

11       A.   Yes.

12       Q.   So you were not consistently, for 12 years

13   straight, a dental assistant?

14       A.   Between part time and full time, I was

15   always working.

16       Q.   Okay.

17       A.   Yeah.  I did take some time off I want to

18   say in -- I can't -- I can't recall.  I did take a

19   period of time off.

20       Q.   Okay.  Just when you were going back to

21   school, what were you going back to school for?

22       A.   To be a cosmetologist.

23       Q.   And what's a cosmetologist?

24       A.   Hair, nails, makeup, esthetician, you

25   know, things like that.



STEPHANIE A. HOFER
July 10, 2006

```
 1      Q.   And was that going to be your new career?

 2      A.   It was going to be something I did on the

 3  side.  It was not going to be a "career."  It was a

 4  filler.

 5      Q.   Okay.  Aside from having the career, have

 6  you contacted a vocational counselor to discuss any

 7  other type of career?

 8      A.   No, I have not.

 9      Q.   And why not?

10      A.   Because I have not.

11      Q.   Okay.  That was your choice not to?

12           MS. MINCHOFF:  Objection.

13           MR. REITH:  Why?

14           MS. MINCHOFF:  Why am I objecting?

15           MR. REITH:  Yes.

16           MS. MINCHOFF:  Because she's been

17  adjudicated disabled.  I doubt if that's her

18  choice.  She's disabled.

19           MR. REITH:  That's fine.

20      A.   It --

21      Q.   Okay.  Did you elect not to contact a

22  vocational counselor?

23           MS. MINCHOFF:  Objection.

24      Q.   You can answer.

25           MS. MINCHOFF:  When?
```



STEPHANIE A. HOFER
July 10, 2006

```
 1      Q.   All right.  Have you contacted a
 2   vocational counselor ever?
 3      A.   I was given limited information about
 4   that.
 5      Q.   Okay.  Did you follow up on the limited
 6   information?
 7      A.   I looked up some information, which was
 8   not pertinent to my situation.
 9      Q.   Okay.  What do you mean, but it wasn't
10   pertinent to your situation?
11      A.   I had a career.
12      Q.   Okay.  Aside from that career did --
13      A.   They don't look -- they don't look for
14   people who don't -- you know, they look for people
15   who are going to -- I -- I don't know.  That would
16   be an assumption on my part.  I -- I apologize.  I
17   don't know.
18      Q.   Okay.  You had one career, correct?
19      A.   Yes, I did.
20      Q.   Okay.  And that career was dental
21   assistant.
22      A.   Yes.
23      Q.   Okay.  You had an injury, correct?
24      A.   Yes, I did.
25      Q.   And that's the reason why we're here,
```



STEPHANIE A. HOFER
July 10, 2006

1    correct?

2        A.    That's the reason why we're here.

3        Q.    Okay.  You can no longer do that career

4    you had, a dental assistant, correct?

5        A.    No, I cannot.

6        Q.    Have you tried to find another career that

7    you can do?

8        A.    Yes.

9        Q.    Okay.  What did you try to find?

10       A.    I tried to use my skills that I learned

11   when I went to school in 2002 -- 2001 -- 2001 for

12   the esthetician/manicurist, and I am unable to do

13   that to the best of my ability.

14       Q.    Okay.  Can you do it at all?

15       A.    Not on paying customers, no.

16       Q.    Okay.  And that was related to the

17   cosmetology schooling?

18       A.    Yes.

19       Q.    Aside from the dental assistant and the

20   cosmetologist, have you tried any other careers?

21       A.    No, I have not.

22       Q.    Okay.  Why not?

23             MS. MINCHOFF:  Objection.

24       A.    Because I haven't.

25       Q.    All right.  And we touched upon -- and we



STEPHANIE A. HOFER
July 10, 2006

1    touched upon the first day and a little bit more

2    today about the Social Security disability issue.

3    Do you receive financial aid from -- not financial

4    aid.  Do you receive any assisted -- financial

5    assistance from Social Security?

6        A.   I've been adjudicated disabled.

7        Q.   Okay.  And you will be receiving monies at

8    some point from SS?

