# HOFER, ET AL v. THE GAP, INC., ET AL

# DENROY SCARLETT

## August 21, 2006

*Prepared for you by*



**Bingham Farms** | Ann Arbor | Detroit | Flint | Grand Rapids | Jackson | Lansing | Mt. Clemens

PHONE:  248.644.8888    FAX:  248.644.1120

www.bienenstock.com

Dockets.Justia.com

DENROY SCARLETT
August 21, 2006

1                IN THE DISTRICT COURT OF THE UNITED STATES

2                 FOR THE DISTRICT OF MASSACHUSETTS

3

4    STEPHANIE HOFER and DOUGLAS HOFER,

5                      Plaintiffs,

6        vs.                     Case No. 05-40170

7    THE GAP, INC., EXPEDIA, INC.,

8    and TURTLE BEACH TOWERS,

9                      Defendants.

10   _____

11

12

13        The Videotaped Deposition of DENROY SCARLETT,

14        Taken at Turtle Beach Towers, Main Street,

15        Ocho Rios, St. Ann, Jamaica, W.I.,

16        Commencing at 11:46 a.m.,

17        Monday, August 21, 2006,

18        Before Rebecca J. Callow, CSR-5228, RPR.

19

20

21

22

23

24

25



DENROY SCARLETT
August 21, 2006

```
 1   APPEARANCES:

 2

 3   STEPHEN J. KUZMA

 4   Stephen Kuzma Law Office

 5   75 Federal Street

 6   Suite 17

 7   Boston, Massachusetts  02110

 8   (617) 338-3020

 9       Appearing on behalf of the Plaintiffs.

10

11   INDIA L. MINCHOFF

12   Russo & Minchoff

13   123 Boston Street

14   Boston, Massachusetts  02125

15   (617) 740-7340

16       Appearing on behalf of the Plaintiffs.

17

18   SCOTT D. FERINGA

19   Sullivan, Ward, Asher & Patton, P.C.

20   25800 Northwestern Highway

21   Suite 1000

22   Southfield, Michigan  48037

23   (248) 746-0700

24       Appearing on behalf of the Gap, Inc.

25
```



DENROY SCARLETT
August 21, 2006

1    THOMAS T. REITH

2    Burns & Levinson, L.L.P.

3    125 Summer Street

4    Boston, Massachusetts  02110

5    (617) 345-3000

6        Appearing on behalf of Expedia, Inc.

7

8    ALSO PRESENT:

9    Lynsey Williams - Video Technician

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



DENROY SCARLETT
August 21, 2006

```
 1    Ocho Rios, St. Ann, Jamaica, W.I.,

 2    Monday, August 21, 2006

 3    11:46 a.m.

 4

 5              VIDEO TECHNICIAN:  We are now on the record.

 6         This is the videotape deposition of Denroy Scarlett

 7         being taken on Monday, August 21st, 2006.  The time is

 8         now 11:46 and 40 seconds a.m.  We are located at the

 9         Turtle Beach Towers in Ocho Rios, Jamaica.  This

10         deposition is being taken on behalf of the defendants

11         in the matter of Stephanie Hofer and Douglas Hofer

12         versus The Gap, Incorporated; Expedia, Incorporated;

13         and Turtle Beach Towers.  This is case number 05-40170

14         FDS.  This matter is being held in the United States

15         District Court for the District of Massachusetts.

16              My name is Lynsey Williams, video

17         technician.  Will the court reporter swear in the

18         witness and the attorneys briefly identify themselves

19         for the record, please.

20                   DENROY SCARLETT,

21    was thereupon called as a witness herein, and after

22    having first been duly sworn to testify to the truth,

23    the whole truth and nothing but the truth, was

24    examined and testified as follows:

25              MR. FERINGA:  I'm Scott Feringa.  I
```



DENROY SCARLETT
August 21, 2006

1          represent Gap.

2                    MR. REITH:  Thomas Reith.  I represent

3          Expedia, Inc.

4                    MS. MINCHOFF:  India Minchoff, for the

5          plaintiff, Stephanie Hofer and Douglas Hofer.

6                    MR. KUZMA:  Good morning, sir.  My name is

7          Stephen Kuzma.  I represent Stephanie Hofer.

8     A.   Good morning.

9                    MR. KUZMA:  And note my -- again, the

10         objection -- the continuing objection to the authority

11         granted or not granted for the deposition to go

12         forward today.

13                              EXAMINATION

14    BY MR. FERINGA:

15    Q.   Can you give me your full name, please?

16    A.   Denroy Scarlett.

17    Q.   Mr. Scarlett, we introduced before.  My name is Scott

18         Feringa.  I represent Gap.  I'm going to be asking you

19         some questions today.  This is an artificial way of

20         talking, and thus I would ask that before you answer

21         you wait until any one of the lawyers is finished

22         asking the question, then you can answer the question.

23         We'll wait until after you're finished.  We do that

24         because our court reporter needs to get everything

25         down accurately that is said, and if we talk over each



DENROY SCARLETT
August 21, 2006

```
 1        other, it's very difficult.

 2               Additionally, sir, while we all understand

 3        nods of the head or "um-hmm"s or something like that,

 4        we would ask that your responses be all verbal,

 5        whatever they are.

 6   A.   Okay.

 7   Q.   It has to be verbal.

 8   A.   Okay.

 9   Q.   Okay.  Finally, if you have any -- if you don't

10        understand my question, if I'm unclear or if you're

11        unclear with any of lawyers' questions, please tell

12        them, I'm sure they'd be more than happy to rephrase

13        questions for you.  Is that fair, sir?

14   A.   Okay.  No problem.

15   Q.   Okay.  Mr. Scarlett, we are here today at a place

16        called Turtle Beach Towers on Main Street in Ocho Rios

17        Jamaica.  Is that correct?

18   A.   Yes, sir.

19   Q.   And are you a citizen of Jamaica?

20   A.   Yes, sir, I'm a citizen.

21   Q.   How old are you, sir?

22   A.   24.

23   Q.   Are you presently employed at Turtle Beach Towers?

24   A.   Yes, sir, I'm presently employed here.

25   Q.   And what is your position at Turtle Beach Towers, sir?
```



DENROY SCARLETT
August 21, 2006

 1   A.   Night auditor/reception.

 2   Q.   And in March of 2004, were you also so employed?

 3   A.   Yes, sir.

 4   Q.   How long have you been employed at Turtle Beach

 5        Towers?

 6   A.   It's going forward to five years now.

 7   Q.   So does that mean that you would have been employed in

 8        either 2001, 2002?

