# HOFER v. THE GAP, INC., ET AL

# STEPHANIE HOFER

## October 13, 2006

*Prepared for you by*



**Bingham Farms** | Ann Arbor | Detroit | Flint | Grand Rapids | Jackson | Lansing | Mt. Clemens

PHONE:  248.644.8888    FAX:  248.644.1120

www.bienenstock.com

Dockets.Justia.com

Page 355

STEPHANIE HOFER
October 13, 2006

```
 1                          VOLUME: III
                            PAGES:  355 to 458
 2                          EXHIBITS: 12 to 26
 3
 4            UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
 5
 6     Civil Action No. 05-40170 FDS
 7
       STEPHANIE HOFER and DOUGLAS      )
 8     HOFER,                           )
                    Plaintiffs,         )
 9                                      )
       v.                               )
10                                      )
       THE GAP, INC., EXPEDIA,          )
11     INC., and TURTLE BEACH           )
       TOWERS,                          )
12                  Defendants.         )
13
14            CONTINUED VIDEOTAPED DEPOSITION OF
15      STEPHANIE HOFER, called as a witness on
16      behalf of the Defendant, The Gap, Inc.,
17      pursuant to the applicable provisions of the
18      Federal Rules of Civil Procedure, before
19      Jeanette N. Maracas, Registered Professional
20      Reporter and Notary Public in and for the
21      Commonwealth of Massachusetts, at the Offices
22      of Morrison Mahoney, LLP, 250 Summer Street,
23      Boston, Massachusetts, on Friday, October 13,
24      2006, commencing at 1:10 p.m.
25
```



STEPHANIE HOFER
October 13, 2006

```
 1     APPEARANCES:
 2
 3
            LAW OFFICES OF RUSSO & MINCHOFF
 4          By: India Minchoff, Esq.
            123 Boston Street
 5          Boston, Mass. 02125
            For the Plaintiffs.
 6          E-mail: India@russominchofflaw.com
 7
            MORRISON MAHONEY, LLP
 8          By: Meredith M. Lasna, Esq.
            250 Summer Street
 9          Boston, Mass. 02210
            For The Gap, Inc.
10          E-mail: Mlasna@morrisonmahoney.com
11
            BURNS & LEVINSON, LLP
12          By: Thomas T. Reith, Esq.
            125 Summer Street
13          Boston, Mass. 02110
            For Expedia, Inc.
14          E-mail: Treith@burnslev.com
15
            Ralph Scopa, Videographer
16
17
18
19
20
21
22
23
24
25
```


BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

STEPHANIE HOFER
October 13, 2006

```
 1              I N D E X
 2
      Testimony of:                    Page
 3
      Stephanie Hofer
 4    (Resumed)
 5        (by Mr. Reith)        359,445,451
          (by Ms. Minchoff)     440,450
 6
 7
 8              E X H I B I T S
 9
          No.                    Page
10
          12....................360
11        13....................397
          14....................399
12        15....................399
          16....................406
13        17....................407
          18....................408
14        19....................409
          20....................411
15        21....................413
          22....................414
16        23....................421
          24....................425
17        25....................446
          26....................451
18
19
20
21
22
23
24
25
```



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

STEPHANIE HOFER
October 13, 2006

```
1              P R O C E E D I N G S

2              VIDEOGRAPHER:  Good afternoon.  We

3    are now on the record.  This is the

4    videotaped deposition of Stephanie Hofer

5    being taken October 13, 2006.  The time is

6    1:10 p.m.  We are located at Morrison

7    Mahoney, 250 Summer Street, Boston, Mass.

8    This deposition is being taken on behalf of

9    the defendant in the matter of Hofer versus

10   The Gap, Case No. 05-40170 FDS, U.S. District

11   Court of Massachusetts.  My name is Ralph

12   Scopa, videotape operator.

13              Will the court reporter swear in the

14   witness and the attorneys briefly identify

15   themselves for the record, please.

16              MS. MINCHOFF:  Attorney India

17   Minchoff for Stephanie Hofer.

18              MS. LASNA:  Meredith Lasner for The

19   Gap, Inc.

20              MR. REITH:  Thomas Reith on behalf

21   of Expedia, Inc.

22              STEPHANIE HOFER, Resumed

23        A witness called for examination

24   by counsel for the Defendant, The Gap, Inc.,

25   having been first duly sworn, was examined
```



STEPHANIE HOFER
October 13, 2006

```
 1      and testified as follows:

 2                 EXAMINATION, Continued

 3      BY MR. REITH:

 4   Q.  Ms. Hofer, I introduced myself again, Thomas

 5       Reith.  We've met before.  We started my

 6       examination of you on your second day of

 7       deposition going back a little while now, if

 8       you recall.

 9   A.  Yes, I do.

10   Q.  And just to go over the groundrules again

11       so we can get back up to speed, today I'm

12       going to be asking you some questions and,

13       unfortunately, because I've gone second in

14       questioning, things may seem a little bit

15       broken up, but I'll do my best to keep things

16       in a logical flow so we stay with each other,

17       okay?

18   A.  Yes.

19   Q.  Another reminder, that you and I need speak

20       in terms of verbal responses and to allow

21       each other to finish my question and then

22       allow you to finish your answer, okay?

23   A.  Okay.

24                 MR. REITH:  Can you mark that as 12.

25
```



STEPHANIE HOFER
October 13, 2006

```
 1              (Exhibit 12 marked for
 2         identification.)
 3    Q.   I'm just going to put before you a document
 4         that's been marked as Exhibit 12 for
 5         identification today.  It's entitled Notice
 6         of Continued Videotaped Deposition Duces
 7         Tecum directed to Plaintiff Stephanie Hofer.
 8         Do you see that document before you?
 9    A.   Do I?  Yes.
10    Q.   Do you recognize that document?
11    A.   Yes.
12    Q.   And are you appearing here today pursuant to
13         that notice of deposition?
14    A.   Yes.
15              MS. MINCHOFF:  Objection.
16    Q.   Do you see where it starts down the bottom
17         of the page, plaintiff's counsel and
18         plaintiff are required to bring the
19         following --
20              MS. MINCHOFF:  I'm just going to
21         take a look at it since you didn't provide me
22         a copy, if you don't mind.
23              MR. REITH:  Not at all.
24         (Pause)
25              MR. REITH:  I'd just state for the
```



STEPHANIE HOFER
October 13, 2006

```
 1        record it's the same one that's been issued,

 2        just a repeat.

 3   Q.   Do you see down the bottom of that page, Ms.

 4        Hofer, it says, "plaintiff's counsel and

 5        plaintiff are required to bring the following

 6        documents, records and things to said

 7        deposition"?

 8   A.   Yes, I do.

 9   Q.   You see how it continues on from Page 1 to 2

10        and then to 3?

11   A.   Yes.

12   Q.   Did you bring any documents here with you

13        today?

14   A.   No, I did not.

15   Q.   And why not?

16             MS. MINCHOFF:   Objection.  I've made

17        a formal objection to the document request

18        maintained in the notice of deposition.

19   Q.   Shifting our focus now on -- you can put that

20        document aside -- to the booking of the trip

21        through Expedia, did you give Carrie

22        permission to book the trip for you via

23        Expedia.com?

24   A.   Yes, I did.

25   Q.   Who chose to go to Jamaica for the trip?
```



STEPHANIE HOFER
October 13, 2006

1              MS. MINCHOFF:  Objection.  Asked and

2         answered.

3    A.  Mutual decision.

4    Q.  Who chose to go to Turtle Beach Towers?

5              MS. MINCHOFF:  Objection.  Asked and

6         answered.  You can answer.

7    A.  Carrie.

8    Q.  Do you know if anyone at Expedia recommended

9         Turtle Beach Towers to Carrie?

10             MS. MINCHOFF:  Objection.

11   A.  No, I do not know.

12   Q.  Do you know if anyone at Expedia recommended

13        Turtle Beach Towers to you?

14   A.  No.

15   Q.  Before Carrie booked the trip, did you and

16        she discuss using Expedia.com versus another

17        online booking site?

18   A.  I didn't discuss that with Carrie.

19             MS. MINCHOFF:  If you can remember

20        to pause to give me a second to object before

21        you answer the question so the court reporter

22        is not typing over both of our responses at

23        the same time.

24   A.  Yes.  I'm sorry.

25             MS. MINCHOFF:  If I'm going to



STEPHANIE HOFER
October 13, 2006

 1      object.

 2  A.  Okay.

 3  Q.  I should have reminded you of that one, too.

 4      When did you understand that Carrie booked

 5      the trip using Expedia.com?

 6  A.  After she booked it.

 7  Q.  Did you make any direct payment to Expedia in

 8      connection with the trip?

 9          MS. MINCHOFF:  Objection.

10  A.  No, I did not.

11  Q.  Did you directly communicate with anyone at

12      Expedia prior to the booking the trip?

13  A.  No.

14          MS. MINCHOFF:  Objection.

15  Q.  Did you directly communicate with anyone at

16      Expedia after booking the trip?

17          MS. MINCHOFF:  Objection.

18  A.  No.

19  Q.  Did you directly communicate with anyone at

20      Expedia after Carrie booked the trip?

21  A.  No.

22  Q.  Did you directly communicate with anyone

23      at Expedia after you hurt yourself in

24      Jamaica?

25          MS. MINCHOFF:  Objection.



STEPHANIE HOFER
October 13, 2006

 1  A.  No.

 2  Q.  So as between you and Carrie, is Carrie the

 3      only person who spoke with, communicated,

 4      excuse me, with Expedia in connection with

 5      the trip?

 6          MS. MINCHOFF:  Objection.

 7  A.  Yes.  Excuse me.  Could you say that one more

 8      time?

 9          MR. REITH:  Do you mind repeating it

10      back because I know I had a pause in between

11      there.

12          (Question read)

13  A.  She did not speak with anybody from Expedia,

14      as far as I know.  She communicated via the

15      Expedia website.

16  Q.  Okay.  During the process where you and

17      Carrie discussed the possibility of booking

18      a trip, did you visit Expedia.com at all?

19  A.  No.

20  Q.  Did you visit Expedia.com after the booking

21      of the trip?

22          MS. MINCHOFF:  Objection.

23  A.  I can't recall.

24  Q.  Did you visit Expedia.com at any point after

25      you hurt yourself in Jamaica?



STEPHANIE HOFER
October 13, 2006

```
 1   A.   Yes.

 2   Q.   When?

 3   A.   I can't recall.

 4   Q.   Was it in connection with the trip to

 5        Jamaica?

 6   A.   It was out of curiosity to check the website.

 7   Q.   To check the website for what?

 8   A.   Turtle Beach Towers.

 9   Q.   What did you find?

10   A.   Not much.  It's a very limited website.

11        Turtle Beach Towers does not have its own and

12        you have to go through Expedia to get any

13        information, and that's what I did.

14   Q.   Did you try to go through any other websites

15        to get any information on Turtle Beach

16        Towers?

17   A.   No.

18   Q.   Did you try to Google Turtle Beach Towers?

19   A.   Yes.

20   Q.   What did you find?

21   A.   Nothing.

22   Q.   After you hurt yourself in Jamaica, did you

23        file any police reports in Jamaica?

24             MS. MINCHOFF:  Objection.

25   A.   No.
```



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

STEPHANIE HOFER
October 13, 2006

1   Q.  After you hurt yourself in Jamaica, did you

2       file any incident reports with the hotel?

3              MS. MINCHOFF:  Objection.

4   A.  I did not myself.

5   Q.  Did anyone else file any incident reports

6       with the hotel?

7   A.  I do not know.

8   Q.  After you hurt yourself in Jamaica, did you

9       make any reports to anyone about the

10      incident?

11             MS. MINCHOFF:  Objection.  Including

12      medical personnel, anybody?

13  Q.  Anybody.

14             MS. MINCHOFF:  Objection.

15  A.  Could you make that more specific?

16  Q.  I will.  Did you make any report to anyone

17      at Expedia about hurting yourself in Jamaica?

18             MS. MINCHOFF:  Objection.

19  A.  No, I did not.

20  Q.  What did you do to prepare for today?

21  A.  I reviewed my prior testimony, briefly

22      skimmed through and just double-checked my

23      documents that I have at home, my copies of

24      the prior deposition.

25  Q.  What documents did you check at home?



STEPHANIE HOFER
October 13, 2006

1   A.   The copy of the first and second sessions.

2   Q.   And the exhibits to those sessions?

3   A.   I have a file that I perused.

4   Q.   Does that file contain the exhibits to your

5        first two days of deposition?

6             MS. MINCHOFF:   Objection.   Define

7        "exhibits."

8   Q.   During your first few days of deposition,

9        do you recall Attorney Feringa and myself

10       putting documents before you for you to take

11       a look at?

12  A.   Yes, I do.

13  Q.   And to testify on?

14  A.   Yes, I did.

15  Q.   In that file at home, are any of the

16       documents that Attorney Feringa and I put

17       in front of you in that?

