# HOFER, ET AL v. THE GAP, INC., ET AL

# CARRIE L. LaROCHE

## July 27, 2006

*Prepared for you by*



**Bingham Farms** | Ann Arbor | Detroit | Flint | Grand Rapids | Jackson | Lansing | Mt. Clemens

PHONE:  248.644.8888   FAX:  248.644.1120

www.bienenstock.com

CARRIE L. LaROCHE
July 27, 2006

```
 1           IN THE UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF MASSACHUSETTS

 3                C.A. No. 05-40170 FDS

 4    *   *   *   *   *   *   *   *   *   *   *   *   *

 5   STEPHANIE HOFER and DOUGLAS HOFER,        *

 6            Plaintiffs                        *

 7   v.                                         *

 8   THE GAP, INC., EXPEDIA, INC. and          *

 9   TURTLE BEACH TOWERS,                       *

10            Defendants                        *

11    *   *   *   *   *   *   *   *   *   *   *   *   *

12                   VOLUME I

13                 PAGES 1-210

14

15       VIDEOTAPED DEPOSITION OF CARRIE L.

16   LaROCHE, a witness called on behalf of the

17   Defendant Expedia, Inc., pursuant to the

18   Federal Rules of Civil Procedure, before

19   Jessica L. Williamson, Registered Merit

20   Reporter, Certified Realtime Reporter and

21   Notary Public in and for the Commonwealth of

22   Massachusetts, at the Offices of Morrison,

23   Mahoney, LLP, 250 Summer Street, Boston,

24   Massachusetts, on Thursday, July 27, 2006,

25   commencing at 9:46 a.m.
```



CARRIE L. LaROCHE
July 27, 2006

```
 1    A P P E A R A N C E S

 2

 3    LAW OFFICES OF RUSSO & MINCHOFF

 4      (By India Minchoff, Esq.)

 5      123 Boston Street

 6      First floor

 7      Boston, Massachusetts  02125

 8      (617) 740-7240

 9      india@russominchofflaw.com

10      Counsel for the Plaintiffs

11

12    SULLIVAN, WARD, ASHER & PATTON, P.C.

13      (By Scott D. Feringa, Esq.)

14      1000 Maccabees Center

15      25800 Northwestern Highway

16      Southfield, Michigan  48075-1000

17      (248) 746-2727

18      sferinga@swappc.com

19      Counsel for the Defendant The Gap, Inc.

20

21

22

23

24

25
```



CARRIE L. LaROCHE
July 27, 2006

```
 1      A P P E A R A N C E S, Continued

 2

 3      BURNS & LEVINSON, LLP

 4          (By Thomas T. Reith, Esq.)

 5          125 Summer Street

 6          Boston, Massachusetts  02110

 7          (617) 345-3258

 8          treith@burnslev.com

 9          Counsel for the Defendant Expedia, Inc.

10

11      ALSO PRESENT:

12

13          Shawn Budd, Videographer

14

15

16

17

18

19

20

21

22

23

24

25
```



CARRIE L. LaROCHE
July 27, 2006

```
 1                 I N D E X
 2   DEPONENT                          PAGE
 3   CARRIE L. LaROCHE
 4   Examination By Mr. Reith           7, 206
 5   Examination By Mr. Feringa          161
 6
 7                E X H I B I T S
 8   NO.                                PAGE
 9    1  Drawing                         36
10    2  Copies of photographs, 5 pages  40
11    3  Amended Notice of Videotaped    76
             Deposition Duces Tecum
12           Directed to Plaintiffs
13    4  Multipage document headed      107
             "Exhibit B1"
14
      5  Expedia.com sample trip pages  113
15
      6  Document headed "Expedia, Inc.  133
16           Web Site Terms, Conditions,
             and Notices"
17
      7  Sunrays Co., Ltd. receipt      172
18           dated 19-03-04
19    8  Expedia, Inc. document headed  174
             "Turtle Beach Towers
20           Reservation information"
21
22   Note:  Original Exhibits 1 - 8 were retained
         by the court reporter and forwarded on to
23   Bienenstock Court Reporting for
         distribution.
24
25
```



Page 5

CARRIE L. LaROCHE
July 27, 2006

```
 1              P R O C E E D I N G S

 2              THE VIDEOGRAPHER:  Okay.  We are on

 3    the record.  This is the video operator

 4    speaking, Shawn Budd.  Today's date is July

 5    27th, 2006, and the time is 9:46.  We are

 6    here at the offices of Morrison Mahoney

 7    located in Boston, Massachusetts, to take

 8    the videotaped deposition of Carrie LaBelle

 9    in the matter of Stephanie Hofer vs. -- and

10    Douglas Hofer vs. The Gap, Inc., et al.

11         Would counsel please introduce

12    themselves.

13              MS. MINCHOFF:  Attorney India

14    Minchoff for the plaintiffs.

15              MR. FERINGA:  Scott Feringa for

16    Gap.

17              MR. REITH:  Thomas Reith, Burns &

18    Levinson for Expedia, Inc.

19              THE VIDEOGRAPHER:  And would the

20    court reporter please swear in the witness.

21

22

23

24

25
```



CARRIE L. LaROCHE
July 27, 2006

```
 1                    CARRIE L. LaROCHE,

 2      a witness called on behalf of the Defendant

 3      Expedia, Inc., having first been duly sworn,

 4      was deposed and testifies as follows:

 5

 6                    *   *   *   *   *

 7

 8              MR. REITH:  For the record, this is

 9      Attorney Reith.  The parties have agreed to

10      the usual stipulations, that being that the

11      parties will reserve all objections, except

12      as to form, but including motions to strike,

13      until the time of trial.  The witness will

14      have 30 days to read and sign the deposition

15      transcript, and the parties will waive

16      notary on that?

17              MS. MINCHOFF:  I'm fine with that.

18      I don't know if the witness knows what that

19      means.

20              MR. REITH:  I'll explain it to her

21      in a second.

22              MR. FERINGA:  I agree to the

23      stipulations.

24

25
```



CARRIE L. LaROCHE
July 27, 2006

```
 1                    DIRECT EXAMINATION

 2

 3        BY MR. REITH:

 4   Q.   First let me introduce myself.  My name is

 5        Thomas Reith.  I represent Expedia, Inc.

 6        Today I'm going to be asking you some

 7        questions.  If I ask a question that you

 8        don't understand, you can't hear me, please

 9        let me know, and I'll do my best to either

10        rephrase or to speak up, all right?

11   A.   Okay.

12   Q.   You've already caught on to one of the rules

13        in today's deposition is please answer with

14        a verbal response, and I appreciate that you

15        did.  If you have any questions for me about

16        the process or what have you as we go

17        through this today, please let me know, and

18        I'll try to answer the question to the best

19        of my ability, all right?

20   A.   Okay.

21   Q.   You just heard me read into the record

22        various stipulations that the parties agreed

23        to.  The only stipulation that you need to

24        concern yourself with is the reading and

25        signing of the transcript.  After we finish
```



CARRIE L. LaROCHE
July 27, 2006

1   the deposition today a transcript will be

2   put together and will be, in essence, the

3   questioning and testimony of you today.

4     You will receive it in the mail.

5   You'll then have 30 days to read it, go

6   through it.  If there's anything that you

7   find is not as you recall it, you'll be

8   given a chance to make a change on what's

9   called an errata sheet.  It will be in the

10   back of the packet usually.  Just take that,

11   fill it out.  If there are no changes to be

12   made, just sign it and send it back to me,

13   okay?

14 A. Okay.

15 Q. Thank you.  First, please state your name

16   for the record.

17 A. My married name now or as it is on all the

18   other paperwork?

19 Q. All right.  Well, let's first try your

20   married name.

21 A. My married name is Carrie LaRoche.

22 Q. And when were you married?

23 A. July 8th.

24 Q. Congratulations.

25 A. Thank you.


BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

CARRIE L. LaROCHE
July 27, 2006

 1   Q.   Now, what was your name -- last name prior

 2        to July?

 3   A.   Previously Carrie LaBelle.

 4   Q.   Okay.  How do you spell LaBelle, please?

 5   A.   L-A capital B-E-L-L-E.

 6   Q.   Okay.  Have you ever had the last name

 7        LaBlanc?

 8   A.   Never.

 9   Q.   Are you hear today with counsel, Ms.

10        LaRoche?

11   A.   No.

12   Q.   Does Minchoff represent you?

13   A.   No.

14   Q.   Prior to today have you spoken with Ms.

15        Minchoff?

16   A.   Yes.

17   Q.   Okay.  When was the last time that you spoke

18        with her?

19   A.   Last night.

20   Q.   Okay.  And what did you talk about?

21   A.   I called her to find out what exactly a

22        deposition was.

23   Q.   Okay.  And what did she tell you?

24   A.   She told me that the lawyers would ask me a

25        series of questions related to the trip to


BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

CARRIE L. LaROCHE
July 27, 2006

```
 1        Jamaica.
 2   Q.   Is that all she said?
 3   A.   We talked a little bit about my wedding and
 4        honeymoon.
 5   Q.   Okay.  Aside from the wedding and honeymoon,
 6        any discussion about the procedure of
 7        depositions, was there anything else that
 8        you talked about?
 9   A.   No.
10   Q.   Did you discuss the substance of Ms. Hofer,
11        who is here today, her deposition testimony?
12   A.   I don't think I understand what you're
13        asking.
14   Q.   When you were talking with Ms. Minchoff last
15        night, did you talk at all about what Ms.
16        Hofer testified to during her deposition?
17   A.   No.
18   Q.   Prior to last night, when was the -- prior
19        to last night, were there any other
20        instances where you spoke with Ms. Minchoff?
21   A.   Once.
22   Q.   Okay.  When was that?
23   A.   I don't recall the exact date.
24   Q.   Okay.  Can we talk about a year?  When was
25        the year?
```



CARRIE L. LaROCHE
July 27, 2006

```
 1   A.   This year.

 2   Q.   Okay.  Was it in the winter of this year?

 3   A.   No.  There hasn't been a winter of this year

 4        yet, really.

 5   Q.   Would you include January and February in

 6        that?

 7   A.   I don't believe so.

 8   Q.   Okay.  Was it in the spring?

 9   A.   Yes.

10   Q.   Okay.  And what did you discuss with Ms.

11        Minchoff during that conversation?

12   A.   Possible dates for the deposition.

13   Q.   Okay.  And, again, did you talk about

14        anything substantively about the case during

15        that discussion?

16   A.   No.

17   Q.   Aside from Ms. Minchoff, have you spoken

18        with any other attorney about this matter?

19   A.   No.

20   Q.   Do you recognize the name Stephen Kuzma?

21   A.   No.

22   Q.   Okay.  Aside from attorneys, was there

23        anybody else from Ms. Minchoff's office that

24        you spoke with prior to today?

25   A.   Maja.
```



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

CARRIE L. LaROCHE
July 27, 2006

```
 1   Q.   Who is Maja?

 2   A.   Her secretary.

 3   Q.   Okay.  And what did you talk to Maja about?

 4   A.   Deposition dates.

 5   Q.   Is that it?

 6   A.   Yes.

 7   Q.   And when you first spoke with Ms. Minchoff

 8        about deposition dates, who initiated that

 9        call?

10   A.   She did.

11   Q.   When were you born?

12   A.   December 30th.

13   Q.   Of what year?

14   A.   1976.

15   Q.   Can you just tell me a little bit about your

16        education, beginning with high school to

17        present, please.

18   A.   I went to Killingly High School.

19   Q.   I'm sorry, Killingly?

20   A.   Killingly High School.

21   Q.   Do you mind giving us a spelling for the

22        record?

23   A.   K-I-L-L-I-N-G-L-Y.

24   Q.   And where is that?

25   A.   That would be in Danielson, Connecticut.
```



CARRIE L. LaROCHE
July 27, 2006

```
 1   Q.   Okay.  And after Killingly High School in
 2        Danielson, Connecticut, where did you go?
 3   A.   To Nichols College.
 4   Q.   Okay.  And where is Nichols College?
 5   A.   That would be in Dudley, Massachusetts.
 6   Q.   I probably should have asked this in
 7        connection with Killingly, but when did you
 8        graduate from Killingly?
 9   A.   1994.
10   Q.   Did you graduate from Nichols?
11   A.   Yes.
12   Q.   Okay.  And what did you graduate with by way
13        of degree?
14   A.   Marketing degree, the first time.
15   Q.   When you say "the first time," what do you
16        mean by "the first time"?
17   A.   I graduated from Nichols the first time with
18        a marketing degree, then went back to
19        Nichols to get my teaching degree.
20   Q.   Okay.  When did you graduate with a
21        marketing degree?
22   A.   '98.
23   Q.   And when did you graduate with a teaching
24        degree?
25   A.   2005.
```



CARRIE L. LaROCHE
July 27, 2006

```
 1   Q.   Okay.  After Nichols did you continue on

 2        with any postgraduate work?

 3   A.   No.

 4   Q.   And are you certified to teach in any state?

 5   A.   Yes.

 6   Q.   Which state?

 7   A.   Massachusetts and Connecticut.

 8   Q.   When did you receive your Massachusetts

 9        certification, to the best of your

10        recollection?

11   A.   June of '05.

12   Q.   And when did you receive your Connecticut

13        certification?

14   A.   August of '05.

15   Q.   Where do you presently live?

16   A.   In Connecticut.

17   Q.   Where in Connecticut?

18   A.   Danielson.

19   Q.   Where is Danielson, Connecticut in relation

20        to this office?

21   A.   In relation to this office?  About an hour

22        and 15 minutes away.

23   Q.   North or south?

24   A.   Southwest.

25   Q.   Just wondering if you had any problems with
```



CARRIE L. LaROCHE
July 27, 2006

```
 1          the traffic this morning.

 2    A.    No.

 3    Q.    Whom do you live with?

 4    A.    My husband.

 5    Q.    Okay.  And what's your husband's name?

 6    A.    John LaRoche.

 7    Q.    Do you have any children?

 8    A.    Not yet.

 9    Q.    How long have you lived in Danielson with

10          your husband?

11    A.    A year and a half.

12    Q.    Okay.  And what's the address?

13    A.    163 Snake Meadow Road.

14    Q.    How long have you lived at 163 Snake Meadow

15          Road?

16    A.    Three and a half years.

17    Q.    Prior to 163 Snake Meadow Road, where did

18          you live?

19    A.    Massachusetts.

20    Q.    Where in Massachusetts, please?

21    A.    Leominster.

22    Q.    Okay.  Do you have any plans about moving

23          within the next year?

24    A.    No.

25    Q.    Where do you presently work?
```



CARRIE L. LaROCHE
July 27, 2006

```
 1   A.   I'm self-employed, and I'm also a teacher.

 2   Q.   What do you do for self-employment?

 3   A.   I own three Curves For Women locations.

 4   Q.   Three what?

 5   A.   Curves For Women locations.

 6   Q.   And what is that?

 7   A.   It's a women's fitness facility.

 8   Q.   And where are those locations?

 9   A.   Leominster, Mass., Clinton, Mass. and

10        Holden, Mass.

11   Q.   None in Connecticut, though?

12   A.   No.

13   Q.   And where do you teach?

14   A.   Woodstock Academy.

15   Q.   And where is Woodstock Academy, please?

16   A.   In Woodstock, Connecticut.

17   Q.   Fair enough.   In connection with your

18        teaching job, have you ever had any computer

19        training?

20   A.   Do you mean like through the school that I

21        teach at?

22   Q.   Yeah.   In connection with your job, have you

23        had any training via the school system?

24   A.   No.

25   Q.   Have you ever had any computer training
```



CARRIE L. LaROCHE
July 27, 2006

```
 1        outside of your job?

 2   A.   Yes.

 3   Q.   What type of computer training?

 4   A.   In Microsoft Office and --

 5   Q.   Okay.  I didn't mean to interrupt you.  Go

 6        ahead.

 7   A.   Microsoft Office.  I've done a lot of

 8        teaching myself.

 9   Q.   Just with software programs and books and

10        the like?

11   A.   Correct.

12   Q.   Do you know how to read computer source

13        codes?

14   A.   To read?  I'm sorry.

15   Q.   Well, let me ask in the first place, do you

16        know what computer source codes are?

17   A.   Not by how you said it.  If it's explained,

18        I might know what they are.

19   Q.   All right.  Do you know how computer

20        programs are written?

21   A.   No.

22   Q.   Okay.  I don't need to ask the other

23        question then.  Please don't take offense.

24        I ask this of all deponents.  Have you ever

25        been convicted of a crime?
```



CARRIE L. LaROCHE
July 27, 2006

```
 1   A.   No.

 2   Q.   Are you taking any medications today that

 3        would affect your ability to understand what

 4        I'm saying?

 5   A.   No.

 6   Q.   Okay.  Are you taking any medication today

 7        that would affect your ability to tell the

 8        truth?

 9   A.   No.

10   Q.   Have you ever been deposed before?

11   A.   No.

12   Q.   Something I probably should have said a

13        little bit earlier.  Because you haven't

14        been deposed before, you may hear, and I

15        hope not too much from one or both counsel.

16        To the extent an objection is put out there,

17        just allow it to be made so that the record

18        can get the objection, and then you can go

19        ahead and answer, okay?

20   A.   Okay.

21   Q.   Have you ever been party to a lawsuit?

22   A.   Yes.

23   Q.   Okay.  When was that lawsuit filed?

24   A.   I don't remember the exact dates.

25   Q.   Okay.  What year?
```



CARRIE L. LaROCHE
July 27, 2006

```
 1   A.    '95, '96.

 2   Q.    Is that case still open?

 3   A.    No.

 4   Q.    What was the dis -- strike that.

 5         How did that case resolve itself?

 6   A.    Through the lawyers.

 7   Q.    Okay.  Fair enough.  I'll ask it a different

 8         way.  Was that case settled, or did it go to

 9         trial?

10   A.    It was settled.

11   Q.    What type of case was it?

12   A.    A car accident.

13   Q.    Can you just explain to me the facts of that

14         case a little bit?

15   A.    An 80-year-old lady sideswiped me in my

16         mom's car.

17   Q.    Okay.  And there was a settlement ultimately

18         between the parties?

19   A.    Yes.

20   Q.    And aside from that one case, which settled

21         in when?  When did that settle?

22   A.    '95 or '96.

23   Q.    Okay.  So aside from that one case, have you

24         ever been involved in any other lawsuits?

25   A.    No.
```



Page 20

CARRIE L. LaROCHE
July 27, 2006

```
 1   Q.   What did you do to prepare for today?
 2   A.   I looked through my files.
 3   Q.   Okay.  And what files did you look through?
 4   A.   The files on my computer and in my office.
 5   Q.   And when you say on your computer, you mean
 6        your home computer?
 7   A.   Yes.
 8   Q.   And presumably this home computer has
 9        Internet access?
10   A.   Yes.
11   Q.   Who is your Internet carrier -- provider?
12   A.   Currently, it's through my cable company.
13   Q.   Who is that?
14   A.   Eastern Connecticut Cable.
15   Q.   Going back to 2004 who was your Internet
16        service provider at home?
17   A.   I am not sure.
18   Q.   Okay.  We'll talk about that a little bit
19        later.  Now, you say in your office you also
20        looked for files.  Was that your Woodstock
21        Academy office or your office --
22   A.   Home office.
23   Q.   Oh, so you have a home office as well?
24   A.   Yes.
25   Q.   And is the home office computer different
```



CARRIE L. LaROCHE
July 27, 2006

1        than your general home computer?

2   A.   No, one and the same.

3   Q.   And when you were looking on the -- for

4        files on your computer, what did you find?

5   A.   Nothing.

6   Q.   You didn't find any e-mails?

7   A.   Nope.

8   Q.   Didn't find any photographs?

9   A.   Nope.

10  Q.   Didn't find any letters?

11  A.   Nope.

12  Q.   Didn't find any screen pages about the book

13       of the trip?

14  A.   Nope.

15  Q.   We'll get into that a little bit later as

16       well.  Aside from looking on your computer

17       and calling Attorney Minchoff about the

18       process itself about depositions, was there

19       anything else that you did to prepare for

20       the deposition today?

21  A.   No.

22  Q.   Well, did you speak with Ms. Hofer before

23       today about the deposition?

24  A.   We mentioned it last night at her house.

25  Q.   So you met with Ms. Hofer last night?



CARRIE L. LaROCHE
July 27, 2006

```
 1   A.   Yes.

 2   Q.   Okay.  And what was the purpose of that

 3        meeting?

 4   A.   I stayed at her house last night.

 5   Q.   And you and Ms. Hofer are friends?

 6   A.   Yes.

 7   Q.   And how long have you been friends?

 8   A.   Five years.

 9   Q.   And how did you first meet Ms. Hofer?

10   A.   Through my clubs.

11   Q.   The clubs, you mean the Curves?

12   A.   The Curves.

13   Q.   All right.  "Clubs" has a couple different

14        meanings.

15   A.   Sorry.

16   Q.   No worries.  Just want to make sure we're

17        clear.

18             And while you were at her house last

19        night, this being Ms. Hofer's house, what

20        did you discuss?

21   A.   We talked about my wedding and the honeymoon

22        and looked at pictures.

23   Q.   And presumably the pictures you're talking

24        about were from the wedding and the

25        honeymoon?
```



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

CARRIE L. LaROCHE
July 27, 2006

```
 1   A.   Yes.  Sorry.

 2   Q.   That's all right.  And aside from talking

 3        about the wedding and the honeymoon and

 4        looking at pictures relating to those two

 5        things, did you talk at all about this case?

 6   A.   No.  We just -- I just asked her what time

 7        we had to leave in the morning when we were

 8        going to bed.

 9   Q.   So you didn't discuss the substance of this

10        case at all?

11   A.   No.

12   Q.   All right.  Prior to last night had you ever

13        talked to Ms. Hofer about this case?

14   A.   Yes.

15   Q.   Okay.  And when was the last time you spoke

16        to Ms. Hofer about this case?

17   A.   Sunday.

18   Q.   And when you spoke to Ms. Hofer about the

19        case on Sunday, what did you discuss?

20   A.   I called her to let her know that I got my

21        subpoena to come here today.

22   Q.   And aside from that, what did you discuss

23        about the case?

24   A.   I asked her if she knew where the building

25        was, and that's when we had talked about me
```



CARRIE L. LaROCHE
July 27, 2006

```
 1          staying over at her house to drive in

 2          together so that I wouldn't get lost.

 3    Q.    Smart move with the changes.

 4              Aside from those things, did you talk

 5          about the claims that Ms. Hofer and her

 6          husband have made against the defendants in

 7          this case?

 8    A.    No.

 9    Q.    Aside from those few things you've just

10          identified, did you discuss with Ms. Hofer

11          the occurrences -- or I should say the

12          events that happened down at the resort in

13          Jamaica?

14    A.    No.

15    Q.    Okay.  Prior to that discussion this past

16          Sunday, have you ever discussed with Ms.

17          Hofer what happened down in Jamaica?

18    A.    Yes.

19    Q.    Okay.  And when was the last time you spoke

20          with Ms. Hofer about what happened down in

21          Jamaica?

22    A.    I'm not sure of an exact date.

23    Q.    Okay.  Let's talk in months.  Was it after

24          January of 2004 that you spoke to her?

25    A.    Yes.
```



Page 25

CARRIE L. LaROCHE
July 27, 2006

```
1   Q.    Okay.  And was it after March of 2004 that

2         you spoke to her about the events in

3         Jamaica?

4   A.    Yes.  Actually, it wasn't January of '04

5         because the accident didn't happen until

6         March of '04.

7   Q.    I know that.  I was just asking if you had

8         spoken with her after.  We'll go forward.

9              Just by way of reference, the

10        complaint in this case was filed by Ms.

11        Hofer and her husband via her attorneys in

12        September of '05.  Have you discussed the

13        substance of this case with Ms. Hofer since

14        September of 2005?

15  A.    Yes.

16  Q.    Okay.  And just in general, can you recall

17        the dates that you talked with Ms. Hofer

18        after September of 2005 about this case?

19  A.    I'm not sure.

20  Q.    That's fine.  Let's just talk about the

21        substance of the communications then, okay?

22        Can you recall what you and Ms. Hofer spoke

23        about concerning the substance of this case?

24  A.    The trip to Jamaica.

25  Q.    Okay.  And specifically as it relates to the
```



CARRIE L. LaROCHE
July 27, 2006

```
 1        trip to Jamaica, what did you talk about?
 2   A.   Basically me trying to fill in things that
 3        she didn't remember.
 4   Q.   Okay.  And about those things that you tried
 5        to fill in, what did you try to fill in?
 6   A.   The time at the hospital.
 7   Q.   And what did you tell Ms. Hofer about the
 8        time at the hospital?
 9   A.   Basically what happened there.
10   Q.   Okay.  Well, what basically happened there
11        that you told her about?
12   A.   Do you want me to start from the time she
13        was admitted or...
14   Q.   Let's start from the time she was admitted.
15   A.   She was admitted to the hospital.  They took
16        us back to an exam room, if you can call it
17        that, and the doctor started to try to stop
18        the blood loss.
19   Q.   Okay.  And after that what happened?
20   A.   Once they had her stabilized, then they took
21        her to do X-rays and things of that nature
22        to try the see how severe all of the damage
23        was.
24   Q.   And you were there during this time period?
25   A.   I wasn't in the exam room.  They took her
```



CARRIE L. LaROCHE
July 27, 2006

1           into a different section to do the X-rays

2           and things like that.  I was in the waiting

3           area by that room.

4    Q.   Okay.  And so when you had this discussion

5           with Ms. Hofer where you were filling in the

6           blanks, you told her all of these things?

7    A.   Yes.

8    Q.   Okay.  And what else did you tell her when

9           you were trying to fill in the blanks for

10          her?

11   A.   I told her about how when she was out of it,

12          all she kept asking was for some Tylenol and

13          she'd be fine, "Just give me Tylenol, and

14          I'll be fine."  So I was telling her that

15          "They're giving you Tylenol.  It'll kick in

16          in a minute.  Just relax."

