# HOFER, ET AL v. THE GAP, INC., ET AL

# FAYLIN MILLER

## August 21, 2006

*Prepared for you by*



**Bingham Farms** | Ann Arbor | Detroit | Flint | Grand Rapids | Jackson | Lansing | Mt. Clemens

PHONE: 248.644.8888    FAX: 248.644.1120

www.bienenstock.com

Dockets.Justia.com

FAYLIN MILLER
August 21, 2006

```
 1            IN THE DISTRICT COURT OF THE UNITED STATES

 2             FOR THE DISTRICT OF MASSACHUSETTS

 3

 4   STEPHANIE HOFER and DOUGLAS HOFER,

 5                  Plaintiffs,

 6       vs.                    Case No. 05-40170

 7   THE GAP, INC., EXPEDIA, INC.,

 8   and TURTLE BEACH TOWERS,

 9                  Defendants.

10   _____

11

12

13        The Videotaped Deposition of FAYLIN MILLER,

14        Taken at Turtle Beach Towers, Main Street,

15        Ocho Rios, St. Ann, Jamaica, W.I.,

16        Commencing at 10:02 a.m.,

17        Monday, August 21, 2006,

18        Before Rebecca J. Callow, CSR-5228, RPR.

19

20

21

22

23

24

25
```



FAYLIN MILLER
August 21, 2006

1    APPEARANCES:

2

3    STEPHEN J. KUZMA

4    Stephen Kuzma Law Office

5    75 Federal Street

6    Suite 17

7    Boston, Massachusetts  02110

8    (617) 338-3020

9        Appearing on behalf of the Plaintiffs.

10

11   INDIA L. MINCHOFF

12   Russo & Minchoff

13   123 Boston Street

14   Boston, Massachusetts  02125

15   (617) 740-7340

16       Appearing on behalf of the Plaintiffs.

17

18   SCOTT D. FERINGA

19   Sullivan, Ward, Asher & Patton, P.C.

20   25800 Northwestern Highway

21   Suite 1000

22   Southfield, Michigan  48037

23   (248) 746-0700

24       Appearing on behalf of the Gap, Inc.

25



FAYLIN MILLER
August 21, 2006

 1    THOMAS T. REITH

 2    Burns & Levinson, L.L.P.

 3    125 Summer Street

 4    Boston, Massachusetts  02110

 5    (617) 345-3000

 6        Appearing on behalf of Expedia, Inc.

 7

 8    ALSO PRESENT:

 9    Lynsey Williams - Video Technician

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



FAYLIN MILLER
August 21, 2006

1    Ocho Rios, St. Ann, Jamaica, W.I.,

2    Monday, August 21, 2006

3    10:02 a.m.

4

5                    MARKED BY THE REPORTER:

6                    DEPOSITION EXHIBIT NUMBERS 1-7

7                    10:02 a.m.

8                    VIDEO TECHNICIAN:  We are now on the record.

9        This is the videotape deposition of Fay Miller being

10       taken on Monday August 21st, 2006.  The time is now

11       10:02 and 11 seconds a.m.  We are located at the

12       Turtle Beach Towers in Ocho Rios Jamaica.  This

13       deposition is being taken on behalf of the defendants

14       in the matter of Stephanie Hofer and Douglas Hofer

15       versus The Gap, Incorporated; Expedia, Incorporated;

16       and Turtle Beach Towers.  This case number 05-40170

17       FDS.  This matter is being held in the United States

18       District Court for the District of Massachusetts.

19                    My name is Lynsey Williams, video

20       technician.  Will the court reporter swear in the

21       witness and the attorneys briefly identify themselves

22       for the record, please?

23                    FAYLIN MILLER,

24       was thereupon called as a witness herein, and after

25       having first been duly sworn to testify to the truth,



FAYLIN MILLER
August 21, 2006

1          the whole truth and nothing but the truth, was

2          examined and testified as follows:

3                    MR. FERINGA:  Scott Feringa appearing on

4          behalf of The Gap.

5                    MR. REITH:  Thomas Reith on behalf of

6          Expedia, Inc.

7                    MS. MINCHOFF:  India Minchoff for the

8          plaintiffs.

9                    MR. KUZMA:  Steven Kuzma for the plaintiff,

10         Stephanie Hofer.

11                   MR. FERINGA:  Good morning, Ms. Miller.

12    A.   Morning.

13                   MR. FERINGA:  Let the record reflect this

14         deposition is being taken pursuant to Notice and may

15         be used for all purposes as contemplated by the

16         Federal Rules of Civil Procedure and the Federal Rules

17         of Evidence.

18                   MR. KUZMA:  Before we begin, I just want to

19         make a statement that I don't believe consular

20         authority has been granted in the case, and we'd

21         object to the taking of the deposition on that ground.

22                   MR. FERINGA:  We've received consular

23         authority from the Consulate of Jamaica.

24                   MR. KUZMA:  Okay.  I'd like to see it.

25         That's all I need.



FAYLIN MILLER
August 21, 2006

```
 1                    MR. FERINGA:  I think we've provided that

 2          with the motion.  You saw that letter from the

 3          Consulate, from Jamaica.

 4                    MR. KUZMA:  If that's so, I waive my

 5          objection.

 6                    MR. FERINGA:  Let's go off the record.

 7          Somebody's at the door.

 8                    VIDEO TECHNICIAN:  We are going off the

 9          record.  The time is 10:04 and 7 seconds a.m.

10                    (Discussion off the record at 10:04 a.m.)

11                    (Back on the record at 10:05 a.m.)

12                    VIDEO TECHNICIAN:  Back on the record.  The

13          time is 10:05 and 37 seconds a.m.

14                    MR. FERINGA:  Just back on the record in

15          response to Mr. Kuzma's objection, we had supplied

16          with a petition to the Court as Exhibit D, a letter

17          that was faxed to us from the Embassy of Jamaica on 27

18          July 2006 from Mr. Cythe, C-y-e-t-h, Denton, first

19          secretary/consul, advising that the Embassy -- that

20          Jamaica has no objection to the taking of the

21          depositions here.  So we'll use that as part of the

22          record.

23                         EXAMINATION

24    BY MR. FERINGA:

25     Q.   Can you give us your full name, please?
```



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

FAYLIN MILLER
August 21, 2006

```
 1    A.    I'm Faylin, F-a-y-l-i-n.  Miller, M-i-l-l-e-r.

 2    Q.    Mrs. Miller, we were introduced before we started this

 3          deposition.  My name is Scott Feringa.  I'm going to

 4          be asking you some questions today.  The ladies here

 5          will be taking down everything that we say.

 6    A.    Sure.

 7    Q.    Additionally, it's a fairly artificial way of talking,

 8          because two of us can't talk at the same time.  That

 9          way, if we talk at the same time, our court reporter

10          will not be able to take us down both together.  So if

11          you can wait until I'm finished and I'll wait until

12          you're finished, that will be translated well on our

13          record then, please.

14    A.    Okay.

15    Q.    Additionally, Mrs. Miller, if you have any questions

16          about what I have asked you, if I'm unclear in any

17          way, please tell me and I'll be more than happy to

18          rephrase the question.  All right, ma'am?

19    A.    Sure.

20    Q.    Mrs. Miller, we're at the Turtle Beach Towers in Ocho

21          Rios, Jamaica.  Is that correct?

22    A.    Yes, we are.

23    Q.    And, Mrs. Miller, what is your position here?

24    A.    I'm general manager for the apartments.

25    Q.    And how long have you been general manager for the
```



FAYLIN MILLER
August 21, 2006

```
 1        apartments, Mrs. Miller?

 2   A.   28 years.

 3   Q.   Mrs. Miller, what do your job duties entail?  What to

 4        you do as general manager for the apartments?

 5   A.   Well, I oversee staff members of 32.  I oversee -- I'm

 6        the manager for each apartment.  There is a pool,

 7        rented pool.  I actually manage the front desk, manage

 8        the operations of the rooms, Turtle Beach rooms, for

 9        rentals.

10   Q.   All right.  You are here voluntarily to give testimony

11        with respect to a case, a matter that occurred at

12        Turtle Beach Towers on March 18 and 19, 2004.  Is that

13        correct?

14   A.   Yes.

15   Q.   And you and I have spoken on the phone?

16   A.   Yes, we have.

17   Q.   We've arranged this through your good offices by

18        e-mail with you.  Correct?

19   A.   Yes.

20   Q.   Have you spoken with anyone else about this case?

21   A.   No.

22   Q.   Have you spoken with Ms. Minchoff or Mr. Kuzma?

23   A.   No.  Who sent me the e-mail?  You sent me the e-mail.

24   Q.   I did.

25   A.   Yeah.
```



FAYLIN MILLER
August 21, 2006

```
 1   Q.   The towers that we're involved in, how many towers are

 2        there?

 3   A.   There are four towers.

 4   Q.   And then where they first built?  Do you know?

 5   A.   Oh, they are, I would say, 40 years old.

 6   Q.   The reception area, is that at Tower Number 4?

 7   A.   It is.

 8   Q.   And is that the location where guests actually check

 9        in?

10   A.   Yes.  That's right.

11   Q.   I'm going to show you what we have marked as Exhibit

12        Number 1.  And this a photograph of Tower 4 and the

13        reception area.  This is the same photograph that has

14        been used at the deposition of Ms. LaBelle and

15        Mrs. Hofer.

16             MR. FERINGA:  Counsel?

17             MR. KUZMA:  I object to the form.

18   BY MR. FERINGA:

19   Q.   Is this is a photograph of Tower Number 4 and the

20        reception area?

21   A.   Yes, it is.

22             MR. KUZMA:  Objection.

23   BY MR. FERINGA:

24   Q.   And will you hold that up for the camera?  Now, with

25        respect to that photograph, where is the reception
```



FAYLIN MILLER
August 21, 2006

```
 1        area located?

 2   A.   Inside the lobby.  Inside here.  Open the door and you

 3        go in.  It's right in there.

 4   Q.   And in March of 2004, was the reception area in that

 5        same location?

 6   A.   That's never changed for 30 years.

 7   Q.   Okay.  So the photograph that --

 8             MR. KUZMA:  Objection.  Move to strike.

 9   BY MR. FERINGA:

10   Q.   So the photograph that you have in front of you is an

11        accurate representation of how the property looked in

12        March of 2004?

13   A.   Exactly.

14             MR. KUZMA:  Objection to the form.

15   BY MR. FERINGA:

16   Q.   Now you can answer.

17   A.   Exactly.

18   Q.   Now, how many steps lead up to the landing?

19   A.   Three.

20   Q.   If you look in the picture.

21   A.   One, two.  Two.

22   Q.   Two.  And if you show that the -- to all of us,

23        please.

24             The doors -- if you can keep that photograph

25        up, Mrs. Miller, if you could.  The doors, is there a
```



FAYLIN MILLER
August 21, 2006

```
 1        single door or two doors?

 2   A.   Two doors.

 3   Q.   And has it always been two doors?

 4   A.   Always been two doors.

 5   Q.   There is in the right side of that photograph a bench.

 6        You're familiar with that bench?

 7   A.   Yes, I do.

 8   Q.   How long has that bench been there?

 9   A.   For 20, 30 years.  20 years.

10   Q.   As long as you can --

11   A.   -- can remember, yes.

12   Q.   And in back of that bench, what is there?

13   A.   A turtle pond.

14   Q.   How long has that turtle bond pond been there?

15   A.   It has been there the same, about 20 years.

16   Q.   Is there any other turtle pond on the property of

17        Turtle Beach Towers?

18   A.   No.  No.  Never been.

19   Q.   And on March 18, was this the same -- strike that.

20             On March 18, was there any difference in the

21        turtle pond as --

22   A.   No.

23             MR. KUZMA:  Objection.

24   BY MR. FERINGA:

25   Q.   Was there any difference in the turtle pond?
```



FAYLIN MILLER
August 21, 2006

 1   A.   No.

 2                   MR. KUZMA:   Objection.

 3   BY MR. FERINGA:

 4   Q.   Now, I'm going to show -- you can put that one down.

 5   A.   Okay.

 6   Q.   I'm going to show you --

 7                   MS. MINCHOFF:   Scott, did you make

 8          photographs -- I mean, copies for us?

