<u>UNITED STATES DISTRICT COURT</u>
FOR THE DISTRICT OF MASSACHUSETTS
DOCKET NO:  05-40170 FDS

| | |
|---|---|
| STEPHANIE HOFER and DOUGLAS HOFER, <br> Plaintiffs, <br><br> v. <br><br> GAP, INC., EXPEDIA, INC., and TURTLE BEACH TOWERS, <br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) |

### <u>PLAINTIFFS' STATEMENT OF MATERIAL FACTS</u>

Pursuant to Local Rule 56.1, Plaintiffs submit the following concise statement of the material facts of record.

1. Stephanie was born on July 18, 1972; at the time she sustained her injuries she was 31 years old.  (**Exhibit 1**, Deposition of Stephanie Hofer ("Stephanie"), 67:24-25, 307:18-20).

2. On March 18, 2004, Stephanie and her companion, Carrie LaRoche (formerly known as Carrie LaBelle), traveled to Ocho Rios, Jamaica, via a vacation package arranged through Expedia.  (**Exhibit 2**, Deposition of Carrie LaRoche ("Carrie"), 166:14-18); (Stephanie, 148:5-6); (**Exhibit 3**, Travel Itinerary ("Itinerary")).

3. Stephanie and Carrie were scheduled to stay at Turtle Beach Towers ("the Resort"). (Itinerary).

4. Carrie booked the travel plans through Expedia.com and forwarded to Stephanie, via email, the travel itinerary provide by Expedia on March 13, 2004.  (Itinerary); (Stephanie, 341:17-19; 342:4-9).  Stephanie was not present when Carrie booked the trip.  (Stephanie, 346:12-14).

1

5. Carrie paid for the trip but received reimbursement from the Plaintiffs. (Carrie, 85:12-25).

6. Expedia advertises on its web site expedia.com that it has "travel specialists visit thousands of hotels across the globe to ensure [its] descriptions are accurate and up to date." (**Exhibit 4**, Expedia.com - "The Expedia Promise").

7. Expedia is aware that its web users customarily book travel packages for other party members. (Expedia, Motion for Summary Judgment, p.7).

8. The travel itinerary is the only document needed to obtain the services of the package booked on Expedia. (Carrie, 142:23-143:3).

9. Carrie does not have a memory of seeing *Expedia, Inc. Web Site Terms, Conditions, and Notices* Liability Disclaimer. (Carrie, 135:13-136:10).

10. The travel itinerary created by Expedia.com does not include the liability disclaimer. (Itinerary). The travel itinerary also does not list any language indicating that a liability disclaimer exists nor does it contain a link to an online version of a liability disclaimer, but it did include all information required to fulfill its obligation to Stephanie in accordance to Expedia's requirements. (Itinerary).

11. Expedia did not mail a brochure to Stephanie or mail printed e-tickets containing the liability disclaimer. (Stephanie, Volumes I, II, and III).

12. Expedia sold Stephanie's package as a web e-ticket and Stephanie never saw a ticket or any other document that might have had attention-calling language that would have directed her to a liability disclaimer. (Stephanie, Volumes I, II, and III).

13. Carrie and Stephanie never discussed the disclaimer. (Stephanie, 341:17-342:4).

14. There is no evidence that Carrie had the specific authority to bind Stephanie to a liability disclaimer. (**Exhibit 5**, Plaintiff Stephanie Hofer's Second Supplemental Answers to Defendant Expedia, Inc.'s First Set of Interrogatories); (**Exhibit 6**, Stephanie Hofer's Second Supplemental Answers to Defendant, Expedia, Inc.'s First Requests for Admissions).

15. The liability disclaimer relates to Expedia's liability for the acts of Independent Contractors. (Liability Disclaimer, appended to Expedia's Motion for Summary Judgment).

16. On the *Expedia, Inc. Web Site Terms, Conditions, and Notices*, it states that the Web site is being offered to the customer conditioned on the customer's acceptance of its terms. (Liability Disclaimer). The referred to customer in this context is the web user since it only the web user which must agree to the conditions stated therein.