9        A.   Yes.

10       Q.   And as of the last day you -- I don't

11   believe you were sure when the first check would be

12   coming in.

13       A.   I was not sure when the first check was

14   coming in.

15       Q.   Are you sure today?

16       A.   No.

17       Q.   Has it come in yet?

18       A.   No, I've been adjudicated.  I have at -- I

19   have no knowledge of, you know -- I just -- I got a

20   letter.  It said, You're adjudicated.  Best of luck

21   to when you get this check.  I don't -- I don't

22   recall.

23       Q.   Okay.  Aside from the SS payments, are you

24   going to be receiving any additional monies?

25       A.   No.



STEPHANIE A. HOFER
July 10, 2006

```
 1      Q.   And your husband works?

 2      A.   Yes, he does.

 3      Q.   He works full time?

 4      A.   Yes, he does.

 5      Q.   Where does he work?

 6      A.   Triumvirate Environmental.

 7      Q.   And what does he do for Triumvirate

 8  Environmental?

 9      A.   He's a field service supervisor.

10      Q.   That's full time?

11      A.   Yes, it is.

12      Q.   And he's salaried?

13      A.   I am not aware of his salary.

14      Q.   Is he paid a salary?

15      A.   Oh, is he paid a salary?  He's paid an

16  hourly wage.

17      Q.   Okay.

18      A.   With -- yeah.

19      Q.   And aside from the SS payments and the

20  monies that your husband brings home, is there any

21  other financial assistance that your family

22  receives?

23      A.   No.

24      Q.   Let's assume for a moment that you did not

25  hurt yourself down in Jamaica, okay?
```



STEPHANIE A. HOFER
July 10, 2006

 1      A.    (Witness nods.)

 2      Q.    Assuming that, what would your career

 3   plans have been going forward after March 2004?

 4      A.    After March 2004, I would have increased

 5   my hours working as a dental assistant, and I had

 6   hoped to go back to school for dental hygiene to

 7   enhance my career.

 8      Q.    And I believe you testified the first day

 9   that the increased hours at the office were

10   dependent upon the doctor having enough patient

11   load?

12      A.    It -- not necessarily the doctor having

13   enough patients.  I can't speak for him and how

14   many patients he has, but the arrangement was that,

15   you know, if he needed extra, I would be -- you

16   know, if he needed an extra set of hands, my hours

17   were going to increase.

18      Q.    How much would they have increased?

19      A.    Over a period of time, we were hoping they

20   would have increased to full time.

21      Q.    Okay.  Was there a firm commitment that it

22   would increase to full time?

23      A.    I wouldn't say it was a firm commitment.

24   It was kind of contingent on scheduling and things

25   like that.



STEPHANIE A. HOFER
July 10, 2006

```
 1        Q.    Okay.  So it wasn't written down
 2   anywhere --
 3        A.    No.
 4        Q.    -- that you --
 5        A.    No.  And just as an aside, he's a
 6   long-time family friend, so as far as writing
 7   things down, he and I never wrote a thing down, you
 8   know.  It was just understood.
 9        Q.    And by "family friend," what do you mean?
10        A.    We've known -- he's -- he's known my
11   mother for 25, almost 30 years.
12        Q.    You said you intended to go back to school
13   for was it dental hygiene?
14        A.    Yes.
15        Q.    Where had you intended to go back to
16   school?
17        A.    I hadn't applied yet.  I was hoping that I
18   would have been able to look into that and be
19   accepted into a program.  There are many programs.
20   I hadn't looked into where.
21        Q.    Okay.  Where are the many programs?
22        A.    All over the state.
23        Q.    Can you give me a couple of schools that
24   offer these programs.
25        A.    Northeastern has a program.  I believe
```



STEPHANIE A. HOFER
July 10, 2006

1    Quinsigamond Community College has a program.  I

2    know I'm trying to think local.

3        Q.   That's all right.

4        A.   I'm not -- I'm not positive.

5        Q.   That's fine.  And when did you determine

6    that you wanted to go back to school for dental

7    hygiene?

8        A.   I've always wanted to go back to school

9    for dental hygiene.

10        Q.   When you say, "always," do you mean for

11   the last five years?