 9   A.   Yes, sir.

10   Q.   And has it always been as the night auditor or

11        receptionist?

12   A.   From ever since I've been here.

13   Q.   And on March 18, 2004, do you know whether you were

14        presently working at Turtle Beach Towers?

15   A.   Yes, I was here, sir.

16   Q.   How many days a week do you work?

17   A.   Five days per week.

18   Q.   And does that rotate Monday through Friday or is it

19        times Tuesday through Sunday?

20   A.   It's from -- it's normally -- it's from Thursday to

21        Monday.

22   Q.   Okay.  In front of you, or to your left, sir, is a

23        photograph that has been marked as Deposition Exhibit

24        Number 1 for Mrs. Miller.  Will you look at that,

25        Exhibit Number 1?  Is the reception area at which you



DENROY SCARLETT
August 21, 2006

 1          worked in March 18, 2004, located behind the glass

 2          doors that is shown on Exhibit Number 1?

 3    A.    Yes, sir.  That's the reception area behind the glass

 4          there.

 5    Q.    And would you mind turning that around and showing

 6          that to the camera so we can see that?  Thank you,

 7          sir.

 8                    And is there a sign on there that says

 9          "Tower Number 4"?

10    A.    Yes, sir.

11    Q.    And is this the tower in which -- or in front of which

12          is -- the turtle pond is located?

13    A.    Yes, sir.  That's it.

14    Q.    And are there any other turtle ponds on the property

15          of Turtle Beach Towers?

16    A.    Not that I have know of or have ever seen.  That's the

17          only one.

18    Q.    Okay.  Now, in terms of the glass doors that are shown

19          on that picture, are those open or locked at various

20          times during the day?

21    A.    They're not locked with keys, but they're always like

22          shut that way.  They're not locked, but they're shut

23          that way.

24    Q.    If a guest comes in and at any time during the day or

25          night, can the guest go through those doors?



DENROY SCARLETT
August 21, 2006

```
 1   A.   Yes.  They would have access to it 24 hours.

 2   Q.   And is the desk in which you sat behind those glass

 3        doors to the left?

 4   A.   Yes, sir.  That's the desk.

 5   Q.   And thus if somebody came up and knocked on the doors

 6        you would hear them to let them in.  Correct?

 7   A.   Yes.  That would be correct; because I would be there

 8        24 hours for the eight hours working.

 9   Q.   What was your shift?

10   A.   11:30 to 7:30.

11   Q.   11:30 p.m. --

12   A.   -- p.m. to 7:30 a.m.

13   Q.   Now, do you have a memory of a guest, Ms. Stephanie

14        Hofer, having an accident on March 18, 2004, in which

15        she injured her leg?

16   A.   Yes, sir.

17   Q.   And you were on duty that evening?

18   A.   Yes.  I was the one on duty.  I'm the night person.

19   Q.   From the desk or from the lobby area, can you actually

20        see the turtle pond?

21   A.   Not from the -- not from behind the desk, but if

22        you're in the lobby area outside, you could see the

23        turtle pond.

24   Q.   Where do you normally sit when you're on duty?

25   A.   I'm behind the desk.  I couldn't see the turtle pond.
```



DENROY SCARLETT
August 21, 2006

1    Q.    Is there a way from the desk area to see whether

2          guests are approaching the glass doors?

3    A.    You could see when they're approaching the glass

4          doors.

5    Q.    How?

6    A.    When they're on the -- like the landing here stepping

7          up, you could -- if you're looking out, if you're at

8          the desk like, not sitting.  If you're sitting, you

9          couldn't see.  But if you're like standing and maybe

10         at the desk, you could see when they're coming in.

11   Q.    When you're talking about the landing, sir, you're

12         talking about the area in front on top of the stairs,

13         if you'll show the camera.  Is the landing where that

14         mat is located?

15   A.    Yes, sir.

16               MR. KUZMA:  Objection.

17   BY MR. FERINGA:

18   Q.    What -- I want to ask you what first drew your

19         attention to something happening on that shift -- on

20         your shift that day?

21               MR. KUZMA:  Objection.

22   BY MR. FERINGA:

23   Q.    Go ahead.

24   A.    Someone screaming for help.

25   Q.    And do you remember what that individual said?



DENROY SCARLETT
August 21, 2006

```
 1   A.    I don't remember the exact words, but I think she was

 2         saying like, "somebody help me, somebody help me."

 3         Something of this sort.

 4   Q.    And the glass doors were shut?

 5   A.    Yes, sir.

 6   Q.    And so you could hear this lady screaming from the

 7         outside through the glass doors?

 8   A.    That's right.

 9   Q.    What did you do response to that, Mr. Scarlett?

10   A.    Well, I went out immediately and I assisted her by

11         getting her out of the pond.

12   Q.    Okay.  Now, we're talking about "her."  Who is it that

13         you assisted?

14   A.    Well, it's a white female.  Her -- I think her name

15         was Stephanie, and she was like a thick-built person,

16         you know.  So she was in the pond.

17   Q.    All right.  I want to ask you, if you could go to the

18         photograph and perhaps the -- if I might, sir, with

19         respect to Exhibit Number 1, when you saw

20         Ms. Stephanie, as you've described it, where

21         specifically was she located in the pond?  And if

22         you'll show the members of jury.

23   A.    She was -- her legs was in the pond down here and she

24         was like hanging out of the pond, and her head was out

25         like this.
```