18  A.   I don't believe so.

19  Q.   Did you review any other deposition

20       transcripts besides your own prior to coming

21       in today?

22  A.   Excuse me?

23  Q.   Prior to coming here today?

24  A.   No, I did not.

25  Q.   Did you and your mother ever discuss how the



STEPHANIE HOFER
October 13, 2006

1        trip was booked?

2    A.  No.

3    Q.  Drawing your attention back to the discussion

4        for the first two days about disability

5        payments, I believe as of the last time we

6        were here, you had not started to receive

7        payments, is that correct?

8    A.  I can't recall what the date was.

9    Q.  As of today, as you sit here today, have you

10       started to receive those payments?

11   A.  Yes, I have.

12   Q.  And how much are those payments?

13   A.  They're approximately 800 or $900 a month.

14   Q.  Does it vary per month?

15   A.  No.

16   Q.  And are they sent to you in check form?

17   A.  They are directly deposited into my private

18       account.

19   Q.  Where is that private account?

20   A.  At my bank.

21   Q.  What's your bank?

22   A.  IC Credit Union.

23   Q.  Where is IC Credit Union?

24   A.  In Leominster.

25   Q.  Again, forgive me for jumping around.  This



STEPHANIE HOFER
October 13, 2006

```
 1        really is, for a lack of a better term, a
 2        kind of cleanup session where I go through
 3        issues that were raised the first couple of
 4        days that I think need to be followed up on,
 5        okay?  So I'm going to shift gears a little
 6        bit.  I'm going to go to your physical state
 7        after the accident, all right?  Is there
 8        anything that you could do before the
 9        accident that you can no longer do today?
10   A.   Yes, there is.
11   Q.   And what are those things?
12            MS. MINCHOFF:  Objection.  Asked and
13        answered.  You can answer.
14   A.   There are many things that I cannot do that
15        I could do before I became disabled.  Would
16        you like me to --
17   Q.   If you could list them, please.
18   A.   It's probably too long of a list to remember
19        all of them, but there are many that I
20        will start with, exercise being one, routine
21        daily activities, outdoor activities,
22        traveling, hiking, walking dogs, playing with
23        the dogs, running, golfing, water-skiing,
24        walking for long periods of time, skating,
25        sledding, apple-picking, working, laundry,
```



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

STEPHANIE HOFER
October 13, 2006

```
 1        cooking, playing softball.  There are so
 2        many, there's so much.
 3   Q.   If that's all you have for now, that's fine.
 4   A.   I could go on and on and on.  I mean, I could
 5        fill up pages of things, you know, but I
 6        would have to think.  There are things that
 7        you don't necessarily do every day, you know,
 8        and those things, there are many things I
 9        can't do out of a normal routine day, but
10        then there are also many activities that I
11        can't participate in, you know, like during
12        certain times of year, you know.
13        Apple-picking is a big thing right now,
14        you know.  Work is my biggest issue, I can't
15        work, but, you know, summer activities,
16        dancing, enjoying, enjoying things that I
17        used to enjoy.  It's very difficult.  Put me
18        at a wedding and it's not enjoyable because
19        I can't participate so much, so the list
20        could go on and on and on.
21   Q.   As for those things you just listed, I'm
22        going to ask a couple follow-up questions,
23        all right?  How often did you exercise per
24        week before you were injured?
25   A.   Daily.
```



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

STEPHANIE HOFER
October 13, 2006

1   Q.   What did you do daily?

2   A.   I went to a gym and I walked every day with

3        my dogs.

4   Q.   When you say outdoor activities, what type

5        of outdoor activities were you referring to?

6   A.   Walking outside, going to the beach and

7        walking through the sand, climbing trees

8        for apple-picking, running in the yard with

9        the dogs and the kids, up and down the stairs

10       to the decks.  Swimming is very difficult on

11       my leg.  Outdoor activities, just being

12       outdoors.

13  Q.   I'm staying silent because I just want to

14       make sure you're finished so let me know

15       when you're done.

16  A.   No, no, I understand.  There are so many.

17       I think that's all I have right now that

18       comes to mind.

19  Q.   When was the last time you traveled before

20       your accident?

21  A.   Probably a year before my accident.

22  Q.   How often did you travel before your

23       accident?

24           MS. MINCHOFF:  Objection.

25  A.   Relatively often.


BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

STEPHANIE HOFER
October 13, 2006

1   Q.  What do you mean by "relatively often"?

2   A.  Once every six months or so.

3   Q.  How many times have you traveled since your

4       accident?

5   A.  None.

6               MS. MINCHOFF:  Objection.

7   Q.  Prior to your accident, when was the last

8       time you golfed?

9   A.  The fall prior.

10  Q.  How many times per year did you golf prior

11      to your accident?

12  A.  I couldn't count.

13  Q.  More than five?

14  A.  Yes.

15  Q.  More than ten?

16  A.  Yes.

17  Q.  More than 12?

18  A.  Yes.

19  Q.  Where did you golf?

20  A.  All over.

21  Q.  All over Massachusetts?

22  A.  Yes.

23  Q.  All over New England?

24  A.  A few other places in New England, a couple

25      of times in Florida.



STEPHANIE HOFER
October 13, 2006

```
 1   Q.   Prior to your accident, when was the last
 2        time you water-skied?
 3   A.   The summer before.
 4   Q.   How often did you water-ski the summer before
 5        your accident?
 6   A.   Once or twice.
 7   Q.   When was the last time you skated prior to
 8        your accident?
 9   A.   The winter before.
10   Q.   How often did you skate?
11   A.   Every weekend.
12   Q.   That's prior to your accident?
13   A.   Yes.
14   Q.   Have you skated since your accident?
15   A.   No, I have not.
16   Q.   Have you water-skied since your accident?
17   A.   No.
18   Q.   Have you golfed since your accident?
19   A.   No.
20   Q.   Have you tried to golf since your accident?
21   A.   No.
22   Q.   Have you tried to water-ski since your
23        accident?
24   A.   No.
25   Q.   Have you tried to skate since your accident?
```



STEPHANIE HOFER
October 13, 2006

```
 1   A.   No.

 2   Q.   Prior to your accident, when was the last

 3        time you went sledding?

 4   A.   Probably it could have been a few weeks.

 5   Q.   Do you know for sure?

 6   A.   No, I don't know for sure.

 7   Q.   How many times did you go sledding prior to

 8        your accident?

 9   A.   Many times.  We live on a hill.

10   Q.   Have you gone sledding since your accident?

11   A.   No, I have not.

12   Q.   Have you tried?

13   A.   No.

14   Q.   When was the last time you played softball

15        prior to your accident?

16   A.   The year before my accident, the summer

17        before.

18   Q.   And how often per year did you play softball

19        prior to your accident?

20             MS. MINCHOFF:  Objection.

21   A.   Twice a week.

22   Q.   Was it seasonal?

23   A.   Yes.

24   Q.   During the spring and summer?

25   A.   Yes.
```



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

STEPHANIE HOFER
October 13, 2006

```
 1   Q.   Have you played softball since your accident?

 2   A.   No.

 3   Q.   Have you tried?

 4   A.   No.

 5   Q.   Prior to your accident, when was the last

 6        time you went dancing?

 7   A.   Very relatively close.

 8   Q.   I'm sorry?

 9   A.   Relatively close to the time of my accident.

10        I couldn't give you an exact.

11   Q.   Was this going out for a night or at some

12        sort of function?

13   A.   At a function, yeah.

14   Q.   How often did you dance prior to your

15        accident on average per year?

16   A.   On average per year, depends on how many

17        weddings I went to.

18             MS. MINCHOFF:  Objection.

19   Q.   Were weddings the only place you --

20   A.   Weddings or company functions, yeah.

21   Q.   But aside from weddings and company

22        functions, did you dance anywhere?

23   A.   No.

24   Q.   Have you danced since your accident?

25   A.   No.
```



STEPHANIE HOFER
October 13, 2006

```
 1   Q.  Have you tried?

 2   A.  Yes.

 3   Q.  When was the last time you tried?

 4   A.  At my mother's wedding this summer.

 5   Q.  I'm not sure how to ask this so I'll just

 6       ask this straight away.  Does it hurt to

 7       drive?

 8               MS. MINCHOFF:  Objection.

 9   A.  I drive an automatic, and since my leg hurts

10       all day, it's uncomfortable, but I rest it

11       to the side on the rest block so as far as

12       making it any worse, no.  It's just

13       uncomfortable.

14   Q.  I believe you've testified that it's also

15       uncomfortable, sometimes painful to walk,

16       correct?

17   A.  Yes.

18   Q.  And do you walk with the assistance of a

19       cane?

20   A.  Yes, I do, and a brace.

21   Q.  I believe we talked about that the first

22       day, correct?

23   A.  I believe so.

24   Q.  Have you looked into motorized assistance

25       with your mobility?
```



STEPHANIE HOFER
October 13, 2006

1   A.   No.

2   Q.   Why not?

3          MS. MINCHOFF:  Objection.  Calls for

4       medical conclusion.  You can answer.

5   A.   I don't think I have an answer for that.  I

6       don't think I require it.

7   Q.   Have you consulted with anybody about

8       motorized assistance to get around?

9          MS. MINCHOFF:  Objection.  I'm just

10      going to state for the record that a lot of

11      your questions seem to be questions that

12      were previously asked and actually testified

13      to through the first two days.  I think

14      there's over 500 pages of deposition

15      transcript already.

16         MR. REITH:  There's only 354,

17      actually, prior to today, and the questions

18      I ask may sound familiar because a lot of

19      them came from Mr. Hofer's deposition.  These

20      questions have not been asked by my office

21      to Ms. Hofer.  I will try to limit the

22      duplication over anything that Mr. Feringa

23      asked, though.  Fair enough?

24         MS. MINCHOFF:  Fair enough.

25  Q.   And this is one of those topics that Mr.



STEPHANIE HOFER
October 13, 2006

```
 1        Feringa did touch upon.  The concept of the
 2        vocational counseling, do you recall -- just
 3        for the record I'd state that the microphones
 4        do cause much problems during these things,
 5        but that's fine?
 6              Back to the things at hand, do you
 7        recall Mr. Feringa asking you about seeking
 8        out a vocational counselor?
 9   A.   I recall him mentioning it, yeah.
10   Q.   And if I recall correctly, you corrected him
11        and said that it wasn't a vocational
12        counselor that you met with, correct?
13              MS. MINCHOFF:  Objection.
14   A.   Correct.
15   Q.   Have you spoken to someone who could assist
16        you with determining what type of job you
17        may be able to do since our last discussion,
18        our last day of deposition?  Excuse me.
19   A.   Could you repeat that?
20   Q.   Sure.  I'll rephrase it.  It was a little
21        bit of a tough question.  Since our last time
22        that we met for deposition, have you met
23        with any sort of counselor as to possible
24        occupations?
25   A.   No.
```



STEPHANIE HOFER
October 13, 2006

1   Q.  Now, directing your attention to the accident

2       itself, okay, when the flip-flop allegedly

3       gave way, what foot was that flip-flop on?

4               MS. MINCHOFF:  Objection.  Asked and

5       answered.  You can answer.

6   Q.  I just don't recall --

7               MS. MINCHOFF:  Attorney Reith, I'm

8       going to allow her to answer to a certain

9       extent, but this was definitely covered more

10      than once in the 350 or so pages of her prior

11      deposition testimony.

12  A.  The flip-flop that broke was on my right

13      foot.