17   Q.   You say -- your words, I think you said "out

18          of it."  What do you mean by that?

19   A.   She was pretty much incoherent.  She was in

20          shock at that point, she had lost so much

21          blood.

22   Q.   What do you mean, "She was in shock"?

23   A.   She was in shock from cutting her leg.

24   Q.   Did the doctors tell you she was in shock?

25   A.   I don't recall at this time if they used



CARRIE L. LaROCHE
July 27, 2006

```
 1       that specific word.
 2   Q.  All right.  Do you have any medical
 3       training?
 4   A.  No.
 5   Q.  Was Ms. Hofer inebriated at this point?
 6   A.  Absolutely not.
 7   Q.  All right.  Aside from the -- being
 8       admitted, the stopping of the blood, the
 9       stabilization, the going on to the X-rays,
10       what else happened while at the hospital
11       that you filled in the blanks for her?
12   A.  The fact that she called her husband from my
13       cell phone when we were there to let him
14       know that she had been in an accident, and
15       when she was on the phone with him, she told
16       him that we were going to go home according
17       to -- as planned.  It was just a little cut
18       and we were going to go and lay on the beach
19       the next day.
20   Q.  All right.  And so you overheard her on the
21       cell phone with her husband?
22   A.  Yeah, I was standing right there.
23   Q.  And what else did she say to him while she
24       was on the phone with him?
25   A.  Specifically, I'm not -- I don't remember.
```



CARRIE L. LaROCHE
July 27, 2006

```
 1   Q.   Okay.  Did you speak to Ms. Hofer -- Mr.
 2        Hofer at that point?
 3   A.   Yes.
 4   Q.   And so you got on the phone with him?
 5   A.   Yes.
 6   Q.   And this was your phone again?
 7   A.   Yes.
 8   Q.   And what did you discuss with Mr. Hofer at
 9        that point?
10   A.   I let him know that the accident was more
11        severe than what she had told him and that
12        it wasn't just a little cut, that she had a
13        lot of stitches and lost a lot of blood.
14   Q.   And can I ask -- strike that.
15        I'm going to ask, what did Mr. Hofer
16        say in response.
17   A.   He just asked how she was, if she was okay.
18   Q.   Did he say anything to the effect, "What
19        happened?"
20   A.   Yes.  He asked how it happened, and I told
21        him that apparently she had fallen into the
22        turtle pond.
23   Q.   When you say "apparently," why do you say
24        "apparently"?
25   A.   Because I wasn't there.  I didn't see it.
```



Page 30

CARRIE L. LaROCHE
July 27, 2006

```
 1   Q.   Did anybody tell you that she fell into the

 2        turtle pond?

 3   A.   Stephanie did.

 4   Q.   What did Stephanie say about the falling

 5        into the turtle pond?

 6   A.   She said that her flip-flop broke, she fell

 7        down the stairs and fell into the turtle

 8        pond.

 9   Q.   When did she tell you that the flip-flop

10        broke?

11   A.   When I saw her when she was laying on the

12        bench right next to the turtle pond right

13        after it happened.

14   Q.   Let's just talk about that for a second,

15        your getting to the turtle pond, okay?

16   A.   Uh-huh.

17   Q.   Forgive me as I flip.  When did you first

18        find out that Stephanie hurt herself?

19   A.   When someone from the hotel called the room.

20   Q.   Okay.  Do you recall who called the room?

21   A.   No.

22   Q.   Did they identify themselves as being from

23        the hotel?

24   A.   No.

25   Q.   Can you be certain they were from the hotel?
```



CARRIE L. LaROCHE
July 27, 2006

```
 1   A.   No.

 2   Q.   Okay.  You just assumed it was someone from

 3        the hotel calling about it?

 4   A.   Nobody else would know our room number.

 5   Q.   Did the person who called you explain what

 6        happened?

 7   A.   No.

 8   Q.   What did they say?

 9   A.   They said, "Your friend cut her foot.  You

10        need to come to the front desk."

11   Q.   Okay.  And so did you go to the front desk?

12   A.   Yes.

13   Q.   Okay.  And what did you see when you got to

14        the front desk?

15   A.   Before I made it to the actual front desk, I

16        saw Stephanie laying on the bench in front

17        of the turtle pond with her leg half hanging

18        off gushing blood everywhere.

19   Q.   I just want to talk to you about who else

20        was there when you arrived.  When you first

21        got to see Stephanie and she was sitting on

22        the bench, were there any other persons

23        standing around?

24   A.   Yes.

25   Q.   Who else was standing around?
```



CARRIE L. LaROCHE
July 27, 2006

 1   A.   I don't know their names.

 2   Q.   Do you know their occupations?

 3   A.   No.

 4   Q.   Did you ever ask their names?

 5   A.   No.

 6   Q.   What were those persons doing standing

 7        around?

 8   A.   They were literally standing there.

 9   Q.   Okay.  Were they doing anything to help --

10   A.   No.

11   Q.   -- Stephanie?

12   A.   They were standing there watching her as she

13        screamed.

14   Q.   Okay.  And what was she screaming?

15   A.   She was yelling, "Get my friend.  Get my

16        friend."

17   Q.   And "the friend" being you?

18   A.   Yes.

19   Q.   All right.  Upon your arrival did you talk

20        to Stephanie right away?  I'll rephrase it.

21            When you came upon the scene of the

22        accident, did you go over to Ms. Hofer and

23        talk to her?

24   A.   Yes.

25   Q.   And what did you talk about?



CARRIE L. LaROCHE
July 27, 2006

```
 1    A.    I wouldn't say it was a conversation.  I

 2          more started yelling orders to everybody.

 3    Q.    Okay.  Well, did Ms. Hofer say anything to

 4          you?

 5    A.    Just basically like "Thank God you're here.

 6          Help me."

 7    Q.    Did you ask her at that point what happened?

 8    A.    Not yet.

 9    Q.    But you did at some point?

10    A.    Yes.

11    Q.    And when was that?

12    A.    Shortly afterwards.

13    Q.    Okay.  Was this on the ride to the hospital?

14    A.    No.

15    Q.    Okay.  When you say "shortly after," was it

16          still at the scene of the accident?

17    A.    Yes.

18    Q.    And who were you shouting orders at?

19    A.    I don't know their names.

20    Q.    So was it just a sort of anybody at all --

21    A.    Whoever was there.  I yelled for people to

22          get towels, call 911, get an ambulance here.

23    Q.    And did they react?

24    A.    Yes.

25    Q.    How did they react?
```



CARRIE L. LaROCHE
July 27, 2006

```
 1   A.   Someone went and got towels, because towels

 2        appeared, and someone said, "There is no

 3        ambulance on the island."

 4   Q.   And after someone brought over the towels

 5        and someone responded about the ambulance,

 6        what did you do next?

 7   A.   I tried to stabilize her leg and tried to

 8        stop the bleeding.

 9   Q.   And how did you try to do that?

10   A.   I had her elevate her leg up to try to stop

11        the flow of blood and tried to wrap the

12        towels around it to keep pressure on it to

13        try to stop the flow of blood.

14   Q.   And, again, you don't have any medical

15        training, right?

16   A.   No.

17   Q.   So it was just something you thought to do?

18   A.   Yeah.

19   Q.   After you were telling people to help and

20        trying to get them to bring whatever sort of

21        assistance to you, did you then turn to

22        Stephanie and ask her what happened?

23   A.   Yeah.

24   Q.   Okay.  And what did you ask her

25        specifically?
```



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

CARRIE L. LaROCHE
July 27, 2006

```
 1   A.   I asked her what happened.

 2   Q.   Fair enough.  And what did she say?

 3   A.   She said that her flip-flop broke, she fell

 4        down the stairs and into the turtle pond.

 5   Q.   Did you see the flip-flop?

 6   A.   I did see it on the stairway.

 7   Q.   Okay.  Where on the stairway?

 8   A.   On the stair.

 9   Q.   Top stair, bottom stair, middle stair?

10   A.   Middle.

11   Q.   Middle stair?

12   A.   (No verbal response.)

13   Q.   Are you an artist?

14   A.   No.

15   Q.   That's fine.  I'm going to take the mike off

16        in a second, but just so we get our bearings

17        I'd like have you draw the scene of the

18        accident, okay?

19   A.   Okay.

20   Q.   Whether -- the staircase, the front door,

21        whatever the scene of the accident was,

22        okay?

23   A.   Okay.  (Witness complies.)

24            Do you want me to draw trees?

25   Q.   I'd like you to draw it as the accident
```



CARRIE L. LaROCHE
July 27, 2006

```
 1        scene appeared.  If there were trees --

 2   A.   Well, I think they were more like shrubs.

 3   Q.   Trees, stone, walkways, et cetera.  I would

 4        like you to draw in as much detail as you

 5        can, please, and then just label it.

 6             MR. REITH:  Did you get that on

 7        tape?

 8             THE VIDEOGRAPHER:  (No verbal

 9        response.)

10   A.   (Witness complies.)

11   Q.   Are we done?

12   A.   I think that's as good as my drawing gets.

13   Q.   Okay.  I'm just going to come over to your

14        angle, okay?

15   A.   Sure.

16             MR. REITH:  I should have used a

17        different color paper, but before we go any

18        further, I'm just going to ask you to mark

19        this as Exhibit 1 for identification today,

20        please.

21             (Exhibit No. 1, Drawing, marked for

22        identification.)

23   Q.   Excuse my reach.

24   A.   Uh-huh.

25   Q.   I don't mean to hover.
```



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

CARRIE L. LaROCHE
July 27, 2006

```
 1                MR. REITH:  Can you just zoom in on
 2         this, please?
 3                MR. FERINGA:  You might want to
 4         move the soda.
 5                THE WITNESS:  Sorry.
 6                MR. FERINGA:  That's all right.
 7         Don't worry.
 8                MR. REITH:  Let me do this:  Put
 9         something behind it, okay?  And if you just
10         stay zoomed, I'm just going to ask the
11         witness to describe what she has drawn here.
12    A.   This down here (indicating) would lead to
13         where the parking lot was.
14    Q.   Okay.
15    A.   There was a walkway on either side.  The
16         stairs went up to the front door, which that
17         was the lobby in there.  On the side there
18         was the turtle pond with some shrubs behind
19         it, and there was a bench.
20    Q.   Okay.  Was there anything on this side?
21         You've left it blank.
22    A.   I don't remember that side.
23    Q.   Okay.  And these doors (indicating), were
24         they a single door or split doors?
25    A.   I don't recall.
```



CARRIE L. LaROCHE
July 27, 2006

1    Q.    Okay.  And you've drawn something large and

2          box-like around the door.

3    A.    The building.

4    Q.    Is that the building?

5    A.    That's the building.

6    Q.    Okay.  And you've -- how many stairs have

7          you drawn here?

8    A.    I drew four.

9                MR. REITH:  Okay.  We'll just leave

10         that for now.  Counsel, I'll have a copy of

11         that made during a break.

12   Q.    Using the diagram that you have just put

13         together -- and if I could just ask for my

14         pen back in the interim.

15   A.    Oh, sorry.

16   Q.    You can hold onto the pen, and then I'll

17         take it back after --

18               MR. REITH:  India, do you have a

19         pen for her?  Thank you.  I just have to

20         take my copious notes.

21   Q.    If you can draw on Exhibit 1 for

22         identification today where you saw the

23         sandal.

24   A.    (Witness complies.)

25   Q.    If you can just hold that up, please.



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

CARRIE L. LaROCHE
July 27, 2006

```
 1   A.   Uh-huh.

 2              MR. REITH:  Can you just zoom in on

 3        that?  You all set?

 4              THE VIDEOGRAPHER:  (No verbal

 5        response.)

 6   Q.   And if you could just circle that and write

 7        next to it "Sandal."

 8   A.   (Witness complies.)

 9   Q.   Okay.  What color was the sandal?

10   A.   I don't remember.

11   Q.   What did the sandal look like?

12   A.   It was a flip-flop.

13   Q.   Describe for the record what you mean by

14        "flip-flop."

15   A.   A flip-flop where it has the spot where your

16        toe -- your big toe goes on one side and the

17        rest of your toes are on the other side, and

18        it goes from the middle out to the two sides

19        of the shoe.

20   Q.   But you saw that sandal, you say, sitting on

21        one of the stairs?

22   A.   Yes.

23   Q.   Okay.  And it appears from your drawing that

24        it was on one of the many stairs there more

25        towards the middle --
```



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

Page 40

CARRIE L. LaROCHE
July 27, 2006

```
 1   A.   Yes.

 2   Q.   -- of the staircase?

 3             And it's your testimony that that

 4        right there (indicating) is the lobby or the

 5        scene of the accident at Turtle Beach

 6        Towers?

 7   A.   To the best of my memory.

 8   Q.   Okay.  Have you discussed with Ms. Hofer the

 9        portion of her deposition where she was

10        asked to make a drawing similar to that?

11   A.   No.

12             MR. REITH:  Can I just ask that

13        that be marked as Exhibit 2 for

14        identification today.  I'm just going to

15        pass that down to counsel.  Thank you for

16        the copies, Scott.

17             (Exhibit No. 2, Copies of

18        photographs, 5 pages, marked for

19        identification.)

20   Q.   I'm just going to ask you to take a look at

21        one, two, three, four, five, the five

22        photographs that have been given to you --

23        or I should say copies of photographs given

24        to you, and let me know when you've had a

25        chance to take a look at them.
```



CARRIE L. LaROCHE
July 27, 2006

```
 1              (Witness reviews photographs.)

 2   Q.   Using the first photograph, can you just

 3        tell me where Ms. Hofer was situated when

 4        you came upon the scene?

 5              MS. MINCHOFF:  Objection.

 6   Q.   All right.  I'll back up a little bit.  Do

 7        you recognize this series of photographs?

 8   A.   No.

 9   Q.   You don't recognize this series of

10        photographs as a pictorial of the scene of

11        the accident down in Jamaica?

12   A.   No.

13   Q.   So you don't recognize this series of

14        photographs as the staircase leading to the

15        front lobby of Turtle Beach Towers?

16   A.   No.

17   Q.   Have you ever seen or visited the location

18        that is depicted in this series of pictures?

19   A.   No.

20   Q.   So it's your testimony that this series of

21        pictures is not the location where you came

22        upon Stephanie after her accident in

23        Jamaica?

24   A.   Not to my knowledge.

25   Q.   And it's also your testimony that this is
```



CARRIE L. LaROCHE
July 27, 2006

```
 1          not the depicted staircase where you saw --
 2          well, I should say allegedly saw the sandal
 3          located after the accident?
 4   A.     No.
 5   Q.     Is it your testimony that this bench which
 6          is depicted throughout this series of
 7          photographs is not the bench that you saw
 8          Stephanie sitting on when you came upon her
 9          after the accident in Jamaica?
10                 MS. MINCHOFF:   Objection.
11   A.     Can you repeat that?
12   Q.     Okay.  This bench that's identified in the
13          first page of Exhibit 2 for identification
14          today, is that the bench that you saw
15          Stephanie sitting on?
16                 MS. MINCHOFF:   Objection.
17   A.     I wouldn't remember.
18   Q.     But you testified a little bit earlier,
19          probably about four questions ago, that you
20          do not recognize this location to be where
21          Stephanie had her accident, correct?
22   A.     No.
23   Q.     When you came upon Stephanie after the
24          accident, was she wearing any clothing?
25   A.     Yes.
```



CARRIE L. LaROCHE
July 27, 2006

```
 1   Q.   What was she wearing?

 2   A.   Shorts and a T-shirt.

 3   Q.   What color were her shorts?

 4   A.   Tan.

 5   Q.   What color was her T-shirt?

 6   A.   White.

 7   Q.   Was she wearing anything on her feet?

 8   A.   No.

 9   Q.   Had she been wearing anything on her feet

10        that day?

11   A.   Yes.

12   Q.   What was she wearing?

13   A.   Flip-flops.

14   Q.   But, again, you can't remember the color of

15        the flip-flops?

16   A.   No.

17   Q.   But you're sure she was wearing flip-flops

18        that day?

19   A.   Yes.

20   Q.   How can you be sure?

21   A.   Because before we left she said, "Look at my

22        new flip-flops."

23   Q.   And did you look at them?

24   A.   Yes.

25   Q.   But you don't recall what color they were?
```



CARRIE L. LaROCHE
July 27, 2006

```
 1   A.   No.

 2   Q.   Was she wearing anything else besides her

 3        tan shorts and her white shirt?

 4   A.   Underwear and a bra.

 5   Q.   We don't have to get into that.

 6            And forgive me if I asked this.  I

 7        probably did.  I just don't recall the

 8        answer right now.  What did Carrie (sic) say

 9        to you when you were talking to her at the

10        scene of the accident?

11            MS. MINCHOFF:  Objection.

12   Q.   You can answer.

13            MS. MINCHOFF:  What did Stephanie

14        say to her?

15            MR. REITH:  Yes.

16            MS. MINCHOFF:  You said Carrie.

17            MR. REITH:  Oh.  Well, that's a

18        good objection, then.

19   BY MR. REITH:

20   Q.   What did Stephanie say to you, "you" Carrie,

21        at the scene of the accident?

22   A.   She said to "Help me."

23   Q.   Okay.  Aside from helping her, anything

24        else?

25   A.   I asked her what happened.
```



CARRIE L. LaROCHE
July 27, 2006

1   Q.   Okay.  And that's when she said what?

2   A.   She said that she was walking down the

3        stairs, her flip-flop broke and she fell in

4        the turtle pond.

5   Q.   Okay.  What time was this?

6   A.   I don't recall exactly.

7   Q.   Okay.  Well, all right.  Let's talk about

8        general time periods.  Was it after 9:00?

9   A.   Yes.

10  Q.   Was it after 10:00?

11  A.   Yes.

12  Q.   Was it after --

13            MR. FERINGA:  10:00, 9:00 p.m.,

14       a.m.?

15            MR. REITH:  Forgive me, counsel.

16  Q.   Was it after 9:00 p.m.?

17  A.   Yes.

18  Q.   Was it after 10:00 p.m.?

19  A.   Yes.

20  Q.   Was it after 12:00 a.m.?

21  A.   No.

22  Q.   Are you sure?

23  A.   Yes.

24  Q.   How can you be sure?

25  A.   Because I had the 11:00 news on.



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

CARRIE L. LaROCHE
July 27, 2006

```
 1   Q.   How far into the 11:00 news were you when

 2        you got the call from the resort?

 3   A.   I don't remember.

 4   Q.   10 minutes, 15 minutes?

 5             MS. MINCHOFF:  Objection.

 6   A.   I'm not sure.

 7   Q.   Do you know if it was near the end of the

 8        11:00 news?

 9   A.   I don't remember.

10   Q.   Which 11:00 news was it?

11   A.   I don't remember.

12   Q.   Okay.  Was it being broadcast out of

13        Florida?

14   A.   I don't remember.

15   Q.   Was it being broadcast out of anywhere else

16        in the continental United States?

17   A.   I don't remember.

18   Q.   Okay.  After you came upon the scene, asked

19        for people's help, stabilized Ms. Hofer,

20        asked her what happened, what did you do

21        next?

22   A.   I asked if there was anyone that could take

23        us to the hospital.

24   Q.   And who did you ask that of?

25   A.   I asked in general.
```



CARRIE L. LaROCHE
July 27, 2006

```
 1   Q.   How many people were there, including you
 2        and Ms. Hofer?
 3   A.   Approximately four to eight maybe.
 4   Q.   Okay.  I'm trying to figure out a way how to
 5        differentiate this.  Were they local
 6        residents or tourists?
 7   A.   Some of both.
 8   Q.   Some of both.
 9             Did you get into any specific
10        discussions with any of them aside from
11        asking them to help?
12   A.   I talked with Henry McKenzie once we were in
13        his car.
14   Q.   And who is Henry McKenzie?
15   A.   He's the gentleman that offered to drive us
16        to the hospital.
17   Q.   Do you know what Mr. McKenzie does for a
18        living?
19   A.   No.
20   Q.   Where was Mr. McKenzie's car?
21   A.   In the parking lot.
22   Q.   Was it a cab?
23   A.   No.
24   Q.   So what happened after Mr. McKenzie offered
25        to take you in his car?
```



CARRIE L. LaROCHE
July 27, 2006

```
 1   A.   A couple of the people helped me put

 2        Stephanie in the back seat of the car.

 3   Q.   And did you ever get the names of these

 4        people who helped you?

 5   A.   No.

 6   Q.   What was the condition of Stephanie's leg at

 7        this point?  Was it in some sort of traction

 8        so it didn't move, or was it just being

 9        covered in towels?

10   A.   I had it wrapped in towels.

11   Q.   Okay.  But there was no splint on it at this

12        point?

13   A.   No.

14   Q.   Before you put the towels on, did you wash

15        the cut out with anything like water?

16   A.   No.

17   Q.   After certain persons assisted you getting

18        Ms. Hofer into the car, what happened next?

19   A.   We drove to the hospital.

20   Q.   How far of a drive was it?

21   A.   Approximately 10 to 15 minutes.

22   Q.   And what was Ms. Hofer's state at this

23        point?

24             MS. MINCHOFF:  Objection.

25   Q.   I can rephrase for you.
```



CARRIE L. LaROCHE
July 27, 2006

1   A.   Yeah.

2   Q.   Was Ms. Hofer coherent?

3   A.   Not really.

4   Q.   Okay.  Was she saying anything to you in the

5        car ride?

6   A.   She was kind of rambling.

7   Q.   What was she rambling about?

8   A.   It didn't really make sense.

9   Q.   Any specific recollections?

10  A.   I don't remember exactly what she said, no.

11  Q.   Do you remember generally what she said?

12  A.   No.

13  Q.   And Mr. McKenzie, you talked to Mr. McKenzie

14       in the car ride over?

15  A.   Not really.

16  Q.   Did you call Mr. Hofer in the car ride over

17       to the hospital?

18  A.   No.

19  Q.   Did you call anybody using your cell phone

20       on the car ride over?

21  A.   No.

22  Q.   So in the car ride over you were mainly just

23       monitoring Ms. Hofer?

24  A.   I was trying to calm her down.

25  Q.   Okay.  When you say "calm her down," what do



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

CARRIE L. LaROCHE
July 27, 2006

```
 1        you mean by that?
 2   A.   She kept complaining about how much pain she
 3        was in and rambling, and I just kept telling
 4        her "We're going to be there.  Calm down.
 5        It's okay."
 6   Q.   And we talked about the admission process to
 7        the hospital, but what happened between
 8        getting in the car to the point of admission
 9        into the hospital?
10   A.   What do you mean, what happened in the car?
11   Q.   It took you about 15 minutes to get to the
12        hospital?
13   A.   Right.
14   Q.   Okay.  Where did you pull up to, the front
15        entrance, the emergency entrance?
16   A.   I believe it was the emergency entrance.
17   Q.   Okay.  And what happened next after you
18        pulled up?
19   A.   Someone brought a wheelchair out, and we got
20        Stephanie into the wheelchair and wheeled
21        her into the exam room.
22   Q.   Okay.  Now, flashing forward to the point
23        where Ms. Hofer is talking on the phone with
24        her husband, okay?
25   A.   Uh-huh.
```



CARRIE L. LaROCHE
July 27, 2006

1   Q.   You next got on the phone with Mr. Hofer?

2   A.   Yes.

3   Q.   Okay.  After you spoke to Mr. Hofer, what

4        happened next?

5   A.   We waited for the doctors.

6   Q.   Okay.  And how long did you wait for the

7        doctors?

8   A.   Approximately a couple hours.

9   Q.   And at some point did the doctors come back

10       to talk to you and Stephanie?

11  A.   Yes.

12  Q.   And what did they say to you when they came

13       back?

14  A.   They said that she was going to need

15       surgery.

16  Q.   Okay.  Did they specify what type of

17       surgery?

18  A.   I don't recall.

19  Q.   Okay.  Did you react in any way to their

20       saying that she needed surgery?

21  A.   What do you mean?

22  Q.   Did you say anything in response to the

23       doctors?

24  A.   When they told me that she needed surgery?

25  Q.   Yes.



CARRIE L. LaROCHE
July 27, 2006

```
 1   A.    I don't remember exactly how I reacted.

 2   Q.    Okay.  Was there a discussion of whether or

 3         not Ms. Hofer would have the surgery in

 4         Jamaica?

 5   A.    Yes.

 6   Q.    Okay.  And what was said during that

 7         discussion?

 8   A.    I told them that I'm not giving them

 9         permission to operate on her.  I'm not in

10         charge of her person and that she has a

11         husband, and I asked them if it was possible

12         to have it done in the States or if it

13         needed to be done down there.

14   Q.    But Mr. Hofer wasn't on the phone at this

15         point?

16   A.    No.

17   Q.    Did you offer to call Mr. Hofer to ask if

18         the surgery could take place in Jamaica?

19   A.    I'm sorry?

20   Q.    Did you offer to call Mr. Hofer to ask him

21         if the surgery could take place in Jamaica?

22   A.    Not at that point, no.

23   Q.    Okay.  At any point did you offer that?

24   A.    Yes.

25   Q.    Okay.  And when was that that you offered to
```



CARRIE L. LaROCHE
July 27, 2006

```
 1        call Mr. Hofer?
 2   A.   It was after the doctor told me that they
 3        could stabilize her for us to fly home so
 4        she could have the surgery back home.
 5   Q.   And after they had that discussion with you,
 6        did you in fact call Mr. Hofer again?
 7   A.   Yes.
 8   Q.   Okay.  Do you recall when you spoke to Mr.
 9        Hofer about the possibility of surgery or
10        coming home?
11   A.   Around midday.
12   Q.   Okay.  This is midday what day?
13   A.   The 19th.
14   Q.   Okay.  Forgive me, I should have asked this
15        before.  When was Ms. Hofer admitted to the
16        hospital?
17             MS. MINCHOFF:  Objection.
18   A.   I don't know the exact time.
19   Q.   Was it after midnight on the morning of the
20        19th?
21   A.   Yes.
22   Q.   How can you be sure about that?
23   A.   Because by the time we left the hotel and
24        got to the emergency room and they worked on
25        her to stabilize her first and did the
```



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

CARRIE L. LaROCHE
July 27, 2006

```
 1        X-rays, all before they admitted her, it was

 2        daylight outside when they admitted her.

 3   Q.   Okay.  All right.  So maybe I misunderstand

 4        the chronology.  They admitted her after

 5        they brought her into the exam room and took

 6        the X-rays and stabilized her?

 7   A.   Yes.

 8   Q.   Okay.  What did the admission process

 9        entail?

10   A.   I don't remember exactly.

11   Q.   Was there any paperwork to be filled out?

12   A.   Yes.

13   Q.   Did you fill out the paperwork for her?

14   A.   No.

15   Q.   Ms. Hofer filled out the paperwork?

16   A.   Yes.

17   Q.   And do you recall the types of questions the

18        paperwork asked of her?

19   A.   No.

20   Q.   Did you review the paperwork before she

21        executed it?

22   A.   At the time I did.

23   Q.   Okay.  But as you sit here today, you can't

24        remember the questions asked?

25   A.   Not off the top of my head, no.
```



CARRIE L. LaROCHE
July 27, 2006

1   Q.   You don't have any of those admission
2        documents yourself, do you?
3   A.   No.
4   Q.   Did you ever have any of those admission
5        documents?
6   A.   Yes.
7   Q.   Okay.  When did you have them?
8   A.   When we were in Jamaica.
9   Q.   What happened with the admission documents
10       eventually?
11  A.   They went to Stephanie and her husband.
12  Q.   Okay.  When did they go to her husband?
13  A.   I don't recall the exact date.
14  Q.   Presumably they went to Ms. Hofer and her
15       husband after you all got back from Jamaica,
16       though?
17  A.   Yes.
18  Q.   And was it the next day when Mr. Hofer
19       picked you all up at the airport, or was it
20       at some later point?
21            MS. MINCHOFF:  Objection.
22            MR. REITH:  That's fine.
23  A.   Say that again.
24  Q.   I'll ask it a different way.  When did you
25       arrive back from Jamaica?