 9                   MR. FERINGA:   I didn't.   I apologize.

10   BY MR. FERINGA:

11   Q.   I'm going to show you what I've marked as Exhibit

12          Number 2.

13                   MR. FERINGA:   Counsel?

14                   MR. KUZMA:   Yes.

15                   MR. REITH:   Thank you.

16   BY MR. FERINGA:

17   Q.   And this is -- can you tell us what that photograph

18          is?

19   A.   This is the reception area doors, the car parking, the

20          turtle pond, this is the bench, the same steps that go

21          up.

22   Q.   Okay.   You can show that to the members of the jury.

23          Thank you.

24                   And that's a close-up -- a closer shot than

25          Exhibit Number 1.   Correct?



FAYLIN MILLER
August 21, 2006

```
 1                    MR. KUZMA:  Objection.

 2   BY MR. FERINGA:

 3   Q.   "Yes"?

 4   A.   Yes.  Yes.

 5   Q.   And are those steps the same as they were in March of

 6        2004?

 7   A.   Yes, it is.  Never changed.

 8   Q.   Okay.  Thank you.

 9                    The reception area, Mrs. Miller, is that

10        something that is staffed all of the time?

11   A.   24 hours.

12                    MR. KUZMA:  Objection.

13   BY MR. FERINGA:

14   Q.   How long -- how many hours in the day is the reception

15        area staffed?

16   A.   Okay.  You have one at 7:30 gets off at 3:30, and one

17        would be at 3:30 and get off at 11:30, and one is on

18        11:30 to 7:30.

19   Q.   So is there ever a time when the reception area is not

20        staffed?

21   A.   No.  Not at all.  Never.

22   Q.   And was that true in March of 2004, Mrs. Miller?

23   A.   Oh, they were always there staffed.  Three staff.

24   Q.   With respect to the glass doors that we see in either

25        Exhibits 1 or 2, Mrs. Miller, are those doors ever
```



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

FAYLIN MILLER
August 21, 2006

```
 1       locked?

 2   A.   No.

 3   Q.   And from the reception desk, can the person at the

 4        reception desk see through the glass doors?

 5   A.   Yes.

 6   Q.   At one point in time, did you employ a Shian Nelson?

 7   A.   Yes.

 8   Q.   And was Shian Nelson employed as a -- at least a front

 9        desk manager in 2004?

10   A.   She was a receptionist, and then Stewart [sic] was the

11        night auditor, and he stays all night.  Night

12        auditor/manager.

13                  MR. KUZMA:  Who is?

14   A.   Denroy.

15   BY MR. FERINGA:

16   Q.   Denroy Scarlett?

17   A.   Scarlett.  Yes.

18   Q.   So in March of 2004, in March of 2004, was Shian

19        Nelson the receptionist during the day?

20   A.   From 3:30 to 11:30.

21   Q.   And then the night manager would have been a --

22   A.   From 11:30 --

23   Q.   -- Mr. Denroy Scarlett?

24   A.   From 11:30 to 7:30.

25   Q.   Let me show you what we have marked as Exhibit Number
```



FAYLIN MILLER
August 21, 2006

```
 1        3, and ask you to tell us what this photograph is,

 2        please?

 3   A.   This is the same front desk area for Tower Number 4.

 4   Q.   And is this just taken from a different view from

 5        Exhibits 1 and 2?

 6   A.   Apparently, because I see the pedestrians here.  We

 7        have flowers in the other section, the other side of

 8        this sign.

 9   Q.   All right.  If we can show the members of the jury.

10             That shows two concrete benches?

11             MR. KUZMA:  Objection.

12   BY MR. FERINGA:

13   Q.   Does that show concrete benches in that photograph?

14   A.   Yes.

15   Q.   Beyond the bench that's sort of in the middle of

16        photograph, is there a turtle pond in back of that?

17   A.   No.  Never.

18   Q.   And where your left hand is, Mrs. Miller, what is that

19        section?

20   A.   That's just like a garden that we have some flowers

21        at.

22   Q.   And was this the same configuration as it was in March

23        of 2004?

24   A.   It was.  Nothing has changed.

25   Q.   And I'm going to show you what I have marked as
```



FAYLIN MILLER
August 21, 2006

 1          Exhibit Number 4.  Can you tell us what that

 2          photograph is?

 3     A.   That's the front desk area.

 4     Q.   And does it show any evidence of a turtle pond?

 5     A.   Yes.  Right here.

 6     Q.   Can you show it to the members of the jury?

 7               So what you're pointing to with your finger

 8          is the turtle pond.

 9     A.   The turtle pond.  Correct.

10     Q.   Thank you.

11               MR. REITH:  If you don't mind me asking,

12          Scott.

13               If you don't mind, Ms. Miller, if you can

14          speak up just a little bit.

15     A.   Okay.

16               MR. REITH:  We want to make sure we get it.

17          My hearing must be shot from the flight, so...

18     A.   Okay.

19               MR. REITH:  Thank you.

20     BY MR. FERINGA:

21     Q.   And I'm just going to show you what we've marked as

22          Exhibit Number 5, and ask whether you can identify

23          that photograph as well.

24     A.   That's the turtle pond.

25     Q.   And is this the -- was this turtle pond the same as it



FAYLIN MILLER
August 21, 2006

```
 1        was in 2004?

 2   A.   It is.

 3   Q.   Thank you.

 4   A.   It was.

 5   Q.   I'm going to show you what has been marked at a

 6        previous deposition as Hofer Exhibit Number 5, and

 7        it's a drawing that Ms. Hofer made in her deposition

 8        in March -- I mean, on June 29, 2006, and purported to

 9        be the layout of the lobby and turtle pond area.

10   A.   There was not two turtle ponds, just one.

11   Q.   And my question is --

12              MR. KUZMA:  I move to strike.

13   BY MR. FERINGA:

14   Q.   The question I have, Mrs. Miller, is is this an

15        accurate representation of what the property was like

16        on March 18, 2004?

17   A.   No.  It hasn't been changed from that.

18   Q.   Can you --

19   A.   No.  It has not been changed.  This is not.  This is

20        saying one, two, three, steps there, not four steps.

21        This is saying two turtle ponds, we only had one

22        turtle pond.

23   Q.   And in terms of the door area, if it has been

24        represented by Ms. Hofer that that door was a single

25        glass door, was that --
```



FAYLIN MILLER
August 21, 2006

1    A.    No.  Two doors.

2    Q.    Two doors.

3    A.    The way it was built.  That's the way it was built.

4          Two doors.

5    Q.    There's also been testimony by Ms. Hofer that the

6          walls of the turtle pond itself and the edge of the

7          turtle pond was made of stone and jagged stone.

8    A.    No.

9    Q.    Is that accurate?

10   A.    No.  That's not.  No stones there.  It's just like

11         this.

12               MR. KUZMA:  I object and move to strike.

13   BY MR. FERINGA:

14   Q.    It's what --

15   A.    No.  It was -- there was no stones there.

16   Q.    And if you could just pick up the Exhibit Number 5.

17   A.    It was just like this.  It has never been like this.

18   Q.    And I'm going to show you what has been marked at a

19         previous deposition as LaRoche Deposition Exhibit

20         Number 1.  This was a drawing by what -- a lady whose

21         name was "LaBelle" at the time, now "LaRoche."  Is

22         that an accurate representation of the condition of

23         the property on March 18?

24               MR. KUZMA:  Objection.

25   A.    It's not.



FAYLIN MILLER
August 21, 2006

```
 1   BY MR. FERINGA:

 2   Q.   All right.  And what's -- if you show the camera, what

 3        is different about this than what actually occurred?

 4               MR. KUZMA:  Objection.

 5   A.   We have two doors, we have two steps, we have one

 6        turtle pond, and these are like a garden.

 7   BY MR. FERINGA:

 8   Q.   Okay.  So where --

 9   A.   And this is a bench.  Yes.  This is the walkway.

10   Q.   Where Ms. now LaRoche says that there are one, two,

11        three, four stairs leading up to a single door, is

12        that accurate or not accurate?

13   A.   No --

14               MR. KUZMA:  Objection.

15   A.   -- it's not.  It was two steps.

16   BY MR. FERINGA:

17   Q.   You can place those down.

18               As part of your job responsibilities, are

19        you required or do you investigate incidents that

20        occur within rentals?

21   A.   I do.

22   Q.   And is that something that you have done over the

23        years that you've served as general manager?

24   A.   Yes, I have.

25   Q.   And do you prepare reports as part of your normal
```



FAYLIN MILLER
August 21, 2006

```
 1        course of business?

 2   A.   Yes, I do.

 3   Q.   And do you send those to your superiors?

 4   A.   Strata.  The Strata.  There is Strata corporation, so

 5        the Strata is for the grounds and -- for the grounds.

 6        So I have to send a letter to the Strata, which I did.

 7   Q.   "Strata" is spelled how?

 8   A.   S-t-r-a-t-a.  Strata Number 7.

 9   Q.   And it's part of your job responsibilities -- if there

10        is an incident that occurs outside on the grounds, is

11        it your responsibility then to investigate that and

12        send a report?

13   A.   Yes, I do.

14   Q.   And the report, is that done in the normal course of

15        business for you?

16   A.   It is.

17   Q.   In fact, did you conduct an investigation with respect

18        to the incident that occurred on March 18, 2004,

19        Ms. Miller?

20   A.   Yes, I did.

21   Q.   Do you remember this incident?

22   A.   Yes, I do.

23   Q.   With respect to this incident, Mrs. Miller, how, in

24        fact, were you first notified that some sort of

25        incident took place?
```



FAYLIN MILLER
August 21, 2006

1   A.   I was called at home on the telephone at about

2        midnight or thereabout to say that a guest -- she was

3        sitting in the turtle pond earlier in the evening.

4        She was in Tower Number 1.  Her room was in Tower

5        Number 1, which is way over there; and that is Tower

6        4.  She went in the turtle pond, was sitting in it.

7        She was told by both guests and staff that she should

8        not sit in the pond.  And she said she wanted one of

9        the turtles to take to her apartment.  I was told that

10       they were -- receptionist told her, that is Shian,

11       told her this could not be, she should get out of

12       there, because they would bite.  Would bite here.

13               MR. KUZMA:  I'm sorry.  I didn't get who you

14       said.

15               MR. FERINGA:  Shian.

16  A.   Shian.

17               MR. KUZMA:  Shian.  Okay.  Continue.

18  A.   Yes.  Right.  They would bite.  I also have guests who

19       told me, from Canada, who has actually deceased now,

20       she had cancer and is deceased, who told me that she

21       went to her and told her that it was not appropriate

22       for her to sit in the pond with the turtles; they're

23       there for attractions.