17. Expedia website expedia.com contains a star rating of the hotels and resorts it promotes on its web site. (**Exhibit 7**, Expedia.com – "Star Rating").

18. Expedia designates the resorts and hotels it promotes as its "partners." (The Expedia Promise).

19. Expedia guarantees that the travel booked with Expedia will meet the descriptions on its site and in the travel itinerary or it will work with its "partners" to find a solution. (The Expedia Promise).

20. In its Star Ratings description, Expedia states in cases where the available data is insufficient to meet its standards, its makes an effort to perform additional research, including further review of media and *additional* visits to the property. (Star Rating).

21. The contract between Expedia and the Resort began in 2000. In 2000, Faylin Miller was the general manager of the Resort. Faylin Miller continues to act as the Resort's general manager. (**Exhibit 8**, Deposition of Faylin Miller ("Miller"), 7:20-8:9) (The Plaintiffs attached as Exhibit 8 the deposition transcript of Ms. Miller and have also mailed the videotape of Faylin Miller's deposition to be added to the summary record).

22. Expedia has a representative in charge of its Caribbean territories, which includes the Resort. (**Exhibit 9**, Email Correspondence from Expedia to Sherma Thomas ("Party Emails")) (Expedia designated these emails as "CONFIDENTIAL." Therefore, pursuant to the terms of the Parties' Protective Order, Plaintiffs have mailed Exhibit 9 to the Court in an envelope designated "CONFIDENTIAL").

23. Expedia exercised control over how the Resort accommodated guests who had booked through Expedia as well as how the Resort accommodated guests that booked through other means. ("Party Emails").

24. Expedia had the ability to compel the Resort to displace non-Expedia booking guests in favor of a guest booking through Expedia. (Party Emails).

25. Expedia controlled payment to the Resort from reservations generated through Expedia. (Party Emails).

26. Ten to fifteen percent of the Resort's revenues are derived from Expedia bookings. (Miller, 51:17-24).

27. The Resort does not maintain an independent web site to allow potential guests to obtain information about the Resort. (Miller, 80:21-22).

28. Expedia conducted bi-annual successive inspections of the Resort starting from the inception of its contract which were personally witnessed by Ms. Miller. (Miller, 52:2-14).

29. Expedia's inspections were of the Resort's "rooms and grounds," which included the stairs leading up to the lobby and the turtle pond where Stephanie sustained her injuries. (Miller, 52:15-19).

30. After performing its inspections, Expedia generated and directed, via email, written inspection reports to Faylin Miller to ensure compliance. (Miller, 52:25-54:3; 55:4-20).

31. Faylin Milller, on behalf of the Resort, made the repairs ordered by Expedia and per Expedia's direction, confirmed her compliance in writing to Expedia. (Miller, 55:9-20).

32. Expedia documented the areas in need of repair with photographs. (Miller, 53:7-10).

33. At no point in time, in response to a number of deposition questions regarding Expedia, did Ms. Miller ever state or even suggest that another travel agency other than Expedia was involved with the inspections. (Miller, Volume I).

34. Nashara Frazier, an Expedia employee, visited the Resort within two months of Stephanie's accident. (**Exhibit 10**, Deposition of Nashara Frazier ("Frazier"), 20:18-20).

35. Daine Thomas is identified by Expedia as its guest contact representative. (**Exhibit 11**, Registration Information Card).

36. Faylin Miller identified Daine Thomas as her representative contact with Expedia. (Miller, 54:13-17).

37. Expedia objected to producing those individuals who inspected the Resort for oral examination, claiming that such information was overly burdensome, <u>irrelevant</u> to the Plaintiffs' case, and was the subject of confidential and proprietary information. (**Exhibit 12**, Expedia's Response to Plaintiffs' Notice of Deposition, Response Number 5).

38. Instead of allowing the Plaintiffs to examine under oath those individuals who performed the inspections at the Resort, Expedia designated Nashara Frazier for deposition, the individual who had been sent by Expedia to visit the Resort after Stephanie's fall. *Id.*; (Frazier, 4:7-18).