12        A.   I mean since I started in the dentistry, I

13   always wanted to do that.

14        Q.   You said you had done dentistry for about

15   12 years.

16        A.   Yeah.  Yeah.  Yeah.

17        Q.   Okay.  And you had intended to go back for

18   hygiene those entire 12 years?

19        A.   It was a thought.  It was never, you know,

20   a full intention.  It was, you know, I think about

21   it here, or I think about it there.  I'm going to

22   look into it, or maybe I'm not going to do it right

23   now, because the time's not right.

24        Q.   So as of the time of your injury in

25   Jamaica, being March 2004, did you have any



STEPHANIE A. HOFER
July 10, 2006

1    specific intention of returning to school for

2    dental hygiene at that point?

3        A.   I had no specific intention.  I had not

4    applied for anything like that.

5        Q.   Okay.  Don't be offended -- I ask this of

6    all persons who I depose.  It goes over sometimes,

7    sometimes it doesn't go over too well.  Have you

8    ever been convicted of a crime?

9        A.   No.

10       Q.   Are you taking any medications today that

11   might affect your testimony or your ability to tell

12   the truth?

13       A.   I take medications every day, but they do

14   not affect my ability to tell the truth.

15       Q.   Okay.  And you're on medications today?

16       A.   Yes, I am.

17       Q.   And could you just tell me which

18   medications those are.

19       A.   I take MS Contin, Neurontin, Ultram,

20   Cymbalta, and I believe that's all for the morning.

21       Q.   Okay.  So that's what you're presently on

22   now?

23       A.   Yes.

24       Q.   Okay, and for the afternoon session, there

25   will be some other medications?



STEPHANIE A. HOFER
July 10, 2006

```
 1      A.   Yes, there will.

 2      Q.   Do you want to give me the head's up now

 3 so we don't have to go back into it later.

 4      A.   I could.

 5      Q.   Please do.

 6      A.   You don't mind if I look?

 7      Q.   I do not mind at all.

 8      A.   I keep them organized in a fashion.

 9      Q.   And again, I'll ask it while you're

10 looking, do any of these medications cause you any

11 confusion?

12      A.   Yes, they do.

13      Q.   Okay.  Do they cause you such confusion

14 that you wouldn't be able to understand my

15 questioning?

16      A.   It could be possible.  I may need to ask

17 you to clarify things for me.  Sometimes it takes

18 me a few minutes to actually process.  So I may

19 hesitate a bit, but it -- you know, I can get a

20 little fuzzy, but as the day goes on and the

21 medications have been in my system, I do far better

22 as far as focusing.  Focus is my -- is my main --

23 one of my main problems with medication.

24      Q.   So is it safe for me and all of us to

25 assume here today that unless you ask me for
```



STEPHANIE A. HOFER
July 10, 2006

1  clarification, unless you ask me to repeat, that

2  you understand my question and you're not confused?

3      A.   Not necessarily.  I am doing my very best

4  to understand and ask to clarify.

5      Q.   Okay.

6      A.   And I am trying my very best to answer my

7  questions -- your questions as best as I can.

8      Q.   Okay.  I'm just going to have to tell you

9  for the record the way it usually works.  I implore

10  you, to the extent you don't understand anything,

11  let me know, because the record, unfortunately or

12  fortunately, is going to reflect that you do

13  understand otherwise.

14      A.   Okay.  Okay.

15      Q.   Thank you.  I'll let you finish the task

16  at hand.

17      A.   Okay.  This afternoon I will be taking

18  Celebrex, MS Contin, Motrin, Zanaflex, and Sinemet

19  -- and Ultram.  I apologize.

20      Q.   Don't apologize.  I just want to talk to

21  you a little bit about preparation for deposition.

22      A.   Okay.

23      Q.   Okay.  I'm not going to get into anything

24  specific you talked about with your attorney, but

25  what I would like to get into is conversations with



STEPHANIE A. HOFER
July 10, 2006

 1    other persons, okay?

 2        A.    Okay.

 3        Q.    Specifically Carrie, Ms. LaBelle.

 4        A.    Okay.

 5        Q.    I've also seen her in as Ms. LeBlanc.  Why

 6    is that?