DENROY SCARLETT
August 21, 2006

```
 1   Q.   Which was -- when you say her legs were in the pond,

 2        there's a dark section on that photograph.  Can you

 3        indicate where her legs were inference to that dark

 4        section?

 5   A.   It was down here.

 6   Q.   Do you want to use this to point, sir?

 7   A.   Like down here.  This section.  This area.

 8   Q.   Okay.  And when you said she was spread out and her

 9        legs -- and her head was in a location, where was her

10        head?

11   A.   She was more like -- she was more resting on the bench

12        here, leaning on the edge of the pond and the bench.

13   Q.   So was she in the pond or outside the pond at this

14        point?

15             MR. KUZMA:  Objection.

16   A.   She was part -- partly in the pond and partly out.

17   BY MR. FERINGA:

18   Q.   What part of her was out?

19   A.   The upper body.

20   Q.   Where was -- where was her buttocks?

21   A.   It was more in the pond.

22   Q.   Okay.  And in terms of where her legs were facing,

23        where were her legs -- or were her feet facing toward

24        the green shrubbery in the back of the pond where it

25        says "Tower Number 4"?
```



DENROY SCARLETT
August 21, 2006

```
 1                  MR. KUZMA:  Objection.

 2   A.   They were facing that way.

 3   BY MR. FERINGA:

 4   Q.   They were facing toward the tower?

 5   A.   She was here.

 6   Q.   Okay.  Were her legs and feet still in the pond?

 7   A.   Yes, sir.

 8   Q.   You have to speak --

 9   A.   Yes.  Yes, sir.  I'm sorry.

10   Q.   And her buttocks were in the pond?

11   A.   Yes, sir.

12   Q.   And her upper back was on the edge of the pond?

13   A.   Yes, sir.

14   Q.   When you first got to her, what did she say to you,

15        what did you say to her?

16   A.   Not exact words, but she said she was looking at the

17        turtles.  She was looking at the turtles and, you

18        know, she was like crying and all of that, and she was

19        just -- she was like repeating, saying that she was

20        just admiring the turtles, and she thinks she slipped

21        on something, you know.  But when I went there, it was

22        like -- she was -- she was actually too close to the

23        edge of the pond.

24   Q.   When you said she was too close to the edge of the

25        pond, what do you mean by that, sir?
```



DENROY SCARLETT
August 21, 2006

 1   A.   She was up on the edge here.  She had to be up on the
 2        edge here to slip in the pond.
 3   Q.   Okay.  Let me show you another exhibit.  And this is
 4        an exhibit that has been marked as Exhibit Number 5,
 5        and this is a side view.
 6             When you say she was close -- she was close
 7        to the edge of the pond, what -- you showed that,
 8        would you hold that up?  When you said she was close
 9        to the edge of pond, where was she?
10   A.   She would have to be here.
11   Q.   So are you pointing to the section -- is that section
12        close to the bench?
13   A.   Yes.  That's the section close to the bench.
14   Q.   All right.  And did she tell you specifically where
15        she was standing before she fell into the pond?
16   A.   No, she didn't; but, you know --
17             MR. KUZMA:  Objection.
18   A.   -- just looking at what happened, she must have been
19        close to the edge of the pond to fall into it.
20             MR. KUZMA:  Objection.  Move to strike.
21   BY MR. FERINGA:
22   Q.   Let me ask this question.  Did she tell you, sir --
23        first of all, did she tell you that she was attempting
24        to look at the turtles?
25             MR. KUZMA:  Objection.


BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

DENROY SCARLETT
August 21, 2006

1   A.   Yes, sir.

2   BY MR. FERINGA:

3   Q.   Okay.  What specifically did she tell you?

4              MR. KUZMA:  Objection.  Asked and answered.

5   A.   She told me that she was admiring the turtles.  You

6        know, she was just admiring the turtles.

7   BY MR. FERINGA:

8   Q.   Did she how it was that when she was admiring the

9        turtles that she ended up in the pond?

10  A.   She said that she was just admiring the turtles and

11       she slipped -- you know, just slipped in the pond.  I

12       don't know how, but she just slipped in the pond.

13  Q.   Okay.  Did she say -- when you asked her how did this

14       happen, did she say anything about the fact that a

15       flip-flop or her slipper broke which caused her to

16       fall in the pond?

17             MR. KUZMA:  Objection, that he even asked

18       her that.

19  A.   Well, I saw the flip-flop --

20  BY MR. FERINGA:

21  Q.   No.  My question was --

22             MR. KUZMA:  No, if he could finish the --

23             MR. FERINGA:  No.  Move to strike.

24             MR. KUZMA:  If the witness can finish the

25       answer before interrupting.