14  Q.  Here we go again with jumping around a little

15      bit, okay?  There was a line of questioning

16      from your first day of deposition on Page

17      193, and I can show it to counsel to the

18      extent they request, where Attorney Feringa

19      asked his question, not mine, you were not

20      supposed to be drinking alcohol while you

21      were on Prozac, correct?  Ms. Minchoff

22      objected, and then the answer was, "you know

23      what?  It's not written in law and my doctor

24      says you can have a couple of drinks, just

25      don't overdo it."  Do you remember that line



STEPHANIE HOFER
October 13, 2006

```
 1      of questioning?

 2              MS. MINCHOFF:  Objection.

 3  A.  I would have to look through it to

 4      actually...

 5  Q.  Do you mind if I present it to you --

 6  A.  No.

 7  Q.  -- just to give you the context.

 8  A.  I do recall this line of questioning.

 9  Q.  Which doctor said that to you?

10  A.  Probably, and this would just be a good

11      guess, it would be the doctor that prescribed

12      that medication.

13  Q.  Which doctor was that?

14  A.  I believe that was Dr. Frazier.

15  Q.  Again, is Dr. Frazier your primary?

16  A.  My primary care.

17  Q.  That's all I have for that.  Thank you.  Are

18      you still in therapy?

19              MS. MINCHOFF:  Objection.

20  Q.  Let me ask it again.  Are you still in

21      physical therapy?

22  A.  Yes.

23  Q.  How often do you go to physical therapy?

24  A.  It's just been revised and I'll be going two

25      days a week.
```



Page 381

STEPHANIE HOFER
October 13, 2006

```
 1   Q.   At any point did you have a break in the

 2        physical therapy, stop going?

 3   A.   Yes, I did have a break.

 4   Q.   When was that break?

 5   A.   Probably -- I couldn't put a time frame on

 6        it.  There was a time, I think it was a

 7        four-month break where they discharge you

 8        because you've reached a certain point, and

 9        then your next appointment your doctor

10        re-evaluates you and decides whether or not

11        you need to be back in physical therapy, and

12        I just got that decision this past week.

13   Q.   Who made that decision?

14   A.   My neurologist.

15   Q.   Just remind me the name, please.

16   A.   Dr. Stojanovic, S T O J A N O V I C.

17   Q.   Have you discussed this lawsuit with your

18        mother since her deposition?

19   A.   No.

20   Q.   Have you discussed the lawsuit with Carrie

21        since Carrie's deposition?

22   A.   No.

23   Q.   I'm not sure if we discussed this during

24        the first few days, and if we did, forgive

25        me.  Did you speak with your husband on the
```



STEPHANIE HOFER
October 13, 2006

```
 1      phone after your injury while you were in

 2      the hospital?

 3              MS. MINCHOFF:  Objection.

 4  A.  I believe I did.

 5  Q.  Do you recall what was said during that

 6      discussion?

 7              MS. MINCHOFF:  Objection.

 8  A.  I don't recall.  Sorry.

 9              MS. MINCHOFF:  Don't answer.

10              MR. REITH:  Basis?

11              MS. MINCHOFF:  I'll withdraw the

12      objection as to whether you can recall

13      whether you remember what you said during a

14      conversation that you're not sure you had.

15      You can answer that question.

16  A.  I was very out of it.  I don't recall what

17      was said.

18  Q.  Do you remember the general substance of it?

19  A.  No.

20  Q.  Prior to injuring your foot in Jamaica,

21      did you have any injuries that would have

22      impaired your mobility?

23  A.  No.

24  Q.  This is a good thing.  I'm flipping through

25      as quickly as possible here.  We're going to
```



STEPHANIE HOFER
October 13, 2006

1       go through some documents now, okay?

2                   MR. REITH:  India and Meredith, just

3       for purposes of procedure, the complaint to

4       this action was marked as Exhibit 11 last

5       time.  The original complaint, I believe it

6       was with Scott because he retained the

7       originals, so my thought was today, for

8       examination purposes, I was just going to

9       mark a copy of that as Exhibit 11A.  Does

10      anybody have any objection to that?

11                  MS. MINCHOFF:  I don't even think

12      you need to mark it, Tom.  I think you can

13      just show her a copy of it.

14                  MR. REITH:  It just doesn't have an

15      exhibit marker on it.

16                  MS. MINCHOFF:  Let me just take a

17      look at it.

18              (Pause)

19                  MR. REITH:  The only issue is I

20      think this copy that I'm presenting here has

21      a copy of the civil action cover sheet.

22      Okay.  It had everything?

23                  MS. MINCHOFF:  It was stapled,

24      the copy provided to me as Exhibit 11 from

25      Attorney Feringa has attached to the



STEPHANIE HOFER
October 13, 2006

```
 1      complaint, which is eight pages, two

 2      additional pages, one being the civil cover

 3      sheet and the second or the last page, being

 4      the second page of the civil cover sheet.

 5              MR. REITH:  Right.  If you don't

 6      mind, just pass that copy to her.

 7              MS. MINCHOFF:  And I'll hold on to

 8      this for now.

 9              MR. REITH:  Absolutely.

10  Q.  Ms. Hofer, the document that's been put

11      before you was originally marked as

12      Exhibit 11 to, I believe, the second day of

13      your deposition.  This is a copy of that

14      document, okay?

15  A.  Okay.

16  Q.  Just directing your attention to Page 2 of

17      the complaint, you see the seventh paragraph

18      there?

19  A.  Yes.

20  Q.  Actually, strike that because I asked you a

21      question about Paragraph 7 last time.

22      Turning your attention to Paragraph 8, do

23      you see that paragraph?

24  A.  Yes, I do.

25  Q.  Do you see where it says, "all access to its
```



STEPHANIE HOFER
October 13, 2006

```
 1        information on the Internet is via Hyperlinks
 2        such as the one provided through Expedia"?
 3                MS. MINCHOFF:  Objection.
 4   A.   Yes.
 5                MS. MINCHOFF:  Hypertextlinks.
 6                MR. REITH:  The term used in the
 7        complaint?
 8                MS. MINCHOFF:  You said Hyperlinks.
 9        The term used in the complaint is that
10        Hypertextlinks.
11                MR. REITH:  Thank you.
12   Q.   Do you know if any other websites use
13        Hypertextlinks to access Turtle Beach Towers?
14   A.   Not that I know of, no.  I don't know.
15   Q.   Paragraph 9 refers to a shuttle to the
16        resort.  Do you see that?
17   A.   Yes, I see it.
18   Q.   Who provided the shuttle to the resort, what
19        company?
20   A.   I don't remember.
21   Q.   Does Jamaica Tours remind you?
22   A.   It does ring a bell, but I'm not sure.  I
23        know there may be a couple, but that could
24        be it.
25   Q.   Was the shuttle that took you to the resort
```



STEPHANIE HOFER
October 13, 2006

```
 1        hired by the resort?
 2                  MS. MINCHOFF:  Objection.
 3     A.  I have no idea.
 4     Q.  How did you know to get on that shuttle to
 5        the resort?
 6     A.  When we got off the plane, you carry, had
 7        some vouchers and you bring them to a desk
 8        and they assign you to wherever it is you're
 9        supposed to go.  Somebody brings you to a
10        certain area and they say this is how you'll
11        be getting to your hotel.
12     Q.  Do you recall what company that person was
13        who said this is how you'll get to your
14        hotel?
15     A.  No, I don't.
16     Q.  Was that person from Expedia?
17     A.  I don't recall.
18     Q.  Did that person identify themselves as being
19        from Expedia?
20     A.  I don't recall.
21     Q.  Did that person have a name badge on that
22        says they were an Expedia employee?
23     A.  I can't recall that.
24     Q.  Was it a man or woman?
25     A.  I can't recall that.
```



STEPHANIE HOFER
October 13, 2006

```
 1   Q.   Turning your attention to Paragraph 11 on

 2        Page 3, do you see where it says, "stairway

 3        was very dimly lit and did not contain

 4        guardrails"?

 5   A.   Yes.

 6   Q.   How dimly lit was the staircase?

 7   A.   I can't recall.

 8   Q.   Could you see the stairs going up to the

 9        lobby?

10   A.   Yes.

11   Q.   Could you see the lobby door?

12   A.   Yes.

13   Q.   Could you see the turtle pond?

14   A.   I knew it was there.

15   Q.   How did you know it was there?

16   A.   When we arrived, it was light out.

17   Q.   Aside from when you arrived, do you recall

18        seeing it on your way up the stairs to the

19        lobby that evening?

20   A.   Yes.

21   Q.   And when you turned to go back down the

22        stairs, could you see the staircase on the

23        way down?

24             MS. MINCHOFF:  Objection.

25   A.   Yes.
```



STEPHANIE HOFER
October 13, 2006

1   Q.  Could you see your foot, your right foot?

2            MS. MINCHOFF:  Objection.

3   A.  At what point?

4   Q.  As you were walking down the stairs.

5   A.  I wasn't exactly looking at me feet when I

6       was going down until something happened, till

7       I had the accident.  When I looked at my

8       feet, yes, I saw them.

9   Q.  Were there any lights out around the lobby

10      entrance?

11  A.  I can't recall that.

12  Q.  You state that the staircase did not contain

13      guardrails, correct?

14  A.  Correct.

15  Q.  What is the importance of there being a

16      guardrail by the turtle pond?

17           MS. MINCHOFF:  Objection.

18  A.  Could you repeat that, please?

19  Q.  Sure.  What difference does it make that

20      there were no guardrails next to the turtle

21      pond on the staircase?

22           MS. MINCHOFF:  Objection.

23  A.  It's my opinion that if there's not a

24      guardrail and somebody stumbles, they've got

25      nowhere to go but down, nothing to hang on



STEPHANIE HOFER
October 13, 2006

```
1         to as they fall or nothing to block them from
2         falling into the turtle pond.
3    Q.   Can you state with certainty if there was a
4         guardrail there, you wouldn't have fallen
5         into the turtle pond?
6              MS. MINCHOFF:  Objection.
7    A.   I can't say with certainty, but it's a
8         probability that I wouldn't have fallen.
9    Q.   You base that opinion on what?
10             MS. MINCHOFF:  Objection.
11   A.   That opinion is just my opinion.  It's common
12        sense.
13   Q.   Paragraph 19, draw your attention to that,
14        please.
15   A.   Yes.
16   Q.   "In the future, Stephanie will require
17        reconstructive and plastic surgery in her
18        left leg."  Do you see where it states that?
19   A.   Yes, I do.
20   Q.   Have you undergone any reconstructive and
21        plastic surgery?
22   A.   Not yet.
23   Q.   Do you have any plans to in the future?
24   A.   Yes.
25   Q.   When in the future?
```



STEPHANIE HOFER
October 13, 2006

```
 1   A.   When my doctors and I are absolutely positive
 2        that my healing from the actual accident is
 3        done so that when you go for plastic surgery,
 4        you're not, you know that everything is
 5        healed and you can do that now.
 6   Q.   Have you discussed the timetable with your
 7        doctors for that?
 8   A.   They can't give me a timetable.
 9   Q.   Turning your attention to Count 5, which is
10        entitled Negligent Failure to Warn Expedia,
11        on Page 7, just let me know when you're
12        there.
13   A.   Negligent Failure to Warn Expedia?
14   Q.   Yes.  Do you see that?
15   A.   Yes.
16   Q.   Do you see where it says Expedia is an agent
17        for the resort, No. 46?
18   A.   Yes, I see that.
19   Q.   What facts do you personally have that
20        Expedia is an agent for the resort?
21              MS. MINCHOFF:  Objection.
22   A.   Can I answer?
23   Q.   Yes.
24              MS. MINCHOFF:  Yes.
25   A.   Since Expedia is the sole entity that
```



STEPHANIE HOFER
October 13, 2006

```
 1        conducts business, you know, therefore, they

 2        act as a -- Expedia acts as a booking agent

 3        for the hotel, but it also acts as a booking

 4        agent for the clients, and as far as that

 5        goes -- we're in 46, you said?

 6    Q.  Or just in general I'm asking.  What

 7        information do you have that Expedia is an

 8        agent for the resort?

 9    A.  I don't have any specific information aside

10        of, you know, that they conduct business

11        with the resort.

12    Q.  Do you know if Expedia has a contract with

13        the resort?

14              MS. MINCHOFF:  Objection.

15    A.  I do not know that.

16    Q.  Do you know if the contract between Expedia

17        and the resort states specifically that

18        Expedia is not an agent for the resort?

19              MS. MINCHOFF:  Objection.

20    A.  I'm unaware of any of that.

21    Q.  Do you see where it says, "Expedia breached

22        its duty to Stephanie in failing to warn

23        her" --

24              MS. MINCHOFF:  Where are you, Tom?

25              MR. REITH:  I was going to get
```



STEPHANIE HOFER
October 13, 2006

```
 1        there.

 2   Q.   Do you see where it says, "Expedia breached

 3        its duties to Stephanie in failing to warn

 4        her of the stairway's dangerous condition" in

 5        Paragraph 49?

 6   A.   Yes, I see that.

 7   Q.   How would Expedia have warned you, Stephanie

 8        Hofer, of the stairway's alleged dangerous

 9        condition?

10             MS. MINCHOFF:   Objection.

11   A.   I believe that Expedia does inspections for

12        the hotels that they represent and there were

13        obviously dangerous situations that weren't

14        mentioned through Expedia for this hotel.

15        Therefore, if Expedia is acting as my travel

16        agent and their booking agency, then I

17        believe that there is a breach.   Either

18        Expedia should have been able to warn

19        potential customers that there is potentially

20        unsafe situations through their inspectors.

21   Q.   What are the alleged dangerous conditions

22        you're talking about here?

23   A.   I'm talking about the railings not

24        surrounding the turtle pool, for one, for

25        actually the most important.   As far as other
```



STEPHANIE HOFER
October 13, 2006

1         dangerous situations around the hotel, I'm
2         sure there are more, but this one is the
3         only one I'm aware of.
4    Q.   What is the only one that affected you
5         personally, though?
6              MS. MINCHOFF:  Objection.
7    A.   The only -- I'm sorry.
8    Q.   You can answer.
9    A.   The only one I'm aware of is --
10             MS. MINCHOFF:  Objection.
11   Q.   You can answer.
12   A.   Can you repeat it now, please?
13             MR. REITH:  Can you please repeat
14        the question to the witness?
15             (Question read)
16   A.   What is the only one what?
17   Q.   Well, I understand from your complaint --
18        correct me if I'm wrong -- that you
19        complained that dangerous conditions were
20        the dimly-lit staircase and a lack of
21        railings, is that correct?
22   A.   That is correct.
23   Q.   Those are the only two conditions that you
24        presently complain of that affected you and
25        allegedly caused your injury?