CARRIE L. LaROCHE
July 27, 2006

```
 1   A.   Later on in the afternoon on the 19th.

 2   Q.   Okay.  And how did you arrive back to

 3        Boston?

 4   A.   By plane.

 5   Q.   Or how did you arrive back to the United

 6        States?

 7   A.   By plane.

 8   Q.   And where did you fly back into?

 9   A.   Into Logan.

10   Q.   Okay.  Was it a direct flight?

11   A.   Yes.

12   Q.   Okay.  And did anybody pick you up at the

13        airport?

14   A.   Yes.

15   Q.   Okay.  Who picked you up at the airport?

16   A.   Who picked me up, or who picked Stephanie

17        up?

18   Q.   Fair question.  Who picked Stephanie up?

19   A.   Her mom and her husband.

20   Q.   And who picked you up?

21   A.   My roommate at the time.

22   Q.   Okay.  At the time that Mr. Hofer and, is it

23        Ms. Pompei?  Is that -- who's that --

24   A.   Her mom?

25   Q.   Yes.
```



CARRIE L. LaROCHE
July 27, 2006

```
 1   A.   Yes.

 2   Q.   At the time they picked up Stephanie, did

 3        you turn over to them the admission papers

 4        from the Jamaican hospital?

 5   A.   Yes.

 6   Q.   Okay.

 7   A.   I believe so.

 8   Q.   Okay.  Going back now to Jamaica --

 9   A.   Can I ask a question?

10   Q.   Sure.

11   A.   I just want to make sure that I'm talking

12        about the same thing.  By "admission

13        paperwork," do you mean they sent us back

14        with a packet of X-rays and a letter stating

15        that we were flying home for medical

16        reasons, or do you mean like receipts like

17        paperwork from her going in?

18   Q.   We can flush it out together.  When you were

19        down in Jamaica, what type of paperwork, any

20        type of paperwork did you or Ms. Hofer

21        receive from the hospital?

22   A.   They gave us a packet that had her I believe

23        medical X-rays, the doctors' notes from down

24        there so that we could give it to the

25        doctors up here so that they would know what
```



CARRIE L. LaROCHE
July 27, 2006

```
 1        was done while we were down there.
 2   Q.   Okay.  But was there a specific series of
 3        documents that actually related to the
 4        checking in or admitting, like name,
 5        address, contact information, anything along
 6        those lines?
 7   A.   I don't remember specifically.
 8   Q.   Okay.  But you do remember Ms. Hofer filling
 9        out something in the hospital?
10   A.   Yes.
11   Q.   And you remember reviewing some sort of
12        documents in the hospital that Ms. Hofer had
13        executed?
14   A.   Yes.
15   Q.   You're just not sure what type of papers
16        those were?
17   A.   Not two and a half years later.
18   Q.   Do you understand that those papers that Ms.
19        Hofer filled out were in the packet that
20        were given to Mr. Hofer?
21   A.   I am not sure --
22                  MS. MINCHOFF:  Objection.
23   A.   -- if they were or not.
24   Q.   Okay.  Did you ever look into the packet of
25        documents that was given to Mr. Hofer?
```



CARRIE L. LaROCHE
July 27, 2006

```
 1   A.   No.

 2   Q.   So this was a packet that was just given to

 3        you by the hospital on the way out the door?

 4   A.   By the doctors to give to the doctors here

 5        in the States.

 6   Q.   Okay.  You mentioned a document that talked

 7        about traveling for medical reasons?

 8   A.   Uh-huh.

 9   Q.   What type of document was that?

10   A.   They had given us a letter to give to the

11        check-in counter at the airport.

12   Q.   Okay.  Do you recall if there was any sort

13        of release that was signed while both of you

14        were in the hospital saying that you would

15        leave the hospital?

16   A.   I am not sure off the top of my head.

17   Q.   Okay.  Did the doctors in discussing Ms.

18        Hofer's condition with you talk about her

19        staying at the hospital in Jamaica to have

20        the surgery instead of traveling?

21   A.   No.

22   Q.   Did the doctors at the hospital present you

23        with any scenarios as to the impact of

24        traveling with this accident -- with the

25        injury?
```



CARRIE L. LaROCHE
July 27, 2006

```
 1   A.   No.

 2   Q.   Aside from the doctors saying to you and Ms.

 3        Hofer that she would need surgery, what else

 4        did they say?

 5   A.   I don't recall specifically.

 6   Q.   Okay.  In general, what did they talk about?

 7   A.   That she would need surgery.

 8   Q.   Okay.  At one point did you all elect to

 9        leave the hospital?

10   A.   After the doctors said she needed surgery, I

11        then called Steph's husband, Doug, to let

12        him know.

13   Q.   And during that conversation what did Mr.

14        Hofer say?

15   A.   We discussed having the surgery done down

16        there versus in the States.

17   Q.   When you say "we," you mean you and Mr.

18        Hofer?

19   A.   Yes.

20   Q.   Okay.  What specifically was said about

21        doing this surgery in Jamaica versus the

22        States?

23   A.   He said to have it done in the States.  He

24        said if they could stabilize her for travel,

25        he wanted it done here versus down there.
```



CARRIE L. LaROCHE
July 27, 2006

1    Q.    Okay.  And during that conversation did you

2          also explain to him the severity of the

3          injury?

4    A.    Yes.

5    Q.    And what did you tell him about the injury?

6    A.    I don't understand.

7    Q.    Well, what did you say about the extent of,

8          you know, Ms. Hofer's injury to her husband?

9    A.    I don't remember exactly.  I told him that

10         they said she needed surgery.

11   Q.    And what did Mr. Hofer say in response?  Was

12         it just you discussed going to the States?

13   A.    Yes.

14   Q.    Okay.  Did he have any other reaction to how

15         severe the injuries sounded?

16   A.    Well, he was asking if she was okay and if I

17         thought that she would be okay to come back

18         to the States.

19   Q.    And what did you tell him in response to his

20         inquiry?

21   A.    I told him that "If it were my wife, I

22         wouldn't have her have surgery down here."

23   Q.    Okay.  So after that phone call with Mr.

24         Hofer, did Ms. Hofer get on the phone with

25         him?



CARRIE L. LaROCHE
July 27, 2006

```
 1   A.   No.

 2   Q.   Okay.  After that phone call that you had

 3        with Mr. Hofer, did you elect to leave the

 4        hospital?

 5   A.   Not right away.

 6   Q.   Okay.  What did you do then next after that

 7        phone call?

 8   A.   I went back and talked to the doctor again.

 9   Q.   Okay.  And where was Stephanie at this

10        point?

11   A.   In the bed.

12   Q.   Okay.  Was the doctor with her in the room?

13   A.   I don't know if he was when I was on the

14        phone.  I had -- I went outside to use the

15        phone.

16   Q.   Okay.  Where did you speak to the doctor

17        after talking with Mr. Hofer?

18   A.   Back in the hospital.

19   Q.   Okay.  And this is in the exam room?

20   A.   Yes.

21   Q.   All right.

22   A.   Well, no, at that point they had moved her,

23        so she was in like a cattle call room, is

24        how they have them down there.

25   Q.   And by "cattle call," do you mean multiple
```



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

CARRIE L. LaROCHE
July 27, 2006

```
 1        persons in multiple beds?

 2   A.   It's just bed after bed after bed lined up

 3        all across the room.

 4   Q.   Okay.  So you went back into that room to

 5        talk with the doctor about moving or not

 6        moving Ms. Hofer?

 7   A.   Yes.

 8   Q.   Okay.  And what did you talk to him about?

 9   A.   I told him that her husband wanted her to go

10        back to the States to have surgery and

11        talked about what we needed to do to get her

12        back to the States.

13   Q.   Okay.  Did Mr. Hofer ever directly speak to

14        any of the doctors?

15   A.   No.

16   Q.   At this point was Ms. Hofer speaking to the

17        doctors directly herself, or were you acting

18        as her intermediary?

19   A.   I was acting as intermediary.  She was

20        drugged up at that point.

21   Q.   Do you know if the doctors did any

22        toxicology tests while she was down there?

23   A.   I have no idea.

24   Q.   The doctors, did they take blood?

25   A.   I don't know.
```



CARRIE L. LaROCHE
July 27, 2006

```
 1    Q.    Okay.  And what was the result of your

 2          discussion with the doctor about moving Ms.

 3          Hofer to the States?

 4    A.    He said that he could stabilize her leg into

 5          a makeshift cast that would be okay for us

 6          to get her back home, and then the doctors

 7          back home could do the surgery.

 8    Q.    And it's at that point that you and Ms.

 9          Hofer checked out of the hospital?

10    A.    No.

11    Q.    Okay.  What happened next after you had that

12          discussion, then, with the doctor about

13          stabilizing her in the air cast and moving

14          her back?

15    A.    Then we tried to figure out how to get her

16          back to the United States.

17    Q.    And did you figure out how to get her back

18          to the United States?

19    A.    Yes.

20    Q.    She's here today, so I see that you did.

21          How -- what did you do to get her back to

22          the United States?

23    A.    I called the airlines to change our

24          reservation so that we could get on a flight

25          back to Boston.
```



CARRIE L. LaROCHE
July 27, 2006

```
 1   Q.   Was there anything else you did?

 2   A.   When?

 3   Q.   Fair enough.  Was there anything else you

 4        did after you spoke to the airlines about

 5        changing the tickets?

 6   A.   Once I confirmed our switched reservations,

 7        then I called Doug back to let him know when

 8        our flight would be arriving so that they

 9        could meet us there.

10   Q.   Okay.  At that point did Ms. Hofer get on

11        the phone with her husband?

12   A.   No.

13   Q.   After you spoke to Mr. Hofer on the phone

14        about coming back to Boston, what happened

15        next?

16   A.   Then the hospital gave us some

17        prescriptions.  I left the hospital with

18        Henry McKenzie to go back to the hotel to

19        pack up our belongings.  Henry drove me back

20        to the hospital, and then he -- we picked up

21        Stephanie at the hospital, and then we drove

22        to the airport.

23   Q.   So what did you do to pack up your

24        belongings at the hotel?

25   A.   I went back to the room, put all our stuff
```



CARRIE L. LaROCHE
July 27, 2006

```
 1        in our suitcases, brought the key back to
 2        the front desk and left.
 3   Q.   Okay.  Did you ever go back to the front
 4        desk and try to find the sandal that was
 5        allegedly sitting on the staircase the night
 6        before?
 7   A.   It didn't come into my mind at that point.
 8   Q.   I should ask, what type of room were you in?
 9   A.   A dump.
10   Q.   Okay.  Aside from a dump, was it a studio, a
11        one bedroom, two bedroom?
12   A.   I don't know if they technically called it a
13        one bedroom, but there was a full size bed,
14        but it wasn't like a separate room with a
15        door.  It just had like a curtain that
16        pulled across, so I don't know if they
17        consider that a studio or if they consider
18        that a one bedroom.
19   Q.   Was the bedroom bigger than the room we're
20        sitting in here?
21   A.   No.
22   Q.   Smaller?
23   A.   The bedroom part or the whole place?
24   Q.   The entire place.
25   A.   The entire place was probably about this
```



CARRIE L. LaROCHE
July 27, 2006

1        big.

2    Q.   Did you have a TV in your room?

3    A.   Yes.

4    Q.   Did you have a radio in your room?

5    A.   I am not sure if there was a separate radio.

6    Q.   Did you have a refrigerator in your room?

7    A.   Yes.

8    Q.   Did you have a mini bar in your room?

9    A.   No.

10   Q.   Did you have any alcohol supplied by the

11        hotel in your room?

12   A.   No.

13   Q.   Did you have any of your own alcohol in the

14        hotel room?

15   A.   No.

16   Q.   When you went back to the hotel to pack up

17        your and Stephanie's belongings, did you go

18        to the front desk and discuss the events

19        where Ms. Hofer was hurt?

20   A.   We didn't discuss the events.  When I

21        dropped off the room key to check out, the

22        lady asked how my friend was, and I said,

23        "We're flying her back home for surgery."

24        It wasn't a real discussion.

25   Q.   Do you know who that woman was?



CARRIE L. LaROCHE
July 27, 2006

```
 1    A.    No.

 2    Q.    Do you know her name?

 3    A.    No.

 4    Q.    Did you ask if you could file a complaint

 5          with the hotel?

 6    A.    No.

 7    Q.    After you left the island, did you ever file

 8          a complaint with the hotel?

 9    A.    No.

10    Q.    Did you file any sort of incident report

11          with the hotel at any time?

12    A.    No.

13    Q.    Did you file any sort of incident report or

14          complaint with the local police in Jamaica

15          at any time?

16    A.    No.

17    Q.    Did you make any reports to anyone on the

18          island about the incident?

19              MS. MINCHOFF:  Objection.

20    A.    What do you mean by "reports"?

21    Q.    Did you fill out any paperwork explaining

22          what happened to Ms. Hofer or your

23          observation of what happened to Ms. Hofer at

24          any point after you left the island?

25    A.    I didn't fill out any paperwork, no.
```



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

CARRIE L. LaROCHE
July 27, 2006

```
 1   Q.   Let's go from the hospital when you were
 2        about to check out.  What happened after you
 3        left the hospital?  Where did you go next?
 4   A.   Straight to the airport.
 5   Q.   Okay.  And this is after you had gone back
 6        to the hotel, packed and returned back to
 7        the hospital you left for the airport?
 8   A.   Yes.
 9   Q.   Okay.  And Mr. McKenzie drove you?
10   A.   Yes.
11   Q.   Okay.  And how long was it from the hospital
12        to the airport?
13   A.   I don't recall.
14   Q.   Was it longer than a half hour?
15   A.   I'm not sure.
16   Q.   Okay.  Well, let me ask this:  Where was the
17        hospital?  Was it in Ocho Rios?
18   A.   I don't know.
19   Q.   Flashing back to testimony from before,
20        though, you believe the ride from the resort
21        to the hospital was about 15 minutes, 10, 15
22        minutes?
23   A.   10, 15 minutes, yes.
24   Q.   But as you sit here today, you cannot tell
25        us how long it was from the hospital to the
```



CARRIE L. LaROCHE
July 27, 2006

```
 1        airport?

 2   A.   No.

 3   Q.   All right.  Do you recall it being a long

 4        ride?

 5                  MS. MINCHOFF:   Objection.

 6   A.   Define a long ride.

 7   Q.   Longer than an hour?

 8   A.   I'm not sure.  It seemed like it took a

 9        while, but we were rushing to catch the last

10        flight out of that day, so I'm not sure

11        exactly how long it took.

12   Q.   Okay.  And you did make the last flight of

13        the day?

14   A.   Yes, we did.

15   Q.   And after you arrived in Boston, what

16        happened?

17   A.   We greeted Steph's mom and her husband and

18        my roommate at the time, and they took Steph

19        and went to the hospital, and me and my

20        roommate went home.

21   Q.   After you got back from Boston, when was the

22        next time you spoke to Ms. Hofer?

23   A.   A week later, approximately.

24   Q.   And what did you talk to Ms. Hofer about

25        during that discussion?
```



CARRIE L. LaROCHE
July 27, 2006

```
 1   A.   I called to see how she was doing.

 2   Q.   Any reason you waited a week?

 3   A.   Because I had talked to her mom in between.

 4   Q.   Okay.  And who's her mom again, please?

 5   A.   Ms. Pompei.

 6   Q.   What's her first name?

 7   A.   Lauren.

 8   Q.   So you spoke with Ms. Pompei after you came

 9        back from Jamaica?

10   A.   Yes.

11   Q.   And you talked to her about Stephanie's

12        condition?

13   A.   Yes.

14   Q.   And when was the first time you spoke with

15        Ms. Pompei after coming back from Jamaica?

16   A.   At the airport.

17   Q.   And what did you say to Ms. Pompei at the

18        airport?

19   A.   I gave her the envelope that the doctors had

20        given us and tried to explain a little bit

21        of what happened, and then they rushed her

22        to the hospital.

23   Q.   What did you explain to Ms. Pompei happened?

24   A.   That Stephanie said she fell down the stairs

25        because her flip-flops broke and she fell in
```



CARRIE L. LaROCHE
July 27, 2006

```
 1          the turtle pond.

 2    Q.    And when you came on Ms. Hofer after the

 3          accident, you know, when she was sitting on

 4          the bench, were there lights on at the front

 5          lobby entrance?

 6    A.    There was lights inside the lobby.

 7    Q.    Were there lights outside the lobby?

 8    A.    Parking lot lights.

 9    Q.    But you could see Ms. Hofer as you

10          approached her from your room, correct?

11                 MS. MINCHOFF:  Objection.

12    Q.    I'll ask it this way, was it dark at the

13          lobby entrance when you came upon the

14          accident scene?

15    A.    Define "dark."

16    Q.    Could you see Ms. Hofer as you stood over

17          her as she sat on the bench?

18    A.    Yes.

19    Q.    Okay.  Could you see the other persons

20          standing around Ms. Hofer as she was sitting

21          on the bench?

22    A.    Yes.

23    Q.    And from where you were standing to where

24          the sandal was allegedly sitting on the

25          staircase, how far was that, approximately?
```



CARRIE L. LaROCHE
July 27, 2006

 1   A.   Approximately from me to you.

 2   Q.   Okay.  All right.  How far would you say

 3        that is?

 4   A.   I don't know.

 5   Q.   12 feet?

 6   A.   Is that 12 feet?

 7   Q.   I'm just trying to do a yardstick in my

 8        head.

 9             MS. MINCHOFF:  Objection.

10   A.   I don't know if that's 12 feet or not.

11   Q.   All right.  Well, it's almost three-quarters

12        of the length of this table; would you

13        agree?

14   A.   Yes.

15   Q.   Okay.  And when you were at the -- flashing

16        back to the airport now -- forward to the

17        airport, did you talk to Mr. Hofer in any

18        more detail about the accident?

19   A.   No.

20   Q.   Okay.  And after the airport where you spoke

21        with Ms. Pompei, when was the next time you

22        spoke with Ms. Pompei?

23   A.   I'm not sure exactly.

24   Q.   Was it a couple days after?

25   A.   I believe so.



CARRIE L. LaROCHE
July 27, 2006

```
 1   Q.   Okay.  But it was definitely before you

 2        spoke to Ms. Hofer herself?

 3   A.   Yes.

 4   Q.   And in that interim conversation with Ms.

 5        Pompei, what did you discuss?

 6   A.   How Stephanie was doing.

 7   Q.   Okay.  What did Ms. Pompei say?

 8   A.   She said that she was having surgeries.

 9   Q.   Other than that, what did Ms. Pompei say?

10   A.   I don't recall that we talked about anything

11        else.

12   Q.   Between the time that you arrived back from

13        Boston and first spoke to Ms. Hofer, did you

14        speak to her husband?

15   A.   I don't remember.

16   Q.   Okay.  When you spoke to Ms. Hofer

17        approximately a week after you got back from

18        Jamaica, what did you all talk about?

19   A.   How she was doing.

20   Q.   Okay.  And what did she say?

21   A.   She said that she was in a lot of pain and

22        had the surgery and that there was going to

23        be more.

24   Q.   And after that discussion did you keep in

25        contact with Ms. Hofer about her condition?
```



CARRIE L. LaROCHE
July 27, 2006

1    A.    Yes.

2    Q.    How often did you talk?

3              MS. MINCHOFF:  Objection.

4    A.    Not -- I don't recall every phone

5          conversation.  I'm not sure.

6    Q.    Okay.  Did you ever keep any notes about

7          your conversations with Ms. Hofer?

8    A.    No.

9    Q.    Did you ever keep any sort of personal diary

10         about the events that occurred down in

11         Jamaica?

12   A.    No.

13             MR. REITH:  I'm about to get into

14         another line of questioning.  Is there any

15         way we can take a two-minute break?

16             MS. MINCHOFF:  Sure.

17             THE VIDEOGRAPHER:  The time is

18         10:56.  We are off the record.

19         (Recess taken.)

20             THE VIDEOGRAPHER:  Okay.  We are

21         back on the record.  This is Tape No. 2.

22         The time is four minutes after 11:00.

23             MR. REITH:  All right.  We're back

24         on.  I would just ask that this be marked as

25         Exhibit 3 for identification today.



CARRIE L. LaROCHE
July 27, 2006

```
 1              (Discussion of the record.)

 2                  (Exhibit No. 3, Amended Notice of

 3          Videotaped Deposition Duces Tecum Directed

 4          to Plaintiffs, marked for identification.)

 5          BY MR. REITH:

 6    Q.    I would just ask you to take a look at that

 7          document.  Let me know if you have a chance

 8          to familiarize yourself with it.

 9              (Witness reviews document.)

10    Q.    Have you had a chance to review it?

11    A.    Yes.

12    Q.    Do you recognize that document?

13    A.    I believe it's the same document that the

14          court marshal gave to me.

15    Q.    Okay.  And did you review that document the

16          court marshal give to you before today?

17    A.    Yes.

18    Q.    And directing your attention to the part of

19          that document which has Schedule A, which is

20          on the third page in.

21    A.    Uh-huh.

22    Q.    So let me know when you're there.

23    A.    Okay.

24    Q.    Did you review Schedule A after the

25          marshal -- we call him constable -- served
```



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

CARRIE L. LaROCHE
July 27, 2006

```
 1        it upon you?

 2   A.   Yes.

 3   Q.   And did you search your files for the

 4        various documents and information that were

 5        requested that you search for?

 6   A.   Can you say that one more time?

 7   Q.   Sure.  I'll represent to you that Schedule A

 8        asks you to look for certain documents --

 9   A.   Correct.

10   Q.   -- and to produce certain documents that you

11        have in your possession.

12   A.   Right.

13   Q.   And you understood that?

14   A.   Yes.

15   Q.   And you understood that when you read it?

16   A.   Yes.

17   Q.   Did you look for the documents that this

18        Schedule A identifies?

19   A.   Yes.

20   Q.   Okay.  And what did you do to look for those

21        documents?

22   A.   I looked on my computer, and I looked in my

23        office files.

24   Q.   Okay.  And by "office files," do you mean

25        hard documents?
```



CARRIE L. LaROCHE
July 27, 2006

```
 1   A.   File cabinets, yes.

 2   Q.   And what was the result of your search?

 3   A.   Nothing.

 4   Q.   You didn't find any documents?

 5   A.   None.

 6   Q.   So you didn't find any photographs taken of

 7        Ms. Hofer during the Jamaica vacation?

 8   A.   No.

 9   Q.   Did you take any photographs while you were

10        down there in Jamaica?

11   A.   No.

12   Q.   Had you ever been to Jamaica before?

13   A.   Nope.

14   Q.   Did you bring a camera with you?

15   A.   Yes.

16   Q.   But you didn't take any pictures?

17   A.   Not yet.

18   Q.   What type of camera was it that you brought

19        down?

20   A.   Digital camera.

21   Q.   Did you bring a video recorder with you?

22   A.   No.

23   Q.   Did you bring a camcorder with you?

24   A.   No.

25   Q.   Did you bring a CD recorder with you?
```



CARRIE L. LaROCHE
July 27, 2006

```
 1   A.   No.

 2   Q.   So there were no recordings made of Ms.

 3        Hofer down on the trip?

 4   A.   No.

 5   Q.   Did Ms. Hofer take any pictures of you while

 6        you were on the trip?

 7   A.   Not that I remember.

 8   Q.   Do you know if Ms. Hofer took any pictures

 9        of the resort while you were down on the

10        trip?

11   A.   Not that I remember.

12   Q.   So you didn't find any documents that were

13        responsive to the first and second request,

14        then?

15   A.   No.

16   Q.   And those are the -- just so we're all on

17        the same page, those are the first and

18        second requests on Schedule A?

19   A.   Yes.

20   Q.   All right.  Now, did you take a look on your

21        computer for any e-mails or electronic

22        correspondence with Ms. Hofer?

23   A.   Yes.

24   Q.   Okay.  And what was the result of that

25        search?
```