24  BY MR. FERINGA:

25  Q.   Mrs. Miller, who was the first one that called you at



FAYLIN MILLER
August 21, 2006

```
 1        about midnight?

 2   A.   The night auditor.

 3   Q.   And is that who, please?

 4              MR. KUZMA:  I'd object to that answer and

 5        move to strike.

 6   BY MR. FERINGA:

 7   Q.   Go ahead.

 8   A.   Denroy Scarlett.

 9   Q.   And what -- and Mr. Scarlett was someone under your

10        direction and control and supervision?

11   A.   Yes.

12   Q.   And was it part of his job responsibilities to contact

13        you, Mrs. Miller.

14   A.   Yes, it was, and he did.

15   Q.   What did he tell you on the telephone, please?

16              MR. KUZMA:  Objection.

17   A.   He told me that a guest was in the turtle pond.  She

18        fell in the turtle pond, and she's bleeding.  I

19        instructed him to get a cab -- taxicab and send her

20        directly to the hospital.

21   BY MR. FERINGA:

22   Q.   Did you arrive at the -- did you come from your house

23        to the property that evening?

24   A.   At 12:30, no, in the night.  No, I did not.

25   Q.   And when did you -- did you have any other
```



FAYLIN MILLER
August 21, 2006

```
 1        communications that evening with Mr. Scarlett or

 2        anyone else from Turtle Beach Towers about this

 3        particular incident?

 4   A.   No.  Just the morning I come into work, I got the

 5        report from him.  I spoke to him in the office.  I

 6        also called the roommate to find out what was

 7        happening, if she was back here.  She told me no, she

 8        was going down to the hospital to look for her, to see

 9        her.  I asked her as soon as she's back to give me a

10        report on her conditions.

11                 When I -- when she did, she came to my

12        office, and she told me that she -- they would have to

13        be flying her out because her ligaments were torn, and

14        she's making arrangements for flying her out.

15   Q.   When you came to the office that morning, which would

16        have been the morning of March 19, you talked to

17        Mr. Scarlett again?  Mr. Denroy Scarlett?

18   A.   Yes.  Yes.  Yes.  Yes, I did.

19   Q.   And did he tell you anything more about what had

20        occurred that previous evening?

21   A.   Yes.  He said that she was drunk, was his words, and

22        she was -- they were playing with the turtles.  And

23        they were -- she was warned not to do so, and she said

24        she wanted one to take back her to her room to put in

25        her bathtub.  And she slipped and he called a taxi,
```



FAYLIN MILLER
August 21, 2006

 1       the guy at the gate, the security guard, and he got a

 2       taxi and he sent her off to the hospital because she

 3       was bleeding very badly.

 4              MR. KUZMA:  Objection.  Move to strike.

 5   BY MR. FERINGA:

 6   Q.   Did you have any conversations with Shian Nelson?

 7   A.   Yes.  Shian was the one who told me that from the

 8       evening she came playing in the water --

 9              MR. KUZMA:  Objection.

10   A.   -- playing with turtles, and she was told not to.

11   BY MR. FERINGA:

12   Q.   All right.  And did you conduct this investigation as

13       part of your investigation?

14   A.   Yes.  Yes, I did.

15   Q.   I'm going to show you what we have marked as some

16       group exhibits and ask whether you -- first, this will

17       be 6A, 6B, and 6C.  6A, is at the top, 6B is second,

18       and 6C is third.

19              I'm just going to direct your attention to

20       what I've marked as Exhibit 6B.  Are you familiar with

21       this document?

22   A.   Yes, I am.

23   Q.   And what is this document?

24   A.   It's the reservation from Expedia.

25   Q.   And is this a document that you have -- that exists in



FAYLIN MILLER
August 21, 2006

 1      your files with respect to Ms. LaBelle and Ms. Hofer?

 2  A.   Yes.  This is what I had.

 3  Q.   And this document is kept in your ordinary course of

 4       business?

 5  A.   Yes, it is.

 6  Q.   Now, this indicated -- strike that.

 7            What date does this indicate that the trip

 8       was booked on?

 9  A.   On the 18th.

10  Q.   On the 18th or --

11  A.   Check-in on the --

12            MR. KUZMA:  Objection.

13  BY MR. FERINGA:

14  Q.   In the upper -- in the right-hand section, there's a

15       section that says "booked on."

16  A.   Yeah.  Right there.

17  Q.   And what does that say?

18  A.   It says checked in --

19            MR. KUZMA:  Objection.

20  BY MR. FERINGA:

21  Q.   I'm looking at this section.  Here.

22  A.   Oh, that's the booking number.  The 15 -- they book on

23       the 15th of the 3rd.

24  Q.   15th of March?

25  A.   Yes.  That's when they made the reservation.  The



FAYLIN MILLER
August 21, 2006

```
 1        reservation was made.

 2   Q.   And then it was for check-in on, then, what date?

 3   A.   On the 18th.

 4   Q.   And does it say who the individual is who is the

 5        guest?

 6   A.   Right.

 7   Q.   And who is that?

 8   A.   It was this Lynn LaBelle, because I had problems when

 9        I heard of the name to find her.  She wasn't named --

10   Q.   Because when you heard the name "Hofer" --

11                MR. KUZMA:  Objection.  Move to strike.

12   A.   Yes.

13   BY MR. FERINGA:

14   Q.   Okay.  So the guest is listed here as Carrie Lynn

15        LaBelle?

16   A.   Right.

17   Q.   Okay.  And there's some writing on this.  Can you say

18        what that says?

19   A.   "Request twin beds, 0/use, Expedia.  Studio."

20   Q.   And there's a telephone number there.  What's that

21        telephone number?

22   A.   360-4972.

23   Q.   Do you know what that goes to?

24   A.   No.

25   Q.   Okay.  Then will you go to the 6C.  What is this
```



FAYLIN MILLER
August 21, 2006

```
 1         document here?
 2    A.   Okay.  Ms. LaBelle is the one who registered.
 3    Q.   What is this document called?
 4    A.   It's a registration card.
 5    Q.   Okay.  And this indicates that the room is registered
 6         under the name of?
 7    A.   Right.  LaBelle.
 8    Q.   Okay.  And on the left-hand side where there's
 9         writing, is that writing that is generally filled out
10         by a guest or by someone in the office?
11    A.   No.  This was written by me after she had the
12         accident.  Not having her name, I called Ms. LaBelle
13         after she went home just to find out how she was
14         doing.  When Ms. LaBelle gave me her telephone --
15         Ms. Hofer's telephone number, which I called her while
16         she was there to find out how she was progressing.
17    Q.   The first portion of my question, then maybe I was
18         unclear, and I apologize, Mrs. Miller.
19    A.   Okay.  All right.  That's all right.
20    Q.   Where the has the name, street, telephone, number
21         nationality, is that filled out by a member of your
22         staff or by the guest?
23    A.   No.  By the guest.
24    Q.   Okay.  And then there's a section that says -- that
25         appears to have the name "Stephanie"?
```



FAYLIN MILLER
August 21, 2006

1   A.   Yes.

2   Q.   And then there's a telephone number?

3   A.   Right.

4   Q.   Is that the -- is that filled out by Stephanie or is

5        that filled out by someone else?

6   A.   No.  I was the one who wrote this here, that I could

7        get -- after calling Ms. LaBelle to find out, she gave

8        me this number to say I could speak to her directly.

9        So I did, and I called her to find out how she was.

10              MR. KUZMA:  Objection.  Move to strike.

11        And, by the way, what exhibit is this?

12              MR. FERINGA:  This is 6C.

13              MR. KUZMA:  Okay.

14  BY MR. FERINGA:

15  Q.   Mrs. Miller, with respect to your own investigation,

16       at some point in time, you attempted to call and, in

17       fact, did call Mrs. Hofer?

18  A.   Yes, I did call her.  This is her number.

19  Q.   Okay.  The right side of this document where it says

20       "For Official Use Only," Mrs. Miller, who is that

21       filled in by?

22  A.   It is filled in by the front desk.

23  Q.   And do you recognize who the clerk was who checked in?

24  A.   This is Shian.

25  Q.   Shian Nelson?



FAYLIN MILLER
August 21, 2006

 1   A.   Yes.

 2   Q.   Is that right?

 3   A.   That's Denroy -- I think this is Denroy's, and...

 4   Q.   Do you recognize it?

 5   A.   The signature, it says "Nelson."  Yes.  Shian's

 6        signature.

 7   Q.   Okay.  Is Shian no longer in your employ?

 8   A.   No, she's not.

 9   Q.   And how long has she been gone from your employ?

10   A.   Since about two years, I think.  About that.

11   Q.   Okay.  I'm going to ask you to look at Exhibit 6A.

12        And with respect to Exhibit 6A, can you tell us what

13        this is, please?

14   A.   Okay.  This is -- this gentleman is the Strata

15        manager.  Dalkeith Lonsdale, who is in charge of the

16        Strata, the general manager for the Strata, so I had

17        to make a report.  This is the report I made to him re

18        the accident.

19   Q.   And was this report conducted after you conducted your

20        investigation?

21   A.   Yes, it is.

22             MR. KUZMA:  Objection.

23   BY MR. FERINGA:

24   Q.   And did you do this report in the ordinary course of

25        your business?



FAYLIN MILLER
August 21, 2006

1    A.    I did.

2    Q.    And this report was done by you?

3    A.    Yes, it is.

4    Q.    And you are a person whose job it is to make such

5          reports.  Is that right?

6    A.    Yes.

7                  MR. KUZMA:  Objection.

8    BY MR. FERINGA:

9    Q.    In terms of your investigation, did you have any

10         information from any of your employees at the time

11         that this incident occurred because there was some

12         broken footwear that caused Ms. Hofer to fall?

13   A.    No, I did not.

14   Q.    In any of the conversations that you had either with

15         Mr. Scarlett or Ms. Nelson or with Ms. Hofer, when you

16         had the conversation with Mrs. Hofer, did you have any

17         conversation in which it was related to you that the

18         cause of this incident was broken footwear?

19   A.    No --

20                  MR. KUZMA:  Objection.

21   A.    -- I did not.

22   BY MR. FERINGA:

23   Q.    Did you receive any information from any source that

24         it was claimed by Mrs. Hofer that a part of the reason

25         for the fall was because of poor lighting conditions?