39. Nashara Frazier had no memory of the Resort's physical layout and, in fact, her testimony relating to her memory of the Resort was in contradiction to Expedia's web site description in that Ms. Frazier testified that the Resort was not located on the beach. (Frazier, 25:23-25); (**Exhibit 13**, Expedia.com's description of Turtle Beach Towers).

40. Stephanie and Carrie arrived at the Resort at approximately 6:00pm on March 18, 2004 and upon arrival Carrie checked them at the Resort's reception. Stephanie went up and down the stairs one time but did not become familiar with the stairs. (Stephanie, 156:18-157:8, 21-24).

41. On the evening of March 18, 2004, only hours after having arrived at the Resort, while she was preparing to descend down the stairs at the Resort, her right flip-flop became detached and she fell into a turtle pond located outside of the Resort's reception area. (Stephanie, 172:14-17, 169:9-12, 179:4-8, 260:17-21, 261:3-10, 379:12-13). Stephanie was attempting to obtain brochures for Carrie and herself

6

regarding tourist attractions for them to visit while on what was supposed to be a vacation. (Carrie, 152:7-14).

42. The accident was caused in part by the dimly lit stairway lacking any handrails. (Stephanie, 181:1-4); (**Exhibit 14**, Complaint).

43. The presence of railing would have prevented Stephanie from falling into the turtle pond. (Stephanie, 181:5-10).

44. At that time Stephanie fell into the turtle pond, she was not aware that the stairs were not guarded by rails for her protection. (Stephanie, 181:11-182:12).

45. There was slate, flagstone, and other razor sharp material inside of the turtle pond which abutted the unguarded stairs. (Stephanie, 150:1-9; 278:17-23).

46. In the accident, Stephanie gouged her leg on the razor sharp material within the turtle pond making her unable to pull herself out of the pond. (Stephanie, 174:5-10, 278:16-279:7; 283:15-22); (**Exhibit 15**, Injury Photographs).

47. Stephanie has a vivid memory of observing her injuries. She looked down and saw blood pouring from her leg and that the skin between her shin and foot had separated; it was as if a potato peeler had been used on her leg and her blood vessels were hanging like spaghetti. (Stephanie, 175:7-17, 176:16-22, 199:16-17, 207:19-209:20, 283:15-21).

48. Denroy Scarlett, an employee of the Resort, did not personally observe Stephanie's fall, but did find Stephanie after the accident. At that time, he observed that she had lost so much blood that the water in the pond had turned blood red. Mr. Scarlett also observed the flip-flop at the scene. (**Exhibit 16**, Deposition of Denroy Scarlett ["Denroy"], 27:1-10, 28:11-14).

49. The rocks in the turtle pond were covered in algae. (Miller, 55:24-56:22).

50. Stephanie has undergone three surgeries as a result of the injuries and will in the future require reconstructive and plastic surgery on her leg. (Stephanie, 220:2-19, 389:16-390:18).

51. Prior to the accident, Stephanie worked as a dental hygienist and was planning to have a child. Today Stephanie is totally disabled, requires the use of a cane and a leg brace, and is forced to wear fitted pressure bandages on her leg. (Stephanie, 52:6-17, 73:20, 74:24-75:1, 218:20-219:9); (**Exhibit 17**, Social Security Administration, Notice of Award]. In addition, in order to manage her injuries, Stephanie is required to take in excess of eleven (11) medications daily. Her neurologist, gynecologist, and primary care physicians have all advised Stephanie not to attempt to become pregnant while on these medications. (Stephanie: 70:10-17, 71:5-17, 222:21-226:25).

        Plaintiffs,
        By their attorney,

        /s/ India L. Minchoff, Esq.
        India L. Minchoff, Esq. (652456)
        Law Offices of Russo & Minchoff
        123 Boston Street, 1st Floor
        Boston, MA 02125
        617/740-7340 telephone
        617/740-7310 facsimile

## **CERTIFICATE OF SERVICE**

      I, India L. Minchoff, Esq., hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 13, 2007.

                                                    /s/ India L. Minchoff, Esq.