 7        A.    Yeah.  That was a typo.  Okay.

 8        Q.    And you've known Ms. LaBelle for

 9    approximately five years?

10        A.    Yes.

11        Q.    You had never gone on vacation with her

12    prior to this one?

13        A.    No, I have not.

14        Q.    After your injury and before filing your

15    complaint, did you discuss this matter with Ms.

16    LaBelle at all?

17            MS. MINCHOFF:  Objection.

18        A.    Can you clarify "this matter."

19        Q.    Sure.  Did you discuss with Ms. LaBelle

20    that you were going to be filing suit against Gap

21    and Expedia?

22        A.    No.

23        Q.    Since filing your complaint to the first

24    day of your deposition, that being June 29th, 2004

25    -- 2006, excuse me, yes, 2006, did you ask her or



STEPHANIE A. HOFER
July 10, 2006

1    discuss with her anything about the accident?

2        A.    Clarify that time period.

3        Q.    Sure.  Time period being from the time of

4    filing the complaint to the first day of your

5    deposition.

6        A.    Have we discussed the matter?

7        Q.    Yes.

8        A.    In -- in between filing the deposition --

9    no, filing the complaint and the first day of the

10   deposition?

11       Q.    Yes.

12       A.    Had we discussed it?

13       Q.    Yes.

14       A.    Yes.

15       Q.    Okay.  Did you discuss with her the

16   allegations in the complaint?

17       A.    We didn't discuss the complaint.

18       Q.    What did you discuss?

19       A.    We discussed what happened, how we both

20   felt about it, how she feels about it, but we never

21   discussed anything pertaining to the suit.

22       Q.    After -- strike that.  Let me start over.

23   You're aware that Expedia filed an answer to the

24   complaint in this case, are you not?

25       A.    I -- I -- I am not familiar with what an



STEPHANIE A. HOFER
July 10, 2006

1    answer is.

2        Q.    Okay.  In general terms, do you understand

3    that Expedia has denied the claims that you have

4    made against them?

5        A.    No, I do not understand that.

6        Q.    Okay.  Do you have any understanding as to

7    Expedia's position?

8        A.    No.

9        Q.    Do you understand that Expedia claims that

10   the online booking was subject to a liability

11   disclaimer?

12       A.    No -- oh.  Excuse me.  I'm sorry.  Say

13   that again.

14       Q.    Do you know that Expedia claims that your

15   allegations, okay, are subject to a liability

16   disclaimer that was online when booked?

17       A.    I understand that now.  But I did not

18   understand that then, because I did not book the

19   trip.

20       Q.    Okay.  All right.  As to -- let me ask it

21   this way:  What do you understand now about the

22   liability disclaimer?

23       A.    What I -- I -- I actually don't --

24       Q.    Okay.

25       A.    -- understand the liability disclaimer.



STEPHANIE A. HOFER
July 10, 2006

1     Q.   Okay.  Have you ever discussed the

2     liability disclaimer with Carrie?

3     A.   No.

4     Q.   Had you ever discussed the booking process

5     with Carrie?

6          MS. MINCHOFF:   Objection.

7     A.   I can't -- no.  Carrie booked the trip.

8     You know, we discussed what we were going to do,

9     and then Carrie booked the trip.

10    Q.   You're throwing me off my outline.  You

11    just jumped ahead a little bit.

12    A.   I'm sorry.

13    Q.   That's fine.  It happens all the time.

14    Just about the trip, then you say Carrie booked the

15    trip.  What do you mean by "booked the trip"?

16    A.   Carrie and I discussed going away on a

17    quick girls' weekend, relaxation.  She is a

18    highly-stressed person and wanted to relax.  So we

19    decided that we would go to the beach and at -- you

20    know, in March to read a book.  She said, "Do you

21    want to go?"  And I said, "Sure."  And she said,

22    "Do you care where?"  I said, "No."  So she booked

23    the trip.

24    Q.   And when you were discussing back and

25    forth about where do you care to go, were any ideas



STEPHANIE A. HOFER
July 10, 2006

1    thrown out there about what location to go to?