DENROY SCARLETT
August 21, 2006

```
 1                    MR. FERINGA:  Mr. Kuzma, you have been
 2          interrupting --
 3                    MR. KUZMA:  He's in middle of an answer.
 4          I'd like his full answer.
 5                    MR. FERINGA:  I'm going to ask my question.
 6     BY VIDEO TECHNICIAN:
 7     Q.   My question specifically is, did she tell you that
 8          the -- that she slipped because there was a broken
 9          flip-flop?
10     A.   No, sir.
11     Q.   All right.  Did you see the flip-flop?
12     A.   Yes, sir.
13     Q.   Where did you see the flip-flop?
14     A.   It was there.
15     Q.   Okay.  Where?
16     A.   In the pond.
17     Q.   All right.  So show me where you saw the flip-flop.
18     A.   I couldn't remember and tell you exactly where we took
19          the flip-flop, but we took the flip-flop from out of
20          the pond.
21     Q.   So when you first saw the flip-flop it was in the
22          pond?
23     A.   Yes, sir.
24     Q.   Was -- and was there any flip-flop on the staircase or
25          the landing?
```



DENROY SCARLETT
August 21, 2006

```
 1   A.   No, sir.

 2   Q.   All right.  And so the flip-flop -- who was the one

 3        that took the flip-flop from the pond?

 4   A.   Well, I can't remember that.  It was either me or

 5        Mr. MacKenzie.

 6   Q.   All right.  And Mr. MacKenzie is who?

 7   A.   He's ones of the security who was on duty.

 8   Q.   All right.  And we've heard his name before.  Did he

 9        somehow assist Ms. Hofer to go to -- Stephanie Hofer

10        to go to the hospital?

11   A.   Yes, sir.

12   Q.   Was it -- was it a taxi that drove or was it

13        Mr. MacKenzie?

14   A.   Mr. MacKenzie.

15   Q.   Okay.

16   A.   In his personal car.

17   Q.   All right.  So let me go back what you saw and what

18        you did when you first spoke to Ms. Hofer.

19             When you asked her what she -- what

20        happened, you said she was crying.  Correct?

21   A.   Yes, sir.

22   Q.   Was she upset?

23   A.   No, sir.  Not from what I see.  She was more in the

24        crying mode.  More crying.

25   Q.   When you asked her a question, did she respond to you?
```



DENROY SCARLETT
August 21, 2006

1  A.   Yes.  She did respond.

2  Q.   And did you -- did you have any sense of whether she

3       was coherent or incoherent when you talked to her?

4            MR. KUZMA:   Objection.

5  A.   She was responding.

6  BY MR. FERINGA:

7  Q.   When you say she was responding, what do you mean by

8       that, sir?

9  A.   She was like, you know, replying to me.

10  Q.   Okay.  And when she was relying to you, did you get

11       the sense that you two were communicating?

12  A.   Yes, sir.

13  Q.   Okay.  So when you saw her in the pond, and the legs

14       in the pond, did you see whether she was injured or

15       not?

16  A.   Yes.  She was injured.

17  Q.   And what drew you to the attention that she was

18       injured, sir?

19  A.   There was blood, and her legs were tearing.

20  Q.   And so when you saw that, what did you attempt -- what

21       did you do?  What did you do next?

22  A.   Well, immediately I couldn't just take her out by

23       myself, so I called for the assistance of the

24       security.  And we took her out and put her on the

25       bench --



DENROY SCARLETT
August 21, 2006

```
 1   Q.   Can I stop you?  The security that you called for

 2        assistance, was that Mr. MacKenzie?

 3   A.   Yes, sir.

 4   Q.   Okay.  So you can't -- you couldn't lift her out of

 5        the pond, you needed some help, and Mr. MacKenzie came

 6        after responding to your calls.  Is that right?

 7   A.   Yes.

 8   Q.   Then what did you do, sir?

 9   A.   We put her on the bench and we got some towels and so

10        forth and then we -- I called my manager.  And we

11        tried to get in touch with a doctor, but there was no

12        one there, so we shipped her off.  Just put her in a

13        car immediately, me and Mr. MacKenzie, and take her to

14        the hospital.

15   Q.   Let me ask you a couple of questions, if I might, to

16        follow up with that, Mr. Scarlett.

17             You said that you called -- after you got

18        Ms. Hofer out of the pond, you put her on the bench.

19        Is that the bench that's shown in Exhibit Number 5?

20   A.   Yes, sir.  That's the bench.

21   Q.   Okay.  And, sir, then you made -- then you got some

22        towels?

23   A.   Yes.

24   Q.   Was -- at this point in time, was there any other

25        individual nearby or close by that identified herself
```



DENROY SCARLETT
August 21, 2006

| | | |
|---|---|---|
| 1 | | as a friend of Mrs. Hofer? |
| 2 | A. | To my memory, not that I remember. |
| 3 | Q. | Okay.  So you got the towels and attempted to wrap the |
| 4 | | leg? |
| 5 | A. | Yes, sir. |
| 6 | Q. | Then you said that you called your manager.  Is that |
| 7 | | Mrs. Miller? |
| 8 | A. | Yes, sir. |
| 9 | Q. | And what did you tell Mrs. Miller? |
| 10 | A. | That there was this guest that had an accident and she |
| 11 | | fell in the pond.  You know, asking her what to do, |
| 12 | | and she said call the doctor.  And not getting through |
| 13 | | to the doctor, I think we went ahead and -- you know, |
| 14 | | Mr. MacKenzie had a car there, so she just asked him |
| 15 | | to assist by taking her to the hospital. |
| 16 | Q. | Was there a -- was there any point in time at which |
| 17 | | somebody attempted to contact Mrs. Hofer's roommate? |
| 18 | A. | I don't remember a roommate.  I'm not remembering her |
| 19 | | roommate. |
| 20 | Q. | So how long was it -- strike that. |
| 21 | | You get on duty at 11:30? |
| 22 | A. | Yes, sir. |
| 23 | Q. | About how long into your shift did this take place? |
| 24 | A. | Maybe about an hour. |
| 25 | Q. | Okay. |