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

STEPHANIE HOFER
October 13, 2006

```
 1   A.  They are the only situations that affected

 2       me.

 3   Q.  Do you know when the hotel was built?

 4   A.  No, I do not.

 5   Q.  Would you be surprised to hear the hotel is

 6       approximately 40 years old?

 7            MS. MINCHOFF:  Objection.

 8   A.  I would have no way to even guess.  I'm not

 9       a contractor.

10   Q.  Would you be surprised to understand that

11       in the 30 years that Ms. Faline Miller has

12       been general manager of that hotel, no one

13       else has ever hurt themselves in the turtle

14       pond?

15            MS. MINCHOFF:  Objection.

16   A.  Excuse me?

17   Q.  Would you be surprised to find out that in

18       the 30 years that Ms. Faline Miller was the

19       general manager of that hotel, that no one

20       else besides yourself hurt themselves in

21       that turtle pond?

22            MS. MINCHOFF:  Objection.

23   A.  Would I be surprised?

24   Q.  Yes.

25            MS. MINCHOFF:  Objection.
```



STEPHANIE HOFER
October 13, 2006

1   A.   That's irrelevant to me.

2   Q.   I'm just wondering how you determined what

3        is dangerous and what is not.

4             MS. MINCHOFF:  Objection.  Asked and

5        answered.

6   Q.   You can answer.

7             MS. MINCHOFF:  Actually, Stephanie,

8        you've already answered it.

9             MR. REITH:  I don't think she has.

10            MS. MINCHOFF:  I believe she has.

11            MR. REITH:  Not that specific

12       question.

13            MS. MINCHOFF:  How generally

14       anything is dangerous to her, is that the

15       question now?  Because you've asked her what

16       was dangerous about the staircase and lack

17       of railing and she's answered that, so what

18       is the question now, Attorney Reith?

19            MR. REITH:  We'll just move on,

20       then.

21  Q.   Back to my initial question I asked probably

22       about five minutes ago now, how did Expedia

23       breach its duties to you, Stephanie Hofer,

24       by failing to warn you of the staircase's

25       dangerous condition?



STEPHANIE HOFER
October 13, 2006

 1            MS. MINCHOFF:  Asked and answered.

 2       Objection.

 3            MR. REITH:  It was not.

 4            MS. MINCHOFF:  Why don't we check

 5       back on the record.

 6            MR. REITH:  Do you want to waste the

 7       time to do that?

 8            MS. MINCHOFF:  Yes.

 9  Q.  I'll ask it a different way, all right?  And

10       this question has not been answered.  How

11       would Expedia have warned you, Stephanie, of

12       the stairway's dangerous condition?

13            MS. MINCHOFF:  I believe it was

14       asked and answered, and I will state my

15       objection and allow the deponent to answer.

16  A.  How would they have?

17            MS. MINCHOFF:  What's the question?

18            MR. REITH:  Would you repeat it,

19       please?

20            (Question read)

21  A.  I don't know how they would have warned me

22       specifically.  However, if there's been an

23       inspection and somebody else didn't notice,

24       then I believe that's negligence.

25  Q.  What personal information do you have that



STEPHANIE HOFER
October 13, 2006

1       Expedia conducted inspections of the resort?

2              MS. MINCHOFF:  Objection.

3   A.  I believe it was said --

4              MS. MINCHOFF:  Any information that

5       you have obtained through your counsel, Ms.

6       Hofer, you don't have to disclose.

7              THE WITNESS:  Okay.

8              MS. MINCHOFF:  And I'm not sure what

9       Attorney Reith meant when he asked you that

10      question.

11  Q.  It was not.

12  A.  Could you repeat it, then, for me, please?

13  Q.  Sure.  What personal information do you have

14      that you, Stephanie Hofer, have that Expedia

15      conducted inspections of the resort?

16  A.  I don't have any personal knowledge.

17  Q.  You can put that exhibit to the side.  Thank

18      you.

19             MS. MINCHOFF:  I'm going to take it

20      back, if that's okay.

21             MR. REITH:  Absolutely.  Mark that

22      as the next exhibit.

23             (Exhibit 13 marked for

24      identification.)

25  Q.  I'm just going to put a document that's been



STEPHANIE HOFER
October 13, 2006

```
 1        marked Exhibit 13 for identification today
 2        before you.  It's entitled Stephanie Hofer's
 3        First Supplemental Answers to Defendant,
 4        Expedia, Inc.'s, First Request for
 5        Admissions, okay?
 6   A.   Yes.
 7   Q.   Do you recognize that document?
 8   A.   Yes, I do.
 9   Q.   Whose signature is that down there above
10        "Stephanie Hofer"?
11             MS. MINCHOFF:  Objection.
12   Q.   I'll ask it a different way.  Is that your
13        signature on the bottom of the page?
14             MS. MINCHOFF:  You said above
15        "Stephanie Hofer."  You mean the typewritten?
16   Q.   Yes.
17   A.   Mine.
18   Q.   I wasn't trying to trick you.
19   A.   You said above, and I...
20   Q.   It could have been handwritten or
21        typewritten.
22   A.   I understand.  Sorry.
23   Q.   But that is your signature?
24   A.   Yes, it is.
25   Q.   You can put that document to the side.
```



STEPHANIE HOFER
October 13, 2006

```
 1              MR. REITH:  I ask you to mark this
 2         as the next document, please.
 3              (Exhibit 14 marked for
 4         identification.)
 5    Q.   I'm just going to put before you a document
 6         that's been marked as Exhibit 14 for
 7         identification today.  It's entitled
 8         Stephanie Hofer's Answers to Defendant,
 9         Expedia, Inc.'s, First Request for
10         Admissions.  Do you recognize that document?
11    A.   Yes, I do.
12    Q.   Just directing your attention to the final
13         page, is that your signature above the
14         typewritten font, Stephanie Hofer?
15    A.   Yes, it is.
16    Q.   You can put that document aside.  Thank you.
17              (Exhibit 15 marked for
18         identification.)
19    Q.   I'm just going to put a document before
20         you that's been marked as Exhibit 15 for
21         identification today.  After you've had a
22         chance to review that document, would you
23         please let me know?
24              MS. MINCHOFF:  Are you going to ask
25         her a specific question about the document
```



STEPHANIE HOFER
October 13, 2006

1       or do you want her to read the document?

2                    MR. REITH:  I'm going to ask her

3       specific questions about Interrogatory 22.

4                    MS. MINCHOFF:  Can I make a

5       suggestion for the sake of time that perhaps

6       the deponent could move to Interrogatory No.

7       22.

8                    MR. REITH:  Sure.

9   Q.  I'll first ask it this way.  The document

10      that's been put before you that's entitled

11      Plaintiff, Stephanie Hofer's, First

12      Supplemental Answers to Defendant, Expedia

13      Inc.'s, First Set of Interrogatories, do you

14      recognize that document?

15  A.  Yes, I do.

16  Q.  And what do you recognize that document as?

17                   MS. MINCHOFF:  Objection.

18  A.  I recognize this as the first set of

19      interrogatories second answers.

20  Q.  You recognize this to be a document as it's

21      entitled, correct?

22  A.  Yes, I do.

23  Q.  And the same goes for the two documents I

24      just showed you in connection with the

25      request to admit?


BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

STEPHANIE HOFER
October 13, 2006

```
 1   A.   Yes.

 2   Q.   Now, if I can direct your attention just

 3        to the final page, before we get to

 4        Interrogatory No. 22, do you recognize the

 5        signature above the typed font, Stephanie

 6        Hofer?

 7   A.   Yes.

 8   Q.   Whose signature is that?

 9   A.   That's my signature.

10   Q.   Just direct your attention to Interrogatory

11        No. 22, if you can review that interrogatory

12        and the answer and the supplemental answer

13        and let me know when you're done.

14   A.   Okay.  (Witness examines document)

15            MR. REITH:  We will take a

16        five-minute break, if no one objects.

17            VIDEOGRAPHER:  Off the record at

18        2:08.

19            (Break taken)

20            VIDEOGRAPHER:  On the record at 216.

21        BY MR. REITH:

22   Q.   Just drawing your attention back to

23        Interrogatory No. 22, the original answer and

24        the supplemental answer.

25   A.   Yes.
```



STEPHANIE HOFER
October 13, 2006

1   Q.   Are you there with me?

2   A.   Yes, I am.

3   Q.   Do you see specifically in the supplemental

4        answer No. 22 where it says, "through

5        December 2005, my medical expenses

6        approximated $129,032.16"?

7   A.   Yes, I see that.

8   Q.   What is that number made up of?

9            MS. MINCHOFF:  Objection.

10  Q.   I can ask it a different way.  Does that

11       number include amounts you had to pay for

12       co-payments in connection with your husband's

13       insurance?

14           MS. MINCHOFF:  Objection.

15  A.   This number was derived by different

16       documents that were requested and calculated.

17  Q.   Do you recall what documents or what type

18       of documents those were?

19  A.   I believe they were requested from the

20       insurance company.

21  Q.   Aside from who they were requested by,

22       were they receipts for medications, were

23       they receipts for therapy?  What type of

24       documents were they?

25  A.   These were receipts for medical expenses,



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

STEPHANIE HOFER
October 13, 2006

1       medical care.

2   Q.  And by "medical care," what do you understand

3       medical care to be?

4   A.  Hospitalization, doctors' appointments,

5       follow-ups, surgery, medically related to

6       the accident.  I couldn't break it down right

7       now for you as to what, how this was

8       itemized.

9   Q.  Do you know if the documents that helped

10      calculate this number, if they were produced

11      in this case?

12              MS. MINCHOFF:  Objection.

13  A.  I don't.  I believe that they were -- my

14      attorney may have had them or made a phone

15      call.

16  Q.  Let me ask it this way.  Without getting

17      into communications directly between you and

18      your attorney, did you provide the documents

19      to your attorney that were used to calculate

20      this number?

21  A.  No, I didn't.

22  Q.  Do you still have those documents?

23  A.  I don't have those documents.

24              MS. MINCHOFF:  Objection.

25  Q.  Who has those documents?



STEPHANIE HOFER
October 13, 2006

```
 1                 THE WITNESS:  You objected.

 2                 MS. MINCHOFF:  Yes.

 3    A.  Who has those documents?

 4                 MS. MINCHOFF:  The documents that

 5         she just identified as her medical expenses

 6         and bills and medical records that you have,

 7         Attorney Reith?  What are you asking her?

 8                 MR. REITH:  Can we just go back to

 9         my question to the witness?

10                 (Question read)

11                 MS. MINCHOFF:  Is that the same

12         question that's before the witness?

13                 MR. REITH:  Yes.

14                 MS. MINCHOFF:  She already answered

15         that question, so objection.

16    Q.  Just turning your attention to the second

17         paragraph of the supplemental answer to

18         No. 22.

19    A.  Yes.

20    Q.  Do you see where it says, "if not for my

21         injuries, I could have worked a 40-hour work

22         week."  Do you see that sentence?

23    A.  Yes.

24    Q.  Were you working a 40-hour work week prior --

25    A.  No.
```



STEPHANIE HOFER
October 13, 2006

```
 1   Q.  -- to your injury?
 2             MS. MINCHOFF:  Objection.
 3   A.  Excuse me.
 4             MS. MINCHOFF:  You can answer.
 5   A.  Yes.
 6             MS. MINCHOFF:  No, you can answer
 7       the question.
 8   A.  I'm sorry.  Excuse me.  Could you repeat the
 9       question, please?
10   Q.  Absolutely.  Prior to your injury, were you
11       working a 40-hour work week?
12   A.  Yes.
13   Q.  Where were you working that 40-hour work
14       week?
15   A.  I was working split between Dr. Meszaros'
16       office and I was also doing nails at my
17       leisure for 20 hours a week or making my own
18       schedule for 20 hours a week.
19   Q.  I just want to make sure, did you read these
20       interrogatories before you signed them?
21   A.  This very one that we're discussing?
22   Q.  Yes.
23   A.  Yes, I did.
24   Q.  Just back to the document that was marked
25       as Exhibit 14 which was your answers to
```



STEPHANIE HOFER
October 13, 2006

1        Expedia's first request for admissions --

2    A.   Do I have a copy of that?

3    Q.   Yes, you do.

4             MS. MINCHOFF:  You don't in front of

5        you.

6    A.   Thank you.

7    Q.   Did you read that before you signed it?

8    A.   Yes, I did.

9    Q.   And did you read the document that was marked

10       as Exhibit 13 before you signed it?

11   A.   Yes, I did.

12   Q.   You can put those aside.  Thank you.

13            MR. REITH:  Mark that as the next

14       exhibit for identification, please.

15            (Exhibit 16 marked for

16       identification.)