CARRIE L. LaROCHE
July 27, 2006

```
 1   A.   There were none.

 2   Q.   Do you maintain any backups of e-mails on

 3        your computer?

 4   A.   No.

 5   Q.   And forgive me, who do you use as an

 6        Internet service provider now?

 7   A.   Currently it's through Eastern Connecticut

 8        Cable.

 9   Q.   And you don't recall what you used back in

10        2004?

11   A.   I'm not sure.

12   Q.   Do you know if it was Verizon?

13   A.   I'm not sure.

14   Q.   Okay.  AOL?

15   A.   I'm not sure.

16   Q.   Do you recognize the e-mail address

17        CarrieLaBelle@AOL.com?

18   A.   Yes.

19   Q.   And when did you use the e-mail address

20        CarrieLaBelle@AOL.com last?

21   A.   When did I use it last?

22   Q.   Yes.

23   A.   I am not sure exactly.

24   Q.   Okay.  And do you -- but as you sit here

25        today, you can't recall who provided you the
```



CARRIE L. LaROCHE
July 27, 2006

```
 1         Internet so that you could go onto AOL.com,
 2         correct?
 3    A.   Say that again.
 4    Q.   You don't remember who the Internet service
 5         provider was back in 2004, correct?
 6    A.   No.
 7    Q.   Do you recall back in 2004, whoever your
 8         Internet service provider was, if you
 9         maintained backup for your e-mails?
10    A.   I don't remember.
11    Q.   But during your search for documents that
12         were requested in Schedule A, you didn't
13         find anything that was responsive to
14         Paragraph No. 3 then?
15    A.   No.
16    Q.   Turning your attention to Paragraph No. 4,
17         did you review any documents before you came
18         here today, other than the subpoena that the
19         constable served on you?
20    A.   Not other than this, no.
21    Q.   All right.  So you didn't bring any
22         documents then --
23    A.   No.
24    Q.   -- for No. 4?
25    A.   No.
```



CARRIE L. LaROCHE
July 27, 2006

 1   Q.   Did you bring any documents that related to
 2        any communications between you and Expedia,
 3        Inc.?
 4   A.   No.
 5   Q.   All right.  Did you have any documents at
 6        any point that related -- between you and
 7        Expedia, Inc. concerning the Jamaica trip?
 8   A.   At one point I did.
 9   Q.   Okay.  And what did you have?
10   A.   The travel itinerary.
11   Q.   Anything else?
12   A.   Not that I can remember.
13   Q.   And was that from Expedia, Inc. or
14        Expedia.com?
15   A.   Is there a difference?
16   Q.   I'm not going to answer that question, but
17        I'm going to ask, do you recall who it was
18        from?  Was it Exped --
19   A.   I printed it off the Internet.
20   Q.   Okay.  And what website did you print it off
21        of?
22   A.   I went to Expedia.com, but I can't guarantee
23        if I wasn't forwarded to a different site or
24        anything like that.
25   Q.   Aside from the travel itinerary, was there



CARRIE L. LaROCHE
July 27, 2006

```
 1        anything else that you had?

 2   A.   No.

 3   Q.   And what happened to that travel itinerary?

 4   A.   I gave it to Stephanie.

 5   Q.   Oh, when did you give it to Stephanie?

 6   A.   I don't remember the exact date.

 7   Q.   And why did you give it to Stephanie?

 8   A.   Because she asked for it.

 9   Q.   I know you can't remember the specific date,

10        but can you remember the year?

11   A.   It wasn't this year.  It wasn't '06.  I'm

12        not sure if it was in '04 or '05.  I'm not

13        sure.

14   Q.   Do you know if you gave it to her after

15        September of 2005?

16   A.   I am not sure.

17   Q.   Aside from the travel itinerary that you

18        gave to Stephanie, what other documents did

19        you give to Stephanie?

20   A.   Some receipts from the trip.

21   Q.   And what receipts were those?

22   A.   I'm not sure specifically.  I know there was

23        one for dinner.  I'm not sure what else was

24        in there.

25   Q.   But there was more than one receipt?
```



CARRIE L. LaROCHE
July 27, 2006

```
 1   A.   Yes.

 2   Q.   And were they credit card receipts or just

 3        statement accounts from your bank?  What

 4        type of receipts were they?

 5   A.   Receipts from down in Jamaica.  It wasn't

 6        bank statements or anything like that, it

 7        was receipts from when we were in Jamaica.

 8   Q.   Okay.  But do you know if they were debit

 9        cards that related to your credit card?

10   A.   I don't remember at the time.

11   Q.   But you didn't keep a copy of the receipts

12        that you gave to Stephanie?

13   A.   No.

14   Q.   And you didn't keep a copy of the itinerary

15        that you gave to Stephanie?

16   A.   No.

17   Q.   Aside from the itinerary and receipts,

18        multiple receipts that you gave to

19        Stephanie --

20             MS. MINCHOFF:  Objection.

21   Q.   -- what other documents did you give to her?

22             MS. MINCHOFF:  Objection.

23   A.   It was just the itinerary and some receipts.

24   Q.   Did you just offer those to Stephanie, or

25        did she ask for them?
```



CARRIE L. LaROCHE
July 27, 2006

```
 1   A.   She asked for them.

 2   Q.   And you don't recall when she asked for

 3        them?

 4   A.   No.

 5   Q.   Did she tell you why she needed them?

 6   A.   No.

 7   Q.   She didn't say anything to the effect "I

 8        need them for this lawsuit that I'm engaged

 9        in"?

10   A.   No.

11   Q.   Did you ask her why she needed them?

12   A.   No.  I had assumed it was to pay me back the

13        money that I had dished out while we were

14        down there.

15   Q.   Did she ever pay you back?

16   A.   Yes.

17   Q.   When did she pay you back?

18   A.   I am not sure the exact date.

19   Q.   How much did she pay you back?

20   A.   I don't remember what the total was.

21   Q.   Was it over $100?

22   A.   Yes.

23   Q.   Was it over $500?

24   A.   Yes.  It was probably -- I don't know exact,

25        but it was approximately probably around 700
```



CARRIE L. LaROCHE
July 27, 2006

```
 1        or thereabouts.

 2   Q.   And how did she make payment to you, cash or

 3        check?

 4   A.   Some of it was cash, and I think there might

 5        have been a check.

 6   Q.   Do you have a copy of that check still?

 7   A.   No.

 8   Q.   Would your bank?

 9   A.   No.  I deposited the check.

10   Q.   You said that there was pay-back for the

11        money that you dished out down there.  What

12        do you mean by that?

13   A.   The money that I had used while she was in

14        the hospital to get her prescriptions and

15        things like that.

16   Q.   Okay.  And was it also for the dinner that

17        you talked about before?

18   A.   No.

19   Q.   Did she ever pay you back for the dinner?

20   A.   She paid for the dinner.

21   Q.   But you gave her a receipt for the dinner,

22        too, didn't you?

23   A.   Yes.  I had the receipt for dinner.

24   Q.   Okay.  So she paid for dinner, and you kept

25        the receipt?
```



CARRIE L. LaROCHE
July 27, 2006

```
 1   A.   Yes.

 2   Q.   And why?

 3   A.   The receipt ended up in my purse through all

 4        the running around, and I had her purse

 5        while I was at the hospital, so somehow it

 6        ended up in my purse.

 7   Q.   Fair enough.  Aside from the travel

 8        itinerary and the receipts, can you think of

 9        any other documents you gave to Stephanie?

10   A.   Not right now, no.

11   Q.   Okay.  Have you ever asked for those

12        documents back?

13   A.   No.

14   Q.   Why not?

15                MS. MINCHOFF:   Objection.

16   A.   I have no need for them.

17   Q.   But, again, you didn't know why Stephanie

18        needed them, either, did you?

19   A.   I didn't ask her specifically.

20   Q.   Do you have any documents -- or did you

21        discover any documents after your search

22        relating to communications with Turtle Beach

23        Towers?

24   A.   No.

25   Q.   Did you ever have any written communications
```



CARRIE L. LaROCHE
July 27, 2006

 1        with Turtle Beach Towers?

 2    A.   Nope.

 3    Q.   Did you search for documents relating to

 4        communications with The Gap?

 5    A.   No.

 6    Q.   Did you ever have any communications in

 7        connection with the Jamaican incident with

 8        Gap?

 9    A.   No.

10    Q.   Did you have any -- strike that.

11             Did you find any documents concerning

12        any communications with Henry McKenzie?

13    A.   No.

14    Q.   Did you have any communications with

15        McKenzie?

16    A.   Nope.

17    Q.   Did you keep any notes on your discussions

18        with Mr. McKenzie?

19    A.   Nope.

20    Q.   Turning your attention to No. 6, did you

21        look for the subject sandals?

22    A.   No.

23    Q.   Why not?

24    A.   Because it wasn't high on my priority list.

25    Q.   Okay.  I'm talking in connection with this


BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

CARRIE L. LaROCHE
July 27, 2006

```
 1          actual request.  You don't possess the
 2          sandals?
 3     A.   No.
 4     Q.   At any point did you give a call back to the
 5          hotel saying, "Did you find those sandals?"
 6     A.   No.
 7     Q.   Did you and Stephanie ever talk about
 8          calling back to the hotel and asking for the
 9          sandals?
10     A.   No.
11     Q.   Other than when Stephanie talked to you
12          about the sandals at the time of the
13          incident, did you ever talk about the
14          sandals again?
15     A.   Afterwards?
16     Q.   Yes.
17     A.   Like after the accident happened?
18     Q.   Yes.
19     A.   We might have mentioned it at some point in
20          conversation.  I don't recall an exact
21          conversation or what was said.
22     Q.   Okay.  Do you have any documents or did you
23          discover any documents that concerned the
24          actual reservation or purchase of the trip
25          on Expedia.com?
```



CARRIE L. LaROCHE
July 27, 2006

```
 1   A.   Can you say that one more time?
 2   Q.   Sure.  When you booked the trip through
 3        Expedia --
 4   A.   Uh-huh.
 5   Q.   -- did you print out as you went along, you
 6        know, the various screens?
 7   A.   No.
 8   Q.   Did you print out the confirmation of the
 9        reservation on Expedia.com?
10   A.   Yes.
11   Q.   Okay.  And did you maintain that document?
12        Did you keep that document?
13   A.   For how long?  Till today?
14   Q.   That's a good question.  How long did you
15        hold onto the document that you printed out
16        concerning the confirmation?
17   A.   I had it till I gave it to Stephanie.
18   Q.   Okay.  And that's a travel itinerary you're
19        talking about?
20   A.   It was the print-off confirmation of what
21        our itinerary was.
22   Q.   Okay.  Let's see here.  Do you have any
23        credit card receipts concerning the
24        reservation and purchase of the trip?
25   A.   No.
```



CARRIE L. LaROCHE
July 27, 2006

```
 1   Q.   Who paid for the trip?

 2   A.   I did.

 3   Q.   And how did you pay for it?

 4   A.   Initially by credit card.

 5   Q.   What do you mean by "initially"?

 6   A.   Stephanie paid me back afterwards for her

 7        portion.

 8   Q.   When did that happen?

 9   A.   I don't know exactly.

10   Q.   How much did she pay you back?

11   A.   Approximately around the 700, 750, like I

12        mentioned earlier.

13   Q.   Okay.  So the 700, 750 is not just for the

14        money that you, quote, dished out while you

15        were down there?

16   A.   It includes it, because the original trip

17        was only approximately 700.  The 700 to 750

18        approximately included the money that I

19        dished out for her prescriptions when we

20        were down there.

21   Q.   And, again, she repaid you that 700 to 750

22        in both cash and check?

23   A.   Yes.

24   Q.   Were you ever reimbursed for the trip by the

25        resort?
```



CARRIE L. LaROCHE
July 27, 2006

```
 1   A.   No.

 2   Q.   Were you ever reimbursed for the trip by

 3        Expedia.com?

 4   A.   No.

 5   Q.   Did you ever request a reimbursement from

 6        the hotel?

 7   A.   No.

 8   Q.   Did you ever request a reimbursement from

 9        Expedia?

10   A.   No.

11   Q.   Can I ask you why you didn't ask the Turtle

12        Beach Towers for a reimbursement?

13             MS. MINCHOFF:   Objection.

14   A.   My concern wasn't with that at that point in

15        time.

16   Q.   I'm talking ever.  Why didn't you ask for a

17        reimbursement for the trip at any point

18        after the accident?

19   A.   My concern was getting my friend home and

20        getting her well.  When I got back to the

21        States after that, I was consumed with my

22        life and didn't have time to deal with it.

23   Q.   Is that the same reason why you didn't ask

24        Expedia --

25   A.   Yes.
```



CARRIE L. LaROCHE
July 27, 2006

```
 1   Q.   -- for reimbursement?
 2              Again, in connection with No. 7, did
 3         your review of documents at home result any
 4         papers concerning Turtle Beach Towers
 5         brochures or related documents?
 6   A.   No.
 7   Q.   And your review of your documents at home,
 8         did it come up with any documents concerning
 9         your on-line browsing for vacation packages
10         prior to making the trip through
11         Expedia.com?
12   A.   No.  There are no documents at my house.
13   Q.   So you don't have any videotapes,
14         photographs, personal diaries, video
15         recordings or notes concerning the trip?
16   A.   No.
17   Q.   I know this may seem a little bit mundane to
18         go through each and every one, but I have to
19         do it as a matter of form.
20   A.   That's fine.
21   Q.   I appreciate your patience.
22              So you don't have any documents, then,
23         in connection with Request No. 10, which
24         asks for documents concerning the monies you
25         spent while on vacation, costs incurred by
```



CARRIE L. LaROCHE
July 27, 2006

```
 1        you or fees and charges assessed by you

 2        while at Turtle Beach or down there in

 3        Jamaica?

 4   A.   I have no documents, no.

 5   Q.   Okay.  And whatever documents you had

 6        concerning costs or monies that you expended

 7        were turned over to Stephanie?

 8   A.   Yes.

 9   Q.   And, again, in connection with Document

10        Request No. 11 here, you didn't make any

11        written incident reports or complaints to

12        anyone about the accident down in Jamaica,

13        correct?

14   A.   No.

15   Q.   So you don't have any documents in

16        connection with No. 11, then, do you?

17   A.   No.

18   Q.   That's over.  Put No. 3 aside.

19             Just jumping ahead now to your booking

20        of the trip, okay?

21   A.   Uh-huh.

22   Q.   You testified earlier that you have the

23        Internet at home?

24   A.   Yes.

25   Q.   And do you use the Internet at home?
```



CARRIE L. LaROCHE
July 27, 2006

```
 1   A.    Uh-huh.

 2   Q.    And what do you use the Internet for?

 3   A.    Business things, personal things.

 4   Q.    Peruse various websites?

 5   A.    I'm sorry?

 6   Q.    Do you peruse various websites?

 7              MS. MINCHOFF:   Objection.

 8   A.    I go on different websites.

 9   Q.    Okay.  And when going on the different

10         websites that you view on-line, have you

11         ever come across a portion of a website that

12         says, "Before you continue on here, please

13         read the following terms and conditions"?

14         Have you ever seen that on a website that

15         you've explored on the Internet?

16   A.    Yes.

17   Q.    And so you're familiar with that process

18         that you are demonstrated or shown certain

19         terms and conditions; someone asks you to

20         either click on something or to agree to

21         those terms and conditions, right?

22              MS. MINCHOFF:   Objection.

23   A.    Say that one more time.

24   Q.    Have you ever gone on a website that

25         identifies certain terms and conditions that
```



CARRIE L. LaROCHE
July 27, 2006

1          govern the use of that website?

2                    MS. MINCHOFF:  Objection.

3     A.   Yes.

4     Q.   Okay.  And what was the last website that

5          had that sort of language?

6     A.   I believe it was a credit card website.

7     Q.   Okay.  And aside from that credit card

8          website, are there any other websites that

9          you've viewed in the past, albeit a lot,

10         that have those sorts of terms and

11         conditions?

12                   MS. MINCHOFF:  I'm sorry, albeit

13         what?

14                   MR. REITH:  A lot.  I'm referring

15         to number of websites that she may have

16         viewed.  I'll ask it a different way.

17    Q.   Aside from your credit card website that

18         you're referring to that had the terms and

19         conditions section --

20    A.   Uh-huh.

21    Q.   -- had you ever viewed any other websites

22         that contain such terms and conditions

23         language?

24                   MS. MINCHOFF:  Objection.

25    A.   I don't know if they're specifically the


BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

CARRIE L. LaROCHE
July 27, 2006

```
 1      same as the credit card ones.

 2  Q.  Aside from being specifically the same, did

 3      they have sections that say, "These terms

 4      and conditions govern our specific website"?

 5      Have you ever seen that other than the bank

 6      website?

 7  A.  Yes.

 8  Q.  Okay.  How many trips have you booked

 9      on-line?

10  A.  I am not sure off the top of my head.

11  Q.  Okay.  More than five?

12  A.  It might be right around five.  I'm not sure

13      of a specific number.

14  Q.  And what websites did you use when you

15      booked those trips?

16  A.  Various websites.

17  Q.  Which various websites?

18  A.  Different airline ones, Expedia, a couple of

19      other ones that I'm not sure of the names

20      that people have told me to try.

21  Q.  Have you ever been on Orbitz?

22  A.  Yes.

23  Q.  Have you ever been on Travelocity?

24  A.  Yes.

25  Q.  Ever been on Hotels.com?
```



CARRIE L. LaROCHE
July 27, 2006

1   A.   No.

2   Q.   And where did you book those five trips to?

3            MS. MINCHOFF:   Objection.

4   A.   Off the top of my head, I'm not sure of

5        specifically all of them.   I booked my

6        honeymoon.

7   Q.   To where?

8   A.   To Sedona, Arizona.

9   Q.   It's nice there.

10           Any others that you can remember?

11  A.   I booked the trip with Stephanie and I down

12       to Jamaica.   I know I've booked a cruise

13       on-line before.   There might be other ones.

14       I'm not sure.

15  Q.   All right.   And when you booked those trips

16       on-line using those websites that you talked

17       about, did you ever come across a section of

18       the websites that said you needed to review

19       certain terms and conditions of that

20       website?

21  A.   I'm not positive.

22  Q.   Okay.   You have at least encountered it in

23       connection with the bank that we talked

24       about earlier?

25  A.   Yes.



CARRIE L. LaROCHE
July 27, 2006

```
 1   Q.   And when you encountered it in connection
 2        with the bank, what was the language like?
 3        What were the terms and conditions like?
 4             MS. MINCHOFF:  Objection.
 5   A.   Are you asking for, like, what they stated
 6        throughout the whole thing?
 7   Q.   Yeah.  What do they state?
 8   A.   I am not exactly sure.
 9   Q.   Okay.  Were you required to review on the
10        bank's website those documents before you
11        proceeded using the bank's website?
12   A.   Yes.
13   Q.   And did you read the terms and conditions on
14        that bank website?
15   A.   I skimmed them.
16   Q.   Okay.  But you continued to use the website
17        after you skimmed them?
18   A.   Yes.
19   Q.   Who booked the trip to Jamaica?
20   A.   I did.
21   Q.   Who was present when you booked the trip?
22   A.   Nobody.
23   Q.   Where did you book the trip from?
24   A.   My house.
25   Q.   This was in Danielson, Connecticut?
```



CARRIE L. LaROCHE
July 27, 2006

1   A.   Yes.

2   Q.   Before you booked the trip, did you and

3        Stephanie discuss going on vacation?

4   A.   Yes.

5   Q.   And did you discuss possible locations for

6        the vacation?

7   A.   I'm not positive off the top of my head.

8        I'm assuming we would have.

9   Q.   Why do you assume that?

10  A.   Because I wouldn't just book a trip and say,

11       "You're going here."  I would ask for input.

12  Q.   Okay.  Do you recall asking her for input?

13  A.   Not specifically, but I would assume I

14       wouldn't just call up my friend and say,

15       "Hey, we're going here."

16  Q.   Do you recall Stephanie offering any input

17       on where you should go for vacation?

18  A.   I don't remember.

19  Q.   Do you remember what day of the week it was

20       that you flew down to Jamaica?

21  A.   It was a Thursday.

22  Q.   How soon did you and Stephanie begin talking

23       about going on vacation prior to that?

24  A.   Monday night.

25  Q.   Okay.  Do you recall any other specific



CARRIE L. LaROCHE
July 27, 2006

```
 1        destinations, you know, locations that you

 2        would consider going?

 3              MS. MINCHOFF:   Objection.

 4   A.   I don't remember.

 5   Q.   Well, who chose to go to Jamaica?

 6   A.   I'm not sure whose decision it actually was

 7        at this point.

 8   Q.   Did anyone recommend to either of you that

 9        you should go to Jamaica?

10   A.   I don't remember.

11   Q.   Well, did anybody say to you specifically,

12        "You should go to Jamaica for a vacation"?

13   A.   I don't remember that far back.

14   Q.   Okay.  Well, did anyone from Expedia.com

15        refer Jamaica to you as a vacation location?

16   A.   Do you mean a specific person?

17   Q.   Yes.

18   A.   I didn't talk to a specific person, no.

19   Q.   Okay.  Did Stephanie give you her permission

20        to book the trip for her?

21   A.   Yes.

22   Q.   What did she say to let you know that you

23        could book the trip for her?

24   A.   I believe I called her and said, "How does

25        this sound?"  And she said, "Go for it."
```



CARRIE L. LaROCHE
July 27, 2006

```
 1    Q.    Okay.  So before you actually booked the
 2          trip you gave a call to Stephanie to talk
 3          about the actual booking?
 4    A.    Yes.
 5    Q.    Okay.  Do you recall what you said to her?
 6    A.    Not specifically.  I'm assuming I would have
 7          told her where we would be staying, the
 8          price, when we would leave, those kinds of
 9          things.
10    Q.    Okay.  Do you remember generally talking to
11          her about it being in Jamaica?
12    A.    Yeah.
13    Q.    Do you remember talking to her generally
14          about it being Ocho Rios?
15    A.    We weren't in Ocho Rios.
16    Q.    Where were you?
17    A.    I know it wasn't Ocho Rios.
18    Q.    So when you traveled down to Jamaica, the
19          resort you stayed at was not in Ocho Rios?
20    A.    I'm not positive at this point.
21    Q.    Do you recognize the name Ocho Rios?
22    A.    Yes.
23    Q.    What do you recognize it from?
24    A.    I don't know.
25    Q.    When you were in the planning process of the
```



CARRIE L. LaROCHE
July 27, 2006

```
 1        vacation, did you -- how did you search for
 2        possible destinations?
 3   A.   I don't recall at this point.
 4   Q.   Okay.  Do you remember doing a Google search
 5        in general?
 6   A.   I was on Expedia, and I did a search through
 7        Expedia.
 8   Q.   Okay.  And when you did the search for
 9        Expedia, how did you access the Internet, as
10        a new customer or as a previous customer?
11   A.   I'm not positive.
12   Q.   Had you booked a trip on Expedia.com prior
13        to the Jamaica trip?
14   A.   I believe I did.
15   Q.   Do you recall where it was to?
16   A.   I believe it was a cruise.
17             (Pause.)
18   Q.   Do you recognize the account name
19        Curves1230?
20   A.   I'm not sure off the top of my head.  It
21        might be one of my business credit cards.
22        I'm not sure.
23   Q.   Okay.  Do you know if you used the name
24        Curves1230 to sign onto Expedia.com when you
25        booked the trip for Jamaica?
```



CARRIE L. LaROCHE
July 27, 2006

```
 1   A.   I don't remember.

 2   Q.   At any point did you ever have a user name

 3        and password to book trips on Expedia.com?

 4   A.   Yes.

 5   Q.   Okay.  When?

 6   A.   When did I have a password?

 7   Q.   Yes.

 8   A.   I'm assuming I still have one now.

 9   Q.   Okay.  What is that password?

10   A.   I have no idea.

11   Q.   When was the last time you booked a trip via

12        Expedia.com?

13   A.   The Jamaica one.

14   Q.   Who chose Turtle Beach Towers to stay at?

15   A.   I did.

16   Q.   Why?

17   A.   Because the pictures looked nice on the

18        Internet.

19   Q.   Aside from the pictures looking nice, did

20        you do any review of other persons' comments

21        who had stayed there in the past?

22             MS. MINCHOFF:  Objection.

23   A.   I believe on the website there was like a

24        star kind of rating, if I remember right.

25   Q.   Was there a section in the star rating that
```



CARRIE L. LaROCHE
July 27, 2006

```
 1        said "Review" -- "Customer Reviews"?
 2   A.   There may have been.  I don't remember at
 3        this time.
 4   Q.   Do you have any specific recollection that
 5        you did any sort of these -- reviewed any of
 6        these reviews?
 7             MS. MINCHOFF:  Objection.
 8   A.   I am not positive.  I would have assumed
 9        that I would have tried to find out
10        information about the place to make sure
11        that it was a safe and decent place to go
12        to.
13   Q.   And you wouldn't have gone to a place that
14        you thought was not safe or decent, correct?
15   A.   Not to my knowledge, no.
16   Q.   Again, during the planning process and right
17        before you booked the trip, did you talk to
18        Stephanie about how you were going to book
19        the trip, whether it be on-line or via a
20        conventional travel agent?
21   A.   I don't remember if we discussed that.
22   Q.   Now, you said you had Stephanie's permission
23        to book the trip for her, correct?
24   A.   Yes.
25   Q.   Did Stephanie give you permission to book
```



CARRIE L. LaROCHE
July 27, 2006

```
 1        the trip via Expedia.com?

 2   A.   I don't know if she specifically said, "I

 3        give you permission to book it through

 4        Expedia."

 5   Q.   Well, you understood that you had her

 6        permission to book the trip for her,

 7        however?

 8   A.   To the best of my knowledge, yes.

 9   Q.   And you used Expedia.com to book the trip?

10   A.   I did use Expedia.com, yes.

11   Q.   How did you get to Expedia.com?  Did you

12        type it into your cursor?

13   A.   I don't remember at this point.

14   Q.   Okay.  So you don't recall if you were

15        hyperlinked from some other website?

16   A.   I'm not sure.

17   Q.   Prior to booking the trip on Expedia.com,

18        did you search any other websites for travel

19        packages to Jamaica?

20   A.   I may have.  I'm not sure.

21   Q.   Okay.  Prior to booking the trip via

22        Expedia.com, did you do any other research,

23        if you would, on Turtle Beach Towers via any

24        other websites?

25   A.   I don't remember.
```



CARRIE L. LaROCHE
July 27, 2006

```
 1   Q.   Can you say for certain that you did not?

 2              MS. MINCHOFF:   Objection.

 3   A.   I don't remember.

 4   Q.   When you called Ms. Hofer about booking the

 5        trip, did you tell her that you were going

 6        to book it via Expedia.com?

 7   A.   I'm not sure if I mentioned it or not.

 8   Q.   At some point did you tell Ms. Hofer that

 9        you booked the trip via Expedia.com?

10   A.   At some point I'm sure I did.

11   Q.   Do you know when it was?

12   A.   I have no idea.

13   Q.   Do you know if you told her over the

14        telephone or by some other method?

15   A.   I don't know.  I don't remember.

16              MR. REITH:   Just please mark that

17        as the next exhibit.

18              (Exhibit No. 4, Multipage document

19        headed "Exhibit B1," marked for

20        identification.)

21   Q.   I'm just going to walk you through these.

22        I'm not going to ask you to review the whole

23        packet right now.  We'll go one by one.

24   A.   Okay.

25   Q.   So that way we'll try to expedite this as
```



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

CARRIE L. LaROCHE
July 27, 2006

```
 1       much as possible, okay?

 2   A.  Uh-huh.

 3   Q.  I will represent to you and counsel at the

 4       table this is B1 from plaintiffs'

 5       supplemental document disclosures.  I just

 6       extracted it from the overall production.

 7              MS. MINCHOFF:  B1, B2, B3?

 8              MR. REITH:  Yes, yes, and

 9       following.  It was just pursuant to the

10       second supplemental production --

11              MS. MINCHOFF:  All right.

12              MR. REITH:  -- okay?

13       BY MR. REITH:

14   Q.  Just directing your attention to the next --

15       the first page after B1, do you see at the

16       top there where it says "From," "To"?

17   A.  Uh-huh.

18   Q.  Okay.  Do you recognize that address,

19       CarrieLaBelle@AOL.com?

20   A.  Yeah.

21   Q.  Okay.  Do you recognize this document?

22   A.  It looks like it was our travel summary.

23   Q.  Okay.  Is this the travel summary or

24       itinerary that you provided to Stephanie?

25   A.  I'm not sure at this point.  I don't recall
```



CARRIE L. LaROCHE
July 27, 2006

 1        exactly what the document looked like.