FAYLIN MILLER
August 21, 2006

```
 1  A.   No --

 2                  MR. KUZMA:  Objection.

 3  A.   -- I did not.  No.

 4  BY MR. FERINGA:

 5  Q.   Did you receive any information from any source that

 6       one of the claimed causes of the accident was the lack

 7       of a guardrail or a handrail on the staircase?

 8  A.   No --

 9                  MR. KUZMA:  Objection.

10  A.   -- I did not.

11  BY MR. FERINGA:

12  Q.   In terms of your position as general manager -- or as

13       manager of the Turtle Beach Towers, did you come to

14       the conclusion as to how this accident occurred?

15                  MR. KUZMA:  Objection.

16  A.   Yes.  Because I was told that she was drunk, she was

17       intoxicated, and she went back to the room, came back

18       a second time when the accident occurred.

19  BY MR. FERINGA:

20  Q.   It says in your report, which we've marked as Exhibit

21       6A, that you had a telephone conversation with

22       Mrs. Hofer on March 31st.  Is that correct?

23  A.   Yes.

24                  MR. KUZMA:  Objection.

25  BY MR. FERINGA:
```



FAYLIN MILLER
August 21, 2006

```
 1   Q.   In that telephone conversation, what did Mrs. Hofer

 2        tell you?

 3   A.   That she spent ten days in the hospital and her

 4        ligaments were torn, and that -- you know, it's going

 5        to be hard for her to be walking again.

 6   Q.   In the telephone conversation that you had with

 7        Mrs. Hofer on March 31, Mrs. Miller [sic], was there

 8        any statement by Mrs. Miller that the accident

 9        occurred because of broken footwear?

10   A.   No.

11                  MR. KUZMA:   Objection.

12   BY MR. FERINGA:

13   Q.   Did she blame the condition of Turtle Beach Towers for

14        the fall?

15   A.   No.

16   Q.   Did she say anything about the accident at all?

17   A.   No.  She just...

18   Q.   Did you have any further communications with

19        Mrs. Hofer after March 31?

20   A.   No, I did not.

21   Q.   Did you have any further communications with the lady

22        who was identified as the guest, Ms. LaBelle?

23   A.   No, I did not.

24   Q.   Have you filed any other reports?

25   A.   No, I did not.
```



FAYLIN MILLER
August 21, 2006

```
 1                    MR. FERINGA:  Move for admission of Exhibits
 2         1 through 6C.  I have no other questions.
 3                    MR. KUZMA:  Note my objections.
 4                    Do you have any questions, Tom?
 5                    MR. FERINGA:  We need to go off the record.
 6                    VIDEO TECHNICIAN:  We're going off the
 7         record.  The time is 10:37 and 27 seconds a.m.
 8                    (Recess was taken at 10:37 a.m.)
 9                    (Back on the record at 10:38 a.m.)
10                    VIDEO TECHNICIAN:  We are back on the
11         record.  The time is 10:38 and 50 seconds a.m.
12                    MS. MINCHOFF:  No questions.
13                    MR. REITH:  Excuse me.  Thomas Reith for
14         Expedia, Inc.  I have no questions at this time.  I
15         will reserve to the extent something comes up at this
16         point after Ms. Kuzma inquires.
17                                    EXAMINATION
18    BY MR. KUZMA:
19    Q.   Good morning, again Ms. Miller.
20    A.   Good morning.
21    Q.   My name is Stephen Kuzma.  I represent Stephanie Hofer
22         and her husband in the case.
23                    Do you still have the photographs in front
24         of you that Mr. Feringa showed you?
25    A.   Which of them?
```



FAYLIN MILLER
August 21, 2006

```
 1   Q.   I'm sorry?

 2   A.   Which of them?

 3   Q.   The photographs that you have in your left hand, do

 4        you still have those that he showed you?  You still

 5        have them?

 6   A.   Yes.  Yes, I do.

 7   Q.   Okay.  How long have you worked here?

 8   A.   For 30 years.

 9   Q.   30 years.  And fair to say that you've walked up and

10        down those stairs that we see in those photographs --

11   A.   Every day.

12   Q.   -- thousands of times?

13   A.   Every day of the week.  I'm here seven days of the

14        week.

15   Q.   So you've walked up and down those --

16   A.   Yes.

17   Q.   -- and you're very familiar with those stairs and the

18        entryway?

19   A.   Yes, I am.

20   Q.   When Mr. Feringa asked you how many steps lead up to

21        the landing, you first said three steps.  Correct?

22   A.   Yes, but I have -- yes, but --

23   Q.   You did say three.  Right?

24   A.   Yes, I did say three.

25   Q.   Okay.  And then you changed your answer to two.
```



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

FAYLIN MILLER
August 21, 2006

```
 1        Correct?

 2   A.   I know it's two, but, you know, walking up, three.

 3        Yes.

 4   Q.   So you changed your answer from three steps to two.

 5        Correct?

 6   A.   Uh-huh.  Yes.

 7   Q.   And, again, it's fair to say that you're very familiar

 8        with --

 9   A.   Yes, I am.

10   Q.   -- those stairs?

11   A.   Yes, I am.

12   Q.   All right.  And you're very familiar with the

13        reception --

14   A.   Yes, I am.

15   Q.   -- area beyond those stairs?

16   A.   Yes.

17   Q.   And as to enter the lobby, there's a reception desk on

18        the left-hand side of the lobby.  Correct?

19   A.   Yes.

20   Q.   And on the right-hand side of the lobby there's seats?

21   A.   Yes.

22   Q.   From the vantage point behind the reception desk, is

23        it fair to say that you can't see the turtle pond

24        which is shown in those photographs?

25   A.   No.  But there's a glass with the mirror there, or
```



FAYLIN MILLER
August 21, 2006

```
 1          picture on the wall.  You can stand at that desk and
 2          you see anybody coming from that angle.
 3     Q.   All right.  My question is not whether you can see
 4          anyone coming from that angle, but can you see the
 5          turtle pond from behind the reception desk through
 6          that mirror down below.  Can you see it?
 7     A.   No.  No.
 8     Q.   Thank you.  Is it fair to say, Ms. Miller, that you
 9          try to maintain a safe resort?
10     A.   Yes, I do.
11     Q.   And you feel that you do maintain a safe resort?
12     A.   Yes, I do.
13     Q.   So if any stairs were chipped, that would not be a
14          safe condition.  Correct?
15     A.   Right.
16     Q.   You would agree with that?
17     A.   I would.
18     Q.   You've stated to counsel that you conducted an
19          investigation.  Correct?
20     A.   Yes, I did.
21     Q.   How many times over the course of your employment
22          history here have you conducted an investigation
23          regarding an accident which occurred here?
24     A.   We've not had an accident.  This is the first major
25          report we have.
```


BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

FAYLIN MILLER
August 21, 2006

```
 1   Q.   This is the first in 28 years?

 2   A.   Yes.  Uh-huh.

 3   Q.   So is it fair --

 4   A.   You will have like little things like in the room like

 5        they bump their feet beet on the table, they bounce

 6        off the glass of the table or something.  But away

 7        from that, this is the biggest major one I've ever

 8        had.

 9   Q.   All right.  Is it fair to say that based upon your

10        testimony anyway that this was the first accident of

11        this type --

12   A.   Yes.

13   Q.   -- that this is the first investigation that you've

14        conducted.  Correct?

15   A.   No.  I have like daily reports that I have to make, if

16        something happened.  Like, as I said, if a glass is

17        broken, if somebody walk like in the glass door or

18        something like that, then I have to make a report.

19   Q.   I specifically asked you whether this is your first

20        investigation.  Do you understand me?

21   A.   Um-hmm.

22   Q.   "Yes"?

23   A.   No.  I investigate other cases.  Yes.  Other cases I

24        have.

25   Q.   But this is the first type of --
```



FAYLIN MILLER
August 21, 2006

 1   A.   Major one, yes.

 2   Q.   And this is the first major investigation that you

 3        yourself have conducted.  Fair to say?

 4   A.   Yes.

 5   Q.   Do you have any training in accident investigation?

 6   A.   Like what training?

 7   Q.   Any training.

 8   A.   First aide or something like that?

 9   Q.   Interviewing witnesses.  Do you have any training?

10   A.   Yes, I do, like --

11   Q.   Where did you get that training?

12   A.   From school.  My schooling.

13   Q.   What school?

14   A.   I went to the management technical school.

15   Q.   When was that, ma'am?

16   A.   That's about 50 years ago.

17   Q.   Fifteen?  Fifty?

18   A.   40, 50 years ago.  I'm 60.  Yes.

19   Q.   Okay.  All right.  Since that time, have you had any

20        further training in accident investigation?

21   A.   No, I haven't.

22   Q.   Have you had any further education in interviewing

23        witness to an accident?

24   A.   No.  Just the basic day-to-day.  You have a basic

25        day-to-day guest coming in with complaints and you



FAYLIN MILLER
August 21, 2006

1          have to do that sort of a...

2     Q.   Is it fair to say, Ms. Miller, that you have no

3          personal knowledge -- personal knowledge -- about how

4          this accident occurred?

5     A.   Well, I was told by my staff.  I was told by my two

6          staff what took place.

7     Q.   Is it fair to say that you were not there at the time

8          of the accident?

9     A.   I was not there.  It was 12:30.  I was home.

10    Q.   Is it fair to say, Ms. Miller, that everything that's

11         in your report consists of something that someone told

12         you about the accident?

13    A.   Yeah.  I was told by the two staff.

14    Q.   All right.  And one of the staff is no longer here.

15         Correct?

16    A.   Right.

17    Q.   What does Stephanie Hofer look like?  Can you describe

18         her to me, please?

19    A.   No.  I haven't met her.

20    Q.   You never met her?

21    A.   No; because the same night she came in is when she

22         went to the hospital.

23    Q.   All right.  So you've never met Ms. Hofer.  Did the

24         two staff members that you spoke of that you report on

25         in your report, did they ever tell you what she looked



FAYLIN MILLER
August 21, 2006

1       like?

2   A.   No.

3   Q.   Is it fair to say that at the time of the accident

4        that there were hundreds of guests at Turtle Beach

5        Towers?

6               MR. REITH:  Objection.

7   A.   I wouldn't say hundreds of guests.

8   BY MR. KUZMA:

9   Q.   Not hundreds?  More than a hundred?

10  A.   No.  I would say around -- in March -- March is a slow

11       period, so I would say about -- we were about -- I

12       could say what percentage.  Maybe about 35 percent,

13       which comes out to be about 40 or 60 guests.

14  Q.   40 or 60 guests?

15  A.   Um-hmm.

16  Q.   Is it fair to say that this was spring break?

17  A.   No.  I didn't have spring break at that time.

18  Q.   I'm sorry?

19  A.   They always go to Negril.

20  Q.   No, that's not my question.  My question is not where

21       they go, my question is, is it fair to say that this

22       was spring break time period, whether they come here

23       or somewhere else?

24  A.   Okay.

25               MR. REITH:  Objection.



FAYLIN MILLER
August 21, 2006

1    BY MR. KUZMA:

2    Q.    "Yes"?

3    A.    I don't know what time spring break was that year.

4    Q.    Now, according to your testimony, you said that

5          Mr. Denroy said that there was a guest in the turtle

6          pond bleeding.  Is that what you said?

7    A.    No.  He said that the guest fell in the turtle pond

8          and she was bleeding when he called me.  And at the

9          time I told him to send her to the hospital.

10                   MR. KUZMA:  I'd move to strike.

11   BY MR. KUZMA:

12   Q.    Did you ever ask the two people under your employ

13         whether they found a broken sandal at the scene of the

14         accident?

15   A.    I was not told about the sandal.

16   Q.    When were you first told about a sandal?

17   A.    After I got an e-mail saying that she was -- there was

18         a court case, I think, an insurance court case, which

19         was thrown out.  And then insurance company called me

20         to tell me that they were doing something to say that

21         a sandal was broken, and that was the cause of

22         accident.