2        A.    Somewhere warm.

3        Q.    Somewhere warm like North Carolina, or

4    somewhere warm like the islands?

5        A.    Islands.  North Carolina's not really warm

6    in March.

7        Q.    I was going to correct myself at that

8    point but you caught me.  All right.  So you were

9    talking about going to the islands.

10       A.    Yes.

11              THE WITNESS:  I'm sorry.

12              MS. MINCHOFF:  That's okay.

13       A.    I apologize.

14       Q.    Don't apologize.  So you talked about

15    going to the islands?

16       A.    Yes.

17       Q.    Okay.  Any islands in particular?

18       A.    We did not discuss any particular islands.

19       Q.    You didn't say Bermuda versus the

20    Caribbean?

21       A.    (Witness nods.)  No.

22              VIDEO OPERATOR:  Five minutes left on

23    tape.

24       Q.    Aside from going to an island, did you

25    discuss any other specifics about the location?



STEPHANIE A. HOFER
July 10, 2006

```
 1        A.    (Witness nods.)

 2        Q.    No?

 3        A.    Oh.  I'm sorry.  I'm sorry.  No.

 4        Q.    Okay.  And how long did that discussion

 5    take place?

 6        A.    I couldn't recall.  I can't recall how

 7    long we discussed it.

 8        Q.    Okay.  I believe you testified your first

 9    day that it was on maybe a Tuesday that you

10    discussed --

11        A.    Yes.  We discussed it on a Tuesday.  We

12    left on Thursday.

13        Q.    Okay.

14        A.    It was a very quick decision.

15        Q.    That's what I wanted to talk to you about.

16    Ms. LaBelle, you had known her for five years, yes?

17        A.    Yes.

18        Q.    Okay.  You had never been on vacation with

19    her before?

20        A.    No.

21        Q.    Why did you elect to go on vacation with

22    Ms. LaBelle this time?

23        A.    That's a question I couldn't answer.

24    Opportunity?

25        Q.    Okay.  I'm just going to put before you a
```



STEPHANIE A. HOFER
July 10, 2006

 1   document that's been marked as Exhibit 11 for

 2   identification today.

 3        A.   Okay.

 4        Q.   Ask you to take a look at it.  Let me know

 5   when you've had a chance to review it.

 6             MR. REITH:  Counsel.

 7             (Complaint marked Exhibit 11.)

 8        A.   (Witness reviews document.)

 9        Q.   If you need to take a break, let me know.

10   There's five minutes left.

11        A.   There's five minutes left on the tape.

12   I'll stand up when it's done.

13             MS. MINCHOFF:  You can -- I'm sure

14   Attorney Reith won't mind if you want to stand now

15   as he asks you a couple of questions either.

16             THE WITNESS:  Do you mind?

17             MR. REITH:  No --

18             MR. FERINGA:  We have to change the tape,

19   so why don't we go off the record and change the

20   tape.

21             MS. MINCHOFF:  If you want to take a walk

22   around the office --

23             VIDEO OPERATOR:  The time is 11:34.  This

24   is the end of Cassette No. 1.  We are off the

25   record.



STEPHANIE A. HOFER
July 10, 2006

```
 1              (Recess was taken.)

 2              VIDEO OPERATOR:  The time is 11:44.  This

 3    the beginning of Cassette 2 in the deposition of

 4    Stephanie Hofer.  We are on the record.

 5         Q.   Before we went off the record, we were

 6    talking about the booking of the trip.  Do you

 7    remember that?

 8         A.   Yes.

 9         Q.   Okay.  Do you recall testifying that

10    Carrie is the one who booked it?

11         A.   Yes.

12         Q.   All right.  Just turning your attention to

13    Paragraph No. 7 under the factual allegations in

14    Exhibit No. 11 for today, do you see where it says,

15    "On March 15, 2004, Stephanie and a friend reserved

16    a travel vacation to Jamaica through Expedia.com

17    ('Expedia')"?  Do you see that?

18         A.   Yes, I do.

19         Q.   You didn't reserve the travel vacation,

20    did you?

21         A.   No, I did not.

22         Q.   So that allegation isn't exactly accurate,

23    is it?

24              MS. MINCHOFF:  Objection.

25         Q.   You can answer.
```



STEPHANIE A. HOFER
July 10, 2006

1       A.   I would reword that.

2       Q.   Okay.  How would you reword it?

3       A.   Carrie reserved a travel vacation to

4   Jamaica for herself and Stephanie.

5       Q.   Who paid for the trip?

6       A.   Carrie.

7       Q.   Okay.  And do you know how Carrie paid for

8   the trip?