DENROY SCARLETT
August 21, 2006

```
 1   A.   Thereabouts.

 2   Q.   So -- and then from the time that you first noticed

 3        Mrs. Hofer to the time she left in Mr. MacKenzie's

 4        car, how long was -- was she there?

 5   A.   That's about -- from about 10 to 15 minutes,

 6        thereabouts.

 7   Q.   Okay.  So during that 10 to 15 minutes, did Mrs. Hofer

 8        say anything more about how this accident occurred?

 9   A.   The only thing she said is that she was there admiring

10        the turtles and she fell in the pond and --

11   Q.   Okay.  I'm sorry, sir.

12   A.   Go ahead.

13   Q.   At what point in time did -- was the flip-flop taken

14        out of the pond?

15   A.   I don't have any exact memory of that one.

16   Q.   Was it after Mrs. Hofer left?

17   A.   I couldn't tell.  I couldn't tell.

18   Q.   Okay.  Who was it that cleaned up the pond?

19   A.   There's a ground person who cleans up the pond.

20   Q.   Okay.  But in terms of -- in terms of the flip-flop,

21        it was -- it was in the pond, it was either you or

22        Mr. MacKenzie that would have taken it out, or someone

23        else?

24             MR. KUZMA:  Objection.

25   A.   Could be someone else.
```



DENROY SCARLETT
August 21, 2006

```
 1    BY MR. FERINGA:

 2    Q.    Okay.  Did you look at the condition of the flip-flop?

 3    A.    I'm not remembering.

 4    Q.    Did you see anything wrong with the flip-flop that

 5          came from the pond?

 6    A.    Flip-flop, flip-flop.  I not remembering about a

 7          flip-flop.  I wasn't -- that day I wasn't focusing on

 8          the flip-flop.  You know, I was more focusing on the

 9          guest and her damage.

10    Q.    Do you know what happened to the flip-flop that you

11          removed from the pond?

12    A.    I don't know of it.

13    Q.    Okay.

14    A.    I don't know where it is.

15    Q.    After this 10 to 15 minutes where you were with

16          Mrs. Hofer, and after she left for the hospital with

17          Mr. MacKenzie, did you have any further contact with

18          her at all?

19    A.    No, sir.

20    Q.    Did you --

21    A.    Only with Mr. MacKenzie.

22    Q.    Only with Mr. MacKenzie.  Did you have any contact

23          with the -- a lady by the name of Ms. Carrie LaBelle,

24          who was purported to be the roommate with Ms. Hofer?

25    A.    I don't remember any roommate.
```



DENROY SCARLETT
August 21, 2006

```
 1   Q.   After that next morning when Mrs. Miller came in and
 2        came on duty, did you have a conversation with
 3        Mrs. Miller?
 4   A.   Yes.  I spoke to Ms. Miller.  I had to like, you know,
 5        talk to her, because she's my manager, before I go.
 6   Q.   And did you have any conversations with her about the
 7        accident that had occurred the night before with
 8        Mrs. Hofer?
 9   A.   Yes, sir.
10   Q.   All right.  And what essentially did you tell her?
11   A.   Basically what I told Ms. Miller is that -- I told her
12        what happened the night before and what did I do after
13        and how everything run.  And after Mr. MacKenzie
14        reported that she was okay and everything was all
15        right with her at the hospital and all of that, that
16        was basically my report to Ms. Miller.
17   Q.   Okay.  Did you fill out anything in writing,
18        Mr. Scarlett?
19   A.   No, sir.
20   Q.   After that conversation that you had with Mrs. Miller
21        on the morning of now the 19th of March, did you ever
22        have any further discussions with Mrs. Miller about
23        this incident?
24   A.   No, sir.
25   Q.   You and I have spoken.  Is that right?
```



DENROY SCARLETT
August 21, 2006

1   A.   Yes, sir.  Yes.

2   Q.   All right.  And was that in person or by telephone?

3   A.   By telephone.

4   Q.   And do you remember what I asked you?

5   A.   Some stuff.  Not everything.

6   Q.   Do you remember, did I go over questions that I would

7        purport to ask with you at the deposition?

8   A.   No.

9   Q.   Did you agree in that telephone conversation to

10       voluntarily appear to give a deposition in this

11       matter?

12  A.   Yes, sir.

13  Q.   And our office and you have communicated by e-mail.

14       Is that right?

15  A.   Yes, sir.

16  Q.   And you received a copy of the Notice of Deposition?

17  A.   Yes, sir.

18  Q.   Did you and I talk today before the deposition?

19  A.   No.  Only from like maybe a month or so ago, yes.

20  Q.   Okay.

21  A.   But not before today.

22  Q.   Have you talked with any of the other lawyers, either

23       Ms. Minchoff or Mr. Kuzma or Mr. Reith?

24  A.   No, sir.

25                 MR. FERINGA:  I don't have any other



DENROY SCARLETT
August 21, 2006

```
 1        questions.  Thank you, sir.
 2              MR. REITH:  I'll just state for the record,
 3        Thomas Reith for Expedia.  At this point, I don't have
 4        any questions.  I'll reserve my right to inquire to
 5        the extent Mr. Kuzma flushes something out that I have
 6        to inquire about.
 7              MR. KUZMA:  Thank you.
 8                    EXAMINATION
 9  BY MR. KUZMA:
10  Q.   Good morning, Mr. Scarlett.
11  A.   Good morning.
12  Q.   My name it is Stephen Kuzma.  I'm here with India
13        Minchoff, and we represent Stephanie Hofer, the one
14        that got hurt on the day and night in question.
15              Sir, have you ever spoken with me before?
16  A.   No, sir.
17  Q.   Have you ever spoken with Attorney Minchoff before?
18  A.   No, sir.
19  Q.   Have we ever sent you any e-mails, as far as you know?
20  A.   No, sir.
21  Q.   Did you ever take any photographs or know whether
22        anyone has taken any photographs of the accident
23        scene?
24  A.   No, sir.
25  Q.   You stated a couple minutes ago that you had a
```