17   Q.   I'm going to put before you a document

18       that's been marked as Exhibit 16 for

19       identification.  It's entitled Plaintiffs',

20       Douglas Hofer and Stephanie Hofer, Answers

21       to Defendant Expedia, Inc.'s, First Set of

22       Interrogatories.  I'm just going to ask you

23       if you recognize that document.

24   A.   Yes, I do.

25   Q.   Do you recognize that as your answers to



STEPHANIE HOFER
October 13, 2006

1       Expedia's first set of interrogatories?

2   A.  Yes, I do.

3   Q.  And is that your signature on the last page

4       above the typed font, Stephanie Hofer?

5   A.  Yes, it is.

6   Q.  Did you review this document before you

7       signed it?

8   A.  Yes, I did.

9   Q.  You can put that document aside.  Thank you.

10              MR. REITH:  Mark that as the next

11      exhibit, please.

12              (Exhibit 17 marked for

13      identification.)

14  Q.  I'm just going to put a document before

15      you that's been marked Exhibit 17 for

16      identification.  Just let me know when you've

17      had a chance to review it.

18  A.  Okay.

19  Q.  Do you recognize it?

20  A.  No, I don't recognize it, but I see it.

21  Q.  Do you know what it is?

22  A.  It's a receipt signed by Carrie LaBelle

23      for Runways Deli & Bar at Sangster

24      International Airport in Montego Bay.

25  Q.  Did you visit Runways Deli & Bar when you



STEPHANIE HOFER
October 13, 2006

```
 1       were down in Jamaica?

 2   A.  I don't recall.  It says the date is

 3       3/19/04, which was the date we left Jamaica.

 4   Q.  Okay.  You can put the document aside.  Thank

 5       you.

 6               MR. REITH:  Mark this as the next

 7       exhibit.

 8               (Exhibit 18 marked for

 9       identification.)

10   Q.  I'm just going to put a document before

11       you that's been marked as Exhibit 18 for

12       identification today.  Just let me know when

13       you've had a chance to review it.

14   A.  Okay.

15   Q.  Do you recognize that document?

16   A.  No, I don't.

17   Q.  Do you know why Ms. LaBelle was paying out

18       $5,570 as indicated in the amount paid out

19       line?

20               MS. MINCHOFF:  Objection.

21   A.  No, I don't.

22               MS. MINCHOFF:  Are you calling

23       Jamaica money dollars?

24               MR. REITH:  I'm also referring to

25       the amount paid out dollar amount.
```



STEPHANIE HOFER
October 13, 2006

```
 1                  MS. MINCHOFF:  Which is the same as

 2          amount of JAM in the line above?

 3                  MR. REITH:  Yes.

 4    A.    It's actually 100 American.

 5    Q.    Do you know why she took out $100?

 6    A.    It says March 18, 2004, 2:55 p.m.  She

 7          exchanged $100 currency for Jamaican money.

 8    Q.    Do you know that on your own or do you know

 9          that only from reviewing this document?

10    A.    I only know that from reading this document.

11    Q.    You can put that document aside.  Thank you.

12          Were you going through physical therapy in

13          June of 2004?

14    A.    Yes.

15                  MR. REITH:  I ask you to mark that

16          document as the next exhibit, please.

17                  (Exhibit 19 marked for

18          identification.)

19    Q.    Directing your attention to the document

20          that's been marked as Exhibit 19 for

21          identification today, do you recognize this

22          document?

23    A.    No.

24    Q.    Just directing your attention down, though,

25          to the fourth entry, see there's a line
```



STEPHANIE HOFER
October 13, 2006

1       straight across there?

2    A.   Yes.

3    Q.   I'll represent to you because the page is

4        cut off, the date on the far left side is

5        6/8/04.

6    A.   Mm-hmm.

7            MS. MINCHOFF:  Objection.

8    Q.   Do you see where it says PT cancelled?

9    A.   Yes.

10   Q.   Do you recall cancelling any physical therapy

11       in 2004?

12   A.   I don't recall.

13   Q.   Did you?

14   A.   I may have.

15   Q.   Do you recall why?

16   A.   No, I don't.

17   Q.   Did you go to all your physical therapies

18       that were assigned during the year 2004?

19   A.   I would assume I did.  However, if there was

20       something to be cancelled, I'm sure it was

21       made up at some point.

22           MR. REITH:  I ask you to mark this

23       as the next document, please, for

24       identification.

25



STEPHANIE HOFER
October 13, 2006

```
 1                    (Exhibit 20 marked for
 2          identification.)
 3    Q.    I'm just going to put before you the document
 4          that's been marked as Exhibit 20 for
 5          identification today.  Could you please take
 6          a look at that and let me know when you're
 7          done.  So you don't have to try to read the
 8          entire thing.  I can direct you to a specific
 9          line, if that would be helpful.
10    A.    No, I'd like to read the entire thing.
11          (Witness examines document)  Okay.
12    Q.    What was U. Mass. Memorial Health Alliance?
13    A.    What was the U. Mass. Memorial Health
14          Alliance?
15    Q.    Yes.  I'll ask it a different way.  Do you
16          know what U. Mass. Memorial is?
17    A.    Yes.
18    Q.    What is it?
19    A.    It's a hospital.
20    Q.    Okay.  Did you ever attend U. Mass. Memorial
21          for treatment in connection with your injury?
22    A.    Yes.
23    Q.    Do you recall attending U. Mass. Memorial in
24          or around September of 2004?
25    A.    Yes.
```



STEPHANIE HOFER
October 13, 2006

1  Q.  Do you see where it says six lines down,
2      "improving endurance and function"?
3  A.  Yes.
4  Q.  Do you recall how well you were progressing
5      in connection with your rehabilitation in or
6      around September of 2004?
7            MS. MINCHOFF:  Objection.  As to
8      endurance?
9  Q.  Just in general.
10 A.  As to what?  As to zero where I wasn't
11     functioning at all?  I was improving.
12 Q.  At any point did you reach an optimal level
13     of improvement where the doctors said that
14     you weren't going to improve any further?
15 A.  Yes.
16 Q.  When was that that you reached that?
17 A.  I don't recall.
18 Q.  Was it within the last year?
19 A.  I believe it may have been in the last year,
20     but there's always something, you know, to
21     keep pushing, keep trying, because maybe you
22     never know.  But, yes, they have said to me
23     that it's as good as it's going to get.
24 Q.  Between the time that you injured yourself
25     in Jamaica and present day, did you ever



STEPHANIE HOFER
October 13, 2006

1         re-injure your foot, your left foot, that is?

2    A.   Have I ever re-injured my left foot?

3    Q.   Yes.

4    A.   Define "re-injure."

5    Q.   Have you ever sprained your left foot since

6         your injury in Jamaica?

7    A.   I could have.  I don't recall.  I don't know.

8    Q.   Did the wounds on your -- strike that.  It

9         is your left foot that you hurt down in

10        Jamaica?

11   A.   Yes, it is.

12   Q.   Did your wounds on your left foot ever heal

13        and then did you hurt them again such that

14        they reopened?

15             MS. MINCHOFF:  Objection.

16   A.   I don't recall.

17   Q.   You can put that document aside.  Thank you.

18             MR. REITH:  Mark that as the next

19        document, please.

20             (Exhibit 21 marked for

21        identification.)

22   Q.   I'm just going to put before you a document

23        that has been marked as Exhibit 21 for

24        identification, ask you to take a look at

25        it in as much detail as you like and let me



STEPHANIE HOFER
October 13, 2006

1        know when you're done.

2   A.   (Witness examines document)

3              (Exhibit 22 marked for

4        identification.)

5   A.   Okay.

6   Q.   Just directing your attention to the section

7        that says function.

8   A.   Yes.

9   Q.   I'm going to have to backtrack a little bit.

10       I want to make sure we're all on the same

11       page.  Do you see where it says Health

12       Alliance up top?

13  A.   Yes, I do.

14  Q.   What is Health Alliance?

15  A.   Health Alliance is part of U. Mass. Memorial

16       Health Care.

17  Q.   Did you attend Health Alliance at any point

18       for assistance with your injury?

19  A.   Yes.  This is the physical therapist part

20       of Health Alliance.

21  Q.   Thank you.  Do you see where it's dated

22       11/29/04 up top?

23  A.   Yes.

24  Q.   Were you attending Health Alliance as of

25       November '04?


BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

STEPHANIE HOFER
October 13, 2006

1   A.  Yes, I was.

2   Q.  Now, directing your attention to the section

3       that says function.

4   A.  Yes.

5   Q.  The second line, do you see where it says,

6       "no foot slap or drop noted"?

7   A.  Yes, I do.

8   Q.  Do you know what that means?

9   A.  It means with AFO, "no notice foot slap or

10      drop noted, good plus balance, left single

11      leg," and then it's cut off.

12  Q.  What is with AFO mean?

13  A.  With my brace.  An AFO is a brace.

14  Q.  So with your brace on, you don't have any

15      foot slap or drop?

16  A.  Right.

17  Q.  And without it, do you?

18  A.  Without it, I do.

19  Q.  Put that aside.  Thank you.  I'm going to

20      put a document before you that's marked

21      Exhibit 22 for identification today.  Just

22      let me know when you've had a chance to

23      review it in as much detail as you'd like.

24  A.  (Witness examines document)  Okay.

25  Q.  Just directing your attention to the top



STEPHANIE HOFER
October 13, 2006

```
 1        of the page where it says Health Alliance,
 2        do you see that?
 3   A.   Yes.
 4   Q.   Is that the place you attended physical
 5        therapy?
 6   A.   Yes.
 7   Q.   Were you attending Health Alliance as of
 8        March of '05?
 9   A.   Yes.
10   Q.   Were you attending Health Alliance as of
11        April '05?
12   A.   Yes.
13   Q.   Directing your attention down to the April,
14        I believe it's 13, '05 entry, which is the
15        second entry on the page.
16   A.   Yes.
17   Q.   Do you see where it says, "ability for
18        prolonged activity" in the second line?
19   A.   Yes.
20   Q.   Do you know what that entry is referring to?
21   A.   Yes.
22   Q.   What is it referring to?
23   A.   It means that my ability for prolonged
24        activity during physical therapy has
25        increased.
```



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

STEPHANIE HOFER
October 13, 2006

```
 1   Q.   So that's only while you're in physical

 2        therapy?

 3   A.   While I have been in physical therapy, my

 4        endurance had increased.  I was able to,

 5        during physical therapy, was able to reach

 6        my goal is what that says, is what that

 7        means.

 8   Q.   So am I to understand that it's while you're

 9        actually in the physical therapy session

10        you're able to do the things that you had

11        wanted to do during the actual session?

12   A.   They set goals for you and each time you

13        reach a goal, you get another goal.  So the

14        ability for prolonged activity to reach goals

15        has increased.

16   Q.   But do you see there where it says, "ability

17        for prolonged activity," period?  It doesn't

18        say anything after that about reaching goals,

19        does it?

20   A.   I don't see a period, but I know how Bill

21        wrote, so...

22   Q.   Who is Bill?

23   A.   He was one of my therapists.

24   Q.   What was Bill's last name?

25   A.   Chipman, Chapman, Chapman.
```



STEPHANIE HOFER
October 13, 2006

```
 1   Q.   Is that C H A P M A N?

 2   A.   Yes.

 3   Q.   Directing your attention down a little bit

 4        further where it says, "strength/balance

 5        progressing towards goals"?

 6   A.   Yes.

 7   Q.   What were the goals as of this point in April

 8        of '05?

 9   A.   I'm not quite sure if I can remember those

10        goals, but I know that they were all

11        surrounding my range of motion and my

12        strength so that I would be more functional

13        so that I could return to as much function

14        as that I would gain back.

15   Q.   Since April '05, has your endurance

16        increased?

17             MS. MINCHOFF:  Objection.

18   A.   With consistent exercise with my leg and

19        physical therapy, I would say that it may

20        have increased some.  I actually had

21        discontinued physical therapy for some

22        time so they've re, you know, they want me

23        back in it to re-establish a new baseline

24        and then go from there.  So as far as where

25        I was here to where I am now, I have no idea
```



STEPHANIE HOFER
October 13, 2006

```
 1        because this is based on measurements.
 2   Q.   Excuse my interruption.  Now, when you
 3        stopped the physical therapy, at whose
 4        direction did you stop it?
 5   A.   At the therapist.
 6   Q.   Did you ask to continue it?
 7              MS. MINCHOFF:  Objection.
 8   A.   When a therapist dismisses you, you're
 9        dismissed.
10   Q.   But the answer is you did not ask him to
11        continue it?
12   A.   No.
13   Q.   Do you recognize the term "biofeedback"?
14   A.   Yes, I do.
15   Q.   What does that term mean?
16   A.   That term means that you get hooked up to
17        different electrodes and leads and there's
18        a software that measures stressors or
19        tension, different reactions of your body
20        in accordance to whether it be pain or --
21        you know, they use it for a multitude of
22        things.  But they're using it for me to
23        determine how I can -- it's very difficult
24        to explain.  How I can use alternative
25        methods to help control my pain.  Go ahead.
```



STEPHANIE HOFER
October 13, 2006

1    Q.   Are you done?

2    A.   Yes.

3    Q.   Who is "they"?

4    A.   Dr. Elaine Borgen.

5    Q.   Has Dr. Borgen determined that you can use

6         alternative means to control your pain?