 2   Q.   Okay.  I hate to do this, but I'm going to

 3        have to ask everybody to count off with me.

 4        It's one, two -- it's 12 documents in after

 5        B1.

 6             MR. FERINGA:  What's the heading of

 7        the document?

 8             MR. REITH:  The document is Page 1

 9        of 4 at the top right corner, "Subject:

10        Forward:  Expedia.com Vacation package

11        Purchased."

12             MR. FERINGA:  "Date:  3/15/2004

13        6:10:12 p.m. Eastern Daylight Time"?

14             MR. REITH:  That's correct,

15        counsel.

16        BY MR. REITH:

17   Q.   Do you see that e-mail?

18   A.   Uh-huh.

19   Q.   Okay.  And you recognize the "From"

20        addressee --

21   A.   Yeah.

22   Q.   -- or addressor, I should say?

23             Who is that?

24   A.   That's my e-mail account.

25   Q.   Okay.  And do you know who the "To" line



Page 110

CARRIE L. LaROCHE
July 27, 2006

1        identifies?

2    A.   Uh-huh.

3    Q.   Okay.  Who is that?

4    A.   That's Steph's.

5    Q.   Okay.  And this was sent on 3/15/2004, so

6         about three days before you left for

7         Jamaica?

8    A.   Uh-huh.

9    Q.   Okay.  And was this your forwarding to Ms.

10        Hofer the booking of the trip and telling

11        her where you were going?

12   A.   I believe so.  It appears to be.

13   Q.   Do you know if you told her prior to this

14        e-mail that you were booking the trip

15        through Expedia.com?

16   A.   I'm not sure.

17   Q.   Do you have any other documents or

18        information that you can refer to to make

19        sure that you did or did not send something

20        to her about Expedia prior to this day?

21   A.   I don't have any documents, no.

22   Q.   You can put that aside.  We'll come back to

23        that a little bit later.  Now, I just want

24        to direct your attention and focus all of

25        our attention on the actual booking of the



CARRIE L. LaROCHE
July 27, 2006

1        Expedia.com for the Jamaica trip.  You had

2        used Jamaica (sic) in the past for the, I

3        think you said it was a cruise maybe; is

4        that correct?

5                MR. FERINGA:  Used Expedia, not

6        Jamaica.

7                MR. REITH:  Did I say Jamaica?

8                MR. FERINGA:  Yeah.

9    Q.   Well, that's obviously a faux pas obviously

10       on my part.  Again, I'm not doing well

11       today.

12           Had you used Expedia.com prior to the

13       Jamaica trip?

14   A.   I believe so, yes.

15   Q.   Okay.  And you believe it was in connection

16       with a trip on a cruise, correct?

17   A.   I believe so, yes.

18   Q.   All right.  Other than the cruise trip, were

19       there any other trips that you booked

20       through Expedia.com?

21   A.   I am not sure.

22   Q.   Do you know when you -- if you had to create

23       a user account with Expedia.com when you

24       booked that cruise trip?

25               MS. MINCHOFF:  Objection.



CARRIE L. LaROCHE
July 27, 2006

```
 1   A.    I'm not sure if I booked -- if I made the

 2         account for that cruise trip or not.  I'm

 3         not sure.

 4   Q.    Okay.  At some point did you make a user

 5         account with Expedia.com?

 6   A.    At some point I think I did, yes.

 7   Q.    Okay.  Are you -- can you tell me when that

 8         happened?

 9   A.    I have no idea.

10   Q.    So do you know if you were -- had a user

11         account with Expedia.com on the day that you

12         booked the trip to Jamaica?

13   A.    I am not sure.

14   Q.    So do you know if you had a PIN number for

15         Expedia.com or a PIN identifier for

16         Expedia.com when you booked the trip to

17         Jamaica?

18   A.    I am not sure.

19   Q.    As you sit here today, do you recall the

20         various screens that you had to go through

21         to book the trip on Expedia.com?

22   A.    No.

23   Q.    Tell me what you do remember about the

24         booking process via Expedia.com.

25   A.    I really don't remember much.  I know that I
```



CARRIE L. LaROCHE
July 27, 2006

```
 1          booked it through Expedia.  I couldn't tell
 2          you the process that I took at that point.
 3          It was over two and a half years ago.
 4    Q.    Okay.  Well, do you recall going on
 5          Expedia.com and typing in a possible
 6          destination for Jamaica?
 7    A.    I don't remember at this point.
 8                    (Exhibit No. 5, Expedia.com sample
 9          trip pages, marked for identification.)
10    Q.    Okay.  What's been marked as Exhibit 5 for
11          identification today is an example book of a
12          trip via Expedia.com, okay?  I just am going
13          to walk through with you on this to see if
14          you recognize any of the types of pages that
15          are used in Expedia.com booking process,
16          okay?
17    A.    Yes.
18    Q.    All right?
19                    MS. MINCHOFF:  Just so I'm clear --
20          I'm sorry, Tom -- this is what you went
21          through and printed out the pages?  Is that
22          what this is?
23                    MR. REITH:  Yeah, this is, in
24          essence, an example of a booking process
25          that is uniform for the booking of a
```



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

CARRIE L. LaROCHE
July 27, 2006

```
 1        vacation on Expedia.com.

 2              MS. MINCHOFF:  Objection.

 3              MR. REITH:  And for clarification

 4        purposes, this is not the specific booking

 5        of the Jamaica trip, and I understand your

 6        objection.

 7        BY MR. REITH:

 8   Q.   Turning your attention to the first page, do

 9        you recognize this page or having signed

10        onto a similar type of page when you booked

11        the trip for Jamaica?

12   A.   I am not sure.

13   Q.   So do you remember anything about the first

14        page of Expedia.com when you signed on for

15        the Jamaica trip?

16   A.   Not two and a half years ago, no, I don't

17        remember.

18   Q.   Do you recall typing in Jamaica as a

19        possible destination vacation -- possible

20        vacation destination and then having to wait

21        while Expedia retrieved potential hotels to

22        stay at?

23              MS. MINCHOFF:  Objection.

24   A.   I don't remember.

25   Q.   So turning your attention, then, to the
```



CARRIE L. LaROCHE
July 27, 2006

```
 1        document that is three in that's labeled

 2        No.  -- Page 2 above.  Do you see that?

 3   A.   This one?

 4   Q.   That's it.  Do you recall seeing a page like

 5        that during your booking process?

 6   A.   I don't remember.

 7   Q.   Do you recall being directed back to a page

 8        on Expedia.com where there were travel

 9        vacation package options?

10   A.   I'm not sure.

11   Q.   Do you recall choosing one of the vacation

12        packages or a vacation package from a number

13        of possible vacation packages on

14        Expedia.com?

15   A.   Can you clarify?

16   Q.   Do you recall if during the -- strike that.

17            During the booking process, did

18        Expedia.com offer to you one booking

19        possibility or multiple booking

20        possibilities for Jamaica?

21   A.   I am not sure.

22   Q.   Did Expedia.com when you were booking the

23        travel package in general offer you a number

24        of possible travel destinations that you

25        could choose from?
```



CARRIE L. LaROCHE
July 27, 2006

 1              MS. MINCHOFF:  Objection.

 2    A.    I don't remember.

 3    Q.    Well, do you recall Expedia.com offering you

 4          only one possible vacation destination, that

 5          being Turtle Beach Towers, in Jamaica?

 6    A.    I don't remember.

 7    Q.    All right.  Just turning your attention,

 8          then, to the document that's marked No. 5 in

 9          the top corner, just a few more pages in

10          there.  Do you remember at the time that you

11          were booking the trip for Jamaica that you

12          were offered a page like this with package

13          details for various vacation destinations?

14    A.    I don't remember.

15    Q.    Turning your attention to Page 6, which is a

16          few more in, do you recall getting a page

17          from Expedia.com when you were booking the

18          Jamaica vacation that would allow you to

19          customize your vacation?

20    A.    I don't remember.

21    Q.    Turning your attention, then, to what's been

22          circled as Page No. 7.  Forgive me that

23          these are not labeled any better.  Do you

24          see where I am?  It says "Expedia.com," up

25          top left, "sign in"?



CARRIE L. LaROCHE
July 27, 2006

1   A.   Uh-huh.

2   Q.   Are you with me?

3   A.   Yeah.

4   Q.   All right.  Do you see "Already a registered

5        user"?

6   A.   Yes.

7   Q.   Okay.  Do you recall seeing this page when

8        you booked the trip to Jamaica?

9   A.   I don't remember.

10  Q.   So as you sit here today, you can't tell me

11       if you signed in with a user name and

12       password for booking the trip to Jamaica?

13  A.   I don't remember.

14  Q.   You do recall, though, somehow signing onto

15       Expedia.com to actually book the trip,

16       correct?

17            MS. MINCHOFF:  Objection.

18  A.   I don't know if I signed on or if I just

19       logged onto their website.  There's a

20       difference between signing in to something

21       and then just going to the website on the

22       Internet.  I don't remember how I got onto

23       the website to book the trip.

24  Q.   Do you see on the next page circled Page 8,

25       it says, top left, "Create a new account"?



CARRIE L. LaROCHE
July 27, 2006

```
 1         Do you see that page?

 2   A.    Yes.

 3   Q.    Do you see where it says "Create a new

 4         account"?

 5   A.    Uh-huh.

 6   Q.    And then it lists a number of different

 7         subcategories thereunder.  Do you recall

 8         seeing a page like this when you booked the

 9         trip via Expedia.com to Jamaica?

10   A.    I don't remember.

11   Q.    Okay.  Do you recall any of the times that

12         you used Expedia.com viewing a page like

13         this that says "Create a new account"?

14   A.    I am not sure.  I'm assuming that if I made

15         an account at some point, if this is a

16         standard page, then it -- I'm assuming it

17         would have shown up.  I don't recall seeing

18         this page off the top of my head.

19   Q.    Okay.  Okay.  Just turning your attention to

20         a little bit further down the page, do you

21         see where it says "Review membership

22         agreement"?

23   A.    Uh-huh.

24   Q.    Do you see the sentence where it says, "By

25         continuing on you agree to the following
```



CARRIE L. LaROCHE
July 27, 2006

1        terms and conditions"?

2   A.   Uh-huh.

3   Q.   Do you recall seeing a page like that when

4        you created a new account with Expedia.com?

5            MS. MINCHOFF:  Objection.

6   A.   I don't remember.

7   Q.   You do have an account with Expedia.com,

8        correct?

9   A.   I believe I do.

10  Q.   Okay.  And to have an account, you assume

11       you had to create an account with

12       Expedia.com, correct?

13  A.   I would assume so, yes.

14  Q.   And if this page is a uniform page for the

15       creation of a new account, would you have

16       read this page when you did, in fact, create

17       the new account?

18           MS. MINCHOFF:  Objection.

19  A.   If it was part of making an account at

20       whatever time I made the account, then I

21       would assume it was there and I would have

22       read it --

23  Q.   Okay.

24  A.   -- or skimmed it.  I don't remember off the

25       top of my head if I've seen this or -- in


BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

CARRIE L. LaROCHE
July 27, 2006

1        making my account or not.  I don't remember

2        when I made my account.

3    Q.  Sure.  But if this -- if this page was part

4        of a customer account creation process, you

5        would have read it or at least skimmed this

6        page, correct?

7    A.  I'm assuming I would have either read it or

8        skimmed it.

9    Q.  Okay.  Turning your attention to the part

10       where it says, "Agreement between customer

11       and Expedia, Inc."

12            Do you see that?

13   A.  Uh-huh.

14   Q.  Do you see it on the internal box there?

15   A.  Yeah.

16   Q.  Do you remember having read something that

17       said "Agreement between customer and

18       Expedia, Inc." before today?

19   A.  I don't remember, no.

20   Q.  Okay.  If this agreement between customer

21       and Expedia, Inc. were part of a standard

22       customer account creation process and you

23       created a customer account with Expedia,

24       would you have read this customer agreement?

25            MS. MINCHOFF:  Objection.



CARRIE L. LaROCHE
July 27, 2006

```
 1   A.    I'm assuming I would have read it or skimmed

 2         it.  I don't remember.

 3   Q.    Okay.  Just like you read or skimmed the

 4         bank website terms and conditions we talked

 5         about earlier, correct?

 6               MS. MINCHOFF:  Objection.

 7   A.    Yes.

 8   Q.    Do you see where it says "Sign up and

 9         continue using Expedia.com"?

10   A.    Yes.

11   Q.    Do you remember clicking through on "Sign up

12         and continue using Expedia.com" when you

13         booked the Jamaica vacation?

14   A.    I don't remember.

15   Q.    All right.  Do you remember ever clicking on

16         the icon that says "Sign up and continue

17         using Expedia.com"?

18   A.    I don't remember.

19   Q.    Do you recall if when you signed up for the

20         Jamaica vacation, that the website -- strike

21         that.  That was going to be a bad question.

22         Let's back up.

23         Turning your attention to the document

24         that's -- or page that's marked circled 10,

25         it's a few more pages into it.  Are you
```



CARRIE L. LaROCHE
July 27, 2006

 1        there?

 2   A.   Yeah.

 3   Q.   Do you see at the top left corner where it

 4        says "Trip Preferences"?

 5   A.   Yeah.

 6   Q.   Below that "Expedia.com," the icon

 7        "Expedia.com"?

 8   A.   Oh, you're talking about the upper, upper

 9        "Trip" --

10   Q.   Yes.

11   A.   -- "Preferences"?

12   Q.   Upper, upper.

13   A.   Okay.

14   Q.   Do you see right below it says

15        "Expedia.com"?

16   A.   Yeah.

17   Q.   And then do you see down below it says

18        "Welcome, Jill"?

19   A.   Uh-huh.

20   Q.   Okay.  Do you recall seeing something that

21        said "Welcome, Carrie" when you booked the

22        trip for Jamaica?

23   A.   I don't remember.

24   Q.   Do you recall ever seeing a greeting like

25        "Welcome, Carrie" when using Expedia.com?



CARRIE L. LaROCHE
July 27, 2006

```
 1   A.   I don't remember.
 2   Q.   Do you recall seeing a page like this that
 3        identifies itself as a trip preferences
 4        page?
 5   A.   I don't remember anything.
 6   Q.   Turning your attention to the document
 7        that's been marked circle 12, a few more
 8        pages in.  You there?
 9   A.   Yeah.
10   Q.   Forgive me.  Do you recall receiving a --
11        reviewing a page like this or seeing a page
12        like this that said, "Expedia.com is loading
13        your Seat Pinpointer.  Please wait" when you
14        booked the trip for Jamaica?
15   A.   I don't remember.
16   Q.   Okay.  Do you recall ever having seen a page
17        like this prior to today?
18   A.   I don't remember.
19   Q.   Okay.  Turning your attention to the
20        document that's been marked as circled 14.
21        It's a few more pages in.  Do you see where
22        it says, "Review your trip items"?
23   A.   Yeah.
24   Q.   In connection with booking the Jamaica trip,
25        do you recall seeing a page that said
```



Page 124

CARRIE L. LaROCHE
July 27, 2006

1          "Review your trip items"?

2    A.   I don't remember.

3    Q.   Okay.  In connection with your prior usage

4          of Expedia.com, do you recall ever seeing a

5          page that said "Review your trip items"?

6               MS. MINCHOFF:  Objection.

7    A.   I don't remember.

8    Q.   Turning your attention to the document

9          that's been marked circled 14a, again, a

10         couple more pages in.

11   A.   Uh-huh.

12   Q.   Do you see where it says -- very top, top

13         left-hand corner it says, "Detailed Rules

14         and Restrictions"?

15   A.   Yeah.

16   Q.   In connection with your booking of the

17         Jamaica trip, do you recall seeing a page

18         like this that said "Detailed Rules and

19         Restrictions"?

20   A.   I don't remember.

21   Q.   Turning your attention to the document

22         that's been marked circled 15, it's

23         basically the last -- within the last few

24         pages, the heading is "Billing and delivery

25         information"?



CARRIE L. LaROCHE
July 27, 2006

```
 1   A.   Uh-huh.

 2   Q.   So you're there with me?

 3   A.   Yeah.

 4   Q.   Okay.  In connection with the Jamaica trip,

 5        do you recall seeing a document that was

 6        entitled "Billing and delivery information"?

 7   A.   I don't remember.

 8   Q.   Do you remember anything about the closeout

 9        of the booking process for the Jamaica trip?

10   A.   No.

11   Q.   Okay.  So you don't remember receiving a

12        confirmation about the cost of the trip?

13   A.   At some point I received the itinerary

14        because that's what I had given to

15        Stephanie.

16   Q.   Is that all you recall receiving?

17   A.   That's all I can remember right now.

18   Q.   About these other websites that you may have

19        used to book trips, we talked about Orbitz

20        and Travelocity, have you actually used

21        those to book trips or have you just

22        reviewed them?

23   A.   I am not sure off the top of my head.

24   Q.   Okay.  When was the last time you visited

25        Orbitz?
```



CARRIE L. LaROCHE
July 27, 2006

 1   A.   I don't know.

 2   Q.   Well, whenever you visited Orbitz, did you

 3        go through the various website pages to

 4        actually book a trip?

 5             MS. MINCHOFF:   Objection.

 6   A.   I'm not sure.  I don't remember the last

 7        time I was on their website.

 8   Q.   How about Travelocity; when was the last

 9        time you viewed that website?

10   A.   I don't know.

11   Q.   Did you go through pages of that website

12        before booking a trip?

13             MS. MINCHOFF:   Objection.

14   A.   I'm not sure.

15   Q.   Well, have you booked a trip via

16        Travelocity?

17   A.   I don't believe so.

18   Q.   Okay.  Which websites have you used on-line

19        to book a trip besides Expedia.com and I

20        believe you mentioned an airline one before?

21        What other websites?

22   A.   I'm not sure off the top of my head.  I've

23        booked trips for myself.  I have booked

24        trips for family and things like that.  I

25        don't remember exactly what websites I've



CARRIE L. LaROCHE
July 27, 2006

1           been on and what I was booking or for who.

2    Q.    Okay.  What airline website did you use to

3          book trips?

4    A.    Trips in general?

5    Q.    Yeah.  The one that you were talking about

6          earlier.  You mentioned that you may have

7          booked a trip using an airline website.

8          Which airline website?

9    A.    I've searched all airline websites, U.S.

10         Airways, Delta, Southwest.

11   Q.    Okay.  Aside from searching, have you

12         actually booked on-line using one of those

13         websites?

14   A.    Yes.

15   Q.    Okay.  Which one was the last one you booked

16         on?

17   A.    Southwest.

18   Q.    Okay.  And do you recall if Southwest

19         contained any terms and conditions for your

20         usage of that website?

21   A.    What do you mean?

22   Q.    Was there a section on that website that

23         said "Please review the bottom terms and

24         conditions before proceeding with your

25         booking of the trip"?



CARRIE L. LaROCHE
July 27, 2006

```
 1   A.   I'm not sure.

 2   Q.   Do you recall if there was any language like

 3        that at all?

 4   A.   I don't remember.

 5   Q.   Okay.  When you booked the trip using

 6        Expedia.com, whose contact information did

 7        you provide to Expedia?

 8                  MS. MINCHOFF:   Objection.

 9   A.   I don't remember.  I'm assuming it's mine if

10        they sent me the e-mails.

11   Q.   Okay.  Did you give Expedia.com Stephanie's

12        name?

13   A.   I would assume I did.

14   Q.   Did you give Expedia.com -- well, let's go

15        back.  Why do you assume that?

16   A.   Because her name was listed in the copies of

17        the e-mails that you showed me.

18   Q.   Okay.  And did you provide Stephanie's

19        address to Expedia.com?

20   A.   I don't remember.

21   Q.   Okay.  Did you provide Stephanie's telephone

22        number to Expedia.com?

23   A.   I don't remember.

24   Q.   Do you recall giving any information to

25        Expedia.com that would allow Expedia.com to
```



CARRIE L. LaROCHE
July 27, 2006

```
 1        contact Stephanie?
 2   A.   I don't remember.
 3   Q.   But you were the only one who booked the
 4        trip?
 5   A.   Yes.
 6   Q.   Okay.  And Stephanie had no part in the
 7        booking of the trip through Expedia.com?
 8             MS. MINCHOFF:  Objection.
 9   A.   I was the one that booked the trip on
10        Expedia.
11   Q.   Okay.  How much were you charged for the
12        trip to Jamaica?
13   A.   I don't remember the exact amount.
14   Q.   But to this day you've never received any
15        sort of credit on that trip?
16   A.   No.
17             MS. MINCHOFF:  Objection.
18   Q.   I'll clarify.  To this day you've never
19        received a credit from Expedia.com on that
20        trip, have you?
21   A.   No.
22   Q.   And you haven't received a credit from the
23        hotel in connection with that trip, have
24        you?
25   A.   No.
```


BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

CARRIE L. LaROCHE
July 27, 2006

```
 1   Q.   Did you directly communicate with anyone at
 2        Expedia.com after you got back from Jamaica?
 3   A.   No.
 4   Q.   Did you directly communicate with anyone at
 5        Expedia.com after Stephanie hurt herself in
 6        Jamaica?
 7   A.   Repeat that.
 8   Q.   Yeah.  Did you directly communicate with
 9        anyone at Expedia.com after Stephanie had
10        hurt herself in Jamaica?
11   A.   Not that I remember, no.
12   Q.   Have you visited Expedia.com since the
13        booking of the Jamaica trip?
14   A.   I believe so, yes.
15   Q.   Okay.  When was that?
16   A.   I am not sure of the exact dates.
17   Q.   Okay.  But it was after the trip to Jamaica
18        that you visited Expedia.com?
19   A.   I believe so, yes.
20   Q.   Do you recall why you visited Expedia.com
21        after Jamaica?
22   A.   I would assume to check rates.
23   Q.   Check rates on what?
24   A.   Some sort of trip.
25   Q.   Okay.  So looking into the possibility of
```



Page 131

CARRIE L. LaROCHE
July 27, 2006

```
 1          booking another vacation via Expedia.com?
 2   A.     I don't know if I looked for a specific
 3          vacation or not, but I believe I might have
 4          went to Expedia.com to look for flights for
 5          my honeymoon.
 6   Q.     So you still use Expedia.com to this day,
 7          then?
 8                   MS. MINCHOFF:  Objection.
 9   A.     I have not purchased another thing from
10          Expedia.com, no.
11   Q.     But you have used the website to explore the
12          possibility of airline prices or other
13          travel --
14   A.     To compare rates with other companies, yes.
15                   MR. REITH:  How is everyone doing?
16                   MS. MINCHOFF:  What time do you
17          want to break?
18                   MR. REITH:  What time do you have?
19                   THE VIDEOGRAPHER:  It's four
20          minutes after 12:00.
21                   MR. REITH:  Now is a good time to
22          break, and then we'll come back.
23                   MS. MINCHOFF:  Okay.
24                   MR. REITH:  So counsel agrees to 45
25          minutes?  I know we say a half hour each
```



CARRIE L. LaROCHE
July 27, 2006

1          time, and we end up at 45 minutes anyways.

2                    MS. MINCHOFF:  45 minutes is fine.

3                    MR. REITH:  Is that all right for

4          you, Jessica?

5                    MR. FERINGA:  Go off the record.

6                    MR. REITH:  Off the record.

7                    THE VIDEOGRAPHER:  The time is five

8          minutes after 12:00.  We're off the record.