23   Q.    Let me ask you this:

24               Is the first time -- I noticed that you

25         pointed.  The first time you became aware that a



FAYLIN MILLER
August 21, 2006

```
 1        sandal may have been involved, was that in a

 2        conversation that you had with Attorney Scott Feringa?

 3   A.   No.

 4   Q.   When was the first --

 5   A.   It was from the insurance company in Jamaica, who

 6        advised me that they were now saying that it was a

 7        broken sandal that caused the accident.

 8   Q.   Okay.

 9   A.   I told him I was not aware of a sandal.

10   Q.   When did you have that conversation?  Approximately.

11   A.   It's about four or five months ago.  If I can recall.

12   Q.   Three, four, five months ago this year.  Right?

13   A.   Yes.

14   Q.   So that would be 2006 you had this conversation.

15        Right?

16   A.   Right.  Yes.

17   Q.   Ms. Miller, you referenced an e-mail.  Do you have

18        your file folder with you?

19   A.   Um-hmm.

20   Q.   And may I see that e-mail, please, that you referred

21        to in your testimony?

22   A.   He didn't send me anything.  He just told me about the

23        course case.

24   Q.   Okay.  If I may.  Thank you.

25             And this is a letter that you received from
```



FAYLIN MILLER
August 21, 2006

```
 1          Attorney Scott Feringa?  "Yes"?

 2   A.     Um-hmm.

 3   Q.     Could I see that, please?  Thank you.

 4                MR. KUZMA:  I would like to have this

 5          marked.  We can do it --

 6                MR. FERINGA:  Exhibit 8.  It's there.

 7                MARKED BY THE REPORTER:

 8                DEPOSITION EXHIBIT NUMBER 8

 9                10:51 a.m.

10                MR. KUZMA:  I'm going to mark this e-mail as

11          Exhibit 8.

12   BY MR. KUZMA:

13   Q.     When did you first speak with Attorney Scott Feringa

14          regarding this accident?

15   A.     I am not sure of the dates exactly.  Sometime in June

16          or July.

17   Q.     Of which year?

18   A.     2006.

19   Q.     July of 2006?

20   A.     Right.

21   Q.     And did you make some notes for yourself regarding

22          your conversation with Mr. Feringa?

23   A.     No, I really didn't.

24   Q.     What were you just looking at, ma'am?  Is that another

25          letter -- is that a letter from --
```



FAYLIN MILLER
August 21, 2006

```
 1   A.   Yes.

 2              MR. FERINGA:  It's a Notice of Deposition.

 3   BY MR. KUZMA:

 4   Q.   It's a Notice of Deposition from Mr. Feringa?

 5   A.   Yes.

 6   Q.   Thank you.  When you first spoke with Mr. Feringa,

 7        what did Mr. Feringa say to you and what did you say

 8        to Mr. Feringa?

 9   A.   He just told me about the court case, that they would

10        be coming to Jamaica to investigate.  I didn't know if

11        he -- who he was with.  I didn't know who he was with,

12        he just told me his name and he was coming to Jamaica

13        to investigate Ms. Schafer's case.  I didn't know

14        where he was from or anything.  I just got a letter

15        from him by e-mail to say the dates that he was coming

16        and if I would make myself available and I would make

17        my staff available for that.

18   Q.   All right.  Ms. Miller, When you say Ms. Schafer's

19        case, who are you speaking of?

20   A.   You know, Ms. -- the guest that got in the accident.

21   Q.   That would be Ms. Hofer.  Right?

22   A.   Ms. Hofer.  Yes.

23   Q.   Do you sometimes confuse guests' name?

24   A.   No.  Not really.  Just her name was not on the

25        registration.
```



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

FAYLIN MILLER
August 21, 2006

```
 1   Q.   But it's on the documents front of you.  Correct?

 2   A.   What documents?

 3   Q.   Well, the document that you have in your right hand.

 4        Right?

 5   A.   Yes.

 6   Q.   You know that this is is an accident involving

 7        Ms. Stephanie Hofer.  Is that fair to say?

 8   A.   Right.

 9   Q.   By the way, was there a Ms. Schafer who was a

10        registered guest at the time of this accident at

11        Turtle Beach Towers?

12   A.   If there was what?

13   Q.   Was there a Ms. Schafer also a guest here at the time

14        of this accident?

15   A.   No.  I had no record of her until I found that --

16        investigated and I found out that she was coming from

17        apartment 10E.  Then I called Ms. LaBelle and she told

18        me they were all sharing the apartment.  They were

19        both sharing the apartment.

20   Q.   At the time of the accident that we're here for today,

21        there were about how many guests?  Would you say 40 to

22        60 guests?

23   A.   Yes.

24   Q.   Would there also be some apartment owners on the

25        premises of Turtle Beach Towers at that time?
```



FAYLIN MILLER
August 21, 2006

```
 1   A.   Yes.
 2   Q.   And how many apartment owners were there also in
 3        addition to the guests?  About.
 4   A.   I would say about 30.
 5   Q.   So is it fair to say that there were about 90 to a
 6        hundred guests and apartment dwellers at Turtle Beach
 7        Towers at the time of the accident?
 8   A.   Sure.
 9   Q.   By the way, do you sell alcohol at Turtle Beach
10        Towers?
11   A.   No.  We don't.
12   Q.   Is it fair to say that there's no liquor store at the
13        premises of Turtle Beach Towers?
14   A.   There's a restaurant open at that beach.
15   Q.   But my question is, was there a liquor store?
16   A.   No.
17   Q.   Is there a bar that serves liquor at Turtle Beach
18        Towers.
19   A.   There was at the time.
20   Q.   There was at the time?
21   A.   Yes.
22   Q.   What's the name of the bar?
23   A.   Billy George Restaurant has a bar and restaurant.
24   Q.   And that restaurant serves liquor.  Is that a fair
25        statement?
```



FAYLIN MILLER
August 21, 2006

1   A.   Yes, it does.

2   Q.   And the bartenders at -- is that owned by Turtle Beach

3        Towers that --

4   A.   No, it's not.  It's privately owned.

5   Q.   Where is it located?  On the premises?

6   A.   Yes.  By the poolside.

7   Q.   And it's fair to say that those bartenders try to

8        ensure that they don't serve anyone to the point that

9        they're intoxicated?

10  A.   Yes.  I would say so.

11  Q.   And that would be a good rule of safety.  Is that fair

12       to say?

13  A.   Yes.

14                 MR. REITH:  Objection.

15  BY MR. KUZMA:

16  Q.   And you are interested in the safety of your guests

17       here.  Correct?

18  A.   Sure.

19  Q.   Do you have any control over how much alcohol is

20       served at the bar?

21  A.   No, I don't.

22  Q.   Do you try and make sure that the bartenders know that

23       they shouldn't serve people so that they're

24       intoxicated?  Do you do that?

25  A.   No; because they are on holiday and they can also go



FAYLIN MILLER
August 21, 2006

```
 1          in the supermarket and purchase.

 2    Q.    That's not my question.

 3    A.    Okay.

 4    Q.    I move to strike.

 5    A.    Okay.

 6    Q.    How long from the time of the accident was it to the

 7          time that you arrived at the scene of the accident?

 8    A.    Oh, it took place at midnight, and I am at work at

 9          nine o'clock.  So the guards waited for me -- Shian

10          was on duty in the morning, and Denroy stayed on to

11          give the report.

12    Q.    So about nine hours had passed from the time of the

13          accident to the time that you arrived at the scene of

14          the accident?

15    A.    Yes.

16    Q.    And how far to you live from here?

17    A.    Half an hour drive.

18    Q.    Do you know a taxi driver by the name of "MacKenzie"?

19    A.    No; but I was told that he was on duty at the gate

20          when the accident happened and took her to the

21          hospital.

22    Q.    Who told you that?

23    A.    Denroy.

24    Q.    Denroy told you that MacKenzie was here?

25    A.    Yes.
```



FAYLIN MILLER
August 21, 2006

1    Q.    Did you put that in your accident report?

2    A.    No.

3    Q.    Do you know whether MacKenzie was the taxi driver that

4          took Ms. Hofer to the hospital?

5    A.    Yeah.  I spoke to the guard --

6                    MR. REITH:  Objection.

7    A.    I spoke to the guard on duty that was on duty at the

8          gate, and he's the one who had the car who took her --

9          who came and took her to the hospital.

10   BY MR. KUZMA:

11   Q.    And now, is it fair to say that that was Henry

12         MacKenzie that transported her to the hospital?

13   A.    Yes.

14   Q.    It fair to say that the Turtle Beach Towers is a gated

15         community; that is, you have to pass through a gate?

16   A.    Yes.

17   Q.    And there's a guard stationed at the front of that

18         gate?

19   A.    Yes, there is.

20   Q.    And no one gets in without the guard's permission.  Is

21         that fair to say?

22   A.    Right.

23   Q.    And that's also for the safety of your guests?

24   A.    Yes.

25   Q.    Is it fair to say that Mr. MacKenzie is one of the



FAYLIN MILLER
August 21, 2006

```
 1         regular cab drivers that works out of the hotel?
 2    A.   Yes.  He -- you find taxi operators that would work
 3         out like in the nights, after midnight, that would be
 4         around in the area.  Yes.
 5    Q.   And he was one of the regulars.  Correct?
 6    A.   Yes.
 7    Q.   After this accident -- when did you first discover
 8         that Mr. MacKenzie was the taxi driver that took
 9         Ms. Hofer to the hospital?
10    A.   The same morning I came on duty.
11    Q.   About what time did you discover that?
12    A.   Because what actually happened, I was the one who was
13         going to take up job of paying the taxicab to take her
14         to the hospital, but I was told that it was paid by
15         Ms. LaBelle.
16    Q.   All right.  So my question to you, ma'am, Ms. Miller,
17         is, when did you first become aware that Mr. MacKenzie
18         was the taxi driver that took her to the hospital?
19    A.   The same morning when I came in, about 9:30.
20    Q.   About 9:30.  Did you ever speak with Mr. MacKenzie
21         about his observations of Ms. Hofer that night and
22         that morning?
23    A.   Yes.  He said she was bleeding heavily.
24    Q.   She was what?
25    A.   Bleeding.
```



FAYLIN MILLER
August 21, 2006

1    Q.    Bleeding heavily, yes.

2    A.    And she was not in the right frame of mind.

3    Q.    Did he say she was in shock from having her leg cut

4          open?

5    A.    He just said not in the best frame of mind at the

6          time.

7    Q.    Did he say anything else?

8    A.    No.

9    Q.    "No"?

10   A.    No.

11   Q.    Is it fair to say, Ms. Miller, that the business of

12         Turtle Beach Towers is providing accommodations for

13         guests that want to stay here?

14   A.    Yes.

15   Q.    That is the business of Turtle Beach Towers?

16   A.    Yes.

17   Q.    Of the guests that arrive at Turtle Beach Towers as

18         guests, can you tell me what percentage of those

19         guests, as far as you know, book their trips through

20         Expedia?

21   A.    Expedia, I would say about 10 percent.  10,

22         15 percent.

23   Q.    10, 15 percent?

24   A.    Yes.

25   Q.    By the way, have you ever spoken with Attorney Reith?


BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

FAYLIN MILLER
August 21, 2006

1   A.   No, I haven't.

2   Q.   Have you ever seen anyone from Expedia -- or who works

3        for Expedia at Turtle Beach Towers?

4   A.   Yes.  They will come and do checks now and again, room

5        checks.

6   Q.   They would come and do checks?

7   A.   Inspections.

8   Q.   Inspections.  Okay.  And how often would they perform

9        their inspection?  About.

10  A.   It's maybe about two times a year they would.

11  Q.   And they could come -- all right.

12            And they would come here, and is it not fair

13       to say that they would do that in 2004, 2005, 2006?

14  A.   Yes.

15  Q.   And would those be inspection -- what would those

16       inspections of the premises consist?