9       A.   No, I don't.

10      Q.   Do you know if she used a credit card?

11      A.   No, I don't.

12      Q.   Were you present when Carrie actually

13   reserved the trip?

14      A.   No, I was not.

15      Q.   Do you know how she reserved it, whether

16   it was done telephonically or online?

17      A.   I -- Expedia.com.

18      Q.   Okay.  And how do you know she booked it

19   through Expedia.com?

20      A.   I -- I don't.  I don't -- or she told me.

21      Q.   Okay.  So Carrie told you that she booked

22   it via Expedia.com?

23      A.   Correct.

24      Q.   And when did she tell you that?

25      A.   I believe after she booked it.



STEPHANIE A. HOFER
July 10, 2006

1        Q.    Okay.  How soon after she booked it did

2   she --

3        A.    I don't recall.

4        Q.    Okay.  But you know from speaking with

5   Carrie that she booked it via Expedia.com.

6        A.    Yeah.

7              MS. MINCHOFF:  Are you okay?

8              THE WITNESS:  I'm getting tremors.  I'll

9   be all right.

10             MS. MINCHOFF:  Let me just state for the

11  record, Stephanie, if you need to tell Attorney

12  Reith at any time to take a break --

13             THE WITNESS:  Okay.

14             MS. MINCHOFF:  -- I know you're not

15  feeling well right now, just please let him know.

16             THE WITNESS:  I'm sorry.

17             MR. REITH:  Do you need a second?

18             MR. FERINGA:  Do we need to take a lunch

19  break?  Do we need to do something just so that --

20             THE WITNESS:  No -- I'll be -- I'm okay.

21  I'm uncomfortable.

22             MR. FERINGA:  This is not an endurance

23  contest.  Please, it's up to you.

24             MS. MINCHOFF:  Stephanie, do you want to

25  take a lunch right now?  What time is it?



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

STEPHANIE A. HOFER
July 10, 2006

1              MR. REITH:  It's 10 of 12.

2              THE WITNESS:  Okay.  Yes, please.

3              MR. REITH:  Take a lunch break now?

4              THE WITNESS:  Yes, please.

5              MR. REITH:  We'll take a lunch break now.

6    Can we check back in at 12:30, is that long enough?

7              MS. MINCHOFF:  Fine.

8              VIDEO OPERATOR:  The time is 11:47.  We're

9    off the record.

10             (Whereupon the deposition recessed at

11             11:47 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

STEPHANIE A. HOFER
July 10, 2006

```
 1              AFTERNOON SESSION (12:30 p.m.)

 2              MR. FERINGA:  All right.  We're back on

 3    the record.  This is Scott Feringa.  We're back on

 4    the record.  We are now not on video.  We were

 5    advised before we went back on the record that Mrs.

 6    Hofer is simply not feeling well and that does not

 7    feel that it was -- it would be a good thing for

 8    her to continue.  So what we're going to do is

 9    suspend this deposition to take place at another

10    date, time, and place that is convenient for Mrs.

11    Hofer and for counsel, and in terms of other

12    documents and things like that, I'm sure that we

13    can work those out between counsel.  But -- so at

14    this point, we'll just suspend the deposition

15    because of Ms. Hofer's inability to continue.

16              MS. MINCHOFF:  And the only thing I'd like

17    to add to the record is that we at least have an

18    agreement that we're going to attempt to reschedule

19    the deposition to occur in the afternoon,

20    preferably after 2 o'clock, so that the Plaintiff

21    has had an opportunity to have her medications

22    settle in.  And we've agreed, if we can find a

23    stenographer that will agree, to go as late as we

24    possibly can on that day.

25              MR. FERINGA:  I agree because, actually,
```



STEPHANIE A. HOFER
July 10, 2006

1    it's better for me because I can fly out in the

2    morning and fly back in the evening.  Agreed.