DENROY SCARLETT
August 21, 2006

```
 1        conversation with, Ms. Miller, your supervisor, the

 2        day after the accident or the morning of the accident?

 3   A.   Yes, sir.

 4   Q.   What time of day was that?  About.

 5   A.   That would be like after nine, thereabouts, because

 6        Ms. Miller gets in the office like nine o'clock.  So

 7        any time after that.  That would be after nine

 8        thereabouts.

 9   Q.   And you testified that you told her everything about

10        what had happened after the accident occurred.  Right?

11   A.   Yes, sir.

12   Q.   Did you tell her anything about what you were told or

13        what you observed before the accident occurred?

14   A.   No, sir.

15   Q.   That was a "no."  Right?

16   A.   No.

17   Q.   The flip-flop that you saw in the turtle pond, what

18        color was it?  Do you recall?

19   A.   No.  I don't recall the color of the flip-flop.

20   Q.   Was there one flip-flop in the turtle pond or two?

21   A.   Don't recall how much was there.

22   Q.   But you know there was at least one?

23   A.   I'm not sure if it was one or two in the pond, or one

24        was on her feet and the other one was in the pond.

25        I'm not sure.
```



DENROY SCARLETT
August 21, 2006

```
 1   Q.   All right.  Okay, sir.  And it is fair to say that you
 2        didn't see how this accident happened.
 3   A.   Yes, sir there that's fair to say.
 4   Q.   You did not?
 5   A.   No.
 6   Q.   Okay.
 7   A.   Because I was in the office, so I couldn't see.
 8   Q.   And when you say were in the office, is that an office
 9        that's behind the reception desk?
10   A.   Yes, sir.
11   Q.   Is it fair to say that you have music piped in into
12        the lobby area?
13               MR. REITH:  Objection.
14   A.   I would have music, but it wouldn't be music that I
15        couldn't hear what's going on outside, it would be
16        very low.
17   BY MR. KUZMA:
18   Q.   Okay.  And is because it was at night?
19   A.   Yeah.
20   Q.   After the accident occurred -- I just want to be clear
21        about this, sir.  You were able to communicate with
22        Ms. Hofer?
23   A.   Yes, sir.
24   Q.   She was responsive to your questions?
25   A.   Yes, sir.
```



DENROY SCARLETT
August 21, 2006

```
 1   Q.   It was clear to you that she was badly injured at that

 2        time?

 3   A.   She was.

 4   Q.   Is it clear to you that she was badly injured?

 5   A.   Yes, sir, she was.

 6   Q.   And did you see the cut on her leg?

 7   A.   Yes, sir, I did.

 8   Q.   Was it fair to say that it was a deep cut that you

 9        saw?

10   A.   It was a really bad cut.

11   Q.   Was there blood all over the turtle pond?

12   A.   Yes, sir.  There was blood all over the turtle pond.

13   Q.   Did it turn the turtle pond water red?

14   A.   It did.  It did.  It did.

15   Q.   When you saw at least one of the flip-flops, was it

16        floating on top of the water?

17   A.   I can't recall remembering seeing a flip-flop, sir.

18        I'm trying to remember if there was a flip-flop in the

19        pond or whatnot.  I didn't see a flip-flop afterwards,

20        so I'm trying to remember.

21   Q.   Okay.  I believe you said -- you already testified

22        that you did see at least one flip-flop in the turtle

23        pond.  Right?  You did say that earlier?

24   A.   No.  I don't remember saying that.

25   Q.   You don't remember saying that?
```



DENROY SCARLETT
August 21, 2006

```
 1                    What is Mr. MacKenzie's first name?
 2   A.   I don't know his first name, because he doesn't work
 3        with my company, so -- he's just a security company.
 4        They change them pretty often.
 5   Q.   Okay.  And the security company is hired by Turtle
 6        Beach Towers?
 7   A.   Yes, sir.
 8   Q.   And was he working at the front gate at the time of
 9        the accident or in the lobby?
10   A.   He was -- I think he was a person doing the patrol for
11        the night, so he was the one moving around.
12   Q.   Has he seen -- strike that.
13                    Have you seen Mr. MacKenzie recently?
14   A.   No, sir.
15   Q.   Do you know what happened to Mr. MacKenzie?
16   A.   No, sir.
17   Q.   Do you know whether he is alive?
18   A.   No.  I don't know if he's alive.
19   Q.   Is the reason why you used Mr. MacKenzie's vehicle to
20        transport Stephanie Hofer to the hospital because you
21        didn't want to wait for a taxi to take her?
22   A.   Well, it was an emergency, and that was the quickest
23        vehicle I could get access to, so I used
24        Mr. MacKenzie's car.
25   Q.   I'm not sure if you were asked this earlier, but do
```



DENROY SCARLETT
August 21, 2006

```
 1        you know what happened to the flip-flops at the scene

 2        of the accident?

 3   A.   No, sir.

 4   Q.   But there is a maintenance crew employed by Turtle

 5        Beach Towers to clean up the premises?

 6   A.   Yes, sir.

 7   Q.   Is it fair to say that you utilized -- when I say

 8        "you," I mean Turtle Beach Towers, used their services

 9        to clean out the turtle pond?

10   A.   Yes, sir.

11   Q.   How -- and, again, I believe you said it was about 10

12        or 15 minutes from the time that you saw her in the

13        turtle pond from the time that she was taken away by

14        Mr. MacKenzie?

15   A.   Yes, sir.

16   Q.   Did you see Ms. Hofer carrying anything into the car?

17   A.   No, sir.

18   Q.   Now, you testified that she also said to you when you

19        arrived at the scene of the accident that she slipped

20        on something.  Do you remember testifying to that?

21             MR. REITH:  Objection.

22   A.   Not slipping on something.  She slipped.  Not on

23        something.  She slipped when she -- she must -- would

24        have been at the edge of pond to slip.

25   BY MR. KUZMA:
```