7                   MS. MINCHOFF:   Objection.

8    A.   It's not a determination.   It's like a

9         trial thing.   It either works for you or it

10        doesn't.

11   Q.   I'll ask it this way.   Have you and

12        Dr. Borgen discussed alternative means to

13        control your pain?

14   A.   Yes.

15   Q.   What are those alternative means?

16   A.   Visualization, deep breathing, relaxation

17        techniques, things like that.

18   Q.   Have you tried those alternative methods?

19   A.   I try them every day.

20   Q.   How do they help?

21   A.   Not very much.

22   Q.   Since April 2005, has your range of mobility

23        on your injured foot increased?

24   A.   No.

25                  MR. REITH:   I ask you to mark this


BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

STEPHANIE HOFER
October 13, 2006

1       the next document.

2               (Exhibit 23 marked for

3       identification.)

4   Q.  I'm going to put before you a document that's

5       been marked Exhibit 23 for identification,

6       ask you to take a look at that document and

7       let me know when you're done reviewing it to

8       the extent you like.  And while you're doing

9       that, if no one objects, can we take a

10      two-minute break?

11              VIDEOGRAPHER:  The time is 2:48.  We

12      are off the record.

13              (Break taken)

14              VIDEOGRAPHER:  The time is 2:51.

15      This is the beginning of Cassette No. 2 in

16      the deposition of Stephanie Hofer.  We are

17      on the record.

18              VIDEOGRAPHER:  Off the record at

19      2:51.

20              (Discussion off the record)

21              VIDEOGRAPHER:  The time is 2:52.

22      This is the beginning of Cassette 2 in the

23      deposition of Stephanie Hofer.  We are on

24      the record.

25      BY MR. REITH:



STEPHANIE HOFER
October 13, 2006

```
 1   Q.   Just directing your attention to the document

 2        that's been marked as Exhibit 23 for

 3        identification today, entitled Stephanie

 4        Hofer's Second Supplemental Answers to

 5        Defendant, Expedia, Inc.'s, First Request for

 6        Admissions, do you recognize that document?

 7   A.   Yes, I do.

 8   Q.   And are those your answers to Expedia's first

 9        request for admissions?

10   A.   Yes, they are.

11             MS. MINCHOFF:   Objection.

12   Q.   Are those your second supplemental answers

13        to Expedia, Inc.'s request for admissions?

14   A.   Yes.

15   Q.   Directing your attention to the second page

16        just above the typed font, Stephanie Hofer,

17        is that your signature?

18   A.   Yes, it is.

19   Q.   Did you read this document before you signed

20        it?

21   A.   Yes, I did.

22   Q.   Now, directing your attention to request to

23        admit No. 9, just ask you to read that to

24        yourself and let me know when you're done,

25        including the answers, please.
```



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

STEPHANIE HOFER
October 13, 2006

```
 1    A.   (Witness examines document)  Okay.

 2    Q.   Do you see where it says in the request to

 3         admit No. 9, "Carrie read the liability

 4         disclaimer section of the agreement before

 5         reserving the trip"?

 6    A.   Yes, I see that.

 7    Q.   Do you see the supplemental response which

 8         says, "Stephanie is without personal

 9         knowledge to admit or deny, but does state

10         that Carrie testified at her deposition

11         under oath that she did not recall seeing

12         the liability disclaimer section of the

13         agreement before reserving the trip"?

14    A.   Yes, I see that.

15    Q.   Did you review the deposition transcript

16         before you made this answer?

17              MS. MINCHOFF:  Objection.

18    A.   I had glanced through the deposition, but

19         so yes, I had -- what do they call that?  I

20         flipped through it, but before I supplemented

21         the answer, I don't believe that that was

22         why I supplemented the answer.  I was at

23         the deposition.

24    Q.   I'm just wondering if the terminology that

25         she did not recall seeing the liability
```



Page 424

STEPHANIE HOFER
October 13, 2006

 1       disclaimer, was that taken verbatim from the

 2       deposition transcript?

 3               MS. MINCHOFF:  Objection.

 4   A.  I couldn't take anything verbatim from any

 5       of the transcripts.

 6   Q.  So is it fair to say that we would have

 7       to review the deposition transcript of

 8       Ms. LaBelle to determine exactly what she

 9       said at her deposition?

10               MS. MINCHOFF:  Objection.

11   A.  Yes.

12               MS. MINCHOFF:  Do you mean exactly

13       word for word?

14               MR. REITH:  Yes.

15               MS. MINCHOFF:  Not the substance of

16       what she said?

17               MR. REITH:  Word for word.

18               MS. MINCHOFF:  Okay.

19   Q.  You understood my question, Ms. Hofer,

20       correct?

21   A.  I understood your question to mean that I

22       didn't know verbatim what she said.  If we

23       wanted to know verbatim, we would have to

24       go back into the transcript.

25   Q.  Thank you.  You can put that one aside.


BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

Page 425

STEPHANIE HOFER
October 13, 2006

```
 1              MR. REITH:  I ask you to mark that

 2         as the next document.

 3              (Exhibit 24 marked for

 4         identification.)

 5    Q.   I ask you to take a look at the document

 6         that's been put before you and marked as

 7         Exhibit 24 for identification and let me

 8         know when you're done reviewing it.

 9    A.   (Witness examines document)

10    Q.   I can maybe save you some time unless you'd

11         like to review the entire thing.

12    A.   I'm pretty familiar with this line here,

13         so...

14    Q.   Well, do you recognize the document?

15    A.   Yes, I do.

16    Q.   Do you recognize the document as Plaintiff,

17         Stephanie Hofer's, Second Supplemental

18         Answers to Defendant, Expedia, Inc.'s, First

19         Set of Interrogatories?

20    A.   Yes.

21    Q.   Turning your attention to the final page,

22         Page 7, just let me know when you're there.

23    A.   I'm there.

24    Q.   Do you recognize the signature above the

25         typed font, Stephanie Hofer?
```



STEPHANIE HOFER
October 13, 2006

```
 1   A.   Yes.

 2   Q.   Whose signature is that?

 3   A.   That's my signature.

 4   Q.   Did you read these second supplemental

 5        answers before you signed this document?

 6   A.   Yes, I did.

 7   Q.   All right.  Just directing your attention

 8        to supplemental answer No. 6, I would ask

 9        you to read the supplemental answer to

10        No. 6.

11   A.   Out loud?

12   Q.   To yourself.

13              MS. MINCHOFF:  And the question?

14   Q.   And the question.

15   A.   And the question?

16   Q.   Thank you.

17   A.   So just the question and then the

18        supplemental answer?

19   Q.   Yes.

20   A.   Okay.  "State the basis of" --

21   Q.   Oh, to yourself.

22   A.   Oh.  I just said out loud?

23   Q.   Just to familiarize yourself.

24   A.   And nobody said -- okay.  Sorry.

25   Q.   I'm sorry.  Please read the answer as well.
```


BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

STEPHANIE HOFER
October 13, 2006

1        We'll go through all of it.  Read it to

2        yourself.

3    A.  (Witness examines document)  Okay.

4    Q.  We're just going to jump, then, to the

5        supplemental answer No. 6, all right?

6    A.  Excuse me.  That's what I just read.

7    Q.  Yes.

8            MS. MINCHOFF:  He also asked you to

9        read the answer.

10   A.  I did.  I read the question, the original

11       answer and the supplemental answer.

12           MS. MINCHOFF:  Okay.

13   Q.  I just wanted you to familiarize yourself

14       with all of it.

15   A.  Okay.

16   Q.  I'm now going to direct your attention to

17       supplemental answer No. 6.

18   A.  Okay.

19   Q.  More specifically, the sentence that begins,

20       "Expedia does not expect each person

21       traveling in a party to log on to its website

22       separately."  Do you see that sentence?

23   A.  Yes.

24           MS. MINCHOFF:  That portion of the

25       sentence?



STEPHANIE HOFER
October 13, 2006

1   Q.   I'll ask it that way.  Do you see that
2        portion of the sentence?
3   A.   Yes.
4   Q.   How do you know that Expedia does not expect
5        each person traveling in party to log on to
6        its website separately?
7             MS. MINCHOFF:  Objection.  The
8        document speaks for itself, the rest of the
9        sentence.
10            MR. REITH:  You're not allowing her
11       to answer?
12            MS. MINCHOFF:  I did not instruct
13       her not to answer.
14  A.   Oh, I'm sorry.  If you look at the rest of
15       the sentence, when the sign-on user books
16       the trip, that person makes the arrangements
17       for the other travelers as well so there
18       is no need for multiple sign-ons, multiple
19       people to sign on for one trip.
20  Q.   Have you ever booked a trip via Expedia.com?
21  A.   No, I have not.
22  Q.   So how do you know what the policy and
23       procedure is?
24            MS. MINCHOFF:  Objection.
25  A.   I don't.



STEPHANIE HOFER
October 13, 2006

```
 1   Q.   Did you provide your name to the Expedia.com
 2        in connection with the trip to Jamaica?
 3   A.   I did not.
 4   Q.   Do you know if Carrie provided your name to
 5        Expedia.com in connection with your trip to
 6        Jamaica?
 7   A.   I can't speak for Carrie, but she must have.
 8   Q.   Do you know if Carrie provided your contact
 9        information to Expedia.com?
10   A.   I don't know what type of information she
11        may or may not have provided.
12   Q.   So I would have to ask Carrie about that?
13   A.   You would have to ask Carrie.
14   Q.   Did you provide your contact information
15        to Expedia directly?
16             MS. MINCHOFF:  Objection.
17   A.   No.
18             MS. MINCHOFF:  I'm sorry.  What was
19        the question?
20             MR. REITH:  I just asked if Ms.
21        Hofer provided her contact information to
22        Expedia directly.
23             MS. MINCHOFF:  Directly.  I'm sorry.
24   A.   No.
25   Q.   Do you see the next sentence where it says,
```



STEPHANIE HOFER
October 13, 2006

```
 1         "per Expedia.com's requirements, all members
 2         of the sign-on user's party utilizing the
 3         services of Expedia.com are made known to
 4         Expedia.com, as all such persons are intended
 5         users of Expedia services"?
 6    A.   I see that.
 7    Q.   Okay.  Do you personally know what the
 8         requirements are for signing on in booking a
 9         trip using Expedia.com?
10    A.   No, I do not.
11    Q.   Do you know what services Expedia.com
12         provides?
13    A.   It's my understanding that Expedia.com
14         provides the travel packages and
15         recommendations of different resorts and
16         different areas for different travelers
17         acting sort of as a travel agent, an online
18         travel agent.
19    Q.   Do you have any personal information as to
20         what Expedia.com offers for services?
21              MS. MINCHOFF:  Objection.  What does
22         "personal information" mean?
23              MR. REITH:  Other than her
24         understanding.
25              MS. MINCHOFF:  That's not personal.
```



STEPHANIE HOFER
October 13, 2006

1         I don't know what you mean.  Objection.

2    Q.   Do you understand the question?

3    A.   I'm sorry, I don't.

4    Q.   Is it your understanding that Expedia.com

5         provides an avenue for persons to book

6         travel-related vacations or travel-related

7         services?

8    A.   Is it my understanding that that is what

9         Expedia.com does?

10   Q.   Yes.

11   A.   That is my understanding.

12   Q.   Turning your attention to the next sentence,

13        top of the next paragraph in supplemental

14        answer No. 6 where it says, "Expedia inspects

15        the resorts it markets on its website and

16        has implemented procedures to monitor the

17        safety of said resorts marketed on its

18        website."  Do you see that sentence?

19   A.   Yes, I see that sentence.

20   Q.   What are the implemented procedures that

21        you are referring to here?