9                    (Lunch recess taken.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CARRIE L. LaROCHE
July 27, 2006

```
 1                    AFTERNOON SESSION

 2                    THE VIDEOGRAPHER:  Okay.  We are

 3          back on the record.  This is Tape No. 3.

 4          The time is 12:52.

 5

 6                    (CARRIE L. LaROCHE, Resumed.)

 7                    DIRECT EXAMINATION, Continued

 8

 9          BY MR. REITH:

10    Q.    Before the break we were talking about the

11          booking process via Expedia.com.  I just

12          want to ask you a few more questions about

13          that.  I'll put one more document in front

14          of you.

15    A.    Sure.

16                    MR. REITH:  Ask you to mark that,

17          please.

18                    (Exhibit No. 6, Document headed

19          "Expedia, Inc. Web Site Terms, Conditions,

20          and Notices," marked for identification.)

21                    MS. MINCHOFF:  5?

22                    MR. REITH:  6.

23    Q.    I'm just going to ask you a few questions

24          about this.  I can ask you first off the bat

25          if you recognize this document.
```



CARRIE L. LaROCHE
July 27, 2006

```
 1   A.   Not really, no.

 2   Q.   Okay.  Do you recognize reviewing a document

 3        or a screen printout like this when you

 4        booked the trip to Jamaica via Expedia.com?

 5   A.   I don't remember.

 6   Q.   Okay.  Do you recall reviewing this

 7        particular document or a document like it

 8        when you booked any other trips via

 9        Expedia.com?

10   A.   I don't remember.

11   Q.   All right.  Just directing your attention

12        down to the part that says "Liability

13        Disclaimer," I'm just going to ask you to

14        read that section, please, to yourself, and

15        let me know when you're done.

16   A.   Okay.

17             (Witness reviews document.)

18             (Discussion off the record.)

19   A.   How far did you want me to read?

20   Q.   Just to the end of that section, "Liability

21        Disclaimer."  It ends right before you get

22        to "Indemnification."

23   A.   Right, at the top here.  Okay.

24   Q.   Have you seen this language before today?

25             MS. MINCHOFF:  Objection.
```



CARRIE L. LaROCHE
July 27, 2006

```
 1   A.   This particular, like, word for word this
 2        (indicating) or --
 3   Q.   Yes.  Have you seen the section labeled
 4        "Liability Disclaimer" prior to today?
 5   A.   I don't know.
 6   Q.   Okay.  Do you recall -- strike that.
 7             Did you see this specific language or
 8        something similar to it at the time you
 9        booked the trip using Expedia.com?
10   A.   I don't remember.
11   Q.   All right.  Let's just talk about the travel
12        to Jamaica.  You took a plane, correct?
13   A.   Yes.
14   Q.   Do you enjoy flying?
15   A.   Sometimes.
16   Q.   Did you enjoy flying this day down to
17        Jamaica?
18   A.   It was okay.
19   Q.   Okay.  Do you ever get nervous on planes?
20   A.   Sometimes.
21   Q.   When you get nervous, what do you do to try
22        to calm your nerves?
23   A.   Go to sleep.
24   Q.   Do you do anything else like read?
25   A.   Yeah, sometimes.
```



CARRIE L. LaROCHE
July 27, 2006

1   Q.   Do you ever drink on the plane?

2   A.   No.

3   Q.   Do you drink ever?

4   A.   Occasionally.

5   Q.   Okay.  Do you take any medications to help

6        you fly?

7   A.   No.

8   Q.   On the actual flight on May -- I'm sorry,

9        March --

10  A.   March.

11  Q.   -- 18, 2004, did you eat on the plane?

12  A.   I believe we brought breakfast on the plane.

13  Q.   Do you recall what it was?

14  A.   Not off the top of my head, no.

15  Q.   Okay.  So no idea what you ate for breakfast

16       that day on the flight?

17  A.   I'm not -- I'm not positive, no.

18  Q.   Okay.  Do you have any idea?

19            MS. MINCHOFF:   Objection.

20  A.   I'm assuming, knowing me, it was probably a

21       ham, egg and cheese sandwich.

22  Q.   Did you drink any beverages on the plane?

23  A.   I don't remember.

24  Q.   Okay.  Do you remember having water on the

25       plane?



CARRIE L. LaROCHE
July 27, 2006

```
 1   A.   I don't remember.
 2   Q.   Did you have any alcoholic beverages on the
 3        plane?
 4   A.   No.
 5   Q.   Did Stephanie have any alcoholic beverages
 6        on the plane?
 7   A.   No.
 8   Q.   You're sure of that?
 9   A.   I'm positive.
10   Q.   How can you be positive of that?
11   A.   Because she sat next to me the whole time.
12   Q.   And when you got off the plane -- where did
13        you fly into?
14   A.   We had a layover where we switched planes, I
15        believe, and then we flew into an airport in
16        Jamaica.
17   Q.   Do you recall where the layover was?
18   A.   I'm not sure.
19   Q.   Could it have been Philadelphia?
20   A.   It may have been.  I'm not sure off the top
21        of my head.
22   Q.   And do you recall how long the layover was?
23   A.   Not long because our flight left late from
24        Boston because of snow.
25   Q.   Okay.  So did you go immediately from the
```



CARRIE L. LaROCHE
July 27, 2006

```
 1         Boston plane to the plane in Philly?
 2    A.   Yes.
 3    Q.   So you didn't stop at any restaurants in
 4         between?
 5    A.   No.  We didn't have time.
 6    Q.   And then after Philly or wherever you
 7         stopped over, where did you fly into?
 8    A.   The airport in Jamaica.
 9    Q.   Was it in Montego Bay?
10    A.   I don't remember names at this point.  I'm
11         sorry.
12    Q.   That's all right.  If it says that on your
13         travel itinerary --
14    A.   If it says that on the itinerary, then
15         that's where we flew into.
16    Q.   Okay.  Were you greeted by anyone when you
17         got off the plane?
18    A.   What do you mean, "greeted by anyone"?
19    Q.   I'll hearken back to some of my vacations in
20         that part of the world, and I know when I
21         got off the plane I was greeted by either a
22         travel agent or I was greeted by a customs
23         agent, but I was met by someone immediately
24         after the plane.  When you disembarked the
25         plane, did anyone approach you?
```





CARRIE L. LaROCHE
July 27, 2006

```
 1   A.   There may have been someone there.  I'm not
 2        sure.
 3   Q.   Okay.  Was there any sort of welcoming
 4        committee coming over to you with any drinks
 5        or anything like that off the plane?
 6   A.   Not that I remember, no.
 7   Q.   Anyone greeting you with island punch or
 8        anything along those lines?
 9   A.   No.
10   Q.   Anybody coming over to you and trying to
11        sell you any goods?
12   A.   What do you mean by "goods"?
13   Q.   I don't know, wicker baskets?
14   A.   Not that I remember, no.
15   Q.   After you got off the plane, did you have to
16        go to customs?
17   A.   I don't remember.
18   Q.   Okay.  Well, after you got off the plane,
19        what do you remember next?
20   A.   I remember we got on a bus and the bus took
21        us to the hotel.
22   Q.   Okay.  How long was the bus trip?
23   A.   Quite a while.  I don't -- I don't know an
24        exact time frame for you, but it seemed like
25        we were on there forever, but that could
```



CARRIE L. LaROCHE
July 27, 2006

```
 1        also have been because it had been a long
 2        day.  We were at the airport at 6:00 in the
 3        morning, so...
 4   Q.   I know you don't know specifically, but was
 5        it greater than an hour on the bus?
 6   A.   It may have been.  I'm not -- I'm not
 7        exactly sure of a specific.
 8   Q.   Okay.
 9   A.   I can't say for sure that it was an hour,
10        two hours.  I don't -- I don't know.  It
11        seemed like we were on there for a while,
12        but the bus did make some stops.
13   Q.   Okay.  Where did the bus make stops?
14   A.   At other hotels.
15   Q.   Okay.  Did the bus make any stops at any
16        roadside markets?
17   A.   No.
18   Q.   Did the bus make any stops at any
19        supermarkets?
20   A.   No.
21   Q.   Did the bus make any stop at any liquor
22        stores?
23   A.   No.
24   Q.   Was anybody drinking on the bus, any other
25        passengers?
```



CARRIE L. LaROCHE
July 27, 2006

1   A.   Not that I saw.

2   Q.   Did you talk to anybody on the bus?

3   A.   I don't remember at this point.

4   Q.   Okay.  Well, what did you do on the bus that

5        you can remember?

6   A.   Stephanie and I talked, and we looked out at

7        the scenery.

8   Q.   Did you have anything to eat on the bus?

9   A.   I don't remember at this point.  We might

10       have had some snacks with us.  I'm not sure.

11  Q.   And where did the bus end up leaving you

12       off?

13  A.   At the hotel.

14  Q.   Okay.  Which hotel was this?

15  A.   The Turtle Beach.

16  Q.   Do you know the full name of the resort?

17  A.   To the best of my knowledge, it's Turtle

18       Beach Towers.

19  Q.   And where on the resort premises did the bus

20       take you?

21  A.   Right by the lobby.

22  Q.   Okay.  And is this the lobby that we've

23       talked about earlier and you drew a

24       picture --

25  A.   Yes.



CARRIE L. LaROCHE
July 27, 2006

1    Q.    -- which has been marked as Exhibit 1 for

2          identification today?

3    A.    Yes.

4    Q.    And after the bus dropped you off at the

5          lobby, what happened next?

6    A.    We checked in.

7    Q.    When you say "we," did both you and

8          Stephanie check in?

9    A.    No.  It was under my name.

10   Q.    Okay.  So the hotel had your information,

11         your name, your credit card, et cetera?

12   A.    Yes.

13   Q.    Did the hotel have any of Stephanie's

14         information?

15   A.    I don't know.

16   Q.    But you were the main point of contact for

17         the hotel when you were checking in?

18   A.    Yes.

19   Q.    Did the hotel front desk require Stephanie

20         to check in as well?

21              MS. MINCHOFF:  Objection.

22   A.    I don't remember.

23   Q.    But you physically were the one who went

24         over to the desk and signed you both in?

25   A.    I went in and said, "I'm registering.  This



CARRIE L. LaROCHE
July 27, 2006

 1          is my thing."

 2    Q.    By "thing" you mean this is my --

 3    A.    I showed them the itinerary.

 4    Q.    And what happened -- or what did you do

 5          next, excuse me, after you checked in?

 6    A.    They walked us to our room.

 7    Q.    And who's "they"?

 8    A.    One of the hotel people.

 9    Q.    Was it the person working behind the desk?

10    A.    I don't remember.

11    Q.    Okay.  Was it a man or a woman?

12    A.    It was a man.

13    Q.    Okay.  How old?

14    A.    I don't remember.

15    Q.    Late 20s, 30s?

16    A.    I have no idea.

17    Q.    Explain to me how the resort is set up.

18          Were you staying in a villa, or were you

19          staying in a room?  Were you staying in a

20          tower?  How is the resort set up by way of

21          the premises itself?

22                MS. MINCHOFF:  Objection.

23    A.    They have buildings.  They walked us to our

24          building and said "This is your room."

25    Q.    Okay.  And what building was your room in?


BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

Page 144

CARRIE L. LaROCHE
July 27, 2006

1    A.    I don't remember.

2    Q.    Well, did they say you're in Tower No. 2,

3          Room No. X?

4    A.    I don't remember.  They walked us to it.  I

5          didn't pay attention to, you know, this is

6          such and such building.  They walked us to

7          it, and that's how I knew it as this is our

8          building.

9    Q.    Okay.  And when you all checked in at the

10         front desk, were you offered any sort of

11         beverages, alcoholic or otherwise?

12   A.    No.

13   Q.    All right.  So you weren't offered water?

14   A.    No.

15   Q.    You were not offered any rum punch?

16   A.    They offered us nothing when we checked in.

17   Q.    So it was simply filling out paperwork and

18         walking over to your room?

19   A.    Yup.

20   Q.    Just referring your attention back to what's

21         been marked as Exhibit 1 for

22         identification --

23              MR. REITH:  Excuse me, Scott.

24         Thank you.

25   Q.    -- you see that turtle pond there that you



CARRIE L. LaROCHE
July 27, 2006

```
 1       drew?

 2   A.  Uh-huh.

 3   Q.  At any point during the day did you go into

 4       that turtle pond?

 5   A.  Did I go into the turtle pond?

 6   Q.  Yes.  Did you go into the turtle pond?

 7   A.  No.

 8   Q.  Did you ever try to catch any turtles in

 9       that turtle pond?

10   A.  No.

11   Q.  Did you ever climb into the turtle pond and

12       climb out of the turtle pond?

13   A.  No.

14   Q.  Did Stephanie ever climb into the turtle

15       pond?

16   A.  No.

17   Q.  Did Stephanie ever climb into the turtle

18       pond and try to catch turtles?

19   A.  No.

20   Q.  Did Stephanie ever climb into the turtle

21       pond and climb out of the turtle pond for

22       any reason?

23   A.  No.

24   Q.  And you say that fairly emphatically.  How

25       do you know?
```



CARRIE L. LaROCHE
July 27, 2006

```
 1   A.   Whenever she was around me, I would have
 2        seen her if she had climbed in.
 3   Q.   Okay.  Well, let's talk about that.  Was she
 4        around you the entire time that you were at
 5        the Turtle Beach Resort?
 6   A.   The entire time except for when she went to
 7        get the brochures at night.
 8   Q.   Okay.  So from the moment you got off the
 9        plane until the moment you checked in your
10        room and until the time that she hurt
11        herself late on the night of the 18th you
12        were together?
13   A.   Yes.
14   Q.   The entire time?
15   A.   Except for if she went into the ladies'
16        room, I didn't follow her in --
17   Q.   Okay.
18   A.   -- in our room.
19   Q.   Any --
20   A.   But any other time we were together.
21   Q.   Sorry.  I didn't mean to cut you off there.
22             And during your entire time together
23        you didn't see Stephanie take a drink of
24        alcohol?
25                  MS. MINCHOFF:  Objection.
```



CARRIE L. LaROCHE
July 27, 2006

```
 1   A.   She had one drink at dinner.

 2   Q.   Okay.  And where was dinner?

 3   A.   At Jimmy Buffet's Margaritaville.

 4   Q.   And where was Jimmy Buffet's Margaritaville?

 5   A.   Someplace within walking distance of the

 6        hotel.

 7   Q.   How far in walking distance?

 8   A.   I'm not sure exactly, maybe a five-minute

 9        walk, thereabouts.

10   Q.   Is that a five-minute walk from your hotel

11        room or a five-minute walk from the lobby?

12   A.   From the lobby to our room is probably about

13        a minute walk, so around five minutes or so.

14        I didn't time it.

15   Q.   Now, when the staff brought you to your room

16        after checking in, what did you do next?

17   A.   We unpacked.

18   Q.   What else did you do when you were in your

19        room?

20   A.   We unpacked, we changed and went to dinner.

21   Q.   How long were you in your room for before

22        you went to dinner?

23   A.   Maybe around a half hour.

24   Q.   And during that time did you do anything

25        else besides unpack and get ready and go to
```



CARRIE L. LaROCHE
July 27, 2006

```
 1      dinner?

 2  A.  We had the TV on.

 3  Q.  Do you recall what time you went to dinner?

 4  A.  I'm not sure exactly, no.

 5  Q.  Was it dark yet?

 6  A.  Not on the way over, no.

 7  Q.  But on the way back from dinner it was?

 8  A.  Yes.

 9  Q.  Do you recall what time you came back from

10      dinner?

11  A.  Around 10:30ish.

12  Q.  And while you were at dinner what did you

13      have to eat?

14  A.  I don't remember off the top of my head.

15  Q.  Did you have anything to drink at dinner?

16  A.  I had one drink.

17  Q.  What drink was that?

18  A.  I don't remember.

19  Q.  Was it a margarita?

20  A.  I don't remember.  Knowing me, it would

21      probably be a toasted almond.

22  Q.  What's a toasted almond?

23  A.  It's Kahlua, Amaretto and milk.

24  Q.  Now I can understand why.

25          Did you have any dessert at dinner?
```



CARRIE L. LaROCHE
July 27, 2006

1   A.   I don't remember if we did or not.

2   Q.   Okay.  And what did Stephanie eat?

3   A.   I'm not sure.

4   Q.   What did Stephanie drink?

5   A.   She had a margarita.

6   Q.   And after dinner, what did you do next?

7   A.   When we left the restaurant, we stopped at

8        one or two of the kiosks and went back to

9        the room.

10  Q.   By "kiosks," you mean a shopping center of

11       some sort?

12  A.   Yeah.

13  Q.   Like a booth or something?

14  A.   There was like booths kind of almost

15       attached to the restaurant.

16  Q.   Okay.  So this is in Jimmy's Margaritaville?

17  A.   Yes.

18  Q.   Do you recall what those kiosks were?

19  A.   The names of them?

20  Q.   Yeah, or what they sold.

21  A.   All different kinds of souvenirs and things

22       like that, suntan lotion and whatnot.

23  Q.   Did you buy anything?

24  A.   I bought suntan lotion.

25  Q.   And after you went to the kiosks, what did



CARRIE L. LaROCHE
July 27, 2006

```
 1         you do next?
 2    A.   We left the kiosks and went back to the
 3         room.
 4    Q.   Did you walk directly to the room?
 5    A.   Yes.
 6    Q.   Did you have to walk past the lobby to get
 7         to your room?
 8    A.   I believe we walked through the parking lot
 9         in front of the lobby.
10    Q.   Did you stop by the turtle pond at all on
11         your way back to your room?
12    A.   No.
13    Q.   After you got back to your room, what did
14         you do then, you personally?
15    A.   I got changed into my pajamas.
16    Q.   Okay.  And what did Stephanie do when you
17         got back to your room?
18    A.   Stephanie -- while I was changing into my
19         pajamas Stephanie said she was going to go
20         outside and have a cigarette.
21    Q.   And did she leave the room?
22    A.   Yes.
23    Q.   Do you know what time she left the room to
24         have her cigarette?
25    A.   I'm not sure of an exact time.  I would
```



CARRIE L. LaROCHE
July 27, 2006

```
 1        probably say somewhere around 11:00.
 2   Q.   Okay.  Was it before the 11:00 news started
 3        that you talked about before?
 4   A.   No.  The news was on when she left.
 5   Q.   How long had the news been on before she
 6        left?
 7   A.   I don't know.
 8   Q.   And when did she come back from having her
 9        cigarette?
10   A.   Come back in the room or --
11   Q.   Yes, come back in the room.
12   A.   She didn't come back in the room.
13   Q.   Well, what happened next after she left the
14        room to have her cigarette?
15   A.   She left the room, and a couple minutes
16        later she tapped on the outside window of
17        our room and scared the daylights out of me.
18   Q.   Okay.  I assume you had some choice words
19        for her --
20   A.   Yes.
21   Q.   -- but we won't get into that.
22             What happened after she banged on the
23        window?
24   A.   When she banged on the window, I opened it
25        up and told her that she scared the living
```



CARRIE L. LaROCHE
July 27, 2006

```
 1        daylights out of me, not quite in those
 2        terms, but -- and she was like "I'm sorry,"
 3        you know, just kind of -- you know, we kind
 4        of laughed it off, and she said that she was
 5        going to go to the front desk and grab some
 6        brochures for us.
 7   Q.   Okay.  And what type of brochures did she
 8        say she was going to get?
 9   A.   I believe we were looking to go to Dunn
10        River Falls which is out there.
11   Q.   What's Dunn River Falls?
12   A.   I'm not quite sure exactly.  Steph had heard
13        about it, I believe.  I don't know much
14        about it myself.
15   Q.   After you had the discussion about getting
16        things for the next day, what happened next?
17   A.   I shut the window and I went and laid down
18        in bed.
19   Q.   After you were laying in bed, is that when
20        you received the call from someone from the
21        hotel about Stephanie's accident?
22   A.   I'm sorry, what?
23   Q.   I'll ask it this way:  How soon after you
24        were laying in bed did you receive the call
25        from the front desk about Stephanie's
```



CARRIE L. LaROCHE
July 27, 2006

1        accident that we talked about earlier?

2   A.   Maybe five, ten minutes.

3   Q.   Okay.  And before you went to see Stephanie

4        at the accident site, did you change?

5   A.   No.

6   Q.   And Stephanie -- strike that.

7           Did Stephanie change before she went

8        outside to have her cigarette?

9   A.   I'm not sure.

10  Q.   Okay.  What do you recall her wearing as she

11       walked out of the room?

12  A.   When she left the room to go smoke a

13       cigarette?

14  Q.   Yes, please.

15  A.   She was in shorts and a T-shirt.

16  Q.   Okay.  Same tan shorts and white T-shirt we

17       talked about before?

18  A.   Yes.

19  Q.   What was she wearing on her feet?

20  A.   The flip-flops.

21  Q.   And you know that for certain?

22  A.   She had them on her feet all day.

23           (Pause.)

24  Q.   Did Ms. Hofer talk to you about this case

25       before she filed the complaint?



CARRIE L. LaROCHE
July 27, 2006

```
 1   A.   Not that I can remember.
 2   Q.   Did you speak to Ms. Minchoff's office
 3        before Stephanie and her husband filed the
 4        complaint?
 5   A.   No.
 6             (Discussion off the record.)
 7   Q.   Did Ms. Hofer ask you to assist in
 8        responding to discovery requests in this
 9        case?
10   A.   I'm not sure what you mean by that.
11   Q.   Well, did Ms. Hofer ask you to provide her
12        with your recollections of the trip at any
13        point after September 2005?
14   A.   After September of 2005?
15   Q.   Yes.
16   A.   I'm not sure.
17   Q.   Okay.  Did Ms. Hofer ask you at any point to
18        provide her with your recollections at any
19        point after the accident?
20   A.   Yes.
21   Q.   Okay.  And when was that?
22   A.   I'm not sure of an exact time.
23   Q.   At any point after the accident in Jamaica
24        did Mr. Hofer ask you to provide your
25        recollections of what happened on the trip
```



CARRIE L. LaROCHE
July 27, 2006

```
 1        to Jamaica?

 2   A.   Say that one more time, please.

 3             MR. REITH:  Can you repeat that

 4        back.

 5             (Record read.)

 6   A.   No.

 7   Q.   Have any of Ms. Hofer's attorneys asked you

 8        to provide them with any information

 9        concerning the trip to Jamaica?

10   A.   No.

11   Q.   Have any of Ms. Hofer's attorneys asked you

12        to provide them with documents concerning

13        the trip to Jamaica?

14   A.   No.

15   Q.   Don't worry, these (indicating) are the ones

16        I don't need.

17             Did Ms. Hofer ever present to you a

18        document entitled "Request for Admissions"

19        and ask you to help her answer them?

20   A.   No.

21   Q.   Did Ms. Hofer ever present you with a

22        document entitled "Interrogatories" and ask

23        you to help her answer them?

24   A.   No.

25   Q.   Did Ms. Hofer ask -- ever present to you a
```



CARRIE L. LaROCHE
July 27, 2006

```
 1        document entitled "Request for Production of

 2        Documents" and ask you to assist her in

 3        providing documents?

 4   A.   No.

 5   Q.   Have any of Ms. Hofer's attorneys ever

 6        provided you with a document entitled

 7        "Request for Admissions" and asked you to

 8        provide answers for them?

 9   A.   No.

10   Q.   Have any of Ms. Hofer's attorneys provided

11        you with a document entitled

12        "Interrogatories" and asked you to provide

13        answers for them?

14   A.   No.

15   Q.   Have any of Ms. Hofer's attorneys provided

16        you a document entitled "Request for the

17        Production of Documents" and asked you to

18        provide documents --

19   A.   No.

20   Q.   -- in connection with them?  No?  Is that a

21        no?

22   A.   No.

23   Q.   Before Ms. Hofer and Mr. Hofer filed a

24        complaint, which was September 2005, did Ms.

25        Hofer let you know that she was going to be
```



CARRIE L. LaROCHE
July 27, 2006

1        suing Expedia, Inc.?

2   A.   Before 2005, before September --

3   Q.   Yeah.

4   A.   -- of 2005?

5            She had talked about the possibility

6        of filing a lawsuit, but I didn't know if

7        there was anything definite or not.

8   Q.   What did she say about filing a lawsuit?

9   A.   She had just mentioned that she was

10       considering it.

11  Q.   Did she say who she was considering suing?

12  A.   I don't believe so.

13  Q.   So she didn't say, "I'm considering suing

14       Turtle Beach"?

15           MS. MINCHOFF:   Objection.

16  A.   I don't really remember at this point what

17       the exact conversation was.

18  Q.   Do you recall around the time that you had

19       this conversation?

20  A.   I have no idea.

21  Q.   All right.  So you can't pinpoint a month

22       for me?

23  A.   No.

24  Q.   Do you know if it was after September 2005,

25       though?



CARRIE L. LaROCHE
July 27, 2006

1    A.    I have no idea.

2    Q.    Okay.  During that conversation that Ms.

3          Hofer talked about the possibility of a

4          lawsuit, did she ask for your opinion about

5          bringing a lawsuit?

6    A.    Not that I remember, no.

7    Q.    At any point had Ms. Hofer asked for your

8          cooperation in prosecuting this lawsuit

9          against Expedia, Inc.?

10   A.    What do you mean by asking for my

11         cooperation?

12   Q.    Has she asked you to provide her documents?

13   A.    No.

14   Q.    I thought she asked you to provide her

15         documents and you provided her the itinerary

16         and the copy of the receipts from the money

17         that you put out on vacation.

18               MS. MINCHOFF:   Objection.

19   A.    She did ask me for that, but she did not say

20         that it's for a lawsuit.

21   Q.    Okay.

22   A.    I had no idea what it was for.  Like I said

23         before, I had assumed it was to tally, you

24         know, what we had spent down there so she

25         could pay me back.