17  A.   Grounds and rooms.

18  Q.   Grounds and rooms?

19  A.   Yes.

20  Q.   And would they point out things to you at times that

21       need --

22  A.   Yes.

23  Q.   If I could just finish, Ms. Miller.

24  A.   Okay.

25  Q.   Would they point out things on occasion to you as the



FAYLIN MILLER
August 21, 2006

1        manager here which need to be fixed?

2   A.   Yes.  If there is...

3   Q.   That would be true of items within a hotel room?

4   A.   Right.

5   Q.   As well as what needs to be fixed on the grounds?

6   A.   Yes.

7   Q.   Would they take photographs also upon their

8        inspections?

9   A.   Yes.  If they see anything wrong, they would do a

10       checklist.

11  Q.   And if they saw anything wrong, would they give a list

12       of things which needed correcting or would they just

13       tell you?

14  A.   They would e-mail it.

15  Q.   They would e-mail it to you?

16  A.   Yes.

17  Q.   Do you keep a separate file of the correspondence with

18       Expedia?

19  A.   I do have, but I don't have it in my possession here.

20  Q.   Okay.  You didn't bring that with you to the

21       deposition.  Is that fair to say?

22  A.   Right.

23  Q.   All right.  And in 2004, is it fair to say that you

24       had a separate file for Expedia's, let's say,

25       inspection reports of your facility?



FAYLIN MILLER
August 21, 2006

```
 1   A.   Yes.

 2   Q.   And that would be true also of 2005 and 2006?

 3   A.   Yes.

 4   Q.   How long -- as far as you know, how long have you --

 5        and by "you" I mean Turtle Beach Towers been doing

 6        business with Expedia?  Approximately.

 7   A.   It about three years.  Three or four years.  Time goes

 8        so quickly, about five years, I think.

 9   Q.   So let's say from 2001 through the present?

10   A.   Um-hmm.

11   Q.   "Yes"?

12   A.   Right.

13   Q.   Have you ever seen a contract between Expedia And

14        Turtle Beach Towers?

15   A.   It is there, Mr. Dane Thomas.  Yes.

16   Q.   I'm sorry?

17   A.   Yes.  There is one with Mr. Dane Thomas, yes.

18   Q.   Okay.  And when was the last time you saw that?

19   A.   It's in the office, I know, with Mr. Thomas.  I have

20        not seen it this year, but I know there is.

21   Q.   And Mr. Thomas is who?

22   A.   He is like the apartment owner.  He is apartment owner

23        for 10E.

24   Q.   For 10E?

25   A.   Right.
```


BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

FAYLIN MILLER
August 21, 2006

1   Q.   And he has a contract with Expedia to rent out his
2        apartment?
3   A.   Yes.
4   Q.   The inspection reports that Expedia does that you've
5        seen and maintained in a file folder, are they
6        handwritten or are they on a form?
7   A.   I think they would be typed or by e-mail, but on a
8        form.
9   Q.   So they would send you the e-mail after their visit.
10       Right?
11  A.   Yes.
12  Q.   And you would try and correct those things which
13       needed correcting?
14  A.   Sure.
15  Q.   Yes.  Okay.  After you received that correspondence
16       from Expedia, and you attempted to correct the
17       situation, how did you notify Expedia that the
18       situation that was listed on their inspection report
19       was corrected?
20  A.   We would fill the checklist and send it back to them.
21  Q.   Okay.  Would anyone from Expedia then come to the
22       premises to make sure that it was, in fact, corrected?
23  A.   No.  No.
24  Q.   Thank you.  The turtle pond that we see in those
25       photographs that Mr. Feringa showed you, is it fair to



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

FAYLIN MILLER
August 21, 2006

```
 1        say that at the present time, as we sit here today,

 2        that it does have some rocks in it?

 3   A.   It has at least two for the turtles to sit on.  About

 4        three rocks, but they're inside the pond.

 5   Q.   If you could show me in those photographs where those

 6        rocks are?

 7             MR. FERINGA:  We're looking at Exhibit

 8        Number 5?

 9   BY MR. KUZMA:

10   Q.   We're looking at Exhibit Number 5, Mrs. Miller.  And

11        you've pointed out to the jurors where those two rocks

12        are.  Correct?

13   A.   Yes.  In the pond.

14   Q.   Thank you.  Is it fair to say that the one rock -- if

15        you could hold that up again.  The one rock has a lot

16        of algae on it, the one that's partially underneath

17        the water.

18   A.   This one here?

19   Q.   Yes.  The one that's underneath the water a little

20        bit, that has a lot of algae on it.  Is that fair to

21        say?

22   A.   Yes.

23   Q.   And there's no railing that guards that turtle pond

24        from the staircase.  Correct?

25   A.   There's no what?
```



FAYLIN MILLER
August 21, 2006

1  Q.  There's no railing.

2  A.  No.

3  Q.  When was the last time that any tile was replaced at

4      that location?

5  A.  There was no tile replaced as long as -- for as long

6      as I know.

7  Q.  Is it fair to say, Ms. Miller, that when you perform

8      an investigation you try and do a full and fair

9      investigation?

10 A.  Yes.  I do.

11 Q.  Now, when you performed this particular investigation,

12     how long did it take you?

13 A.  I spoke to them in the morning when I came on duty and

14     I made the report.  I spoke to the guard on duty, and

15     when I made a follow-up with Ms. LaBelle to find out

16     the hospital condition, what it was like -- what she

17     was like, when she told me she have to fly her out

18     country the same day.  That's the following day.

19 Q.  When did you finish your report?  That is, when did

20     you conclude your investigation?

21 A.  It was about -- at about the end of the month.

22 Q.  The end of the month?

23 A.  Yes.  Because I called her to find out -- I had it all

24     written down, and then I called her to find out

25     because she said she spent ten days in the hospital,



FAYLIN MILLER
August 21, 2006

 1      so...

 2  Q.  Did any employees ever give you any written reports

 3      about what happened.

 4  A.  No.

 5  Q.  If you would, Ms. Miller, can you take me through --

 6      you testified that you had two -- you had conversation

 7      with two people the next day.  Denroy was one.  Right?

 8  A.  Um-hmm.

 9  Q.  And who was the other one with?

10  A.  Shian.

11  Q.  And how long did those conversations last?

12  A.  I would say about half an hour.

13  Q.  Half an hour in total?

14  A.  Yes.

15  Q.  Okay.  And spoke with Carrie LaBelle, too.  Correct?

16  A.  Yes.

17  Q.  And how long did that conversation last about the

18      accident or the condition of Ms. Hofer?

19  A.  When I called first she was on her way to the

20      hospital, she was not in the room.  And I -- when she

21      came back -- I left her a message and she came -- I

22      would say about 15 minutes, because I was saying to

23      her there were guests saying to her not to go into the

24      pond, and she was into the pond --

25                  MR. KUZMA:  I would move to strike.



FAYLIN MILLER
August 21, 2006

```
 1   A.   Okay.

 2   BY MR. KUZMA:

 3   Q.   I'm only interested in how much time you spoke with

 4        Ms. LaBelle.

 5   A.   Maybe about 10 minutes.

 6   Q.   And you testified that you also spoke with

 7        Mr. MacKenzie.  Correct?

 8   A.   Yes.

 9   Q.   How long did that conversation take?

10   A.   Maybe about 10 minute also.

11   Q.   After you spoke with those people four individuals, is

12        it fair to say that your investigation was pretty much

13        complete at that time until you spoke with Ms. Hofer

14        ten days down the road?

15   A.   Yes.  Yes.

16   Q.   All right.  And the conversation that you had with

17        Ms. Hofer, how long was that?

18   A.   Just by telephone.  I just took my telephone and I

19        called her.  I think she told me that she was in the

20        hospital for ten days, and her ligaments were torn.

21   Q.   Now, when you spoke with her, was she in the hospital

22        or was she at home?

23   A.   I wasn't sure, but I don't know if she was at home or

24        in the hospital.

25   Q.   Is it fair to say that you don't know whether she was
```



FAYLIN MILLER
August 21, 2006

1        on any pain medication at that time?

2   A.   No.  I really don't know.

3   Q.   Is it fair to say that you didn't know whether she was

4        on any medication at all for the injuries that she

5        suffered.  Is that fair to say?

6   A.   Yes.

7   Q.   Okay.  How many times have you spoken with attorney

8        Feringa about this case?

9   A.   I think he called me once to say -- just to find out

10       from me if -- if I would be available for the date

11       that we was mentioning that he was coming down.  And I

12       actually started to say to him about -- I wanted to

13       say she was -- I don't know who it was.  She was drunk

14       or intoxicated, and he said he didn't want to hear

15       that or something, he just wanted to know what day --

16       he just wanted to come down and if I would have the

17       staff here and meet with him.  I didn't know he was

18       whom, if he was for Ms. Hofer or who he was with.  I

19       didn't know.

20                MR. KUZMA:  I move to strike that.

21   BY MR. KUZMA:

22   Q.   I was only asking you how many times you spoken with

23       Mr. Feringa.

24   A.   Okay.  I don't know if it was once or twice, to be

25       truthful.  I know he called to confirm, to ask me if I



FAYLIN MILLER
August 21, 2006

```
 1          was -- was it once?  I don't remember.

 2   Q.     Did he tell you some of the questions that he might be

 3          asking you about the accident?

 4   A.     No.  No.  No, he did not.

 5   Q.     Did you tell you the subject nature of the deposition?

 6   A.     No.  He did not.

 7   Q.     He didn't even tell you the subject of the deposition?

 8   A.     No.  I came here today blind, not knowing.

 9   Q.     So this was all a surprise to you?

10   A.     Yes.  It was.

11   Q.     And you do acknowledge receiving what has been marked

12          as Exhibit 8?

13   A.     Yes.

14   Q.     Did you ever speak with any investigators about this

15          accident?

16   A.     No.  Just the local insurance company came to

17          investigate.

18   Q.     Did you give them a written statement?

19   A.     No.  All this was done -- I gave the Strata this and

20          the Strata is the one who actually did the rest.

21   Q.     What is depicted as your accident report, which is

22          dated April 5, 2004, did you type that out yourself?

23   A.     Yes -- the secretary did.

24   Q.     If I could have a moment, Ms. Miller.

25   A.     Sure.
```



FAYLIN MILLER
August 21, 2006

```
 1   Q.   The people, Ms. Miller, that you spoke with about her
 2        condition, did either one of your employees tell you
 3        that they saw her drinking --
 4   A.   No.
 5   Q.   -- before the accident?
 6   A.   No.
 7   Q.   Do you know how much income Turtle Beach receives
 8        approximately on a yearly basis from Expedia?
 9             MR. REITH:  Objection.
10   A.   I would have to go through my accounting system.  I
11        don't know.
12   BY MR. KUZMA:
13   Q.   All right.  I'm going to ask you, Ms. Miller, if you
14        can do that sometime over the course of the next
15        couple months.  Can you do that for me?
16   A.   Okay.
17   Q.   Thank you.  And also I'm going to ask you if you would
18        preserve your file folders regarding the inspections
19        that Expedia does of Turtle Beach Towers that you've
20        already testified to?
21   A.   Okay.
22   Q.   By the way, do you have a shredder on the premises?
23   A.   No.
24   Q.   Have you ever seen the website that Expedia has that
25        lists Turtle Beach Towers?
```



FAYLIN MILLER
August 21, 2006

 1   A.   Yes, I have.

 2   Q.   Okay.  Ms. Miller.  Thank you for your patience.  I do

 3        want to look through some of these documents that

 4        counsel has shown you.