3              MR. REITH:  Agreed.

4              (Whereupon the deposition suspended at

5              12:28 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

STEPHANIE A. HOFER
July 10, 2006

```
 1                 DEPONENT'S ERRATA SHEET

 2               AND SIGNATURE INSTRUCTIONS

 3

 4

 5             The original of the Errata Sheet has

 6   been delivered to India Minchoff, Esq.

 7             When the Errata Sheet has been

 8   completed by the deponent and signed, a copy

 9   thereof should be delivered to each party of record

10   and the ORIGINAL delivered to Scott Feringa, Esq.

11   to whom the original deposition transcript was

12   delivered.

13

14

15             INSTRUCTIONS TO DEPONENT

16

17             After reading this volume of your
     deposition, indicate any corrections or changes to
18   your testimony and the reasons therefor on the
     Errata Sheet supplied to you and sign it.  DO NOT
19   make marks or notations on the transcript volume
     itself.

20

21

22

23

24   REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE

25   COMPLETED AND SIGNED ERRATA SHEET WHEN RECEIVED.
```



Page 353

STEPHANIE A. HOFER
July 10, 2006

```
 1   Commonwealth of Massachusetts
 2   Middlesex, ss.
 3
 4
             I, P. Jodi Ohnemus, Notary Public
 5   in and for the Commonwealth of Massachusetts,
     do hereby certify that there came before me
 6   on the 10th day of July, 2006, the deponent herein,
     who was duly sworn by me; that the ensuing
 7   examination upon oath of the said deponent was
     reported stenographically by me and transcribed
 8   into typewriting under my direction and control;
     and that the within transcript is a true record of
 9   the questions asked and answers given at said
     deposition.
10
11           I FURTHER CERTIFY that I am neither
     attorney nor counsel for, nor related to or
12   employed by any of the parties to the action
     in which this deposition is taken; and, further,
13   that I am not a relative or employee of any
     attorney or financially interested in the outcome
14   of the action.
15
             IN WITNESS WHEREOF I have hereunto set my
16   hand and affixed my seal of office this
     10th day of July, 2006, at Waltham.
17
18   _____

     _____
19
20                   P. Jodi Ohnemus, RPR, RMR, CRR
                     Notary Public,
21                   Commonwealth
                     of Massachusetts
22                   My Commission Expires:
                     4/21/2007
23
24
25
```


BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

STEPHANIE A. HOFER
July 10, 2006

```
 1   ATTACH TO DEPOSITION OF:  STEPHANIE HOFER, DAY II
     CASE:  HOFER VS. THE GAP
 2
                          ERRATA SHEET
 3
     INSTRUCTIONS:  After reading the transcript of your
 4   deposition, note any change or correction to your
     testimony and the reason therefor on this sheet.
 5   DO NOT make any marks or notations on the
     transcript volume itself.  Sign and date this
 6   errata sheet (before a Notary Public, if required).
     Refer to Page 352 of the transcript for errata
 7   sheet distribution instructions.
 8   PAGE LINE
     ____ ____     CHANGE: _____
 9                 REASON: _____
     ____ ____     CHANGE: _____
10                 REASON: _____
     ____ ____     CHANGE: _____
11                 REASON: _____
     ____ ____     CHANGE: _____
12                 REASON: _____
     ____ ____     CHANGE: _____
13                 REASON: _____
     ____ ____     CHANGE: _____
14                 REASON: _____
     ____ ____     CHANGE: _____
15                 REASON: _____
     ____ ____     CHANGE: _____
16                 REASON: _____
     ____ ____     CHANGE: _____
17                 REASON: _____
18         I have read the foregoing transcript of
     my deposition and except for any corrections or
19   changes noted above, I hereby subscribe to the
     transcript as an accurate record of the statements
20   made by me.
21   _____
     STEPHANIE A. HOFER
22         Subscribed and sworn to before me
     this _____ day of _____, 2006.
23
     _____
24   Notary Public
     My Commission Expires:
25
```