DENROY SCARLETT
August 21, 2006

```
 1   Q.   Okay.  Now, I'm not going to ask you to guess.  Okay?

 2        Do you understand that, sir?

 3   A.   That's okay.

 4   Q.   I'm simply asking you did she say that she slipped?

 5   A.   Yes, she said that she slipped.

 6   Q.   So that was her words.  Correct?  "Yes"?

 7   A.   Yes, sir.

 8   Q.   And then you said that you believed that she was too

 9        close to the edge?  Did you say that?

10   A.   Yes.

11   Q.   But you now you didn't see how it happened.  Right?

12   A.   No, sir.

13   Q.   So that's a guess on your part.  Right?

14   A.   Yes.

15   Q.   When you spoke with Ms. Miller the next day about what

16        had happened, how long was that conversation?  About.

17   A.   Maybe about 15 minutes.  I don't remember.

18   Q.   And everything that you said in response to

19        Mr. Feringa's questions about what you said to her in

20        that conversation or what she said you, you've told us

21        the whole conversation -- right? -- as you remember

22        it?

23   A.   Well, I am not remembering the whole conversation that

24        I had with Ms. Miller on that day.

25   Q.   All right.  But that's as best you can recall as to
```



DENROY SCARLETT
August 21, 2006

```
 1         what you said to Attorney Feringa?

 2    A.   Yeah.  We went through what happened the night before

 3         and, you know, if she has been stabilized and

 4         everything's okay, and all of that.

 5    Q.   Now, what shift were you working that night into the

 6         day?

 7    A.   11:30 p.m. to 7:30 p.m. -- a.m.  A.m.  Sorry.

 8    Q.   So you stayed after your tour of duty until Ms. Miller

 9         showed up.  Correct?  "Yes"?

10    A.   Yes.

11    Q.   Did you ever fill out an accident report?

12    A.   No, sir.

13    Q.   Do you know what the accident reporting procedure is

14         at Turtle Beach Towers when a guest gets injured?

15    A.   Well, normally we would make a report, like write it

16         down, and we would normally get in touch with

17         Ms. Miller because she's the person of authority.  So

18         once report it to she, and she would be the one who

19         takes it from there.

20    Q.   Sir, how long have you worked for Turtle Beach Towers?

21    A.   It has been going four to five years.

22    Q.   Have you ever made out an accident report?

23    A.   No, sir.

24    Q.   Did you make out an accident report in the case?

25    A.   No, sir.
```



DENROY SCARLETT
August 21, 2006

```
 1   Q.   Why not?

 2   A.   I made a report to Ms. Miller by the phone, but I

 3        didn't make a written down.  I made a report to

 4        Ms. Miller.

 5   Q.   And why didn't you?

 6   A.   Well, I think reporting it to Ms. Miller by the phone,

 7        she would take everything from there.  She's where the

 8        buck stops, so, you know...

 9   Q.   Mr. Scarlett, Ms. Miller just testified Expedia

10        representatives would inspect the hotel premises.

11        Have you ever seen anyone from Expedia inspecting the

12        hotel premises during the time that you've been an

13        employee here?

14              MR. REITH:  Objection.

15              You can answer.

16   A.   I couldn't tell you, because I'm a night person.  So

17        if an Expedia persons come in to inspect the property,

18        that would have been in the day.  So I don't work day

19        shifts.  I work nights only.

20   BY MR. KUZMA:

21   Q.   All right.  But were you aware that Expedia did that?

22        Whether you saw him here physically or not, where you

23        aware that Expedia inspects the premises --

24              MR. REITH:  Objection.

25   BY MR. KUZMA:
```



Page 34

DENROY SCARLETT
August 21, 2006

1    Q.    -- when you're not here.

2    A.    I'm not sure of that.  I wasn't sure of that.

3    Q.    You're not aware of that?

4    A.    No.  I'm not.

5    Q.    Is it fair to say that Ms. Miller would be in a better

6          position to know that fact than you would be?

7    A.    Yes, sir.

8    Q.    Because she --

9    A.    She's the manager.

10   Q.    She's the one that's in charge.  Right?

11   A.    Yes, sir.

12   Q.    If you can, sir, would you look at that photograph

13         that my brother counsel showed you?  I think you

14         pointed to what you described to be a dark area as to

15         where you saw Stephanie Hofer.  Can you take that

16         photograph and hold it up to the jurors?

17                All right.  And you pointed to the dark

18         area.  That's where you saw Stephanie Hofer.  Right?

19   A.    Right.

20   Q.    Now, that dark area, what is located at that dark

21         area?

22   A.    There is like some -- what do you call it, like some

23         blocks, or -- blocks or concrete slabs, something of

24         the sort, in the pond that the turtle would normally

25         go on and like get sunlight and so forth.



DENROY SCARLETT
August 21, 2006

 1   Q.   And part of that area is covered with algae, the
 2        water -- that is the part of the blocks that are
 3        covered by water?
 4                    MR. REITH:  Objection.
 5   A.   Not to the top.
 6   BY MR. KUZMA:
 7   Q.   Not the top?
 8   A.   The top is out --
 9   Q.   Right.
10   A.   -- because that's where the turtle and go and get
11        sunlight.
12   Q.   Yeah; but the part that is underneath the water is
13        covered with algae.  Correct?
14   A.   I'm not sure.  Because if we cleaned it like almost
15        every day or every other day, they're supposed to
16        clean the algae out.
17   Q.   All right.  You can put that photograph down.
18                    Mr. Scarlett, how many times in the time
19        period that you've worked at Turtle Beach Towers have
20        you walked up and down those stairs?
21   A.   That's maybe about a thousand times or so forth.
22   Q.   All right.  And --
23   A.   Or more.
24   Q.   All right.  Without looking at the photograph, how
25        many steps are there leading from the walkway into the