22             MS. MINCHOFF:  Objection just to

23        the extent that any information that you

24        may have obtained through conversations

25        confidentially or communications



STEPHANIE HOFER
October 13, 2006

```
 1       confidentially with counsel.
 2   Q.  Can you answer that question that I just
 3       asked without revealing confidential
 4       communications?
 5   A.  No.
 6   Q.  Do you personally have any information
 7       separate and apart from that which you found
 8       out through your counsel about the so-called
 9       implemented procedures?
10           MS. MINCHOFF:  Objection.
11   A.  No.
12   Q.  What information do you have separate and
13       apart from what you may have learned through
14       your counsel about Expedia taking an active
15       role and continuing role in inspecting the
16       property?
17           MS. MINCHOFF:  Objection.
18   A.  Could you repeat that, please?
19           MR. REITH:  Can I ask you to read
20       that back?
21           (Question read)
22           MS. MINCHOFF:  Objection.
23   A.  I can't answer that question.  I don't know
24       what Expedia's continuing role is.
25   Q.  You see the final sentence where it says,
```



STEPHANIE HOFER
October 13, 2006

```
 1        "in addition, on Expedia's own website it
 2        represents that it researches the resorts
 3        advertised by Media Review and visits to the
 4        property sites."  Do you see that sentence?
 5   A.   Yes, I do.
 6   Q.   Have you personally seen those
 7        representations on Expedia's website?
 8                  MS. MINCHOFF:  Objection.
 9   A.   No, I have not.
10   Q.   You can put that document aside.  Do any
11        of the documents that you've produced to
12        date to your counsel to produce to my office
13        specifically state that Expedia has a duty
14        to warn you or users of its website?
15                  MS. MINCHOFF:  Objection.  If you
16        want to show her every document that I've
17        produced to you, I'd prefer that you do that
18        if you're going to ask her that question.
19                  MR. REITH:  She can simply state --
20                  MS. MINCHOFF:  That there's
21        thousands of documents that have been
22        produced?
23   Q.   Can you answer the question?
24   A.   Could you say it again?
25                  MR. REITH:  Could you please repeat
```



STEPHANIE HOFER
October 13, 2006

```
 1       the question?

 2               (Question read)

 3               MS. MINCHOFF:  I maintain my

 4       objection that unless you want to produce to

 5       the deponent the thousands of pages that I

 6       produced to you, she's not going to have that

 7       knowledge.  But I have no problem with her

 8       reviewing every page of documents that I've

 9       produced.

10               MR. REITH:  You can object.

11   Q.  And my question to you is, can you answer

12       the question as phrased?

13   A.  No, I'm sorry, I cannot.

14   Q.  That's fine.  This is going to be one of

15       those sort of jumps to something we haven't

16       talked about before.  Were you present for

17       your mother's deposition?

18   A.  Yes, I was.

19   Q.  Do you recall your mother testifying about

20       receiving a call from you from some beach?

21               MS. MINCHOFF:  Objection.  You're

22       asking her to comment on someone else's

23       testimony.

24               MR. REITH:  I'm not asking her to

25       comment on someone's else testimony.  I'm
```



STEPHANIE HOFER
October 13, 2006

1        asking if she recalls her mother testifying
2        on that subject.
3                MS. MINCHOFF:  On that subject or
4        what you just stated, Attorney Reith?  Does
5        she recall her mother stating what you just
6        represented at deposition?  Is that the
7        question?
8                MR. REITH:  Yes.
9                MS. MINCHOFF:  Objection.  You can
10       answer.
11   A.  I don't know if I recall my mother stating
12       that at deposition, but I do recall calling
13       my mother.
14   Q.  When did you call your mother when you were
15       in Jamaica?
16   A.  At dinner.
17   Q.  Where were you at dinner?
18   A.  Jimmy Buffet's Margaritaville.  It's right
19       on the beach.
20   Q.  Was Attorney Minchoff's office the first
21       office you contacted about possibly bringing
22       a suit against Expedia?
23   A.  No.
24                MS. MINCHOFF:  Objection.  Asked and
25       answered.



STEPHANIE HOFER
October 13, 2006

1           MR. REITH:  It wasn't asked and

2       answered of this deponent.  It was asked and

3       answered of both her mother and Mr. Hofer,

4       but not Ms. Hofer.

5   Q.  Your answer was?

6   A.  No.

7   Q.  Who else did you speak to?

8   A.  Christopher Disesa, D I S E S A.

9   Q.  Where is Mr. Disesa's office?

10  A.  Leominster, Massachusetts.

11  Q.  How did you get put in touch with Mr. Disesa?

12  A.  He is a friend of the family.  He's handled

13      other legal matters for my mother.

14  Q.  You did not retain Mr. Disesa in connection

15      with this case?

16          MS. MINCHOFF:  Objection.

17  A.  No.

18          MS. MINCHOFF:  You can answer.

19  A.  No.

20  Q.  Did you discuss the sum and substance of

21      your claims with Expedia with Mr. Disesa?

22          MS. MINCHOFF:  Objection.  Don't

23      answer.

24          MR. REITH:  What grounds?

25          MS. MINCHOFF:  Whether or not she



STEPHANIE HOFER
October 13, 2006

```
 1        retained him doesn't mean that she didn't
 2        speak to him as counsel.
 3   Q.   Did you speak to Mr. Disesa as your attorney?
 4   A.   Yes.
 5   Q.   Did you and he form an attorney-client
 6        relationship?
 7              MS. MINCHOFF:  Objection.  That
 8        calls for a legal conclusion.  All you need
 9        to know is she spoke to him as counsel.  Do
10        not answer a single question as to your
11        conversations with Mr. Disesa.
12   Q.   So you did not retain Mr. Disesa?
13   A.   No, I did not.
14   Q.   Did Mr. Disesa decline to undertake your
15        representation?
16              MS. MINCHOFF:  Objection.  Don't
17        answer.
18              MR. REITH:  That's not privileged.
19              MS. MINCHOFF:  It would be
20        privileged because the only --
21              MR. REITH:  It's not privileged.
22              MS. MINCHOFF:  Sir, Attorney Reith.
23   Q.   I'm asking you to answer the question.
24              MS. MINCHOFF:  I'm instructing you
25        not to answer the question and I'm your
```



Page 438

STEPHANIE HOFER
October 13, 2006

```
 1       counsel, so I suggest you listen to me and

 2       not Mr. Reith.

 3            MR. REITH:  I'll reserve my right

 4       to bring a motion to compel to the extent

 5       necessary.

 6            MS. MINCHOFF:  You may do so.

 7  Q.   Any other counsel that you met with prior to

 8       retaining Attorney Minchoff's office?

 9  A.   No.

10  Q.   Just directing your attention now to the

11       point at which you were heading from, I

12       believe it was Leominster to the airport to

13       go on the trip to Jamaica, okay?

14  A.   I'm sorry?

15  Q.   Directing your attention to the point where

16       you were driving to the airport to go to

17       Jamaica.

18  A.   Okay.

19  Q.   Did anyone from Expedia, Inc. drive you to

20       the airport?

21  A.   No.

22  Q.   Did anyone from Expedia meet you at Logan?

23  A.   No.

24  Q.   Did anyone from Expedia help you check in

25       at Logan?
```



STEPHANIE HOFER
October 13, 2006

```
 1   A.   No.
 2   Q.   Did anyone from Expedia fly with you down
 3        from Logan to Philadelphia?
 4   A.   No.
 5   Q.   Did anyone from Expedia fly with you from
 6        Philadelphia to Jamaica?
 7   A.   No.
 8   Q.   Did anyone from Expedia meet you at the
 9        airport in Jamaica?
10   A.   Not that I know of.
11   Q.   No one identified themselves to you as an
12        Expedia, Inc. employee down in Jamaica, did
13        they?
14             MS. MINCHOFF:  Objection.  Asked and
15        answered.  You can answer.
16   A.   No.
17   Q.   Did anyone from Expedia, Inc. drive you to
18        Turtle Beach Towers?
19   A.   No.
20   Q.   Did anyone from Expedia, Inc. accompany
21        you on the shuttle bus to Turtle Beach
22        Towers?
23   A.   No.
24   Q.   Did anyone from Expedia, Inc. meet you at
25        Turtle Beach Towers?
```



STEPHANIE HOFER
October 13, 2006

```
 1   A.   No.

 2   Q.   During your stay in Jamaica, I realize it

 3        was short, but during your stay in Jamaica,

 4        did you meet anyone from Expedia, Inc.?

 5   A.   No.

 6   Q.   I have no further questions.  I thank you

 7        for your time.

 8   A.   Thank you.

 9             MS. MINCHOFF:  I actually may have

10        a couple of questions.  I'd like to just take

11        a one-minute break.

12             VIDEOGRAPHER:  Off the record at

13        3:17.

14             (Break taken)

15             VIDEOGRAPHER:  On the record at

16        3:26.

17                    EXAMINATION

18        BY MS. MINCHOFF:

19   Q.   Ms. Hofer, returning your attention to

20        Exhibit No. 24 which you were reviewing with

21        Attorney Reith, entitled Plaintiff, Stephanie

22        Hofer's, Second Supplemental Answers to

23        Defendant, Expedia, Inc.'s First Set of

24        Interrogatories, I direct your attention

25        to supplemental answer No. 6.
```



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

STEPHANIE HOFER
October 13, 2006

```
 1   A.   Yes.

 2   Q.   And I believe Attorney Reith asked you some

 3        questions regarding the sentence that reads,

 4        "Expedia does not expect each person

 5        traveling in party to log on to its website

 6        separately to book a travel vacation as is

 7        evidenced by the fact that in the booking

 8        process, Expedia.com requests that the

 9        sign-on user provide the names and contact

10        information of the other persons traveling

11        in the sign-on user's party.  Do you see that

12        sentence?

13   A.   Yes, I do.

14   Q.   Have you ever been provided with any

15        documents from Carrie LaBelle regarding the

16        trip you took to Jamaica?

17   A.   Yes, I have.

18   Q.   Were one of those documents a copy of that

19        itinerary and some documents from the booking

20        process?

21   A.   Yes.

22   Q.   Were you able to learn any information from

23        reviewing those documents, Ms. Hofer?

24   A.   Yes.

25   Q.   What information?
```



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

STEPHANIE HOFER
October 13, 2006

```
 1   A.   The information I learned from reviewing

 2        those documents was that, No. 1, being the

 3        itinerary of where we were going and the

 4        time frame, and the second being that she

 5        was the one to provide my information for

 6        the booking process, and that's when I

 7        learned that I didn't need to be, I didn't

 8        need to sign on to give Expedia my own

 9        personal information.

10   Q.   And sticking with that supplemental answer

11        No. 6 to Exhibit 24, you see in the last

12        sentence that, or do you recall Attorney

13        Reith asking you a question about the last

14        sentence of that answer and asking you

15        whether you knew what it stated or whether

16        you had gone on to Expedia's website to

17        determine whether it represented that it

18        researches the resort?

19   A.   Yes.

20   Q.   Have you seen any documents from Expedia's

21        website?

22   A.   Yes.

23   Q.   Have any of the documents that you've seen

24        from Expedia's website allowed you to

25        conclude that on its website it represents
```



STEPHANIE HOFER
October 13, 2006

```
 1        that it researches the resorts advertised

 2        by Media Review and visits to the property

 3        sites?

 4   A.   Yes.

 5              MR. REITH:   Objection.

 6   Q.   Did you review that document that allowed

 7        you to make that conclusion prior to

 8        answering or providing answers to your

 9        interrogatories in Exhibit 24?

10   A.   Yes.

11   Q.   Ms. Hofer, returning to the first paragraph

12        of supplemental answer No. 6, looking at

13        the sentence that says, "per Expedia.com's

14        requirements, all members of the sign-on

15        user's party utilizing the services of

16        Expedia.com are made known to Expedia.com

17        as all such persons are intended users of

18        Expedia services."  Do you see that sentence?

19   A.   Yes.

20   Q.   Just a minute ago we talked about the

21        documents that Carrie LaBelle provided to

22        you with respect to the booking process

23        for your trip to Jamaica?

24   A.   Yes.

25   Q.   Did those documents allow you to make the
```



STEPHANIE HOFER
October 13, 2006

```
 1      conclusion that you've stated there in

 2      supplemental answer No. 6 that I just read

 3      into the record?

 4              MR. REITH:  Objection.

 5  A.  Yes.

 6              MS. MINCHOFF:  I have no further

 7      questions.

 8              MR. REITH:  I have a few follow-up.

 9              MS. MINCHOFF:  I'm sorry.  Do you

10      mind?  I'm sorry.

11      BY MS. MINCHOFF:

12  Q.  One last question, Ms. Hofer.  Do you recall

13      or -- strike that.

14              When you spoke with an attorney

15      prior to speaking with myself at my office,

16      the decision not to retain that attorney,

17      was that based on a confidential, private

18      conversation that you had with him?

19  A.  Yes.

20              MS. MINCHOFF:  I have no further

21      questions.  Mr. Reith?

22              MR. REITH:  A few follow-up

23      questions.

24

25
```



STEPHANIE HOFER
October 13, 2006

```
 1              EXAMINATION

 2       BY MR. REITH:

 3   Q.  You've now expounded about some of the

 4       questions and answers that I had asked you

 5       before in connection with the supplemental

 6       answer No. 6, correct?

 7              MS. MINCHOFF:  Objection.

 8       Expounded?  Is that the --

 9              MR. REITH:  Yes.

10   A.  I don't understand what expounded...

11   Q.  Your attorney has now asked you certain

12       questions in connection with supplemental

13       answer No. 6 that related to some questions

14       that I asked before, correct?

15   A.  Yes.

16   Q.  And you have now offered certain answers

17       in connection with your attorney's questions

18       that explain further some of the issues that

19       I asked you about, correct?

20   A.  Yes.

21   Q.  And you now offered those answers after

22       having a moment to speak to your attorney

23       behind closed doors, correct?

24              MS. MINCHOFF:  Objection.

25   A.  Yes.
```