CARRIE L. LaROCHE
July 27, 2006

1    Q.    Okay.  Did she ask if you would appear on
2          her behalf as a witness at trial should this
3          case get to trial?
4    A.    I'm not sure if she specifically asked me
5          that or not.
6    Q.    Okay.  Has she generally asked you that?
7    A.    Yes.
8                    MS. MINCHOFF:  Objection.
9    Q.    Okay.  What did she say?
10   A.    I don't remember specifically.
11   Q.    Well, what did -- what do you remember
12         generally?
13   A.    There was a conversation, and she mentioned
14         that, you know, I might have to be called in
15         to say what I remembered.
16   Q.    When was that conversation?
17   A.    I don't remember.
18   Q.    Okay.  Was her attorney present at the time
19         that you had that conversation?
20   A.    No.
21   Q.    Has anybody from her attorney's office asked
22         you to cooperate as a witness in this case?
23   A.    Specifically asked me to cooperate as a
24         witness?
25   Q.    Yes.



CARRIE L. LaROCHE
July 27, 2006

```
 1   A.   No.

 2   Q.   Did Ms. Hofer tell you how much she is suing

 3        Expedia, Inc. for?

 4   A.   No.

 5   Q.   Did Ms. Hofer ever discuss with you how much

 6        she intended on suing anybody for in

 7        connection with the Jamaica vacation?

 8   A.   No.

 9   Q.   Did she ever discuss with you what she hopes

10        to get out of this lawsuit by way of

11        recovery financially?

12   A.   No.

13   Q.   Did she ever make any overtures to you that

14        you would be able to share in any sort of

15        windfall as a result of this litigation?

16   A.   No.

17             MR. REITH:  I presently have

18        nothing further for the witness.

19             MS. MINCHOFF:  Scott, before we

20        start, how long do you think you're going to

21        have?

22             MR. FERINGA:  I don't know.

23             MS. MINCHOFF:  All right.  I didn't

24        know if you just had a few questions

25        after -- if you thought about that.
```



CARRIE L. LaROCHE
July 27, 2006

```
 1                    MR. FERINGA:  I don't know.

 2                    MS. MINCHOFF:  Okay.  Go ahead.

 3

 4                    CROSS EXAMINATION

 5

 6         BY MR. FERINGA:

 7    Q.   Hi.  We were introduced off the record.  My

 8         name is Scott Feringa.  I represent The Gap.

 9         I'm going to follow up on some questions

10         that Mr. Reith has asked, and if I am in any

11         way unclear, please let me know.  I'll be

12         more than happy to rephrase the question,

13         all right?

14    A.   Okay.

15    Q.   In 2004 how would you characterize your

16         relationship with Mrs. Hofer?

17                    MS. MINCHOFF:  Objection.

18    A.   What do you mean, how would I characterize

19         it?

20    Q.   How would you characterize it?  Were you

21         acquaintances?  Were you friends?  Were you

22         close friends?  Were you best friends?

23                    MS. MINCHOFF:  Objection.

24    A.   What do you consider the difference between

25         close friends, best friends?
```



CARRIE L. LaROCHE
July 27, 2006

```
 1   Q.   Do you have best friends, people that you
 2        consider your closest friends?
 3   A.   To me closest friends and best friends is
 4        one and the same.
 5   Q.   Okay.  That's fine.  Whether you use close
 6        friends or best friends, do you consider --
 7        did you in 2004 consider Mrs. Hofer to be
 8        one of your closest or best friends?
 9   A.   Yes.
10   Q.   And does that continue today?
11   A.   Yes.
12   Q.   In that light, how often in 2004 would you
13        guys see each other?
14   A.   Back in 2004?
15   Q.   Yeah.
16   A.   I'm not sure exactly.
17   Q.   You know, once a week, twice a week?  Did
18        you talk on the phone once a day, once a
19        week, something like that?
20   A.   I can't remember --
21               MS. MINCHOFF:  Objection.
22   A.   -- back in 2004.
23   Q.   What about --
24   A.   Sorry.
25   Q.   That's fine.  What about presently?
```



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

CARRIE L. LaROCHE
July 27, 2006

```
 1   A.   Presently if -- we see each other once every
 2        couple of weeks.
 3   Q.   What about do you talk on the telephone
 4        between that period of time?
 5   A.   Sometimes, not all the time.
 6   Q.   Do you e-mail or instant message?
 7   A.   No, not really.  We forward the occasional
 8        joke, but we don't, like, have conversations
 9        through e-mail.
10   Q.   Was Mrs. Hofer invited -- Mr. and Mrs. Hofer
11        invited to your wedding?
12   A.   Yes.
13   Q.   Mr. Hofer in his deposition testified that
14        there was no reimbursement for the trip from
15        the Hofers to you.
16             MS. MINCHOFF:  Objection.
17   Q.   Do you -- is that correct?
18             MS. MINCHOFF:  Objection.
19   A.   I have no idea what he said.
20   Q.   I would like you to assume that that is what
21        his testimony was.  Assuming that that was
22        his testimony, would that be correct
23        testimony?
24             MS. MINCHOFF:  Objection.
25   A.   Assuming that he said that there was no
```



CARRIE L. LaROCHE
July 27, 2006

 1         money paid to me?

 2    Q.   Correct.

 3    A.   Is that what you're saying?

 4    Q.   Correct.

 5    A.   Then that would be incorrect.

 6    Q.   All right.  This was not an understanding on

 7         your part that you would be paying for the

 8         trip to take your friend to Jamaica,

 9         correct?

10    A.   Say that one more time.

11    Q.   Sure.  This was not a trip in which you had

12         agreed to pay for your trip for your friend

13         to accompany you on the trip to Jamaica,

14         correct?

15    A.   Correct.

16    Q.   The understanding was that Mrs. Hofer was

17         going to reimburse you for the -- half of

18         the trip, essentially her portion of the

19         trip, correct?

20    A.   Correct.

21    Q.   And I believe you testified that the

22         reimbursement was both in cash and in the

23         form of a check?

24    A.   Yes.

25    Q.   And was that reimbursement received by you



CARRIE L. LaROCHE
July 27, 2006

1          sometime in the year 2004?

2    A.   I don't remember.

3    Q.   Would you assume that to be the case?

4               MS. MINCHOFF:  Objection.

5    A.   I don't remember.

6    Q.   All right.  And is the reason -- you've used

7         that a number of times, you don't remember.

8         Is that because it's now two and a half

9         years ago that some of the events may have

10        faded from your memory?

11              MS. MINCHOFF:  Objection.

12   A.   It's not necessarily that some of the events

13        have faded from my memory, it's my main

14        memories are of seeing my friend bleeding

15        out.

16   Q.   Okay.  You've told us that -- and correct me

17        if I'm wrong -- your testimony was that Mrs.

18        Hofer had had the same flip-flops on, I

19        believe your words were, quote, all day, end

20        quote; is that correct?

21   A.   Uh-huh.

22   Q.   Yes, no?

23   A.   Yes.  Sorry.

24   Q.   And I don't mean to interrupt.  I'm not

25        trying to be rude, but we have to have a




CARRIE L. LaROCHE
July 27, 2006

1        verbal response.

2    A.   Sorry.

3    Q.   No, no, no, no.  Don't be sorry.  It's a

4        strange way of communicating, trust me.

5             And when you said to Mr. Reith in

6        answer to one of his questions where

7        Stephanie said, "Look at my new pair of

8        flip-flops," was that conversation that --

9        or that comment made when you picked her up

10       or when you first met to go to the airport

11       that morning?

12   A.   I'm not positive if it was that morning or

13       if it was the night before.

14   Q.   Okay.  Did you two stay together someplace

15       and then travel to the airport together the

16       morning of the 18th when you took the flight

17       to Jamaica?

18   A.   Yes.

19   Q.   Okay.  And where was that?

20   A.   We stayed at Stephanie's house.

21   Q.   Okay.  On the morning of the 18th, then, was

22       Stephanie wearing the flip-flops that she

23       eventually wore at Turtle Beach Towers,

24       which are now in part the subject matter of

25       this litigation?



CARRIE L. LaROCHE
July 27, 2006

```
 1   A.    Yes.

 2   Q.    When -- and if your flight from Boston to

 3         Philadelphia, Philadelphia to Montego Bay,

 4         Jamaica was at 7:30 in the morning, what

 5         time would you guys have dressed and then

 6         left for the airport in order to make the

 7         7:30 flight?

 8               MS. MINCHOFF:   Objection.

 9   A.    I'm not sure exactly.  I believe we probably

10         left by 5:00, I would assume, to make sure

11         that we got there in time.

12   Q.    And you said that it was snowing out?

13   A.    Yes.

14   Q.    And Mrs. Hofer, you told us, was wearing the

15         flip-flops that she was -- ended up wearing

16         in Jamaica, the same pair, correct?

17   A.    Yes.

18   Q.    Did you -- because it was snowing, were you

19         late in getting to the airport at all?

20   A.    No.

21   Q.    Do you remember up until the time that the

22         two of you boarded the plane, the U.S. Air

23         flight from Boston to Philadelphia, whether

24         Mrs. Hofer had made any complaints about the

25         flip-flops; that is, "These things don't
```



CARRIE L. LaROCHE
July 27, 2006

```
 1          feel right.  Something is wrong with them"?
 2     A.   Not that I remember.
 3     Q.   Did she appear to you to have any difficulty
 4          walking in the flip-flops?
 5     A.   I can't say that I paid attention to her
 6          walking.
 7     Q.   And I understand that, but you don't
 8          remember her tripping or falling or taking
 9          the flip-flops off and looking at the
10          flip-flops or anything like that?
11     A.   No.
12     Q.   Did you have to run to make the plane in
13          Boston?
14     A.   No.
15     Q.   You said, I think, that the plane was late
16          in getting into Philadelphia from Boston
17          because you were delayed in Boston, correct?
18     A.   Yes.
19     Q.   If the itinerary at least that we've
20          received from Expedia demonstrates that you
21          were supposed to arrive at -- airlines --
22          8:59 a.m. and then leave Philadelphia to
23          Montego Bay at 10:30 a.m. --
24     A.   Uh-huh.
25     Q.   -- do you know about how much time you had
```



CARRIE L. LaROCHE
July 27, 2006

 1        between the two flights?

 2    A.  I don't remember anymore.

 3    Q.  Do you remember being concerned about making

 4        your connection from Philadelphia to

 5        Jamaica?

 6    A.  No.

 7    Q.  Philadelphia airport is a big, long airport

 8        with a number of different pods on it.

 9    A.  Yeah.

10    Q.  Do you remember whether you had to go from

11        one of the pods or one of the arms of the

12        airport along the moving walkways to get to

13        another pod, or was the connection on the

14        same -- in the same arm?

15    A.  It was in a different arm.

16    Q.  All right.  Do you remember then having to

17        hurry or run or walk fast from the time you

18        disembarked from the flight from

19        Philadelphia to -- I mean, from Boston to

20        Philadelphia --

21            MS. MINCHOFF:  Objection.

22    Q.  -- in order to get to the flight from

23        Philadelphia to Jamaica?

24            MS. MINCHOFF:  Objection.

25    A.  We didn't have a problem because they had a



CARRIE L. LaROCHE
July 27, 2006

1          golf cart waiting for us.

2    Q.    Okay.  And did the golf cart take you right

3          to the next gate?

4    A.    Yes.

5    Q.    Do you remember whether on getting off the

6          plane to get to the golf cart and then from

7          the golf cart to the next plane whether Mrs.

8          Hofer had any difficulty with her sandals at

9          all?

10                  MS. MINCHOFF:  Objection.

11   A.    I don't remember.

12   Q.    Do you remember her taking them off and sort

13         of walking in her bare feet?

14                  MS. MINCHOFF:  Objection.

15   A.    Not that I remember.

16   Q.    When you arrived in Jamaica -- at least the

17         flight itinerary indicates that the arrival

18         time was supposed to be 2:09 p.m. -- do you

19         remember whether the plane at least in

20         arriving in Jamaica was on time, early or

21         late?

22   A.    I'm not sure.

23   Q.    And do you remember the amount of time that

24         it took to clear customs, get your bags and

25         then get on the shuttle?



CARRIE L. LaROCHE
July 27, 2006

```
 1   A.   I don't remember.

 2   Q.   And why is it that you don't remember?

 3             MS. MINCHOFF:  Objection.

 4   A.   Because we had landed.  We were on vacation.

 5   Q.   And you didn't care?

 6   A.   I wasn't concerned about time at that point.

 7   Q.   All right.  Do you remember at any point in

 8        time after landing in Jamaica to the time

 9        that the two of you got on the shuttle that

10        was going to then take you to the hotel

11        whether Mrs. Hofer complained at all about

12        the sandals that she was wearing?

13   A.   I don't remember.

14   Q.   Do you remember her taking them off and

15        essentially walking barefoot around the

16        airport?

17   A.   I don't remember her ever walking barefoot

18        around an airport, no.

19   Q.   You don't remember her complaining about

20        anything; is that fair to say?

21   A.   Not that I can remember.

22             MS. MINCHOFF:  Objection.

23   Q.   Now, the -- I think you had told Mr. Reith

24        that you don't remember being in a place

25        called Ocho Rios, correct?
```



CARRIE L. LaROCHE
July 27, 2006

1    A.    I remember saying that to him.

2    Q.    Okay.  I'm going to show you --

3              MR. FERINGA:  We're going to have a

4         deposition exhibit marked whatever number

5         we're on, 7.

6              (Exhibit No. 7, Sunrays Co., Ltd.

7         receipt dated 19-03-04, marked for

8         identification.)

9    Q.    And this is a document that has been

10        produced to all counsel in a -- in what is

11        known as The Gap's third supplemental or

12        Rule 26 disclosure.  This is -- is your

13        writing on this document?

14   A.    Yes.

15   Q.    All right.  And under "Name," "Street,"

16        "City," "Telephone Number," "Nationality"

17        and then "Signature," those are all your --

18        that's all your writing -- copies of your

19        writing, correct?

20   A.    Not all of it, no.

21   Q.    There is a section where it says -- past

22        "Nationality" there's something that says

23        "Stephanie," and then there's a telephone

24        number?

25   A.    Correct.


BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

CARRIE L. LaROCHE
July 27, 2006

```
 1   Q.   That is not your writing, correct?

 2   A.   That is not my writing.

 3   Q.   And in terms of what is in the, quote, "For

 4        Official Use Only," and then there's a

 5        series of things on the right-hand side,

 6        boxes, it would appear to be "Arrival Date,"

 7        "Departure Date," et cetera, that's not your

 8        writing, correct?

 9   A.   That's not my writing.

10   Q.   So your writing, then, would be "Name,"

11        "Street," "City," "Telephone Number,"

12        "Nationality," with the exception of

13        "Stephanie" and then the telephone number

14        and then your signature, correct?

15   A.   Correct.

16   Q.   If Turtle Beach Towers is in Ocho Rios, you

17        would not disagree with that, would you?

18   A.   No.

19   Q.   And they have listed there a room number,

20        106.  Do you remember -- does that help

21        refresh your recollection that that was a

22        room number where you were in?

23             MS. MINCHOFF:   Objection.

24   A.   Where do you see 106?

25   Q.   Under "Room Number" under the section "For
```



CARRIE L. LaROCHE
July 27, 2006

1        Official Use Only" there's "Arrival Date,"

2        "Departure Date," and then it says "Room

3        Number."

4              MS. MINCHOFF:  Objection.

5    A.   That doesn't look like 106.

6    Q.   Okay.  You were on the first floor of the

7         building, correct?

8    A.   Yes.

9    Q.   Just to complete this line, I'm going to

10        show you what we're going to be marking as

11        Exhibit No. 8.

12              (Exhibit No. 8, Expedia, Inc.

13        document headed "Turtle Beach Towers

14        Reservation information," marked for

15        identification.)

16   Q.   And this is a document that was also

17        contained in the document production.  You

18        would have received Turtle Beach Towers

19        reservation confirmation from Expedia,

20        correct?

21   A.   I don't know.

22   Q.   In any event, do you see where it says

23        "Turtle Beach Towers, Ocho Rios," and then

24        it says, comma, "JAM" at the top left-hand

25        corner?


BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

CARRIE L. LaROCHE
July 27, 2006

1    A.    Yes.

2    Q.    You're not denying that you went to an

3          entity identified as Turtle Beach Towers in

4          Ocho Rios, Jamaica on October 18, correct?

5                MS. MINCHOFF:  Objection.

6    A.    I wasn't there in October.

7    Q.    I mean, I'm sorry, March 18?

8                MS. MINCHOFF:  Objection.

9    A.    I mean, if this is the accurate one, I have

10         not seen this before, so I'm not sure where

11         this came from.

12   Q.    Okay.  But in any event, you're not denying

13         that you were -- that you had booked a

14         reservation at an entity identified as

15         Turtle Beach Towers in Ocho Rios, Jamaica,

16         correct?

17               MS. MINCHOFF:  Objection.

18   A.    Yes.  I did mistake that earlier.

19   Q.    Okay.  I wanted to ask you, then, some

20         questions about the day that you had.  From

21         the time that you arrived at your -- when

22         you arrived at the Turtle Beach Towers, you

23         went into the lobby area of the reception

24         and spoke with a female desk clerk, correct?

25   A.    I don't believe I said it was a female desk



CARRIE L. LaROCHE
July 27, 2006

 1        clerk.

 2   Q.   No.  I did.  You spoke with a female desk

 3        clerk who checked you in, correct?

 4             MS. MINCHOFF:  Objection.

 5   A.   I'm not sure at this point.  I don't

 6        remember who checked us in.

 7   Q.   Can you say one way or the other whether it

 8        was a male or female desk clerk who checked

 9        you in?

10   A.   I don't remember.

11   Q.   In order to go into the lobby area, you

12        would have had to pass a turtle pond,

13        correct?

14   A.   The turtle pond was next to the steps.  You

15        had to walk up the steps to go into the

16        lobby, yes.

17   Q.   Did you even pay any attention to the turtle

18        pond as you were walking for the first time

19        into the reception area?

20             MS. MINCHOFF:  Objection.

21   A.   I don't -- I'm not sure exactly what was

22        said, but I know -- I'm sure we made

23        reference to the fact that, "Oh, look, a

24        turtle pond."

25   Q.   All right.  Do you remember anything more



CARRIE L. LaROCHE
July 27, 2006

1      about that turtle pond other than the fact

2      that it was there?

3  A.  What do you mean, do I remember anything

4      more?

5  Q.  Yeah, did you pay any attention to it at

6      that point in time as to its configuration,

7      whether there were rocks in it, whether

8      there were smooth walls, anything of the

9      sort?

10         MS. MINCHOFF:  Objection.

11  A.  Not while walking into the hotel, no.

12  Q.  Did you have any conversation with Mrs.

13      Hofer about the turtle pond as you were

14      walking from the shuttle into the reception

15      area?

16  A.  I don't remember exactly.

17  Q.  Do you remember generally?

18  A.  Generally we made reference to the fact

19      that, "Oh, look, a turtle pond."

20  Q.  Okay.  Do you remember whether Mrs. Hofer

21      made any comments about it?

22  A.  Other than the, "Oh, look, it's a turtle

23      pond," not that I can remember.  We -- I

24      went in, and we checked in.

25  Q.  Before you checked in and as you're walking



CARRIE L. LaROCHE
July 27, 2006

```
 1        into the door, did you see any other guests

 2        or people around the turtle pond?

 3   A.   I don't remember if they were around the

 4        turtle pond.  I have no idea.

 5   Q.   Okay.  As you left the shuttle and walked

 6        into the reception area, do you remember

 7        having -- Mrs. Hofer having any difficulty

 8        with her sandals whatsoever?

 9   A.   I don't remember.

10   Q.   Did she make any comments about them?

11   A.   I don't remember.

12   Q.   Did she take them off and walk barefoot?

13   A.   She didn't walk barefoot, that I remember.

14   Q.   Okay.  Fine.  Do you have your -- that

15        drawing that you have?

16   A.   Yes.

17   Q.   Okay.  I'm going to switch over the court

18        reporter.  Can you hold up -- what I'm going

19        to ask you to do is compare what is the

20        second page of -- excuse me for standing

21        over you.

22   A.   No problem.

23   Q.   I apologize.  I don't mean to be rude.

24        What I'm going to -- is the third page

25        of the Group Exhibit No. 2, and ask whether
```



CARRIE L. LaROCHE
July 27, 2006

```
 1          the bench that you have identified and the

 2          turtle pond that you identified is the same

 3          bench and turtle pond that exist in the

 4          photograph.

 5                  MS. MINCHOFF:  Objection, asked and

 6          answered.

 7                  MR. FERINGA:  I have not asked this

 8          question.

 9                  MS. MINCHOFF:  No, you're --

10                  MR. FERINGA:  All right.

11                  MS. MINCHOFF:  -- badgering --

12                  MR. FERINGA:  And thus, your

13          objection under the Federal Rules is not a

14          good objection.

15                  MS. MINCHOFF:  I'm making my

16          objection --

17                  MR. FERINGA:  Thank you.

18                  MS. MINCHOFF:  -- Scott.

19                  MR. FERINGA:  Go ahead.

20                  MS. MINCHOFF:  It's asked and

21          answered.

22          BY MR. FERINGA:

23     Q.   The question is, is the turtle pond and the

24          bench the same turtle pond and bench that

25          exists in Group Exhibit No. 2?
```



Page 180

CARRIE L. LaROCHE
July 27, 2006

 1   A.    No.

 2   Q.    Were there more than one turtle pond in the

 3         area in Turtle Beach Towers?

 4   A.    I can't answer that.  We didn't go around

 5         the whole area.

 6   Q.    You only saw one?

 7   A.    That was the one that I saw.

 8   Q.    And you only saw the one that was at the

 9         reception area, correct?

10   A.    The turtle pond by the lobby, yes.

11   Q.    Okay.  Can you hold up both of those, your

12         drawing and that photograph to the camera,

13         please, so the camera can --

14   A.    Sure.

15   Q.    -- zoom in on it?  The other way.

16   A.    (Witness complies.)

17   Q.    There we go.

18              MR. FERINGA:  (To videographer.)

19         Got it?

20              THE VIDEOGRAPHER:  (No verbal

21         response.)

22   Q.    Now, you have drawn a set of stairs to what

23         would be the -- as you're moving into the

24         lobby, the right of the turtle pond,

25         correct?



CARRIE L. LaROCHE
July 27, 2006

1   A.   I'm sorry, say that again.

2   Q.   Sure.  That was probably poorly asked.  If

3        you look at the -- if you look at the front

4        door as you have identified the door?

5   A.   On my drawing or on this drawing

6        (indicating)?

7   Q.   On your drawing.

8   A.   Okay.

9   Q.   You have drawn the stairs to the right of

10       the turtle pond, correct?

11  A.   If you're looking at the door --

12  Q.   Yes.

13  A.   -- the stairs are to the right of the turtle

14       pond, yes.

15  Q.   And in the photograph that is in your right

16       hand, are there stairs to the right of the

17       bench and what I will represent to be the

18       turtle pond?

19            MS. MINCHOFF:   Objection.

20  A.   There is a stair, yes.

21  Q.   Yes.  And you remember there to be more

22       stairs, correct?

23  A.   Yes.

24  Q.   Okay.  Now, in back of the turtle pond

25       between the building and the turtle pond on



CARRIE L. LaROCHE
July 27, 2006

```
 1        your drawing you have trees or bushes,

 2        correct?

 3   A.   Yes.

 4   Q.   And in the photograph in your right hand are

 5        there trees and bushes in back of the turtle

 6        pond before the building?

 7   A.   There is some sort of shrubbery, yes.

 8   Q.   And what you're saying is that that

 9        shrubbery is not the same shrubbery that you

10        remember, or can you say?

11   A.   I don't believe it is, no.

12   Q.   Okay.  Now, if you'll go to the first page

13        of that group exhibit.

14   A.   That page (indicating)?

15   Q.   Yes.  Do you see there to be a walkway in

16        front of the stairs and turtle pond and

17        bench?

18   A.   Are you talking about this area here

19        (indicating)?

20   Q.   Yes, extending -- extending toward the back

21        part of that photograph.

22   A.   Yeah.

23   Q.   Okay.  And in front of -- and in your

24        photograph -- I mean, in your drawing is

25        there a walkway that would -- that exists in
```



CARRIE L. LaROCHE
July 27, 2006

1          front of the bench in front of the stairways

2          and in front of the building?

3     A.   Yes.

4     Q.   And you then have -- in the photograph that

5          you have that is in your right hand, do you

6          see beyond that walkway what appears to be a

7          roadway or parking lot?

8               MS. MINCHOFF:   Objection.

9     A.   Do you mean over here (indicating)?

10    Q.   Yes.

11    A.   I see that something goes off in that area.

12         I can't say from this picture whether it's a

13         parking lot or...

14    Q.   In your drawing you have at the bottom -- I

15         think it's covered up by your fingers -- a

16         parking lot?

17    A.   Right.  That's right in front of the lobby,

18         though, not off to the side.

19    Q.   Right.

20    A.   What you're talking about is off to the

21         side, correct?

22    Q.   Right.  Can you see in front of the lobby

23         area the beginning of a roadway sort of

24         where the stairs would continue on?

25    A.   There's the beginning of something here



CARRIE L. LaROCHE
July 27, 2006

1      (indicating), yes.

2  Q.   Yes.  If I represented to you that this was

3      the turtle pond in that -- the only turtle

4      pond at the Turtle Beach Towers, are you

5      saying that this is not the photograph of

6      the reception area -- strike that.

7         I want to represent to you that the

8      testimony is going to be that this is the

9      turtle pond at which it is claimed Mrs.

10     Hofer fell.

11         MS. MINCHOFF:  Objection.

12  Q.  Assuming that to be the case, is it your --

13     aren't you mistaken regarding your memory of

14     the configuration of the turtle pond?

15         MS. MINCHOFF:  Objection.

16  A.  So you're saying that --

17  Q.  That's it.

18  A.  Assuming that this is it, you want me to

19     admit that what I'm remembering is wrong?

20  Q.  Correct.

21  A.  No.

22  Q.  All right.  Did you take any pictures of the

23     turtle pond?

24  A.  No, I did not.

25  Q.  Did you take any pictures at all of the


BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

CARRIE L. LaROCHE
July 27, 2006

1          area?