 5   A.   Okay.

 6              MR. FERINGA:  Ms. Miller, I have a couple of

 7        follow-up questions, if I might.

 8              MR. KUZMA:  Scott, I'm still -- I'm still

 9        going.

10              MR. FERINGA:  I'm sorry.  I thought you

11        ended.  I apologize, Mr. Kuzma.

12              MR. KUZMA:  Okay.

13              MR. FERINGA:  Do you want to go off the

14        record or --

15              MR. KUZMA:  No.  Thank you.

16   BY MR. KUZMA:

17   Q.   If we can go back to -- Ms. Miller, do you still have

18        that with you, this exhibit --

19              MR. FERINGA:  Exhibit 6B?

20   BY MR. KUZMA:

21   Q.   -- from Expedia?  If you would, Ms. Miller, if you can

22        turn to this page?

23   A.   Yes, I have it.

24   Q.   All right.  In response to Mr. Feringa's questions

25        about when this trip was booked.  Do you recall him



FAYLIN MILLER
August 21, 2006

```
 1        asking you when it was booked?

 2   A.   Yes.

 3   Q.   And you said the 18th.  Correct?

 4   A.   No.  The check-in day is the 18th.

 5   Q.   No, but my question is to you --

 6   A.   Okay.

 7   Q.   -- originally you said it was booked on the 18th.

 8        Correct?

 9   A.   Yeah.

10   Q.   And you know that -- and you said that with the

11        document front of you.  Correct?

12   A.   I was actually looking on the check-in date.

13   Q.   All right.  So you may a mistake on that point.

14   A.   Yes, I did.

15   Q.   If you could look at the bottom of that document and

16        it says, "Do not disclose contracted rates to guests."

17        Do you see that?

18   A.   Right.

19   Q.   Do you see that on all Expedia bookings?

20   A.   Yes.

21   Q.   And then it says please enter confirmation numbers at

22        http://extranet.expedia.com?

23   A.   Right.

24   Q.   Is that what you do when a guest arrives?

25   A.   Yes.
```



FAYLIN MILLER
August 21, 2006

```
 1    Q.   And that website, is that something that you have
 2         access to from your hotel?
 3    A.   Yes.
 4    Q.   And you have the Internet here?
 5    A.   Yes, we do.
 6    Q.   Can you name for me any of the Expedia representatives
 7         that perform the investigation of the hotel as you've
 8         already described?
 9    A.   Not off my head.  Not out of my...
10    Q.   Is it the same people that come out every year?
11    A.   No.  They're different folks.
12    Q.   Different folks?
13    A.   Yes.
14    Q.   Are they located on the Island of Jamaica or are they
15         from off-island?
16    A.   They're from off-island.
17    Q.   Do they give you business card and say "I'm with
18         Expedia"?
19    A.   Yes.  Dane Thomas has.
20    Q.   I'm sorry?
21    A.   Yes.
22    Q.   If you would, Ms. Miller, can you look at another
23         exhibit that was shown to you.  It is the one that
24         says LaBelle 1, which is a hand drawing.  If you could
25         look at that again, I just want to ask you some
```



FAYLIN MILLER
August 21, 2006

1          questions about that.

2                    MR. REITH:  It's actually the other one,

3          Steve, and it says "LaRoche."

4                    MR. KUZMA:  Oh, LaRoach.  Okay.

5     BY MR. KUZMA:

6     Q.   Do you have that?  And if you could hold that up for

7          the jurors, please.  All right.

8                    Now, in response to Mr. Feringa's questions

9          you said that you did not believe -- and tell me if

10         I'm mistaken, that you did not believe that that's

11         what the front entrance looked like?

12    A.   That's not like what the front entrance looked like.

13    Q.   Okay.

14    A.   It was not and it is not.

15    Q.   It was not and is not.  If you would, look at that and

16         is it fair to say that the door is at the top of the

17         stairs.  Correct?

18    A.   Yes.

19    Q.   So that part is correct?

20    A.   Yes; but there's two doors instead of one.

21    Q.   Right.  I understand that.  That wasn't my question.

22    A.   Okay.

23    Q.   But the door was in the right location.  Right?  At

24         the top of the stairs?

25    A.   Yes.



FAYLIN MILLER
August 21, 2006

```
 1   Q.   And she also had four lines drawn?

 2   A.   Yes.

 3   Q.   And it says "stairs"?

 4   A.   Right.

 5   Q.   And is it fair to say that there are stairs in front

 6        of the door?

 7   A.   Two.

 8   Q.   Two.  But you said three originally.  Right?

 9   A.   Yeah.

10   Q.   "Yes"?

11   A.   When I came at first I said two, not recalling.  One,

12        two, three, and the steps that go up.

13   Q.   So at that time, even though you walked up those steps

14        thousands of times --

15   A.   Yes.  Yes --

16   Q.   -- if I may Ms. Miller -- you made a mistake about how

17        many stairs.  Correct?

18   A.   I wouldn't say a mistake, it's just you have one at

19        the bottom down here.

20   Q.   Um-hmm.

21   A.   Before you up to the two steps.  So you know, if you

22        walk in the mornings, you have a little grate from the

23        floor, to the -- so that's what I was commenting.

24   Q.   So it could be three, it could be two?

25   A.   No.  It's two.
```



FAYLIN MILLER
August 21, 2006

```
 1   Q.   It's two?

 2   A.   Yes.

 3   Q.   You're sure about that now?

 4   A.   I'm positive.

 5   Q.   All right.  Is it fair to say that on this diagram,

 6        she put the turtle pond to the left of the stairs?

 7   A.   Yes.

 8   Q.   "Yes"?  And that's the way it is, so that's accurate

 9        also.  Correct?

10   A.   Yes.

11   Q.   And, in fact, she didn't put a turtle pond on the

12        right of the stairs, did she?

13   A.   I do not se one here, no.

14   Q.   You're not seeing one so that part is accurate, also.

15        Correct?

16   A.   Yes, it is.  Yes.

17   Q.   And then she puts a bench in front of the turtle pond.

18        Correct?

19   A.   Yes.

20   Q.   And that much is accurate also.  Right?  The bench is

21        in front of the turtle pond?

22   A.   It is, yes.

23   Q.   And, in fact, we saw that in the photographs that you

24        have in front of you.  Correct?

25   A.   Yes.
```



FAYLIN MILLER
August 21, 2006

1  Q.  And in front of the bench, she puts a walkway.  Right?

2  A.  Yes.

3  Q.  And there is a walkway in front of the bench?

4  A.  Yes.

5  Q.  So that part is accurate also.  Correct?

6  A.  Yes.

7  Q.  By the way, Ms. Miller, you don't know how many times

8      she walked up and down these stairs before the

9      accident, do you?

10              MR. FERINGA:  "She"?

11              MR. KUZMA:  She, meaning --

12  A.  Stephanie.  No, I don't.

13  BY MR. KUZMA:

14  Q.  Carrie LaBelle.

15  A.  Carrie LaBelle is not the one that was in the

16      accident.

17  Q.  No.  Her friend.

18  A.  Right.

19  Q.  You don't know how many times she walked up and down

20      those stairs.  Correct?

21  A.  No, I don't.

22  Q.  How long as far as --

23  A.  She only stayed one night.

24  Q.  I'm sorry?

25  A.  It's just she had to check out after one day to go



FAYLIN MILLER
August 21, 2006

```
 1        back with her friend.

 2   Q.   So you know she had at least walked up and down those

 3        stairs twice.

 4   A.   Yes, or maybe more than that.

 5   Q.   If you could, ma'am, can you please tell me, as far as

 6        you know, how long Stephanie Hofer was on the premises

 7        of Turtle Beach Towers before her accident?

 8   A.   She came in -- she arrived about five-something, 5:30

 9        in the afternoon, and the accident occurred near to

10        midnight.

11   Q.   How do you know she arrived at 5:30?

12   A.   Because that's -- when I made investigation with

13        Shian, that's what she told me.

14   Q.   Okay.  So you knew that she was here at 5:30 because

15        that's when you began your investigation?

16   A.   Can you repeat?  No.

17   Q.   I'll withdraw the question.

18   A.   Yeah.

19   Q.   If I could, do you know what Ms. Hofer did from the

20        time she checked in at Turtle Beach Towers to the time

21        of her accident?  Do you know anything about what she

22        did?

23   A.   No.

24   Q.   Do you know where she had dinner?

25   A.   No.
```



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

FAYLIN MILLER
August 21, 2006

```
 1   Q.   Do you know where she went in the neighborhood during

 2        that time?

 3   A.   No.

 4              MR. KUZMA:  Ms. Miller, thank you very much.

 5   A.   You're welcome.

 6                         RE-EXAMINATION

 7   BY MR. FERINGA:

 8   Q.   Mrs. Miller, I just have a couple more questions if I

 9        might, please.

10              Within the walking distance of Turtle Beach

11        Towers, how many restaurants and bars are there?

12   A.   One, two, three -- about eight.

13   Q.   And is one of those restaurant and bars Jimmy

14        Buffett's Margaritaville?

15   A.   Yes.  Just across the road.

16   Q.   There's something called "Island Village."  Is that

17        the thing in which -- or the project in which

18        Margaritaville is located?

19   A.   Yes, it is.

20   Q.   With respect to the roommate of Ms. LaBelle, you have

21        her identified as "Stephanie."  Is that correct?

22   A.   Right.

23   Q.   And that is identified on Exhibit 6B, which is the

24        reservation card?

25   A.   Yes.  Uh-huh.
```



FAYLIN MILLER
August 21, 2006

```
 1   Q.   I mean, on 6C.  I'm sorry.  Reservation card.  Is that

 2        correct?

 3   A.   Um-hmm.  Yes, I do.

 4   Q.   And that is in your own hand?

 5   A.   Right.

 6             MR. FERINGA:  Thank you.  I have no other

 7        questions.

 8                      EXAMINATION

 9   BY MR. REITH:

10   Q.   Good afternoon.

11   A.   Good afternoon.

12   Q.   Or actually it's not afternoon, it's still morning.

13        My name is Thomas Reith.  I represent Expedia, Inc.

14        Thank you very much for your time.  Just a few

15        follow-up questions for you.

16             Do you recall if Expedia conducted an

17        investigation of the premises in 2003?

18   A.   I would have to check my records.

19             MR. KUZMA:  Objection.

20   BY MR. REITH:

21   Q.   And where are these records?

22   A.   They're in the office of Mr. Dane Thomas, who signs

23        the contract with Expedia?

24   Q.   And who is Dane Thomas?

25   A.   Dane Thomas is owner who owns 20 -- almost 20
```



FAYLIN MILLER
August 21, 2006

1           apartments at Turtle Beach.

2    Q.    Okay.  So is it fair to say that Mr. Thomas is the one

3           who contracted with Expedia?

4    A.    Right.

5    Q.    And he contracted with Expedia to advertise his

6           specific units?

7    A.    Yes.  Yes.

8                     MR. KUZMA:   Objection.

9    BY MR. REITH:

10   Q.    Mr. Dane Thomas did not contract with Expedia to

11          advertise the entirety of Turtle Beach Towers, did he?