Page 36

DENROY SCARLETT
August 21, 2006

```
 1        lobby?

 2   A.   There is a landing coming from the road down the

 3        bottom.

 4   Q.   And how many steps?

 5   A.   And that would be like one, two steps.  For the

 6        landing where the mat is, that would be just one step

 7        up.

 8   Q.   One step up.  And then -- what? -- one step into the

 9        lobby?

10   A.   Yes, sir.

11   Q.   So how many altogether?

12   A.   One step into the lobby.  No?  That would be one step

13        up to the landing, and then into the lobby would be

14        the same flat area going into the front desk.

15   Q.   Mr. Scarlett, when you are working the night shift,

16        are you the person in charge of the hole hotel at

17        least during the night shift?

18   A.   I'm in charge of the front desk with three other

19        security who patrol the property.

20   Q.   And when you arrive to work, are you made aware of how

21        many guests you have on the premises?

22   A.   Yeah.  Because -- well, I do -- I'm doing the night

23        auditing, so I know the house count of the guests who

24        is staying in house.

25   Q.   All right.  Can you tell me percentage-wise how much
```



Page 37

DENROY SCARLETT
August 21, 2006

```
 1         of Turtle Beach Towers was booked with guests that

 2         night?  Approximately.

 3    A.   I cannot recall that, sir.  That cannot be recalled.

 4    Q.   You can't recall?

 5    A.   No, sir.

 6    Q.   Where was the bathroom in the reception area?

 7    A.   Where was the bathroom?

 8    Q.   Yeah.  Was there a bathroom in the reception area?

 9    A.   It was to your right.  It was to your right as you

10         enter in.

11    Q.   When you saw the flip-flop that you testified to

12         earlier, did you happen to see whether it was damaged

13         at all?

14    A.   I can't recall seeing the flip-flop damaged or

15         something of the sort.  This flip-flop -- I don't

16         recall seeing the flip-flop.  I'm not remembering

17         that.

18    Q.   Was the first time you became aware that Stephanie

19         Hofer was at the resort at the time that you

20         discovered her after she called for help?

21    A.   Could you rephrase that?

22    Q.   Yeah.  The first time you became aware that Stephanie

23         Hofer was here, was that when you realized that she

24         was hurt?

25    A.   Yes, sir.
```



DENROY SCARLETT
August 21, 2006

1  Q.  Can you tell me approximately how many people were

2      around the lobby area at the time of the accident?

3  A.  I was the --

4            MR. REITH:  Objection.

5  A.  -- only person in the lobby at work, but there were

6      security on duty, and they weren't in the lobby area.

7      They were at their posts and one was patrolling.

8  BY MR. KUZMA:

9  Q.  Was there a crowd outside when you arrived --

10 A.  No, sir.

11 Q.  -- to see Stephanie Hofer?

12 A.  No, sir.

13 Q.  So it's just you and her?

14 A.  Say again?

15 Q.  When you saw her in the turtle pond, or at least

16     partially in the turtle pond, it was just you and her?

17 A.  Yes, sir.

18            MR. KUZMA:  I have no further questions.

19     Thank you.

20 A.  You're welcome.

21            MR. FERINGA:  No questions.

22                    EXAMINATION

23 BY MR. REITH:

24 Q.  Mr. Scarlett, I have just two quick questions.  I want

25     to direct your attention to when you came out upon



DENROY SCARLETT
August 21, 2006

```
 1        Mrs. Hofer.  Okay?

 2   A.   Pardon me?

 3   Q.   I want to direct your attention to the time when you

 4        came out of the lobby and saw Ms. Hofer.  Okay?

 5             I believe you testified earlier that you and

 6        Ms. Hofer spoke when you came out and found her.

 7        Correct?

 8   A.   Yes, sir.

 9   Q.   All right.  And when you spoke to Ms. Hofer, did she

10        tell you she fell in pond because it was dimly lit?

11             MR. KUZMA:  Objection.

12   A.   No, sir.

13   BY MR. REITH:

14   Q.   When you spoke to Ms. Hofer, did she tell you she fell

15        in the pond because there was no railing?

16   A.   No, sir.

17             MR. REITH:  I have no further questions.

18             MR. FERINGA:  No questions.

19             MR. KUZMA:  Okay.  We're done.  Thank you,

20        sir.

21             VIDEO TECHNICIAN:  We are concluding this

22        deposition.  The time is 12:29 and 31 seconds p.m.

23             (The deposition was concluded at 12:29 p.m.

24        Signature of the witness was not requested by

25        counsel for the respective parties hereto.)
```



DENROY SCARLETT
August 21, 2006

```
 1                    CERTIFICATE OF NOTARY

 2        STATE OF MICHIGAN      )

 3                               ) SS

 4        COUNTY OF LIVINGSTON   )

 5

 6            I, Rebecca J. Callow, a Notary Public in and for

 7        the above county and state, do hereby certify that the

 8        above deposition was taken before me at the time and

 9        place hereinbefore set forth; that the witness was by

10        me first duly sworn to testify to the truth, and

11        nothing but the truth; that the foregoing questions

12        asked and answers made by the witness were duly

13        recorded by me stenographically and reduced to

14        computer transcription; that this is a true, full and

15        correct transcript of my stenographic notes so taken;

16        and that I am not related to, nor of counsel to either

17        party nor interested in the event of this cause.

18

19

20

21                         _____

22                         Rebecca J. Callow, CSR-5228

23                         Notary Public,

24                         Livingston County, Michigan

25        My Commission expires:  January 13, 2011
```



Page 41

DENROY SCARLETT
August 21, 2006

```
 1                    INDEX TO EXAMINATIONS

 2

 3   Witness                                    Page

 4   DENROY SCARLETT

 5

 6   EXAMINATION

 7   BY MR. FERINGA:............................... 5

 8   EXAMINATION

 9   BY MR. KUZMA:................................. 25

10   EXAMINATION

11   BY MR. REITH:................................ 38

12

13                     INDEX TO EXHIBITS

14

15   Exhibit                                     Page

16   (Exhibits not offered.)

17

18

19

20

21

22

23

24

25
```