STEPHANIE HOFER
October 13, 2006

```
 1               MR. REITH:  You all have to forgive

 2        me because I didn't intend on using this.

 3        I have two copies of this document.  I would

 4        just ask if you can take a look at it and

 5        pass it down to Attorney Minchoff and then

 6        I'm going to have it marked.  It's a whole

 7        rigmarole, I understand.

 8               MS. MINCHOFF:  Just for the record,

 9        is this --

10               MR. REITH:  I was going to say for

11        the record, this was part of defendant --

12        excuse me, the plaintiff's initial document

13        responses, as you can tell from the

14        identification of B1 and B2, et cetera, which

15        was your office's identification.

16               MS. MINCHOFF:  So this is part of

17        my first document response and there's been

18        four document responses now?

19               MR. REITH:  Yes.  Mark this and then

20        I'll take that one back.

21               (Exhibit 25 marked for

22        identification.)

23  Q.    I'm just going to put before you a document

24        or series of documents that's been marked

25        as Exhibit 25 for identification.
```



STEPHANIE HOFER
October 13, 2006

```
 1              MR. REITH:  I'll represent to all
 2         parties and counsel present that this was
 3         taken from the initial document response
 4         and production from plaintiffs to Expedia
 5         to my office, okay?
 6    Q.   Do you recall your attorney asking you about
 7         reviewing documents provided by Ms. LaBelle?
 8    A.   I'm sorry?
 9    Q.   Do you recall recently your attorney was just
10         asking you questions about various documents
11         you reviewed that Ms. LaBelle gave to you?
12    A.   Yes.
13              MS. MINCHOFF:  Objection.
14    Q.   Do you recall testifying as to a certain
15         itinerary that you may have reviewed?
16    A.   Mm-hmm.
17    Q.   I ask you to take a look at that document
18         series and let me know if you see the
19         itinerary in there.
20    A.   Looks like it's right here.
21    Q.   Does that itinerary identify your contact
22         information at all?
23    A.   Yes.
24    Q.   What does it say?
25    A.   Travelers, Carrie LaBelle and Stephanie
```



STEPHANIE HOFER
October 13, 2006

```
 1       Hofer.

 2   Q.  Does it list your address?

 3   A.  No.

 4   Q.  Does it list your website?  Strike that.

 5               MS. MINCHOFF:  Excuse me.

 6   Q.  Does it list your e-mail address?

 7   A.  No.

 8   Q.  Does it list your telephone number?

 9   A.  Not right here.

10   Q.  Does it anywhere?

11   A.  I don't know.

12               MS. MINCHOFF:  I just suggest that

13        we allow her to take the time to look through

14        the 50 or so documents that have just been

15        put in front of her.

16               MR. REITH:  That's fine.

17   A.  It does not there.

18               MS. MINCHOFF:  Just take the time

19        to go through it.

20   A.  Okay.  (Witness examines document)  Excuse

21        me.  Exhibit B3 seems to be for the home

22        trip.  Do you want me to go further into

23        that?

24   Q.  If the home trip is from Expedia.

25   A.  It's not.
```



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

Page 449

STEPHANIE HOFER
October 13, 2006

```
 1   Q.   My question specifically was in connection
 2        with the itinerary in the documents from
 3        Expedia with your contact information was
 4        provided.
 5   A.   All right.
 6             MS. MINCHOFF:  No, actually, his
 7        question specifically was is there an e-mail
 8        address.
 9   A.   Yes, and there is not, through Exhibit B1.
10   Q.   And I also asked is your telephone number
11        listed there?
12   A.   No, it is not.
13   Q.   That's all I have in connection with that.
14        Do you recall what document you reviewed
15        before answering these, this supplemental
16        set of answers that identified Expedia.com's
17        requirements?
18             MS. MINCHOFF:  Objection.
19   A.   I reviewed documents that Carrie had given
20        to me.  Basically, they're copies like this
21        regarding the itinerary and the travel
22        package and things like that.  I reviewed
23        those before answering the supplemental.
24   Q.   Do you recall what specific documents stated
25        that all persons who may be identified by a
```



STEPHANIE HOFER
October 13, 2006

 1      sign-on user party are intended users of

 2      Expedia services?

 3              MS. MINCHOFF:  Objection.

 4   A.  I can't exactly say which particular

 5      document.

 6   Q.  So as you sit here today, you don't know

 7      which document you reviewed?

 8   A.  No.  I reviewed the documents that Carrie had

 9      given to me that the user was one user.

10              MR. REITH:  I have no further

11      questions.

12              MS. MINCHOFF:  I just have one

13      follow-up question.

14                  EXAMINATION

15   BY MS. MINCHOFF:

16   Q.  Ms. Hofer, are you aware of approximately

17      how many pages of documents have been

18      produced to Expedia on your behalf in this

19      case?

20   A.  I'm not aware.  I know thousands.

21   Q.  Approximately how many pages are included

22      in Exhibit 25 that Attorney Reith just

23      provided to you to review?

24   A.  Approximately how many pages?

25   Q.  Correct.



STEPHANIE HOFER
October 13, 2006

1   A.   It feels like 50 pages.

2   Q.   It's fair to say that that's just a very

3        small portion of the documents?

4   A.   This is a very small portion.

5                  MR. REITH:  Objection.

6                  MS. MINCHOFF:  No further questions.

7                  MR. REITH:  A couple of follow-up.

8        I have a couple of follow-up questions.  If

9        you can put that document to the side, okay?

10                 I ask you to mark this document as

11       the next exhibit, please.

12                 (Exhibit 26 marked for

13       identification.)

14                      EXAMINATION

15       BY MR. REITH:

16  Q.   The document that's put before you has been

17       marked as Exhibit 26 for identification,

18       it's entitled Plaintiffs' Fourth Supplemental

19       Response to Defendant, Expedia, Inc.'s, First

20       Request for Production of Documents.  Do you

21       see the title of that document?

22  A.   First request, fourth supplemental, yes, I

23       see that.

24  Q.   Do you recognize this document?

25  A.   Yes.



Page 452

STEPHANIE HOFER
October 13, 2006

1  Q.  Did you review this document before your

2      attorney served it on my office?

3              MS. MINCHOFF:  Objection.  Attorney

4      Reith, you're actually beyond the scope of

5      the cross-examination from my questions at

6      this point.

7              MR. REITH:  I'm not.  It's going to

8      leads into it.

9              MS. MINCHOFF:  Objection.  It

10     has not led into it.  My question was

11     approximately does she know how many

12     documents were produced.  That was it.

13             MR. REITH:  The scope of your

14     cross-examination would lead the individuals

15     who review this transcript to conclude that

16     not all documents from Ms. LaBelle have

17     been provided.  I'm about going to try to

18     establish that documents which are germane

19     to whether or not your client was identified

20     as an intended user have, in fact, been

21     provided and are here today for her review.

22     That's where I'm going.

23             MS. MINCHOFF:  I would object to

24     that because you are again only producing --

25     I don't know.  What's this?  100 pages of



STEPHANIE HOFER
October 13, 2006

```
 1       the approximate thousands of pages and we

 2       have 350.  It's beyond the scope.

 3               MR. REITH:  You can object.

 4               MS. MINCHOFF:  I am objecting, and

 5       I'm going to instruct her not to answer

 6       because you're beyond the scope of my

 7       question.

 8               MR. REITH:  All right.

 9  Q.   Just directing your attention to request

10       No. 11, it says, "any and all documents the

11       plaintiffs contend establish or that

12       plaintiffs rely on or will rely on to

13       attempt to prove or establish that," quote,

14       "'Expedia owes a duty to prospective

15       customers of its service to ensure that

16       facilities listed on its website are

17       reasonably safe for consumers who purchase

18       their vacation through its service,'" end

19       quote, "as averred in Section 2A of the

20       parties' Joint Rule 16.1 statement."  Do

21       you see that?

22  A.   Do I see that sentence?  That statement?

23       Yes, I see that.

24  Q.   Do you see in the supplemental response it

25       says, "plaintiffs object to request No. 11
```



STEPHANIE HOFER
October 13, 2006

```
 1        to the extent that it seeks disclosure

 2        of documents that are protected by the

 3        attorney-client privilege and work product.

 4        Subject to and without waiving said

 5        objections and to the extent the plaintiffs

 6        have responsive non-objectionable documents

 7        in their custody, control or possession, they

 8        have been attached as 4-S-11.  Plaintiffs

 9        reserve the right to supplement this

10        response."  Do you see that supplemental

11        response?

12   A.   Yes.

13   Q.   Directing your attention to the documents

14        which are appended as 4-7-11, I would ask you

15        to take a look through those and to see if

16        your contact information is included.

17             MS. MINCHOFF:  Beyond the scope.

18        Objection.  I'm going to instruct you not

19        to -- it's beyond the scope of my

20        cross-examination question.

21             MR. REITH:  So you're instructing

22        your client not to answer that question?

23             MS. MINCHOFF:  We can go tit for tat

24        all day long if we want to --

25             MR. REITH:  I'm asking you.
```



STEPHANIE HOFER
October 13, 2006

1              MS. MINCHOFF:  Yes, I am.

2              MR. REITH:  I reserve my right to

3       move to compel and to seek costs for having

4       to go to the court to get this answer.  I

5       have no further questions.

6              VIDEOGRAPHER:  The time is 3:44.

7       This deposition is concluded.  This is the

8       end of Cassette 2.  We are off the record.

9              (Whereupon the deposition was

10      concluded at 3:44 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 456

STEPHANIE HOFER
October 13, 2006

```
1              DEPONENT'S ERRATA SHEET
2            AND SIGNATURE INSTRUCTIONS
3
4           The original of the Errata Sheet has
5      been delivered to India Minchoff, Esq.
6           When the Errata Sheet has been
7      completed by the deponent and signed, a copy
8      thereof should be delivered to each party of
9      record and the ORIGINAL delivered to Scott D.
10     Feringa, Esq., Sullivan, Ward, Asher &
11     Patton, P.C., 1000 Maccabees Center, 25800
12     Northwestern Highway, Southfield, MI 48075,
13     to whom the original deposition was
14     delivered.
15
16              INSTRUCTIONS TO DEPONENT
           After reading this volume of your
17     deposition, indicate any corrections or
       changes to your testimony and reason therefor
18     on the Errata Sheet supplied to you and sign
       it.   DO NOT make marks or notations on the
19     transcript volume itself.
20
           REPLACE THIS PAGE OF THE TRANSCRIPT
21         WITH THE COMPLETED AND SIGNED ERRATA
           SHEET WHEN RECEIVED.
22
23
24
25
```


BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

STEPHANIE HOFER
October 13, 2006

```
 1        ATTACH TO THE DEPOSITION OF: Stephanie Hofer,
                                      Vol. III
 2
          CASE: Hofer vs. The Gap, et al
 3
 4                      ERRATA SHEET
 5
          INSTRUCTIONS:   After reading the transcript
 6        of your deposition, note any changes or
          corrections to your testimony and the reason
 7        therefor on this sheet.   DO NOT make any
          marks or notations on the transcript volume
 8        itself.   Sign and date this Errata Sheet
          (before a Notary Public, if required).
 9        Refer to Page 3-456 of the transcript for
          Errata Sheet distribution instructions.
10
          PAGE    LINE
11                      CHANGE:
                        REASON:
12                      CHANGE:
                        REASON:
13                      CHANGE:
                        REASON:
14                      CHANGE:
                        REASON:
15                      CHANGE:
                        REASON:
16                      CHANGE:
                        REASON:
17                      CHANGE:
                        REASON:
18
              I have read the foregoing transcript
19        of my deposition and except for any
          corrections or changes noted above, I hereby
20        subscribe to the transcript as an accurate
          record of the statements made by me.
21
          Date
22
23
                        Stephanie Hofer
24
25
```



STEPHANIE HOFER
October 13, 2006

```
 1      COMMONWEALTH OF MASSACHUSETTS)
 2      SUFFOLK, SS. )
 3
 4
                I, Jeanette Maracas, Registered
 5      Professional Reporter and Notary Public in
        and for the Commonwealth of Massachusetts, do
 6      hereby certify that there came before me on
        the 13th day of October, 2006, at 1:10 p.m.,
 7      the person hereinbefore named, who was by me
        duly sworn to testify to the truth and
 8      nothing but the truth of his knowledge
        touching and concerning the matters in
 9      controversy in this cause; that he was
        thereupon examined upon his oath, and his
10      examination reduced to typewriting under my
        direction; and that the deposition is a true
11      record of the testimony given by the witness.
12
                I further certify that I am neither
13      attorney or counsel for, nor related to or
        employed by, any attorney or counsel employed
14      by the parties hereto or financially
        interested in the action.
15
16              In witness whereof, I have hereunto
        set my hand this 20th day of October, 2006.
17
18
19
20
21                      Notary Public
                        My commission expires 9/6/13
22
23
24
25
```