2    A.    No, I did not.

3    Q.    Do you have any, any documents at all that

4          would document the turtle pond and the

5          location other than the drawing that you've

6          made today?

7    A.    Do I?  No.

8    Q.    You are certain that there were four or five

9          steps leading to the reception area,

10         correct?

11              MS. MINCHOFF:  Objection.

12   A.    Yes.

13   Q.    And if you look at the third photograph down

14         in Group Exhibit No. 2 where it has two

15         photographs -- I mean, two stairs, you're

16         saying that that was not present on October

17         18, 2004 at Turtle Beach Towers, correct?

18              MS. MINCHOFF:  Objection.

19   A.    Not to my knowledge, no.

20   Q.    And to the best of your knowledge, you're

21         not mistaken in that recollection?

22   A.    That's correct.

23              MS. MINCHOFF:  Objection.

24   Q.    Between the time that you arrived at Turtle

25         Beach Towers and the time that you left for



Page 186

CARRIE L. LaROCHE
July 27, 2006

```
 1          dinner going to Jimmy Buffet's

 2          Margaritaville, which was off-site, did you

 3          see any individuals in and around the turtle

 4          pond?

 5    A.    I don't remember.

 6    Q.    Did you see anybody that you -- appeared to

 7          you to be intoxicated playing inside of the

 8          turtle pond?

 9    A.    Not that I remember, no.

10    Q.    If you saw an intoxicated guest playing in

11          and around the turtle pond, that's something

12          that you certainly would have remembered?

13    A.    I would think so.

14    Q.    At any point in time that you were with Mrs.

15          Hofer from the time you arrived at Turtle

16          Beach Towers to the time that you came back

17          to see her as she -- having been called to

18          see her when she was on the bench with her

19          leg bleeding, did she appear to be -- to you

20          to be altered in her level of consciousness

21          or mentation in any way?

22                   MS. MINCHOFF:  Objection.

23    A.    No.

24    Q.    Have you ever seen her altered in mentation

25          prior to October -- I mean, prior to March
```



CARRIE L. LaROCHE
July 27, 2006

1        18, 2004?

2                  MS. MINCHOFF:   Objection.

3   A.   I don't believe I ever did see her.

4   Q.   Altered?

5   A.   Altered.

6   Q.   All right.  We've received -- and this has

7        been supplied to counsel in the request, in

8        our document requests -- a report from Faye

9        Miller, who's the manager of Turtle Beach

10       Towers.  And in that report she says, quote,

11       "The guest was intoxicated and was seen by

12       the turtle pond playing with the turtles.

13       She was advised to desist from doing so by

14       other guests and the receptionist on duty.

15       She replied that she wanted to take one up

16       to her room to put in the bathtub," end

17       quote.

18   A.  Who said that?

19   Q.  Faye Miller, the manager of Turtle Beach

20       Towers.

21             Do you have any knowledge of that?

22   A.  Absolutely not.

23   Q.  Do you remember Mrs. Hofer being escorted

24       back to her room by the receptionist?

25   A.  Absolutely not.



CARRIE L. LaROCHE
July 27, 2006

1  Q.   Do you remember any conversation -- so --
2       strike that.
3            So if Ms. Miller puts that in her
4       report following her investigation, you
5       would say that Ms. Miller is mistaken?
6  A.   Absolutely.
7  Q.   In terms of the bench that you recall seeing
8       Mrs. Hofer sitting upon or being upon when
9       you came upon her after having been summoned
10      to attend your friend, was it similar to the
11      bench shown in the photograph on Exhibit 2?
12           MS. MINCHOFF:   Objection.
13 A.   I would think most benches are similar.  I
14      don't know what you're --
15 Q.   Well, it could be a wooden park bench.  It
16      could be a stone bench.  It could be a
17      concrete bench.  I'm not sure.  Does that
18      bench as documented in group Exhibit 2 meet
19      your recollection of what the bench was like
20      that Mrs. Hofer was on when you saw her,
21      having been summoned to see her?
22           MS. MINCHOFF:   Objection.
23 A.   No.
24 Q.   In what way was the bench different?
25 A.   It's the wrong color.



CARRIE L. LaROCHE
July 27, 2006

```
 1   Q.   What color was it?

 2   A.   It was gray.

 3   Q.   Was it --

 4   A.   This one's like a pinky color.

 5   Q.   All right.  And was it a gray concrete

 6        color?

 7             MS. MINCHOFF:  Objection.

 8   Q.   Was it a gray concrete-like color?

 9   A.   I don't know if it was definitely concrete,

10        but it was like that grayish color.

11   Q.   Was it a wood bench?

12   A.   No.

13   Q.   Was it a stone bench?

14   A.   No.

15   Q.   What material did you think it was made of?

16   A.   I would -- I don't know specific terms of

17        materials of that kind of nature, but not

18        knowing those kinds of things, I would have

19        said it was a gray concrete bench.

20   Q.   All right.  Let me back up.  When Mrs. Hofer

21        and you walked to dinner, you said it was,

22        what, a five-minute walk, ten-minute walk?

23   A.   Around a five-minute walk.

24   Q.   And it was across the road from the Turtle

25        Beach Towers?
```



CARRIE L. LaROCHE
July 27, 2006

```
 1   A.   I don't believe I said it was across the

 2        road.  I'm not --

 3   Q.   Did you have to go off-property?

 4   A.   Yes.

 5   Q.   And when you went off-property, did you have

 6        to go across a road?

 7   A.   I don't fully remember at this point.

 8   Q.   Okay.  Did Mrs. Hofer have any difficulty

 9        walking from Turtle Beach Towers to Jimmy

10        Buffet's Margaritaville?

11   A.   Not that I can remember.

12   Q.   You don't remember her stumbling, tripping,

13        anything of the sort?

14             MS. MINCHOFF:  Objection.

15   A.   I don't remember.  It was over two and a

16        half years ago.

17   Q.   Okay.  And when you say, "It was over two

18        and a half years ago," is that because the

19        passage of time, two and a half years, has

20        sort of flushed out some of the things from

21        your memory of that time?

22             MS. MINCHOFF:  Objection.

23   A.   Is that a question or a statement?

24   Q.   Yes, that is a question.  Isn't it the case

25        that over -- since it had occurred over two
```



CARRIE L. LaROCHE
July 27, 2006

```
 1        and a half years ago, that your memory is

 2        not as good now after the events as then?

 3             MS. MINCHOFF:   Objection.

 4   A.   Some details may not be as easily remembered

 5        as others.

 6   Q.   But to the best of your knowledge, Mrs.

 7        Hofer had no difficulty walking from Turtle

 8        Beach Towers to Jimmy Buffet's

 9        Margaritaville?

10   A.   Not that I can remember.

11   Q.   And she kept her flip-flops on the entire

12        time?

13   A.   Yes.

14   Q.   From the time she was at Jimmy Buffet's

15        Margaritaville to the time you got back

16        to -- the two of you got back to Turtle

17        Beach Towers, did she have any difficulty

18        walking in the flip-flops?

19   A.   Not that I remember, no.

20   Q.   And from the time that you made it back

21        after dinner to the room to the time that

22        you saw her leaving to go outside for the

23        cigarette, did she claim -- did she say that

24        she had any difficulty with the flip-flops?

25   A.   She did not say anything, no.
```



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

CARRIE L. LaROCHE
July 27, 2006

```
 1   Q.   Did you see her having any difficulty?

 2   A.   Not that I can remember, no.

 3   Q.   When she went outside, was she wearing the

 4        same pair of flip-flops that she started off

 5        the day with in Boston?

 6   A.   Yes.

 7   Q.   And this was the same pair of flip-flops, at

 8        least one of the flip-flops, that you saw on

 9        one of the four or five steps when you went

10        to be with your friend, correct?

11   A.   I'm sorry, repeat that.

12   Q.   Sure.  This was the same set of flip-flops

13        that you saw, at least one of which was on

14        the steps, when you came to see Mrs. Hofer

15        when she was sitting on the bench with her

16        leg bleeding?

17   A.   Yes.

18   Q.   When you went back with Mr. McKenzie to pack

19        up and collect your things so that you could

20        take Mrs. Hofer's things back to the air --

21        back to the hospital and then go to the

22        airport, do you remember having a

23        conversation with Mrs. Faye Miller, who

24        identified herself as the manager of Turtle

25        Beach Towers?
```



CARRIE L. LaROCHE
July 27, 2006

```
 1   A.   No.

 2   Q.   Did you have a conversation with anybody at

 3        Turtle Beach Towers about how Mrs. Hofer was

 4        doing, which would now be on March 19, 2004?

 5   A.   Can you repeat that one more time?

 6   Q.   Sure.  You told me that -- or you told us

 7        here that you stayed with Mrs. Hofer at the

 8        hospital and then returned sometime on March

 9        19 after Mrs. Hofer had been admitted to the

10        hospital to go to Turtle Beach Towers to

11        pack up your things and you returned with

12        Mr. McKenzie, correct?

13   A.   Correct.

14   Q.   When you were at the Turtle Beach Towers and

15        after you had completed packing up, did you

16        go and check out?

17   A.   Yes.

18   Q.   And did you speak with anybody at Turtle

19        Beach Towers about the fact that -- why you

20        were leaving?

21   A.   Yes.

22   Q.   And who did you speak with?

23   A.   I don't know the person's name.

24   Q.   Was it a man or a woman?

25   A.   It was a younger girl.
```



CARRIE L. LaROCHE
July 27, 2006

```
 1   Q.   All right.  And what did this younger girl

 2        say to you, and what did you say to her?

 3   A.   I'm not sure if this is to a T exactly what

 4        was said, but I said that I was checking

 5        out, and she said, "Oh, are you the friend

 6        of the girl that got hurt?"  And I said,

 7        "Yes."  And she said, "Is she okay?"  And I

 8        said, "We're going back to the United States

 9        so she can have surgery."

10   Q.   Do you remember anything else about that

11        conversation?

12   A.   No.  That was the gist of it.

13   Q.   Did you have any other conversations with

14        anyone else that you believed to be

15        associated with Turtle Beach Towers that

16        day, which would be March 19, 2004?

17   A.   No.

18             MR. FERINGA:  Do you need to take a

19        break?

20             MR. REITH:  Yes.

21             MR. FERINGA:  We need to go off the

22        record.

23             THE VIDEOGRAPHER:  The time is 2:00

24        p.m.  We're off the record.

25             (Recess taken.)
```



CARRIE L. LaROCHE
July 27, 2006

```
 1                    THE VIDEOGRAPHER:  Okay.  We are

 2          back on the record.  This is Tape No. 4.

 3          The time is six minutes after 2:00.

 4          BY MR. FERINGA:

 5   Q.     When you were asked to come -- strike that.

 6              You received a telephone call from

 7          someone in your room telling you to go to

 8          the reception area, or did somebody come to

 9          your room?

10   A.     I received a telephone call.

11   Q.     All right.  And was that from a man or a

12          woman?

13   A.     It was a man.

14   Q.     And he just said, "Your friend has been

15          hurt.  Go to the reception area"?

16   A.     No.  He said, "Your friend cut her foot.

17          You need to come."

18   Q.     Anything else?

19   A.     No.

20   Q.     Okay.  And I assume that you ran right

21          over --

22   A.     Yes.

23   Q.     -- to the reception area?

24   A.     Yes.

25   Q.     When you got to the reception area, you saw
```



CARRIE L. LaROCHE
July 27, 2006

1          Mrs. Hofer on a bench that you described as

2          gray and possibly concrete, correct?

3     A.   Yes.

4     Q.   Did you see any other men or women around

5          her at that time?

6     A.   Yes.

7     Q.   And was it -- did you see men or women or

8          both?

9     A.   There was both.

10    Q.   All right.  And were there -- were there

11         people who you thought were guests versus

12         people from Jamaica who worked at the hotel?

13              MS. MINCHOFF:  Objection.

14    A.   I didn't ask the people, so guessing as to

15         why I thought they were there...

16    Q.   Were they both black and white guests -- or

17         people?

18              MS. MINCHOFF:  Objection.

19    Q.   Let me ask this question:  The men that you

20         saw, did any of the men that you saw

21         identify themselves as the individual who

22         contacted you?

23    A.   Nobody identified themself to me.

24    Q.   Do you remember a man by the name of Denroy

25         Scarlett, who was the night desk clerk?



CARRIE L. LaROCHE
July 27, 2006

```
 1   A.   I didn't get anybody's names.

 2   Q.   Did anybody come and identify themselves as

 3        being associated with Turtle Beach Towers to

 4        you?

 5   A.   No.

 6   Q.   How many men were there?

 7   A.   I'm not sure exactly, but I believe there

 8        was at least two or three gentlemen and one

 9        or two ladies.

10   Q.   Were the men black or white?

11   A.   They were both.

12   Q.   All right.  Do you remember one of the men

13        eventually being introduced to you as Mr.

14        McKenzie?

15   A.   As Henry McKenzie?

16   Q.   Correct.

17   A.   Yes.

18   Q.   Did Henry McKenzie introduce himself to you,

19        or did somebody introduce him to you?

20   A.   He introduced himself to me.

21   Q.   In terms of the women, were the women black

22        or white or both?

23   A.   There was both.

24   Q.   Were any of the women that were there

25        speaking to you in English with some sort of
```



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

Page 198

CARRIE L. LaROCHE
July 27, 2006

```
 1        accent, potentially German?

 2   A.   I don't re -- I don't remember anyone

 3        specifically speaking to me.

 4   Q.   Did anybody say anything to Mrs. Hofer that

 5        you were overhearing the conversation?

 6   A.   Nobody was talking to Stephanie when I got

 7        there.

 8   Q.   Did anybody identify themself -- strike

 9        that.

10             Did any of the people that were there,

11        the men or women, say they saw what actually

12        happened?

13   A.   No.

14   Q.   At any point in time on the 18th or the 19th

15        did you learn of anyone who actually saw

16        what happened?

17   A.   No.

18   Q.   In any of your conversations with Mrs. Hofer

19        from March 18 to the present did she

20        indicate to you at any point in time that

21        she was aware that there was another

22        individual or individuals who witnessed her

23        fall?

24   A.   No.

25   Q.   Looking back on the 18th or 19th when you
```



Page 199

CARRIE L. LaROCHE
July 27, 2006

```
 1          arrived and saw your friend bleeding on the
 2          bench --
 3               (Discussion off the record.)
 4    Q.    Let me start again.  Looking back on the
 5          18th or the 19th when you arrived and saw
 6          your friend bleeding on the bench, are you
 7          aware of whether anybody was taking any
 8          photographs of the scene?
 9    A.    I have no idea.
10    Q.    All right.  You don't remember in your
11          mind's eye seeing flashes or anything of the
12          sort?
13    A.    I don't remember, no.
14    Q.    Do you remember anybody complaining to any
15          of the other individuals about the condition
16          of or the steps of Turtle Beach Towers or
17          the walkways or the steps?
18    A.    I don't remember.
19    Q.    When you went back to Turtle Beach Towers to
20          collect your things and check out, do you
21          remember making any complaints to the
22          younger woman who was behind the desk about
23          Turtle Beach Towers?
24    A.    No.
25    Q.    Do you remember making complaints about the
```



CARRIE L. LaROCHE
July 27, 2006

```
 1         walkways, the staircase, the entranceway to

 2         the reception area?

 3    A.   No.

 4    Q.   And to the best of your knowledge, the last

 5         time that you saw the sandals that were at

 6         least on Mrs. Hofer's feet the last time you

 7         saw them -- strike that.

 8             The sandal that you saw on the step,

 9         the last time that you saw that sandal was

10         at Turtle Beach Towers, correct?

11    A.   Correct.

12    Q.   And when you arrived the following day, that

13         sandal was not there, correct?

14    A.   Correct.

15    Q.   You did nothing to preserve the sandal, that

16         is, keep it, pack it, ask anybody else to

17         save it or pack it, correct?

18    A.   Correct.

19    Q.   I want to ask you some questions about the

20         hospital.

21    A.   Sure.

22    Q.   Was there a particular doctor that you dealt

23         with when you were acting as Mrs. Hofer's

24         advocate?

25                 MS. MINCHOFF:  Objection.
```


BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

Page 201

CARRIE L. LaROCHE
July 27, 2006

 1   A.   What do you mean, like a particular doctor?

 2   Q.   Was there a doctor with whom you were

 3        speaking about, you know, what should be

 4        done, what is going to be done, what's not

 5        going to be done?

 6   A.   There was a nighttime doctor, and then there

 7        was a daytime doctor.

 8   Q.   Do you remember the name of the nighttime

 9        doctor?

10   A.   No.

11   Q.   Do you remember the name of the daytime

12        doctor?

13   A.   No.

14   Q.   Was the nighttime doctor male or female?

15   A.   Male.

16   Q.   Was the daytime doctor male or female?

17   A.   Male.

18   Q.   You said that when you -- strike that.

19            You recall that Mrs. Hofer was

20        actually admitted to the hospital and was

21        not any longer in -- strike that.

22            After Mrs. Hofer was in the emergency

23        room, I think you've told us that she was

24        admitted to the hospital itself, correct?

25   A.   Correct.



CARRIE L. LaROCHE
July 27, 2006

```
 1   Q.   And the hospital itself, as you have

 2        described it, was a ward in which there were

 3        lots of people?

 4   A.   Yes.

 5   Q.   When Mrs. Hofer left the hospital to go to

 6        the airport in Mr. McKenzie's car, you were

 7        handed a group of papers and X-rays,

 8        correct?

 9   A.   I was handed an envelope.

10   Q.   All right.  Did you see -- strike that.

11            The envelope was what size?

12   A.   It was like a nine by twelve manila

13        envelope.

14   Q.   And did you have any sense of how many

15        documents were within this thing?

16   A.   No.

17   Q.   Like one sheet of paper, two sheets of

18        paper, anything of the sort?

19   A.   I'm not sure.  I didn't open it.

20   Q.   Are you even aware that there were X-rays in

21        there?

22   A.   I can't say I'm positive, but the doctor

23        told me that he was putting all the

24        paperwork that the doctors in Boston would

25        need in that envelope.
```

CARRIE L. LaROCHE
July 27, 2006

```
 1    Q.    Do you know -- did you watch the doctor put
 2          a group of paper -- a sheaf of papers and
 3          X-rays in that envelope?
 4    A.    No.
 5    Q.    At any point in time when you were on the
 6          plane to travel back to Boston did either
 7          Mrs. Hofer or you open that envelope to read
 8          about those things?
 9    A.    Nope.
10    Q.    Who had control of those documents?
11    A.    I did.
12    Q.    And when you arrived in Boston, you handed
13          those documents to Mr. Hofer and Mrs.
14          Pompei?
15    A.    Correct.
16    Q.    And that was the last that you saw of them,
17          correct?
18    A.    Correct.
19    Q.    You've told us a couple of times that when
20          Mrs. Hofer left to go have a cigarette and
21          was tapping on the window scaring the heck
22          out of you, that you had the news on?
23    A.    Uh-huh.
24    Q.    Do you remember that?
25    A.    Yes.
```



CARRIE L. LaROCHE
July 27, 2006

1   Q.   Was the news local Jamaican news, or was it

2        United States news?

3   A.   I don't remember.

4   Q.   Do you have a memory of whether the TV had

5        American programming or Jamaican

6        programming?

7   A.   It was American.

8   Q.   So, to the best of your knowledge, you were

9        not watching local Jamaican programming?

10                MS. MINCHOFF:   Objection.

11  A.   I don't know if it was local Jamaican

12       programming or not.  I could understand the

13       words that they were speaking.

14  Q.   Yeah, but you know how Jamaicans have that

15       fabulous accent.  Do you remember hearing

16       the television having people talking in that

17       Jamaican accent or were there Americans?

18  A.   I believe they were Americans.  I don't

19       remember having a hard time trying to

20       decipher with their accent.

21  Q.   So you don't remember whether you were

22       watching American news from some station

23       someplace in the United States or Jamaican

24       news?

25  A.   I can't say for sure either way.



CARRIE L. LaROCHE
July 27, 2006

```
 1   Q.   Your memory is, however, that there was some

 2        newscast on and it was after 11:00 p. -- and

 3        because there was a newscast on, that's why

 4        you think this took place at 11:00 p.m.?

 5                MS. MINCHOFF:  Objection.

 6   A.   Not necessarily, no.

 7   Q.   Do you remember specifically that you

 8        received a call sometime between 11:00 and

 9        11:30 p.m.?

10   A.   I don't know the specific time that the

11        phone call came in.

12   Q.   But is it the case that you're remembering

13        what time the phone call came in because you

14        thought that there was news on and news

15        comes on at 11:00?

16                MS. MINCHOFF:  Objection.

17   A.   Not necessarily.

18   Q.   How -- but when Mr. Reith asked you why do

19        you think it was on the 18th versus after

20        midnight on the 19th, you said, quote,

21        "Because the news was on," end quote?

22                MS. MINCHOFF:  Objection.

23   A.   Yes.

24   Q.   Okay.  And so is it the case that you're

25        relating the time of this incident to when
```



CARRIE L. LaROCHE
July 27, 2006

1          you were watching the news?

2    A.    I don't believe so, no.

3    Q.    All right.  So you remember specifically

4          looking at a clock or being aware of the

5          time when the call came in?

6    A.    I remember that -- it being after 11:00,

7          because I remember when the phone rang, I

8          remember thinking who's calling?

9    Q.    All right.  Do you -- and why is it that you

10         don't remember it being after 12:00?

11   A.    Because I would have remembered that.

12   Q.    Why?

13   A.    Because there's a big difference between

14         11:00 and 12:00.

15              MR. FERINGA:  All right.  I don't

16         have any other questions.

17              MR. REITH:  I just have one follow-

18         up, two follow-ups.

19

20                   REDIRECT EXAMINATION

21

22         BY MR. REITH:

23   Q.    We've talked a little bit about who was

24         on-site when you all arrived at the resort,

25         and I just want to ask you, did you see any


BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

CARRIE L. LaROCHE
July 27, 2006

```
1        representative from Expedia, Inc. or

2        Expedia.com at the Turtle Beach Towers

3        resort when you arrived?

4    A.  How would I know it's them?

5    Q.  The persons that you saw, though, at, let's

6        say, the lobby, you understood those persons

7        to be employees of Turtle Beach Towers,

8        though, correct?

9    A.  I couldn't tell you specifically who they

10       were employed by.  I walked in, and they

11       were behind the reception desk.  I didn't

12       ask them who was their employer.

13   Q.  Did anybody identify themselves to you as

14       being an employee of Expedia, Inc. while you

15       were on premises at Turtle Beach Towers?

16   A.  No.

17               MR. REITH:  That's all I have.

18       Thank you.

19               MS. MINCHOFF:  I have no questions.

20               MR. FERINGA:  We're off the record.

21               THE VIDEOGRAPHER:  Okay.  The time

22       is 2:19.  We are off the record.

23                   (Whereupon the deposition was

24                    concluded at 2:20 p.m.)

25
```



CARRIE L. LaROCHE
July 27, 2006

```
 1                    ATTACH TO THE DEPOSITION OF
                          CARRIE L. LaROCHE
 2      CASE:  HOFER  -VS-  THE GAP
 3                    ERRATA SHEET
 4      INSTRUCTIONS:  After reading the transcript
        of your deposition, note any change or
 5      correction to your testimony and the reason
        therefor on this sheet.  DO NOT make any
 6      marks or notations on the transcript volume
        itself.  Sign and date this errata sheet
 7      (before a Notary Public, if required).
        Refer to Page 210 of the transcript for
 8      errata sheet distribution instructions.
 9      PAGE    LINE
                     CHANGE:
10                   REASON:
                     CHANGE:
11                   REASON:
                     CHANGE:
12                   REASON:
                     CHANGE:
13                   REASON:
                     CHANGE:
14                   REASON:
                     CHANGE:
15                   REASON:
                     CHANGE:
16                   REASON:
                     CHANGE:
17                   REASON:
                     CHANGE:
18                   REASON:
                     CHANGE:
19                   REASON:
20
        I have read the foregoing transcript of my
21      deposition and except for any corrections or
        changes noted above, I hereby subscribe to
22      the transcript as an accurate record of the
        statements made by me.
23
24
                                           ___
25                    CARRIE L. LaROCHE      DATE
```



CARRIE L. LaROCHE
July 27, 2006

```
 1          In the United States District Court

 2          For the District of Massachusetts

 3

 4              I, Jessica L. Williamson, Registered,

 5          Merit Reporter, Certified Realtime Reporter

 6          and Notary Public in and for the

 7          Commonwealth of Massachusetts, do hereby

 8          certify that CARRIE L. LaROCHE, the witness

 9          whose deposition is hereinbefore set forth,

10          was duly sworn by me and that such

11          deposition is a true record of the testimony

12          given by the witness.

13              I further certify that I am neither

14          related to or employed by any of the parties

15          in or counsel to this action, nor am I

16          financially interested in the outcome of

17          this action.

18              In witness whereof, I have hereunto set

19          my hand and seal this 10th day of August,

20          2006.

21

22

23              Jessica L. Williamson, RMR, RPR, CRR

24              Notary Public, CSR No. 138795

25              My commission expires: 12/18/2009
```



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

CARRIE L. LaROCHE
July 27, 2006

1        DEPONENT'S ERRATA SHEET

2        AND SIGNATURE INSTRUCTIONS

3

4            The original of the Errata Sheet has

5        been delivered to India Minchoff, Esq.

6            When the Errata Sheet has been

7        completed by the deponent and signed, a copy

8        thereof should be delivered to each party of

9        record and the ORIGINAL delivered to Thomas

10       T. Reith, Esq. to whom the original

11       deposition transcript was delivered.

12

13                INSTRUCTIONS TO DEPONENT

14

15           After reading this volume of your

         deposition, indicate any corrections or

16       changes to your testimony and the reasons

         therefor on the Errata Sheet supplied to you

17       and sign it.  DO NOT make marks or notations

         on the transcript volume itself.

18       REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE

19       COMPLETED AND SIGNED ERRATA SHEET WHEN

20       RECEIVED.

21

22

23

24

25