12   A.    No.

13                    MR. KUZMA:   Objection.

14   BY MR. REITH:

15   Q.    And I believe you testified that Expedia personnel

16          have inspected the premises from 2004 --

17   A.    Yes.

18   Q.    I'm sorry.  It's tough, because of the way we discuss

19          things, but let me just get the conversation out and

20          I'll let you get your answer back to me.  Okay?

21   A.    Um-hmm.

22   Q.    I believe you testified that there have been

23          inspections of the premises from 2004, 2005, 2006.  Is

24          that correct?

25   A.    Right.



FAYLIN MILLER
August 21, 2006

```
 1   Q.   And do you recall specifically who did the

 2        investigation in 2004?

 3   A.   No.  I don't.

 4   Q.   Do you recall specifically who did the investigation

 5        in 2005?

 6   A.   No.

 7   Q.   Do you recall specifically who did the investigation

 8        in 2006?

 9   A.   No.

10   Q.   How many times per year do they inspect?

11   A.   About two times.

12   Q.   And I believe you testified, correct me if I'm wrong,

13        that when they investigate, they sometimes submit to

14        you reports on the investigation?

15   A.   Right.

16   Q.   Now, when the individuals come to investigate, do they

17        investigate the entire resort or just those 20 units

18        that Mr. Dane Thomas owns?

19   A.   Those rooms that Mr. Dane Thomas...

20   Q.   When was the last time that Expedia or a person --

21        strike that.

22             How do you know these individuals who

23        investigate Mr. Dane Thomas's 20 units are from

24        Expedia?

25   A.   They would come --
```



FAYLIN MILLER
August 21, 2006

```
 1                    MR. KUZMA:  Objection.

 2   A.   He could call us to say that they're coming over, to

 3        expect Mr. So-and-so, and someone would take them to

 4        the rooms for inspection.

 5   BY MR. REITH:

 6   Q.   Okay.  So is it fair to say, Mr. Thomas or someone on

 7        his behalf would contact you?

 8   A.   Yes.

 9   Q.   Okay.  And that Mr. Thomas or you would say -- or that

10        person would say to you, X individual from Expedia is

11        coming to investigate my 20 units?

12   A.   Right.

13                    MR. KUZMA:  Objection.

14   BY MR. REITH:

15   Q.   Or they would say they're coming to investigate my

16        units?

17   A.   Yes.

18                    MR. KUZMA:  Objection.

19   BY MR. REITH:

20   Q.   You understand I mean Mr. Thomas when I say "my"

21        there, don't you?

22   A.   Pardon me?

23   Q.   You understand when I say "my units," I'm referring to

24        Mr. Thomas's?

25   A.   Thomas.  Right.
```



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

FAYLIN MILLER
August 21, 2006

```
 1   Q.   Forgive me.  How many years have you worked here?

 2   A.   About 28, 30 years.

 3   Q.   I know you answered it a couple times.  I just want to

 4        make sure I got it right.  28 or 30 years?

 5   A.   Yes.

 6   Q.   And in those 28 or 30 years, how many times has there

 7        then an incident such as the one that Ms. Hofer argues

 8        happened in the Turtle pond?

 9             MR. KUZMA:  Objection.

10   A.   That the first one.

11   BY MR. REITH:

12   Q.   That's the first one?

13   A.   First one.

14   Q.   That's the first time someone alleged that they fell

15        into a turtle pond was this past -- this case?

16   A.   Yes.

17             MR. KUZMA:  Objection.

18   Q.   Is it fair to say that Expedia -- strike that.

19             Is it fair to say that no one from Expedia

20        has issued an inspection report about the turtle pond?

21   A.   No.

22   Q.   No one has?

23   A.   No one has.

24   Q.   Is it fair to say that no one from Expedia has asked

25        you or anyone from your resort to fix anything with
```



FAYLIN MILLER
August 21, 2006

1          the turtle pond?

2    A.    No.

3                    MR. KUZMA:  Objection.

4    BY MR. REITH:

5    Q.    The that's "no," they have not asked you?

6    A.    They have not asked.

7    Q.    Before, forgive me, Mr. Kuzma asked you about, I

8          believe, where the Expedia reps came from, if they

9          were from the island or if they were from somewhere

10         else.  Do you recall that question?

11   A.    Yes.  They're from abroad.  They're from abroad.  I'm

12         sorry.

13   Q.    Abroad.  I didn't hear what the answer was before.

14         And do you know specifically where they're from

15         abroad?

16   A.    No.  I don't know.

17                    MR. REITH:  I have nothing further.

18                    MR. KUZMA:  Ms. Miller, just a couple

19         follow-ups.  We're going to change the tape.

20                    VIDEO TECHNICIAN:  This marks the end of

21         tape number 1.  We are going off the record.  The time

22         is 11:27 and 56 seconds a.m.

23                    (Off the record at 12:30 p.m.)

24                    (Back on the record at 12:32 p.m.)

25                    VIDEO TECHNICIAN:  The marks the beginning



FAYLIN MILLER
August 21, 2006

```
 1        of tape number 2.  We are on the record.  The time is

 2        11:30 and 9 second a.m.

 3                          RE-EXAMINATION

 4  BY MR. KUZMA:

 5  Q.   Mrs. Miller, again, this is Steve Kuzma.  I represent

 6        Stephanie Hofer and her husband in the case.

 7                    On the card which has been marked as Exhibit

 8        6B, I believe the reservation information.  Are you

 9        with me there?

10  A.   Yes, I am.

11  Q.   Where it says "guests" do you list?

12                    MR. REITH:  I'm sorry.  I'm trying to get

13        her on the right page.

14  A.   This is Expedia.  Oh, I see.  Okay.  Yes.

15  BY MR. KUZMA:

16  Q.   Where it says "guest," do you see it says "Carrie Lynn

17        LaBelle"?

18  A.   Right.

19  Q.   When you receive this from Expedia, are all of the

20        guests' named listed or is it just the person who made

21        the booking?

22                    MR. REITH:  Objection.

23  A.   You do have -- sometimes you have a sheet with two

24        names, but you have adult here, two persons so it's a

25        room for two.  So you give the --
```



FAYLIN MILLER
August 21, 2006

1    BY MR. KUZMA:

2    Q.    So you know that there's another guest.  Right?

3    A.    Yes.

4    Q.    Okay.  And you just don't know the name at the time?

5    A.    Right.

6    Q.    And you've seen that before?

7    A.    Yes.

8    Q.    Is it fair to say that the cruise ships that come to

9          Jamaica, and specifically to Ocho Rios, docks down the

10         street from Turtle beach towers?

11   A.    They always do.

12   Q.    They always do.  Is it fair to say that those

13         cruise-goers utilize the marketplace across -- the

14         duty-free market place across from Turtle Beach

15         Towers?

16   A.    Yes.

17               MR. REITH:  Objection.

18   BY MR. KUZMA:

19   Q.    What's the name of that marketplace?

20   A.    There's a market -- the opposite over here?

21   Q.    Yeah.  Island...

22   A.    Island Village.  Yes.

23   Q.    Island Village?

24   A.    Right.

25   Q.    There you can -- you've been there a number of times.



FAYLIN MILLER
August 21, 2006

```
 1          Is that fair to say?

 2    A.    Yes.

 3    Q.    And you can buy duty-free liquor and jewelry?

 4    A.    Yes.

 5    Q.    Clothes, that sort of thing?

 6    A.    Right.

 7    Q.    And that you, in fact, are aware that a lot of

 8          cruise-goers utilize the island village to buy stuff?

 9    A.    Yes, I do.

10    Q.    And is it fair to say that, as you've witnessed over

11          the course of your years here at Turtle Beach Towers,

12          that you've witnessed literally hundreds of people

13          when the cruise ship arrives buying stuff at the

14          Island Village?

15    A.    I know they pass through.  We see them going through

16          the gates.  I'm not over there to see what they

17          purchase.

18    Q.    Okay.  But you do know that hundreds pass in front of

19          Turtle Beach Towers at any given time?

20    A.    Yes.  Every day.

21    Q.    Does Turtle Beach Towers maintain its own website?

22    A.    No.

23    Q.    And you've seen Turtle Beach Towers listed on the

24          Expedia web page.  Is that fair to say?

25    A.    Yes.
```



FAYLIN MILLER
August 21, 2006

```
 1   Q.   And when you've observed Expedia listing Turtle Beach

 2        Towers, it doesn't specifically refer to Dane Thomas's

 3        20 apartments.   Correct?

 4   A.   No; but it's "Attention:  Dane Thomas" is on the paper

 5        there.

 6   Q.   Right.  But specifically on the website it doesn't say

 7        his name, does it?

 8   A.   No.

 9   Q.   And you've never seen his name on the website at

10        Expedia for Turtle Beach Towers.   Correct?

11   A.   No.

12   Q.   You testified that -- in response to my questions,

13        that Expedia investigates the grounds as well as the

14        rooms.   Is that fair to say?

15   A.   Yes.

16   Q.   And that Expedia has had a contract with Turtle Beach

17        Towers for approximately five years or six years,

18        since 2000?

19   A.   Five years, yes.

20   Q.   Is it fair to say during each one of those years

21        Expedia has conducted an investigation of the grounds

22        and the rooms at Turtle Beach Towers?

23   A.   Yes.

24             MR. KUZMA:  I have nothing further.   Thank

25        you.
```



FAYLIN MILLER
August 21, 2006

1                    MR. FERINGA:  No questions.

2                    MR. REITH:  No questions.

3                    MR. FERINGA:  We're done.

4                    VIDEO TECHNICIAN:  We are concluding this

5          deposition.  The time is 11:34 and 13 seconds a.m.

6                    (The deposition was concluded at 11:34 a.m.

7              Signature of the witness was not requested by

8              counsel for the respective parties hereto.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



FAYLIN MILLER
August 21, 2006

```
 1                   CERTIFICATE OF NOTARY

 2        STATE OF MICHIGAN      )

 3                               ) SS

 4        COUNTY OF LIVINGSTON   )

 5

 6             I, Rebecca J. Callow, a Notary Public in and for

 7        the above county and state, do hereby certify that the

 8        above deposition was taken before me at the time and

 9        place hereinbefore set forth; that the witness was by

10        me first duly sworn to testify to the truth, and

11        nothing but the truth; that the foregoing questions

12        asked and answers made by the witness were duly

13        recorded by me stenographically and reduced to

14        computer transcription; that this is a true, full and

15        correct transcript of my stenographic notes so taken;

16        and that I am not related to, nor of counsel to either

17        party nor interested in the event of this cause.

18

19

20

21                              _____

22                              Rebecca J. Callow, CSR-5228

23                              Notary Public,

24                              Livingston County, Michigan

25        My Commission expires:  January 13, 2011
```



FAYLIN MILLER
August 21, 2006

1                    INDEX TO EXAMINATIONS

2

3    Witness                                    Page

4    FAYLIN MILLER

5

6    EXAMINATION

7    BY MR. FERINGA:................................. 6

8    EXAMINATION

9    BY MR. KUZMA:................................. 33

10   RE-EXAMINATION

11   BY MR. FERINGA:............................. 71

12   RE-EXAMINATION

13   BY MR. REITH:................................ 72

14   RE-EXAMINATION

15   BY MR. KUZMA:................................ 78

16

17                      INDEX TO EXHIBITS

18

19   Exhibit                                    Page

20   (Exhibits attached to transcript.)

21

22   DEPOSITION EXHIBIT NUMBERS 1-7............... 4

23   DEPOSITION EXHIBIT NUMBER 8................. 43

24

25



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888